**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **OCTAVIO RODRIGUEZ CIRA and FABIOLA MERLOS MARTINEZ, as Surviving Parents of FERNANDO OCTAVIO RODRIGUEZ, Deceased, and OCTAVIO RODRIGUEZ as Administrator of the Estate of FERNANDO OCTAVIO RODRIGUEZ,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
|     **Plaintiffs,** )<br>) | **CIVIL ACTION FILE**<br><br>**NO. 1:21-CV-01999-VMC** |
| **v.** )<br>) | |
| **COUNTY OF HENRY, OFFICER ROBERT P. BUTERA, In his Individual and Official Capacity, and OFFICER QUINTON C. PHILLIPS, In his Individual and Official Capacity,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
|     **Defendants.** )<br>) | |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

COME NOW HENRY COUNTY, ROBERT P. BUTERA, and QUINTON

C. PHILLIPS, Defendants in the above-styled civil action, and, pursuant to F.R.C.P.

56 and Local Rule 56.1, submit this Brief in Support of their Motion for Summary

Judgment, showing the Court as follows:

**OVERVIEW OF FACTS**

On September 20, 2019, City of Hampton officers responded to 911 calls

regarding a naked man walking in the street at night, endangering himself and

motorists. After the Hampton officers tried to detain the man, later identified as Fernando Rodriguez, the officers called for backup when Rodriguez resisted.

In response, Henry County officers arrived. During a struggle with Rodriguez, as he tried to resist and tried to get away, Officer Phillips used his Taser to help other officers gain control over Rodriguez.

When Rodriguez continued with outbursts and resistance during the handcuffing process, Officer Phillips used the Taser again in short drive stun applications to try to gain compliance. Once Rodriguez was finally fairly controlled and somewhat secured in handcuffs with shackles on his ankles, Officers Phillips and Butera used some physical downward force to hold Rodriquez to try to prevent him from fighting or moving away from the officers.

As the handcuffing had been completed, the officers had summoned EMS to the scene. Officers Phillips and Butera continued to hold Rodriquez on the ground until EMS arrived. As the ambulance was arriving at the scene, the officers began noticing that Rodriquez's pulse rate was high and it appeared he was breathing intermittently. As the paramedics were coming to check on Rodriquez, it appeared to Officer Phillips that Rodriquez had stopped breathing.  At that point the medics arrived and began assessing Rodriquez. After a couple of minutes, the medics placed Rodriquez on a gurney, and then began chest compressions and other measures.

They transported Rodriquez to the hospital, where he died two days later.

**ARGUMENT AND CITATIONS TO AUTHORITY**

**I.     QUALIFIED IMMUNITY PROTECTS OFFICERS PHILLIPS AND BUTERA FROM PLAINTIFFS' SECTION 1983 CLAIMS**

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "in all but exceptional cases." *Rioux v. City of Atlanta, GA.*, 520 F.3d 1269, 1282 (11th Cir. 2008)(internal citations and quotes omitted). Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority," *Harlow v. Fitzgerald*, 457 U.S. 800, 807, (1982), and ensures that fear of liability will not "unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

Qualified immunity shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law, particularly the "hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 205-206 (2001). Put another way, qualified immunity allows for reasonable but mistaken judgments and protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011). The burden is on the governmental official to show that he was engaged in a discretionary function for qualified immunity to apply, and once shown "the

burden shifts to the Plaintiff to show that the Defendant is *not* entitled to qualified immunity." *Cottone v. Jenne,* 326 F.3d 1352, 1358 (11th Cir. 2003).

Here, Defendants raised the qualified immunity defense, and the evidence shows that they were acting within their discretionary authority at all relevant times. Therefore, Plaintiffs bear the burden to show that (1) the officers violated decedent's constitutional right, and (2) that the right was clearly established at the time of the alleged violation. *Cozzi v. City of Birmingham*, 892 F.3d. 1288, 1293 (11th Cir. 2018). That is, Plaintiffs must demonstrate that Defendants' actions violated decedent's constitutional rights that were clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 815-16 (2009); *Al-Amin v. Smith*, 511 F.3d 1317, 1324 (11th Cir. 2008).

In determining whether a right was "clearly established," courts must assess the objective reasonableness of the action at the time of the alleged violation and ask whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. at 202. Most often, this means that, for a constitutional right to have been "clearly established" in regard to a use of force, there must be a materially similar case decided by the Supreme Court, Eleventh Circuit or the Georgia Supreme Court that would have served as fair warning to the officers that their actions were

-4-

unconstitutional. *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002).

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful.

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53, 200 L.Ed.2d 449, 454 (2018)(cleaned up)(citing *Mullenix* v. *Luna*, 577 U. S. ___, ___, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) (*per curiam*)).

The undisputed facts here show no violation of Rodriguez's constitutional rights, and even if there was, no clearly established law placed Officers Butera and Phillips on notice that their actions were unlawful.

## A. DEFENDANT PHILLIPS' TASER USE WAS OBJECTIVELY REASONABLE AND DID NOT VIOLATE CLEARLY ESTABLISHED LAW

### 1. OBJECTIVE REASONABLENESS

Plaintiffs allege that Defendants' Taser use against Fernando Rodriguez was excessive force because he "was not resisting or attempting to evade arrest," Complaint at ¶¶ 7, 154(a), and that when the "officers repeatedly tased Fernando," they violated his Fourth Amendment right to be free from an unreasonable seizure.

*Id.* at ¶ 7. The evidence, however, shows that each time that Defendant Phillips used his Taser, Rodriguez was being combative and resisting the officers' attempts to restrain, handcuff and control him. Therefore, the Taser use did not violate the Fourth Amendment.

Officers Phillips and Butera went to the scene in response to urgent calls by the Hampton officers for assistance in dealing with a combative, naked suspect in the street, and they were aware that the suspect had physically resisted the officers' efforts to detain him. After arrival, Officer Phillips observed Rodriguez resisting and refusing to comply with commands, and that the City Officer's attempt to use his Taser was futile because of lack of connectivity.

Under these circumstances, it was reasonable and appropriate for Officer Phillips to use his Taser to try to stop Rodriguez's resistance and to control him. The video shows that each time Officer Phillips used his Taser it was in response to Rodriguez's acts of resistance and refusal to comply with lawful commands.

Whether a use of force is objectively reasonable turns on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865 (1989). Use of force "must

be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight'". *Post v. City of Ft. Lauderdale*, 7 F.3d. 1552, 1559 (11th Cir. 1983)(quoting *Graham*, 490 U.S. at 396; *Long v. Slaton*, 508 F.3d 576, 577 (11th Cir. 2007).

Federal courts recognize that police officers must make judgments in difficult and rapidly evolving circumstances about the force a particular situation requires. *Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994). Under *Graham*, the reasonableness analysis must allow for the fact that police officers must make decisions in circumstances that are tense, uncertain and rapidly evolving about the amount of force that is necessary in a particular situation, and the courts must not engage in Monday morning quarterbacking. *Graham*, 490 U.S. at 396-97.

Here, Fernando Rodriguez was naked, belligerent, yelling at passing cars, obstructing police officers and resisting arrest, and therefore probable cause for arrest existed for numerous crimes. Further, Rodriguez needed to be restrained because he presented an immediate danger to the public and himself. Several cars had nearly struck him, resulting in the 911 calls, and he was yelling at passing motorists, creating the potential for violence.

The evidence shows that, after Ofc. Phillips arrived, Rodriguez continued to resist, refused to comply with orders, and repeatedly tried to break free. Rodriguez

ignored officers' commands to roll-over and pushed himself across the asphalt, away from the officers. When Phillips attempted to grab his arm, Rodriguez immediately pulled it away and started swinging his arms violently, saying "Not this time, boyeee! Get the fuck off me!" Def. Ex. 4 at 00:05:07;00.

Ofc. Phillips did not immediately deploy his Taser; instead, he afforded Rodriguez ample opportunity to comply with the officers' commands for him to "Roll over!" and to stop resisting. Phillips finally deployed his Taser with the specific purpose of providing the Hampton officers with an opportunity to go hands-on Rodriguez so they could try to handcuff and subdue him until EMS arrived. Under these difficult and tense circumstances, Ofc. Phillips did not violate the Fourth Amendment by using his Taser multiple times to encourage compliance and/or to provide the Hampton officers with an opportunity to gain control over him. *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir.2004); *Chaney v. City of Orlando, FL*, 291 Fed. Appx. 238, 244 n.3 (11th Cir. 2008)

Although the Hampton officers were able to go hands-on with Rodriguez after Phillips' first Taser deployment, they were **not** able to gain control over him. Def. Ex. 4 at 00:06:30;27. Because he was sweaty and naked the officers could not keep their grasp on him, as he was swinging his arms and flailing his legs, which threatened to injure them.

As that was occurring, Ofc. Phillips used his Taser in drive stun mode in short applications to try to gain compliance, as Officers Lewis and Bowlden struggled to complete the handcuffing. Video shows that Rodriguez was actively resisting and trying to prevent Ofc. Bowlden from being able to pull his handcuffed left wrist back over his head so that it could be linked to the handcuffs that Ofc. Lewis had secured on his right wrist. *Id.* at 00:07:17;20. As Bowlden and Lewis tried to link the handcuffs and gain control over Rodriguez, one of them yelled, "hit him again," and Phillips used his Taser in drive stun mode to assist the Hampton officers in connecting the handcuffs and to overcome Rodriguez's resistance. When the Hampton officers continued to struggle to control Rodriguez, who increased his verbal and physical resistance, distraught Hampton officer again yelled "Hit him again!" Phillips used his Taser in drive stun. *Id.* at 00:07:18;00.

Thereafter, at 00:07:42;18 on the video, Rodriguez was on his side/stomach with his left leg below him, and his right leg was pulled up and to his right.



At 00:08:17;00, Rodriguez says "[unintelligible] get up." And the officers tell him, "No." and "Stop. STOP!" *Id.* at 00:08:18—00:08:21;00. The video shows that Rodriguez bellowed and began to move again, and Ofc. Phillips again used his Taser in drive stun mode for 1 second. *Id.* at 00:08:22;00--00:08:24;00; Def. Ex. 15 (Phillips Taser Log) at 24 (Seq. #698). During this time, Rodriguez was moving about and pulling his knees underneath him in an apparent attempt to "get up." *Id.* at 00:08:28;22.



Although Rodriguez had finally been handcuffed through the linking of 2 sets of handcuffs, video evidence shows he had not stopped resisting. Therefore, since Rodriguez had not stopped resisting or ceased posing a threat to the officers, use of force was justified. *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015)("[F]orce applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive."); *Buckley v. Haddock*, 292 Fed. Appx. 791, 795 (11th Cir. 2008)(finding that an officer's use of Taser on handcuffed subject who refused to comply with repeated orders, was not shackled and tried to "stand up" did not violate the Fourth Amendment).

Indeed, after numerous Taser deployments, Rodriguez continued to resist and

tried to roll over on his left side and tried to bite the officers. *Compare Def. Ex. 4 (Combined BWC Video)* at 00:08:50;04 *with id.* at 00:08:50;27 (showing Rodriguez rotating over on to his left hip); *id.* 00:08:56;45 (Hampton officer saying, "Dude, you bite me, I'm going to kick your teeth out."). At that point, Ofc. Phillips again used his Taser in drive stun mode on Plaintiff for 1 second at 00:09:03;00; Def. Ex. 15 (Phillips Taser Log) at 24 (Seq. # 699), and then again for 2 seconds at 00:19:20;15, yet Rodriguez continued resisting. The eyeshot is that under the circumstances, Ofc. Phillips' attempts to use the Taser in drive stun to gain compliance and stop resistance was not unreasonable. *Fennell v. Gilstrap*, No. 4:07-CV-0052-HLM, 2008 U.S. Dist. LEXIS 131758, at *7 (N.D. Ga. Apr. 9, 2008)(holding that a jailer who, along with five other jailers, was trying to restrain a combative arrestee, did not use excessive force under the Eighth Amendment when he kicked the arrestee in face when it appeared he was biting one of the other jailers); *aff'd* by *Fennell v. Gilstrap,* 559 F.3d 1212, 1214 (11th Cir. 2009).

At approximately 00:10:14;00, Rodriguez again exploded with rage and energy and managed to free himself by yanking his wrist out from under Officer Stroud's foot.



*Id.* at 00:10:15;24. So, less than 2 seconds later, when Rodriguez had again spontaneously started yelling and thrashing about and freeing his hands from the officer's foot, Ofc. Phillips deployed his Taser for 2 seconds against Rodriguez so that the other officers could regain control of his hands.

Accordingly, as the video conclusively establishes, each time Ofc. Phillips used his Taser, it was in response to Rodriguez's resistance and repeated refusal to comply with lawful orders. Therefore, Phillips' use of his Taser did not violate Rodriguez's Fourth Amendment rights.

### 2. Officer Phillips' Taser Use Did Not Violate Clearly Established Law

Even if any of Ofc. Phillips' Taser applications are somehow viewed, in 20/20 hindsight, as being unnecessary, the Taser use did not violate clearly established law under the facts and circumstances. For a right to be clearly established, it must be

"sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1146 (11th Cir. 2017). In other words, courts must ask whether the officers in the case at hand had fair warning from existing precedent that their conduct was unconstitutional. This does not mean that the plaintiff must find another case that is factually identical, but the unlawfulness of the conduct at issue must have been "apparent." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011)(*en banc*).

Here, the relevant, existing authority did not prohibit Ofc. Phillips from repeatedly using the Taser to try to gain compliance and stop Rodriguez's resistance. In cases where officers faced circumstances similar circumstances, the Eleventh Circuit has held that qualified immunity protects the officers. *See Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015)(holding that the officer's repeated use of a Taser did not violate the Fourth Amendment because "force applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive."); *see also Hoyt*, 672 F.3d at 978-80 (granting qualified immunity to officers who tased the plaintiff repeatedly in response to his "vigorous resistance" because he was never "totally immobilized" and "continued to pose a danger"); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) (repeated

"use of a [t]aser[ ] was appropriate" when the suspect's "behavior was violent, aggressive, and prolonged"); *Callwood v. Jones*, 727 Fed. Appx. 552 (11th Cir. 2018) (qualified immunity granted to officers who repeatedly tased the naked decedent who was aggressively resisting).

Accordingly, Ofc. Phillips did not clearly establish law when he deployed his Taser numerous times to try to subdue Rodriguez in response to his resistance and aggressive behavior and failure to comply.

### B. DEFENDANTS' USE OF FORCE TO RESTRAIN RODRIGUEZ UNTIL EMS ARRIVED WAS OBJECTIVELY REASONABLE AND DID NOT VIOLATE CLEARLY ESTABLISHED LAW

#### 1. THE USE OF RESTRAINT FORCE WAS OBJECTIVELY REASONABLE

Plaintiffs allege Defendants Phillips and Butera used excessive force by restraining Rodriguez on the ground while he "was not resisting or attempting to evade arrest." Doc. 1 (Complaint) at ¶ 154. Allegations of excessive force in the manner of restraint are also judged under the Fourth Amendment objective reasonableness standard. The courts must analyze a use of force on a case-by-case basis "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and be mindful that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers … violates the Fourth Amendment." *Graham*, 490 U.S. at 396; *Crenshaw v. Lister*, 556 F.3d 1283,

1290 (11th Cir. 2009)(internal quotation marks omitted).

In other words, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97 (internal quotation marks omitted). And, the Court should pay "careful attention to the facts and circumstances of each particular case, including . . . whether [the suspect] is actively resisting arrest or attempting to evade an arrest by flight." *Crenshaw*, 556 F.3d at 1290. As the Eleventh Circuit has warned, the use of force should not be viewed "from the comfort and safety of our chambers" but rather "through the eyes of the officer on the scene." *Crosby v. Monroe County*, 394 F.3d 1328, 1333-34 (11th Cir. 2004).

Here, over the course of the incident, Rodriguez repeatedly pulled away from the officers, tried to get away, swung at officers, cursed at the officers, pulled handcuffs off, tried to bite the officers and positioned himself to get up once they had him on the ground. Under those circumstances, it was more than reasonable for the officers to place Rodriguez in a prone position and apply some body weight pressure to keep him from getting up, crawling away (which could have caused harm) or fighting with the officers.

Rodriguez posed a threat to his own safety, the safety of motorists, and the safety of the officers. Rodriguez had an altered and excited mental state (brought on by LSD use), and he needed to be restrained to protect all concerned and so that EMS could examine and treat him as necessary. Furthermore, it was reasonable to keep applying physical restraint on Rodriguez after he was sort of handcuffed, because of his actions.

Indeed, moments after handcuffs were linked together over his head, Rodriguez pulled his arms down and underneath his chest, and twisted onto his left shoulder and hip, while also bending his right knee at his side. Def. Ex. 4 at 00:07:39;00—00:07:45;22. In response, Ofc. Phillips maintained his knee and shin on Rodriguez's right shoulder blade, upper back, trying to keep him from rolling over. At the same time, Ofc. Butera tried to control his left leg/hip to try to keep him restrained.

Rodriguez intermittently continued to physically resist and made outbursts. He yelled, "Let me get up!" and bellowed as he tried to lift his hips and pull his knees farther under him. *Id.* at 00:07:45;22—00:08:29;11. Phillips kept his knee on Rodriguez's shoulder blade area, but Rodriguez had his buttocks raised up in the air, with his knees under him, so he was not fully prone or restrained. For 7 to 7 ½ minutes after the officers got Rodriguez somewhat in the prone position, Officers

-17-

Phillips and Butera battled against Rodriguez's periodic surges where he would try to break free or lash out toward the officers. *Id.* at 00:08:51;00 (being told to "Stop moving!"); 00:09:13;00 (Roaring); 00:09:24;00 (Yelling, "Get the Fuck Off of ME!"); 00:09:43;00 (Shifting against orders that he "Stop!"); 00:09:54;00 (being told to "Stop!"); 00:10:09;00 (Yelling, "Where's my fucking Angel Dust?"); 00:11:05;00 (biting at the officers' feet and legs); 00:11:17;00 (Surging unintelligible yell and shifting); 00:11:34;00 (Lewis saying, "Uh-uh, Dude!" as Rodriguez tried to bite); 00:13:31;00 (Biting again); 00:13:36;00 (being ordered "Put your head down!"); 00:14:52:00 (Again, "Keep your face down"); 00:15:08;00 ("Don't move").

During this time, Ofc. Phillips kept Rodriguez from rising up farther by keeping his knee across Rodriguez's shoulder blades/upper back. Ofc. Butera had a knee on Rodriguez's left buttock to keep him from raising his butt up, and at that point Rodriguez was more fully prone. Def. Ex. 12 (GBI statement Quinton Phillips) at 2; Def. Ex. 4 at 00:14;44;24.

Rodriguez's actions demonstrated that he intended to continue resisting and trying to break away, and it was reasonable for the officers to restrain him to prevent that from occurring. Rodriguez's actions justified Ofc. Phillips and Butera using physical force to hold him down. As to any questioning of the prone position,

allowing Rodriguez in his combative state to be on his back would have allowed him more easily to kick and resist the officers, thereby increasing the risk of harm to the officers. Indeed, officers are trained that placing a combative suspect in a prone position is the best way to control the suspect and promote safety. Def. Ex. 37 (Darrell Ross Report) at 23-24. Moreover, Chief Amerman, Henry County officers had not been trained or warned about risks of positional asphyxia from prone position before this incident. Def. Ex. 34 (Amerman depo.) at 80.

It was also reasonable for Officers Phillips and Butera to continue to use minimal physical force to restrain Rodriguez after the paramedics arrived, given his prior conduct, off and on resistance, and danger to all present. Rodriguez had been combative and resisting until just a couple of minutes before EMS arrived, and therefore it was reasonable for Officer Phillips and Butera to continue using minimal restraint force to control Rodriguez until the paramedics could safely assess him, particularly in light of his on and off outbursts and uncertainty about his condition in the moments before medics takeover.

Additionally, Defendants Phillips and Butera were not aware that Rodriguez was having any difficulty breathing **due to the restraint force used**. Rodriguez shifted and moved, and talked, yelled and screamed—all of which indicated that he could breathe. Rodriguez also never verbalized or indicated to the officers that he

could not breathe. Defendants saw Rodriguez breathing until just seconds before EMS arrived, and when the paramedics arrived, the officers deferred to them to assess Rodriguez.

There is also no evidence that the amount of pressure used to restrain Rodriguez was unreasonable. The GBI medical examiner did not find any trauma to Rodriguez's body from the restraint during autopsy. Finally, there is no evidence that through training or otherwise, either Ofc. Phillips or Ofc. Butera knew, or should have known, that asphyxia would occur from keeping a suspect from raising up by placing a knee across his shoulder blades (Phillips) or a knee on his hip (Butera). The HCPD policies had at the time did not address any such risk.

Simply put, it was objectively reasonable for Officers Phillips and Butera to restrain Rodriguez in the manner in which they did. The force used was related to the legitimate law enforcement purpose of restraining Fernando Rodriguez to protect the officers and to prevent him from attempting to flee again, and to allow EMS to assess him.

## 2. THE USE OF FORCE DID NOT VIOLATE CLEARLY ESTABLISHED LAW

Defendants' use of restraint force did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). No binding case law involving materially

similar facts and circumstances existed that would have put Officer Phillips on notice that it was constitutionally impermissible for him to restrict Rodriguez's ability to continue to resist and try to get up by placing his knee and upper shin across Rodriguez's shoulders. Similarly, no binding case law exists that would have put Butera on notice that holding Rodriguez's legs to prevent him from kicking and/or trying to get up was clearly unlawful. That is, the law did not provide Defendants "fair and clear notice" that their actions would violate the Constitution.

Indeed, the most factually similar precedent is the Eleventh Circuit's decision in *Lewis v. City of West Palm Beach, Fla.,* 561 F.3d 1288 (2009), where defendant officer Shaw had an encounter with the plaintiff Lewis, who was disoriented, stumbling into the road, and trying to flag down passing vehicles. When Officer Shaw attempted to stop Lewis, he was breathing heavily, grunting incoherently, and appeared to be under the influence of some type of narcotic (similar to the way Rodriguez was behaving). Lewis resisted, forcing Ofc. Shaw to take him to the ground so that he could be handcuffed.

Moments later, backup Officer Root arrived to assist Shaw, and Root placed his knee on Lewis' upper back and neck to restrain him during the handcuffing process. Lewis' legs were then bound using leg restraints. The officers then used a hobble chain to connect the leg restraints to the handcuffs, and they left Lewis in a

"hog-tied" and prone position. The officers then noticed Lewis had lost consciousness and called paramedics, but the medics were unable to revive him.

The exact cause of Lewis' death was unclear. The medical examiner who performed the autopsy concluded the cause of death was sudden respiratory arrest following physical struggling restraint due to cocaine-induced excited delirium, while plaintiff's medical expert testified the cause of death was asphyxia caused by neck compression.

Lewis' mother filed suit alleging excessive use of force, and the district court ruled qualified immunity protected the officers. On appeal, the Eleventh Circuit affirmed, holding that "[e]ven if the officers' actions violated Lewis's Fourth Amendment rights, the [plaintiff] did not demonstrate that the officers' conduct was an intrusion on a clearly established right." *Id.* at 1291. Specifically, the Court held that:

> case law does not provide the necessary precedent, either specifically or through broad principles, to clearly establish the right. Thus, only if the officer's conduct was so egregious and unacceptable so as to have blatantly violated the Constitution would qualified immunity be unavailable to them. However, to come within this narrow exclusion, 'plaintiff must show that the conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without case law on point." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) and, that "this standard is met when every reasonable officer would conclude that the excessive force used was plainly unlawful. *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926-27 (11th Cir. 2000).

The Court noted "decisions of the officers who were confronted with 'circumstances that are tense, uncertain and rapidly evolving' should not be second-guessed." *Lewis*, at 1292.

The facts in *Lewis* are similar to the present case in that the officer used knee pressure on the suspect's upper back (and neck in that case) to hold him down and he was kept in a prone (hogtied) position, and there was medical opinion that the restraint force and position caused his death by positional asphyxia; also, as in this case, there were other potential causes of death (excited delirium due to restraint struggle and drug use). Here, Defendants' experts opine that Rodriguez's enlarged heart and hypertensive heart disease, atherosclerosis, LSD use and related excited delirium caused his death. SUMF ¶¶95, 96 and 97.

On similar evidence and theories of liability, the Eleventh Circuit held in *Lewis* that the defendant officers did not violate clearly established law by the process in which the suspect had been restrained in the prone position, including placing a knee on his neck, even assuming that it caused positional asphyxia. The *Lewis* court noted that while the additional restraint of Lewis once he was subdued may not have been entirely necessary, under the circumstances it was not such an egregious violation of a constitutional right to defeat qualified immunity. Therefore, *Lewis* defeats any contention that the law was "clearly established" that an officer

could not use knee pressure and/or keep a handcuffed suspect in the prone position for a brief period until EMS arrived.

The decision in *Mongeau v. Jacksonville Sheriff's Office*, 197 Fed.Appx. 847 (11th Cir. 2006) also supports qualified immunity. In *Mongeau*, the suspect (Mongeau) fled from police during a traffic stop, and after ending the pursuit, the officers approached the vehicle, and Mongeau failed to comply with the officer's orders for him to exit. The officers then pulled Mongeau out of the car, and allegedly slammed him to the ground and punched him about his head and back to subdue and handcuff him. After he was handcuffed, an officer placed his knee on Mongeau's upper back and neck to keep him on the ground, even though he was no longer struggling.

Mongeau alleged that Officer Edmonds had used excessive force in placing his knee on plaintiff's neck and back while he was handcuffed on the ground. In assessing the excessive force claim, the Eleventh Circuit held that Mongeau's erratic and reckless behavior, which indicated a clear intent to resist posing danger to the officers, justified the continued restraint. The Court held that the officers' conduct in restraining and incapacitating Mongeau, specifically including placement of a knee on Mongeau's back and neck (while in the prone position), was objectively reasonable given Mongeau's previous resistance and risk of flight.

The *Mongeau* case is factually analogous as Rodriguez had been noncompliant, reckless and combative and had tried to evade detention for an extended period of time. He consistently ignored every command that officers gave him; he swung at officers as they tried to detain him; he tried to bite officers; he tried to avoid detention.

As in *Mongeau*, a reasonable officer in the same position as Phillips and Butera would have believed that Rodriguez presented a risk of flight and danger to himself, the officers, the responding medics and the public, such that it was reasonable to continue restraining him until paramedics arrived and assessed him. Thus, the existing case law supports the reasonableness of Defendants' actions, and certainly did not place them on notice that their actions were unlawful.

In the absence of case law clearly establishing the unlawfulness of Officers Phillips and Butera's actions, there are 2 other ways Plaintiffs can try to show Defendants violated clearly established law: (1) plaintiffs can show that a broad statement of principle within the Constitution, statute, or case law clearly established a constitutional right applicable to the facts, or (2) that Defendants "conduct was so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis*, at 1291-92. First, there is no broad statement of principle that would apply in this case. Secondly, Plaintiffs also cannot show that the Defendants'

conduct was so egregious and unacceptable that the officers would have known they were violating the Fourth Amendment.

As to an egregious conduct theory, the Eleventh Circuit has noted that the officer's conduct would have to be so egregious and unacceptable that it would be an obvious or "blatant" violation of the Constitution. *Lewis*, at 1292. "[T]o come within this narrow exception 'plaintiff must show that the official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without case law on point.'" *Id.* (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). The requisite fair and clear notice can be given without case law only "[i]n some rare cases." *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003). This is not such a case, particularly in light of the *Lewis* decision.

In sum, there was no case law on materially similar facts at the time of this incident that held the extent of physical force used to restrain Rodriguez was unconstitutional, no broad principles of law that placed the statutory or constitutional question about the reasonableness of the force used "beyond debate," *Ashcroft*, 131 S.Ct. at 2083, and the officers' use of force was not egregious.

### C. **THE EVIDENCE FAILS TO SHOW THAT EITHER PHILLIPS OR BUTERA FAILED TO INTERVENE TO PREVENT A CONSTITUTIONAL VIOLATION**

Plaintiffs allege that Defendants Phillips and Butera violated Rodriguez's Constitutional rights by failing to intervene to protect him from excessive force. *See* Doc.1, ¶¶ 160-161. For § 1983 "failure to intervene" liability to attach, an officer must have had actual knowledge of an impending unconstitutional use of force and the physical ability and opportunity to intervene, yet failed to do so. *See Ensley v. Soper*, 142 F.3d 1402, 1407-08 (11th Cir.1998). Obviously, in the absence of excessive force, or force does not violate a clearly established right, there is no duty to intervene. *Bussey-Morice v. Kennedy,* 657 Fed. Appx 909, 915 (11th Cir. 2016)(citing *Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009)). Similarly, when an officer's force does not violate a clearly established right, another officers' failure to intervene does not violate a clearly established right. *Id.* Because neither Officer Phillips nor Officer Butera violated Rodriguez's clearly established rights in their application of force, neither failed to intervene to stop excessive force.

### D. **THE DEFENDANTS DID NOT FAIL TO PROVIDE RODRIGUEZ MEDICAL CARE IN VIOLATION OF THE FOURTEENTH AMENDMENT**

Plaintiff raises a federal claim based on alleged delay in providing medical care. This claim requires Plaintiff to show "(1) [the arrestee] had a serious medical

need; (2) the Officers were deliberately indifferent to that need; and (3) the Officers' deliberate indifference and [arrestee's] injury were causally related." *Hinson v. Bias*, 927 F.3d 1103, 1121 (11th Cir. 2019). For causation, Plaintiff must substantiate that the officer's misconduct caused him medical harm. Fed.R.Evid. 701; *McDaniels v. Lee*, 405 Fed. Appx. 456, 458 (11th Cir.2010); *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994).

Because Rodriguez's heart stopped beating and the paramedics started CPR, at some point during the encounter he had developed a "serious medical need." Before that occurred, however, Defendants were aware that EMS had been summoned and were on the scene, so medical care had been summoned and was provided. Thus, the questions presented for these Defendants relate to the "deliberate indifference" standard and causation elements.

### 1. PLAINTIFF CANNOT SUPPORT DELIBERATE INDIFFERENCE

In regard to the subjective "deliberate indifference" element, "the plaintiff must present, for each officer, evidence from which a reasonable jury could conclude that (1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence." *Valderrama v. Rousseau*, 780 F.3d 1108,

1116 (11th Cir. 2015). Video from the incident requires resolution in Defendants' favor. As a matter of law, the evidence fails to show either Phillips or Butera knew Rodriguez was in serious medical danger **but intentionally refused to provide access to medical care**.

Contrary to "deliberate indifference," an ambulance was requested approximately eight (8) minutes after Officers Lewis and Stroud arrived on scene[1]. At that point, Rodriguez had only been in handcuffs for a few seconds, and he had not displayed any life-threatening medical problem. In fact, Rodriguez continued to resist for the next roughly seven (7) minutes. During that entire time, EMS was on the way.

Where officers call an ambulance even *before* they see a medical emergency, it is impossible to infer "deliberate indifference." *Zellers v. Echevarria*, No. 1:08-cv-2806, 2011 U.S. Dist. LEXIS 166162, at *21 (N.D. Ga. May 4, 2011)(Batten, J.)(granting summary judgment in similar circumstances, and holding the officer's prompt call for medical attention indicated concerned for the detainee's wellbeing.).

---

[1]   Def. Ex. 4 (Combined BWC Video) at 00:07;48;17; Def. Ex. 11 (HCPD Supplemental reports) at 2 ("about 10:19 PM"); Def. Ex. 6 (911 CAD) at 7 ("10:19:35"); Def. Ex. 6 (911 CAD) at 7 ("10:11:22…Unit 318H At Scene;" and "10:19:35… adv start a s4 to the m[a]le"); Def. Ex. 4 (Combined BWC Video) at 00:07:48;17.

Additionally, the pre-emergency request for an ambulance justified officers in believing that medics would be there shortly to handle any medical problem. Courts overwhelmingly have ruled that officers discharge any medical responsibility to an injured detainee by promptly summoning medical providers[2]. That basic rule ends Plaintiffs' "deliberate indifference" claim, both as a matter of substantive law and based on qualified immunity because the opposite idea (*i.e.*, that officers have to do more) is not "clearly established."

Even if Officers Phillips and Butera are not insulated by the fact that paramedics were summoned before any serious medical need arose, there are

---

[2]      *Stevens-Rucker v. City of Columbus*, 739 Fed. Appx. 834, 846 (6th Cir. 2018)(officer's duty to obtain medical aid "does not require the officer to intervene personally."); *Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017)("an officer does not act with reckless disregard when he immediately summons help …."); *Tatum v. City and Cnty. of S.F.*, 441 F.3d 1090, 1099 (9th Cir. 2006)(holding that "a police officer who promptly summons the necessary medical assistance has acted reasonably … even if the officer did not administer CPR"); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986)(rejecting jury instruction that officer may have duty to render aid personally, and stating "[d]ue process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured . . . by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital."); *Beshers v. Harrison*, No. 2:04-CV-54-WCO, 2005 U.S. Dist. LEXIS 51575, at *23-24 (N.D. Ga. 2005)(O'Kelley, J.), *aff'd* 495 F.3d 1260 (rejecting claim that officers had duty to render aid personally, and granting summary judgment where ambulance was called promptly).

additional bases for summary judgment. Less than ten (10) minutes after the call for

EMS, paramedics were on-scene to begin treatment[3]. Around this time Mr.

Rodriquez was still making sounds and officers verified he was breathing[4]. And once

medics arrived, the officers did not interfere with or delay the medics' ability to

assess Rodriguez. Def. Ex. 35 (Koehn depo.) at 77-78. Thus, there was no deliberate

indifference.

In hindsight it appears that Rodriguez developed an undiagnosed "serious

medical need" around the time that medics arrived, though there is no basis to infer

that any officer had such knowledge or belief at the time. And, with medics at hand,

Defendants were entitled to get out of the way and rely on the medics to assess the

suspect.

In fact, it even took the medics a few minutes to detect any serious medical

need, which further undercuts the idea that any officer was "deliberately

indifferent." Courts hold that no police officer is required to display more prescience

about undiscovered medical issues than trained medical professionals. See *Williams*

---

[3]     Def. Ex. 19 (Henry Co. EMS PCR) at 1 ("Arrived on Scene: 09/20/2019
22:28:47").
[4]     Def. Ex. 4 (Combined BWC Video) at 00:16:26:27 ("Yeah, he's still
breathing."); *Id.* at 00:16:43;00-00:16:49:03 (Officer Phillips states he observes
breathing).

*v. Limestone County, Ala.*, 198 Fed.Appx. 893, 897 (11th Cir.2011)("officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care."); *Zellers v. Echevarria*, No. 1:08-cv-2806, 2011 U.S. Dist. LEXIS 166162, at *20-21 (N.D. Ga. May 4, 2011)(Batten, J.)(finding no reason for officers to know about medical risk that was not detected by medics).

Therefore, Plaintiff cannot show that any officer acted with deliberate indifference.

### 2. PLAINTIFF CANNOT SUPPORT CAUSATION

Plaintiff's claim also has an insurmountable causation problem. Plaintiff cannot show that any Defendant's alleged indifference caused Rodriguez's death. There are several aspects to the causation analysis.

The first causation aspect concerns the basic lack of connection between any officer's medical response (or lack thereof) and the death. Medical care was entrusted to the medics, not officers. Therefore, there is no causal connection between any officer's medical response and the death.

A second causation aspect concerns the technical medical issue raised by Rodriguez's death from an unclear cause that had no apparent available remedy. To reach a jury, Plaintiff must present competent expert testimony "that [Rodriguez] would have survived … absent the alleged indifference" of a given Defendant. See

*Weathers v. Lanier*, 280 Fed.Appx. 831, 833 (11ᵗʰ Cir. 2008). Georgia law has the same rule. *Cowart v. Widener*, 287 Ga. 622, 631, 697 S.E.2d 779 (2010)(requiring expert testimony for issues of medical causation outside the ken of ordinary experience and stating "a defendant's conduct is not a cause of the event, if the event would have occurred without it").

Under the rule elaborated in *Weathers* and *Cowart*, Plaintiff's claim against these Defendants fails on the causation prong. Plaintiff has no admissible evidence that any type of medical treatment—much less something that a Defendant could or "should" have done—would have saved Rodriguez's life in this situation.

Accordingly, Defendants are entitled to summary judgment for lack of sufficient causation between any Defendant's medical response and the death.

### E. PLAINTIFFS' SUPERVISORY LIABILITY CLAIM AGAINST DEFENDANT BUTERA FAILS BECAUSE HE WAS NOT OFC. PHILLIPS' SUPERVISOR

"Supervisory liability under § 1983 occurs when the ***supervisor*** personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the ***supervising*** official and the alleged constitutional deprivation." *Valdes v. Crosby*, 450 F.3d 1231, 1236 (11ᵗʰ Cir. 2006).

Plaintiffs allege that Butera was Phillips' supervisor and that he directed his subordinate to use excessive force, thereby violating Rodriguez's constitutional

rights. The undisputed evidence shows Ofc. Butera was not Ofc. Phillips' supervisor: they both were "patrolman," with no authority over the other. Def. Ex. 36 (Amerman depo.) at 21. There is also no evidence that Butera ever instructed Phillips to take or not take any particular action. Accordingly, Butera is entitled to summary judgment.

## II.  THERE IS NO EVIDENCE THAT HENRY COUNTY HAD A CUSTOM POLICY OR PRACTICE THAT CAUSED ANY CONSTITUTIONAL VIOLATIONS AND THEREFORE PLAINTIFFS' MONELL CLAIMS FAIL

Henry County cannot be held liable under § 1983 for a constitutional violation committed by an employee merely by virtue of the employment; that is, there is no *respondeat superior* liability. *Monell v. Dept. of Social Services*, 436 U.S. 658, 692 (1978). The governmental entity can only be held liable where the execution of the government's policy or custom causes the constitutional violation. *Canton*, 489 U.S. at 385. "Indeed, [an entity] is liable only when the [entity's] 'official policy' causes a constitutional violation." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018; *Canton*, 489 U.S. at 385; *Gold v. City of Miami*, 151 F.3d 1346, 1351 n.10 (11th Cir. 1998)

There are two methods for establishing a county's policy: a plaintiff can identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county. *Monell*, 436 U.S. at 690-91, 694, 98 S.Ct. 2018. In the

absence of an officially adopted policy, a plaintiff must show that the county had a *custom* or a *practice* of permitting a particular conduct and that such conduct was the "moving force [behind] the constitutional violation." *City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197 (alteration in original). In this approach, liability arises from a municipality's tolerance of or acquiescence to the unconstitutional conduct of its officers to such a degree that it becomes an accepted custom or usage. *Id.*

Alternatively, a plaintiff can attempt to establish entity liability based on the inadequate training, supervision or discipline of officers. *City of Canton*, 489 U.S. at 388. In making a failure to train claim, a plaintiff must specifically prove that: 1) the training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the municipalities notice of but deliberate indifference towards the potential harm; and 3) the inadequacy was closely related to or actually caused the injury.

Plaintiffs vaguely allege that policies of Henry County "caused Rodriguez's injuries and death", Complaint ¶ 188, and that the County had knowledge of unconstitutional patterns and practices that "failed to provide for the safety of arrestees . . .." *Id.*, ¶ 191. Plaintiffs also allege the County failed to properly train its officers in use of force and prone restraint, and that the failure to train caused Rodriguez's injuries and death. *Id.*, ¶¶ 200-207. Plaintiffs cannot prevail under these

theories.

First, the evidence shows Rodriguez did not suffer a constitutional violation, and thus, Plaintiffs cannot make a threshold showing for a *Monell* claim. Secondly, Plaintiffs cannot show that the County had an unconstitutional policy or practice regarding use of force or restraint, or that there was widespread recurring use of excessive force or unreasonable restraints that resulted in constitutional violations. Thirdly, the evidence fails to show that Henry County inadequately trained, supervised, or disciplined its officers with respect to use of force or restraints, or that it was on notice of a need for additional training to prevent recurring constitutional violations.

Plaintiffs make broad based, vague allegations that Henry County, Georgia had known unconstitutional policies and practices that were the moving force behind and cause of Rodriguez's injuries and death but cite no evidence to support such allegations. Plaintiffs also allege that Henry County knew of the "Defendant Officers' repeated unconstitutional, unlawful and other improper conduct" but never terminated or disciplined them, but again there are no facts alleged or evidence to support such. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007)(noting that a complaint "does not need detailed factual allegations" but must contain "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action"); *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)(noting that legal conclusions "are not entitled to the assumption of truth" and "must be supported by factual allegations").

There is also no evidence showing any prior factually similar occurrences that resulted in constitutional violations. Chief Amerman testified that during his 28 years of employment, he has never known of a suspect having any injuries or complications (such as positional asphyxia) from restraint in the prone position with body weight pressure. Def. Ex. 34 (Amerman depo.) at 80. Thus, Plaintiffs cannot support a theory that Henry County was deliberately indifferent to the need for more training, supervision or discipline based on prior incidents or occurrences.

Both Ofc. Phillips and Ofc. Butera were POST certified law enforcement officers in good standing. *See* Def. Ex. 16 (Phillips POST Profile); Def. Ex. 17 (Phillips Taser Recert); Def. Ex. 18 (Butera POST Profile). Ofc. Phillips had just completed his Taser recertification just two (2) weeks prior to the underlying incident. *See* Def. Ex. 17 (Phillips Taser Recert.) Since both officers were POST certified and current with their training requirements and were in good standing, they are presumed to have been adequately trained. *Perez v. City of Sweetwater*, 770 Fed. Appx. 967, 976 (11th Cir. 2019)(holding that affirmative evidence of a department's consistent training program to "stay certified" cannot support a finding

that the city was deliberately indifferent).

Next, "[w]hen a failure to train is at issue, a plaintiff must present some evidence that the municipality knew of a need to train . . . in a particular area and the municipality made a deliberate choice not to take any action." *Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1255-56 (M.D. Ala. 2010)(citing *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997)). Notice can be established by a pattern of constitutional violations or through a single incident if the need for further training is glaring, not a mere imperfection. *Gold*, 121 F.3d at 1446.

Plaintiffs cannot show that there was a need to train that was so obvious that the County knew its failure to train its officers would result in a constitutional violation. *Mingo v. City of Mobile*, 592 Fed. Appx. 793, 799 (11th Cir. 2014). As to inadequate supervision, there is no evidence that either Phillips and Butera had been involved in any similar, prior uses of force or restraint that was unreasonable or excessive, such that it could be argued there was a failure to supervise and notice of potential constitutional violations likely to occur.

### III. OFFICIAL IMMUNITY BARS PLAINTIFFS' STATE LAW CLAIMS FOR NEGLIGENCE, ASSAULT AND BATTERY AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Official immunity bars Plaintiffs' state law claims because Defendants were acting within their discretionary authority, and there is no evidence either Phillips

-38-

or Butera acted with actual malice or intent to do wrong. *See* Ga. Const. of 1983, Art. I, Sec. 2, Par. 9 (d); *Cameron v. Lang*, 274 Ga. 122, 123(1), 549 S.E.2d 341 (2001). Under Georgia law, an officer has immunity for "discretionary" acts, even if performed negligently. *See*, *e.g*., *Cameron*, 274 Ga. at 125 (dismissing claims despite negligence during pursuit). Georgia law holds that a law enforcement officer's decision to detain, arrest, and use force are discretionary functions for purposes of official immunity[5].

Accordingly, Plaintiffs must show evidence sufficient to establish "actual malice" to overcome official immunity. There is no such evidence. Even if the Court were to find that a certain act was inappropriate in some sense, that is something far different from the "actual malice" required to pierce official immunity.

> Actual malice is a demanding standard: it requires an officer to act with "a deliberate intention to do a wrongful act." Adams v. Hazelwood, 520 S.E.2d 896, 898 (Ga.1999). True, a jury can infer actual malice based on an officer's conduct. See *Lagroon v. Lawson, 759 S.E.2d 878, 883 (Ga.Ct.App.2014)*. But **unreasonable conduct does not support such an inference**. *See Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1333 (11th Cir. 2006); *Marshall v. Browning*, 712 S.E.2d 71, 75 (Ga.Ct.App.2011); *Anderson v. Cobb*, 573 S.E.2d 417, 419 (Ga.Ct.App.2002). **Even recklessly illegal conduct does not**

---

[5]      *Selvy v. Morrison*, 292 Ga.App. 702, 665 S.E.2d 401 (2008); *Reed v. DeKalb County*, 264 Ga.App. 83, 86-87, 589 S.E.2d 584 (2003)(arrest); *Tittle v. Corso*, 256 Ga.App. 859, 569 S.E.2d 873, 876(1)(2002)(arrest and use of force); Outlaw v. Nasworthy, 250 Ga.App. 362, 551 S.E.2d 785 (2001); *Kidd v. Coates*, 271 Ga. 33, 33, 518 S.E.2d 124 (1999)(execution of search warrant and shooting of decedent were discretionary).

> **support an inference of actual malice**. *See Murphy v. Bajjani*, 647
> S.E.2d 54, 60 (Ga.2007); *Daley v. Clark*, 638 S.E.2d 376, 386
> (Ga.Ct.App.2006).

*Black v. Wigington,* 811 F.3d 1259, 1266 (11th Cir. 2016)(emphasis supplied).

In sum, neither a Fourth Amendment violation nor allegedly unreasonable conduct add up to the "actual malice" required to pierce official immunity[6]. Because the evidence does not show actual malice, official immunity bars all state law claims against Defendants.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth in this Brief, Defendants request the Court to grant complete summary judgment in their favor. Should the Court dismiss fewer than all defendants or claims, Defendants respectfully request the Court to certify any dismissal as a final order under Fed. R. Civ. P. 54.

---

[6]     *See also Adams v. Hazelwood*, 271 Ga. 414, 414–415(2), 520 S.E.2d 896 (1999)(defining actual malice in official immunity context); *Selvy*, 292 Ga.App. at 705–706, 665 S.E.2d 401 (2008)(showing of actual malice or intent to injure requires more than "poor judgment, rude behavior, and reckless disregard for the rights and safety of others").

[Signatures-next page]

This 11th day of August, 2022.

WILLIAMS, MORRIS & WAYMIRE, LLC

/s/ Terry E. Williams
TERRY E. WILLIAMS
Georgia Bar No. 764330

*/s/ G. Kevin Morris*
G. KEVIN MORRIS
Georgia Bar No. 523895
Attorneys for Defendants Henry County, Butera and Phillips

Building 400, Suite A
4330 South Lee Street
Buford, GA 30518
(678) 541-0790
(678) 541-0789(f)
terry@wmwlaw.com
kevin@wmwlaw.com

## **CONCLUSION**

WHEREFORE, for the reasons set forth in this Brief, Defendants request the Court to grant complete summary judgment in their favor. Should the Court dismiss fewer than all defendants or claims, Defendants respectfully request the Court to certify any dismissal as a final order under Fed. R. Civ. P. 54.

This 11th day of August, 2022.

WILLIAMS, MORRIS & WAYMIRE, LLC

/s/ Terry E. Williams
TERRY E. WILLIAMS
Georgia Bar No. 764330

*/s/ G. Kevin Morris*
G. KEVIN MORRIS
Georgia Bar No. 523895
Attorneys for Defendants Henry County, Butera and Phillips

Building 400, Suite A
4330 South Lee Street
Buford, GA 30518
(678) 541-0790
(678) 541-0789(f)
terry@wmwlaw.com
kevin@wmwlaw.com

## CERTIFICATE OF TYPE STYLE

This document was prepared using Times New Roman 14-point font.

This 11th day of August, 2022.

WILLIAMS, MORRIS & WAYMIRE, LLC

/s/ Terry E. Williams
TERRY E. WILLIAMS
Georgia Bar No. 764330

/s/ G. Kevin Morris
G. KEVIN MORRIS
Georgia Bar No. 523895
Attorneys for Defendants Henry County, Butera and Phillips

Building 400, Suite A
433outh Lee Street
Buford, GA 30518
(678) 541-0790
(678) 541-0789
terry@wmwlaw.com
kevin@wmwlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day served a copy of the within and foregoing DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT on all parties via U.S. Mail and/or the Court's electronic filing system, as follows:

Jess B. Johnson
PATE, JOHNSON & CHURCH, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
jess@patejohnson.com

This 11th day of August, 2022.

WILLIAMS, MORRIS & WAYMIRE, LLC

*/s/ Terry E. Williams*
TERRY E. WILLIAMS
Georgia Bar No. 764330

*/s/ G. Kevin Morris*
G. KEVIN MORRIS
Georgia Bar No. 523895

Bldg. 400, Suite A
4330 South Lee Street
Buford, GA 30518
678-541-0790
678-541-0789
terry@wmwlaw.com
kevin@wmwlaw.com