Page 93

1  custody --
2     A    Okay.
3     Q    -- and they are -- there is some medical
4  issues going on with that detainee or arrestee, what
5  are your officers trained to do?
6          MR. WILLIAMS:  Object to the form.  I assume
7     you are talking about inmates injured and the
8     officer sees that an inmate or suspect is
9     injured?
10    A    Call an ambulance.
11    Q    Is that the only thing?
12    A    No.  They also are trained on how to use the
13 AED and CPR and some basic first aid.  And some of my
14 employees are actually paramedics.  So it goes from
15 Band-Aid to a paramedic.
16    Q    What's the AD?
17    A    AED, the defibrillator.
18    Q    Is that if the heart stops?
19    A    Yes.  You hook them up and shock them.
20    Q    They are all trained on that?
21    A    The ones that have them, yes.
22    Q    And CPR?
23    A    Majority -- definitely AED's.
24    Q    Were they ever trained that they had to give
25 medical treatment to someone in their custody?

Page 94

1     A    I think they have to provide medical -- I'd
2  have to defer to departmental training officer but
3  some level of care, help, calling for an ambulance.
4  You know, open wounds, bleeding, attempt to stop the
5  bleeding.  Using the defibrillator, CPR, giving
6  Narcan.  I give out a lot of life saving awards.  They
7  do a pretty good job of giving care.
8     Q    In this case did the officers provide any
9  medical treatment?
10    A    Other than -- from the video that I saw, it
11 appears -- I believe it was Phillips who first notices
12 that it appears that Mr. Rodriguez is having an issue
13 breathing.  And they are assessing.  And I know the
14 ambulance is coming.  And it appears their concern is
15 heightened as the ambulance is coming.  And they are
16 still assessing.
17         And it's almost simultaneously when the
18 ambulance shows up and they are like hey, I think he's
19 having serious difficulty breathing.  Like at that
20 same point.  From my experience if the ambulance
21 wasn't there, the officers would have took action as
22 far as CPR or AED, doing something of that nature.
23 Usually when the ambulance is there, they are the pros
24 that handle that.
25    Q    Did medical treatment of Mr. Rodriguez

Page 95

1  comport with departmental policies?
2          MR. WILLIAMS:  Object to form.  Go ahead.
3     A    From what I saw, yes.  They -- I'll say the
4  ambulance was called at least 10 minutes before any
5  indication of something else was wrong.  And then I
6  believe they checked on -- at least the video I saw
7  hey, when are you coming, when are you coming.  Hurry
8  up.  They wanted them there.  But he was still yelling
9  and kicking.  And I don't think -- didn't appear to be
10 any concern about breathing at that point.  Not until
11 really when the ambulance showed up.
12    Q    Your officers, are they individually covered
13 by any liability insurance?
14    A    Not that I'm familiar with.
15    Q    ACCG --
16    A    Individually?
17    Q    Um-hmm.
18    A    I have to consult with my attorney.  I don't
19 have --
20    Q    I was just curious.
21    A    I don't know.
22         MR. JOHNSON:  Okay.  That's all I have.
23         MR. WILLIAMS:  I just have a couple of
24    follow-up questions real quickly.
25 ///

Page 96

1                    REDIRECT-EXAMINATION
2  BY MR. WILLIAMS:
3     Q    There was a good bit of discussion about the
4  recommendations of ACCG, maybe other sources that
5  occurred after some period of time and apparently
6  after this incident regarding warnings of positional
7  asphyxia.
8          Do you even know if there is a medical or a
9  technical basis for determining whether there is a
10 danger of somebody suffering positional asphyxia just
11 from being in the prone position, restrained in the
12 prone position?
13    A    No.
14    Q    So the adoption of a warning about the
15 possibility of positional asphyxia, is that just an
16 attempt to employ the best practices to avoid
17 potential problems?
18    A    Oh absolutely.  When your insurance company
19 calls you and say don't do this, if we can fit it into
20 best practices, we will do that.
21    Q    For -- you've been policing for about 28
22 years, 27 years?
23    A    34 years.
24    Q    34 years total?
25    A    Just 28 at Henry.



Page 97

1  Q  Any estimate how many times that you've been
2  aware of that a suspect or detainee was placed in the
3  prone position and restrained for a period of time?
4  A  Oh my goodness.
5  Q  Would that be thousands?
6  A  Yes. Probably just by me.
7  Q  And were you ever aware of any of them
8  having died from positional asphyxia?
9  A  No. I've only heard stories about hog tying
10 and people passing. I've never -- never happened at
11 Henry County PD. Never happened at any department I
12 was with or been associated with or really heard
13 about.
14 Q  Do you have the training or expertise to
15 determine how much weight would need to be applied to
16 someone's back in a prone position to result in
17 positional asphyxia?
18 A  No.
19 Q  Do you know whether Mr. Rodriguez died from
20 positional asphyxia?
21 A  I don't know that, no.
22 Q  And the current policy that was adopted
23 based upon recommendations you got after some of the
24 high-profile incidents, it doesn't restrict face down
25 and prone restraint; correct?

Page 98

1  A  No.
2  Q  Just warns against -- prohibits prolonged
3  face down; is that right?
4  A  I don't even know that it prohibits. I
5  believe best practice is to get them in a recovery
6  position as soon as it is safe to do so.
7  Q  And that would just depend upon the
8  officer's discretion under the facts and
9  circumstances?
10 A  Yes. They are the ones that would have to
11 determine when it was safe to do so.
12    MR. WILLIAMS: All right. No further
13    questions.
14    MR. JOHNSON: Just a brief follow up.
15         RECROSS-EXAMINATION
16 BY MR. JOHNSON:
17 Q  If you place weight on someone's back while
18 they are in the prone position, does that increase the
19 risk that they will have difficulty breathing?
20    MR. WILLIAMS: Object to form. Competency.
21 A  Having had somebody on my back, sure. It
22 made trying to get up, trying to fight, trying to
23 breathe, trying to do anything more difficult,
24 absolutely from personal experience.
25 Q  What was that personal experience?

Page 99

1  A  Fighting.
2  Q  While you are on the ground --
3  A  Sure.
4  Q  -- in the prone position --
5  A  Sure.
6  Q  -- someone has been on your back --
7  A  Absolutely.
8  Q  -- with a knee?
9  A  Sure.
10 Q  It's more difficult to breathe?
11 A  And choking me and everything else.
12 Q  Is it more difficult to breathe?
13 A  When someone is choking you on your back,
14 yes.
15 Q  When someone has a knee on your back.
16 A  I'd say everything is more difficult. It's
17 more difficult for the person to get up. Well in this
18 example me. It was more difficult to get up. It was
19 more difficult to attempt to engage the person. I was
20 fighting. It was -- everything is more difficult.
21 Q  When was this fighting?
22 A  Oh my goodness. Well I've done that in
23 training. I've done that with my sons that are both
24 wrestlers and go to state. And I've -- throughout the
25 last 34 years.

Page 100

1  Q  Okay. Officer Phillips, what is his -- how
2  much does he weigh do you think? If you had to
3  ballpark it.
4  A  200.
5  Q  How tall is he?
6  A  I have no idea.
7  Q  Okay. Is he a muscular guy?
8  A  Doesn't look like it.
9  Q  What does he look like?
10 A  Looking at his picture he looks kind of --
11 Q  From your personal experience with him.
12    MR. WILLIAMS: Do you mean -- what does he
13    look like, that's a broad question. Are you
14    talking about is he thin, tall, skinny, fat?
15    MR. JOHNSON: Any of those things.
16    MR. WILLIAMS: What did he look like.
17 A  A husky man.
18 Q  Okay.
19 A  Not in the best shape I would say.
20 Q  Officer Phillips, how much does he weigh if
21 you had to guess?
22 A  Probably 250.
23 Q  How tall is he?
24 A  I have no idea.
25 Q  Okay.

