# ATTACHMENT "A"

## *Opinions Report of*
## *Darrell L. Ross, Ph.D.*

*Rodriguez, et al. v. Henry County, et al.*:
No. 1:21-CV-01999-

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

May 10, 2022

I, Darrell L. Ross, Ph.D., declare that if called upon as a witness, I would competently testify to the facts set forth herein. I declare the following:

1.      I received my Ph.D. in 1992 from Michigan State University. Since August 2010, I have been employed as a Professor, the Department Head of Sociology, Anthropology, and Criminal Justice, and the Director of the Center of Applied Social Sciences at Valdosta State University, Valdosta, GA. That from 2006 to 2010, I served as a Professor and the Director of The School of Law Enforcement and Justice Administration at Western Illinois University, Macomb, IL. I was a Professor and former Chair of the Department of Criminal Justice at East Carolina University, Greenville, NC from 1992 to 2006. Attached hereto is a current copy of my CV, a list of cases in which I have rendered an opinion within the last four years, and my fee schedule.

2.      From 1985 to 1992 I served as the Technical Assistance Coordinator for the Criminal Justice Institute at Ferris State University, Big Rapids, MI. My duties included: research and training for police, corrections, security, and military personnel, locally and nationally and I also instructed academic courses. I was a certified instructor by the Michigan Commission on Law Enforcement Standards and instructed the state training curriculum in the police academy at Ferris, including the mechanics of arrest, search, and subject control and restraint techniques, responding to persons in crisis and responding to the mentally ill, and physical fitness and physical wellness.

4.      From 1973 to 1985 I worked for the Michigan Department of Corrections and I was the Unit Manager/cell block manager of a psychiatric/protective custody cell block housing 500 mentally ill prisoners at the State Prison of Southern Michigan, Jackson, MI. I was a correction officer and a probation officer. Further, working for the training division as a certified instructor I provided instruction at all levels of departmental positions and jail officers throughout the state, teaching a variety of courses including, policy and procedures, correctional liability issues, defensive tactics and subject control techniques, the use of restraints, crisis intervention, and responding to the mentally ill prisoner. From 1985 to 2008 I was a certified instructor by the State of Michigan Department of Corrections Jail Division teaching numerous courses including defensive tactics and subject control and application of restraints, policies and procedures as well as teaching jail administrators, sheriff's and agency instructors.

5.      Since 1988 I have published over 100 manuscripts, including articles, five books, and nine book chapters/monographs. I have authored and have made hundreds of national and international

conference and training presentations with a majority force related. I have developed and have provided numerous line level and administrative training programs for police, correctional officers, military, and security personnel throughout the United States and internationally. I have analyzed thousands of published Section 1983 United States Supreme Court and lower court decisions on the use of deadly and non-deadly force in law enforcement, published articles on the liability trends and implications of these decisions and associated human factors, and routinely provide training to police officers and administrators on these decisions, liability, and associated factors.

I have been researching, publishing, speaking at numerous conferences and training seminars for police and correctional administrators, officers, instructors, death investigators, medical examiners, and attorneys on various issues regarding use of force and arrest-related deaths (ARD), subject control techniques, the application of restraints, and including the outcomes of prone restraint, Excited Delirium Syndrome (ExDS), and response to the mentally ill for over 25 years. I have been a consultant to the National Institute of Justice, Less-Lethal Devices Technology Working Group, on the subject of ExDS as well as to numerous police and sheriff's departments on the subject. I am on the teaching faculty for the Americans for Effective Law Enforcement (AELE) and routinely teach for the Institute for the Prevention of In-Custody Deaths (IPICD).

I have been certified TASER instructor by Axon International (formerly TASER Intl.) and a Taser Evidence Collection, and Analysis. I am also a certified law enforcement instructor by the Georgia POST. I am on the teaching faculty of the American for Effective Law Enforcement (AELE) and Institute for the Prevention of In-Custody Deaths (IPICD). Regularly I have provide consulting services on developing and editing policies and procedures in policing and corrections, including the use of force, developing use of force systems and have provided training on policy development (see current CV attached).

6.     I have expertise from training, education, and experience, and possess specialized technical and scientific knowledge of: police use of force standards, policies, procedures, and practices, and responses to subject resistance, subject control techniques, use of force equipment and force options, the use of restraints and prone restraint procedures, and officer use of force training. I am a board member of the Integrated Use of Force Options Training Organization (IL). Since 1987 I have served on the Pressure Point Control Tactics Management, Inc. Advisory Board (PPCT). As board member I have assisted in researching and developing the teaching curriculum and

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

instructing these subject control and restraint techniques to thousands of police and correction officers, federal officers, private security personnel, all branches of the military, and instructors nationally and internationally.

7.   I have served as a consultant and or trainer for: National Institute of Justice, GA Chiefs of Police Association, GA Board of Regents Police, Michigan Commission on Law Enforcement Standards, Topeka, KS PD, Battle Creek, MI PD, MI Sheriff's Association, Illinois Law Enforcement Training and Standards Board, IL State Police, North Carolina Justice Academy, Federal Law Enforcement Training Center, Alaska Peace Officers Training Commission, Pennsylvania Law Enforcement Training and Education Commission, State of Florida Police Training Commission, Florida Department of Corrections, State of Wyoming Police Training Commission, American Corrections Association, National Institute of Corrections, Michigan Department of Corrections, Michigan Department of Corrections Jail Division, North Carolina Department of Corrections, Corrections Corporation of America, States Attorney's General Office in 6 states, U.S. Attorney's General Office in Florida, Federal Bureau of Prisons, Australia Government, Hong Kong Correctional Services, other agencies across the United States, and various branches of the military (see CV for further reference).

8.   I understand that Mr. Rodriquez's estate has filed a civil action claiming that the involved officers used excessive force during the confrontation with Mr. Rodriquez. I have been requested to provide an opinion as to the force used by the Henry County police officers Phillips and Bureta in controlling and restraining Mr. Rodriquez and to opine on the relevant policies and the training provided to these officers.

Further, my opinions are not intended to intrude upon the Court's realm but they are solely to provide background and explanation as to how law enforcement officers are trained, instructed, guided, and held accountable in their use of force in performance of their duties and how I have instructed thousands of officers. The use of force standards, information, and guidance are used by law enforcement agencies, policy makers, and governmental officials to gauge the appropriateness of an officer's use of force. In this regard my opinions expressed in this report are focused on whether the officers use of force was within generally accepted law enforcement practices and training and whether they acted appropriately given the totality of the circumstances they encountered, acted within their training, and acted within their department's policy. I reserve the privilege to amend and/or supplement these opinions should additional documents become available.

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

9.      My opinions are based on my knowledge, research, training, and experience of these practices, training various criminal justice, military, and private security personnel, and from reviewing the following case documents:

- ➤ Plaintiff's Complaint for Damages;
- ➤ Plaintiff's Initial Disclosure;
- ➤ Plaintiff's Supplemental Disclosure;
- ➤ Body Worn Camera Videos of: Officer Mason Lewis; Officer Stroud; Officer Phillips; Officer Bowlden, and Officer Butera;
- ➤ Reports of: Officer Quinton Phillips; Officer Robert Butera; Officer Stroud; Officer Gregory Bowlden; Detective Shannon Brady; Detective Ashley Ramsey;
- ➤ GBI Investigative Summary with Exhibits;
- ➤ GBI Taser Receipt for officer Phillips Taser;
- ➤ Henry County Emergency Management Call for Service Detail Report (9/20/19);
- ➤ Henry County Fire Department Patient Care Report (9/20/2019);
- ➤ Autopsy Report (Dr. Steven P. Atkinson)
- ➤ Autopsy Photos;
- ➤ Factsheets/Training Records of: Officer Robert Butera and Quinton Phillips;
- ➤ Taser Recertification of Officer Phillips (9/6/2019);
- ➤ Henry County Police Department General Orders: Use of Force, #302.00 (5/6/2019) and Conducted Energy Weapon, #604.00 (6/3/2019);
- ➤ Factsheets of officers: Mason Lewis; Gregory Bowlden; and Stroud;
- ➤ Audio Interviews of: Becerra; Brandon Brumfield; Andrew Kohen; and Kevin Rodriquez;
- ➤ Criminal History of Fernando Rodriquez;
- ➤ Scene Diagram Sketch; Markus Stroud;
- ➤ Taser X2 Data Port of Phillips;
- ➤ Taser Data Port of Lewis;
- ➤ Taser Data Port of Bowlden;
- ➤ 3---911 Calls to Dispatch
- ➤ Witness Written Statements of Michelle Thrasher and Curtis Minter; and
- ➤ Opinions Report of Geoffrey Alpert, Ph.D. and Bill Lowe, Ph.D.

10.     Opinion #1        Administrators of the Henry County Police Department (HCPD) have developed and implemented General Orders on the Use of Force and Conducted Energy Weapons

An important function for police administrators is to provide their officers with relevant policies and procedures. Policies are means in which an organization provides guidance and reasonable decision making of employees. Policies cannot cover every conceivable situation an officer will confront and must allow for the totality of circumstances and reasonable decisions to be considered when discretionary decisions and actions of employees are involved.

Opinion

I have reviewed the HCPD's *Use of Force General Order*, Number 302.00 (5/6/19). In my opinion, the policy appropriately guides officers in the use of objective reasonable force in response to various types of subject resistance and within the facts and circumstances as perceived by the officer at the time force was needed. This is an important issue as officers are provided with numerous force options in which to consider based on varying types of subject resistance which may potentially be encountered by an officer. Not all situations can be handled with one or two force options and officers need varying reasonable force options to select from when confronting a resisting subject. In many confrontations a subject may interact with an officer in a compliant mode and within a split-second elevate his resistance to a physical attack or a deadly force attack against an officer without warning. Therefore, I teach police administrators to develop their use of force policies to encompass the totality of the confrontation circumstances, environmental variables, innumerable subject variables, types of subject resistance, response time issues, and to provide officers with various force options with which to respond to a subject's type of resistance.

In my opinion, administrators from HCPD have established and implemented the *Use of Force General Order* which set forth general guidelines of conduct and procedures directing officer decisions and actions when determining use of force measures force. In my opinion, the HCPD's *general order on the use of force* comports with state and federal law and contemporary law enforcement practices, including:

> ➢ Guiding an officer's use of force in response based on the perception of the officer and not from 20/20 hindsight;
> ➢ Guiding officers to exercise reasonable care and judgment in fulfilling the police objective and to use objective reasonable force in the performance of their duties;
> ➢ Guiding an officer to use force to protect society and themselves;

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

➤ Providing definitions of associated use of force terms;

➤ Guiding the officers to use reasonable non-deadly force as may be necessary to apprehend and arrest a suspected felon or misdemeanant;

➤ Describing the circumstance factors for justifying the use of reasonable force;

➤ Considering the subject characteristics for justifying the use of force;

➤ Describing to use the instrumentality of force according to the training;

➤ Describing the criteria for using deadly force;

➤ Describing the unauthorized use of force;

➤ Guiding officers to provide medical attention for an arrestee who sustained an injury;

➤ Identifying training on the use of force;

➤ Requiring officers to submit a written report; and

➤ Describing the department's review of the use of force and treatment of the officer.

Further, administrators of HCPD have developed and implemented General Order number 604.00, *Conducted Energy Weapon* (Taser), on June 23, 2019. The GO directs officers to deploy the CEW as follows:

➤ In accordance with General Order 302.00;

➤ Is considered the same of level of force as Oleoresin Capsicum;

➤ To justify the deployment of the CEW;

➤ When practical to provide a warning the CEW is being deployed;

➤ Deployment of the CEW with electrical pulse or without the cartridge installed;

➤ Recommending the use of the CEW for three activations unless the subject continues to resist, is non-compliant with the officer's orders, and to consider employing other defensive tactics techniques;

➤ Describing the various considerations for use and non-use of the CEW;

➤ Describing after deployment procedures; and

➤ Requiring officer training on the CEW

In my opinion HCPD administrators have fulfilled their responsibility by providing their officers with written general orders on the use of force and the use of CEW, which appropriately guides officer decision making and their performance in the field. The GOs were operational prior to the incident. Because not all situations can be handled with one or two force options officers are provided with numerous force options to consider based on the varying types of subject resistance and the encounter circumstances. In my opinion, the administrators of HCPD have established

and authorized appropriate force measures to consider based on innumerable incident variables, which guide officer decision making, actions, and responsibilities. As I would expect, HCPD administrators have purposely addressed the important issue of guiding officers in the reasonable use of force, consistent with accepted law enforcement practices.

11.   Opinion #2      Administrators of HCPD have provided officers Butera and Phillips with adequate training

I have reviewed the training records of officers Butera and Phillips. As I would expect, administrators of the HCPD have provided officers Butera and Phillips with ongoing training consistent with the United States Supreme Court's decisions in *City of Canton v. Harris*, 489 U.S. 378 (1989) and *Connick v. Thompson*, 563 U.S. 51 (2011).

A.      Officer Robert Butera

On December 15, 2006, officer Butera completed the requirements for the basic jail training and completed 32 hours of training in 2007 while working for the Spalding County Sheriff's Office. In 2008 he was hired at the Henry County Police Department (see GA Peace Officer Standards and Training Council records). As required in Georgia, officer Butera completed the basic police academy on March 14, 2008.

Butera's training records shows that he completed annual training since 2008 through the date of the incident. Officer Butera was certified on the use of CEW in 2008 and has received annual recertification in the CEW. He has also annually completed recertification in firearms. From 2017 to 2019, Butera completed annual training pursuant to the Governor's training initiative on the following topics: autism; use of force and de-escalation; cultural awareness; and community policing. Butera has completed additional in-service training throughout his law enforcement career which is relative to this incident including: defensive tactics, OC, weapon retention, and expandable baton; Crisis Intervention Team (CIT); officer survival; policy and procedures; dealing with mentally ill/diminished capacity; body worn camera; CPR; AED; field training officer; mental health and mental retardation; legal update; DUI/DWI, verbal judo; and restraint devices. From 2006 through 2019, officer Butera completed a total of 1,751 hours of training, averaging about 125 hours of annual training.

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

B.      Officer Quinton Phillips

Officer Phillips began employment at Henry County Sheriff's Office in March 2016 and worked as a jailer. He completed 127 hours jail officer training during 2016. In 2017 he completed 19 hours of training. From 2018 to 2019 he worked as a law enforcement officer for HCPD. In 2018 Phillips completed the basic police academy (9/18) and other training, totally 443 hours. In 2019 Phillips completed 21 hours of training. Phillips completed the following training: Taser certification and re-certification; defensive tactics; legal update; officer survival; de-escalation techniques; body worn camera; use of deadly force; firearms qualification; OC and expandable baton; and policy and procedures. From 2017 to 2019 Phillips completed an average of 155 hours of training.

Opinion

Based on my review of the aforementioned documents administrators of the HCPD have made a conscious choice and by practice provide their officers with annual training beyond the basic academy in order for them to keep abreast of their law enforcement duties. The combination of the training provided, with the relevant general orders identified, adequately prepared the officers to appropriately respond to the circumstances created by Mr. Rodriquez. Officers Phillips and Butera had completed annual CEW requalification just prior to the incident. In my opinion the officers followed their use of force training within the totality of circumstances when they confronted Mr. Rodriquez, which is described in more detail in the following opinions.

Overall, the general orders reviewed and the training assessed illustrate that HCPD's administrators have more than adequately provided and prepared officers Phillips and Butera with an operational policy and commensurate training in order for them to perform their law enforcement duties. These components manifestly show that that there is no evidence of a training, policy, or supervision deficiency at the HCPD, and the training and policies align with accepted law enforcement practices.

12.    Background      Hampton law enforcement officers responded to a call of a naked man

On September 20, 2019, Fernando Rodriquez attended the Imagine Music Festival concert. Hampton City police received several phone calls that a naked man was walking down the roadway on Oak Street. It would be later revealed that Mr. Rodriquez had taken lysergic acid diethylamide (LSD) earlier at the concert (Ramsey Report; 9/23/2019; Autopsy Report).

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

Hampton police officer Lewis was dispatched to call of a naked man walking down Oak Street at about 22:05. Officer Stroud heard the dispatch and proceeded to the location as he was nearby. As Stroud proceeded to the location a motorist pulled up and advised Stroud that he observed a male walking naked on Oak Street (see Stroud report; 9/20/2019). Officer Stroud proceed onto Oak Street and observed male walking in the middle of Oak Street naked (later identified as Mr. Rodriguez).

Stroud parked on the shoulder, exited from his patrol vehicle, drew his CEW, and officer Lewis also arrived at about 22:11. As Lewis exited his patrol vehicle, Mr. Rodriguez walked past him, and Lewis drew his CEW. The officers followed Mr. Rodriguez and gave him several instructions to stop and to go to the ground, he ignored the instructions, and continued to walk away from the officers down the middle of street (See Stroud and Lewis' reports, 9/20/19; see GBI Interviews of Stroud and Lewis; see Lewis and Stroud's BWC video).

Mr. Rodriguez turned back and faced Lewis and Stroud, turned away from them and continued to walk away, and stated "I bet you won't fucking touch me, Fuck you, and you wish boy." Mr. Rodriguez continued to walk away and did not comply with Lewis' instructions. Officers Lewis and Stroud again instructed Mr. Rodriguez to stop several times and he turned around faced the officers a second time, adopted a fighting stance, clenched his fists, began to walk backwards, mumbled something, turned around and continued to walk down the street and away from the officers.  An oncoming motorist observed Mr. Rodriguez walking toward the vehicle and quickly stopped.

Officer Lewis instructed Mr. Rodriguez to stop and when he did not, he deployed his CEW at about 22:11:52, for one, 5-second cycle, before Mr. Rodriguez reached the vehicle (see Lewis video and TASER Data Port). The probes struck Mr. Rodriguez in the back and he fell to the ground. Both officers instructed Mr. Rodriguez to roll onto his stomach and place his hands behind his back but he ignored the commands. Mr. Rodriguez rolled back and forth on the ground, was growling and yelling, and attempted to stand up. The officers again instructed Mr. Lewis to roll onto his stomach and place his hands behind his back.

Mr. Rodriguez did not comply and Lewis deployed the CEW for a second 5- second cycle at about 22:12:19. The officers instructed Mr. Lewis to roll onto his stomach and place his hands behind his back several times. Mr. Rodriguez sat up and looked at the officers and Stroud instructed him "to roll over and stated so they could get him help and don't fight us."

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

Both officers formed the perception that Mr. Rodriquez's behaviors displayed an altered mental state and that he presented a danger to himself, the officers, and to the public. Officer Stroud radioed and requested back-up at about 22:12:29. The officers instructed Mr. Rodriquez to roll over but he stated "Fuck you and No," and attempted to stand up. At about 22: 12:36, officer Lewis deployed his CEW for a third, 5-second application and Mr. Rodriquez fell back to the ground. Mr. Rodriquez ignored the officers' instructions and had moved closer to the stopped vehicle. Officer Stroud reached to grab Mr. Rodriquez's arm to control it but Mr. Rodriquez quickly pulled it away from Stroud, failed to comply with the officers' instructions, and stated "I'm going to stay here," at about 22:13:10. Stroud formed the perception it was not wise to go hands on with Mr. Rodriquez due to his altered mental state.

Mr. Rodriquez attempted to stand up again and officer Lewis deployed a fourth activation of the CEW at about 22:12:47. Officer Stroud again instructed Mr. Rodriquez to roll over on his stomach so they could get him an ambulance, and that they were attempting to help him.

At about 22:13:18 Mr. Rodriquez placed his hand on the ground, attempted to stand up, and Lewis deployed his CEW for a fifth time for 5-seconds. Mr. Rodriquez refused to comply with the officers' commands to roll over on his stomach.

Officer Bowlden from the Hampton police department responded to the location at about 22:13:50. On location, officer Bowlden activated his BWC, observed Mr. Rodriquez laying flat on his back talking out of his head, mocking the officers' commands, and refused to comply with their commands (see Bowlden's report and BWC video). Bowlden approached Mr. Rodriquez, gave him several instructions to roll over onto his stomach for handcuffing but Mr. Rodriquez did not comply.

From about 22:11:20 to 22:18:00, Mr. Rodriquez continued to refuse the officers instructions to roll over, continued to scream, asked where his son was, mumbled with incoherent speech, yelled "get me with a Taser, Taser, Taser," and "Fuck You Pussy." At about 22:16:42 officer Bowlden grabbed Mr. Rodriquez's arm in order to handcuff him but Mr. Rodriquez quickly pulled his arm away. Bowlden lost his grip as Mr. Rodriquez's arms were extremely sweating making it impossible to retain the grip. Mr. Rodriquez became more agitated and attempted to strike officer Bowlden and aggressively moved across the pavement toward Bowlden and attempted to stand up.

At about 22:16:18, officer Lewis activated his CEW for a sixth, 5-second deployment but it was ineffective as the probe wires became disconnected. Mr. Rodriguez began to slide and move his body on his back with his arms toward officer Bowlden's patrol vehicle. Officer Bowlden warned Mr. Rodriguez that he "would pop his ass with the taser." Fearing that Mr. Rodriguez would harm an officer, a member of the public, and/or gain entrance into his patrol vehicle, deployed his CEW for one, 5-second activation at about 22:16:33. The probes made contact with Mr. Rodriguez's left side. The officers were unable to physically control Mr. Rodriguez and he attempted to pull himself up by the bumper of Bowlden's patrol car—stating "not today boy." Mr. Rodriguez failed to comply with the officers' repeated instructions, officer Bowlden activated his CEW for a second 5-second deployment at about 22:16:54 (see Lewis, Stroud, and Bowlden's reports and Lewis and Bowlden's videos).

Mr. Rodriguez's Behaviors and Actions: 22:11 to 22:17

Beyond being naked, Mr. Rodriguez's behaviors, actions, and statements were shown on the videos and reported by the officers as demonstrating an altered mental state. Behaviors underscoring the perceptions that Mr. Rodriguez's behaviors reflected that he may be under the influence of an illicit drug included: failed to comply with officers instructions (throughout the contact); refused to stop and walked toward a motorist's parked vehicle; combative; turned and faced the officers adopting a fighting stance with clinched fists; incoherent and mocking speech; screaming; sweating profusely; extreme strength; violently flailing and pulling his arms away from the officers; extreme agitation; attempting to strike the officers several times; kicking at the officers; actively resisting control and restraint by the officers by violently thrashing his body on the pavement; and actively moving his body away from the officer's control.

Based on the circumstances an immediate officer response was required. Officer Lewis used verbal instructions in an attempt to stop Mr. Rodriquez and gave him ample time to stop, comply, and surrender peacefully. Based on Mr. Rodriquez's behaviors, officer Lewis perceived that Mr. Rodriquez, would attack the officers if they got to close. Mr. Rodriquez walked away and headed for the stopped motorist. When Mr. Rodriquez refused to comply with Stroud and Lewis' instructions, Lewis deployed his CEW.

Lewis deployed his CEW in the Probe Mode. The probes struck the back of Mr. Rodriquez and Mr. Rodriquez fell to ground. On the ground, Mr. Rodriquez did not comply with either Lewis or Stroud's instructions to roll over, to stop, actively resisted and struggled/thrashed on the ground, sat up, and attempted to stand up. These behaviors of active resistance continued and escalated

from about 22:12:18 through about 22:17:00. Officer Stroud attempted to grab Mr. Rodriquez in an attempt to control and restrain him. However, Mr. Rodriquez violently and quickly pulled his arm away, and Stroud called for back-up. Officer Lewis deployed his CEW for a total of 7 trigger pulls during this period, totaling 35 seconds. Officers Stroud and Lewis gave Mr. Rodriquez numerous and repeated instructions to roll over and to stop.

Officer Bowlden arrived on location in response to Stroud's request at about 22:14:28 (see Report and BWC video). Bowlden instructed Mr. Rodriquez to roll over on his stomach in order to safely handcuff him. Bowlden attempted to grab Mr. Rodriquez's left arm to control it but he vigorously pulled it away. Mr. Rodriquez began sliding his body backward moving close to Bowlden's patrol vehicle (a back stroke swimming motion). As Mr. Rodriquez moved close to Bowlden's vehicle, Bowlden formed the perception that Mr. Rodriquez posed a further threat risk if he gained access to the vehicle which could pose danger to himself, to the on-scene officers, and nearby citizens. Mr. Rodriquez continued to slide and move backward down the street on his back next to the patrol car, and Bowlden applied his CEW for one more probe discharge and on Drive Stun application. Bowlden discharged his CEW for four applications for a total of 15 seconds: 22:16:33 (5s); 22:16:54 (5s); 22:17:40 (1s); and 22:17:43 (4s).

Officers Lewis and Bowlden applied their CEWs after verbal commands failed and used it in response to Mr. Rodriquez's active resistance and combative behaviors. Mr. Rodriquez demonstrated an immediate threat of harm to himself, the community, and the on-scene officers. Officer Stroud attempted to control Mr. Rodriquez by using verbal commands and empty-hand control as did officer Bowlden but Mr. Rodriquez aggressively resisted and pulled his arms away. Based on the circumstances created by Mr. Rodriquez, officer Stroud radioed for additional officers.

13.    Opinion #3    Henry County Police Officers Phillips and Butera used Appropriate Force

A.    Use of Force Guidelines

When examining an allegation of excessive force, the totality of circumstances of the situation must be examined within the framework of four general incident components including: (1) nature of the call/incident circumstances; (2) the circumstance environment; (3) the actions or inactions of the suspect; and (4) the response of the involved officers. The review of the incident and an officer's response must be performed in accordance with the objective reasonableness standard and criteria outlined in the United States Supreme Court's decision in *Graham v.*

*Connor*, 490 U.S. 396 (1989) including: the crime at issue, whether the suspect posed and immediate threat to the safety of the officer (s) or others, whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  Such an assessment recognizes that officers must frequently decide to use a level of force under tense, uncertain, and rapidly evolving circumstances confronting the officer (s). In accordance with these factors, whether the suspect posed an immediate threat to the officer's safety is the most critical. The use of force assessment must also include all of the facts and circumstances of each case on its merits, based upon the perception of the officer (s) on scene at the moment force was required.

Law enforcement officers do not have the luxury of scripting their response to the dynamics of a fluid situation and are often forced to make split-second decisions. Officers do not have the option of selecting what dispatch calls they respond to, nor do they have the ability to choose the location or the environment, or the type of subject they may contact. Law enforcement officers are taught and, in the training I provide to them, that their type of force must be predicated on the resistive behaviors, and actions/inactions, demonstrated by a particular person. Officers may use force in self-defense, defense of another, to prevent a crime, to effect an arrest, to maintain control, and to prevent a person from harming himself or others. It is highly common for law enforcement officers to respond to a dispatch call and respond to the behaviors and actions created by the subject and to control and restrain them in order to protect the person from harming themselves and others in order to provide appropriate care and aide. Frequently, deciding to use a degree of force must be made in a split second and there is no luxury of time for the officer to "wait and see" what a resisting person "may or may not do."

B.    Contact Location

The facts of this incident underscore the dailies realities that officers face when responding to the varying circumstances and the call of a naked man. On location of the contact officers Lewis and Stroud observed Mr. Lewis walking down the middle of the street naked (Oak street and Windsor Parkway; see Google Map). As shown on the Body Worn Camera videos, the environment of the contact was at night (22:12), it was dark and the officer's patrol cars and one motorist's vehicle headlights provided limited illumination. The overhead lights of the officer's patrol vehicles were activated. The street was asphalt pavement aligned with grass with thick trees on either side with a white fence on one side of the street. The contact location was in a semi-residential area and there was a church and a few residences and other buildings in the immediate area. At least one vehicle was shown driving by during the initial contact with officers Lewis and Stroud (Lewis

BWC). One other citizen vehicle approached the location of the encounter with their headlights on and Mr. Rodriquez was walking toward the citizen's vehicle.

C.      Officers Phillips and Butera On Location

Henry County police officer Phillips heard over the radio that Butera was dispatched to the incident and later heard that Butera should expedite with lights and siren. Phillips also decided to assist and responded on scene at about 22:16:00 (see Lewis BWC). On location Phillips activated his BWC video, and as he approached, he observed Mr. Rodriquez on the pavement attempting to slide way on his back from officers Stroud, Lewis, and Bowlden (see Phillips report and BWC). Phillips reported that he observed officer Bowlden activate his CEW for 1, 5-second deployment. Phillips observed Mr. Rodriquez cease movement during the activation of the CEW, made growling noises, and resumed sliding on his back away from the officers and toward the back of the patrol vehicle.

Officer Phillips reported that he grabbed Mr. Rodriquez's left arm but it was sweaty and Phillips could not maintain his grip. Phillips reported that Mr. Rodriquez was strong, pulled his arm away from him and violently swung his arms upward at Phillips, attempting to strike him in the face. As Mr. Rodriquez continued his active resistance, Phillips stepped back and instructed Mr. Rodriquez to stop but Mr. Rodriquez did not comply, and continued to slide on his back on the pavement away from the officers. Phillips observed and heard Bowlden's CEW crackling (@ about 22:17:40 & 22:17:43). Phillips deployed his CEW (X2) for one, 5-second activation and the probes connected to the right side and right leg of Mr. Rodriquez at about 22:18:03 (Lewis BWC).

The officers moved closer to Mr. Rodriquez in an attempt to control and to restrain Mr. Rodriquez in handcuffs. Phillips instructed Mr. Rodriquez to stop moving, he did not comply and continued his sliding movements on the pavement away from the officers (along the side of Bowlden's patrol car). Phillips deployed his CEW again for a 5-second activation at about 22:18:09. The probes struck Mr. Rodriquez near the hip and the right leg. Mr. Rodriquez continued to actively move away from the officers on his back in a back stroke motion, he did not comply with the officers' instructions to stop and roll over, and Phillips discharged the CEW at 22:18:55 and again at about 22:19:04.

While Phillips deployed the CEW, officers Stroud and Bowlden attempted to handcuff Mr. Rodriquez and he actively resisted by kicking at the officers, thrashing, and flailing and

aggressively pulling his arms away from the officers and he continued to move away on his back away from the officers. Phillips instructed Mr. Rodriquez to stop moving, Stroud instructed Phillips to activate the CEW, and he applied the CEW in the Drive Stun mode at about 22:19:59 for about 1 second to the lower back of Mr. Rodriquez. Officer Lewis was able to secure one handcuff on Mr. Rodriquez's right hand (see Lewis' report). Mr. Rodriquez continued to actively resist during the handcuffing process by vigorously pulling his arms away, kicking at the officers, thrashing on the ground, and screaming.

Phillips applied the CEW in the Drive Stun mode to Mr. Rodriquez's lower back during the handcuffing process for 1 second at about 22:20:38 and for 2 seconds at about 22:21:52. Officer Bowlden placed one handcuff on Mr. Rodriquez's left hand but could not secure it as Mr. Rodriquez had several fingers missing and the cuff slipped off. Bowlden was able to secure Mr. Rodriquez's left hand in handcuffs with a separate set of handcuffs (see Lewis and Bowlden's reports). Mr. Rodriquez was secured in two sets of handcuffs with his hands extended in front of his head.

Officer Stroud radioed dispatch and requested emergency medical services (EMS) at about 22:19:36 and Unit E5 was dispatched at about 10:22:21. Dispatch updated at 22:22:28 with information advising a subject with an altered mental state (see Henry County Call for Service Detail Report).

Officer Butera responded on scene at about 22:19:00 (see Butera report, BWC video and Lewis BWC video). Mr. Rodriquez continued to aggressively resist after he was restrained, by thrashing his body and struggling against the officers, kicking his feet, swinging his hands, and screaming. Mr. Rodriquez was actively moving and was in a position on his left side with his hips extended in the air, attempted to get up, and attempted to bite the officers several times. Officer Phillips reported that he placed his knee on Mr. Rodriquez's left shoulder and instructed officer Butera to control Mr. Rodriquez's hip and left leg area.  (@ about 22:25:58).

Phillips reported that Stroud stood on the handcuffs to keep Mr. Rodriquez from hitting the officers with his hands, that he instructed Mr. Rodriquez not to bite him or he would kick him, that Mr. Rodriquez turned his head toward Stroud's feet, and Stroud kicked Mr. Rodriquez once in the face. Officer Stroud reported that as he restrained Mr. Rodriquez's left arm, Mr. Rodriquez bit his foot and ankle, and he kicked him one time. Stroud reported that after Mr. Rodriquez continued to thrash on the ground and continued to attempt to the bite the officers. Officer Lewis

also reported that Mr. Rodriquez continued to scream and thrash on the ground and attempted to bite his shoe as he restrained his arm (see Lewis Report).

Bowlden reported that he left to retrieve a set of leg shackles from his patrol car, returned, and secured Mr. Rodriquez's ankles in the leg shackles at about (@ about 22:21:44). Bowlden reported that he stood on the chains of the leg shackles. Bowlden also reported that officer Phillips placed his knee on the shoulder of Mr. Rodriquez and Butera restrained Mr. Rodriquez's thigh area.

After officer Bowlden secured Mr. Rodriquez in leg restraints, officer Butera controlled Mr. Rodriquez's left leg and upper thigh just below the buttocks. Officer Butera reported that Mr. Rodriquez was: screaming unintelligible words at the top of his lungs; grunting and groaning; pushing himself up and up off the ground; extraordinarily strong and almost able to overcome the five officers holding him. Butera also reported that Mr. Rodriquez had rigid muscle tone, appeared to have an elevated pulse rate, was indicative of someone who had been using narcotics, and that officer Stroud requested an ambulance at about 10:19 pm (see Butera Report; GBI Investigation Interview).

Phillips reported that several officers called for an ambulance and that Mr. Rodriquez was instructed to stop moving several times and that he radioed for Henry County sergeants to respond to the location. Phillips reported that while waiting for the ambulance the officers used enough weight to maintain control of Mr. Rodriquez. Phillips reported that Mr. Rodriquez was not lying flat on his chest and he was leaning somewhat on his side. Phillips also reported that just before the ambulance arrived, he observed Mr. Rodriquez had shallow breathing, asked if Mr. Rodriquez stopped breathing, and observed Mr. Rodriquez move his legs (see Phillips Report; GBI Investigation Interview).

D.      Mr. Rodriquez's Behaviors

Mr. Rodriquez exhibited behaviors and statements demonstrating a mind body disconnect. Officer Stroud advised dispatch that Mr. Rodriquez demonstrated behaviors consistent with an altered mental state including: violence, active and aggressive resistance; attempting to strike and kick the officers; extreme strength; sweating; screaming; incoherent speech; high threshold to pain; agitation; refusing to comply with officer instructions; out of touch with reality; and actively moving away from the officers control efforts.

I have studied the dynamics of the involving a naked man and while rare, the contact is considered a high-risk situation and presents one of the most unpredictable, violent, and dangerous confrontations for a law enforcement to respond (Ross and Brave, 2020). It can be a serious mistake to underestimate the situation, the condition and capabilities of the subject, or the level of immediate threat or danger presented by the subject. In our study we found that de-escalation techniques, even attempted, were ineffective in a significant percentage of incidents. Further, naked subjects were at least four times more likely to engage in violent behaviors requiring higher levels of force options to be employed, and on average, at two to four officers were required to capture, control, and restrain the subject. Many of the behaviors exhibited by Mr. Rodriquez aligned with the Excited Delirium Syndrome (ExDS) and it has been shown in field research that subjects manifesting six or more behaviors as Mr. Rodriquez did, resulted in higher levels of violence and resistance, requiring officers to use varying use of force options (Hall et al. 2012; Baldwin, et al., 2018; and Ross and Hazlett, 2018).

E. Opinion

1.      Officer Phillips Appropriately Discharged his CEW

It was appropriate for officer Phillips to respond to the incident. Mr. Rodriquez's active resistance, combative behaviors, and failure to comply with officers' instructions, created the further need for more officers to respond and assist. Phillips heard the initial call for back-up requesting officer Butera and then he heard the request for Butera to respond with lights and siren. The second call created a sense of urgency and Phillips chose to respond, which was appropriate. Officer Phillips responded on location about five minutes after officer Stroud and Lewis made contact with Mr. Rodriquez and he responded to provide back-up assistance to officers Stroud, Lewis, and Bowlden (@ about 22:16:00).

As can be seen on Phillips BWC, he observed Mr. Rodriquez naked, laying in the street to the right and in front of a patrol car with its overhead lights on. Mr. Rodriquez was attempting to stand up and officers Stroud, Lewis, and Bowlden were standing near Mr. Rodriquez. Lewis' CEW could be heard cycling, indicating a bad or no connection of the probes and the lead wires. The officers instructed Mr. Rodriquez to roll over on his side and when he failed to comply, officer Bowlden discharged his CEW in the probe mode. Officer Phillips had only few seconds to assess the scene and Mr. Rodriquez's behaviors and actions. Phillips did not have time to ponder what Mr. Rodriquez may or may not do and had to quickly decide to respond to assist as Mr. Rodriquez actively resisted the efforts of control by Stroud, Lewis, and Bowlden. Based on

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

Phillip's experience, training, and his observations, he would rightfully form the perception that Mr. Rodriquez needed to be controlled and restrained, was moving and attempting to stand up, was non-compliant to officer insturctions, and was actively resisting the officers' efforts of control.

Mr. Rodriquez failed to comply with officers Stroud, Lewis, Bowlden, and Phillips repeated instructions and it appeared that an application of the CEW had little sustained effect on Mr. Rodriquez. After officer Bowlden discharged his CEW, officer Phillips attempted to use physical control of Mr. Rodriquez's arm. However, Mr. Rodriquez vigorously pulled his arm back and Phillips was unable to secure a grip on the arm. Mr. Rodriquez quickly slid backward along the patrol vehicle on his back, stated "not this time boy," grabbed the bumper and attempted to stand up, and stated "get the fuck off of me boys," and continued to scream. Mr. Rodriquez continued to slide backward on his back and moved behind Bowldens's patrol car approximately12 to 15 feet. Officer Bowlden applied a Drive Stun twice but it was ineffective.

Mr. Rodriquez failed to comply with the officers' instructions and stated "it is what it is" at about 22:18:03." Officer Lewis' and Bowlden's CEW applications were ineffective having lost charge and the officers again attempted to roll Mr. Rodriquez over for handcuffing and he rolled back and forth and pulled his arms away. The CEW lead wires most likely became dislodged due to Mr. Rodriquez's violent struggle and constant bodily movements on the pavement.

Phillips discharged his CEW only after Lewis and Bowlden's CEW applications proved to be ineffective and Mr. Rodriquez continued to actively resist and scream. To his credit, before Phillips discharged his CEW he attempted to physically control Mr. Rodriquez but was unsuccessful. Phillips also observed that Lewis and Bowlden were unsuccessful in physically controlling Mr. Rodriquez as well. Mr. Rodriquez's behaviors and active resistance posed an immediate threat to himself, the responding officers, and to the public. Mr. Rodriquez needed medical intervention and posed a threat risk to responding paramedics and medical intervention could not be provided until he was controlled and restrained.

As the officers attempted to control and restrain Mr. Rodriquez, officer Phillips discharged his CEW in the probe mode four separate times, and two appeared to make at least make connection but had minimal sustained effect. Mr. Rodriquez was able to power through the applications and continued to actively resist the officers and aggressively rolled on the ground while screaming.

The deployments of the CEW were not continuous and the trigger pulls were for 5 seconds applications (22:18:03 to 2:19:04; see Taser Data Port; Lewis BWC). Between CEW applications the officers continued to provide Mr. Rodriquez with instructions and attempted to physically control him. Mr. Rodriquez violently struggled and actively resisted the officers flailing his arms and kicking, rolling on the ground, and he was sweating making the capture, control and restraint process difficult. The officers lost control and their grip several times but continued to instruct Mr. Rodriquez to stop and roll over for handcuffing.

Observing Mr. Rodriquez's behaviors, officer Phillips transitioned from the Probe Mode to discharging the CEW in the Drive Stun Mode. Three different applications of the Drive Stun Mode were applied, 2 for 1 second, and 1 application for 2 seconds. All total, officer Phillips discharged his CEW 7 different times, for a total of 25 seconds, over about 4 minutes. It appears that three trigger pulls of the CEW did not fully result in muscular control.

The CEW is a less-lethal weapon designed to incapcitate a resisting person without causing death or permenent injury. The CEW is designed to be used in two different modes. In the probe mode, an officer can deploy the CEW from a safe distance through an Air Cartridge mechanism which projects two probes connected to wire leads. The probes attach to the person and carry electrical impulses which cause neuromuscular incapacitation (NMI) causing involuntary stimulation of the sensory nerves and motor nerves. The probe mode of application is not dependent upon pain and is effective on persons who may have a high tolerance of pain. Immediate submission by momentarily disrupting the nervous and muscular system occurs. By design the CEW applies a five second electrical discharge cycle. Officers are instructed to deploy the CEW and assess the situation prior to applying additional discharges if feasible. The CEW uses an electrical discharge to disrupt the body's ability to communicate messages from the brain to muscles causing motor skill dysfunction, known as neuromuscular incapactiation (NMI). It provides a safe force option for officers confronting a combative persons and can quickly stop conflicts, avoids the need to use higher forms of force, can the confrontation time span, and has a lower injury rate for persons and officers alike.

In the probe mode, the CEW uses compressed nitrogen to fire 2 small probes at typical distances of up to 7.7 m (meters) or 25 feet. When the CEW trigger is pulled, the voltage first serves to open the nitrogen cartridges to release the nitrogen to propel the probes towards the target. These probes are designed to pierce or become lodged in most light clothing (which is usually overcome by the 50,000 V (volt, arcing capability). The sharp portion of the probe is typically 9 mm

(millimeters) long and will usually penetrate the epidermis and dermis to a depth of 4-5 mm for a good electrical connection.

The CEW delivers only a fraction of the 50,000 V to the body and the mean delivered pulse voltage is 580V. The actual delivered electrical current of the CEW is only about 1.9 milliamperes (mA) or 0.0019 amperes (A) and the peak current is only about 3 A. The stored energy in the CEW is about 0.36 joules (J) per pulse (J/pulse) and the delivered energy is about 0.1 J/pulse. By comparison an automatic external cardiac defibrillator (AED) used numerous times per day by paramedics uses 360 J, over 3,000 times greater than the CEW. The CEW is only powered by a battery of two 3 V cells, commonly used in some small digital cameras (such as the Nikon F6). It is the CEW's rapid cycling that can cause the person's muscles to contract at about 19 times a second that can offer the effective incapacitation of the subject in the probe mode, or pain compliance in the drive-stun mode, while still offering a significant safety margin from electrical injury. The result leads to a loss of regional muscle control and a fall to the ground to end a violent confrontation (Kroll et al., 2019).

According to Tuttle (2018), over 18,000 law enforcement agencies, private security, and the military in the United States use the CEW and over 7 million deployments have been applied and over 4 million applications have occurred in the field. The CEW has an impressive record of safety. Research studies in the field have repeatedly shown than the use of CEW's are safe, are significantly instrumental in reducing the need to resort to lethal force, reduces the injury and death potential of subjects, and reduces officer injuries.

Further, reliable human subject and field studies performed on the medical aspects of the CEW also demonstrate that there is no conclusive medical evidence indicating that the CEW poses a significant risk of serious injury or death from the direct effects of its use even, with multiple applications (Bozeman et al. 2008; Hall, et al 2012; Ho et al. 2010; Kroll, 2009; Laub, 2011; Brewer & Kroll, 2009; MacDonald, et al. 2009; Mesloch, et al. 2008; Ross and Hazlett, 2018; Smith, et al 2007; Taylor & Woods. 2010; Vilke, et al. 2011; Vilke, et al. 2009; White et al. 2008).

Collectively, these studies show that the use of the CEW reduces suspect injuries by about 2/3. Law enforcement agencies deploying CEWs have also seen a reduction in the use of deadly force by the police (Ferdik, et al., 2014). The current literature as a whole suggest that the deployment of the CEW has a margin of safety as great or greater than most alternatives and recommends using the CEW over physical control techniques when it is justified.

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

During the handcuffing process, Phillips applied the Drive Stun Mode. The Drive Stun Mode is a second mode of operation of the CEW. It provides an alternative to the Probe Mode, frequently used in close quarters of a resisting subject, and is used as a pain compliance device. It does not produce NMI like the Probe Mode. The officer makes direct contact with the body location by pushing the front of the weapon into the skin to operate like a stun gun. The Drive Stun mode is applicable for close quarter circumstances and generally used as a pain compliance device when confronting a combative person. The fixed electrodes are about 1.6 inches apart. The electrodes of the CEW do not penetrate the skin, the current flow is primarily through the dermis between the electrodes and there is no significant penetration beyond the fat layer. To gain the maximum application of the Drive Stun Mode, the CEW muzzle must be held firmly and perpendicular on the location as it is applied. Expected impact of the CEW exposure can result in local skin irritation or minor contact burns.

In my opinion officer Phillips demonstrated his comprehension of the force principle of escalation and de-escalation and appropriately applied the CEW in both modes of operation and followed his training. The principle guides an officer to gauge the level of resistance and aggression of a subject and as the subject escalates the level of resistance as Mr. Rodriquez did in this incident, an officer is justified in escalating the force option in proportion to the need and the level of resistance encountered. In fact, and to his credit and prior to discharging the CEW, officer Phillips used an empty-hand control technique in an attempt to physically control Mr. Rodriquez. This attempt was unsuccessful as Mr. Rodriquez violently pulled his arm away and continued to slide backward on his back on the pavement and away from the officers (along the side of the patrol vehicle).

In my opinion the application of each CEW discharge by officer Phillips was appropriate under the totality of the circumstances encountered, was not disproportionate to the resistance encountered, and only used for control purposes in order to restrain Mr. Rodriquez. The CEW was the appropriate and preferred level of force to use based on prior unsuccessful attempts of empty-hand control and based on the active and violent resistance of Mr. Rodriquez.

Actually, officer Phillips' use of the CEW allowed officers Stroud, Lewis, and Bowlden an opportunity to control and handcuff Mr. Rodriquez under power. All of the officers reported (and the videos show) that Mr. Rodriquez was highly combative, violent, extremely strong, sweating, screaming, kicking, actively resisting, and moving away from the officers. Prior to officer Phillips arriving on scene, the other officers' collective efforts of control were violently rebuffed by Mr.

Rodriquez. Like many other incidents that involve a naked man or a subject under the influence of an illicit drug (s), like Mr. Rodriquez, it takes about 3 or 4 officers to control and restrain the violent subject. Clearly, Mr. Rodriquez needed assistance. The officers could not provide access to medical care until he was controlled and restrained. It would be unsafe for paramedics to attempt to treat Mr. Rodriquez until he was controlled and restrained. With officer Phillips' assistance, the officers were able to finally capture, control, and restrain Mr. Rodriquez during a discharged cycle of the CEW (under power), which accomplished the objective.

In my opinion, officer Phillips followed the HCPD's *Use of Force General Order*, number 302.00. In accordance with the GO, officer Phillips' amount of force was reasonable and necessary and the CEW was activated based on the active resistance displayed by Mr. Rodriquez, the immediate threat he posed to the responding officers, and the threat he posed to himself and others. Further, additional factors which factored into the use of the CEW by Phillips pursuant to the GO included the following: size of the subject (Mr. Rodriquez stood over 6 feet, weighed 316 pounds, and had a BMI of 41.8; see autopsy report); subjects' ability to escalate force (Phillips assessed Mr. Rodriquez active resistance within seconds of arrival; he took a swing at Phillips; was kicking; screamed and swore at the officer; moved away from the officers; attempted to stand up; did not comply with instructions; and posed a threat to himself and to the officers); and drug and alcohol use of the subject (behaviors and active resistance suggested illicit drug influence and he tested positive for LSD; see autopsy report).

Moreover, officer Phillips followed the *CEW General Order*, number 604.00. Officers are directed to use additional discharges of the CEW if the targeted subject is not controlled by the initial burst. Also, Phillips complied with the GO as while he applied the Drive Stun mode, other officers where able control and restrain Mr. Rodriquez (under power).

Multiple applications of the CEW by officer Phillips was objectively necessary in this incident. First, it is likely that the probe spread was too narrow creating some disruption in the current flow as Mr. Rodriquez was able to power and fight through the applications. Second, the probe connections may have also become disrupted as Mr. Rodriquez vigorously rolled on the ground and he slid on his back on the pavement loosening the connection. The Probe lead wires are extremely thin and can become easily snapped and/or disconnected when a subject actively rolls on the ground. Third, Mr. Rodriquez had a BMI of over 41kg which would serve as an insulator to the current flow whereby minimizing the full ability to maximize muscular control.

Under the totality of circumstances, the CEW was the preferred option to quickly immoblize Mr. Rodriquez. It represented the best and the safest force option available to control Mr. Rodriquez and was consistent with generally accepted police practices and training. The CEW can serve the purpose of gaining control over a person whose active resistance and behaviors are consistent with being under the influence of a chemical substance, such as in this incident. The CEW has been recommended as the preferred less-lethal device when an officer confronts a severely aggressive and agitated person (Bozeman, et al., 2017; Castillo, 2012; Ho, et al., 2010; Hughes, 2011; Nakajima and Vilke, 2016; Ross, 2021; Ross & Brave, 2020; Ross and Hazlett, 2018; Vilke and Payne-James, 2016).

## F.    The Use of Prone Restraint

The officers observed that Mr. Rodriquez's behaviors exhibited a mind-body disconnect and he needed to be controlled and restrained in handcuffs before the officers could access medical care for him. His altered mental state and his consumption of LSD increased his ability and strength to actively fight and resist the officers' efforts of control. As shown on the videos attempting to subdue and restrain Mr. Rodriquez while he was on his back gave him the ability to roll away from the officers, to actively kick and use his arms and hands to actively strike at the officers, pulled away from their grip, and moved away from them.

Mr. Rodriquez was a large individual and combined with being under the influence of LSD, his extreme strength, and being in a position on his back, gave him a foundation to continue to actively resist the officers' ability to quickly capture, control, and restrain him. The officers gave Mr. Rodriquez repeated instructions to stop fighting, to roll over, and provided with him opportunities to comply. The officers repeatedly advised Mr. Rodriquez to roll over so they could provide him with access to appropriate medical care and he did not comply.

In my opinion, the officers needed to place Mr. Rodriquez in the prone position which would allow them to safely control and restrain him. Allowing Mr. Rodriquez to remain in a position on his back, with the ability to actively fight the officers, would deviate from a legitimate and accepted police control and restraint practices. Attempting to restrain Mr. Rodriquez in his violent combative state while on his back is not a safe tactic for the officers and would jeopardize their safety. In this situation, moving Mr. Rodriquez to the prone position was the most appropriate method to safely control and restrain him and the officers followed acceptable police control and restraint practices.

Officers are taught the best position to establish control and restrain a combative person is in the prone position. The preferred, more secured, and safest position to accomplish control and restraint is in the prone position and officers are not taught to control and restrain a combative and violent person in the supine position. The primary purpose of its use is to reduce the level of danger to the officers and the subject in order to safely control, restrain, and apply the handcuffs, and/or leg restraints. Placing one or two knees on the back of a combative detainee who is prone or controlling the shoulder of a prone combative person are components of the restraint system used to safely control the subject who is actively resisting so that the hands/arms maybe controlled for handcuffing.

Besides providing the safest method to control and restrain a violent subject, the prone position: enhances officer safety; it provides a safer position for the subject; it provides a bio-mechanically stable position for control and restraint; provides a tactical advantage for the restraining officers; it restricts the ability for the subject to strike the officers with his hands and feet; and provides the subject with proper ability to ventilate.

I am familiar with the prone restraint process having instructed thousands of police and corrections officers and subject control instructors nationally and internationally in its application. I have performed and published research in the field on the topic, particularly on its use with violent subjects. I have also been part of a team of researchers who studied and published research on weight and placing knees on the back of a restrained subject.

The prone restraint technique is taught in police and correctional academies and in in-service training courses throughout the United States, Canada, Australia, and Hong Kong. In order to prevent a person from harming himself and from rolling over, twisting, attempting to stand up and fight against the controlling officers, officers are instructed to place a knee on the shoulder of the person or on the lower back area to assist in controlling the person. Officers are taught to kneel next to the person or to place a knee on the shoulder between the shoulder blades of the person and/or one knee on the lower back to control the arrestee. Control of an arm/hand is established through the use of a wristlock and maintained in order to apply the handcuffs, which are positioned behind the back of the arrestee. Officers are taught to give verbal instructions to the resisting person throughout the process.

Officers Lewis, Stroud, and Bowlden were able to turn Mr. Rodriquez over on his side while officer Phillips discharged his CEW (under power). Mr. Rodriquez continued to actively resist the officers by twisting and thrashing his body, pulling his hands back and forth, attempted to stand

up, and continued to scream. The officers instructed Mr. Rodriquez to stop resisting and to relax but he continued to actively resist them and attempted to escape their control. Officer Stroud placed a knee on Mr. Rodriquez's upper back and brought Mr. Rodriquez's right arm back for handcuffing. Officer Lewis secured Mr. Rodriquez's right arm with a handcuff. Officer Bowlden placed a handcuff on Mr. Rodriquez's left arm but it slipped off due to several fingers missing on his right hand. Bowlden was able to re-secure Mr. Rodriquez's left hand in a handcuff, with a separate set of handcuffs. Due to Mr. Rodriquez's continued active resistance, and not being fully prone, he was secured in two sets of handcuffs with his hands extended in front of him.

After the handcuffs were secured on Mr. Rodriquez officer Stroud stood up. Mr. Rodriquez continued to scream and actively resist, by moving and kicking his legs. Officer Bowlden retrieved a set of leg shackles from his patrol vehicle and applied them on Mr. Rodriquez's ankles.

Due to Mr. Rodriquez's active resistance and struggling against being handcuffed, the control and restraint process took about 3 ½ minutes: from about 22:18:02 through 22:21:42 (see Lewis and Bowlden BWC videos). As shown on the videos, Mr. Rodriquez was not controlled, was not fully prone, and continued to actively resist during the restraint process. As Mr. Rodriquez continued to scream, actively struggled against the officers, he rolled onto his right side, rolled to a position where he was on all fours in a praying like position (on his knees, buttocks extended up, with his hands extended in front of his head), rolled onto his left side, and then back to a position on all fours. The officers continued to instruct Mr. Rodriquez to calm down and were able to keep him from standing up, by placing hand pressure on his back, and knee pressure on the shoulder area of Mr. Rodriquez by officer Philips, while Mr. Rodriquez continued to scream incoherently and move his body. As officer Stroud controlled Mr. Rodriquez's left arm, Mr. Rodriquez bit him on the foot and ankle and Stroud kicked him in the face. Mr. Rodriquez also attempted to bite officer Lewis. Officer Stroud stood on the chains of the handcuffs and officer Bowlden stood on the chains of the leg restraints.

The Lewis video showed that at about 22:25:27 Mr. Rodriquez appeared to be in the prone position. Officer Phillips placed his left knee on Mr. Rodriquez's upper back and also held the CEW on Mr. Rodriquez's back. After Mr. Rodriquez was finally restrained in handcuffs and the leg restraints, and officer Phillips did not discharge the CEW. Officer Butera placed his left knee on Mr. Rodriquez's left upper thigh and hip area.

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

Opinion

In my opinion, it was appropriate to secure Mr. Rodriquez in two sets of handcuffs. Based on the active resistance of Mr. Rodriquez the officers encountered and because of his hand abnormality, it was a prudent decision and the simplest procedure to use. It is not uncommon to use two or even three sets of handcuffs on a combative subject in order to minimize the risk of an injury to a subject's shoulders and arms as they aggressively resist being handcuffed. The objective is to secure the handcuffs as safely and quickly as possible in order to fully control the subject. While it is preferred to secure the handcuffs with both hands behind the subject's back, the handcuffs were secured in front with Mr. Rodriquez's arms extended in front. Mr. Rodriquez displayed extreme strength and attempting to force his hands behind his back would take longer, increase his resistance and struggle against being restrained, and increase the risk of Mr. Rodriquez sustaining an injury. Under the totality of circumstances, it was appropriate to secure Mr. Rodriquez with two sets of handcuffs in front with his hands extended.

Further, rather than relax and calm down as repeatedly instructed by the officers, Mr. Rodriquez escalated his active resistance by biting officer Stroud, attempted to bite officer Lewis, and began to actively move his body and kick his legs. It is not uncommon to apply leg shackles or leg restraints on a violent subject who was also secured in handcuffs. A trained and experienced officer would rightfully restrain the legs of a violently kicking subject to protect the subject and the responding officers. In order to keep Mr. Rodriquez safe and for officer safety from getting kicked, officer Bowlden secured Mr. Rodriquez's ankles in leg shackles which was appropriate and comported with accepted police restraint procedures. I am also familiar with the leg restraints that officer Bowlden applied in this case, having trained numerous officers in its application. Leg restraints are basically oversized handcuffs and are separated by a chain of about 12 to 15 inches (or more depending on the brand) safely secure the legs, and simultaneously allow a range of motion for the restrained person. In this incident, the leg shackles were secured independent of the handcuffs.

Officer Phillips placed his left knee on the upper back of Mr. Rodriquez due to Mr. Rodriquez's active resistance and only to control Mr. Rodriquez which was appropriate. Over the course of several minutes Mr. Rodriquez had exhibited combative and aggressive resistance, refused to comply with repeated instructions of the officers, fought through multiple applications of the CEW, showed extreme strength, violently fought off the officers physical control efforts, actively moved away from the officers (moving on his back from about a total of 50 feet, from in front of

Bowldens' vehicle to about 15 feet behind the vehicle), continued to resist during the handcuffing process, actively resisted after being restrained, and continued to scream and groan. Mr. Rodriquez was in a position on all fours for a period of time and attempted to stand up. He also rolled from side to side and attempted to stand up. Even though Mr. Rodriquez was restrained it did not restrict him from continuing to actively resist and the officers could not allow him to stand up, only to take an additional extended period of time to re-capture, control, and use additional restraint measures to restrain him again. Being restrained does not totally eliminate a person's ability to actively and aggressively resist and from harming himself and others, including the responding officers.

There existed a high risk of potential harm and injury to Mr. Rodriquez, the officers, and to the public should that occur. For example, witness Michelle Thrasher wrote a statement and advised the Henry County Police Department that she was traveling on Oak Street at about 9:25 pm on 9/20/2019 and observed Mr. Rodriquez in the middle of the road who appeared to be under the influence of drugs. She reported that he jumped in front of her and she had to slam on the breaks to avoid hitting him (Thrasher Report, 9/25/19).

The videos show that Mr. Rodriquez continued to actively resist after being restrained. In my opinion, it was appropriate for officer Phillips' to control Mr. Rodriquez by applying his left knee to the upper back of Mr. Rodriquez for the sole purpose of controlling and restraining him. It was also appropriate for officer Butera to place his knee on the upper thigh area of Mr. Rodriquez as a preventative control measure. Application of these control techniques aided in minimizing the harm Mr. Rodriquez could inflict on himself, others, and the responding officers. It prevented him from standing up and harming himself, the officers, and the public. It also allowed the officers to monitor Mr. Rodriquez. Mr. Rodriquez posed a safety risk to the officers and to himself and maintaining control of him in the restrained position was appropriate, given the circumstances. Both of these procedures were appropriate, were only used to control Mr. Rodriquez, and were successful in preventing him from rolling away or from moving to a kneeling position, and from standing up.

Officer Butera applied a degree of knee pressure on the buttocks and thigh area of Mr. Rodriquez for about 2 minutes and stood up. Butera's full weight was not applied on the upper thigh and the buttocks area. Placing pressure on the upper thigh and buttocks area does not compromise ventilation. Also, placing a knee on the upper thigh area did not apply pressure on the diaphragm,

did not apply pressure on the abdomen, it did not occlude the airway, it did not apply pressure to the rib cage, and it did not apply pressure compressing the chest.

Further, as a control technique, officer Phillips placed his left knee on the upper back of Mr. Rodriquez, it was applied as pressure for about 3-4 minutes, when it appeared that Mr. Rodriquez was in the prone position. Placing a knee on the back of a subject who continued to resist after control and restraint does not violate a law enforcement restraint procedure. Phillips did not place his full weight of his knee on the back of Mr. Rodriquez. It can be estimated that Phillips placed about 25% to 30% of his weight (including the weight of his duty belt) on the back of Mr. Rodriquez. In our study (Kroll et al., 2018) we researched the application of weight force by using one or two knees technique during the prone restraint process on a subject. We found that the weight of the officer is irrelevant to prone force weight as it applies to the single knee technique and only a modest factor when an officer applies the double-knee technique. There was no positive correlation of officer weight with the prone force. This finding corresponds with previous research which reported that it would take two officers each weighing about 285 pounds and balancing on the back of a prone subject to produce compressional asphyxia (Kroll et al., 2017). In this incident there is no evidence that an officer stood or sat on Mr. Rodriquez.

Applying a single knee on the back of Mr. Rodriquez is an accepted restraining technique. It did not: compromise his ventilation; occlude the airway; restrict the diaphragm or abdominal breathing; it did not fracture any ribs or other bones; it did not compress the chest; it did not simultaneously compress the ribs and the abdomen; and it did not apply pressure on the neck. It was not inappropriate for either officer Stroud or officer Bowlden to stand on the chains of the restraints and doing so did not compromise Mr. Rodriquez's ability to ventilate.

Steven P. Atkinson, M.D., Associate Medical Examiner, opined that the cause of death was due to asphyxia as a result of physical restraint in the prone position with compression of the chest. Dr. Atkinson also concluded that the LSD in Mr. Rodriquez's system was a significant condition of the cause of death and he classified the death as a homicide (Autopsy Report, 5/4/2020). Dr. Atkinson further concluded that: there were no injuries to the neck and no evidence of trauma to soft issues of the neck; there were no fractures of the musculoskeletal system; there were no injuries to the respiratory system; and there were no fractures noted to the ribs.

A finding of asphyxia does not align with the scientific research conducted on the topic of prone restraint. Law enforcement officers successfully use the prone restraint position with thousands of combative subjects annually without the subject sustaining an injury let alone a death. The notion

that placing a combative person in the prone position to control them can cause asphyxia is unsupported by the scientific research which has been conducted over the last 25 years. The prone position is not a dangerous position to control and restrain a combative detainee (DiMaio and DiMaio, 2006; Hall, 2012; Karch, 2016; Lassoff, et al., 2017; Savaser and Chan, 2018).

The prone position is the preferred position used when attempting to control and restrain a combative detainee (Neuman, 2006). The reputable scientific human subject studies conducted on prone restraint confirms that using the prone restraint position and/or the maximally restrained position with a combative subject does not cause an alteration in the amount of oxygen in an individual's blood, which is the requirement necessary for asphyxia to occur, nor does it restrict ventilation nor compromise respiratory function (Chan, et al., 1997 & 1998; Chan, et al. 2004; Ho et al., 2011; Kroll & Brave, 2020; Michaelwicz, et al., 2007; Neuman, 2006; Savser & Chan, 2018; Schmidt and Snowden, 1999; Sloane, et al. 2014;). Sloane, et al. (2014) studied prone positioning of obese subjects and found that prone positioning did not cause respiratory compromise.

Human subject research studies have shown that weight force while restrained did not produce evidence of hypoxia or hypoventilation indicating a risk of asphyxiation or life-threatening abnormalities in ventilation (Carey, 1999; Ho et al., 2011; Michaelwicz, et al., 2007; Savaser, et al. 2013; Vilke, et al., 2005). Collectively these studies show a robust consensus that the prone restraint position does not cause life threatening changes in pulmonary function. Further, Kroll et al. (2017) designed a biomechanical model to examine the force necessary to cause rib fractures resulting in flail chest (compressional asphyxia). Kroll found it would take over 626 pounds of pressure on the chest to be fatal. Through the model, the researchers determined that it would take two 285-pound officers balanced perfectly on the chest for a period of time of a resisting subject to produce compression asphyxia.

Additionally, Kroll et al. (2018) measured the weight force of placing one knee or two knees on a Simulaids Rescue Randy training mannequin placed in the prone position, which replicated the prone restraint process. Respondents placed either one knee on the shoulder blade area of the mannequin or placed one knee on the shoulder blade area and the other knee on the lower back. It was determined that the two-knee method applied slightly more weight than the one knee method. The results of the study found that body weight is irrelevant to prone-weight with the single-knee technique and only a slight influence with two-knees. Both findings were well below a consequential risk level of injury potential. The results show that the use of placing one or two

knees on the back during the restraint process is a safe technique and does not support a risk of restraint asphyxia. The findings also support the prospective field research that has examined the outcome of prone restraint with violent subjects.

Moreover, prospective field research which examined the outcomes of violent prone restraint incidents provides greater weight of evidence regarding the safe use of the prone restraint technique than lab experiments. Hall et al. (2012, 2015) studied over 1,255 prone restraint incidents in police custody in Canada, and did not find a correlation between prone positioning and death and asphyxiation. Our own study (Ross and Hazlett, 2016) of 1,085 prone restraint arrest incidents with law enforcement officers showed that the prone restraint position was not related with a risk of asphyxiation or death with violent arrestees who exhibited signs of intoxication, mental illness, and/or drug use. Our study showed the prone restraint position did not lead to any death and 16 percent sustained a moderate injury, even when intermediate weapons or other force measures were applied prior to or during the restraint of a violent arrestee, when weight was applied on the back of the arrestee, and also when the subject's ankles were restrained from 1 to 5 minutes.

Lasoff, et al. (2017) also studied 2,431 force incidents, of which 1,535 (63%) subjects were placed in the prone restraint position, and he reported no deaths during the study. In these studies, arrestees exhibited co-morbidities of mental illness, drug use, or intoxication, and many demonstrated two of these. Moreover, in their collective totality, these studies examined over 3,000 field prone restraint incidents and not one death was reported, despite subjects remaining prone after handcuffing. Further, the laboratory and field research literature related to the use of the prone restraint does not suggest any specific risk to an arrestee.

We further studied subjects exhibiting features of Excited Delirium who were exposed to a CEW application (Ross and Hazlett, 2018). We found that subjects were restrained in the prone position with weight on their backs, and about 30% of the subjects' legs were hobbled for about 1 to 5 minutes. Not one subject died.

Additionally, Vilke (2020) examined the findings of 20 experimental studies on the prone restraint. The consensus findings of the reputable published scientific research examining weight on subjects restrained prone do not support an increased risk of ventilation compromise or an adverse impact on cardiac failure. As well, Vilke found factors outside the prone restraint position are related to the sudden death. Indeed, DiMaio and DiMaio (2006) and Karch (2016) reported that the acceptance of the concept of positional or restraint asphyxia as the cause of death in

restraint associated death often involves the suspension of common sense and logical thinking
and is unsupported by the scientific research.

It is more likely that Mr. Rodriguez's death was attributable to his: hypertensive and
atherosclerotic cardiovascular disease; enlarged heart (cardiomegaly) which weighed 560 grams,
left ventricular hypotrophy; coronary heart disease; LSD in his system; and with his own violent
struggle against the officers' use of control techniques placed undue stress on his already
vulnerable cardiovascular system.

The US Department of Justice has reported intermittingly from 1996 through 2015 on police and
citizen contacts, averaging over 60 million contacts annually. The DOJ reported that the use of
non-deadly force used by the police during the contact is rare, occurring in about 2% and no
deaths were reported (Durose, et al, 2005 & 2007; Eith and Durose, 2011; Davis, et al. 2018).

Further, the likelihood of an arrest-related death occurring during a citizen and police contact is
also rare. An arrest-related death during the use of non-deadly force during a citizen and police
contact has been estimated at about 0.003 percent chance likelihood (Graham, 2014; Synder,
2012; Bozeman et al., 2018; Hall et al., 2012). The risk of death from the police deploying the
CEW in less than 0.25 percent (Laub, 2011). Also, Brave (2021) reported that it is estimated that
there is: 1 "temporal death" (not causal) in 9,753,000 contacts/calls for service with a subject; 1
"temporal death" after using force/ CEW in 3,000 applications; 1 "temporal death" in 10,000,000
contacts/call for service with a naked subject; and 1 "temporal death" in 30,000 use of force/CEW
applications with a naked subject. By comparison, the U.S. National Parks Service (NPS)
reported 1 death in 1,000,000 recreational visits (2017).

In my opinion officers Phillips and Butera responded appropriately, were properly prepared, and
trained to respond to Mr. Rodriguez's violence and active resistance, and to control him when he
presented active and aggressive resistance. Officer Butera's involvement in the incident was
minimal and he only used force pressure on the upper thigh area for the purpose of controlling
Mr. Rodriguez.

Officers Phillips and Butera's application of force measures were consistent with commonly
instructed defensive tactics, techniques and restraints, and were consistent with accepted law
enforcement practices, including using the prone restraint position. Officers Phillips and Butera
responded as I would expect and took precautions to ensure Mr. Rodriguez was controlled and
restrained only in response to his active resistance. Given the active, combative, and continious

resistance demonstrated by Mr. Rodriquez, and his repeated defiance of the officers instructions (as shown on the videos), officers Phillips and Butera objectively applied the appropriate quantum of force, control and restraint measures. These control measures were only used in response to Mr. Rodriquez's combative behaviors.

14.   Medical Intervention

Once Mr. Rodriquez was restrained, officer Stroud radioed for emergency medical services (see Henry County Call for Service Detail Report; Henry County Fire Department Patient Care Report; Stroud Report; BWC). EMS personnel had difficulty in locating the incident location and contacted Mr. Rodriquez at about 22:29:00.

Officer Phillips observed that Mr. Rodriquez had shallow breathing, asked if Mr. Rodriquez had stopped breathing, and one officer responded that he was playing possum. Phillips observed Mr. Rodriquez's legs moving and an officer stated that he was twitching. Officer Stroud checked for a pulse and could not find one. Officer Phillips stood up and EMS personnel arrived and took over.

With the assistance of the officers, EMS placed Mr. Rodriquez on a stretcher and the officers removed the restraints from Mr. Rodriquez. EMS began CPR, conveyed him to the ambulance and transported him to the hospital. Mr. Rodriquez passed away three days later in the hospital.

Opinion

In my opinion restraining and controlling Mr. Rodriquez in the prone position did not impair his ability to ventilate and did not cause or contribute to his sudden and unexpected death. There is no evidence from the officers' reports, the officers BWC videos, or from the investigation that an officer was on alert that Mr. Rodriquez was in immediate medical distress during the control and restraint process. There is no evidence that Mr. Rodriquez: exhibited signs of agonal breathing; made noises like he was choking; had an inability to exchange air proficiently; had his airway occluded; exhibited symptoms of a seizure; showed signs of cyanosis; yelled out that he could not breathe; began foaming at the mouth; or was vomiting. Also, standing on the chains of the handcuffs and the leg shackles did not impair or restrict Mr. Rodriquez's ability to ventilate.

Rather, Mr. Rodriquez's behaviors showed the opposite. Over the course of several minutes Mr. Rodriquez had exhibited combative and aggressive resistance, refused to comply with repeated instructions of the officers, fought through multiple applications of the CEW, showed extreme strength, violently fought off the officers physical control efforts, actively moved away from the

officers (moving on his back from about a total of 50 feet, from in front of Bowldens' vehicle to about 15 feet behind the vehicle), continued to resist during the handcuffing process, actively resisted after being restrained, and continued to scream and groan. Even while prone and restrained Mr. Rodriquez continued to move his body, attempted to stand up, and screamed. With these factors in mind, an officer would not make the inference or conclude that Mr. Rodriquez was in immediate medical distress.

Mr. Rodriquez also had the capacity to vocalize. Being able to yell and vocalize is an indicator that he had an open airway, that he had the ability to move air in and out, and indicated that he was actually breathing. If a person is actually experiencing ventilation problems the person would not be talking, they would be unable to vocalize, and would exhibit symptoms recognizable by facial expressions indicating they are having breathing difficulties.

In my opinion, objectively and based on the collective totality of these factors, experienced and trained law enforcement officers, such as Phillips and Butera, would not form the perception that Mr. Rodriquez was in immediate medical distress requiring that they act differently. In my opinion, officer Phillips monitored Mr. Rodriquez and when he observed that he appeared to be experiencing shallow breathing, he requested an officer to check him. Officer Stroud had earlier radioed for EMS to respond. Once it was determined that Mr. Rodriquez did not have a pulse, officer Phillips stood up, and EMS immediately initiated treatment.

15.    Conclusion

Each violent restraint incident contains its own unique set of innumerable variables which must be considered by the responding officers, including their own safety, the safety of the resisting person, the safety of the community, the confrontation environment, the level or type of resistance and the continued resistance of the person, and the strength of the person to identify a few. There is no magical turn on/off switch which demonstrates that a violent resisting person is completely subdued. Only after the involved officer (s) have formed the perception that the resisting person is subdued sufficient to cease the use of force and/or restraint will they determine the next course of action. In making the determination, I train officers to consider their own safety as well as the safety of the subject, and the safety of general public.

Within the totality of the circumstances it was appropriate to control and restrain Mr. Rodriquez in the prone position. The use of the CEW and the control and restrain measures used to restrain Mr. Rodriquez did not cause an adverse effect upon his physiology and his own violent resistance

against being controlled by the officers required that his hands and legs be restrained. Objectively, and under the circumstances the officers confronted, there is no evidence that these officers would understand that they had an affirmative duty to act differently than they did. Law enforcement officers facing volatile and unpredictable situations, as was encountered in this confrontation, should be able to perform their duties and use of force measures, training, experience, departmental policies, and on scene judgment with confidence that it will not be second guessed later in a non-stressful atmosphere.

Respectfully submitted:

*Darrell L. Ross, Ph.D.*     May 10, 2022

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

References

Baldwin S., Hall C., Bennell, C. et al. (2018). Excited delirium syndrome: Situational factors and risks to officer safety in non-fatal use of force encounters. *International Journal of Law and Psychiatry*, 60:26-34.

Bozeman WP, Stopyra JP, Klinger DA, et al. (2017). Injuries associated with police use of force. *Journal of Trauma Acute Care Surgery*, 84 (3): 466-472.

Bozeman WP, Hauda, W. E., 2nd, Heck, J. J., Graham, D. D., Jr., Martin, B. P., & Winslow, J. E. (2009). Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects. *Ann Emerg Med*.

Brave M (2021). *Use of force by LEOs: Statistical analysis.* Presentation at the Institute of Prevention In-Custody Deaths conferene (IPICD); Las Vegas, NV.

Brewer, JE and Kroll MW (2009). Field statistics overview (Chp. 24). In Kroll and Ho (eds.) *TASER, conducted electrical weapons: Physiology, Pathology, and Law*: 283-301.

Cary, N. et al. (1999). Evaluation of simulated resistance in the prone position on cardiorespiratory function following exercise in humans. *Respiratory and Human Physiology*, 30, 525.

Castillo, E, Prabhakar N., and Luu B. (2012). Pattern of law enforcement-related injuries in the US. *Journal of Trauma Acute Care Surgery*, 80 (6): 870-876.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM (2004). Weight force during prone restraint and respiratory function. *American Journal Forensic Medicine Pathology*; 25:185-9.

Chan TC, Vilke GM, and Neuman T (1998). Reexamination of custody restraint position and positional asphyxia. *Am J Forensic Medicine Pathology*, 19:201-5.

Chan TC, Vilke GM, Neuman T, and Clausen JL (1997). Restraint position and positional asphyxia. *Ann Emerg Med*, 30:578-86.

Davis E, Whyde A, and Langton, L (2018*). Contacts between police and the public, 2015*. US Department of Justice, Bureau of Justice Statistics, Washington, D.C.

DiMaio TG and Di Maio JM (2006). *Excited delirium syndrome: Cause of death and prevention*. Taylor and Francis Group, CRC Press, Baca Rotan, FL.

Durose MR, Smith EL, Langan PA (2005). *Contacts between police and the public, 2007*. US Department of Justice, Bureau of Justice Statistics, Washington, D.C.; 1-32.

Durose, MR, Schmitt,, EL, Langan PA (2002). *Contacts between police and the public, 2005*. US Department of Justice, Bureau of Justice Statistics, Washington, D.C.

Eith C & Durose, MR (2011). *Contacts between police and the public, 2008*. US Department of Justice, Bureau of Justice Statistics, Washington, D.C.

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

Fedrick F, Kaminski RJ, Cooney MD, and Sevigny, EL (2014). The influence of policies on conducted energy device use and police use of lethal force. *Police Quarterly,* 17 (4):328-358.

Graham, MA (2014). Investigation of deaths temporally associated with law enforcement apprehension. *Academy of Forensic Pathology*, 4: 366-389.

Hall, C, Votova, K, Heyd C, Walker B, MacDonald S, Eramian D, and Vilke GM (2015). Restraint in police use of force events: Examining sudden in custody deaths for prone and not-prone positions. *Journal of Forensic and Legal Medicine*, 1-19.

Hall CA, McHale AMD, Kader AS, Stewart LC, MacCarthy CS, Fick GH (2012). Incidence and outcome of prone positioning following police use of force in a prospective, consecutive cohort of subjects. *Journal Forensic Legal Medicine,* 19: 83-9.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR (2011). Effect of position and weight force on inferior vena cava diameter: Implications for arrest-related deaths. *Forensic Science International*, 212; 256-259.

Hughes EL (2011, December). Special panel review of excited delirium: Special report. National Institute of Justice, Washington, D.C., 1-42.

Karch, SB (2016). The problem of police-related cardiac arrest. *Journal of Forensic and Legal Medicine*, 41: 36-41.

Kroll MW & Brave MA (2020). *Defending non-firearm arrest-related death incidents*. Paper presented at the International Municipal Lawyers Association conference, Washington, D.C.:1-19.

Kroll MW, Brave MA, Pratt HMO, Witte KK, Kunz SN, & Luceri RM (2019, July). Benefits, risks, and myths of handheld electrical weapons. *Human Factors and Mechanical Engineering for Defense and Safety:* 1-12.

Kroll MW, Brave MA, Kliest SR, Ritter MB, Ross, DL, and Karch, SB. (2018, December). Applied force during prone restraint: Is officer weight a factor? *American Journal of Forensic Medicine and Pathology*, 1-7.

Kroll MW, Still GK, Neuman TS, Graham MA, and Griffin LV (2017). Acute forces required for a fatal compression asphyxia: A biomechanical model of historical comparisons. *Medicine, Science, and the Law*, 0:1-8.

Kroll, MW (2009). Physiology and pathology of TASER electronic control devices. *Journal of Forensic Legal Medicine,* 16 (4):173-177.

Lasoff DL, Hall CA, Bozeman WP, Chan TC, Castillo EM and Vilke GM (2017). Proning: Outcomes of use of force followed with prone restraint. *J Forensic Med*., 1-3.

Laub JH (2011). Study of deaths following electro muscular disruptions. NIJ Report, Washington, DC.

MacDonald JM, Kaminski RJ, Smith MR (2009, Dec.). The effect of less-lethal weapons on injuries in police use-of-force events. *Am J Public Health,* 99 (12):2268-2274.

Mesloch C, Henych M, Thompson LF, and Wolf R (2008). A qualitative analysis of conducted energy weapons: TASER X26 v. Stinger S2000. A NIJ Report.

Michalewicz, BA. Chan, TC, Vilkem GM, Levy, SS, Nueman, T and Kolkhorst, FW (2007). Ventilatory and metabolic demands during aggressive physical restraint. *Journal of Forensic Science*, 52:171-175.

Nakjima Y and Vilke GM (2016). Use of force in the prehospital environment. In Eds. Zeller, SL, Norstrum KD, and Wilson MP, *The diagnosis and management of agitation*, Chp. 12: 173-178, Cambridge University Press.

Neuman, T (2006). Positional and restraint asphyxia. In, Ross, DL and Chan, TC, *Sudden Deaths in Custody*. Humana Press: 39-57.

Ross, DL and M Brave (2020). Assessing use of force liability and law enforcement response to the naked subject. *Law Enforcement Executive Forum*, 20 (1):1-21.

Ross, DL and Hazlett (2018). Assessing the symptoms associated with excited delirium syndrome and the use of conducted energy weapons. *Forensic research & Criminology International Journal*, 6:187-196.

Ross, DL and ML Hazlett (2016, January). A prospective analysis of the outcomes of violent prone restraint incidents in policing. *Forensic Research and Criminology International Journal*, 2: 1-10.

Savaser D and Chan TC (2018). Positional and restraint asphyxia. In Ross, DL and Vilke, GM, eds., *Guidelines for investigating officer-involved shootings, arrest-related deaths, and deaths in custody*, chp. 7. Routledge Publisher, NY.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen, AV, Shah, V and Chan TC (2013). The effect of prone maximal restraint position with and without weight force on cardiac output and other hemodynamic measures. *Journal of Forensic and Legal Med*, 1-22.

Schmidt P and Snowden T (1999). The effects of positional restraint on heart rate and oxygen saturation. *Journal of Emergency Medicine*, 17:777-82.

Sloane, C, Chan,TC, Kolkhorst, F, Nueman, T, Castillio, EM, Vilke, GM (2014). Evaluation of the ventilatory effects of the prone maximum restraint (PMR) position on obese subjects, *Forensic Science International*, 27: 1-9.

Smith, MR, Kaminski RJ, Alpert, GP, Fridell, et al. (2007). The impact of conducted energy devices and other types of force outcomes. NIJ report.

Synder HN (2012). *Arrests in the United States, 1980-2009*. US Dept. of Justice, Washington, D.C., Bureau of Justice Statistics.

Taylor B and Woods, DJ (2010). Injuries to officers and suspects in police use of force cases: A quasi-experimental evaluation. *Police Quarterly*, 13: 260-289.

Tuttle, S (2018). *Risk management: TASER conducted energy weapons field data*. AXON, Scottsdale, AZ.

United States National Parks (2017). Mortality dashboard key statistics: CY2014-CY2016. www.nps.gov/ogscy-14-cy16mortality-dashboard-key-statistics.

Opinions Report of Darrell L. Ross, Ph.D.
Rodriguez, et al. v. Henry County, et al.: No. 1:21-CV-01999-TCB

Vilke GM (2020). Restraint physiology: A review of the literature. *Journal of Forensic and Legal Medicine*, 1-6.

Vilke GM and Payne-James J (2016). Excited delirium syndrome: aetiology, identification, and treatment. In Eds. JM Gall and JJ Payne-James, *Current practice in forensic medicine*, Vol. 2, John Wiley & Sons, Ltd.

Vilke, GM, et al. (2011). The effect of Taser on cardiac, respiratory and metabolic physiology in human subjects. *DOJ Report*, 1-28.

Vilke GM, Sloan CM, Suffecool A, Kolkhurst FW, Neuman T, Castillo EM, Chan TC (2009). Physiologic effects of the TASER after exercise. *Academic Emergency Medicine*, 16 (8): 794-710.

Vilke GM, Micalewicz B, Kohlkorst F, Nueman T, Chan TC (2005). Does weight force during physical restraint cause respiratory compromise? *Academy of Emergency Medicine*, 12:16.

White MD, Ready, J, Rigg C, Dawes, DM, Hinz A, Ho JD (2012). An incident-level profile of TASER device deployments in arrest-related deaths. *Police Quarterly,* 20 (10):1-28.

# CURRICULUM VITAE OF
# DARRELL L. ROSS, Ph. D.

*Rodriguez, et al. v. Henry County, et al.*: No.
1:21-CV-01999

*CURRICULUM VITAE OF*
*DARRELL L. ROSS, Ph. D.*

## EDUCATION:

Michigan State University
150 Administration Building
East Lansing, Michigan 48824-1046

**Ph. D.** Higher Education Administration
Dissertation: *An Analysis of Citizen Resisting in Policing*. June, 1992.

**Master of Science**, Criminal Justice; Correctional Administration and minored in Criminal Justice Education. Thesis submitted on: *Decision-Making in the Use of Non-Deadly Force in Corrections*. March, 1987.

**Bachelor of Arts** in Criminal Justice and minored in Psychology, 1978.

Lansing Community College
Lansing, Michigan 48914

**Associate of Arts** in Criminal Justice, 1976.

Harvard University, Kennedy School of Government
Cambridge, MA

Executive Leadership/ Management Programs
(May - October, 1999)

## HIGHER EDUCATION EXPERIENCE:

**August 2010 to present:**

**Professor, Department Chair, and Director of The Center for Applied Social Sciences**; Department of Sociology, Anthropology, and Criminal Justice, Valdosta State University, Valdosta, GA. Responsible for 18 faculty, 550 students (3 UG & 2 Grad programs), 6 GAs, 10 department budgets, scheduling courses, teach graduate criminal justice courses, personnel issues, evaluating, hiring and promotion of faculty & staff, enrollment management, curriculum development, department executive committee, internship program, accreditation responsibilities of two graduate programs, strategic planning, collecting, assessing and reporting departmental data, and all other administrative duties of the Department. I am a member of the Graduate Faculty, a member of VSU's Executive Administrative Team, and I serve on numerous College and University committees. I supervise graduate students and serve on doctoral and thesis committees in the department and in the College. I serve on the USG Chancellor's Campus Police/Pubic Safety Advisory Board and the Use of Force Policy and Training committees.

**(August, 2006 to June 2010) The School of Law Enforcement and Justice Administration, Western IL University, Macomb, IL, Professor & Director:** Was responsible for 40 faculty and staff members, 2000 undergraduate and 120 graduate students, five extension sites, 4 advisors, 10 GAs, 2 TAs, and the internship program. Additionally, I was responsible for the three department budgets, course curriculum/scheduling, strategic planning, recruiting, hiring, retention and evaluating faculty, program assessments, all departmental committees, teaching courses, implementing the employment contract, enrollment management, student scholarships, and collecting, assessing, and reporting departmental data, and director of the Applied Institute of Criminal Justice Studies. I was a member of the Graduate Faculty, and member of WIU's Administrative Team.

**Department of Criminal Justice**, **East Carolina University, Greenville, NC** (1992-2006), **Professor & Director of Forensic Sciences,** (Chair of the Program from 1999 to 2002). Instructed 12 courses in criminal justice to undergraduate and graduate students, conducted research, supervised and advised thesis

students, and served on various departmental, college, and university committees.  As Chair, I assisted in developing and managing the Master's Program and I was the Director of the Forensic Science program. I was a member of the graduate faculty.

**Ferris State University (1985 to 1992), Criminal Justice Institute** Big Rapids, MI.
Hired in an administrative position as the Technical Assistant Coordinator of the Institute and my responsibilities included:

1. Provided technical assistance, training, continuing education, research, consulting services and wrote grants for a myriad of criminal justice agencies, for both line level and administrative personnel on a local/national basis. Provided program assessments for Criminal Justice programs.

2. Certified State of Michigan (MCOLES) instructor in Police Defensive Tactics, Instructed Defensive Tactics, Physical Conditioning, Arrest and Control Tactics, Human Relations/Crisis Intervention, Human Factors, & Response to the Mentally Ill in the police academy. I was certified as an instructor by the State of Michigan in the Jail Training Academy (now MSCTC).

3. Instructed academic criminal justice courses; Correctional Theory and Practice, Correctional Offenders, and Juvenile Delinquency. Supervised and advised student interns. Designed and implemented the curriculum for five academic core correctional courses for correction officer certification as required by the Michigan Correction Officer Training Council.

4. Instructed courses in Correctional Theory and Practice and Juvenile Delinquency as an adjunct instructor from 1979 to 1984.

**Adjunct Instructor**:

1. **North Carolina Justice Academy Salemburg, NC** (1994-2001).  Provided instruction in a 40 hour "Non-Lethal Force" course for police officers statewide. Also provided certification for instructors in various PPCT defensive tactics courses.

2.  **Law Enforcement Management Institute** (1994-2006): Assisted in developing a 200-hour Executive Police Management course and provided training to line level & police administrators in a variety of management subjects, Wilson Community College, Wilson, NC.

**Lansing Community College**: Criminal Justice/Law Center, Lansing, Michigan

Instructed the course, "Introduction to Corrections," Fall, 1985.

**Jackson Community College:** Criminal Justice Program, Jackson, Michigan

Instructed courses in Criminology, Parole and Probation, and Stress Management in Corrections, 1979 to 1982.

## FIELD EXPERIENCE (1973 to 1985)

A.  **Michigan Department of Corrections (1981 to 1985)** Training Academy--Lansing, MI 48914
Hired as a Human Resource Developer to instruct and develop training programs for all levels of departmental employees and MI Sheriff Departments.   My responsibilities included:

1. Researching and writing training programs such as:  Stress Management, Legal Issues for Correctional Personnel, The Criminal Justice Process, Report Writing, Physical Wellness and Fitness Program for new recruits, and managing client caseloads for parole/probation agents.

2. Additional training programs presented: Defensive Tactics and Use of Force, Custody and Security Issues, Riot & Tactical Team Training, Crisis Intervention, Prisoner Behaviors, Absconder Team Training, Managing Problem Employees, Suicide Awareness, Crime Investigations, Responding to the Mentally Ill Prisoner, Management/Supervision Training, and Investment in Excellence,

B. **Michigan Department of Corrections** (1979 to 1980)
   Circuit Court Probation: Jackson, Michigan: <u>Probation Agent</u> and responsibilities included:
     1. Investigation of and writing of pre-sentence investigation reports.
     2. Caseload management of over 100 probationers

   Served on the Director's task force to investigate the riots at the State Prison of Southern MI (June/July, 1980).

C. **Michigan Department of Corrections (1976 to 1979)**
   State Prison of Southern Michigan (SPSM)
   4000 Cooper Street- Jackson, Michigan

     <u>Resident Unit Manager</u> of a 500-man cell block, with16 officers, 2 assistants, and 2 psychiatrists. The unit was considered a "Special Protective/ Psychiatric Unit." The housing unit contained mentally impaired prisoners and protective custody prisoners. My supervisory responsibilities included: providing security management functions, maintenance of security, custody, treatment, and discipline of prisoners, classifying prisoners for custodial housing, working closely with psychologists for psychologically impaired/suicidal prisoners, writing parole eligibility reports and working with Parole Board, conduct disciplinary hearings, and answering first-step prisoner and employee grievances.

     <u>Correctional Specialist</u> (1973 to 1975), duties included: Supervising prisoners in housing units, prisoner and facility searches, custodial and security functions, transporting prisoners, and working various custodial assignments.

**<u>CERTIFICATIONS, AWARDS, BOARD MEMBER:</u>**

May 21 to prst.   Teaching Faculty, Americans for Effective Law Enforcement (AELE, Las Vegas, NV)

May 21 to prst.   Editorial Board Member, *Journal of Public Safety* (AELE)

Feb. 2020-prst.   Editorial Board Member, *Law Enforcement Executive Forum Journal* (Macomb, IL)

September 2019  Advisory Board Member, Integrated Use of Force Options, Charleston, IL

October 2019   Bola Wrap Instructor certification, Las Vegas, NV

March 2018    TASER, CEW Instructor certification, AXON Enterprise, Scottsdale, AZ

March 2018    TASER Evidence and Collection Analysis certification; AXON Enterprise, Scottsdale, AZ

July 15-prst.    Advisory Board Member University of GA System Campus Public Safety (Campus Police) and the Advanced Police Academy, GA Board of Regents, Atlanta, GA

October 13    Inducted into The Wall of Fame, Distinguished Alumni Award, School of Criminal Justice, Michigan State University, East Lansing, MI

June 11-prst.   Certified Law Enforcement Instructor by GA Peace Officers Standards and Training Council.

March 09     Awarded The Best Practices Award by PRIMA, for the development of a training program on "Sudden Deaths In Custody," with Dr. Ted Chan, for MMRMA, Livonia, MI.

August 06        Awarded Department "Scholar of the Year" by the East Carolina University Department of Criminal Justice.

April 04         Awarded the "Scholar/Professor of the Year" by the Chancellor's Office, East Carolina U.

November 02      Advisory Board member for Law Enforcement Training Network (LETN), Carrollton, TX.

September 01/02  Advisory board member for Caliber Press, Street Survival, Carrollton, TX.

July 2000        Awarded the "Excellence in Leadership Award," by the Pressure Point Control Tactics Mgt. Systems, Millstadt, IL.

December 1997    Awarded the "Outstanding Criminal Justice Professor Award," by the North Carolina Criminal Justice Education Association.

December 97/98   Advisory Board Member for *Police Marksman*, Montgomery, AL

September 1997   International Who's Who of Professionals

July 1997        Board of Trustees: National Law Enforcement Credentialing Board, Columbus, OH

1996/1999        Advisory Board Member for Safe Restraint Inc., Walnut Creek, CA.

1989-present     Advisory Board Member/Assistant Director/Director of Research of Pressure Point Control Tactics Management Systems, Inc., Belleville, Illinois (PPCT). Past Editor of the Training and Information Journal. Certified to instruct at the instructor and instructor trainer levels in:

|  |  |  |
|---|---|---|
| 1. Pressure Points | 2. Cell Extractions | 3. Use of Force Human Factors |
| 4. Impact Weapons | 5. Knife Defense | 6. Neck restraints |
| 7. Violent Patient Management | 8. Defensive Tactics | 9. Special Operations Tactics |
| 10. Handcuffing/restraints | 11. Use of Force Decision Making | |
| 12. Weapon Retention | 13. Ground fighting (GAGE) | |

1987-1988        PPCT Instructor Trainer - Certified to instruct all components of PPCT Defensive Tactics.

1986 -1987       PPCT Basic Instructor in Pressure Points and Defensive Tactics.

1986-1992        State certified Defensive Tactics Instructor, by the Michigan Law Enforcement Officers Training Council (POST). Served as an assessor in defensive tactics for various police academies.

1981-present     Certified Jail Instructor, Michigan Correction Officer Training Council. Certified to instruct: Correctional Law, Custody & Security, Suicide Awareness, Prisoner Behavior, Defensive Tactics, Report Writing, Booking, Intake and Classification, Stress Management, and Crisis Intervention.

1982 to 1986     Law Enforcement Training Associates Inc., Los Angeles, CA, Crisis Intervention Instructor.

Certified to provide law enforcement training in: GA, MI, NC, MS, IL, KS, OH, CO, TN, TX, NV, and FL

**Professional Development**

I routinely attend professional development seminars in:
     Higher Education and Criminal Justice Higher education
     Policing and Corrections
     Legal, Liability Issues & Employment law
     Expert Witnessing
     Use of Force issues (Non-Deadly and Deadly Force)

4

Arrest-Related Deaths
Police Subject Control Techniques and the Use of Restraints
Human Factors
Police practices/procedures & training issues
Forensics

## PUBLICATIONS AND RESEARCH

### Books

1. *Civil Liability Issues in Criminal Justice, 7th ed.* (May, 2018), Routledge Publishers. Contracted to revise 8th edition (August, 2022).

2. *Guidelines for investigating, officer involved shootings, arrest related deaths, and custodial deaths*; (July, 2017); co-author, Gary Vilke, MD; Taylor & Francis/Routledge Publisher.

3. *Sudden Deaths In Custody*, co-author Ted Chan, MD, Humana Press, Totowa, NJ (2006).

4. *Liability Issues in Corrections*, Carolina Academic Press, Durham, NC. (2005).

5. *Introduction to Corrections in Michigan*. Correctional Consultants Inc., publishers, Jackson, Michigan, (1989).

### Monographs/Book Chapters

1. Assessing TASER® Conducted Energy Weapons, Arrest Related Deaths, and Emerging Liability Trends (March, 2017). ***Research Gate,*** #DOI-10.13140/RG.2.2.29211-26409 (co-author M. Brave, JD).

2. Book Chapter: Prevention and Training, in M. J. Palmiotto (Ed.) *Police Use of Force: Important Issues Facing the Police and the Communities They Serve*, (Chapter 10; pp. 169-184) (2016, August); Sergevnin, V. & D. L. Ross, CRC Press, Taylor and Francis Publisher.

3. Book chapter: Section 1983 and Liability Issues for Criminal Justice Personnel (Chapter 15, pgs. 201-220); in *Current Legal Issues in Criminal Justice*, 2nd ed. (2014) ed. by Craig Hemmens, Ph.D., Oxford Press.

4. Sudden Deaths in Correctional Custody (July, 2013), *Federal Penitentiary Institute Encyclopedia*, Samara Law Institute, St. Petersburg, Russia, No. 692, pp. 338-445.

5. Chapter 1: What we Know About Police Use of Force: Dispelling the Myths, Special Edition Monograph *of The Journal of Law Enforcement Forum,* pp.1-29 (December, 2011).

6. Chapter 4: Liability for failing to train and police use of force," Special Edition Monograph of the *Journal of Law Enforcement Forum*, pp. 59-79 (December, 2011).

7. " Correctional Administration and Section 1983 Liability Issues," a chapter in *Handbook of Criminal Justice Administration,* Marcel/Decker Publishers, NY, pp. 319-342 (September, 2000).

8. "Use of Force Policy Development and Implementation," *Use of Force: Current Practice and Policy*, by Craig Hemmens, J.D., Ph. D., American Correctional Association, Landham, MD (December, 1999).

9. "The Problem of Custodial Deaths in Prisons and Jails." C*orrectional Institutions In Michigan*, Correctional Consultants, Jackson, Michigan (December, 1988).

## Published Journal Articles

1. Non-fatal assaults trends in policing during violent arrests (Winter Ed., 2022). *GA Association of Police Chiefs Magazine*; 30-33.

2. Arrest-related deaths and investigation protocols. *GA Association of Chiefs of Police Magazine* (Fall Ed., 2021); 34-40.

3. A review of the patterns of police non-fatal assaults sustained during violent arrest situations (September, 2021). *Journal of Crime and Criminal Behavior*, Vol. 1, #1: 69-88.

4. Police shootings after electrical weapon seizure: homicide or suicide by cop (July 28, 2021). *International Journal of Legal Medicine:* 1-9 (Kroll M, Ross DL, Brave M & Williams HE).

5. Arrest-related deaths: Policy and training recommendations. *GA Association of Chiefs of Police Magazine* (Summer Ed., 2021); 38-43.

6. Civil liability issues associated with non-firearms arrest-related deaths (April 2021). *GA Association of Chiefs of Police Magazine* (Spring, 2021 ed.); 38-41.

7. Risk factors associated with excited delirium syndrome and arrest-related deaths (January, 21). *GA Association of Chiefs of Police Magazine* (Winter, 2021 ed.):58-62.

8. Assessing the liability issues associated with police response to the naked subject (2020, March); co-author Michael Brave JD, *Journal of Law Enforcement Executive Forum*, 20 (1):1-21.

9. Kroll MW, Brave M, Kleist S, Ritter M, Ross DL, & Karch S (2020, Jan.). Prolonging the prone postulate: Letter to the Editor, *American Journal of Forensic Medicine and Pathology*, 1-2.

10. Examining the liability issues associated with prone restraint deaths in detention (2019, May). *Forensic Research & Criminology International Journal*, 7(3): 109-118.

11. Kroll MW, Brave M, Kleist S, Ritter M, Ross DL, & Karch S (2018, Dec.). Applied force during prone restraint: Is officer weight a factor? *American Journal of Forensic Medicine and Pathology*, 1-7.

12. Assessing trends in CEW applications in corrections (Nov. 2018). *Criminal Law Bulletin;* Vol. 54, #6: 1383-1405.

13. Reviewing civil liability in corrections and operationalizing risk management, *Criminal Law Bulletin* (August, 2018); 54, 4: 973-991.

14. Assessing the symptoms associated with excited delirium syndrome and the use of conducted energy weapons (June, 2018). *Forensic Research and Criminology International Journal*, 6 (3):187-196. [co-author, Michael Hazlett, Ph.D.].

15. Administrative Liability Issues Associated with Correctional Tactical Response Teams, *Criminal Law Bulletin* (June, 2018); 54 (3): 731-748.

16. Assessing deadly force liability decisions and human factors research (2018, March). *ILEETA Journal*, Vol. 8, (1): 35-38.

17. *Taylor v. Barkes*: Liability Issues and Custodial Suicides (December, 2017). *Criminal Law Bulletin*, Vol 53 (6): 1283-1304.

18. Reviewing the Prisoner Litigation Reform Act (August, 2017). *Criminal Law Bulletin,* Vol 53 (4): 849-865.

19. An Analysis of Section 242 Prosecutions and Sentencing Trends: 1997-2015. (June, 2017). *Criminal Law Bulletin,* 53 (3): 569-589.

20. Assessing the trends in the application of Civil Rights of Institutionalized Persons Act (CRIPA) in prisons and jails: 2000 to 2014, (December, 2016). *Criminal Law Bulletin*, 52 (6): 1720-1741.

21. Examining *Kingsley v. Hendrickson*: Ending the "Twilight Zone," (June, 2016), *Criminal Law Bulletin*, 52:818 837.

22. An analysis of the outcomes of violent prone restraint incidents in policing (January, 2016). *Forensic Research and Criminology International Journal*, 2 (1): 1-10 (co-author, Michael Hazlett, Ph.D.).

23. *Plumhoff v. Rickard*: Clarifying the use of deadly force and qualified immunity (2015, June). *Criminal Justice Review*, 40 (2): 244-257.

24. Assessing the Trends in Qualified Immunity (2015, May) *ACJS Today*, 14 (3):14-20.

25. Probable Cause and the Sniff Factor: A Review of *Florida v. Harris* and *Florida v. Jardiness, Criminal Justice Review* (September, 2013), 38:412-422.

26. Assessing Lethal Force Liability Decisions and Human Factors Research, *Journal of Law Enforcement Forum*. (July, 2013) 13: 85-107.

27. Analyzing Perceptions and Misperceptions of Police Officers in Lethal Force Virtual Simulator Scenarios (October, 2012). *Journal of Law Enforcement Forum*, 12 (3): 53-73 (co-authors, R. Murphy & M. Hazlett, Ph.D.)

28. *Messerschmidt v. Millender*: Expanding Probable Cause and Restricting Liability (September, 2012) *Criminal Justice Review*, 37 (3):416-427.

29. Best Practices in Police Use of Force Training, *Journal of Law Enforcement Forum* (2012, March) 146-157, (co-author, Vladimir Severginin, Ph.D.).

30. Legal Issues and Risk Management for Department Chairs. *The Department Chair*, Vol. 22, No.2, 14-  19 (Fall, 2011).

31. Expanding the Confrontation Clause and Testimonial Hearsay Statements: *Michigan v. Bryant*, (September, 11), *Criminal Justice Review*, 36: 375-386 (co-author Fred Knowles, Ph.D.)

32. *MD v. Shatzer*: Revisiting Re-interviewing After Invoking Miranda's Right to Counsel, *Criminal Justice Review*, (September, 2010), 35: 371-385 (co-author Jill Myers, JD).

33. Book Review: C. Tartaro and D. Lester (2010). *Suicide and Self Harm in Prison and Jails*. Lexington Books, Lanham, MD. *Criminal Justice Review*, Vol. 35, #2:253-255, (June, invited).

34. The Liability Trends of Custodial Suicides (March/April 2010). *American Jails*, 37-47. Re-printed as: Legal Liability Trends for Correctional Suicides, *Corrections & Mental Health*: National Institute of Corrections, (July 2012)—article reprinted in *American Jails* (April, 2017).

35. The Use of Force, Science, Liability, and Restraint Asphyxia (March, 2010). *Journal of Law Enforcement Forum,* 10:35-56.

36. Virtual Training Systems and Survival Humanistic Factors Research Study (2009). *Interservice/Industry Training Simulation and Education Conference*, paper, No 91916, pp. 1-10 (Co-author R. Murphy).

37. Officer Safety Trumps Passenger Privacy: *Arizona v. Johnson* (2009, September). *Criminal Justice Review,* 34:468-481, (co-author, Jill J. Myers, JD).

38. Policing by Consent Decree: An Analysis of 42 U.S.C. Section 14141 and the New Model for Police Accountability, *Police Practice & Research, An International Journal,* (2009, June) 3:199-208 (co-author, Patricia Parke)

39. *Scott v. Harris*: Seeing is Believing (Sept., 2008). *Criminal Justice Review*, 33:431-446.

40. Assessing Detainee Resistance and Detention Officer Use of Force in Michigan Jails (2008). *Journal of Law Enforcement Executive Forum*, 8:412-431 (July).

41. An Analysis of Civil Liability and Sudden In Custody Deaths in Policing (2007). *Journal of Law Enforcement Executive Forum* (7) 1:7-30.

42. A Risk Management Assessment of the Claims, Losses, and Litigation of Police Agencies in Michigan: 1985 to 1999 (2006), *International Journal of Police Strategies and Management,* Vol. 29, No.1, 38-57 (co-author Madhava Bodapati, Ph.D.).

43. The Liability Issues of Restraint Deaths in Detention," *Criminal Law Bulletin,* (Dec. 05).

44. A Content Analysis of Forty Years Worth of Use of Force of Studies in Policing (2005). *Journal of Law Enforcement Executive Forum*, 5:121-148.

45. Reviewing Hudson v. McMillian Ten Years Later, *Corrections Liability Reporter*, (April/May, 05).

46. Assessing *Hudson v. McMillian*: Ten Years Later, *Criminal Law Bulletin*, (Sept./Oct. 04), pp. 501-517.

47. Essay: Review of 3 books on "Police Misconduct and Ethics in Policing," (autumn, 2003). *Journal of Criminal Justice Policy Review*, pp. 382-395 (invited).

48. The Impact of Survival Stress in Police Use of Force Encounters (May, 03), *Journal of Law Enforcement Executive Forum*, V3/N2, pp. 9-25 (co-author, Bruce K. Siddle).

49. Jail Liability: Reducing the Risk by Studying the Numbers," *American Jail Magazine* (Jan/Feb, 03) co-author Bill Page.

50. Ground Fighting: Assaults on Police Officers, *Caliber Press Street Survival Newsline*, No. 630 (Jan. 03) Co-authored with Mark Dunston.

51. An Assessment of Loses, Claims, and Liability Issues in Michigan Police Departments, *Legal Defense Journal* (Fall, 02).

52. An Assessment of Graham v. Connor, Ten Years Later, *Policing, Intl. Journal of Police Strategies & Management,* Vol. 25, No. 2, (June, 02).

53. Examining the Liability Issues of Custodial Restraint Deaths, *Legal Defense Journal* (Fall, 01).

54. Assessing Custodial Deaths in Jails, *American Jail Magazine, AJA,* (12/01), pgs. 13-25.

55. Emerging Trends in Police Failure to Train Liability, *Policing: An International Journal of Police Strategies and Management* (July, 2000).

56. Examining the Liability Factors of Sudden Death Wrongful Deaths in Police Custody, *Police Quarterly*, Police Executive Research Forum (PERF) Publishers, (December, 1999).

57. Editor and contributed two chapters to Pressure Point Control Tactics Instructor Manual, *Inmate Control Tactics*," PPCT Publications, Milldstadt, IL (June, 1999).

58. Assessing the Patterns of Citizen Resistance During Police Arrest, *FBI Law Enforcement Bulletin,* (June, 1999).

59. Factors Associated with Excited Delirium Deaths in Police Custody, *Modern Pathology* (11/98).

60. Comparing the Recidivism Rates of Boot Camp Graduates and Electronic House Arrest Offenders, *Criminal Justice Policy Review, (*Spring, 1998) (Co-authored Mark Jones, Ph. D).

61. In-Custody Deaths: Assessing Section 1983 Liability Issues. *Police Marksman*, May/June, 1998.

62. A Study of the Risk Factors Associated with Sudden Deaths in Police Custody, *Police Marksman*; 11/12/97.

63. Examining Less-Than-Lethal Force Training Since the *Canton* Decision, *Police Marksman,* (May/June, 1997) (Co-author Mark Jones, Ph. D).

64. Decision-Making and the Police Force Continuum, *PPCT Internet Training Publications*, (June/97).

65. Emerging Trends in Correctional Civil Liability Cases: A Content Analysis of Federal Court Decisions of Title 42 United States Code Section 1983: 1970-1994," *Journal of Criminal Justice* (Dec., 1997).

66. What Matters?, What Works?: Recidivism Among Probationers in North Carolina, *Perspectives* (June,1997); also reprinted in *Annual Editions, Criminology*, 1998/99, co-authored with Mark Jones, Ph. D.

67. A Comparison of the Recidivism Rates Between Bootcamp Participants and Regular Probation in North Carolina, *American Journal of Criminal Justice* (Nov '97) (co-author Mark Jones, Ph. D).

68. The Medical Implications and Training Recommendations Concerning OC, *International Use of Force Journal,* (November, 1997) (co-author Bruce Siddle).

69. A Twenty-Five Year Analysis of Section 1983 Jail Litigation, *Corrections Compendium,* January, 1997.

70. Examining the Liability Concerns of Suicides in Youthful Detention Facilities, *Journal of Juvenile Justice and Detention Facilities* (Spring, 1997).

71. Book review: The Equip Program: Teaching Youth to Think and Act Responsibly Through a Peer Helping Approach, by John C. Gibbons, Grandville, Bud Potter and Arnold P. Goldstein, *The Journal of Juvenile Offender Treatment Programs, (*1997).

72. Examining the Administrative Liability Issues of Correctional Tactical Teams, *American Jails*, (11/96).

73. Assessing Prisoner Assaults on Correction Officers, *Correction Compendium*, (August, 1996).

74. Supervisory Liability Concerns For Special Tactical Units, and a book review of *SWAT Teams,* by Robert L. Snow, *Police Marksman,* (July/August, 1996).

75. Assessing the Frequency of Less-than-Lethal Force Training For Police Officers, *Journal of Contemporary Literature in Criminal Justice,* (August, 1996) (co-author Mark Jones).

76. Analyzing the Most Common Types of Resistance in Police/Citizen Encounters, *International Use of Force Journal,* (May, 1996).

77. An Analysis of In Custody Deaths and Positional Asphyxiation, *Police Marksman*, (March, 1996).

78. A Twenty Year Analysis of Section 1983 Litigation in Corrections. *American Jails,* (May/June 1995).

79. Sudden Death Syndrome in Police Custody. *PPCT Training and Information Journal*, March, 1994.

80. Tactical Considerations. *PPCT Training and Information Journal*, (Nov., 1993).

81. Analyzing the Police Use of Force and Citizen Resistance During Police Arrest and Use of Force Issues In Corrections, *PPCT Training and Information Journal*, (May, 1993).

82. A National Analysis of Prisoner Assaults on Correction Officers (1993).

83. Identifying Citizen Resistance During Police Arrest*, PPCT Publications*, Millstadt, IL, (June, 1992).

84. Study Examines Non-Deadly Force Physical Force Policies, *Corrections* Today, (July, 1991).

85. Focus on Correctional Officer Assaults, *PPCT Training and Infor. Jour.* (Nov. 1989).

86. An Analysis of Educational Requirements for Correctional Officers for Entry Level and Promotion -Is It Necessary?  In the inaugural edition of the *Yearbook-of Correctional Education,* a co-publication of the International Education Association and Simon Fraser University, Canada, (May, 1989).

87.  A Model Policy on the Use of Non-Deadly Force in Corrections: Based on a Comprehensive Analysis of Correctional Non-Deadly to Corrections in Michigan. Force Policies Nationwide. Published by *PPCT Publications,* Millstadt, Illinois, (1989).

**PoliceOne.com Publications**

1. "Liability and Restraint Asphyxia" (10/10)
2. "The Science & Human Studies on Restraint Asphyxia" (2/10)
3. "Assessing Contextual Cues and Human Factors in Police Use of Lethal Force Incidents," (2/08)
4. "Recent Medical Studies Hail the Safe Use of Conducted Energy Weapons," (11/07)

**CorrectionsOne.com Publications**

1. Examining Custodial Suicide Liability Trends in Confinement Facilities (11/10)
2. "Officer Safety, Liability, and Prisoner Transports," (3/09)
3. "Detention Officers Use of Force in MI Jails," Part II (8/08)
4. "Analyzing Detainee Resistance in MI Jails," Part I (7/08)
5. "The Use of Restraints in Detention and Lessons Learned," (2/08)
6. "A Review of the *Hudson v. McMillian* Decision; Ten Years Later," (12/07)
7. "Lessons Learned From Death in Detention by Alcohol Intoxication," (10/07)

**Training Manuals/Curriculum**

1. Contributed chapter on Excited Delirium, OH State Training Academy, for the OH Attorney's General Office, Columbus, OH (November, 2010).

2. Instructor manual entitled: "Sudden In-Custody Deaths," Michigan Municipal Risk Management Authority, Livonia, MI (co-author, Ted Chan, M.D., 2006/revised 2010).

3. Chapter on "Use of Force Research in Policing" for the *Pressure Point Control Tactics Defensive Tactics Instructor Manual,* PPCT Management Systems, Inc, Publications, Millstadt, IL, (1995).

**RESEARCH IN PROGRESS:**

1. Safety of vascular neck restraints applied by police officers

2. Arrest-related deaths in law enforcement

3. Deadly force and human factors research in LE

4. Use of force options transitioning

**MANUSCRIPT AND BOOK REVIEWER**

Editorial Board Member: AELE, *Journal of Public Safety; Law Enforcement Executive Forum Journal*

Review articles/books for: Journal of Forensic and Legal Medicine, Journal of Medicine, Science, and the Law, Journal of Criminal Justice Review, Journal of Criminal Justice, Criminal Law Bulletin, American Journal of Criminal Justice, Pecos Press, Anderson Publishing Company, Journal of Crime and Justice, Carolina Academic Press, Modern Pathology, Journal of Contemporary Criminal Justice, and Journal of International Policing. Reviewer and member of the Technical Advisory Committee for the *Canadian Police Research Centre*.

**PROFESSIONAL TRAINING ACTIVITIES**:

| | |
|---|---|
| May 22 | Provided training on Supervisor liability issues in law enforcement; CASS/VSU Campus Police, Valdosta State University (GA) [GA Post & GA Chiefs Association certified] |
| | Provided training on: Deadly force liability decisions and human factors research, at the AELE Use of Force seminar, Las Vegas, NV (peer reviewed; NV Post certified). |
| April 22 | Facilitated Planning Goals at the GA Chiefs Annual Planning Conference and provided training on leadership and developing a new supervisor training program, Columbus, GA (GA Chiefs of Police Association certified, invited). |
| March 22 | Provided two training sessions on: Assessing the status of Excited Delirium (ExDS); Investigating arrest-related deaths, at the annual ILEETA conference, St. Louis, MO (w/Michael Brave, JD). |
| January 22 | Provided training on: Liability issues and correction tactical teams; managing the mentally ill jail detainee; and panel on use of force in jails; at the AELE Jail/Prisoner Legal Issues conference, Las Vegas, NV (invited; NV POST certified) |
| December 21 | Provided training on: Less-lethal force options, applied science, and liability issues; CASS/VSU Campus Police, Valdosta State University (GA) [GA Post Chiefs Association certified] |
| November 21 | Presented training on: Lab and field research on prone restraint with violent subjects; The Institute of the Prevention of In-Custody Deaths training conference, Las Vegas, NV (invited; NV POST certified) |
| October 21 | Presented: Civil liability and use of force policies, for the GA Board of Regents Campus Police Chiefs annual conference, Helen, GA (GA POST & GA Police Chiefs certified; invited) |
| July 21 | Provided training on: Strategies for mitigating use of force liability; GA Association of Chiefs of Police annual summer training conference (2 sessions), Savannah, GA (certified by GA POST, invited) |
| May 21 | Presented: Use of force options transitioning; Reviewing research methods in use of force incidents; and Panel member on use of force options; AELE conference on Use of Force, Las Vegas, NV (invited, peer reviewed, & certified by NV POST certified) |
| March 21 | Provided training on: Developing a comprehensive use of force system: Law enforcement administrators. Co-presented with Randy Means, JD. |

| | |
|---|---|
| March 21 | Provided training on: Supervisory liability issues, for the Harris County Sheriff's Office (Huston, TX) Command Personnel (invited) |
| January 21 | Provided training on: Risk management in jails and supervisor liability, AELE seminar on Jail and Prisoner Legal Issues seminar, Las Vegas, NV (invited & certified by NV POST certified) |
| January 21 | Provide training webinar on: Developing a comprehensive use of force system: Law enforcement administrators; sponsored by Randy Means, JD & Associates |
| October 2020 | Provided training webinar: Policy Development, Implementation, Maintenance, Monitoring, Evaluating, and Revision in Policing and Corrections, AELE, Las Vegas, NV |
| September 2020 | Provided training video on" Examining Violent Prone Restraint Incidents in Policing, for the Public Safety Discipline and Internal Affairs Investigations virtual seminar, AELE, Las Vegas NV |
| June 2020 | Provided training webinar on: Examining Violent Prone Restraint Incidents in Policing, AELE, Las Vegas, NV |
| March 2020 | Provided training on: police policy development and liability issues, for the GA Campus Police Chiefs annual conference, Cordele, GA (GA POST & GA Police Chiefs certified) |
| January 2020 | Provided 16-hours of training on: understanding and managing arrest-related deaths, at Valdosta State University; Co-presenter Michael Brave, JD (GA POST & GA Police Chiefs certified) |
| October 2019 | Provided training on: Assessing the liability trends associated with police response and naked subjects, and Dissecting use of force civil litigation at the Injury Prevention and In-Custody Deaths seminar, Las Vegas, NV (co-presenter Michael Brave, JD; NV POST certified) |
| March 2019 | Provided training on: Patterns of officer and civilian injuries during arrest, at the annual ILEETA conference, St. Louis, MO (co-presenter Michael Brave, JD) |
| February 2019 | Provided training on: Human Factors and Lethal Force Liability Decisions, at the annual CJAG conference, Valdosta State University, Valdosta, GA (GA POST certified) |
| September 2018 | Provided training on: Guidelines for investigating arrested-related deaths, officer involved-shootings, and human factors for MS Chiefs Association, Ocean Springs, MS. |
| March 2018 | Presented training on: Developing a Use of Force System in Law Enforcement for Law Enforcement Supervisors, Georgia Technical Institute University Police Department, Atlanta, GA (GA POST certified). |
| March 2018 | Presented research/training on: Deadly Force Liability Decisions and Human Factors, at the ILEETA annual training conference, St. Louis, MO (Co-Presenter, Michael Brave). |
| November 2017 | Provided training on: (a) Field Research on the Outcomes of Violent Restraint Incidents in Policing; and (b) Analyzing CEW Usage, Excited Delirium, and Emerging Liability Issues at the annual Injury Prevention and In-Custody Deaths seminar, Las Vegas, NV (invited). |
| | Provided 12 hours of training: IA Critical Incidents From Every Angle; Labor Relations Information Systems, Las Vegas, NV (panel member). |
| October 2017 | Presented 4 hours of training: Managing Use of Force and Liability Reduction; University of GA System campus law enforcement chiefs training conference, Valdosta State University, Valdosta, GA (GA POST certified) |

| | |
|---|---|
| October 2017 | Presented 2 hours of training: Emerging Liability Trends in Taser Arrest-Related Deaths, at the annual CJAG conference, Valdosta State University, Valdosta, GA (GA POST certified) |
| August 2017 | Provided 4 hours of training: Administrative Liability Issues for Correction Tactical Teams, TN Corrections Institute, Facility Training Officer Program, Pidgeon Forge, TN (invited). |
| June 2017 | Provided 4 hours of training: Officer Involved Shootings and Associated Human Factors for Command Personnel, Region 1 GA Police Chiefs Association, Tifton, GA (GA POST certified, invited). |
| March 2017 | Presented 4 hours of research: Liability Trends in Taser Arrest-Related Deaths, annual ILEETA conference, St. Louis, MO (co-author, Michael Brave). |
| December 2016 | Co-presented 8 hours of training: Critical Incident Analysis, Officer-Involved Shootings for LE Commanders, Human Factors, and 8 hours of Arrest-Related Death Investigations for LE Commanders, for Topeka, KS Police Department Command Staff (w/Randall Murphy). |
| November 2016 | Provided 12 hours of training: IA Critical Incidents From Every Angle; Labor Relations Information Systems, Las Vegas, NV (panel member). |
| Aug.-Sept. 2016 | Co-presented 8 hours of patrol officer training: Use of Force Liability Issues, Human Factors, and Use of Force Policy and Report Writing, Topeka, KS [275 officers] (w/Randall Murphy). |
| July 2016 | Co-presented 16 hours of supervisory training: Use of Force Liability and Policy Issues; Topeka, KS Police Command Personnel, Topeka, KS (w/Randall Murphy) |
| June 2016 | Presentation to the Oregon Chiefs of Police, Sheriff's, and Prosecutor's Association Legislative Committee on Body Worn Cameras: Human Factors, Officer Involved Shooting Investigations, and Body Worn Cameras, Salem, OR (6 hours invited) |
| June 2016 | Presented research on Restraint Asphyxia Update: Science and the Law, at the MI Sheriff's Association Summer Training Conference, Grand Rapids, MI (invited) |
| May 2016 | Presented 8 hours of Liability Issues Update for LE Administrators and 4 hours of Emerging Leadership Issues for the Police Executive; Region 1, GA Chiefs of Police Association training conference, Valdosta, GA PD (GA POST certified) |
| March 2016 | Co-presented 4 hours of training: Arrest-Related Custodial Deaths Investigations, ILEETA annual conference, Chicago, IL (co-presenters, Michael Brave & Mark Kroll, Ph.D.) |
| March 2016 | Provided 3 hours of training: Managing Use of Force and Liability Reduction: A Chief's Imperative; University of GA System campus law enforcement chiefs training conference, McCrae, GA (GA POST certified) |
| May 2015 | Presented 4/4-hour training blocks: Administrative Liability Issues in Law Enforcement; Designing a Use of Force System; Critical Incident Analysis, & Policy Implementation, Monitoring and Evaluation. So. GA Chiefs Association conference, VSU, Valdosta, GA; (GA POST & GA Chiefs certified). |
| November 2014 | Provided 12 hours of training on IA: Critical Incidents From Every Angle; Labor Relations Information Systems, Las Vegas, NV (invited & panel member). |
| October 2014 | Provided 8 hours of training on the Administrative Implications on Violent Prone Restraint Incidents, Excited Delirium, and Sudden Deaths In-Custody, for the So. MS Chiefs of Police Association, Ocean Springs, MS (invited, MS POST certified). |

September 14        Provided 8 hours of training on IA: Critical Incidents From Every Angle; Labor Relations
                    Information Systems, Portland, OR; OR Association of Chiefs of Police (invited & panel
                    member).

July 2014           Presented 4 hours of training on research on The Administrative Implications of Violent Prone
                    Restraint Incidents, Excited Delirium, and Sudden Deaths In Custody at the GA Association of
                    Chiefs of Police Annual Summer Training Conference, Savannah, GA (Invited; GA POST
                    certified).

June 2014           Provided 3 hours of training on Stress, Human Factors, and the Intuitive Learning Method for
                    Teaching Responses to Simulated Lethal Force Encounters, at the International Association of
                    Directors of Law Enforcement Standards and Training annual conference, Destin, FL (invited)

May 2014            Provided 16 hours of training for the Battle Creek, MI PD command personnel on Designing a
                    Use of Force System: Policy, Training, Reporting, Liability, Investigations, Implementation, &
                    Monitoring, Battle Creek, MI

April 2014          Provided 8 hours of training on the Administrative Implications on Violent Prone Restraint
                    Incidents, Excited Delirium, and Sudden Deaths In-Custody, at the Region One GA Chiefs
                    conference, Valdosta State University, Valdosta, GA (GA POST certified)

November 13         Provided 12 hours on IA: Critical Incidents From Every Angle; Labor Relations Information
                    Systems, Las Vegas, NV (invited & panel member).

October 2013        Provided 8 hours of training on "Liability Issues for Failing to Supervise, Failure to Train and
                    Deficient Policies for Law Enforcement Executives," Region One Chiefs of Police, Valdosta State
                    University (GA POST certified course & GA Chiefs course credits).

July 2013           Provided 8 hours training: "Use of Force Liability Issues, Science, and Human Factor Research.
                    Provided 8 hours training: "Protocols for Investigating Sudden Deaths In-Custody;" Region One
                    Chiefs of Police, Valdosta State University (GA POST certified courses).

May/June 13         Provided 2, 8 hour courses on Critical Issues in Personnel Management and Employee Discipline,
                    for the Cordele, GA Police Department and the Crisp County Sheriff's Department, Cordele, GA
                    (GA POST certified).

March 2013          Provided training to Region One Chiefs of Police: Risk Management for Police Executives (8
                    hours) and Critical Issues in Personnel Management and Employee Discipline (8 hours), Valdosta
                    State University (GA POST certified courses).

November 2012       Provided 12 hours on IA: Critical Incidents From Every Angle; Labor Relations Information
                    Systems, Las Vegas, NV (invited & panel member).

November 2012       Provided 8 hours of training on: Law, Science & Human Factors Impacting Officer Involved
                    Shooting Investigations, Region One Chiefs of Police Council, Valdosta State University (GA
                    POST certified course).

August 2012         Provided 8 hours of training on: Law, Science & Human Factors Impacting Officer Involved
                    Shooting Investigations, Region One Chiefs of Police Council, Valdosta State University (GA
                    POST certified course).

July 2012           Provided 8 hours of training on: Protocols for Investigating Sudden Deaths In-Custody; Region
                    One Chiefs of Police Council, Valdosta State University (GA POST certified course).

| | |
|---|---|
| March 2012 | Provided 8 hours training on: Human Factors, Science, and the Use of Lethal Force in Policing and 4 hours on Administrative Liability Issues for the GA Chiefs of Police Regional Conference, Valdosta, GA (invited, GA POST certified course). |
| August 2011 | Provided 8 hours of training on: The Use of Force, Science, Liability, and Sudden Deaths In Custody, for the Laurens County Sheriff's Department, Laurens County Prosecutor's Office, and Dublin Police Department, Dublin, GA (invited; GA POST certified course). |
| | Provided 8 hours of training on: Critical Issues for Law Enforcement in Testifying in Court, Region One Police Chiefs Council, Valdosta State University (GA POST certified course). |
| July 2011 | Provided 8 hours of training on: Protocols for Investigating Sudden Deaths In-Custody; Region One Chiefs of Police Council, Valdosta State University (GA POST certified course). |
| June 2011 | Provided 8 hours of training on: Use of Force & Sudden Deaths In-Custody; Region One Chiefs of Police Council, Valdosta State University (GA POST certified course). |
| March 2011 | Provided 8 hours of training on: Administrative Liability, Science, and Extreme Encounters in Law Enforcement, Region One GA Chiefs of Police Council, Valdosta, GA (invited & GA POST certified). |
| December 2010 | Provided 8 hours of training on: Science, Liability, Sudden Deaths In Custody, and Administrative Implications, for Ingham County Sheriff's Department Command Staff, Okemos, MI (invited). |
| October 2010 | Provided 16 hours of training on: Liability, Science & Human Factors Impacting Officer Involved Shooting Investigations & Sudden In-Custody Death Investigations for the IL State Police Investigators and Attorney's General attorneys, IL State Police Academy, Springfield, IL (invited; IL Law Enforcement Training and Standards Board certified). |
| August 2010 | Provided 8 hours of training on: The Law, Science & Human Factors Impacting Officer Involved Shooting Investigations & Sudden In-custody Death Investigations for the IL Law Enforcement Executive Institute, IL Law Enforcement Training and Standards Board certified, Rockford, IL Police Department (invited). |
| July 2010 | Provided 8 hours of training for Quincy, IL Mobile Training Unit on: Use of Force, Science, Law, Human Factors, & Sudden Deaths In-Custody, Quincy, IL Police Dept. (invited; IL Law Enforcement Training and Standards Board certified). |
| July 2010 | Provided 24 hours of PPCT Instructor certification and 16 hours of instructor re-certification for the Meijer Corporation, Lansing, MI. |
| June 2010 | Provided: 8 hours of training on: The Law, Science & Sudden In-Custody Death Investigations, and 4 hours on Human Factors and Officer Involved Shootings, State of WY Law Enforcement Academy, Douglas, WY (invited). |
| April 2010 | Provided 8 hours of training on: The Law, Science & Human Factors Impacting Use of Force & Sudden In-custody Death Investigations, IL Law Enforcement Training and Standards Board certified, Executive Inst., Peoria, IL |
| March 2010 | Provided 16 hours of training w/4 other trainers on Use of Force Summit: Critical Issues for Law Enforcement, IL Law Enforcement Training and Standards Board certified, Executive Inst., Rockford, IL |
| December 2009 | Provided 8 hours of training on: Management Strategies for Responding to the Violent Prone Officer, IL Law Enforcement Training and Standards Board certified, Executive Inst., Peoria, IL |

| | |
|---|---|
| August 2009 | Provided 8 hours of training on: "Assessing Legal Issues, Science, and Human Factors Impacting Use of Force Investigations & Sudden In-Custody Death Investigations, at the NC Internal Affairs Investigators Association training conference, Kill Devil Hills, NC (key note presenter & invited). |
| June 2009 | Provided 8 hours of Use of Force Investigations and Sudden Deaths In Custody, for Champaign, IL Police Department (invited; IL Law Enforcement Training and Standards Board certified). |
| | Provided 8 hours of Risk Management Strategies for Criminal Justice Administrators, for the IL Law Enforcement Training Standards Executive Institute (certified), Bloomington, IL. |
| May 2009 | Civil Liability Issues for Law Enforcement Administrators, Center for the IL Law Enforcement Training and Standards Executive Institute (certified), Elmhurst, IL Police Department (16 hours). |
| October 2008 | Provided one-day training on "Assessing Custodial Deaths from Tasers, Pepper Spray and Positional Asphyxia, and the Use of Force, at the MI Field Training Officer conference, Mt. Pleasant, MI (key note presenter & invited). |
| September 2008 | Presented training on "Use of Force Issues in the Post 9/11 Era," at the Terrorism & Law Enforcement: Threats, Responses, and Policy Implications, WIU, Institute for Applied Criminal Justice Studies, Moline, IL (IL Law Enforcement Training and Standards Board certified). |
| February 2008 | Provided 16 hours of PPCT Instructor re-certification for Instructor Trainers, Tampa, FL. |
| November 2007 | Provided a 16-hour refresher instructor seminar on Sudden In-Custody Deaths, for Michigan Municipal Risk Management Authority, Mt. Pleasant, MI. |
| August 2007 | "Tasers, Positional Asphyxia, Excited Delirium and Investigations in Sudden In-Custody Deaths," for the FDLE High Liability Trainers, St. Augustine, FL (invited). |
| August 2007 | "Human Factors and Contextual Cues of Lethal Force Encounters in Policing," for PPCT Instructor Trainers, St. Louis, MO (invited). |
| June 2007 | Provided 24 hours of PPCT Instructor training for the Meijer Corporation, Lansing, MI. Provided 16 hours of PPCT Instructor re-certification training for Meijer, Lansing, MI. Executive Protection. |
| April 2007 | Provided training on "Contextual Cues and Human Factors Associated with Police Use of Lethal Force, at the annual ILEETA conference, Chicago, IL. |
| March 2007 | Conducted 16 hours of re-certification training for PPCT Instructor Trainers, Tampa, FL. |
| December 2006 | Conducted training at the ECU School of Medicine, Pathology Department: *Investigating Sudden Deaths in Custody,* Greenville, NC. |
| June 2006 | Conducted 24 hours of instructor training in "Sudden Deaths In-Custody," for Michigan Municipality Risk Management Authority, Traverse City, MI (co-presenter, Ted C. Chan, M.D.). |
| February 2006 | Conducted 16 hours of training in Managing Marginal LE Employees for the LE Mgt. Institute, Wilson, NC. |
| October 2005 | Conducted a 16-hours training on Risk Management and Supervisory Liability Issues for the LE Mgt. Institute, Wilson, NC. |
| September 2005 | Conducted a 3-day instructor course in a PPCT Ground Avoidance and Ground Escape (GAGE), NAVCON Brig, and police departments, Charleston, SC. |

| | |
|---|---|
| August 2005 | Conducted a 3-day instructor school in Pressure Point Control Tactics and Restraints for the NAVCON Brig, SC DOC, and police departments, Charleston, SC. |
| | Conducted a 3-day instructor school in Pressure Point Control Tactics and Restraints for Meijer, Inc., Lansing, MI. |
| June 2005 | Conducted a 3-day instructor school in PPCT Spontaneous Knife Defense for the NAVCON Brig and Corrections Corporation of America, San Diego, CA. |
| April 2005 | Co-presented 8 hours of "Testifying in Court," ECU, Greenville, NC. |
| March 2005 | Conducted 40 hours of PPCT Instructor Trainer training in defensive tactics, for the MI Department of Corrections & MI Jails, Lansing, MI |
| February 2005 | Conducted 16 hours of training on "Responding to the Marginal Police Performer," LE Mgt. Institute, Wilson, NC |
| January 2005 | Conducted 16 hours of training on "Supervisory Liability Issues & Risk Management," LE Mgt. Institute, Wilson, NC |
| December 2004 | Conducted 3 days of instructor re-certification in PPCT Defensive Tactics and 2days of instructor certification in PPCT GAGE course, Ingham County Sheriff's Dept., Lansing, MI. |
| November 2004 | Provided 16 hours of training in "Exercising Leadership In Criminal Justice Agencies," LE Mgt. Institute, Wilson, NC |
| October 2004 | Provided 4 hours of training on "Risk Management for Jail Administrators," High Point, NC. |
| August 2004 | Re-certified Pressure Point Control Tactics Instructors and certified Collapsible Baton Instructors, (3 days) for Meijer, Inc., Lansing, MI (Executive Protection). |
| August 2004 | Provided 4 hours of training on "Excessive Force Internal Investigations and Liability Issues," at the NC Internal Affairs Investigator's Association conference, New Bern, NC. |
| May 2004 | PPCT Regional Instructor re-certification conference & provided training in "Liability Issues in Use of Force and "Survival Stress in Use of Force Encounters," for CO LE Training Consortium Snow Mass, CO. |
| April 2004 | Conducted 2, 8 hour programs on the "Use of Force, The Mentally Ill, & Custodial Deaths in Detention Facilities," Pitt Community College, Greenville, NC. |
| March 2004 | Conducted a 40 hour PPCT Defensive Tactics Instructor course, NAVCON Brig, San Diego, CA. |
| | Conducted a 3-day PPCT Defensive Tactics Instructor re-certification course, Wilson, NC. |
| February 2004 | Provided 16 hours of "Liability Issues for Police Administrators" and 16 hours of "Managing the Problem Police Officer," LE Mgt. Institute, Wilson, NC |
| Sept. 2003 | Conducted 2 days of training on "The Myths & Realties of the Police Use of Force," Nash Community College, Law Enforcement Academy, Rocky Mount, NC. |
| June 2003 | Conducted 40 hours of Instructor training in Pressure Point Control Tactics, Impact Weapons, and Spontaneous Knife Defense, for the NAVCON Brig & SCDOC, Charleston, SC. |
| | Conducted 24 hours of Instructor training in Pressure Point Control Tactics for Meijer, Inc., Loss Prevention, Corporate Office, Grand Rapids, MI. |

| | |
|---|---|
| May 2003 | Conducted 40 hours of training in PPCT Instructor Trainers Defensive Tactics course, Washington, D.C., for the Threat Management Institute, Nashville, TN. |
| | Presented 16 hours of training in "Supervisory Civil Liability Issues and Risk Management Strategies for Law Enforcement Managers," Cape Fear Community College, Wilmington, NC. |
| | Presented 8 hours of "The Myths and Realities of Police Use of Force," James Sprunt Community College, Kenansville, NC |
| April 2003 | Presented 16 hours of training in "Supervisory Civil Liability Issues and Risk Management Strategies for Law Enforcement Managers," Nash Community College, Rocky Mount, NC |
| | Presented 16 hours of training in "The Myths and Realities of the Police Use of Force," and 8 hours of "Liability Issues Surrounding Internal Affairs Use of Force Investigations," Law Enforcement Management Institute, Wilson, NC |
| February 2003 | Presented 8 hours of training in "Supervisory Liability" to law enforcement and correctional administrators, at James Sprunt Community College, Keanansville, NC. |
| | Presented 16 hours of training in "Supervisory Liability" to law enforcement administrators, Law Enforcement Management Institute, Wilson, NC. |
| Jan. 2003 | Presented 16 hours of training in PPCT Impact Weapons for Meijer Loss Prevention, Grand Rapids, MI. |
| Dec. 2002 | Presented 8 hours of "Risk Management" to law and enforcement and correctional agencies at James Sprunt Community College, Kenansville, NC |
| | Co-taught 8 hours of "Testifying in Court." Ashville, NC. |
| October 2002 | Presented 8 hours of PPCT spontaneous knife defense for the MI Police Corps Academy, Ferris State University, Big Rapids, MI. |
| Sept. 2002 | Presented 16 hours of Risk Management and 16 hours of Leadership Strategies for the Law Enforcement Management Institute, Wilson, NC. |
| June 2002 | Presented 24 hours of PPCT Spontaneous Knife Defense Instructor program for NAVCON Brig, U.S. Marines, Navy, Air Force, U.S. Marshals, and private corrections, San Diego, CA. |
| | Presented 16 hours of training in "Exercising Leadership In Criminal Justice Agencies, LE Mgt. Institute, Wilson Community College, Wilson NC. |
| April 2002 | Presented 8 hours of training in "Liability Issues in SWAT Team Operations, LE Mgt. Institute, Wilson Community College, Wilson, NC<br>Co-presented an 8-hour course in "Testifying in Court," ECU, Greenville, NC. |
| March 2002 | Presented 16 hours of training in "Performance Modeling in Law Enforcement," LE Mgt. Institute, Wilson Community College, Wilson, NC |
| December 2001 | Presented 16 hours of "Supervisory Liability" training for law enforcement administrators, LE Mgt. Institute, Wilson Comm. College, Wilson, NC. |
| November 2001 | Presented 16 hours of "Risk Management" training for law enforcement administrators, LE Mgt. Institute, Wilson Comm. College, Wilson, NC. |

| | |
|---|---|
| October 2001 | Presented 3, 8 hour sessions of "Custodial Restraint Deaths," for Michigan Municipality Risk Management Authority (Livonia, MI) at Mt. Pleasant, Marquette, & Detroit, MI. Certified by MCOLES (Course # 200102). |
| June/Aug. 2001 | Provided 24 hours of Pressure Point Control Tactics Instructor training and 2 days of instructor re-certification training, Meijer Inc. Loss Prevention, Grand Rapids, MI. |
| May 2001 | Provided 40 hours of Instructor certification in PPCT "Inmate Control," (subject control tactics) for the NAVCON Brig, Corrections Corp., INS, U.S. Marshals, the SD County Sheriff's Dept., and San Diego City Jail, San Diego, CA. |
| | Provided 24 hours of Instructor certification in PPCT for the NAVCON Brig, and Sheriff's Departments, Charleston, SC. |
| April/May 01 | Provided 4, 10-hour courses on "Emergency Response Team" training, Pitt County and Guilford County Sheriff's Departments, Greenville, NC. |
| April 2001 | Provided 8 hours of training on "Liability Issues Surrounding IA Investigations and Excessive Force," Southeast Regional Police Academy, Wilmington, NC. |
| March 2001 | Provided 16 hours of training on "Performance Modeling in Law Enforcement," for the LE Mgt. Institute, Wilson Comm. College, Wilson, NC. |
| February 2001 | Provided 8 hours of training on "An Assessment of the *Graham v. Connor* and *Canton v. Harris* Decision: Ten Years Later," for the Southeast Regional Police Academy, Wilmington, NC. |
| February 2001 | Provided 16 hours of Risk Management Training in Law Enforcement Agencies, for the LE Mgt. Institute, Wilson Comm. College. Provided 8 hours training in "Supervisory Liability Issues in Law Enforcement," for the Beaufort Community College Police Academy, Washington, NC. |
| January 2001 | Provided 16 hours of training on "Supervisory Liability Issues in Law Enforcement," for the LE Mgt. Institute, Wilson Comm. College, Wilson, NC. |
| August 2000 | Provided 8 hours of training on "Liability Issues Surrounding IA Investigations and Excessive Force, LE Mgt. Institute, Wilson Community College, Wilson, NC. |
| July 2000 | Provided 4 hours training on "Sudden Deaths in Police Custody," Police CORPS, Ferris State University, Big Rapids, MI. |
| | Provided 24 hours of Pressure Point Control Tactics Instructor Training for Meijer Thrifty Acres, Inc., Grand Rapids, MI. |
| June 2000 | Provided 16 hours of training in "Risk Management and Supervisory Liability for LE Managers," for Law Enforcement Training Services, Ft. Myers, Florida PD, FL. |
| | Provided 8 hours of Pressure Point Control Tactics training for the NAVCON Brig, San Diego, CA. |
| May 2000 | Provided 16 hours of training in "Strategies for Responding to the Marginal Performer," for the Law Enforcement Management Institute, Wilson, NC. |
| May 2000 | Provided 16 hours of training in Exercising Leadership In CJ Organizations," for the NC Department of Corrections, Law Enforcement Management Institute, Wilson, NC |

| | |
|---|---|
| April 2000 | Provided 16 hours of training in "Risk Management and Policy Procedure Development," L. E. Mgt. Institute, Wilson Community College, Wilson, NC |
| | Provided 8 hours of training "Supervisory Liability" for NC Department of Corrections and local police departments, Beaufort Community College Police Academy, Washington, NC. |
| March 2000 | Provided 24 hours of instructor training in PPCT Spontaneous Knife Defense, Southeast Regional Police Academy, Wilmington, NC. |
| | Provided 16 hours of instructor re-certification in Impact Weapons, and Pressure Points, Wilson Community College Police Academy, Wilson, NC. |
| February 2000 | Provided 24 hours of instructor training in Pressure Point Control Tactics for the Air Force Police, NAV CON Brig, DOC of South Carolina, Charleston & Derrick County Sheriff Departments, and Charleston Hospital Police, at the Navy Brig Charleston, SC. |
| January 2000 | Provided 16 hours of police managerial training in "Supervisory Liability Issues," LE Mgt. Institute |
| December 1999 | Provided 16 hours of training in "Exercising Leadership in Policing," LE Mgt. Institute, Wilson, NC. |
| November 1999 | Provided 8 hours of training in "Sudden Deaths in Police Custody," for the NC Justice Academy Salemberg, NC. |
| August 1999 | Provided 16 hours of "correctional emergency response team" training for the Guilford Co. Sheriff's Department, Greensboro, NC |
| | Provide 16 hours of training in "Police Response to the Mentally Ill & Violent Offenders," Roebeson Community College Police Academy, Lumberton, NC. |
| June 1999 | Provided 40 hours of PPCT Defensive Tactics Instructor training for the U. S. Coast Guard, Counter Narcotics Unit and Tactical Law Enforcement Unit, Portsmouth, VA. |
| June 1999 | Provided 24 hours of PPCT Instructor training for Meijer, Inc., Grand Rapids, MI. |
| June 1999 | Provided 8 hours of training in "Cell Extractions" for the NC DOC and regional NC jails, for the Law Enforcement Management Institute, Wilson, NC |
| April 1999 | Provided 8 hours of training on "Sudden Deaths in Police Custody," for the Police Corps Academy at Southern Mississippi University, Hattiesburg, MS |
| | Provided 8 hours of training in "Cell Extractions" for the North Carolina Department of Corrections and regional jails, Law Enforcement Management Institute, Wilson, NC |
| March 1999 | Provided 8 hours of training in "Cell Extractions" for the North Department of Corrections and regional jails, Law Enforcement Management Institute, Wilson, NC |
| | Provided 2, 16 hour programs on "Performance Modeling," for the New Brunswick, NJ PD, for Law Enforcement Training Services @ Rutgers University, NJ |
| February 1999 | Provided 16 hours of training on "Policy and Procedure Development," for the Law Enforcement Management Institute, Wilson, NC. |

20

| | |
|---|---|
| January 1999 | Provided 16 hours of training on Strategies for Responding to the Problem Employee in Law Enforcement," Law Enforcement Management Institute, Wilson, NC. |
| December 1998 | Provided 16 hours of training on "Risk Management for LE Managers" and "Liability Issues Surrounding Sudden Deaths in Police Custody," L E Management Institute, Wilson, NC. Provided 16 hours of training on "Liability Issues in Correctional Administration," Wilson, NC. |
| November 1998 | Provided 16 hours of training on "Liability Issues and the LE Manager," Law Enforcement Management Institute, Wilson, NC. |
| October 1998 | Provided 3, 8 hour training programs on "Sudden Death in Police Custody," for the Central West Law Enforcement Training Consortium, Ferris State University, Big Rapids, MI (course certified by State of MI., MCOLES). |
| October 1998 | Co-instructed "Issues Related to Testifying in Court," 8 hour program for Eastern Area Health Education Center, Greenville, NC. |
| September 1998 | Provided 2, 8 hour programs on "Sudden Death In Police Custody," for the Illinois Law Enforcement Training Association. |
| September 1998 | Provided a 8 hours on "Sudden Deaths in Police Custody," for the Coastal Plains Police Academy, Wilson. NC. |
| | Provided a 24 hour PPCT instructor course for the NAVCON Brig, Charleston,  SC. |
| August 1998 | Conducted an 8 hour program, "Risk Management for LE Managers Coastal Plains Police Academy, Wilson, NC. |
| July/August 1998 | Conducted 2, 16 hour PPCT instructor re-certification courses for Meijer Inc., Grand Rapids, MI |
| May 1998 | Conducted a 24 hour PPCT Spontaneous Knife Defense Instructor course, for Coastal Plains Police Academy, Wilson, NC |
| | Conducted a 16 hour seminar on "Developing Policies and Procedures in Law Enforcement," LE Management Training Institute, Wilson, NC |
| April 1998 | Conducted a PPCT Defensive Tactics Instructor 24 hour re-cert course, for Costal Plains Police Academy, Wilson, NC. |
| | Conducted an 8 hour course in Liabilities Issues Surrounding the Use of Force, Costal Plains Police Academy, Wilson, NC. |
| March 1998 | Conducted a 40 hour PPCT Defensive Tactics Instructor course for the South Eastern Law Enforcement Region, Fayetteville, NC. |
| | Conducted an 8 hour course in "Responding to the Violent Prone Officer," Law Enforcement Management Training Institute, Wilson Community College, Wilson, NC. |
| February 1998 | Conducted a 16 hour course in "Risk Management & Liability Issues of Deaths in Police Custody," Management Training Institute, Wilson, NC. |
| December 1997 | Conducted a 16 hour course in "Police Response to the Mentally Ill, Coastal Plains Police Academy, Wilson, NC. |
| November 1997 | Conducted a 24 hour instructor course in PPCT Spontaneous Knife Defense, NAVCON Brig, Miramar, CA. |

| | |
|---|---|
| October 1997 | Conducted 16 hours of "Supervisory Liability Issues for Police Managers," for the Management Training Institute, Wilson, NC. |
| August 1997 | Conducted 16 hours of "Managing the Marginal Performer in Law Enforcement," for the Management Training Institute, Wilson, NC. |
| July 1997 | Conducted 2, 8 hour Pressure Point Control Tactics program for the Navy, Air Force and Marine Corp Brig, Miramar, CA. |
| May 1997 | Conducted a 16 hour instructor course in Special Operation Response Teams/Cell Extractions, for the Coastal Plains Police academy, Wilson Technical Community College, Wilson, NC. |
| May 1997 | Conducted a 40 hour PPCT Defensive Tactics Instructor course for the North Carolina Justice Academy Salemburg, NC. |
| April 1997 | Conducted a 16 hour PPCT Weapon Retention and Disarming Instructor course, for the North Carolina Justice Academy, Salemburg, NC |
| April 1997 | Conducted an 8 hour course on Liability Issues Surrounding Use of Force, for Wilson CC Police Academy, Wilson, NC. |
| April 1997 | Conducted a 24 hour PPCT Pressure Point Instructor course for Meijer Inc., Grand Rapids, MI. |
| March 1997 | Conducted a 24 hour PPCT Impact Weapon Instructor course for the Coastal Plains Police Academy, at Goldsboro NC, P.D. |
| February 1997 | Conducted an 8 hour training program on "Sudden Death in Police Custody," for the Southern Mississippi Law Enforcement Association, hosted by the Long Beach, MS police department. |
| | Conducted a 16 hour Pressure Point Instructor re-certification course, hosted by the Goldsboro, NC police department. |
| December 1996 | Conducted a 40 hour PPCT Defensive Tactics Instructor course for the U.S. Coast Guard and a Navy Seal Team, International Training Division, Yorktown, VA. |
| October 1996 | Conducted a 24 hour Pressure Point Instructor course for the U.S. Navy & Air Force Brig and the South Carolina Department of Corrections, Charleston, SC. |
| August 1996 | Conducted 16 hours of management training in "Strategies for Responding to Problem Employees," Wilson Technical Comm. College, Wilson, NC. |
| | Conducted a 40 hour PPCT Defensive Instructor Course, Pitt CC Police Academy, Greenville, NC. |
| July 1996 | Conducted a 40 hour PPCT Defensive Tactics Instructor Course for police and military police, FTCC Fayetteville, NC. |
| | Conducted 2, 8 hour "Basic Pressure Point Control Tactics" courses for the Navy and Marine Corp. Brig, Miramar, CA. |
| May 1996 | Conducted 2, 8 hour programs in "Deaths in Police Custody," for police command personnel, Columbus, Ohio Police Department, Columbus, OH. |
| May 1996 | Conducted a 40-hour PPCT Defensive Tactics Instructor course at the North Carolina Justice Training Academy, Salemburg, NC |

April 1996        Conducted a 3-day Pressure Point Instructor course for the Meijer Corporation, Grand Rapids, MI

March 1996        Conducted a 2-day PPCT Instructor program in "Weapon Retention," for the North Carolina Justice Training Academy, Salemburg, NC

February-March    Conducted 4, 8 hour programs in "Suicide Awareness" for the Pitt County Sheriff Department, 1996              Greenville, NC.

February 1996     Conducted an 8 hour training program on "Special Operations Response Team", for the Sarpe County Sheriff Department, Omaha, NE.

                  Conducted an 8 hour program on "Risk Management and Liability Issues for Law Enforcement Administrators," Wilson Police Academy, NC.

January 1996      Conducted a 24 hour PPCT Impact Weapon Instructor school for the Fayetteville Technical Community College, Fayetteville, NC.

                  Conducted an 8 hour training seminar for police command personnel on "Liability Issues for Police Supervisors," Coastal Plains Police Academy, Wilson, NC

December 1995     Conducted a 4-hour course for the Charlotte, NC Command Personnel, in Use of Force Decision Making, Force Continuum, and Use of Force Policy Development.

October 1995      Conducted an 8 hour seminar on "Deaths in Police Custody", for the Savannah, GA PD.

                  Conducted 24 hours of Instructor training in PPCT "Spontaneous Knife Defense", for the North Carolina Justice Academy, Salemburg, NC.

October 1995      Conducted 8 hours of training on "Special Operations Response Teams" for the North MS Law Enforcement Training Center, Tupelo, MS (SWAT team).

September 1995    Conducted 40 hours of instructor training in PPCT Subject Control Tactics, Spontaneous Knife Defense and Cell Extractions for the Hong Kong Correctional Services, Hong Kong.

August 1995       Conducted a 24-hour instructor course in Pressure Point Control Tactics for the North Carolina Justice Academy, Salemburg, NC.

July/August 1995  Conducted 2, 3-day instructor courses in Pressure Point Control Tactics for Meijer Inc. Grand Rapids, MI & Dayton, OH.

July 1995         Conducted a 40-hour instructor course in PPCT Defensive Tactics for the North Carolina Justice Academy, Salemburg, NC (provided for State of NC certified defensive tactics instructors).

June 1995         Conducted a 24-hour PPCT Spontaneous Knife defense course for the Navy/ Marine Corp. Brig, Miramar, CA.

                  Conducted an 8-hour seminar on "Deaths in Police Custody" Lakeland Community College, Mantoon, IL (IL Law Enforcement Training and Standards Board certified).

                  Conducted an 8-hour seminar on "Deaths in Police Custody", for the Pitt Community College Police Academy, Greenville, NC.

May 1995          Conducted a 40-hour PPCT Defensive Tactics Instructor course at the Goldsboro, NC police dept.

| | |
|---|---|
| April 1995 | Provided an 8-hour seminar on "Deaths in Police Custody" for the Kansas City, KS  police department and 25 other police departments. |
| April 1995 | Provided 16 hours of managerial training for the Raleigh, NC police department on, Supervisor Liability and Leadership. |
| | Provided 8-hours of training for the Coastal Plains Police Academy in Tactical Handcuffing and Weapon Retention. Also, conducted 16 hours of training for police managers in Managing the Problem Employee, Wilson, NC. |
| April 1995 | Provided 4-hours of training for the NC Justice Academy in The Force Continuum, part of a 40 hour course on Subject Control, Salemburg, NC, |
| March 1995 | Provided 8-hours of training in Liability Issues for Supervisors, Coastal Plains Police Academy, Wilson, NC. |
| | Provided 24-hours of Instructor Training in "PPCT Knife Defense", Wilson, NC. |
| February 1995 | Provided 24 hours of instructor training in Pressure Point Control Tactics, Coastal Plains Police Academy, Wilson, NC |
| February 1995 | Provided 8 hours of training in Use of Force Liability Issues for police officers, Pitt Community College police academy, Greenville, NC |
| January 1995 | Provided 4 hours of training for the NC Justice Academy on the Force Continuum and Use of Force Decision-Making, Salemburg, NC. |
| December 1994 | Conducted 16 hours police manager training in Liability Issues and Leadership, Coastal Plains Police Academy, Wilson, NC. |
| November 1994 | Conducted 4 hours of training for the NC Justice Academy on the Force Continuum and Use of Force Decision-Making, Salemburg, NC. |
| October 1994 | Conducted 8 hours training on Leadership for Police Managers for Coastal Plains Police Academy, Wilson, NC. |
| October 1999 | Team taught 40-hours of "Train-the-Trainer" course for law enforcement managers, through the Criminal Justice Institute, Ferris State University, Big Rapids, MI. |
| | Conducted 24 hours of Instructor training in Pressure Point Control Tactics for the Meijer Corporation, Grand Rapids, MI. |
| September 1994 | Conducted 8 hours of training on "Critical Issues for Police Trainers," Pitt Community College Police Academy, Greenville, NC. |
| | Conducted 16 hours of training on "Police Response to the Mentally Ill",Coastal Plains Police Academy, Wilson, NC. |
| August 1994 | Conducted a 24 hour Instructor course on PPCT Impact Weapons for the NC Justice Academy, Salemburg, NC. |
| | Conducted 8 hours of training in "Deaths in Police Custody", for the Northern Mississippi Law Enforcement Police Academy, Tupelo, MS. |
| July 1994 | Conducted a 40 hour PPCT Defensive Tactics Instructor course for the NC Justice Academy, Salemburg, NC. |

| | |
|---|---|
| June 1994 | Conducted 24 hours of PPCT Spontaneous Knife Defense Instructor training, for the NC Justice Academy, Salemburg, NC. |
| | Conducted 40 hours of PPCT Defensive Tactics Instructor training for the U.S. Marine Corp. and Navy Brig, Miramar, CA. |
| May 1994 | Conducted 16 hours of police management training in Liability Issues for Supervisors and Leadership, Coastal Plains Police Academy, Wilson, NC. |
| April 1994 | Conducted 24 hours of Instructor training in Pressure Point Control Tactics, Coastal Plains Police Academy, Wilson, NC. |
| | Conducted 16 hours of Defensive Tactics for the Greenville, NC SWAT Team, high risk incidents. |
| March 1994 | Conducted 8 hours of training in "Risk Management for Police Supervisors", Coastal Plains Police Academy, Wilson, NC. |
| | Conducted 24 hours of Instructor training in PPCT Impact Weapon, Pitt Community College Police Academy, Greenville, NC. |
| February 1994 | Conducted two, one day police training seminars for the Coastal Plains Police Academy, Wilson, NC: Liability Issues Surrounding the Use of Force and Tactical Handcuffing and Handgun Retention. |
| | Conducted 16 hours of Special Tactical Response Team training for the Pitt County Sheriff's Department, Greenville, NC. |
| November 1994 | Conducted a 1-day training program on the Force Continuum and use of Force Decision-Making, for the N C Justice Academy, Salemburg, NC. |
| November 1993 | Conducted two, two-day Supervisor's Programs for the Coastal Plains Police Academy, Wilson, NC; Developing Policies and Procedures and Managing The Problem Police Employee. |
| October 1993 | Conducted one-day training of a 5 day Advanced Survival program on "Spontaneous Knife Defense," Coastal Plains Police Academy, Wilson, N.C. |
| August 1993 | Conducted a 24 hours of training for Jail Supervisors in the "Correctional Training Officer" program at the Ingham County Sheriff Department. |
| July 1993 | Conducted a 24 hour PPCT "Pressure Point Control Tactics Instructor Program" for the Meijer Cooperation, Grand Rapids, MI. |
| | Conducted a 40 hour PPCT "Defensive Tactics Instructor Program" for police officers, Ferris State University |
| June 1993 | Conducted 4 days of Pressure Point Control Training for the Pitt County Sheriff's Department-Detention Officers, Greenville, NC. |
| | Conducted 2 days training in Pressure Point Control Tactics, the U.S. Naval/Brig, Miramar, CA. |
| | Conducted a 40 hour PPCT "Defensive Tactics Instructor" course for the Pitt Community College Police Academy, Greenville, NC. |

| | |
|---|---|
| May 1993 | Conducted training in the PPCT Spontaneous Knife Defense course for the Pitt Community College Police Academy, Greenville, NC. |
| | Conducted a two-day re-certification in the PPCT Defensive Tactics Instructor's program for Michigan State certified instructors, Kalamazoo Valley Community College, Kalamazoo, MI. |
| April 1993 | Instructed one-day of a 5-day "Advanced Survival Training" for In-Service police officers; "Spontaneous Knife Defense". Coastal Plains Police Academy, Wilson, NC. |
| | Conducted training for police supervisors in "Leadership," "Supervisory Liability Issues" and Stress Management," for the Police Academy, Wilson Technical Community College, Wilson, NC. |
| March 1993 | Conducted training in the basic PPCT Spontaneous Knife Defense program for the Pitt Community College Police Academy, Greenville, NC |
| | Conducted training in the PPCT Spontaneous Knife Defense Instructor program for the Pitt Community Police Academy, Greenville, NC. |
| | Conducted a 24 hour course in PPCT Spontaneous Knife Defense Instructor program for the NC Justice Academy, Salemburg, NC. |
| February 1993 | Conducted training for police supervisors in "Leadership" and" Supervisory Liability Issues" and "Stress Management," for the Raleigh NC, Police Department. |
| November 1992 | Conducted training in the basic PPCT Spontaneous Knife Defense program for the Pitt Community College Basic Law Enforcement Training Academy, Greenville, NC. Conducted training for police supervisors in "Leadership" and "Supervisory Liability Issues," for the Police Academy, Wilson Community College, Wilson, NC. |
| July 1992 | Instructor for the Meijer Corporation Inc., Grand Rapids, MI, in a 3-day PPCT Instructor Program. |
| | Instructor for a 40-hour PPCT Defensive Tactics Instructor Program for Police Officers, Ferris State University, Big Rapids, MI. |
| | Training Consultant for the ACA the Federal Bureau of Prisons, New York City, 1-day seminar on "Team Building." |
| May/June 1992 | Instructor in a 5-day "Jail Administrator's Program," Ferris State University, Big Rapids, MI. |
| May 1992 | Lead instructor in a 5-day, "Law Enforcement Executive Command Training," - Washtenaw Community College, Ann Arbor, MI. |
| April 1992 | Instructor for the Michigan Department of Corrections. A 5-day and a 3 day PPCT Instructor Program in, "Defensive Tactics and Spontaneous Knife Defense," Lansing, MI. |
| | Instructor in a 3-day PPCT Instructor Program in Impact Weapons. Schoolcraft Community College, Livonia, MI. |
| | Instructor in a 5-day PPCT Defensive Tactics Instructor course-Michigan Department of Corrections Jail Training Division, Lansing, MI. |
| March 1992 | Instructor in a 5-day PPCT Defensive Tactics Instructor course Alpena Community College, Alpena, MI. |

February 1992    Instructor in a 3-day, "Spontaneous Knife Defense Instructor course Michigan Department of Corrections Jail Training Division, Lansing,  MI.

February 1992    Instructor in a 1-day, "Suicide Awareness for Police and Correctional Personnel," and 1-day, "Liability Issues Surrounding the Use of Non-Deadly Force," for correctional and police personnel, Schoolcraft Community College, Garden City, MI.

January 1992    Instructor in a 1-day, "Liability Issues Surrounding Non-Deadly Force," and a 3-day, "PPCT Baton Instructor program"-Ingham County Sheriff Department, Mason, MI.

November 1991    Instructor in a 2-day PPCT Basic Defensive Tactics -Alpena MI, P.D.

October 1991    Instructor in a 2-day, "Police Policy and Procedure Development," program - Kentwood, MI Police Department.

   Instructor in a 3-day PPCT, "Spontaneous Knife Defense Instructor," Ingham County Sheriff Department, Mason, MI.

   Instructor in a 3-day PPCT, "Defensive Tactics Instructor Course," Michigan Department of Corrections, Jail Training Division, Lansing, MI.

September 1991    Instructor of a 2-day "Coaching and Leadership Enhancement," Bureau of Federal Prisons, Duluth, Minnesota. (consultant for ACA)

   Instructor in a 5-day, "PPCT Pressure Point Spontaneous/ Knife Defense," instructor program - Florida Department of Corrections, Vero Beach, FL.
Conducted an 8 hour seminar, "Liability Issues in Non-Deadly Force,"  Schoolcraft Community College, Garden City, MI.

July 1991    Instructor in 3-day PPCT, "Spontaneous Knife Defense and Impact Weapon," instructor program NMU, Marquette, MI.

June 1991    Instructor in a 1-day, "Pressure Point Control Tactics," U.S. Navy Brig,  Miramar, CA

May 1991    Instructor in a 3-day, "Spontaneous Knife Defense" instructor course, Ferris State University, Big Rapids, Michigan.

   Lead instructor in a 5-day, "Jail Supervisor," course - Ferris State University, Big Rapids, MI.

May1991    Instructor in a 5-day PPCT, "Pressure Point Control Tactics and Impact Weapons" instructor course, Florida, DOC Olustee, FL.

April 1991    Instructor in a 3-day PPCT, "Spontaneous Knife Defense," instructor program, Washtenaw Community College, Ann Arbor, MI.

March 1991    Instructor in a 3-day "Pressure Point Control Tactics and Impact Weapons," instructor course, Florida Dept. of Corrections, Vero each, FL.

February 1991    Instructor in a 2-day, "Police Policy and Procedure Development program, Schoolcraft Community College, Garden City, MI.

   Instructor in a 3-day, "Subject Restraint," re-certification instructor course, Meijer Inc., Grand Rapids, MI.

December 1990    Instructor in a 1-day program on, "Liability Issues and Non-Deadly Force for Police Personnel," - Oakland County Sheriff Department, Pontiac, MI.

November 1990    Instructor in a 5-day PPCT, "Defense Tactics" instructor course for police personnel - Northern Michigan University, Marquette, MI.

October 1990    Instructor in a 1-day program on "Liability Issues and Non-Deadly Force for Police Personnel," Schoolcraft Community College, Garden City, MI.

Instructor in a 2-day, "Police Policy and Procedure Development course," Governmental Risk Managers Inc., Plymouth, Michigan.

Instructor in a 1-day, "Liabilities and the Use of Non-Deadly Force" for police personnel - Delta Community College, Saginaw, MI.

September 1990    Instructor in a 3-day PPCT, "Spontaneous Knife Defense" Instructor course, Florida Department of Corrections, Vero Beach, FL.

July 1990    Instructor in a 40-hour PPCT, Defensive Tactics Instructor course, for police personnel. Ferris State University, Big Rapids, MI (grant award).

Instructor in a 5-day PPCT, "Defensive Tactics Instructor course, for the Michigan Department of Corrections, Jail Division, Lansing, MI.

May 1990    Instructor in a 5-day PPCT, "Defensive Tactics Instructor -Trainer course, "for the Dallas, TX PD and Dallas County Sheriff Department.

March 1990    Instructor in a 1-day, "Liabilities and the Use of Non-Deadly Force" for police personnel - Schoolcraft Community College, Garden City, MI.

March 1990    Instructor for a 3-day, "Defensive Tactics," instructor re- certification course for MI Department of Natural Resources Law Enforcement Division - Ferris State University, Big Rapids, MI.

April 1990    Instructor for a 5-day PPCT, "Defensive Tactics Instructor course, Florida Department of Corrections, Mariana, FL

February 1990    Instructor for a 1-day, "Suicide Awareness," program for jail and police personnel - Schoolcraft Community College, Garden City, MI.

January 1990    Instructor for a 5-day PPCT, "Defensive Tactics," instructor course for police/correctional personnel Mecosta County Sheriff Department, Big Rapids, Michigan.

Instructor in a 4-day, "PPCT Basic Defensive Tactics," course, for Oakland County Sheriff Department, Pontiac, MI.

November 1989    Instructor for a 5-day PPCT, "Defensive Tactics," instructor course for police/correctional personnel Ferris State University, Big Rapids, MI.

September 1989    Instructor for a 1-day, "Suicide Awareness," program for jail/ police personnel - Kalamazoo Dept. of Public Safety, Kalamazoo, MI.

July 1989    Instructor for a 5-day, "Subject Restraint," instructor course for Meijer, Inc., Grand Rapids, MI.

May 1989    Instructor for a 5-day, "Developing Instructional Strategies," course for potential trainers for Meijer Inc., Grand Rapids, MI.

Instructor for a 2-day basic, "Pressure Point Control Tactics," course for police personnel, Northwestern Traffic Institute, Ypsilanti, MI.

February 1989    Instructor for a 2-day basic, "Pressure Point and Impact Weapons" course for police personnel, Allegan County Sheriff Department, Allegan, MI.

November 1988    Instructor for a 2-day, "Problem Employee," seminar for the MI Department of Corrections - Sault Ste. Marie, MI.

Instructor for a 1-day, "Suicide Awareness," program for jail/police personnel - Eastern Michigan University, Ypsilanti, MI.

October 1988    Instructor for a 1-day, "Suicide Awareness," program for jail/police personnel - Eastern Michigan University, Ypsilanti, MI.

Instructor for a 2-day, "Problem Employee," course for the MI Department of Corrections - Ionia, MI.

Instructor for a 5-day PPCT, "Defensive Tactics," Instructor course for the Grand Rapids, MI Police Department.

June 1988    Instructor for a 2-day, "Defensive Tactics," course for the U.S. Customs and Immigration and Border Patrol - Sault Ste. Marie, MI.

May 1988    Instructor for a 2-day, "Policy and Procedure Development," for Police Command Personnel - Northwestern Traffic Institute Ypsilanti, MI.

Instructor for a 1-day, "Enhancing Leadership for Police Managers," Northern Michigan University, Marquette, MI.

April 1988    Instructor for a 2-day, "Problem Employee" seminar for police managers Schoolcraft Community College, Garden City, MI.

March 1988    Instructor for a 5-day, "Defensive Tactics" Instructor course for MI Department of Natural Resources Law Enforcement Division, Ferris State University.  Designed this course for the DNR Instructor for a 1-day, "Suicide Awareness," program for police/ jail personnel - Eastern MI University, Ypsilanti, MI.

February 1988    Instructor in the 160-hour jail training program. Taught 4 days of "Defensive Tactics," 2 days of "Correctional Law," 1 day of "Report Writing" and 1 day of "Suicide Awareness." - Mecosta County Sheriff Department, Big Rapids, MI.

Instructor of a 5-day PPCT, "Defensive Tactics," instructor course for police personnel -Smith and Wesson Training Academy, Springfield, MA,

Instructor in a 5-day, "Subject Restraint" instructor program and a 5 day "Developing  I Instructional Strategies," for Meijer Inc., Grand Rapids, MI.

November 1987    Instructed a 1-day, "Suicide Awareness," program for jail/ police personnel - Eastern MI University, Ypsilanti, MI.

October 1987    Instructor for 2-day, "Problem Employee," seminar for police managers, Ferris State University. Big Rapids, MI.

Instructor for the 160-hour jail training program. Taught 4 days of, "Defensive Tactics," 2 days of "Correctional Law," 1 day of, "Report Writing," and 1 day of, "Suicide Awareness" - Mecosta County Sheriff Department, Big Rapids, MI.

September 1987  Instructor for a 1-day, "Suicide Awareness," program for jail/police personnel, Eastern Michigan University, Ypsilanti, MI.

July 1987  Instructor for a 2-day, "Suicide Awareness," program for jail/police personnel, Eastern Michigan University, Ypsilanti, MI.

June 1987  Instructor in a 2-day, "Defensive Tactics," refresher program for police personnel - Ferris State University, Big rapids, MI.

May 1987  Instructor in a 2-day, "Defensive Tactics," refresher program for police personnel - Muskegon Community College, Muskegon, MI.

March 1987  Instructor in a 2-day, "Effective Manager," seminar for the MI Department of Corrections, Parole and Probation Division, Lansing, MI.

February 1987  Instructor for a 2-day, "Defensive Tactics" program for the U.S. Forest Service Law Enforcement Division - Cadillac, MI.

## CONSULTING ACTIVITIES:

Review policies/procedures for law enforcement and correctional agencies regularly (ongoing).

Provided pre-service physical agility testing for police applicants for the State of Illinois (06-10).

May 22-present  Los Angeles County Sheriff's Department: review and provide external assessment of correction officers and deputies use of force (videos, reports, force policy, & IAB investigation reports)

June 21-Sept. 21  Research team to develop a police department for Buckhead, GA (VSU)

January 21  Reviewed use of force policies for Perry, GA police department

June 2020  Reviewed IA investigation for Valdosta State University Campus Police, Valdosta, GA

Jan-Dec. 20-21  Conducting research on use of force field applications for two years, Carol Stream, IL Police Dept.

January 2019  Reviewed an internal investigation of an officer-involved shooting of a dog, for the Battle Creek, MI Police Department, Battle Creek, MI

February 17  Reviewed the GA State University's Campus Police Use of Force Policy, BOR USG Public Safety Committee's policy review

Wrote a 3-hour training program on De-Escalation Strategies for Law Enforcement, for the BOR UGS Public Safety (campus police) in-service training program (26 universities).

April to Dec.16  Provided technical consulting assistance to the Topeka, KS Police Department on Implementing a Use of Force System, Use of Force Policies Development, Training, & Field Implementation.

July 15 to present  Committee member of the University System of GA Campus Safety Law Enforcement and Use of Force Development committee

Sept. 15 to Feb-16  Provided technical consulting assistance to the Moultrie, GA Police Department on manpower analysis, shift scheduling, salary assessment, and dept. reorganization

| | |
|---|---|
| March to June 14 | Provided technical consulting assistance to the Battle Creek, MI Police Department on Implementing a Use of Force System and Use of Force Investigations. |
| April to May 14 | Provided technical consulting assistance to the Champaign, IL Police Department on Conducted Energy Weapons policy development and implementation. |
| March to May 14 | Provided technical assistance to LAAW International, LLC: reviewed/edited Taser, Use of Force, Use of Lethal Force, & Force Report policies |
| April to June 13 | Provided external review, site visit, and submitted report for the Criminal Justice Program, Jacksonville State University, Jacksonville, AL. |
| April to June 13 | National Institute of Justice: Scientific and Technology Review Panel: review and provide assessment of 60 grant proposals, Washington, D.C. (invited). |
| June12–December 13 | Federal Law Enforcement Training Center, Glynco, GA; Research & Training on Pre-Assault Cues in Policing |
| July 12 | Provided updated information and edited revised curriculum on Sudden Deaths In Custody instructor program, for MMRMA, Livonia, MI. |
| May-June 12 | National Institute of Justice: Scientific and Technology Review Panel: **Reducing In-Custody Deaths**; reviewed and provided assessment of 16 grant proposals, Washington, D.C. (invited). |
| April-December 11 | National Institute of Justice: Member of the Technical Expert Working Group on Excited Delirium Deaths and Less-Lethal Technology, Seattle, WA (invited). |
| September-October 10 | State of Ohio Attorney's General Office (Columbus): assisted in developing and editing Sudden In-Custody Deaths training curriculum for the state training academy. |
| June 2010 | Contracted to provide updated research to MMRMA for the Sudden In-Custody Death instructor program, Gaylord, MI |
| August to September 09 | Assisted in the design of the ALARM series of training for IL Police Administrators, for the IL Law Enforcement Training & Standards Board, Springfield, IL. |
| January08-October 11 | Chief scientific researcher and consultant for the Meggitt Corporation (FATS/Caswell) on: "The Effects of Stress on Human Performance and Decision-Making During Police Use of Lethal Force," Suwanee, GA. |
| August-December 08 | Consultant to Missouri Attorney's General office and MO State Police regarding restraining violent arrestees and sudden in-custody deaths. |
| March-June 08 | Consultant to Champaign, IL Police Department and County agencies regarding "Sudden In-Custody Deaths" (Police, Detention Officer, & Health Care response: policy, practice training, and protocols). |
| September-November 07 | Developed an 8-hour training program addressing Sudden Deaths In-Custody for the Michigan Municipal Risk Management Authority, Livonia, MI |
| September-October 07 | Conducted an analysis for shift scheduling and patrol officer deployment for the Springfield, IL Police Department |

31

| August 07 | Reviewed the Taser policy for the Washtenaw County Sheriff's Department, Ann Arbor, MI. |
| April-June 07 | Provided technical assistance to the Queensland Police Service, Brisbane, Australia on Sudden In-Custody Deaths. |
| June 07 | Provided two published interviews with *Force Science News* (Mankato, MN) on research regarding "Contextual Cues and Human Factors Associated With the Police Use of Lethal Force," 2-part series (articles, #74 & #75). |
| April-May 07 | Consulted with Michigan Municipal Risk Management Authority, reviewed Use of Force Training materials. |
| January 07 | Submitted contract to study officer safety issues in policing with Insurance Program Managers Group, risk managers, St. Charles, IL. |
| December 05-June 06 | Grant to develop training curriculum on Sudden In-Custody Deaths and instructor curriculum for the Michigan Municipal Risk Management Authority, Livonia, MI. |
| November 05-Jan. 06 | Consultant to IN Attorney's General Office, on a police use of lethal force. |
| September 05 | Consultant to the Canadian Police Research Centre, Ottawa ON, on a two-year study on "Excited Delirium in Police Restraint Incidents." |
| March 05 | Provided a published interview with *Force Science News* (Mankato, MN) on research regarding "The Myths and Realities of the Police Use of Force (3/25, article #15). |
| September-October 04 | Project consultant for a study on "Stress and Police Officers Performance in Lethal Force Encounters," for PPCT, Belleville, IL. |
| December 03-July 04 | Received a grant to research the "Use of Force in Michigan Jails," Michigan Municipal Risk Management Authority, Livonia, MI. |
| May 03 | For the National Institute of Corrections. Provided Jail Liability training at the American Jail Association conference, Albuquerque, NM |
| December 01- 3-02 | On the search committee for hiring an Assistant Police Chief at East Carolina University. |
| January 2002 | Provided an interview with the Milwaukee Sentinel on custodial restraint deaths. |
| October 2001 | Spoke at the Law Enforcement Administrators meeting, Marquette, MI. |
| August 2001 | Provided an interview with the Denver Post, Denver CO, on custodial restraint deaths. |
| February/August 2001 | Municipal Risk Management Authority, completed a contract to perform a study of a 15 year assessment of liability trends in 151 law enforcement/ & detention facilities in Michigan, Livonia, MI. |
| August 2000 | Provided an interview with WAVEY TV Station, Norfolk, VA; on Positional Asphyxia Deaths in Police Custody. |
| June 2000 | Providing technical assistance to the Research Division of the Federal Law Enforcement Training Center, Glynco, GA. A research project on measuring police field performance under stress (through 12/2001). |

| | |
|---|---|
| May 2000 | Provided technical assistance to Governmental Risk Managers, State of Michigan Jail Training Curriculum, Livonia, MI (Prisoner Behaviors, Correctional Law, Custody & Security & Suicide Awareness). |
| February-December 2000 | Providing technical assistance to Caliber Press, Inc., regarding research on assessing "ground fighting assaults against police officers nationwide," Chicago, IL. |
| June-September 1999 | Provided technical assistance to Smith and Wesson, Inc., on handcuff liability. |
| May 1999 | Facilitated a three-day scenario writing workshop for the MI Police Corps Academy, Ferris State University, Big Rapids, MI. |
| Jan-Dec. 1998 | Provided technical assistance to Merced, CA City Attorney's office regarding a sudden death in police custody. |
| Feb-Mar. 1997/99 | Provided technical assistance to the Jackson, MS City Attorney's Office regarding 2 cases of sudden deaths in police custody and 1 lockup suicide. |
| May-June 1998 | Provided technical assistance to the Dallas, TX City Attorney's office, reference allegations of police abuse of force. |
| April 1998 | Provided technical assistance to the Michigan Law Enforcement Officers Training Council, Lansing, MI.; assessed/edited their new Control Continuum, and deaths in Custody training curriculum. |
| March/April 1998 | Provided technical assistance to the North Carolina Justice Academy, Salemburg, NC; assessed and edited the Basic Law Enforcement Defensive Tactics training curriculum. |
| Feb-Apr. 1998 | Provided technical assistance to the Office of the Attorney General, State of Kansas, and the Kansas Bureau of Investigation, on misuse and abuse of prisoners in the Cherokee County Jail. |
| September 1997 | Assisted the Greenville, NC police department Internal Affairs investigating use of force claims within the department. |
| January - May 1997 | Assisted in the curricula design of 175 hours of advanced management training and instruct courses in the Law Enforcement Management Training Institute, Wilson Community College, Wilson, NC. |
| February 1997 | Provided technical assistance to the Michigan Risk Management Authority: Reviewed policies and procedures for the Wexford County Sheriff's Department Cadillac, MI. |
| July 1996 | Contracted by the American Correctional Association to train Pressure Points to the Navy Brig, Miramar, CA. 2, 8-hour programs. |
| April 1996 to 1998 October 1995 to | Provide use of force consulting services for the Safe Restraints, Inc., Walnut Creek, CA. |
| May 1996 | Contracted by the North Carolina Sentencing and Policy Advisory Commission to research Recidivism of Offenders Assigned to Community Corrections  Programs or or Released From Prison in North Carolina: Fiscal Year 1992-1993, with M. Jones, Ph.D. |
| November 1995 to December 1996 | National Law Enforcement Credentialing Board: served on the Testing Committee to design a comprehensive national credentialing test for law enforcement officers nationwide. |

| | |
|---|---|
| April/May 1995 | Member of three-member team (ECU CJ professors) to write a promotional exam for the Greenville, NC police department in conjunction with COLEA. |
| May 1994 | Edited the book, *Police use of Force and the Reactive Control Model.* Pecos Press Publisher, Tulsa, OK. |
| February 1993 to December 1995 | Served on a Curriculum Committee for the North Carolina Justice Academy to revise the Defensive Tactics curriculum for Basic Law Enforcement Training statewide. |
| June 1993 to June 1995 | Served on a state-wide curriculum committee for developing "Defensive Tactics training for Correction Officers:" North Carolina Justice Training Academy, Salemburg, NC |
| April 1993 to June 1995 | Served on a state-wide curriculum committee for developing annual training for police Officers in "Use of Force Decision- Making and The Force Continuum"; North Carolina Justice Training Academy, Salemburg, North Carolina. |
| December 1992 to July 1993 | Served on the Pitt County Sheriff's Department Task force to assist in opening the new jail in July of 1993, Greenville, NC. |
| November/ December 1992 | Contracted by the Michigan Municipal League to develop a test bank for a supervisory promotion examine in police and sheriff departments in  Michigan, Ann Arbor, MI. |
| July 1992 to 1/93 | Contracted by the MI Department of Corrections Jail Training Division to research and develop and write three instructional programs:" Prisoner Behaviors," "Stress "Management" and "Report Writing", MI. |
| December 1991 to February 1992 | Project Director for a police management study for Thomas Township Policy Agency, Saginaw, MI. |
| April/July 1991 | Contracted by Alpena Community College, Alpena, MI, to assess the criminal justice curriculum and to recommend a new curriculum. |
| Jan.-May 1991 | Committee member in the Vocational Technical Education Curriculum Project for the MI Department of Education. |
| June-Sept. 1989 | Project Director of "A Comprehensive Multi-State Analysis of Law Enforcement and Corrections Training and Management Resources". Contracted by the Governmental Risk Managers, Livonia MI. |
| January 1989 | Group facilitator at a 3-day workshop, for revising and updating curriculum materials for 160-hour jail training program in Mi. Worked at the request of the MI Correction Officers Training Council. |
| March-Nov. 1989 | Project Assistant in the development of a Regional Training Delivery System for Store Detectives, Meijer, Inc., Grand Rapids, MI. |
| March 1989 | Assisted in the design and implementation of a 40-hour Restraint Tactics Instructors program for Meijer Inc. Grand Rapids, MI. |
| March 1988- | |

| | |
|---|---|
| May 1989 | Assisted in the development, design and implementation of a 40-hour "Instructor Strategies Development" training program for the Meijer Corporation, Grand Rapids, MI. |
| January-March 1988: | Assisted in the research, development, design and implementation of the Meijer Incorporated Restraint Training/Matrix Program. |
| January 1988 | Assisted in the research, development, design and implementation of a 40-hour Defensive Tactics Instructors Program for the Michigan Department of Natural Resources.  I also certified these officers as basic pressure point control tactics instructors. |
| June-Sept. 1987 | Provided consultant services to MI Department of Corrections, Jail Training Division, Served as project consultant for, "Analyzing and Revising a Training System: A Curriculum Update." |
| November 1985-February 1986 | Antrim County, MI Prosecutor's Office and Sheriff Department -project assistant consultant for a manpower study within the county. |
| 1985 - 1986 | Kingdom of Saudi Arabia - coordinated and instructed a one-year police management training program for 22 Saudi Arabian Command Officers, at Ferris State University, Big Rapids, MI |

## CONFERENCE PRESENTATIONS

| | |
|---|---|
| June 22 | Scheduled to present research on: Deadly force liability, vehicles as a deadly weapon, and human factors, at the Force Science Institute conference, Orlando, FL (competitive & peer reviewed) |
| March 2020 | Presented research at the GA Board of Regents Campus Police Chiefs conference: Liability and policy issues, Cordele, GA. |
| April 2019 | Presented research on: Examining perceptions and misperceptions of police officers in deadly force virtual simulator scenarios—Keynote Address. Georgia Psychological Society, 14th Annual Meeting, Valdosta State University, Valdosta, GA. |
| March 2019 | Presented research on: Non-fatal injuries sustained by citizens and officers during arrest, at the annual Academy of Criminal Justice Sciences conference, Baltimore, MD. |
| November 2018 | Presented research on: Outcomes Assessment of TASER Applications and Training Implications, at the annual American Society of Criminology, Atlanta. GA. |
| July 17 | Presented research on: Human Factors and Investigating Officer–Involved Shootings, International Symposium on Forensic Science Error Management by the National Institute of Standards and Technology & The Federal Bureau of Investigation Conference, Gaithersburg, MD (competitive) |
| June 17 | Presented research on The Outcomes of Violent Prone Restraint, Taser Usage, Excited Delirium (ExDS), and Liability Issues, at the Police Use of Force in Today's World conference, Miami-Dade County Training Institute (invited & FL certified), Miami, FL |
| September 16 | Presented research on: The Frequency of Excited Delirium Symptoms, Use of the Taser, and Prone Restraint During Police Arrest, at the annual Southern Criminal Justice Association conference, Savannah, GA. |
| March 16 | Presented research on: Contextual Cues and Officer Perceptions in Officer Involved Shootings, at the annual Academy of Criminal Justice Science conference, Denver, CO. |

| | |
|---|---|
| July 15 | Presented research on: Investigating Arrest-Related Deaths, at the International Symposium on Forensic Science Error Management by the National Institute of Standards and Technology & The Federal Bureau of Investigation, Washington, D.C. (competitive) |
| April 15 | Use of Force Panel member, at the ILEETA annual conference, Chicago, IL. |
| March 15 | Presented research on: The Outcomes of Prone Restraint After Violent Arrests, at the Academy of Criminal Justice Sciences annual conference, Orlando, FL |
| February 15 | Presented research on The Outcomes of Prone Restraint After Violent Arrests, at the American Academy of Forensic Sciences annual conference, Orlando, FL (competitive) |
| October 14 | Presented research to the (1) Police Psychology Section and the (2) Physician's Section on: Stress, Human Factors, and Psychological and Physiological Responses During Lethal Force Encounters in a Virtual Simulator Training Environment, at the International Association of Chiefs of Police annual conference, Orlando, FL (competitive; co-presenter, R. Murphy). |
| | Presented research on: Analyzing the Science and The Outcomes of Prone Restraint After Violent Arrests, at the MI Sheriff's Association annual Fall conference, Battle Creek, MI (invited). |
| March 14 | Presented research on Analyzing the Science and The Outcomes of Prone Restraint After Violent Arrests, and panel member on the Use of Force Panel, at the ILEETA annual conference, Chicago, IL. |
| November 13 | Presented research on Sentencing Trends and §242 Prosecutions of Criminal Justice Personnel, at the annual American Society of Criminology conference, Atlanta, GA. |
| March 13 | Presented research on "Officer Involved Shootings, Human Factors, and Liability Issues, at the Academy of Criminal Justice Sciences annual conference, Dallas, TX. |
| July 12 | Key note speaker, presented research on 2 sessions: (1) Human Factors, Liability Issues in Police Use Force Encounters and (2) Risk Management Issues for Police Administrators at the Annual GA Chiefs of Police Association Summer conference, Savannah, GA (invited; certified). |
| April 12 | Presented research on: Human Factors and Liability Issues in Police Lethal Force Encounters, at the ILEETA annual conference, Chicago, IL. |
| March 12 | Presented research on: Stress and Lethal Force Decision Making in a Virtual Simulator Training Environment, Annual Academy of Criminal Justice Sciences Conference, New York. |
| November 11 | Key note presenter at the International Conference on Safety & Security Management and Engineering Technology: *Stress, Officer Perceptions, and the Use of Virtual Simulators Technology in Lethal Force Police Shooting Encounters: Training Implications*; WuFeng University, Chia Yi, Taiwan (invited). |
| May 11 | Presented research on: "Using a Use of Force Stimulator to Measure Human Performance Under Stress in Police Lethal Force Situations, at SimTech conference, Brisbane, Australia (co-author w/Randall Murphy who presented paper). |
| April 11 | Presented research on: Stress, Officer Perceptions, and the Use of Virtual Simulators in Lethal Force Police Shooting Encounters at the annual ILEETA annual conference, Wheeling, IL |
| March 11 | Presented two research papers: The Use of Force Simulators Technology for Research Lethal Force Encounters; Officer Perceptions and Memory in a Virtual Simulator Use of Force, Academy of Criminal Justice Sciences conference, Toronto, Canada |

February 11       Presented research on: Legal Issues and Risk Management for Department Chairs and Deans, Academic Chairperson's National Conference, Orlando, FL.

September 2010    Presented research on: Stress and the Use of Virtual Simulators in Lethal Force Police Shooting Encounters at the annual Southern Association of Criminal Justice conference, Clearwater, FL.

June 2010         Presented research at the MI Sheriff's Association Summer Conference on: Science, Law, Policy, and Issues Surrounding Sudden Deaths In Custody, Gaylord, MI (invited).

April 2010        Presented research on: Stress and the Use of Virtual Simulators in Lethal Force Police Shooting Encounters at the annual ILEETA annual conference, Wheeling, IL (4 hours; invited).

February 2010     Presented research on: Analyzing Misperceptions of Police officers in Lethal Force Simulator Scenarios, Academy of Criminal Justice Sciences annual conference, San Diego, CA.

December 2009     International/inter-Service Simulation Conference presented research on "Using a Use of Force Stimulator to Measure Human Performance Under Stress in Police Lethal Force Situations," Orlando, FL (competitive).

October 2009      Center for Research Innovation: An Analysis of Experimental Research on Stress and Perceptions of LE Officers in a Virtual Simulator Lethal Force Environment, WIU (competitive).

April 09          Presented research: Stress and Human Performance in Police Lethal Force Encounters, annual the International Law Enforcement Educators and Trainers Association, Chicago, IL

                  Presentation on "Investigating Sudden In Custody Deaths" for the WIU conference on Forensic Sciences and the Law, LEJA & Chemistry Departments, Macomb, IL.

March 09          Presented research: Stress and Human Performance in Police Lethal Force Encounters, annual Academy of Criminal Justice Sciences conference, Boston, MA

October 08        Presented: "Tasers, Positional Asphyxia, Excited Delirium and Investigations in Sudden In In-Custody Deaths," at the MI Field Training Officer Association conference, Mt. Pleasant, MI (key note presenter & invited).

April 08          Presentation on "Blood Spatter Assessment" for the WIU conference on Forensic Sciences and the Law, LEJA & Chemistry Departments, Macomb, IL.

March 08          Presented research on, "A Longitudinal Analysis of the Liability Trends of Suicides In-Custody (2,079 cases studied)," at the annual ACJS conference, Cincinnati, OH (chair of the panel).

February 08       Presented research on: "Human Factors and Contextual Cues of 100 Lethal Force Encounters in Policing," at the Use of Force conference, LEJA & Shotokon Karate Macomb, IL.

August 07         Presented research entitled: "Tasers, Positional Asphyxia, Excited Delirium and Investigations in Sudden In-Custody Deaths," at the FDLE High Liability Trainers conference, St. Augustine, FL (invited).

August 07         Present research entitled: Human Factors and Contextual Cues of 100 Lethal Force Encounters in Policing; at the PPCT International Training Conference, St. Louis, MO (invited).

April 07          Presented research entitled: Human Factors and Contextual Cues of 100 Lethal Force Encounters in Policing; at the annual International Law Enforcement Educational Training Association, Chicago, IL.

March 07          Presented research on: An Analysis of Detainee Resistance in MI Jails: 2000-2003, at the annual Academy of Criminal Justice Sciences conference, Seattle, WA.

| | |
|---|---|
| December 06 | Presented "Protocols for Investigating Sudden Deaths In-Custody," Death Investigators Seminar, Brody School of Medicine, Department of Pathology, East Carolina University, Greenville, NC [invited]. |
| June 06 | Presented research on "Sudden Deaths In-Custody" and "The Top Five Jail Litigation Topics," at the annual Michigan Sheriff's Association Summer conference, Crystal Mt., MI. (invited). |
| March 06 | Presented research on "Policing by Consent Decree & Section 14114 Enforcement," at the Oxford Roundtable Seminar, Oxford University, Oxford, England (invited). |
| January 06 | Presented research on "Tasers, Positional Asphyxia, Excited Delirium and Investigations in Sudden In-Custody Deaths, Annual ASLET conference, Albuquerque, NM |
| September 05 | Two presentations: Research on Sudden In-Custody Deaths and Research on Lethal/Non-Lethal Force in U.S. Policing, at the First Annual Canadian Law Enforcement Officer Safety Conference, Victoria, British Columbia (invited). |
| June 05 | Presented research on "Liability Analysis of Law Enforcement Agencies in MI," "Use of Force Issues in MI Jails," and "Strip Searches," at the Michigan Sheriff's Association Summer Conference on Mackinac Island, MI (invited). |
| January 05 | Presented research on "The Myths & Realities of the Police Use of Force," at the Annual ASLET International conference, Jacksonville, FL. |
| October 04 | Presented research on "Risk Management in Detention Facilities," at the NC Jail Administrators Association conference, High Point, NC (invited). |
| September 04 | Presented a legal research paper on "A Ten Review of the *Hudson v. McMillian* Decision: 1992-2002," at the annual Southern Criminal Justice Association conference, Raleigh, NC. |
| August 04 | Presented a 4-hour presentation on "Liability Issues of Excessive Force Investigations by Internal Affairs," at the annual NC Internal Affairs Investigators conference, Newbern, NC. (invited) |
| July 04 | Co-presented a 4-hour presentation on "Issues Related to Testifying in Court," at the annual conference of the North Carolina chapter of the National Association of Social Workers, Wilmington, NC. (invited) |
| May 04 | Presented research on "Analyzing Stress in Police Use of Force Encounters," at the annual Alaska Peace Officers Association conference, Juneau, AK. |
| February 04 | On a panel to discuss jail use of force issues for the NC Jail Administrator's Association, Greenville, NC (8 hours/invited). |
| January 04 | Presentation on "The Myths and Realities of the Police Use of Force: A Forty Year Analysis" and panel presentation on the "Police Use of Force" at the annual ASLET conference, St. Louis, MO. |
| November 03 | Presented research on "A Ten-Year Analysis of the *Hudson v. McMillan* Decision," at the American Society of Criminology conference, Denver, CO. |
| October 03 | Presented research on "Use of Force Issues in Detention Facilities," for the annual NC Jail Administrators Association Conference, High Point, NC (invited). |
| | Presented research on "Failure to Train Liability on the Use of Force in Corrections," at the NCDOC conference for Subject Control Instructors, Raleigh, NC. |

| | |
|---|---|
| July 03 | Presented research on "Unexpected Restraint Deaths in Police Custody," at the PA Police Chiefs Association Summer conference: Harrisburg, PA (invited). |
| | Presented research on "Stress and Performance in Police Use of Force Incidents", at the annual PPCT conference, St. Louis, MO. |
| May 03 | Presented research for the National Institute of Corrections: "Risk Assessment and Liability Issues in Michigan Jails," at the American Jail Association annual conference, Albuquerque, NM. |
| January 03 | Presented research on stress and performance in police use of lethal force incidents, at the annual ASLET conference, Ontario, CA. |
| November 02 | Presented a content analysis of 40 years of use of force research in policing, at the annual American Society of Criminology conference, Chicago, IL. |
| October 02 | Presented research on a survey of police officers and lethal force incidents and research on 40 years of use of force studies in policing at the annual PPCT conference, St. Louis, MO. |
| June 2002 | Presented a research report on "Civil Liability Claims in Michigan's Jails," MI Sheriff's Associations Summer conference, Mackinaw Island, MI (invited). |
| May 2002 | Speaker on use of force training in law enforcement and corrections and custodial deaths issues at the "Less-Than-Lethal/Defensive Tactics" seminar for NC Criminal Justice Trainers, Raleigh, NC |
| April 2002 | Presented research on: "An Assessment of Custodial Deaths in Jails," at the American Jail Association annual conference, Milwaukee, WI (invited). |
| September 2001 | Presented research on a twenty-year analysis of custodial deaths in detention facilities, Southern Criminal Justice Association conference, Baton Rouge, LA. |
| June 2001 | Presented two research papers: "Applying Motor Learning Principles to Use of Force Skills," and "Current Research on Unexpected and Sudden Custodial Deaths," PPCT annual conference, St. Louis, MO. |
| April 2001 | Paper on, "A Twenty Year Analysis of In Custody Deaths in Detention Facilities, Academy of Criminal Justice Sciences annual conference, Washington, D.C. |
| Feb 2001 | Presented research on: "An Analysis of the Impact of *Graham v. Connor* and *Canton v. Harris*, Ten years Later, American Society of Law Enforcement Trainers, Orlando, FL. |
| November 2000 | Presented research on: "An Analysis of the Impact of *Graham v. Connor*, Ten Years Later," American Society of Criminology, San Francisco, CA. |
| | Presented research on: "Assessing Patterns of Citizen Resistance During Police Arrest," for NC Justice Academy Defensive Tactics Instructors conference, Salemburg, NC. |
| July 2000 | Presented research on: "An Analysis of the Impact of *Graham v. Connor* and *Canton v. Harris*, Ten Years Later, PPCT International Conference, St. Louis, MO. |
| May 2000 | Presented research on "Assessing Frequent Litigation in Police Training Since the *Canton* Decision, for the NC Law Enforcement Officers Training Association, Atlantic Beach, NC. |
| April 2000 | Presented research on "Assessing Patterns of Citizen Resistance During Police Arrest," for the Wyoming Law Enforcement Officers/Administrator's Association, Douglas, WY. |

March 2000       Presented a paper on "A Ten Year Review of the *Graham v. Connor* Decision," Academy of Criminal Justice Sciences conference, New Orleans, LA.

January 2000     Presented research, "Assessing the Patterns of Citizen Resistance During Arrest," at the annual American Society of Law Enforcement Trainers conference, Richmond, VA.

November 1999    Presented a paper on "A Profile of Prisoner Recidivism in North Carolina," at the annual conference of the American Society of Criminology, Toronto, Canada.

October 1999     Presentation at the North Carolina Jail Administrator's Conference on "Administrative Liability Concerns in Developing Special Response Teams in Jails,"  Burlington, NC.

September 1999   Presented paper on: "Assessing Frequent Liability Topics in Policing Training Since the *Canton* Decision," at the High Liability Trainer's Conference, for the Florida Department of Law Enforcement Training Commission, Orlando, FL. [invited]

January 1999     Presented paper, "Assessing Frequent Liability Topics in Police Training Since the *Canton* Decision."  Annual ASLET conference Albuquerque, NM.

October 1998     Presented a paper on: "Factors Associated with Excited Delirium Deaths in Police Custody," Southern Criminal Justice Association, Annual Conference, Biloxi, MS.

March 1998       Presented a paper on: Analyzing Civil Liability Factors in Wrongful Deaths Claims in Police Custody," at the Academy of Criminal Justice Sciences conference, Albuquerque, NM.

January 1998     Presented a paper on: "Liability Issues Surrounding Sudden Deaths In Police Custody," at the annual ASLET conference, Mobile, AL.

November 1997    Presented a paper on: "Examining the Historical Changes of Prisoner Characteristics in the United States Since 1850," at the Annual American Society of Criminology conference, San Diego, CA.

October 1997     Presented paper on: "Assessing the Patterns and Correlates of Citizen Resistance During Arrest Circumstances" at the annual Southern Criminal Justice Association conference, Richmond, VA.

August 1997      Presented a paper on the" Excited Delirium and Sudden Deaths in Police Custody" at the annual PPCT conference, St. Louis, MO.

March 1997       Paper presented on "Determining the Recidivism Rates of Offenders In Community-Based Programs in North Carolina," Academy of Criminal Justice Sciences annual conference, Louisville, KY.

January 1997     Presented a paper on "Assessing Less-Than-Lethal Force Training: A Two State Study," American Society of Law Enforcement Trainers annual conference, Buffalo, NY.

November 1996    Presented a paper entitled " Comparing the Recidivism Rates of Bootcamp Participants to Electronic Monitoring Probationers," American Criminology annual conference,  Chicago, IL.

August 1996      Presented a paper entitled "Assessing Deaths in Police Custody Due To Positional Asphyxiation," Pressure Point Control Tactics annual conference, St. Louis, MO.

March 1996       Presented paper at the annual Academy of Criminal Justice Sciences conference; "Assessing the Liability Concerns of Emergency Response Teams in Corrections," Las Vegas, NV.

November 1995    Presented a paper at the annual American Society of Criminology conference; "A Twenty-Five Year Content Analysis of Prisoner Litigation in Jails," Boston, MA.

October 1995  Presentation at the annual conference of the North Carolina Association of Community Restitution Programs; "Assessing Use of force Decision-Making, Wrightsville Beach, NC.

August 1995  Presented two papers at the annual PPCT International conference: TMJ Syndrome and the Application of Pressure Points" and Assessing Methods for Curbing Officer Use of Excessive Force," St. Louis, MO.

March 1995  Paper at the annual Academy of Criminal Justice Sciences conference; "A Content Analysis of Correctional Liability Cases: Decisions of Title 42 U.S.C. Section 1983," Boston, MA.

October 1994  Presented a paper at the Annual Southern Criminal Justice Association conference; "Situational Patterns of Prisoner Assaults on Correctional Officers", Memphis, TN.

August 1994  Presented a paper at the annual PPCT conference: "The Implications of Pressure Points and TMJ Syndrome," St. Louis, MO.

March 1994  Presented a paper at the annual Academy of Criminal Justice Sciences conference: "A Comparison of Math Attitudes Between CJ and Non-CJ Students", Chicago, IL.

January 1994  Seventh Annual American Society of Law Enforcement Trainers Conference, Washington, D. C.: Presentation on "Sudden Deaths Behind Bars."

August 1994  Annual International PPCT Training Conference, Presented paper on "Developing SORT Teams in Corrections", Orlando, FL.

March 1993  Co-authored a paper/presentation on "A Comparative Analysis of the Police Use of Force and Citizen Resisting During Police Arrest," Academy of Criminal Justice Sciences Annual Conference, Kansas City, MO.

August 1992  Annual International PPCT Training Conference, Presented paper on, "Analyzing Citizen Resisting In Policing," and a "Review of the Evolution of Use of Force Litigation," St. Louis, MO.

February 1992  Firefighter Instructors' 44th Annual Educational Conference. Presented seminars on, "Classroom Survival for Instructors," Midland, MI.

November 1991  National Conference on Higher Education and Corrections: Presented a paper on "Analyzing Educational Requirements for Correctional Officers: Entry and Promotion," Columbus, OH.

August 1991  Annual International PPCT Training Conference, Presented papers on, "Training Liabilities in Corrections," "Cell Extractions," "Study on Correction Officer Assaults," and "Knife Defense for Police/Correction Personnel," St. Louis, MO.

August 1990  Annual PPCT International Conference, presented papers on, "Training Liabilities in Corrections," "Designing a Non-Deadly Force Policy in Corrections," and "Expert Witnessing in Criminal Justice," St. Louis, MO.

October 1989  Annual National Correctional Trainers Conference, Knoxville, TN. Presented a paper on, "Assessing the Pressure Point Control Tactics System for Utilization in Corrections by Analyzing  the Components of Acceptability."

August 1989  Annual PPCT International Conference, St. Louis, MO, Spoke on, "Use of Non-Deadly Force Policy Issues in Corrections" and "Litigation Issues in Correctional Physical Force Situations."

August 1988      Annual PPCT International Conference, St. Louis, MO.  Spoke on, "Correctional Use of
                 Physical Force Litigation Issues."

July 1988        Annual International Correctional Education Association.  Spoke on, "Analyzing the Educational
                 Requirements for Corrections Officers for Entry Level and Promotion:  Is It Necessary?" Grand
                 Rapids, MI.

August 1985      American Corrections Association, spoke on the, "Involvement of the Line Officer in Policy
                 Development," at the annual conference in New York.

May 1984         American Corrections Officer Association, spoke on, "Legal Liabilities of Correctional Officer,"
                 annual conference in Ann Arbor, MI.

## TECHNICAL REPORTS / TRAINING MATERIALS RESEARCHED & DEVELOPED

1.    Fiscal feasibility study (report) for the Buckhead City, GA (contract); June to Sept. 2021.

2.    Public Safety Compensation and Scheduling Report, for the City of Moultrie, GA (2/16)

3.    Technical research consulting report on the Outcomes of Violent Prone Restraint Incidents in Police Arrest
      (July,'14), submitted to participating police agencies.

4.    Provided technical assistance to the Battle Creek, MI PD on Implementing a Use of Force System (March-
      May, '14).

5.    Provided technical assistance to the Michigan Municipal Risk Management Authority, Livonia, MI on
      updating training curriculum on Sudden Deaths In-Custody (June, 2010 & July, 2012).

6.    Provided technical assistance to the Michigan Municipal Risk Management Authority, Livonia, MI in
      implementing a basic 8-hour training curriculum on Sudden Deaths In-Custody (Sept.-November, 07).

7.    Grant award by Michigan Municipal Risk Management Authority to design and present instructor
      curriculum (24 hours) on Sudden Deaths In Custody (December-June, 06).

8.    A Technical Report submitted to the Municipal Risk Management Authority, Livonia, MI (July, 2004):
      "An Assessment of Detainee Resistance and Detention Officer Use of Force in Michigan Jails: 2000-2003,"
      (grant funded).

9.    "The Myths and Realities of the Police Use of Force: A Forty Year Analysis," a 16-hour course (2003).

10.   "A Fifteen Year Analysis of Liability Trends in Law Enforcement Agencies in MI," for Michigan
      Municipal Risk Management Authority, Livonia, MI (Oct. 2001). Separate report submitted on Jail claims
      and liability in Michigan (12/01) [grant funded].

11.   "Exercising Leadership in Policing, 32-hour training program (1999).

12.   *Recidivism of Offenders Assigned to Community Corrections Programs or Released From Prison in North
      Carolina: Fiscal Year 1992-93*; researched and submitted to the North Carolina Sentencing and Policy
      Advisory Commission (April, 1996), with Mark Jones, Ph.D. [grant funded]

13.   "Curbing the Use of Excessive Force in Law Enforcement" 8-hour training program (1996).

14.   "Sudden and Unexpected Deaths in Police Custody," an 8-hour training program for law enforcement and
      correctional personnel (1994).

15.   "Police Response to the Mentally Ill" a 16-hour training program (1994).

16.     Co-authored "Developing Instructional Strategies," for the Criminal Justice Institute, Ferris St. University, Big Rapids, MI., a 40-hour program (1994).

17.     Contributed a chapter on "The Force Continuum," in the *Non-Lethal Force Training Program*, for the State of North Carolina Justice Training Academy, Salemburg, NC (1993).

18.      *Prisoner Behavior, Stress Management and Report Writing;* written for the Michigan Department of Corrections Jail Training Division (July, 1992-January, 1993).

19.     *A Management Review of the Thomas Township (MI) Police Department;* for Thomas Township City Commissioners, Project Director. Co-authored with Robert L. Parsons. Ph. D. (Dec. 1991/Feb. 1992).

20.     "Cell Extractions for Correctional Tactical Units" 8-hour training program (1992).

21.     *An Analysis of the Criminal Justice Program at Alpena Community College;* for the President and the Dean of Instruction of Alpena Community College, Alpena, MI (April-July, 1991).

22.      *A Comprehensive Multi-State Analysis of Law Enforcement /Local Corrections Training and Management Resources;* for the Risk Management Authority, Livonia, MI. Project Director and co-authored with Robert L. Parsons, Ph. D. (June-September, 1989).

23.     "Liability Issues Surrounding Use of Force Issues" 8-hour training program (1988).

24.     "Liability Issues for CJ Administrators Supervisors" 16-hour training program (1988).

25.     "Suicide Awareness for Detention Personnel," 8-hour training program (1988).

26.     "Policy and Procedure Development in Law Enforcement" 16-hour training program (1987).

27.      "Managing the Problem Employee in Law Enforcement" 16-hour training program (1987).

**VIDEO TAPES/INTERVIEWS MADE:**

1.     Interview: The science behind arrest-related deaths, PoliceOne.Com (8/16)

2.     Interview: Stress and the Use of Force, PoliceOne.Com (5/11)

3.     "PPCT Control Principles," tape for Use of Force Instructors, Threat Management Institute, Belleville, IL (7/03)

4.     "Liability Issues in Michigan Jails," (6/02) and "Best Jail Practices in Michigan Jails" (10/02), Michigan Municipal Risk Management Authority (MMRMA), Livonia, MI.

5.     "Motor Skill Learning Principles and the Use of Force," Law Enforcement Television Network (LETN), Carrollton, TX, 6/01

6.     PPCT Defensive Tactics Instructor video, 6/01

7.     Law Enforcement Television Network, Carrollton, TX: Taped interview for the program "Roll Call," on "Assessing Patterns of Subject Resistance During Arrest," 1/00.

8.     Law Enforcement Television Network, Carrollton, TX:"The WRAP vs Hog-Tying;" and "Prisoner Assaults on Correction Officers," 8/96.

9.      Safe Restraint Inc., made a training tape on *Positional Asphyxiation and the WRAP*, Walnut Creek, CA, 6/96.

10.     Contracted by Law Enforcement Television Network, Carrollton, Texas.  Made four twenty-minute tapes on: *Deaths in Custody: Policy and Training Recommendations, Suicides Detection in Jails, and The Correctional Training Officer Program*, 4/95.

11      Contracted by Law Enforcement Television Network, Carrollton, TX, four *Tactical & Subject Control Training* tapes for correctional/police officers, 7/92.

12.     Law Enforcement Television Network, Dallas, TX, tape on *Non-Lethal Force Policies and Suicide Awareness for Detention Personnel*, 8/90.

13.     Law Enforcement Network Training Company, St. Louis, MO., tape on *Jail/ Lockup Suicides,* 3/89

14.      High Tech Training Tapes, one tape on *Assessing a Prisoner's Potential for Suicide in the Jail*, 12/88.

Expert Witness

Since 1988, retained as an expert witness on the topics of:
1. Police/correctional use of force: lethal force, less-lethal force tactics/equipment, & restraint issues.
2. Arrest-Related Deaths; Sudden Deaths In-Custody; restraint deaths in police and corrections.
3. Custodial suicides, deaths in detention facilities, and medical care issues in corrections
4. Management, policy and procedures, supervision, and training issues in criminal justice agencies.
5. Security, classification, confinement, and failure to protect issues in prisons, jails and lockup facilities

## MEMBERSHIP AFFILIATIONS:

Criminal Justice Association of Georgia, Academy of Criminal Justice Sciences, American Society of Criminology, Southern Criminal Justice Association, International Law Enforcement Educators and Trainers Association, American Corrections Association, American Jail Association

### Defensive Tactics & Subject Control Training
Selected Agencies Trained Since 1987

| State Police/Highway Patrol | Federal Law Enforcement Agencies |
|---|---|
| AL State Police | US Postal Inspection Service |
| CO State Patrol | US Customs & Immigration |
| MI State Police | US Secret Service-Law Enforcement Division |
| NC Highway Patrol | US Federal Probation |
| NE State Patrol | US Wildlife Service–Law Enforcement |
| VA Highway Patrol | US Marshals |

| Police Departments | |
|---|---|
| West Monroe, AL | College of Charleston, SC Public Safety |
| Alpena, MI | Fayetteville, NC |
| Charlotte, NC | Carey, NC |
| NC State Capital Police | Kalamazoo, MI |
| Hickory, NC | Ferris State Univ. Public Safety |
| Chapel Hill, NC | Portage, MI |
| Morgantown, NC | Traverse City, MI |
| Charlestown, W.VA. | Cadillac, MI |
| Greensboro, NC | Mt. Clemens, MI |
| Greenville, NC | Plymouth, MI |
| East Carolina Univ. Public Safety | Western MI University Public Safety |
| NC State Public Safety | Vero Beach, FL |

44

Washington, NC
Grand Rapids, MI
Detroit, MI
St. Clair Shores, MI
Dallas, TX
Ypsilanti, MI
Grand Haven, MI
Wyoming, MI
Marquette, MI
Negaunee, MI
Southfield, MI
Gross Pointe Shores, MI
Big Rapids, MI
Elizabeth City, NC
Willmington, NC
High Point, NC
UNC Charlotte Public Safety
NC Justice Academy Instructors
Henderson, NC
Wilmington, NC
Raleigh, NC
Mt. Pleasant, SC
Hannah, SC

Dearborn Heights, MI
Taylor, MI
Howell, MI
West Bloomfield, MI
Canton, MI
Tecumsee, MI
Romulus, MI
San Diego, CA City jail
Tupelo, MS
Raleigh, NC Airport Police
Flint, MI
Northern MI Univ. Public Safety
Port Huron, MI
Mt. Airy, NC
Shelby, NC
Kings Mountain, NC
Nagshead, NC
Wrightsville Beach, NC
Goldsboro, NC
Ocean Springs, MS
City of North Charleston, SC

County Sheriff Departments
Pitt County; Greenville, NC
Kalamazoo County, Kalamazoo, MI
Oakland County; Pontiac, MI
Kent County; Grand Rapids, MI
Oceana County; Hart, MI
Grand Traverse County; Traverse City, MI
Sarpe Co., Omaha, NE.
Dare Co., NC
Allegan County; MI
Craven Co., Newbern, NC
Lee County Sheriff's Dept (Tupelo, MS)
Vance Co., Henderson, NC
Dallas County; Dallas, TX
Genesse County; Flint, MI
Beaufort Co. Washington, NC
Alpena County; Alpena, MI
Marquette County; Marquette, MI
Schoolcraft County; Escanaba, MI
Kalkaska County; Kalkaska, MI
Calhoun County; Marshall, MI
Berrien County; MI
Cass County; Cassopolis, MI
Mecosta County; Big Rapids, MI
Ingham County; Mason, MI
Indian River County; Vero Beach, Fl
Gogebic County; MI
Delta County; MI
Washtenaw County; Ann Arbor, MI
Wexford County; Cadillac, MI
Montmorency County; Montmorency, MI
Graham Co., Robinsville, NC
Lenoir Co., Kinston, NC
Cumberland Co., Fayetteville, NC
Carterett Co., Williamston, NC
Dorchester Co., St. George, SC
Charleston Co. Sheriff , SC
New Hanover Co. Sheriff, NC

Department of Corrections
Michigan
Colorado
North Dakota
Florida
Minnesota
U.S. Federal Bureau of Prisons
South Carolina
Hong Kong Corr. Services, Hong Kong
North Carolina
Corrections Corporation of America

Military & Other Agencies

USMC Provost Marshall's Office
US Army Rangers
NAVCON Brig, Miramar, CA
US Marine Corp Brig, Camp Pendelton, CA
US Marine Corp Military Police
US Air Force Military Police, Pope Air Force Base, NC
NAVCON Brig & Air Force, Charleston, SC
US Coast Guard, Yorktown, VA
US Air Force Military Police
Navy Seals Team (#2)
US Coast Guard Tactical Counter Narcotics Unit, Portsmouth, VA
US Army
NC Bureau of Alcohol Law Enforcement
UNC Hospital Police, Chapel Hill, NC
Henry Ford Hosp. Security, Detroit, MI
Pitt Memorial Hospital Police, Greenville, NC
Charleston, SC University Hospital Police
Cleveland Medical Center, Shelby, NC
Meijer Inc., Grand Rapids, MI
NC Wildlife LE Division
NC Marine & Fisheries LE Division
MI Dept. of Natural Resources
AL Marine Patrol
SC Wildlife LE Division

San Diego, CA Co. Sheriff                                    Private Police for Biltmore Estate, Asheville, NC
Wilson Co. Sheriff, NC
McLean Co. Sheriff (Bloomington, IL)

### Suicide Prevention for Jail/Lockup Personnel
### Agencies Trained Since 1987

| | | |
|---|---|---|
| Ypsilanti Police Department | Oceana Co. Sheriff | Troy Police Department |
| Washtenaw County Sheriff Department | Inkster city police | Canton Police Department |
| Mecosta County Sheriff Department | Taylor police | Oceana County Sheriff Dept. |
| Livingston County Sheriff Department | Woodhaven police | Beverly Hills Public Safety |
| Kalamazoo Department of Public Safety | Montcalm County Sheriff Department | Livonia Police Department |
| Roseville Police Department | Kalamazoo county Sheriff Department | Northville, MI Police Dept. |
| Milan Police Department | Berrien County Sheriff department | |
| Wayne County Sheriff Department | Garden City police department | |
| Farmington Hills Police Department | Pitt County Sheriff department | |
| Dearborn Heights Police Department | Kalkaska County Sheriff Department | |
| Sterling Heights Police Department | Newaygo County Sheriff Department | |
| Northville Police Department | Bay County Sheriff Department | |

*Darrell L. Ross, Ph.D.*

**FEE SCHEDULE EXPERT WITNESS/CONSULTANT SERVICES**

**CASE REVIEW:**

> Includes authority to list as an expert witness, up to eight hours of case review and analysis, (retainer applied toward first 8 hours of preliminary case review).

**$3,200.00 retainer required**

**HOURLY RATE**:

> Additional case review (if over eight hours): site visit, interviews, conferences, expert report of opinions, travel time, preparation for deposition, preparation for trial, and testimony (plus all expenses).

**$375.00/hour**

**DEPOSITION:**

> Deposition fee of $1,800.00 per day **paid in advance**, plus all expenses and travel time (flat rate).

**$1,800.00 fee/day plus all expenses**

**TRAVEL:**

> Airline travel billed at coach fare and must be paid in advance. Overnight expenses at actual cost. Meals at $55.00/day. Full-size rental car rate, if a vehicle is necessary. Private vehicle @ .58 cents per mile.

### PAYMENT POLICY

All bills are due thirty days from the invoice date. A finance charge of 1.5% per month (18% per year) will be assessed on all past due invoices. **Deposition fees are payable in advance**.

*Darrell L. Ross, Ph.D.*
*Cases Retained: 2018-2021*

*Rodriguez, et al. v. Henry County, et al.*: No. 1:21-CV-01999

Darrell L. Ross, Ph.D.
Cases Retained: 2018-2021

| Case | Topic | Court | State |
|------|-------|-------|-------|
| 1. Ajibade v. Wilcher, et al. (18/19)<br>No. 4:16-CV-82-WTM-GRS<br>(D. Crt. SD Ga., Savannah, Div.) | Detainee Restraint Death CEW | Fed. | GA |
| 2. Dunigan v. Nugent & Shaffer<br>No. 16-CV-01325 (18) | Arrestee Death | Fed. | MI |
| 3. Booker v. SCDOC (18)<br>No. 2:15-cv-04303-MGL-MGB | Failure to Protect & Prisoner Assault | Fed. | SC |
| 4. Hull-Daniels v. Emmet Co. et al. (18)<br>No. 1:17-cv-00340-PLM | Jail Medical Care | Fed. | MI |
| 5. State of GA v. Robert Olsen<br>No. 16-CR1181-6 (18) Immunity Hearing | Deadly Force | Criminal | GA |
| 6. Fields v. Town of Walterboro, et al.<br>No. 2:17-cv-01741-DCM-BM (18) | Use of Force/CEW | Fed. | SC |
| 7. Lacy v. Snohomish Co, Pendergrass &<br>Trenary, No. 16-2-21526-2-SEA (17/18) | Arrestee Death/CEW | State | WA |
| 8. Albright v. WVRJCFA/Prime Care Med.<br>(18) | Detainee Suicide | WV | Fed. |
| 9. Rotzin v. Arapahoe County, et al.<br>& Sheridan PD; No. 16-cv-02820 (18) | Arrestee Death/CEW | Fed. | CO |
| 10. Clay v. Tunica CO, MS, Sheriff Hemp &<br>John Doe; 1-100, No.2017-0054 (18) | Detainee Suicide | State | MS |
| 11. Kough et al. v. South Carolina Dept. of Corr.<br>No. 0:17-cv-02938-JFA-PJG (18) | Failure to Protect Prisoner/Prisoner Assault | Fed. | SC |
| 12. Brax v. City of Grand Rapids, MI<br>742 Fed. Appx. 952 (6th Cir. 2018) | Use of Force | Fed. | MI |
| 13. Hughes v. Sagaman Co. et al. (19)<br>No. 2012-L-166 | Use of Force--Detainee | State | IL |
| 14. Turner v. City of Champaign, et al.<br>No. 17-CV-226, EIL (D. Crt. CD ILL, 19) | Restraint Death | Fed. | IL |
| 15. Estate of Byrd v. Kalamazoo, Co, et al. (19)<br>No. 1:18-cv-00620-PLM-PJG | Detainee Drug Death | Fed. | MI |
| 16. Humberto Victornio v. Waseca Co. et. al<br>No. 18-cv-226 JNE/DTS (19) | Detainee Suicide | Fed. | MN |
| 17. Gordon v. Birenga & City of Royal Oak<br>No. 5:18-cv-13584 (19) | Deadly Force | Fed. | MI |
| 18. Deloney v. County of Fresno, et al.<br>No.1-cv-17-01336-LJO-EPG (19) | Detainee Suicide | Fed. | CA |

Darrell L. Ross, Ph.D.
Cases Retained: 2018-2021

| Case | Topic | Court | State |
|---|---|---|---|
| 19. State of GA v. Copeland/Howell/Scott (19/21)<br>No. 18-CR-00046B/C: Immunity Hearing/Trial | Arrestee Death/CEW | Criminal | GA |
| 20. Hartger v. Kent County, & Marz<br>No. 1:18-cv-1221-RJJ-RSK (19) | Use of Force | Fed. | MI |
| 21. Zuress v. City of Newark, OH & Burris<br>No. 19:3945 (6th Cir. 19) | Use of Force/Canine | Fed. | OH |
| 22. Keller v. Chippewa Co. Brd. Comm.<br>No. 2:19-cv-00011 (WD Mich. 19/20) | Detainee Discrim/<br>Disability | Fed. | MI |
| 23. Reynolds v. Addis & City of Royal, MI<br>2:18-cv-13699 (20) | Deadly Force | Fed. | MI |
| 24. Lynas v. Stang et al.<br>No. 18-cv-2301 JRT/KMM (20) | Detainee Suicide | Fed. | MN |
| 25. Burghardt/Beard v. Ryan, et al. (20)<br>No. 5:19- cv-00325 | Deadly Force | Fed. | OH |
| 26. Stout v. Newaygo Co, et al. (20)<br>No. 1:19-cv-00400-JTN-STB | Use of Force | Fed. | MI |
| 27. Estate of Gray v. St. Clair Shores, et al.,<br>No. 2:19-cv-10383 (20) | Deadly Force | Fed. | MI |
| 28. May v. Beltrami Co. et al. (20/21)<br>No. 19-cv-1107-JRT-LIB | Detainee Jail Death | Fed. | MN |
| 29. Brenner v. Asfeld, et al., (21)<br>No. 18-cv-02383-NEB/ECW | Detainee Suicide | Fed. | MN |
| 30. Estate of Zielke v. Roscommon Co. et al.,<br>No. 1:19-cv-13053-PDB-PJM (21/22) | Jail Death | Fed. | MI |
| 31. Peterson v. Washington Co. (21)<br>No. 18-cv-2640-DWF-ECW | Jail Use of Force | Fed. | MN |
| 32. Schell v. Madison CO, Schellhardt, et al.<br>No. 319-cv-01326 (21) | CEW/Use of Force | Fed. | IL |
| 33. Erickson v. Pope (21)<br>No. 19-cv-3061-SRN-LIB | Detainee Jail Death | Fed. | MN |
| 34. Burroughs v. City of Niles, OH et al. (21)<br>No. 4:20-cv-00005-SL | Deadly Force | Fed. | OH |
| 35. Malcom James Custody Death Report<br>Racine County DA Office (21/22) | Restraint Chair Death | Criminal | WI |
| 36. Blowers v. Battle Creek, MI et al. (22)<br>No. 1:21-cv-00376-HYJ-SJB | Deadly Force | Fed. | MI |

Darrell L. Ross, Ph.D.
Cases Retained: 2018-2021

Case

| | Topic | Court | State |
|---|---|---|---|
| 37. Kozal v. Chippawa Co. et al. (22)<br>No. 2:21-cv-00031-PLM-MV | Jail strip search | Fed. | MI |
| 38. Rodriquez (Circa) v. Henry Co. et al.<br>No. 1:21-cv-0199-TCB (22) | Restraint Death | Fed. | GA |