IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| OCTAVIO RODRIGUEZ CIRA and | : | |
| FABIOLA MERLOS MARTINEZ, | : | |
| as Surviving Parents of | : | |
| FERNANDO OCTAVIO RODRIGUEZ, | : | |
| Deceased, and | : | CIVIL ACTION |
| OCTAVIO RODRIGUEZ as | : | NO: 1:21-CV-01999-VMC |
| Administrator of the Estate of | : | |
| FERNANDO OCTAVIO RODRIGUEZ, | : | |
| | : | JURY TRIAL DEMANDED |
| PLAINTIFFS, | : | |
| v. | : | |
| | : | |
| COUNTY OF HENRY; | : | |
| OFFICER ROBERT P. BUTERA, In | : | |
| His Individual Capacity; and | : | |
| OFFICER QUINTON C. PHILLIPS, | : | |
| In His Individual Capacity, | : | |
| | : | |
| DEFENDANTS. | : | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs hereby file this Brief in Opposition to Defendants' Motion for

Summary Judgment (Doc. 69) and show the Court the following:

## INTRODUCTION

This case is not about an officer's negligent or mistaken acts. This case is

about two Henry County Police Department ("HCPD") officers causing Fernando

Rodriguez to asphyxiate by kneeling on his back while he lay incapacitated,

handcuffed, and shackled in the middle of the street. This case is also about Henry County's total failure to train its officers on how to safely restrain members of the public during arrest, despite the well-known dangers associated with restraining individuals in the prone position.

Seeking redress for the unlawful killing of their son and brother, Mr. Rodriguez's family filed suit under 42 U.S.C. § 1983 for excessive force (Count I), failure to render medical aid (Count II), supervisory liability (Count III), and *Monell* and *Canton* liability (Counts IV and V) as well as state law claims for wrongful death, negligence (Count VI), assault (Count VII), battery (Count VIII), intentional infliction of emotional distress (Count IX), and attorneys' fees (Count XI) (Doc. 1).

## OVERVIEW OF FACTS

On September 20, 2019, Defendant Quinton Phillips ("Defendant Phillips") and Defendant Robert Butera ("Defendant Butera"), along with three officers from the City of Hampton, detained and arrested Mr. Rodriguez in Hampton, Georgia. (Def. Ex. 11, HCPD Reports at 4-6) (Doc. 69-9 at 4-6). Mr. Rodriguez was walking down the middle of the street naked, unarmed, non-threatening, and in need of medical attention. At 10:11:52 p.m., Officer Mason Lewis of the Hampton Police Department tased Mr. Rodriguez in his back. Mr. Rodriguez fell to the

ground in pain. He would never stand again. (Pls. Ex. 1, Lewis BWC at 00:00-00:040).

After tasing Mr. Rodriguez several times, officers placed Mr. Rodriguez in the prone position, continued to tase him, and handcuffed him. (*Id*. at 00:38-07:41) (Pls. Ex. 13, Lowe Report at 14-15). At approximately 10:19:00 p.m., Defendant Phillips, who weighed at least 240 pounds, placed his knee in the middle of Mr. Rodriguez's upper back, thereby compressing Mr. Rodriguez's chest and impairing his ability to breathe. (Pls. Ex. 25, Training Dashboard at 1) (Pls. Ex. 17, Amerman depo. at 100:20-22) (Pls. Ex. 1., Lewis BWC at 07:45). Defendant Butera then lodged his knee into Mr. Rodriguez's lower back and buttocks while the Hampton officers pinned Mr. Rodriguez's arms, legs, and head. (*Id*. at 09:45-09:50; 13:20-13:24; 14:42-14:45; 15:38-15:41). While Mr. Rodriguez was handcuffed, in the prone position, and pinned to the ground, Defendant Phillips deployed three additional taser shocks.[1]

For more than ten minutes, Defendant Phillips kneeled on Mr. Rodriguez's back. (Pls. Ex. 1, Lewis BWC at 07:45-18:45).[2] Even after Mr. Rodriguez made gasping noises indicating that he could not breathe, Defendant Phillips refused to

---

[1] (Pls. Ex. 1, Lewis BWC at 08:18-08:28; 09:01-09:05; 10:15-10:21)

[2] *See also*, (Pls. Ex. 2, Bowlden BWC 05:28-15:59)

move. (*Id*. at 14:18-15:00). Even after Mr. Rodriguez became unresponsive at approximately 10:26:15 p.m., Defendant Phillips refused to move. (*Id*. at 15:00-18:45). Even after an officer asked "*[a]re you still breathing?*" and even after Defendant Phillips stated "[*h]e's quit breathing*," Defendant Phillips refused to move. (*Id*. at 16:24-16:47). It would take nearly four minutes after Mr. Rodriguez became unresponsive, and nearly two minutes and twenty seconds after Defendant Phillips recognized Mr. Rodriguez had stopped breathing, for Defendant Phillips to remove his knee from Mr. Rodriguez's back at approximately 10:29:58 p.m. (*Id*. at 15:00-18:45).

When paramedics arrived, they found Mr. Rodriguez to be pulseless and not breathing.[3] He later died at Grady Hospital. (Pls. Ex. 4, Georgia Death Certificate). Dr. Steven Atkinson, a medical examiner for the Georgia Bureau of Investigation who has conducted 4,000 autopsies, found that Mr. Rodriguez "*died as a result of asphyxia due to physical restraint in the prone position with compression of the chest*" and that the manner of death was "*Homicide [physical altercation with law enforcement]*."[4] Despite the well-known dangers associated with prone restraint

---

[3] (Def. Ex. 19, Henry County EMS Report at 2) (Doc. 69-17 at 2)

[4] (Def. Ex. 23, Autopsy Report at 6) (Doc. 69-21 at 6-7); (Pls. Ex. 10, Atkinson depo. at 9-10:20-24)

and the risk of positional asphyxia, Defendant Henry County provided no training

to its officers on how to safely restrain members of the public during arrest.[5]

## ARGUMENT AND CITATIONS TO AUTHORITY

### I.    Standard for Summary Judgment and Qualified Immunity

"Summary judgment is proper if the pleadings, depositions, and affidavits

show that there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law." *Mayfield v. Patterson Pump Co.*, 101 F.3d

1371, 1374 (11th Cir. 1996). *Citing*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). "The evidence must be viewed in the light most favorable to the

nonmoving party." *Mayfield*, 101 F.3d at 1374. *Citing*, *Augusta Iron & Steel*

*Works, Inc. v. Employers Ins. Of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).

"The doctrine of qualified immunity protects government officials from

liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known." *Pearson v. Callahan*, 555 U.S. 223, 231, (2009) (citations and

---

[5] Plaintiffs' expert, Geoffrey Alpert, is a professor of criminal justice at the University of South Carolina. He has published extensively on the policies and practices of police departments. (Pls. Ex. 14, Alpert Report at 1). He explains that these dangers have been known in the law enforcement community for decades and that HCPD's policies and training failed to address the known risks. (Pls. Ex. 14, Alpert Report at 1, 6-7) (Pls. Ex. 24, Alpert depo 155-156:3-20)

quotations omitted). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"This court utilizes a two-part analysis for the defense of qualified immunity. First, the defendant government official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995). "After the official makes this showing... the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Glasscox v. Argo, City of*, 903 F.3d 1207, 1213 (11th Cir. 2018).

"A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right…; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right,….; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law. *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009).

**II.** **Defendants Phillips and Butera are not entitled to qualified immunity on the excessive force claims in Count I.**

    A.   Excessive Force

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). "In order to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Id*.

  "The Supreme Court instructed in *Graham v. Connor* that '[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Glasscox*, 903 F.3d at 1214. *Quoting*, *Graham v. Connor*, 490 U.S. 386, 396 (1989). "To balance the necessity of using some force in making an arrest against the arrestee's Fourth Amendment rights, we must evaluate a number of factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer[ ] or others… whether he is actively resisting arrest or attempting to evade arrest by flight…" and "the nature and extent of the arrestee's injuries." *Id*. It is well settled

law that "a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Id.*, *at* 1220.

B. Defendant Phillips is not entitled to qualified immunity for the last three taser deployments.

i. *Graham* analysis

Under *Graham*, Defendant Phillips' fifth, sixth, and seventh taser deployments were unreasonable and constituted excessive force.[6] First, the nature and extent of the injuries weighs in favor of the Plaintiffs. Mr. Rodriguez was bloodied from the pavement and from the taser probes fired into his body. (Def Ex. 23, Autopsy Rprt at 2-3) (Doc. 69-21 at 2-3). And of course, the officers' actions would eventually take Mr. Rodriguez's life. (*Id.* at 6) (Doc. 69-21 at 6). Second, the severity of Mr. Rodriguez's crimes was low. (Pls. Ex. 13, Lowe Report at 15-16). There is no evidence that Mr. Rodriguez had been violent or had committed any felony offenses. *See*, *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002), noting that the arrestee's crimes for "disorderly conduct and obstruction, were of minor severity."

Third, Mr. Rodriguez was not an immediate safety threat to the officers or to

---

[6] (Pls. Ex. 1, Lewis BWC at 08:18-08:26; 09:01-09:05; 10:15-10:21)

anyone else. From the very beginning, the officers recognized that Mr. Rodriguez was not a threat to them. After Officer Lewis's initial taser deployment, the Hampton officers stood casually around Mr. Rodriguez and offered him medical assistance: "*Roll over on your stomach so we can get you an ambulance*." (Pls. Ex. 1, Lewis BWC at 02:04-02:08). Mr. Rodriguez was clearly either impaired by a drug or suffering from a mental health problem, but no one considered him to be an immediate danger. Prior to the officers going "hands on," Mr. Rodriguez had simply laid on the pavement or tried to move away from the painful taser shocks. (*Id*. at 00:40-06:30). He offered no violence to anyone.[7] In fact, when Defendants Phillips and Butera arrived at the scene, they both casually stood over Mr. Rodriguez (*Id*. at 04:46; 08:41).[8]

Fourth, at the time of the final three tasers, Mr. Rodriguez was not actively resisting. The Defendants claim that Defendant Phillips used his taser to "encourage compliance" and "gain control." (Doc. 69-2 at 8). But at the time

---

[7] Mr. Rodriguez was not "*swinging his arms violently*" or "*attempting to flee*." (Doc. 69-2 at 8, 20). The video clearly shows that Mr. Rodriguez was simply trying to get away from the painful taser shocks by moving along the pavement on his back for a short distance. (Pls. Ex. 1, Lewis BWC at 04:54-05:10).

[8] In assessing immediate danger in *Vineyard*, the Eleventh Circuit found it relevant that there was "*a glass or plastic partition between*" the arrestee and officer. *Id*. at 1349. Here, any perceived danger could have been ameliorated by the officers simply taking a couple of steps back until the ambulance arrived.

Defendant Phillips deployed the final three tasers, Mr. Rodriguez was cuffed, naked, unarmed, and in the prone position with five officers pinning his body down. (*Id.*, at 08:18-08:28; 9:01-9:05). His legs were also shackled for the final taser deployment. (*Id*. at 09:16-09:20).[9]

The Defendants nonetheless make several arguments to suggest that Mr. Rodriguez was actively resisting. They point to Mr. Rodriguez's language and screams (Doc. 69-2 at 8, 13, 16, 18).[10] The Eleventh Circuit has made clear that language is not enough, even where an arrestee is screaming: "[the arrestee's] conduct… was a nuisance but not a threat." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002). The Court in *Vineyard* also found it relevant that officers had verbally insulted the arrestee. *Id*. The officers here also insulted and threatened Mr. Rodriguez: "*you're about to piss me off*"; "*you sweaty little hog*"; "*I'm going to kick your teeth out*"; "*I'll break [this arm].*"[11] The officers' orders were also

---

[9] Plaintiffs' expert William Lowe, a long-time Georgia peace officer, Taser Master Instructor, and paramedic, found that the deployment of the taser under these conditions was not consistent with the manufacturer's training and guidelines (Pls. Ex. 13, Lowe Report at 21, 29, 35) (Pls. Ex. 27, Lowe depo at 88-89:9-8).

[10] The Defendants attribute a number of quotes to Mr. Rodriguez (Doc. 69-2 at 10). His statements, however, are largely unintelligible.

[11] (Pls. Ex. 1, Lewis BWC at 04:09-04:21; 08:55-08:59; 10:22-10:30)

contradictory and confusing. Prior to going "hands on," Officer Stroud twice told

Mr. Rodriguez: "*Do not roll over!*" (Pls. Ex. 1, Lewis BWC at 04:31-04:36).[12]

The Defendants also assert that Mr. Rodriguez was "attempt[ing] to 'get

up'" and that he "had not stopped resisting." (Doc. 69-2 at 10-11). But a close

viewing of the video footage shows little to no movement, and any movement that

is detectable can be attributed to Mr. Rodriguez struggling to breathe. With regard

to the fifth taser deployment, the video shows that Mr. Rodriguez's body actually

became more level with the pavement during the alleged resistance (*i.e.*, exactly

what the officers wanted) (Pls. Ex. 1, Lewis BWC at 08:18-08:30).

With regard to the sixth taser deployment, the Defendants argue that Mr.

Rodriguez was trying to bite a Hampton officer's leather work boot (Doc. 69-2,

12). The video, however, does not show Mr. Rodriguez moving his head, let alone

trying to bite the officer (*Id.*, at 08:51-09:05). The Hampton officer's statement

was also only a warning, not an indication that Mr. Rodriguez had actually tried to

bite him ("*Dude, you bite me, I'm going to kick your teeth out.*"). Any movement

---

[12] The officers also joked at Mr. Rodriguez's expense: "*Let's go to Imagine Fest*";
"*Can you believe… this is my first naked man?*"; "*Stroud was hollering like a little
girl on the radio*"; and "*I just didn't want to have to beat the boy to death. You
know what happened to the last one [laughter].*" (Pls. Ex. 1, Lewis BWC at 11:32-
11:34; 12:25-12:30; 14:12-14:19; 17:10-17:18). These jokes demonstrate that the
officers did not perceive Mr. Rodriguez to be a threat.

can again be attributed to Mr. Rodriguez trying to breathe.

For the seventh taser deployment, Defendants argue that Mr. Rodriguez "exploded with rage and energy and managed to free himself..." (Doc. 69-2 at 12). But this is not so. Once again, Mr. Rodriguez was simply trying to breath.[13] Moreover, by the seventh deployment, officers had applied shackles to Mr. Rodriguez's legs, and Defendant Butera had kneeled on Mr. Rodriguez's lower back. (Pls. Ex. 2, Bowlden BWC at 06:20-06:31). Officer Bowlden even stated that Mr. Rodriguez's legs were pinned. (*Id.* at 07:30-07:34).

In *Lombardo v. City of St. Louis, Missouri*, 141 S.Ct. 2239 (2021), the Supreme Court recently remanded a case to the Eighth Circuit because the Court was troubled, in part, by the arresting officer's assertion of "ongoing resistance." The detainee was handcuffed and shackled, moved to the prone position, pinned to the ground, and pressure was placed on his back and torso. The arrestee "tried to raise his chest, saying, 'It hurts. Stop.'" *Id.*, at 2240. The Court noted that the arrestee struggled for 15 minutes in that position before his breathing became abnormal and he stopped moving. Officers then performed chest compressions. *Id.* The Court noted: "it is unclear whether the court thought the use of the prone

---

[13] Mr. Rodriguez did not become free as the Defendants suggest. He was still handcuffed, shackled, and had multiple officers pinning him to the ground.

restraint—no matter… the surrounding circumstances—is *per se* constitutional so long as the individual appears to resist officers' efforts to subdue him." *Id*. The Court was concerned that the Eighth Circuit found it to be insignificant that the arrestee was handcuffed and prone for 15 minutes. *Id*.

The Court found that these factors may show excessive force because there was evidence, in part, which showed that "struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands." *Id*., at 2242. Here, there is also evidence to show that Mr. Rodriguez struggled due to oxygen deficiency and was not actively resisting officers. The video footage clearly shows that Mr. Rodriguez's chest was compressed into the pavement and the audio reveals that Mr. Rodriguez was struggling to breathe (Pls. Ex. 1, Lewis BWC at 08:04-10:30; 11:36-11:58; 14:18-15:00). Dr. Atkinson also explained that it takes several minutes for an individual to lose consciousness before dying from asphyxia. (Pls. Ex. 9, Atkinson depo. at 34:1-16). Common sense dictates that anyone deprived of oxygen will struggle before becoming unconscious.[14]

---

[14] Both Lowe and Plaintiffs' other expert witness, Dr. Geoffrey Alpert, also cite to a 1995 U.S. Department of Justice bulletin titled "*Positional Asphyxia—Sudden Death*" which details that when "*[t]he natural reaction to oxygen deficiency occurs--- the person struggles more violently*." (Pls. Ex. 13, Lowe Report at 21) (Pls. Ex. 14, Alpert Report at 79 (for the link to the bulletin)) (Pls. Ex. 32, DOJ Bulletin at 2). Lowe further testified that Mr. Rodriguez's struggles were due to

*Glasscox* is also instructive. In *Glasscox*, an officer tasered a motorist multiple times. In finding that the motorist did nothing that could be viewed as resistance, the Eleventh Circuit noted that, "[d]uring the second taser shock, Mr. Glasscox's movements were entirely involuntary: his hands and arms curled up toward his chest while he shook and writhed." 903 F.3d at 1215. And when the officer argued that the motorist offered resistance by attempting to pull the taser off his thigh during the fourth shock, the Court reasoned that this could have simply been "an involuntary response to a painful stimulus." *Id*.

In affirming the denial of summary judgment, the Court determined that "a reasonable jury could conclude that [the officer's] own actions appear to have been preventing Mr. Glasscox from complying..." *Id*. at 1215. The Court continued: "[e]ven if the arrestee's resistance justified deployment of a taser initially, if he has 'stopped resisting ... during this time period,' further taser deployments are excessive." *Id*., at 1214. *Quoting*, *Wate v. Kubler*, 839 F.3d 1012, 1020 (11th Cir. 2016). *See also*, *Saunders v. Duke*, 766 F.3d 1262, 1269 (11th Cir. 2014), finding that "even if the complaint could be read to allege that [the arrestee] disobeyed an order by lifting his head off the hot pavement, that minor

---

oxygen deprivation (Pls. Ex. 31, Lowe depo. 119-120:21-9) (Pls. Ex. 33, Lowe's depo. at 84:9-22).

transgression does not mean that the force allegedly used was a constitutionally permissible response…"

As in *Glasscox*, Mr. Rodriguez's limited movement was in response to painful stimuli caused by the officers. The facts are even more compelling in the instant case as the painful stimuli caused Mr. Rodriguez to become unresponsive and ultimately die. A reasonable jury could therefore find that the officers' own actions prevented Mr. Rodriguez complying (*i.e.*, kneeling on his back and impairing his ability to breathe). Because all of the *Graham* factors weigh in Plaintiffs' favor, the final three taser shocks constituted a violation of the Fourth Amendment.

The cases cited by the Defendants are inapposite. In *Mobley v. Palm Beach County Sheriff Dept.*, 783 F.3d 1347 (11th Cir. 2015), for example, the arrestee had been accused of trying to run over an officer with a vehicle and then fleeing. Upon being caught, he resisted and was not restrained with handcuffs at the time force was used. *Id.*, at 1351. *Buckley v. Haddock*, 292 Fed. Appx. 791 (11th Cir. 2008) was an unpublished opinion and the facts were quite different. *Buckley* involved a single officer and the arrestee deliberately disobeyed commands, even asking the officer to shock him. *Id.* at 792.

ii.   Clearly established law.

Defendant Phillips' fifth, sixth, and seventh taser deployments also violated clearly established law. The Court in *Glasscox* made clear that "no objectively reasonable officer in [the arresting officer'] position could have thought it was lawful to use a taser repeatedly on an arrestee who was not resisting, even if that arrestee had previously offered resistance and was not yet restrained." 903 F.3d at 1219. And under *Glasscox*, an arrestee's movements cannot be categorized as resistance where they are caused by the officer's painful stimuli. Therefore, Defendants had fair notice that they could be held liable for their actions.

The cases cited by the Defendants are again inapposite. The Court's decision in *Hoyt v. Cooks*, 672 F.3d 972 (11th Cir. 2012), occurred well before *Glasscox*. The arrestee in *Hoyt* had also committed assault and threatened to kill others, and the officers were not able to handcuff the arrestee during the alleged use of force. *Id.*, at 976. In *Mann v. Taser Inter., Inc.*, 588 F.3d 1291 (11th Cir. 2009), the arrestee was placed in the back of a patrol car where she kicked uncontrollably. She "kicked the rear driver's side window out of the patrol car… bending the steel door frame" before "slamming her head up against the opposite door." *Id.*, at 1300. And in *Callwood v. Jones*, the 727 Fed.Appx. 552, 555 (11th Cir. 2018), the plaintiff had not been handcuffed and the officer was "*fighting for [his] life.*"

16

C.     <u>Defendant Phillips and Defendant Butera are not entitled to qualified immunity for kneeling on Mr. Rodriguez.</u>

     i.     <u>The force was gratuitous</u>

This is not a close question. The Eleventh Circuit has long held that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008); *Lee v. Ferraro*, 284 F.3d 188 (11th Cir. 2002); *Stryker v. City of Homewood*, 978 F.3d 769, 775 (11th Cir. 2020). The use of force here was patently gratuitous as the Defendants have been criminally charged with murder. (Pls. Ex. 12, Indictment).

For several minutes, Mr. Rodriguez can be heard struggling to breathe, crying, and whimpering. (Pls. Ex. 1, Lewis BWC at 13:08-15:00). The video footage then clearly shows that Mr. Rodriguez became unconscious by 10:26:15 p.m. (*Id.*, at 15:00-18:45). At 10:27:37 p.m., an officer announced that "*[h]is pulse rate is through the roof*." (*Id.* at 16:20-16:24). A few seconds later an officer asked if Mr. Rodriguez was breathing. (*Id.* at 16:22-16:28). Defendant Butera did not take his knee off of Mr. Rodriguez until 10:27:52 p.m. – at least **1 minute and 37 seconds** after Mr. Rodriguez became clearly unresponsive. (*Id.* at 16:35-16:38). At 10:27:57 p.m., Defendant Phillips stated twice "*[h]e's quit breathing*." (*Id.* at 16:40-16:48). At 10:29:58 p.m., Defendant Phillips finally removed his knee from Mr. Rodriguez's back – at least **3 minutes and 43 seconds** after Mr. Rodriguez

became clearly unresponsive. (*Id.* at 18:40-18:46).[15] Officer Stroud also told investigators that Mr. Rodriguez had been unresponsive for four minutes before paramedics arrived (Pls. Ex. 39, Stroud Interview at 4).

The Defendants cite to *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288 (11th Cir. 2009), to save them. But in *Lewis*, the officers removed the restraints and began CPR upon noticing that the arrestee was unconscious. Here, they continued to kneel. In a 2018 case nearly on point, Counsel for Defendants similarly argued that *Lewis* required the district court to grant qualified immunity. Judge Clay Land soundly rejected Counsel's argument, finding the facts in *Lewis* inapposite. *See*, *Dyksma v. Pierson*, 2018 WL 3430684 (M.D. Ga. July 16, 2018).[16]

In *Dyksma*, after a dangerous car chase, officers placed the arrestee face down on the side of the road and an officer kneeled on the arrestee's neck for 20 seconds while the arrestee was handcuffed. The arrestee initially screamed and groaned but, as the officer stood up, the arrestee was no longer groaning and had

---

[15] The Defendants argue that "*Defendant Phillips and Butera were not aware that Rodriguez was having any difficulty breathing due to the restraint force used*." (Doc. 69-2 at 19).  The audio shows this is simply not true. The officers were also clearly aware that Mr. Rodriguez had become unresponsive.

[16] An Eleventh Circuit panel, including Judge William Pryor, Judge Newsom, and Judge Martin, affirmed Judge Land's denial of the arresting officer's motion for summary judgment in a *per curiam* decision. *Dyksma v. Pierson*, 763 Fed. Appx. 909 (11th Cir. 2019) (unpublished opinion).

stopped struggling. The arrestee appeared "clearly incapacitated." *Id*., at *3. The officer then placed his knee on the arrestee's neck for *17 seconds* while another officer kneeled on his buttocks. The arrestee did not struggle or resist, but the officers stated that the arrestee was making sounds and not having trouble breathing. *Id*. When the officers realized the arrestee had become unresponsive, they turned the arrestee onto his side and began telling him to breathe. The officers also felt for a pulse and asked emergency personnel to speed up their response. The officers then uncuffed the arrestee and began chest compressions. *Id*. at *4.

In finding that the kneeling officer was not entitled to qualified immunity, Judge Land reasoned: "after the first… neck compression, [the arrestee] was handcuffed and was not resisting or trying to flee. He became quiet and stopped moving his legs and arms." *Id*. at *7. The Court noted that the officer "briefly relieved the pressure twice during that time, and the [the arrestee] lifted his head and neck off the ground slightly but did not otherwise move." *Id.* He noted that the officer "had time to look at the [arrestee] and see that he was incapacitated" and that the officer "consciously decided to press [the arrestee's] neck to the ground again anyway." *Id*. The Court noted: "[The officers] were not authorized to tase or punch him or hit him with a baton. It was likewise unnecessary to press his neck to the ground with a knee." *Id*.

The Court then distinguished *Lewis*:

> Unlike the detainee in *Lewis*, Nicholas was quiet,
> restrained, and possibly unconscious by the time Pierson
> placed his knee on Nicholas's neck the second time. The
> video clearly shows him to be physically incapacitated
> and helpless. *Lewis* does not create any 'haze' that makes
> the line between acceptable and excessive force unclear.
> It would be apparent to a reasonable law enforcement
> officer that a knee to the neck of an uncooperative
> resisting detainee is far different than a knee to the neck
> of someone who is clearly restrained, cooperative, and
> incapacitated. Pierson is not entitled to qualified
> immunity. *Id*. *8.

As in *Dyksma*, the video shows that Mr. Rodriguez was unresponsive and

not resisting, and the officers were acutely aware that Mr. Rodriguez had become

unresponsive. This case is even more egregious in a number of respects. Here, the

officers verbally indicated that Mr. Rodriguez had quit breathing. Defendants

Phillips and Butera nonetheless made the conscious decision to keep their weight

on Mr. Rodriguez's back. The amount of time that elapsed also far eclipsed the 17

seconds of force in *Dyksma*. Additionally, Mr. Rodriguez made no movement

during this period of time unlike the arrestee in *Dyksma*.

The Defendants also point to *Mongeau v. Jacksonville Sheriff's Office*, 197

Fed. Appx. 847 (11th Cir. 2006) (unpublished), a case involving two different

multi-hour, high-speed, and dangerous car chases by the same arrestee. Officers

were rightly afraid that the arrestee was armed, and when he crashed into a light

pole, the arrestee refused to obey their commands. The Eleventh Circuit noted:

"once [the arrestee] was handcuffed the officers stopped using force against him,

except that which was necessary to hold him down and ensure that he did not flee."

*Id*., at 851. Notably, the arrestee in *Mongeau* was not rendered unconscious nor

was he injured by the officer's force. Here, the officers realized Mr. Rodriguez had

stopped breathing but consciously decided to continue to kneel on him.

The Defendants claim that "[t]here is also no evidence that the amount of

pressure used to restrain Rodriguez was unreasonable." (Doc. 69-2 at 20). But the

GBI medical examiner found that the amount of force used did in fact kill Mr.

Rodriguez. (Pls. Ex. 9, Dr. Atkinson depo. at 34:1-16). Medical experts aside, the

video footage clearly shows Defendants Phillips and Butera bearing down on Mr.

Rodriguez with their body weight (Pls. Ex. 1, Lewis BWC at 14:42) (Pls. Ex. 2,

Bowlden BWC at 05:35, 07:10).[17] The Defendants argue that the HCPD policies

"did not address any such risk" and that there is no evidence that the officers knew

that asphyxia would occur (Doc. 69-2 at 20). But department policies do not dictate

the borders of the Fourth Amendment, and the subjective belief of the officers is

irrelevant. *See*, *Hadley*, 526 F.3d at 1330. Case law prohibited the use of force,

---

[17] Defendant Phillips also told the GBI that he "*used more weight with [his] knee*"
following his fourth taser deployment (Pls. Ex. 11, Phillips GBI Statement).

especially deadly force, on an incapacitated arrestee, and the facts show that is what happened here.[18]

In the alternative, based on all of Plaintiffs' arguments and the facts set forth above, Defendant Phillips and Defendant Butera violated the general standard for excessive force set out in *Graham v. Connor* when they kneeled on Mr. Rodriguez.

### ii.   The law was clearly established.

Even if the Court were to determine that there is no binding case law with similar facts, the Defendants had fair notice as there was a broader, clearly established principle and the conduct was so egregious that it violated a constitutional right with obvious clarity. As discussed above, controlling case law in this Circuit prohibits the gratuitous use of force when an arrestee in not resisting. *Hadley*, 526 F.3d at 1330 (11th Cir. 2008). The Eleventh Circuit has explained: "using injurious force on a suspect who does 'not pose a threat of bodily harm to the officers or anyone else' at the time of arrest, and who is not 'attempting to flee or to resist arrest' is 'conduct so egregious that a constitutional right [is] clearly violated' even in the absence of factually similar case law." *Marantes v. Miami-Dade Cnty.*, 649 Fed. App. 665, 671 (11th Cir. 2016). *Quoting*, *Priester v. City of*

---

[18] Alpert also found that the officers violated accepted police practices when they continued to kneel on Mr. Rodriguez. (Pls. Ex. 14, Alpert Report at 9).

*Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000).

In *Dyksma*, for instance, the district court walked through seven different Eleventh Circuit cases since 1997 that stand for this proposition. Judge Land reasoned that "it was beyond debate that a law enforcement officer who jams his knee onto the neck of a helpless and incapacitated arrestee violates the arrestee's Fourth Amendment right to be free from excessive force." *Id.* at *8. He concluded:

> The Eleventh Circuit precedent discussed above clearly established by August 2015 that after a suspect is subdued, handcuffed, not resisting, and not a flight or safety risk, officers cannot kick him, punch him, slam his head into a car or onto hot pavement, use pepper spray on him, or use so much force to handcuff him that it breaks his arm. An obvious corollary is that an officer cannot use his knee and body weight to press to the ground the neck of an incapacitated, handcuffed, non-resisting arrestee. It should have been clear to the deputies in this case that it would be unconstitutional to use such force on Nicholas. *Id.*

The Defendants complain that they did not have "fair and clear" notice that their actions violated Mr. Rodriguez's constitutional rights (Doc. 69-2 at 26). The Eleventh Circuit, however, made clear long before Mr. Rodriguez's arrest that officers cannot use force on an incapacitated arrestee. The motion for summary judgment as to Count I must therefore be denied.

D.    <u>Defendants Phillips and Butera failed to intervene.</u>

"[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable... This liability, however, only arises when the officer is in a position to intervene and fails to do so." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000). As excessive force was used, the only question posed is this: did Defendant Phillips and Defendant Butera have an opportunity to intervene?

In *Priester*, the Eleventh Circuit found that it was error to grant summary judgment to an officer who failed to intervene during a police dog attack that "may have lasted as long as *two minutes*." *Id.*, at 925. The Court reasoned: "Two minutes was long enough for a reasonable jury to conclude that [the officer] had time to intervene and to order Wheeler to restrain the dog." The Court went on: "[b]ecause [the officer] stood on top of the canal with his flashlight on the scene and watched the entire event and was in voice contact with Wheeler, this case is distinguishable from those cases where an officer who failed to intervene was found not liable because he did not observe the violation or have the opportunity to intervene." *Id*.

Defendant Butera, who was right next to Defendant Phillips, watched the violation take place for *at least* 3 minutes and 43 seconds without ordering or

24

pushing Defendant Phillips off Mr. Rodriguez. Defendant Phillips similarly

watched Defendant Butera use excessive force for at least 1 minute and 37 seconds

without intervening. Based on *Priester*, this was enough time for both of the

officers to intervene.[19] Summary judgment must therefore be denied as it relates to

the officers' failure to intervene on Count I.

III.   **Defendants Phillips and Butera are not entitled
to summary judgment on Count II as they failed
to provide constitutionally adequate medical care.**

Plaintiffs must show that Mr. Rodriguez had a "serious medical need," that

the officers "acted with deliberate indifference to [his] serious medical need, and

that "the injury was caused by the defendant's wrongful conduct." *Goebert v. Lee

County*, 510 F.3d 1312, 1326 (11th Cir. 2007). Defendants appear to concede that

Mr. Rodriguez suffered from a serious medical need (Doc. 69-2 at 28). To show

deliberate indifference, a plaintiff must show subjective knowledge of a risk of

serious harm, disregard of that risk, and conduct that is more than mere negligence.

*Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999).

The Eleventh Circuit has explained: "When the need for treatment is

obvious, medical care which is so cursory as to amount to no treatment at all may

---

[19] *Cf. Dyksma, supra*, where Judge Land granted summary judgment for failure to intervene, noting, "[t]his application of force was administered without warning" and the force was of "limited duration" and "unforeseeab[le]" to the other officers.

amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989). Here, Defendants had subjective knowledge of a risk of serious harm and disregarded that risk (*i.e.*, the officers saw and heard Mr. Rodriguez become unresponsive, they discussed Mr. Rodriguez's pulse rate and his lack of breathing, and they refused to take their knees off of Mr. Rodriguez).

Despite killing Mr. Rodriguez, the Defendants argue that the officers did not act with deliberate indifference because they summoned an ambulance (Doc. 69-2 at 29). In *Zellers v. Echevarria*, 2011 WL 13272664 (N.D. Ga. 2011), the case cited by the Defendants, the arrestee suffered a laceration on his chin, and the officer called an ambulance. Paramedics came and examined the arrestee before telling the officers that the officers could transport the arrestee to the hospital. After the paramedics left, the arrestee died from "sickle cell crisis due to sickle cell trait" of which the officer had no knowledge of. *Id*. at *8. Unlike the officers in *Zellers*, the Defendants had actual knowledge that Mr. Rodriguez was in medical distress long before the paramedics were able to examine Mr. Rodriguez, and the officers could have saved him by simply standing up.

The Defendants nonetheless maintain that Mr. Rodriguez was stable until the moment he was released to the paramedics: "Mr. Rodriguez was still making sounds and officers verified he was breathing." (Doc. 69-2 at 31). While this would

be a convenient escape for the Defendants, the evidence shows that Mr. Rodriguez had been unresponsive for approximately four minutes. During this time, the officers could have easily rendered care in the form of 1) lifting their knees off Mr. Rodriguez's body and 2) trying to save his life by performing CPR, for which they had been trained (Pls. Ex. 23, Amerman depo. 93:12-15).

The Defendants further argue that "Plaintiff's claim has an insurmountable causation problem" and that Plaintiffs cannot show "any alleged indifference caused Mr. Rodriguez's death." (Doc. 69-2 at 32). This is not so. First, Dr. Atkinson testified that asphyxia occurs over several minutes and that the knee on Mr. Rodriguez's back caused him to asphyxiate. (Pls. Ex. 9, Dr. Atkinson depo. at 34:1-16). In other words, a jury could find that Mr. Rodriguez would have survived if the knee had simply been removed.

Second, death is not the only injury. In *Reid v. Streit*, 697 Fed. Appx. 968 (11th Cir. 2017), officers failed to take a detainee to the hospital for hours, despite knowledge that the detainee had suffered a broken hand, and the detainee eventually required surgery to rest the bone. The officers argued that the detainee could not show that their deliberate indifference caused his injury. The Eleventh Circuit reasoned: "[w]hile there is no evidence showing that the officers' delay caused the need for Reid's surgery, a jury could find from the evidence that Reid

suffered from extreme pain that night... and the officers did nothing to alleviate it." *Id*., at 973. A jury here could find that the officers' failures to remove their knees caused Mr. Rodriguez to unnecessarily suffer by being deprived of oxygen. The motion for summary judgment must therefore be denied as to Count II.

### IV. Defendant Butera is not entitled to summary judgment on Count III as he supervised Defendant Phillips.

"Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Here, Defendant Butera participated in the excessive force against Mr. Rodriguez and acted as Defendant Phillips' supervisor. Defendant Butera claims that he had no authority over Defendant Phillips because HCPD Chief of Police Mark Amerman says so. (Doc. 69-2 at 34). But Chief Amerman also testified during his deposition as follows:

| | |
|---|---|
| Counsel: | *At the time of the incident that you just described involving Fernando Rodriguez, do you know what their ranks were?* |
| Amerman: | *Patrolmen.* |
| Counsel: | *Did either one outrank the other?* |
| Amerman: | *Butera I think might have been a field training officer.* |

| Counsel: | *Okay.* |
|---|---|
| Amerman: | *So technically he would be the higher rank and was more senior of the two.* |
| Counsel: | *Practically did he have any kind of authority over Phillips?* |
| Amerman: | *I guess it would depend on the scenario but they were both patrolmen. I guess it would depend on the scenario.* |

(Pls. Ex. 35, Amerman depo. 17-18:17-6). Lowe also testified that Defendant Butera was the highest-ranking Henry County officer at the scene as indicated by the chevrons on his sleeve. (Pls. Ex. 36, Lowe depo. 166:22-24), and he explained in his report that Defendant Butera had 14 years of experience, was a field training officer, and had a duty to make sure Mr. Rodriguez was managed appropriately. (Pls. Ex. 13, Lowe Report at 34). In comparison, Defendant Phillips had only been a peace officer for about one year. (Def. Ex. 16, Phillips POST at 1) (Doc.69-14).

The video footage also shows that Officer Stroud (the highest-ranking Hampton officer) made a plan of action (*i.e.*, the officers would wait for an ambulance to arrive). Officer Stroud then asked Defendant Butera: "*Do you agree Butera?*" (Pls. Ex. 1, Lewis BWC 11:54-12:06). In doing so, Officer Stroud acknowledged that Defendant Butera was the highest-ranking officer from Henry County at the scene with decision making authority. Summary judgement must therefore be denied as to Count III.

**V.    Henry County is liable under _Monell_ and _Canton_ for failing
       to train its officers on how to safely restrain individuals.**

A plaintiff must show: "(1) that his constitutional rights were violated; (2)

that the municipality had a custom or policy that constituted deliberate indifference

to that constitutional right; and (3) that the policy or custom caused the

violation." _Monell v. Dep't of Soc. Servs. of City of New York_, 436 U.S. 658 (1978).

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only

where the failure to train amounts to deliberate indifference to the rights of persons

with whom the police come into contact." _City of Canton v. Harris_, 489 U.S. 378

(1989). A plaintiff "must present some evidence that the municipality knew of a

need to train and/or supervise in a particular area and the municipality made a

deliberate choice not to take any action." _Gold v. City of Miami_, 151 F.3d 1346,

1350 (11th Cir. 1998). Furthermore,

> [A] showing of specific incidents which establish a pattern
> of constitutional violations is not necessary to put the City
> on notice that its training program is inadequate. Rather,
> evidence of a single violation of federal rights,
> accompanied by a showing that a municipality has failed to
> train its employees to handle recurring situations
> presenting an obvious potential for such a violation, is
> sufficient to trigger municipal liability.

_Allen v. Muskogee, Okl._, 119 F.3d 837, 842 (10th Cir. 1997). "[A]t all times and in

all _Monell_ cases based on this theory, the Supreme Court has directed the focus on

the presence and proof of 'a known or obvious risk.'" *J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020).

As discussed above, Plaintiffs have shown a violation of Mr. Rodriguez's constitutional rights. The latter two *Monell* factors are addressed below.

### A.    Henry County's policy constituted deliberate indifference.

Henry County claims that Chief Amerman, who is the ultimate decision maker on HCPD policies, was unaware in September of 2019 that improper usage of prone restraint can lead to injury and death. (Doc. 69-2 at 37) (Pls. Ex. 15, Amerman depo. at 15:4-12). But portions of his deposition suggest otherwise.

Chief Amerman testified that the law enforcement community became aware of positional asphyxia in the 80s and 90s. (Pls. Ex. 18, Amerman depo. at 76-78:10-25). He then testified that he's been aware for 34 years that placing weight on someone's back while they are in the prone position can cause difficulty breathing. (Pls. Ex. 17, Amerman depo. at 98-99:17-25). And he was also aware that "hog-tying" arrestees could lead to positional asphyxia. (Pls. Ex. 18, Amerman depo. at 75-76:15-19). Based on this testimony, a jury could find that HCPD was well aware of a need to train its officers on the use of prone restraint.

In addition, Plaintiffs' experts both explained that the law enforcement community has been aware of the dangers of prone restraint and positional

asphyxia for decades and that HCPD's use of force policy in September of 2019 was inadequate as it failed to address these concerns. (Pls. Ex. 24, Alpert depo. at 156:4-14) (Pls. Ex. 13, Lowe Report at 20-21, 35-36). Alpert also explained the genesis for the national standard of prone restraint: "*decades ago there were people dying from … positional asphyxia, which now I think is called compression asphyxia…the national standard became to, once someone was not resisting, someone was under control, to get him off his stomach as quickly as possible*." (Pls. Ex. 24, Alpert depo. at 155:3-14).

Alpert also cited to many of the studies which detail the dangers of improper usage of prone restraint and that adding weight to the arrestee's back can compound these dangers. (Pls. Ex. 14, Alpert Report at 8, 76-88). Both experts also cited the 1995 DOJ Bulletin which warned against positional asphyxia: "*As soon as the suspect is handcuffed, get him off his stomach*." (Pls. Ex. 32, DOJ Bulletin at 2) (Pls. Ex. 13, Lowe Report at 21) (Pls. Ex. 14, Alpert Report at 80 (for the link to the bulletin)) (Pls. Ex. 32, DOJ Bulletin at 2).

But there is more in the record which strongly suggests that Henry County knew about the obvious risk of failing to properly train its officers. On July 17, 2020, HCPD amended its use of force policy to prohibit prolonged face-down prone restraint, and it required officers to avoid positional asphyxia and provide

medical attention to individuals injured from police actions. (Pls. Ex. 19, Amended HCPD Use of Force Policy).[20] The policy was amended again in May of 2021 requiring officers to terminate use of force when an arrestee is under full control (Pls. Ex. 20, Second Amended HCPD Use of Force Policy).

Prior to amending the policy, Chief Amerman sent an email to his department on June 26, 2020, requiring training on restraint and positional asphyxia during arrests (Pls. Ex. 21, Amerman email at 1). In the email, Chief Amerman wrote: "*It is always important for us to stay up to date with our training, especially in the use of force*." By doing so, Chief Amerman essentially conceded that HCPD's training was inadequate.

Additionally, the email contained a YouTube link for a training video titled "*Arrestee Restraint: Positional/Compression Asphyxia*." (*Id*., at 2). During the video, the presenter states: "*it's clear from the cases that the Courts recognize that prone restraint, prone restraint with pressure, positional asphyxia, can be an unreasonable use of force*." (Pls. Ex. 22 at 21:57-22:07). In fact, one of the court opinions cited by the presenter is the *Dyksma* case from 2018. (Pls. Ex. 22 at

---

[20] The amended policy reads, in part: "*Officers restraining a subject should be cognizant of, and avoid, positional asphyxia. This department prohibits prolonged face-down prone restraint. The officer should properly restrain the subject and place the subject in an upright position (sitting or standing) or side laying position*." (Pls. Ex. 19, Amended HCPD Use of Force Policy).

31:20-32:50).[21] A jury could therefore find that Henry County was aware of a need to train on prone restraint and positional asphyxia well before September of 2019.

The evidence also shows that Henry County made a deliberate choice not to take any action. Chief Amerman testified that the use of prone restraint by HCPD was a common practice, including "restrain[ing] the [arrestee] down" while officers waited on medical assistance. (Pls. Ex. 23, Amerman depo. at 88:4-10). At the time of Mr. Rodriguez's arrest, however, HCPD's use of force policy failed to mention prone restraint or positional asphyxia. (Def. Ex. 20, HCPD Use of Force Policy) (Doc. 69-18), and Chief Amerman made clear that his officers did not receive such training (Pls. Ex. 23, Amerman depo. at 89:16-20).  And as evidenced by HCPD's training materials on use of force, HCPD *completely* failed to train its officers on how to safely restrain members of the public during arrest.

---

[21] The training video also explained the proper usage of prone restraint: "*Yes, we may have to put people in a prone position to accomplish handcuffing... when we do that, and we're going to use any kind of pressure to stabilize them while we accomplish handcuffing, we've got to stay away from the neck, we've got to stay away from the center of the back, and stay away from the head as well. When handcuffing is accomplished, then we have to take steps to immediately get off them and put them in a position that facilitates breathing and we've identified those positions as upright or at least on their side.*" (Pls. Ex. 22, Training Video, 52:12-53:06).

34

(Pls. Ex. 28, HCPD PowerPoint Training Slides).[22]

In response to discovery requests about the training Defendants Butera and Phillips received, the Defendants only pointed to the officers' POST records. These records indicate only a general training in use of force (not specifically for prone restraint, positional asphyxia, or even the use of restraints in general). (Pls. Ex. 29, Defendant Butera's POST Records) (Pls. Ex. 30, Defendant Phillips' POST Records). *See*, *Favors v. City of Atlanta*, 849 Fed. Appx. 813, 819 (2021) (unpublished), noting: "[t]hat [the officer] received training on other matters of firearm usage is no answer to whether he received adequate training on the 'usual and recurring' use of deadly force when pursuing a suspect fleeing in a vehicle."

In finding that a county's failure to train an officer on use of force during arrests was a jury question, the Fifth Circuit examined *Canton's* reasoning:

> There [the Court] observed that it is a fact to a moral certainty that police officers are required to arrest fleeing felons. Thus, when the city arms its officers to carry out this task, there is thus the obvious need to train officers in the constitutional limitations on the use of deadly force. This need for training is so obvious that the failure to train is deliberate indifference to constitutional rights. This same observation, we think, may be applied in making arrests with force.

---

[22] Henry County therefore had a policy of not training its officers on how to safely restrain individuals during arrest, and more specifically, had a policy of not training its officers on proper prone restraint and positional asphyxia.

*Brown v. Bryan Cnty., OK*, 219 F.3d 450, 459 (5th Cir. 2000). As in *Brown*, Henry County sent Defendants Phillips and Butera into the field, knowing full well that they would have to use force to restrain members of the public, including use of prone restraint, without any training on how to safely use that force. *See also*, *J.K.J. v. Polk County*, 960 F.3d 367, 381 (7th Cir. 2020), finding that the jury had evidence that the county's policy failures "occurred in the face of an obvious and known risk that its male guards would sexually assault female inmates."; *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020), finding that "a reasonable juror could find [the] training is deficient" despite the fact that "police officers received some form of training on the proper use of force."

Additionally, Amerman testified that the use of force policy was amended at the request of Henry County's insurance provider following the George Floyd case (Pls. Ex. 18, Amerman depo. at 75:1-11). In other words, Henry County refused to take any action until it became concerned that its purse could be impacted. A reasonable jury could therefore find that Henry County knew of an obvious need to train on prone restraint and positional asphyxia but made a deliberate choice to not take any action.

B.    <u>A causal link has been established.</u>

"In *Canton,* the Court stated the proper inquiry to be, 'Would the injury have been avoided had the employee been trained... under a program that was not deficient in the identified respect[s]?'" *Vineyard v. Cnty. of Murray, Ga*., 990 F.2d 1207, 1213 (11th Cir. 1993). The Supreme Court has also indicated: "'The high degree of predictability' that constitutes notice may also support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997). The Seventh Circuit reasoned: "finding causation is not a mechanical exercise like working a math problem and getting answer but instead requires jurors to view evidence in its totality, draw on their life experiences and common sense, and the reach reasonable conclusions about the effects or particular action and inaction." *J.K.J*., 960 F.3d at 385.

There is no question that the injury would have been avoided had Henry County properly trained its officers. Indeed, Chief Amerman admitted causation during his deposition. First, he testified that the officers would have violated Henry County's amended use of force policy if it had been in effect at the time of Mr. Rodriguez's arrest. (Pls. Ex. 23, Amerman depo. at 91-92:17-12). Second, he testified that the "*change in policy*" came about as a result of the Georgie Floyd

case and "*[o]f course unbeknownst to the world we also have this case*" which he

described as "*another lesson learned.*" (Pls. Ex. 18, Amerman depo. 74:17-23).

A jury could also find that the harm was highly predictable due to Henry

County's indifference. Common sense dictates that the total failure to train officers

on how to safely restrain individuals during an arrest could cause the injury in

question. Again, Henry County knew its officers would be restraining people in the

field, and without any training, the natural consequence would be excessive force

and injury. *See*, *Brown*, 219 F.3d at 462, reasoning: "[t]he jury was therefore

justified to conclude that it was obvious to [the sheriff] that officers without any

training have a high predictability of injuring citizens, routinely and unnecessarily,

through the use of improper techniques…" For these reasons, summary judgment

must be denied as to Count IV and Count V.

> **VI.    Official immunity does not bar Plaintiffs' state
> law claims set forth in Counts VI through IX.**

Defendants argue that Plaintiffs have not shown that Defendants Phillips and

Butera "acted with actual malice or intent to do wrong." (Doc. 69-2 at 38-39). This

argument ignores the fact that Defendants Phillips and Butera have been indicted

for the murder of Mr. Rodriguez. (Pls. Ex. 12, Indictment).

In *Dyksma*, Judge Land found that "a jury could infer an actual intent to

cause harm to Nicholas," because "there is evidence to support a conclusion that

Pierson intentionally pressed Nicholas's neck to the ground with his knee after he should have been able to see that Nicholas was handcuffed, incapacitated, and not resisting." 2018 WL 3430684 at *10. There is also evidence for a jury to infer actual intent to harm Mr. Rodriguez as the officers knew that Mr. Rodriguez was handcuffed, shackled, and incapacitated but still continued to kneel on his body.[23]

The evidence of malice is even greater here as the officers joked with one another while Mr. Rodriguez slowly died. Defendants also admitted that they did not render any medical aid.[24] Defendant Butera's guilty intent can also be seen in his actions following the arrest. Defendant Butera's body camera shows that he intended to discuss the incident with Defendant Phillips, but before doing so, Defendant Butera removed his body camera and placed it in his vehicle so that it would not record his statements. (Pls. Ex. 7, Butera BWC at 14:50-15:10). Shortly thereafter, Officer Lewis's body camera recorded Defendant Butera admitting that he tried to contact a defense lawyer. (Def. Ex. 4, Combined BWC Video 52:03-52:27). The recording also shows Defendant Butera admitting that he was aware

---

[23] *See also*, *Beteast v. DeKalb County*, 258 Ga. App. 131, 132 (2002), finding the jury could "make a reasonable inference" that the officers "deliberately intend[ed] to do a wrongful act."

[24] (Pls. Ex. 5, Defendant Butera's Admissions at 4, No. 11) (Pls. Ex. 6, Defendant Phillips' Admission at 4, No. 11).

that Mr. Rodriguez had stopped moving. (*Id.*, at 01:06:45-01:06:57).

Similarly, Defendant Phillips' attempted to conceal the truth. In his written statement to the GBI, he omitted his fifth, sixth, and seventh taser deployments (Pls. Ex. 11, Phillips GBI Statement). During discovery, Defendant Phillips was asked to admit that he put his body weight on Mr. Rodriguez's body. Defendant Phillips lied by responding: "*This Defendant specifically denies that he put his body weight on Mr. Rodriguez*" (Pls. Ex. 6, Phillips Admissions at 3, No. 6). He again lied in responding to Plaintiffs' interrogatories when he stated that he only "*acknowledges that he briefly placed his hand on Rodriguez's back while Mr. Rodriguez was face down*." (Pls. Ex. 8, Phillips Response to Interrogatories at 5-6, No. 11).[25] The video footage clearly contradicts these assertions.

Summary judgment is therefore improper as to Counts VI, VII, VIII, and IX.

## CONCLUSION

For these reasons, Counsel for Plaintiffs respectfully requests that the Court deny the Defendants' Motion for Summary Judgment and that the case be permitted to proceed to trial on all counts and claims.

---

[25] Before Defendant Phillips and Defendant Butera could be deposed, they were indicted and moved to stay the case on the grounds that they would invoke their Fifth Amendment right against self-incrimination. Judge Batten allowed the case to proceed but ordered "the two Officer Defendants shall not be deposed." (Doc. 35 at 12-13).

This 1st day of September, 2022.

                                        PATE, JOHNSON & CHURCH, LLC

                                        /s/ Jess B. Johnson
Pate, Johnson & Church LLC              Page A. Pate
101 Marietta Street, Suite 3300         Georgia Bar No.: 565899
Atlanta, Georgia 30303                  page@patejohnson.com
(404) 223-3310
                                        Jess B. Johnson
                                        Georgia Bar No.: 322066

## **CERTIFICATION**

Counsel hereby certifies that this Response has been prepared with a font

(Times New Roman) and point selection (14 point) approved by the Court in

LR5.1(B).

This 1st day of September, 2022.

PATE, JOHNSON & CHURCH, LLC

/s/ Jess B. Johnson

Pate, Johnson & Church LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
(404) 223-3310

Page A. Pate
Georgia Bar No.: 565899
page@patejohnson.com

Jess B. Johnson
Georgia Bar No.: 322066
jess@patejohnson.com

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day electronically filed the foregoing Brief with the Clerk of Court using the CM/ECF system which will automatically send email notifications of such filing to all counsel of record in this matter.

This 1st day of September, 2022.

PATE, JOHNSON & CHURCH, LLC

/s/ Jess B. Johnson

Pate, Johnson & Church LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
(404) 223-3310

Page A. Pate
Georgia Bar No.: 565899
page@patejohnson.com

Jess B. Johnson
Georgia Bar No.: 322066
jess@patejohnson.com

43