Case 1:21-cv-01999-VMC   Document 73-20   Filed 09/01/22   Page 1 of 3

Octavio Rodriguez Cira, et al. vs County of Henry, et al.
Mark Blaine Amerman
April 07, 2022

Page 85

1  handling of injured.
2     A   Okay.
3     Q   You see the two bold paragraphs at the
4  bottom?
5     A   I do.
6     Q   First two sentences state, officers have an
7  affirmative duty to care for persons in their custody
8  and that officers are responsible for providing or
9  obtaining appropriate medical attention to any person
10 in their custody who is injured.
11        Do you see that?
12    A   I do.
13    Q   Why is this language added to the 2021
14 policy?
15    A   I don't think that's new.
16    Q   Feel free to take a look at it.
17    A   Is that what -- you are saying that's a new
18 statement?
19    Q   Yes. Feel free to take a look at Exhibit
20 14.
21    A   Handling of injured. Officers whose actions
22 have resulted in or alleged to have resulted in injury
23 or death of another person are required, after
24 securing the person, to provide medical aid if
25 necessary and will photograph the injuries. If a

Page 86

1  subject requires more that on-scene medical attention,
2  an attempt will be made to have a separate officer
3  take them to the nearest medical facility versus
4  officers have the affirmative duty.
5        The language is different. It seems like
6  the message is the same. That could have been the
7  same thing when the law changed about duty to
8  intervene. Maybe they changed to make that language
9  stronger.
10    Q   So you are not sure the reason for the
11 change?
12    A   No. I'm assuming. I don't recall. The
13 accreditation manager would have it in her notes
14 probably.
15    Q   Okay.
16    A   Because when we get reviewed, they want
17 to -- probably want to know why we changed. Whether
18 it was through the law change or best practices change
19 amongst the organization, if that's what made the
20 change happen. Me reading it, it's the same message.
21 You hurt, you have a duty to care for people.
22    Q   What is an affirmative duty?
23    A   To my vernacular it's a shall not a should.
24    Q   And is that different from the earlier
25 policy? Does it mention affirmative duty?

Page 87

1     A   The way I interpret it, it's a shall not a
2  should.
3     Q   Okay. Let's take a look at the second bold
4  paragraph. Second sentence in that paragraph states
5  officers restraining a subject shall be cognizant of
6  and avoid positional asphyxia. This department
7  prohibits face down, prone restraint. The officer
8  should properly restrain the subject and place the
9  subject in an upright position sitting or standing or
10 side laying position.
11        Do you see that?
12    A   Yep.
13    Q   Okay.
14    A   That language stemmed from our training that
15 I spoke about earlier, the ACCG.
16    Q   So prone restraint, what were you taught
17 about prone restraint?
18        MR. WILLIAMS: Object to form.
19    A   Now or --
20    Q   ACCG's training that you referenced.
21    A   That it could cause positional asphyxia.
22 People could have difficulty breathing in that
23 position made us aware of that.
24    Q   And you didn't know that before ACCG's
25 training?

Page 88

1     A   Having never had an incident of it, the way
2  they were able to articulate it and talk about agonal
3  breathing definitely made us more aware. So the
4  common practice was don't hog tie. This wasn't a
5  non-common practice in this situation trying to
6  control somebody who's been combative for so long and
7  somewhat appeared to be under the influence of
8  something, it wouldn't be unreasonable to attempt to
9  restrain them down while they waited on medical
10 assistance. Having learned lessons thereafter, i.e.
11 the policy change, we should attempt to put them in
12 what we call recovery position as outlined in what the
13 policy you just read. Sitting or on their side
14 position which would help breathing.
15    Q   This policy amendment in Exhibit 15 was May
16 2021. When was the ACCG training that you received?
17    A   I don't recall when it came out. I do --
18 what I do recall about it -- like I said earlier -- it
19 was around the George Floyd case that was still very
20 active when this training came out.
21    Q   Do you know if the training was in 2021?
22    A   Trying to recall I'd say yes. But I can't
23 tell you for sure.
24    Q   Could it have been 2020?
25    A   It could be. I really don't -- I just -- I

Case 1:21-cv-01999-VMC   Document 73-20   Filed 09/01/22   Page 2 of 3

Octavio Rodriguez Cira, et al. vs County of Henry, et al.
Mark Blaine Amerman
April 07, 2022

Page 89

1  do recall the training.  I do recall it was around the
2  George Floyd time.  I do recall it made an impression
3  on me and I told training and accreditation I want
4  this in policy.  I want our people trained on it.  Get
5  this information out.  That I recall.  That training
6  made an impression on me.
7      Q    Could it have been --
8      A    It was something I'd never gotten before.
9      Q    Could it have been 2019?
10     A    No, I think that was too long ago.  I think
11 it's more recent.
12     Q    So prior to this change in the policy, were
13 your officers taught anything about the prone
14 position?
15     A    Not that I know of.
16     Q    And I think we may have covered this but
17 were they taught anything about positional asphyxia?
18     A    Prior?
19     Q    Prior to this change in policy.
20     A    No, not that I'm aware of.
21     Q    If this policy, Exhibit 15, had been in
22 place before the arrest of Mr. Rodriguez, would the
23 policy have been violated?
24          MR. WILLIAMS:  Object to form.
25     A    I would want to look at -- I'm sure

Page 90

1  everybody as far as training and all actually look at
2  all of the tapes before coming to a conclusion.  From
3  what I seen, I would have liked him to have been in a
4  better recovery position.  To answer your question,
5  yes, quite possibly.
6           But I would want to see all the tapes and
7  see how long he was in the prone.  See about the
8  recovery position.  Ideally I wish somebody -- it's
9  unfortunate what happened.  And it's -- it's an
10 unfortunate incident that we learn from to do it
11 better in the future.  And I think between our case or
12 George Floyd's case or all these different cases, we
13 are learning from this and that's why training is
14 coming out from groups like ACCG and others that do
15 this.
16          I don't want to give you -- I don't know if
17 I'm able to give you -- just say yes or no would they
18 have been in violation of this policy.  To go back
19 and -- how long -- I know from what I saw in the tape
20 he showed me a little while ago, you know, the
21 screaming and the kicking, the still moving and we
22 talk about the recovery position.  As soon as it's
23 safe and practical.  Would it have been practical to
24 have him sitting up if he's still kicking and
25 screaming and you're waiting on the ambulance to come,

Page 91

1  I don't -- I don't know.  I'd want to see more.
2           From what -- in an attempt to answer your
3  question this is the current policy now.  What they
4  did back then would I take issue with what they did
5  back then, yeah, I wish they would have done
6  something -- with this current policy, I wish they
7  would have done something better or differently as far
8  as having him in a recovery position quicker.  Does
9  that a little bit answer your question?
10     Q    Well I heard -- I think I heard a yes, it
11 violated policy and then some clarification.  I'm not
12 sure about the clarification.
13          MR. WILLIAMS:  He didn't like the
14     clarification in other words.  Explain -- it's
15     speculation anyway.  Subject to that you can try
16     to explain more.
17     A    Question, would it be a policy violation.
18 With the current policy now, would it have been a
19 policy violation back then; correct?  That's the
20 question?
21     Q    Um-hmm.
22     A    Based on just what I saw, it would have
23 required me to investigate further.  I'll say that.
24 Would -- why wasn't he in the recovery position.
25 What -- what did you have going on where you felt like

Page 92

1  he couldn't be in a sitting, standing or side
2  position.  You need to explain that to me.
3           I would want somebody in that position as
4  quickly as possible.  As soon as you have control of
5  them, they need to be in the recovery position.  That
6  goes for whether they are having difficulty or not in
7  my opinion.  So it would definitely -- face value,
8  yes.  Something -- this isn't what policy says we're
9  supposed to do.  Now you -- now I want to know why we
10 didn't follow policy.  Why wasn't he in there.  So the
11 answer to your question, yes, that would be a policy
12 violation.  I would inquire further why didn't do you
13 that.
14          Because there's a reason -- as soon as it's
15 practical and safe, you are supposed to do that.  What
16 made you feel that you weren't practical and safe to
17 do that.  Current policy now compared to what they did
18 then.  So yes, to answer your question, yes, it would
19 be a policy violation.
20     Q    Okay.  As far as medical treatment goes,
21 prior to Mr. Rodriguez's arrest what were your
22 officers taught about medical treatment when people
23 are in custody?
24     A    You have to clarify.  I'm not tracking.
25     Q    If someone is in one of your officer's

Case 1:21-cv-01999-VMC   Document 73-20   Filed 09/01/22   Page 3 of 3

Octavio Rodriguez Cira, et al. vs County of Henry, et al.
Mark Blaine Amerman                                                April 07, 2022

Page 93

```
 1  custody --
 2      A    Okay.
 3      Q    -- and they are -- there is some medical
 4  issues going on with that detainee or arrestee, what
 5  are your officers trained to do?
 6           MR. WILLIAMS:  Object to the form.  I assume
 7      you are talking about inmates injured and the
 8      officer sees that an inmate or suspect is
 9      injured?
10      A    Call an ambulance.
11      Q    Is that the only thing?
12      A    No.  They also are trained on how to use the
13  AED and CPR and some basic first aid.  And some of my
14  employees are actually paramedics.  So it goes from
15  Band-Aid to a paramedic.
16      Q    What's the AD?
17      A    AED, the defibrillator.
18      Q    Is that if the heart stops?
19      A    Yes.  You hook them up and shock them.
20      Q    They are all trained on that?
21      A    The ones that have them, yes.
22      Q    And CPR?
23      A    Majority -- definitely AED's.
24      Q    Were they ever trained that they had to give
25  medical treatment to someone in their custody?
```

Page 94

```
 1      A    I think they have to provide medical -- I'd
 2  have to defer to departmental training officer but
 3  some level of care, help, calling for an ambulance.
 4  You know, open wounds, bleeding, attempt to stop the
 5  bleeding.  Using the defibrillator, CPR, giving
 6  Narcan.  I give out a lot of life saving awards.  They
 7  do a pretty good job of giving care.
 8      Q    In this case did the officers provide any
 9  medical treatment?
10      A    Other than -- from the video that I saw, it
11  appears -- I believe it was Phillips who first notices
12  that it appears that Mr. Rodriguez is having an issue
13  breathing.  And they are assessing.  And I know the
14  ambulance is coming.  And it appears their concern is
15  heightened as the ambulance is coming.  And they are
16  still assessing.
17           And it's almost simultaneously when the
18  ambulance shows up and they are like hey, I think he's
19  having serious difficulty breathing.  Like at that
20  same point.  From my experience if the ambulance
21  wasn't there, the officers would have took action as
22  far as CPR or AED, doing something of that nature.
23  Usually when the ambulance is there, they are the pros
24  that handle that.
25      Q    Did medical treatment of Mr. Rodriguez
```

Page 95

```
 1  comport with departmental policies?
 2           MR. WILLIAMS:  Object to form.  Go ahead.
 3      A    From what I saw, yes.  They -- I'll say the
 4  ambulance was called at least 10 minutes before any
 5  indication of something else was wrong.  And then I
 6  believe they checked on -- at least the video I saw
 7  hey, when are you coming, when are you coming.  Hurry
 8  up.  They wanted them there.  But he was still yelling
 9  and kicking.  And I don't think -- didn't appear to be
10  any concern about breathing at that point.  Not until
11  really when the ambulance showed up.
12      Q    Your officers, are they individually covered
13  by any liability insurance?
14      A    Not that I'm familiar with.
15      Q    ACCG --
16      A    Individually?
17      Q    Um-hmm.
18      A    I have to consult with my attorney.  I don't
19  have --
20      Q    I was just curious.
21      A    I don't know.
22           MR. JOHNSON:  Okay.  That's all I have.
23           MR. WILLIAMS:  I just have a couple of
24      follow-up questions real quickly.
25  ///
```

Page 96

```
 1                   REDIRECT-EXAMINATION
 2  BY MR. WILLIAMS:
 3      Q    There was a good bit of discussion about the
 4  recommendations of ACCG, maybe other sources that
 5  occurred after some period of time and apparently
 6  after this incident regarding warnings of positional
 7  asphyxia.
 8           Do you even know if there is a medical or a
 9  technical basis for determining whether there is a
10  danger of somebody suffering positional asphyxia just
11  from being in the prone position, restrained in the
12  prone position?
13      A    No.
14      Q    So the adoption of a warning about the
15  possibility of positional asphyxia, is that just an
16  attempt to employ the best practices to avoid
17  potential problems?
18      A    Oh absolutely.  When your insurance company
19  calls you and say don't do this, if we can fit it into
20  best practices, we will do that.
21      Q    For -- you've been policing for about 28
22  years, 27 years?
23      A    34 years.
24      Q    34 years total?
25      A    Just 28 at Henry.
```