**In The Matter Of:**

*Octavio Rodriguez Cira, et al. v.*
*County of Henry, et al.*

---

*Dr. Geoffrey Alpert*
*June 30, 2022*

---

*Thompson Reporting Services, Inc.*
*Georgia Certified Court Reporters*
*P.O. Box 792*
*Powder Springs, Georgia  30127-0792*
*(678) 483-0600*



Original File 063022GA.txt
Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - -

OCTAVIO RODRIGUEZ CIRA and
FABIOLA MERLOS MARTINEZ,
as Surviving Parents of
FERNANDO OCTAVIO RODRIGUEZ,
Deceased, and
OCTAVIO RODRIGUEZ, as
Administrator of the Estate of
FERNANDO OCTAVIO RODRIGUEZ,

       PLAINTIFFS,       CIVIL ACTION FILE

VS.                   NO.:  1:21-CV-01999-VMC

COUNTY OF HENRY, OFFICER
ROBERT P. BUTERA, In his Individual
and Official Capacity, and
OFFICER QUINTON C. PHILLIPS, In
his Individual and Official Capacity,

       DEFENDANTS.

- - - - - - - - - - - - - - - - - - - - - - - - -

ZOOM DEPOSITION OF DR. GEOFFREY ALPERT

Thursday, June 30, 2022
1900 Hayward Street
Columbia, South Carolina
10:00 a.m.

ANGIE CORNETT
Certified Court Reporter

**Thompson Reporting Services, Inc.**
**(678) 483-0600**

```
 1

 2                    APPEARANCE OF COUNSEL

 3   ON BEHALF OF THE PLAINTIFFS:

 4              JESS B. JOHNSON, Esq.
               Pate, Johnson & Church, LLC
 5              101 Marietta Street, Suite 3300
               Atlanta, Georgia 30303
 6              jess@patejohnson.com

 7

 8   ON BEHALF OF THE DEFENDANTS:

 9              KEVIN MORRIS, Esq.
               Williams, Morris & Waymire, LLC
10              Building 400, Suite A
               4330 South Lee Street
11              Buford, Georgia 30518
               kevin@wmwlaw.com

12

13                      I N D E X

14   WITNESS                              PAGE

15       DR. GEOFFREY ALPERT

16   Cross-Examination by Mr. Morris          4
     Direct Examination by Mr. Johnson      143
17

18

19

20

21

22

23

24

25
```

1

2                      INDEX TO EXHIBITS

3              [No exhibits were tendered.]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    *********

 2              P R O C E E D I N G S

 3                    *********

 4

 5          MR. MORRIS:  This will be the deposition

 6      of Geoff Alpert taken pursuant to agreement and

 7      notice I assume with the same rules that y'all

 8      operated under with Mr. Lowe reserving

 9      objections except to form and responsiveness

10      until first use of the deposition?

11          MR. JOHNSON:  That's fine with me.

12          MR. MORRIS:  Okay.  Very good.  Will you

13      swear the witness, please.

14                  DR. GEOFFREY ALPERT,

15      having been first duly sworn remotely, was

16    examined and testified via Zoom conferencing as

17                      follows:

18                  CROSS-EXAMINATION

19  BY MR. MORRIS:

20      A    Yes, ma'am.

21      Q    Dr. Alpert, will you go ahead and restate

22  your name, full name for the record.

23      A    Geoffrey Alpert.

24      Q    Okay.  And will you tell us where you're

25  currently employed.
```

1     A     Professor of criminology and criminal

2 justice at the University of South Carolina.

3     Q     Okay.  I'm going to opt to skip the

4 educational background, all of that stuff.  I think

5 we have got a pretty good record of that

6 information.  So we will forego some of those

7 traditional background questions if that's all

8 right.

9     A     Fine with me.

10     Q     Okay.  Good.  Dr. Alpert, I am, I'm going

11 to be asking you questions today from the report

12 that you produced in the Cira or Rodriguez, Fernando

13 Rodriguez lawsuit against Henry County.  The

14 questions which I'm going to be mostly drawing from

15 are borne out of your supplemental report that you

16 produced I believe sort of late May.  My belief is

17 that that report is the same as the original report

18 plus additional information.

19          But to make my question a little

20 clearer, you didn't remove anything from your

21 initial report.  You only added to your supplemental

22 report; is that correct?

23     A     That's correct.  And it's dated May 17th.

24     Q     Okay.  Yeah.  It is dated May 17th.  I

25 think the date, my save date is 5/23.  All right.

1    To begin with I wanted to go over the documents that

2    you reviewed, both to prepare your original report

3    and this supplemental report.  On page two it

4    indicates that you reviewed the complaint that you

5    were provided.  Did you review the complaint?

6         A    Yes, sir.

7         Q    The death certificate for Mr. Rodriguez?

8         A    Correct.

9         Q    Generally City of Hampton reports?

10         A    Yes, sir.

11         Q    Generally Henry County police reports?

12         A    Yes, sir.

13         Q    Video of the incident?

14         A    Yes, sir.

15         Q    And then it says in the list POST report.

16    I assume what you're talking about there is POST as

17    in all capital letters P-O-S-T?

18         A    Yes, sir.

19         Q    Okay.  Not as in an after-the-act report.

20    You're talking about Peace Officer Standard and

21    Training?

22         A    Correct.

23         Q    Okay.  And that is sort of a general

24    identification POST report?

25         A    Yes, sir.

1    Q    Okay.  Use of force policy?

2    A    Correct.

3    Q    Taser policy?

4    A    Correct.

5    Q    O.C. spray policy?

6    A    Correct.

7    Q    And the amicus brief by Seth Stoughton?

8    A    Correct.

9    Q    Is there anything else that you reviewed

10   that did not make its way onto this list?

11   A    Yes, sir.  I reviewed the 2001 PERF,

12   P-E-R-F, which is the Police Executive Research

13   Forum report on tasers and I reviewed -- I don't

14   know why I didn't put it on here, but the Henry

15   County use of force training power point that was

16   provided.

17   Q    The Henry County use of force training?

18   A    Power point presentation.  Yes, sir.

19   Q    Do you know what date is on that?

20   A    There's no date on it.

21   Q    Were you able to draw any conclusions

22   about the date?

23   A    No.  I guess I could go in and look at

24   the -- I didn't think about going in and looking at

25   the characteristics of the power point, but I cannot

1  do that.

2      Q     Okay.  Do you know -- so City of Hampton

3  police report is kind of general.  Do you know where

4  these police reports came from?

5      A     Well --

6      Q     Where they are?

7      A     Everything was sent to me.  The reports

8  that I, that I'm referring to were simply police

9  reports completed by the officers.  And the file was

10  just called police reports.  And I think the, I

11  think they're called incident reports or something

12  to that effect.

13      Q     So I guess the point of my question is do

14  you know whether or not you have all of the reports

15  or not?

16      A     I have no idea if I have all.  The ones I

17  have, I can go look if you want.  But I know the

18  Henry County officers -- well, I don't know.  I

19  think there were only two if I remember correctly.

20  I didn't see one by, was it Bowlden?

21      Q     All right.  So you're not aware if there

22  are other reports that may exist that you haven't

23  reviewed?

24      A     Right.  I wouldn't have any idea.  I only

25  know what I was sent.

1     Q     Did you happen to know if there was a GBI

2  investigation?

3     A     I don't recall a GBI investigation.  No,

4  sir.

5     Q     Okay.  So often times when documents are

6  shared with an expert like yourself, if there is a

7  GBI investigation, the GBI typically is sort of a

8  omnibus source for all of the materials related to

9  the investigation.  You weren't able to look and see

10  whether or not the reports you received were

11  collected by the GBI?

12     A     I can't tell.  When I'm looking at the --

13  when I'm looking at the police reports they're just

14  the City typical supplemental reports, reports,

15  incident reports.

16     Q     Okay.  And obviously on the report you

17  didn't indicate by name whose reports you reviewed?

18     A     Well, I didn't -- no, in the review

19  section I did not.  I believe on my, the incident

20  assessment part of my report I cited those specific

21  reports.

22     Q     Uh-huh.  And the same answers would apply

23  for the Henry County reports?

24     A     Yes, sir.

25     Q     Okay.  When you looked at video and you do

1   cite video in your report, which video were you

2   provided to review?

3       A    I can't answer that.  I don't know, I

4   don't know whose body-worn cameras they were.

5       Q    Is it your testimony that you reviewed

6   one, only one video file?

7       A    Yes, sir.

8       Q    Okay.  You're unaware that there are other

9   video files associated with body-worn cameras that

10  are a part of this case?

11      A    Well, I kind of assumed that, but I wasn't

12  sent anything else.

13      Q    Did you ask for those items and not

14  receive them?

15      A    No, sir.

16      Q    Okay.  Now that I brought that to your

17  attention that there are other video files, is that

18  something that you plan to go back and review?

19      A    I might before trial.

20      Q    And consequently those may affirm or alter

21  your conclusions in the report?

22      A    Well, the videos normally -- I would like

23  describing as watching baseball through a straw.

24  You can only see exactly what the camera is focusing

25  on.  And normally they affirm or contradict the

1    officer's statements.  So other than the minutes or

2    the seconds that are shown on the tape -- it really

3    is good to kind of see what, if the officers were

4    reporting what they saw or what they thought.

5        Q    And presumably each of these officers

6    would be, who are wearing body-worn camera, would be

7    giving you a different perspective of the series of

8    events leading up to the, you know, use of force and

9    events thereafter?

10       A    Normally the body-worn cameras are looking

11   at the same event from a different, different angle

12   maybe.  But it sounds like from the descriptions and

13   the detail of the reports, that they may have been

14   standing at one direction or another.  But all the

15   reports are very consistent so I would assume the

16   videos would be.

17       Q    Do you think that you need those videos

18   to -- do you -- let me withdraw that.  Now knowing

19   that there are some videos that exist, do you have

20   some insecurity in the conclusions that you have

21   drawn in this report?

22       A    No, sir.  Most of my opinions are based on

23   the written reports that they, that were written by

24   the officers involved.  And I didn't see any

25   inconsistencies.

1      Q    Okay.  So it's your testimony that you're
2  not likely to change your opinion even if you, even
3  after reviewing the videos?
4      A    If I see anything that would contradict a
5  statement in my report, I might change an opinion.
6  But I don't know.  I can't answer it without seeing
7  it.
8      Q    Right.  And that's where it gets back to
9  the question that I asked earlier is are you
10  insecure in any way about the completeness of your
11  ability -- of your evaluation in this case?
12      A    I'm very -- I am very secure in my
13  conclusions based on the reports that I read which
14  are from the officers and very consistent.  If
15  there's something else that comes up, I just can't
16  answer.
17      Q    Right.  I mean basically you have a
18  limited amount of information from which to draw
19  certain conclusions and evaluate what happened on
20  the scene?
21      A    Well, I wasn't there so I'm always limited
22  by either what is written or what is filmed or what
23  is seen by someone else.  That's correct.
24      Q    Right.  I guess a better way to ask that
25  question is that because there's data points that

1    exist outside of what you reviewed to formulate this

2    opinion, your opinion in this case is not based upon

3    a complete set of objective information and data?

4        A    Well, you asked the question what, you

5    know -- you asked the question do I have everything.

6    I don't know the answer to that other than what you

7    have mentioned today.

8        Q    If I tell you that there are videos from

9    other officers, multiple other officers, and you

10   tell me that you only reviewed the video from one

11   particular officer, you would concede then that you

12   have not formulated your opinions based upon all of

13   the evidence available in this case, right?

14       A    Well, that would be correct assuming the

15   videos show something different.  If they're all the

16   same, well, you're right.  Technically if there are

17   videos that I haven't seen, I haven't seen the whole

18   file.  But as I said normally the written reports

19   are in more detail explaining what you might see.

20   Unless you see something that was either described

21   incorrectly or differently, I think the written

22   reports, are the combination of the written reports

23   I read give me a pretty good idea of what happened.

24       Q    Right.

25       A    And honestly, honestly my conclusions,

1   unless they're just wrong based on the, what a jury
2   would believe, I'm very comfortable with them.
3   Including the number of times Mr. Rodriguez was
4   tased, the lack of any kind of discussion or attempt
5   to diffuse the situation.  All those things are
6   written in great detail and I'm very comfortable
7   with those.
8       Q    Okay.  Specific to the issue of compliance
9   though, you would agree with me that a video is a
10  better source of information -- often times a video
11  is a better source of information about the level of
12  compliance with which an officer encounters?
13      A    You mean a suspect's compliance?
14      Q    Yes, the suspect's compliance.
15      A    It gives you a visual.  But again, after
16  reading all the reports, there's not much
17  inconsistency.  So I have a pretty good sense -- for
18  example, Mr. Rodriguez was, was not compliant, but
19  he wasn't fighting.  He wasn't arguing.  He was just
20  not doing what they told him to do.
21      Q    Uh-huh.  The videos would, that you
22  haven't seen may or may not allow you to observe
23  information that would indicate greater levels of
24  resistance -- let me back it up.  Let me ask it this
25  way.  Isn't it possible that the videos you haven't

1    seen show levels of resistance that may change that

2    opinion about compliance?

3        A    I can't give you a definitive answer.  But

4    my experience is if there's resistance, officers are

5    going to write it.

6        Q    And the -- it is true that the officers

7    described him being combative and resisting?

8        A    Well, not in the beginning.  After he had

9    been tased and kicked and a few other things, yeah.

10   But in the beginning it was pretty clear from

11   everything I read that he wasn't.  In fact, if I

12   recall correctly it was described as the officers

13   approached him and basically threatened him if he

14   didn't stop they are going to tase him and he kept

15   walking, which, you know, I understand he was naked

16   and I understand -- they don't know what's going on.

17              And they described it fairly

18   completely.  Sure, the video could show something

19   else.  Maybe he didn't walk away.  Maybe they were

20   not telling the truth.  I -- the one video showed

21   pretty much what they described.  So.

22       Q    Right.

23       A    Usually again, videos show the same event

24   from a different perspective.  But I didn't see

25   inconsistencies between and among the officers.

```
1        Q    Well, you would agree with me that neither

2   of my individual clients were present at the

3   beginning of the --

4        A    That's correct.

5        Q    -- video?

6        A    Correct.

7        Q    So when I say that the videos may show

8   higher levels of resistance than what you have

9   described in your report, that would then alter your

10  opinions?

11       A    Well, if I see something that's not in my

12  report it might alter the fact pattern.  I don't

13  know if it's going to alter the opinions.  When you

14  talk about my opinions because they are based on a,

15  pretty much a broad pattern as opposed to one event.

16                  I mean for example, you have Phillips

17  saying when Rodriguez turned his head towards

18  Stroud's feet, Stroud kicked him in the face.  Now,

19  I didn't see that specifically in the video.  Maybe

20  Mr. Rodriguez opened his mouth.  Maybe he didn't.

21  It doesn't matter.  Step -- take a step back.  You

22  don't just kick him in the face when someone turns

23  his head towards you.  Yeah, there could be a slight

24  difference, but it doesn't affect my opinion that

25  that was excessive and unnecessary.
```

1       Q     The takeaway from this is though that your

2   opinions are not based upon all of the available

3   information in this case?

4       A     Well, if there is information that I

5   haven't seen, then that would be accurate.  Yes,

6   sir.

7       Q     Okay.  We went through your list of cases

8   in a recent deposition.  I'm not going to go back

9   through them.  Let me ask this.  Have you ever been

10  retained as an expert in any case, in any case

11  involving positional asphyxia?

12      A     Yes, sir.

13      Q     Okay.  And can you give me the name of

14  that case.

15      A     Well, there been multiple cases, many of

16  which involved tasers.  Others involve use of force.

17  Well, I will give you one.  George Floyd.

18      Q     Okay.  Did you offer a professional

19  opinion in that case?

20      A     I did not.  I was on the civil side.  I

21  was not deposed.  They settled before we went to

22  deposition.

23      Q     Okay.

24      A     I wrote reports.  And yes, I offered

25  professional opinions.

1      Q    Okay.  And would you be willing to send me
2  a copy of your report in that case?
3      A    I will ask the lawyers if they will allow
4  it.
5      Q    Was that report produced pursuant to Rule
6  26?
7      A    I'm not -- I'm not sure what you mean.
8      Q    Well, in your, in your report you describe
9  it as being a Rule 26 report so I figured you might
10  know what a Rule 26 report is.
11      A    I mean if they tell me it's a Rule 26
12  report I will put it on there.
13      Q    Okay.
14      A    But there have been dozens of cases.  In
15  fact, several in Australia, coronial hearings where
16  I dealt with it.  Another one was Daniel Prude.  I
17  testified to the grand jury in Daniel Prude about
18  positional asphyxia.
19      Q    Did you give a written report in Daniel
20  Prude?
21      A    I don't recall if I did or not.
22      Q    What would it take for you to be able to
23  answer that question yes or no?
24      A    Probably write the prosecutor.
25      Q    Well, would it also not be a document that

1   you save right there on your computer?

2        A    When cases are resolved I don't save.  I

3   don't save the.

4        Q    So are you saying on your computer right

5   now you have no file materials or written opinions

6   related to the Daniel Prude case?

7        A    That's correct.  Well, I may have, I may

8   have the grand jury report, but I don't have

9   anything that I submitted.

10        Q    Okay.  So it's possible that you submitted

11   a report to the Office of the Attorney Generals?

12        A    You know, I don't think I did because I

13   think -- well, I don't remember.  But I remember

14   testifying for quite a while to the grand jury and I

15   don't recall referencing a report.

16        Q    Do you know if the Attorney General's

17   office produced any summary of your report?

18        A    Well, I don't remember writing a report.

19   I don't recall -- I know they -- they submitted a

20   report on the case.

21        Q    Okay.  And --

22        A    And I don't know if they referenced -- if

23   I wrote a report if they referenced it or just my

24   testimony.

25        Q    Do you know whether or not the office of

1    the Attorney General summarized your testimony in

2    the Daniel Prude case?

3        A    I don't think they just, they went through

4    mine particularly.  I think they wrote a report on

5    all of the testimony.  It's been -- it's been -- I

6    read that when it first came out.  I was very upset

7    with them on a couple of things.  And I wrote them

8    and asked them why they missed certain things.  And

9    they apologized and I haven't looked back.

10       Q    Do you have a copy of the correspondence

11   that you sent to them?

12       A    No.  I don't keep e-mails.

13       Q    Okay.  What was it about the summary of

14   your opinions that you disagreed with?

15       A    It wasn't a summary.  They -- instead

16   of -- I testified that I believe that the positional

17   asphyxia was a approximate cause.  They put in the

18   report that I said it was the proximate cause.

19       Q    So your opinion was that there were other

20   proximate causes of his demise?

21       A    Yes, sir.

22       Q    Okay.  Were there any other opinions in

23   that summary that you -- were there any other

24   opinions that they attributed to you in that summary

25   that you did not offer?

```
 1        A    I don't believe so.  But when I saw that
 2   one -- excuse me.  I pretty much focused on it and
 3   got pretty upset with the lawyers and whoever wrote
 4   the report, the Attorney General, in the Attorney
 5   General's office.
 6        Q    Were you asked about any other law
 7   enforcement tactics in that case?
 8        A    Oh, yes.
 9        Q    Okay.  Other than his prone position upon
10   the ground.  I needed to finish my question that you
11   just answered yes.  Were there any other law
12   enforcement tactics that you were asked about other
13   than being placed in a prolong prone position?
14        A    Yes, sir.
15        Q    Okay.  What were those law enforcement
16   tactics that you were asked about?
17        A    There was one about where the officer had
18   his knee on Mr. Prude's head when he was getting
19   control of him and there was -- I can't -- that was
20   the one that stuck out.  But -- and there probably
21   were others, but the main --
22        Q    Is that --
23        A    I'm sorry?
24        Q    Isn't it correct that you told the officer
25   the Attorney General for New York in the Daniel
```

1    Prude investigation that the head segmentation

2    tactic was appropriate under the circumstances?

3        A    Yes, sir.  I said because they were

4    trained in it, they -- the way the officer described

5    doing it keeping his knee on his head for a short

6    period of time.  And that was something that the

7    Department had approved.  Yes, sir.

8        Q    Okay.  Had the Department not approved it,

9    would it have been, would your opinion had changed?

10       A    Probably because I wasn't -- as I

11   testified to the grand jury and obviously you have

12   read the report more recently than I have.  So I had

13   not -- I was not familiar with that tactic.

14       Q    The --

15       A    That is true.  I based it on the training

16   that the officer -- and the training officer

17   explained and the officer who used that tactic

18   explained.

19       Q    Okay.  And in that case force was applied

20   to Daniel Prude's neck because he was spitting,

21   correct?

22       A    No, sir.  Force was not applied to his

23   neck.

24       Q    Okay.

25       A    He had his --

1     Q    A knee, a knee as you just testified, was
2   placed on Daniel Prude's neck because they were
3   trying to put him in a spit mask?
4     A    No, sir.  The knee, the knee was applied
5   to his head, which I was most concerned about they
6   didn't put something on the ground because it was
7   freezing and he was naked.  And they put a spit mask
8   on him after that.
9     Q    What is a hypoglossal maneuver?
10    A    I have no idea.
11    Q    Did you not testify that head segmentating
12  and the hypoglossal maneuver were reasonable?
13    A    As I testified five minutes ago, yes,
14  based on the training and the description from the
15  training officer and the officer who used it.  I've
16  never heard of that term.  I seen the technique
17  done, a similar technique done where, yeah, the knee
18  on the head was not in any way restricting blood or
19  oxygen.  And it was to see take control of his head.
20  So, and of course the body follows the head so.
21  Yeah, I agreed that was reasonable for the amount of
22  time it was used under the conditions.
23    Q    Okay.  And you -- I'm going to tell you,
24  I'm going to represent to you that the report says
25  that you, you said it was reasonable for the

1    officers to use a hypoglossal maneuver.  Would you

2    like to see it?

3         A    No.  I don't disagree with that.

4         Q    I just asked you -- I asked you what is a

5    hypoglossal maneuver because I've never heard of it

6    either.

7         A    It, as you remind -- look, it's been a

8    long time since I read any of that or testified to

9    the grand jury.  But it was a technique that I never

10   heard that term and I think you're right.  I think

11   they were, they were kind of included as one.  The

12   sentence you said a while ago kind of reminded me

13   that yeah, they were combined.

14        Q    Okay.  The hypoglossal and the -- the

15   hypoglossal maneuver and the head segmentation?

16        A    Yeah.  I think the head segmentation is

17   the term that they used in training.  And the

18   hypoglossal is what, I guess what they did.  Like I

19   said, I'd never heard of it.  I had seen that done

20   differently.  Never heard the term before.

21        Q    Okay.  And as you sit here today do you

22   remember the specific portions of the video in that

23   case upon which you use to formulate your opinion?

24        A    I remember watching him put his knee on

25   his head.  That's why I was very critical of the

1   fact that they didn't put something down between his

2   body and the ice cold pavement.

3       Q    Were there any -- well, you would concede

4   that part of your opinion and the need for the level

5   of force related to the Corona virus, Covid-19

6   outbreak and the fact that Mr. Prude was spitting?

7       A    Yeah.

8       Q    The need to control him to apply the spit

9   mask?

10      A    Yes, sir.

11      Q    Okay.  So they had a heightened reason to

12  use the head segmentation, hypo -- hypoglossal

13  maneuver because of the threat of Corona virus?

14      A    Well, I think they were, the officers

15  testified it was more than just Corona virus.  There

16  were all sort of things that they were concerned

17  about about spitting, which I don't blame them.

18      Q    Right.  Would you put biting in the same

19  category as spitting?

20      A    No, sir.  It's a different category, but

21  it can be, it can certainly be just as dangerous.

22      Q    Okay.  Would you, if a subject were trying

23  to bite an officer, would you generally find it

24  appropriate for an officer to use the head

25  segmentating maneuver, hypoglossal maneuver?

1      A     I think you can control the head in a

2  variety of ways.  But yes, if an officer is trying

3  to bite and you don't have them controlled and you

4  can't just back away, yes, I think it's reasonable

5  to use that to put, if you have a spit mask to put

6  it on.  Yes, sir.

7      Q     Okay.  Well, a spit mask isn't going to do

8  much about stopping someone from biting though,

9  correct?

10     A     The ones I have seen you can't bite

11 through them.

12     Q     Well, it's porous enough to allow for

13 breathing, correct?

14     A     Oh, yes, sir.

15     Q     Okay.  Do you know where the hypoglossal

16 nerve is?

17     A     No, sir.

18     Q     Okay.  Where would you describe, how would

19 you characterize the area below the mandible?

20     A     I have no medical training.  I have use of

21 force training in staying away from anything where

22 you can cut off the blood or cut off the oxygen.  So

23 I can't answer those questions.

24     Q     So if I were to tell you that the

25 hypoglossal area is the area behind the mandible,

1    would you describe that as being the neck area?

2        A    Well, because you were pointing to your

3    neck I would disagree with you.  I don't know.

4    That's why I testified earlier and testified to the

5    grand jury I was not aware of that specific

6    technique or those terms.

7        Q    Okay.  Would you find it appropriate or

8    inappropriate for a law enforcement officer to use a

9    tactic of applying pressure beneath the jaw?

10       A    If you're talking about the neck area

11   where you're cutting off oxygen, yes, sir.

12       Q    Okay.  And if that area were also the

13   hypoglossal area, how would you reconcile that?

14       A    Because what I saw in the Daniel Prude

15   video was an officer's knee on a forehead -- not on

16   a forehead, but on the side of his head, not

17   anywhere near his neck and certainly not an area

18   that was cutting off blood or oxygen.

19       Q    Is it fair to conclude that you're not an

20   expert in either the head segmentating procedure or

21   the hypoglossal maneuver?

22       A    As I've never heard of them before.  Yes,

23   sir.

24       Q    Okay.  So you offered opinions in George

25   Floyd.  You offered opinions in Daniel Prude.  Both

```
 1   of which are positional asphyxia cases.  As you sit
 2   here today are there any cases that are listed on
 3   your Rule 26 report that are, any other cases that
 4   are positional asphyxia cases?
 5        A    There are a lot that I have testified in
 6   over the years that deal with positional asphyxia.
 7   Yes, sir.  I can't tell you which ones.
 8        Q    Okay.  I will go through them.
 9        A    It's not going to do me any good.  I
10   don't, I don't remember the specific facts of the
11   cases and which ones would involve a positional
12   asphyxia or compression asphyxia issue.
13        Q    Right.  But I want to go and I want to
14   call these lawyers and I want to get your deposition
15   testimony and I want to find out what opinions you
16   offered.  And so I don't want to be calling people
17   on chase cases.  And if you can isolate the cases
18   that are positional asphyxia.
19        A    Well, I can tell you the ones that say
20   pursuit next to them were probably not.  And the
21   ones that said use of force, if there's a taser -- I
22   mean, I just don't know.  Sometimes use of force
23   they leave them on their stomachs too long and
24   that's part of the problem and sometimes they don't.
25        Q    Yeah.  Cause some of these are just
```

1    referred to as use of force cases and that's why I

2    cannot discern whether they're not -- I can't

3    discern whether or not they're positional asphyxia

4    cases.

5         A    Right.  Right.  I can't either.

6         Q    So let me jump to that in your opinion.

7    Do you have it in front of you?

8         A    What's that?

9         Q    Do you have your list of cases in front of

10   you?

11        A    I can get it.

12        Q    That will be great.

13        A    Yes, sir.

14        Q    All right.  And the one that I have, what

15   I have is from 2018 to 2022.

16        A    Correct.

17        Q    That's what I'm seeing.  I believe it's

18   on, the pagination is a little different.  Claypoole

19   was a pursuit.  Frantom was a pursuit.  Seabrooks

20   pursuit.  Driving was Lopez.  Wanskek.  What about

21   Garber?  That one just says use of force.

22        A    Yeah.  Garber, that was not a positional

23   asphyxia case.

24        Q    It was not?

25        A    No, sir.

1       Q    Okay.  What about Givens versus City of

2   Chicago?

3       A    No.  That was, I believe that was a

4   shooting case.

5       Q    Mary Dann v. Heart Heritage?

6       A    No.

7       Q    Colorado v. Rodarte?

8       A    No, sir.

9       Q    Okay.  Scott v. Charlotte?

10      A    No, sir.

11      Q    Davis versus Waller?

12      A    No, sir.

13      Q    Simmons versus Charleston County?

14      A    No, sir.

15      Q    Okay.  Coronial inquest into the death of

16  Jack Kokaua in Australia?

17      A    Yes, sir, that was.

18      Q    All right.

19      A    Rolfe was not.

20      Q    Right.  Prude was, yes?

21      A    Yes.

22      Q    Green versus Valdez?

23      A    I don't remember that case.

24      Q    Maybe, maybe not.  Pizer versus Rock Hill?

25      A    No, sir.

```
 1        Q    Thorington versus Scott?

 2        A    I don't think so.

 3        Q    All right.  Those are all the cases that I

 4   have.  I didn't see the George Floyd case on there.

 5   But I can only assume that means you didn't offer

 6   sworn testimony or produce a report?

 7        A    That's correct.  No, I did produce a

 8   report.  I didn't provide any sworn testimony.

 9        Q    Okay.  And you were retained and paid and

10   all that stuff?

11        A    Yes, sir.

12        Q    By the State?

13        A    No, sir.

14        Q    By who?  By the family?

15        A    Yes.

16        Q    Okay.  All right.  Do you know how you got

17   involved in this case?

18        A    I got a phone call I would assume.  I

19   don't have the specific recollection.  I would

20   assume I got a call as normally happens.

21        Q    Who was it from?  Do you know if it was

22   from Mr. Johnson or another lawyer or the family?

23        A    Well, it wasn't the family.  It was

24   probably Mr. Johnson.

25        Q    Okay.  Did you have any prior relationship
```

1    with Mr. Johnson?  You ever worked for him or

2    offered him any opinions?

3          A    No, sir.

4          Q    And what were you asked to do?

5          A    Well, again, in all these cases I ask what

6    the basic facts were that the attorney thinks the

7    jury is going to believe or what the issues were.

8    And when I said it was something I think I could

9    assist with, it was in my will-house, I was asked to

10   look, to review the information and provide opinions

11   on the behavior of the officers and the, I believe

12   the policies.

13         Q    Okay.  Do you recall when that contact was

14   made?

15         A    No.  I'm trying to remember.  I guess it's

16   not on the -- it's not on my report.  It probably

17   was about a year ago, something like that.

18         Q    Were you advised to whether or not the

19   City of Hampton defendants had been dismissed at

20   this point or not?

21         A    I don't recall that.

22         Q    Do you know as you sit here that the City

23   of Hampton police officers are no longer defendants

24   in this action?

25         A    Yes, sir.

```
 1        Q    Okay.  When did you become aware of that?

 2        A    I don't recall.  Somewhere along the line.

 3   I don't -- I don't have any idea of when that part

 4   of the case was resolved.

 5        Q    Prior to you offering an opinion in this

 6   case, prior to you offering an opinion in this case,

 7   did Mr. Johnson offer you any written summary or --

 8   [audio difficulty.]

 9             THE COURT REPORTER:  I'm sorry, Mr.

10        Morris.  You froze up.  Could you repeat your

11        question, please.

12   BY MR. MORRIS:

13        Q    I'm sorry.  Prior to you being retained in

14   this case, did Mr. Johnson or anyone associated with

15   the two plaintiffs in this case provide you with a

16   summary, written summary of the facts?

17        A    Other than what was in the complaint which

18   I normally don't read very closely, no, sir.

19        Q    Okay.  So is my conclusion correct that

20   all of the information that you received about this

21   case prior to being retained was through

22   Mr. Johnson's verbal account?

23        A    That's correct.

24        Q    Okay.  Since the, being retained has

25   Mr. Johnson provided you with any -- has Mr. Johnson
```

1    corresponded with you?

2         A    Yes, sir.

3         Q    Okay.  Has he included facts or materials

4    or arguments that he intends to advance in any of

5    those communications?

6         A    Well, no.  I mean I don't know what he

7    intends to advance, but he certainly never

8    communicated with me.  He never provided me any

9    summaries or any information.  No, sir.

10        Q    How many e-mails has he sent you?

11        A    I have no idea.  Probably more in the last

12   week than before.  But there were a handful of them

13   I guess.  Mostly about coordinating times and

14   nothing of great substance.

15        Q    Okay.  So is it your opinion that you were

16   not provided any information that was used to

17   calculate your opinion or incorporate into your

18   final opinion?

19        A    Nothing I haven't, we haven't talked

20   about, no, sir.

21        Q    Okay.  What methodology did you use to

22   review and form your opinions?

23        A    Well, I tried to put together this

24   incident assessment as well as I could based on the

25   information that I had, which were the reports,

1    video and statements.  I compared that against my

2    understanding of common police practice.  And I

3    found significant gaps between what they did and

4    what they should have done.

5         Q    Okay.  Let me ask, I'm going to jump ahead

6    a second.  Have you participated in any scientific

7    studies -- let me withdraw that.  Have you been

8    responsible for conducting any studies related to

9    positional asphyxia?

10        A    No, sir.

11        Q    Okay.  You have done no research, formal

12   research in the area of positional asphyxia?

13        A    I have not done any original research into

14   the issue of positional or compression asphyxia.  I

15   have not measured -- and part of the problem is to

16   do it properly would be unethical because you can't

17   measure young police cadets or students or officers

18   responses and actions.  You know, I will just put it

19   to you this way.  I have never had -- I played

20   sports in college.  I played sports after college.

21   And I have never seen anyone after exerting him or

22   herself lay down on a stomach to relax.

23        Q    Right.  But you would agree with me that

24   there are people who have conducted formal

25   scientific studies about the positional asphyxiation

1    phenomenon?

2        A    They have and they have used healthy

3    subjects.  And that's the problem.

4        Q    Have you ever served as a peer review or

5    conducted a formal criticism, written criticism of

6    any of these studies on positional asphyxia?

7        A    Well, I have, I have reviewed articles

8    that have been written.  I have -- I have used some

9    of those articles.  And really the same things I'm

10   telling you now is that when you do research in the

11   lab and I have written this several times, to do it

12   properly with subjects who are either significantly

13   overweight or who are under the influence of alcohol

14   and/or drugs, is unethical.

15              So I, my concern there is subjects

16   who are, who volunteer to do this work are usually

17   healthy, either students or police officers or

18   cadets and that's not who the subject of these

19   police involved compression and positional asphyxia

20   cases involve.

21       Q    Right.  But these studies that are

22   conducted, in order to be published with

23   credibility, they have to go through a rigorous peer

24   review criticism, correct?

25       A    Well, peer review is -- yes, they do have

1    to go -- most of the journals, a lot of journals and

2    professional publications they don't use good peer

3    review, but in the academic ones, yes.

4         Q     And the academic ones probably have more

5    scrutiny and, therefore, more credibility in the

6    conclusions drawn, correct?

7         A     Well, it depends on the methods.  You can

8    conclude all you want.  If you're using bad methods.

9    For example, medical journals that are reviewed by

10   doctors, most doctors are not researchers.  They are

11   medical doctors.

12        Q     Rights.  But the research has gone through

13   a level of rigor and criticism that gives it an

14   inherit level of credibility in the industry,

15   correct?

16        A     I can't answer that question for -- I

17   don't read medical journals very often.  I read

18   them.  I don't understand a lot of it.  I'm not a

19   medical doctor.  But I can tell you the, what -- the

20   common police practice is to roll someone over off

21   their stomach as soon as possible and end of story.

22        Q     Right.  Back to my original question.  You

23   have not been responsible for coordinating any

24   scientific studies into the phenomenon of positional

25   asphyxia, have you?

1      A      No, sir, I haven't because to do it

2  properly would be unethical.

3      Q      Right.  There are scientific studies that

4  exist into the phenomenon of positional asphyxia,

5  right?

6      A      With healthy subjects, yes, sir.

7      Q      Okay.  Right.  I'm not asking -- I don't

8  know and I'm not sure if you know what the status of

9  those individuals are.

10     A      Well, you do so because they explain it.

11 That's part of the scientific method is to

12 understand who the subjects are and how research is

13 conducted.

14     Q      Okay.  So you have reviewed the ones where

15 they used only healthy subjects, right?

16     A      Other than situations in which they use

17 police reports, yes, sir.

18     Q      Did you, did you refer to any of the

19 studies into, into in the scientific -- withdraw.

20 Did you refer to any of the scientific studies

21 regarding the phenomenon of positional asphyxia in

22 preparing your report in this case?

23     A      Yes, sir.  I reviewed the amicus brief

24 that we talked about earlier that is probably one of

25 the better reviews that's been conducted of

1  positional asphyxia.

2      Q   So the amicus brief that you submitted is

3  not actually a scientific study.  It's actually an

4  advocacy piece from a particular person, correct?

5      A   Well, but it summarizes, it's -- it's a

6  summary of the literature.  It's a summary which

7  would be a literature review as opposed to, which

8  cites the best literature out there.

9      Q   Okay.  But it was cited in the course of

10  an advocacy piece?

11      A   Yes, sir.  It's an amicus brief.

12      Q   Right.  Have you referred to any

13  non-advocacy piece directly that is a scientific

14  study into the phenomenon of positional asphyxia to

15  formulate your opinions?

16      A   Well, I reviewed some of the research that

17  was cited in the amicus brief.  I reviewed some of

18  the research that is used in other academic surveys

19  and literature.  And I understand, even in the Prude

20  case we spent a lot of time going over those

21  studies.  And particularly the ones from the doctors

22  out in San Diego.

23      Q   Which study in the amicus brief did you

24  find most instructive in formulating your opinions?

25      A   I would have to go back and review it.  I

1    can if you want.

2         Q    Did you rely upon one in particular or is

3    there more than one which you principally relied on

4    to formulate your opinions?

5         A    There was several that I looked at in

6    great detail and looked at the methods and the

7    arguments.

8         Q    Is it your position that the amicus brief

9    discloses the methodology?

10        A    No.  But if you go back to the original

11   sources you can see -- I use the amicus brief

12   because it lists probably the more important

13   studies.  They're cited in there.  I don't rely on

14   the amicus brief for anything other than the review

15   of the literature.

16        Q    Okay.  Does the amicus brief provide any

17   contrary studies or criticisms of the studies that

18   are relied upon?

19        A    Well, I think it -- I believe it has

20   Christine Hall's article listed in there which was

21   brought up significantly in the George Floyd

22   criminal trial.  Which, which wasn't a scientific

23   study with original data, but summarized the

24   Canadian, I think the RCMP experience with

25   positional asphyxia.

1      Q     Which is a non-scientific piece of

2   literature?

3      A     No.  I think it is scientific.  It uses

4   police reports.

5      Q     Right.  But it doesn't, doesn't -- it is

6   not a scientific study.  It is a report on a limited

7   number of police reports from a limited

8   jurisdiction?

9      A     All of Canada.  And I think it is a

10  scientific study.  We do a lot -- I mean data are,

11  come in different forms.  Some are done with

12  original data with subjects.  Others look at police

13  reports.

14     Q    But you would agree with me that when it

15  comes to the subjects involved in those cases, it's

16  not a controlled group that you would have if you

17  were doing a stand-alone scientific investigation?

18     A     I disagree with you, sir.  I think, I

19  think it's using -- it's using subjects who are

20  actually the objects of positional asphyxia.  It's a

21  different, it's not a controlled study where you get

22  your original subjects.  But they're using the

23  reports that explain when positional asphyxia was

24  used.  I'm sorry.  I don't mean asphyxia because

25  that would infer death.  I mean leaving someone on

1   his or her stomach.

2       Q    Okay.  Let me go back to the question I

3   started with.  Did you consult any, did you directly

4   consult any scientific study into positional

5   asphyxia in preparation for this report?

6       A    Yeah.  I went back through and looked at

7   some articles.

8       Q    Did you cite those articles in the report

9   as having relied upon them?

10      A    No.  I used the, the summary that was in

11  the amicus brief because it was probably one of the

12  better ones that I had seen.  I can -- I also

13  included in this report the testimony of Dr. Rich,

14  the video that was embedded in that.

15      Q    But these are not your independent

16  studies.  These are, as we agreed upon these are

17  materials used in an advocacy piece, not an

18  independent scientific study.

19      A    Well, independent scientific studies cite

20  studies that support the theories for the most part.

21  A lot of scientific and peer reviewed studies don't

22  give a totally balanced argument either.  They are

23  trying to explain a point.  So your point, I

24  understand it but, but yeah, I could have cited, I

25  could have cited an article, you know, that

1  summarizes it the same way Mr. Stoughton did in his

2  amicus brief.

3      Q    And if you were going to do that, which

4  article would you have sited?

5      A    I mean I could cite the one by Alm

6  Steinberg that called prone restraint, cardiac

7  arrest and comprehensive review of the scientific

8  literature and explanation of the physiology.

9      Q    Okay.  So the Steinberg article.  Did you

10  consult it in formulating your opinions for this

11  case?

12      A    I discussed with Mr. Steinberg his article

13  before he published it.  I was very familiar with

14  his summary.  Did I look at it specifically, I

15  didn't have to.  I knew what his arguments were.  I

16  knew the research he was citing.

17      Q    Did you look at his methodology?

18      A    Yeah.  He reviewed articles.  He wrote two

19  articles.  One was a response to I think Kroll and

20  one was the one that I just mentioned.  So he

21  summarized things.  He is the medical doctor.  I'm

22  not.

23      Q    Okay.  So you relied upon his expertise in

24  drawing your opinions in this case?

25      A    No.  I didn't rely on it.  I use it as a

1    point of reference.  He is an advocate against it.

2    He is a medical doctor.  He argues with Kroll.  He

3    argues with the other San Diego researchers.  And

4    it's just, there's two sides of the argument.

5                    My point has nothing to do with the

6    medical testimony.  It has to do with it's common

7    police practice not to leave someone on his stomach

8    or her stomach.

9        Q    I understand.  So let me ask you this.  I

10   heard you to say that the Steinberg article was a

11   resource that you referred to in the formulation of

12   your opinions in this case?

13       A    No, sir.  I said I reviewed it.

14       Q    Okay.

15       A    I talked to him when he wrote it.

16       Q    Okay.

17       A    I was familiar with his work.  And it's

18   an -- just as much an advocacy piece against the

19   Kroll arguments.  That's what started him getting

20   involved in this.

21       Q    Okay.  So let me ask my question better

22   because I don't think I did a good job.  What

23   scientific studies did you rely upon in formulating

24   your opinion?

25       A    My background of reading this literature I

1    reviewed some of the, I reviewed the PERF report,

2    which is probably as close to a national standard

3    for policing.  I reviewed studies that deal with

4    policies and practices, not the medical literature.

5    I can't give a medical opinion anyway.  We've

6    already talked about the meat on the head that I

7    couldn't even pronounce.

8        Q    Right.  But is it fair to conclude that

9    your opinions are essentially an aggregate of other

10   opinions in the field of or in the phenomenon of

11   positional asphyxia?

12       A    In the policing world, yes.  My opinions

13   are summarized by -- well, they were developed by

14   the research that was done and the fact that as an

15   accepted police practice to get someone off of his

16   stomach as soon as possible.

17       Q    Right.  And I'm just curious because

18   sometimes policies or accepted practices are based

19   upon faulty science or based upon materials that are

20   incomplete or just bad data.  And I am curious if

21   you have done anything to test the science behind

22   these national standards that have been adopted?

23       A    As I mentioned before, I have looked at

24   the methodologies and have not seen any study done

25   properly using the kinds of subjects that are, that

1    are put in this case in real life.

2        Q    So --

3        A    The studies I have seen once again are

4    using subjects who are healthy.

5        Q    So, Dr. Alpert, I understand that, what

6    you just said to say no, I have not done any

7    research into the methodology or the accuracy of the

8    scientific studies behind the adopted policies or

9    standard.

10       A    That's -- no, that's incorrect.  I have

11   studied the methodologies.  And the methodologies

12   are so bad in the research and the medical research

13   because they're using once again subjects who are

14   healthy that the policing industry has not accepted

15   some of the literature that's out there in the

16   medical journals who has used these healthy

17   subjects.

18               It has been -- for a long time it has

19   been a customary police practice once again to

20   remove someone from his stomach as soon as possible.

21       Q    Right.  But if it were -- let's just say

22   this.  Okay.  If there was a national standard that

23   said let's sprinkle fairy dust on a subject that is

24   on the ground and it was adopted and began some

25   measure of incalculable adoption, but there's no

```
 1    science behind the use of this fairy dust, then the
 2    use of the fairy dust would be suspect, right?
 3         A    Well, when you say there's no science
 4    behind it, people don't die from the use of fairy
 5    dust.  People die from being left on their stomachs.
 6         Q    Well, no, that's what I'm asking you.
 7    Where is the science that says people die from being
 8    placed on their stomach?
 9         A    Watch Dr. Rich's testimony --
10         Q    Who?
11         A    In the Floyd case.  Dr. Rich, it's cited
12    in my report.  Watch his testimony in the Floyd
13    case.  It was compelling, it was medical and it was
14    accepted.
15         Q    Okay.  And is that the only source for
16    science that says leaving someone in a prone
17    position is potentially fatal?
18         A    No, sir.
19         Q    Okay.  Is it the only source upon which
20    you relied to formulate your opinion in this case?
21         A    No, sir.
22         Q    What are the other sources?  What are the
23    other scientific sources?
24         A    Well, I told you there's a whole history
25    of literature particularly with the, in the taser
```

1    research where they tell you to take someone off of

2    his stomach because the medical -- they believe --

3    I'm not a medical doctor.  But a lot of the medical

4    doctors say that leaving you on your stomach

5    compromises your breathing.  And yes, there are,

6    there are medical studies that show that and there

7    are medical studies that argue against it.  And the

8    law enforcement community over the last several

9    decades has taken the reasonable approach to say

10   let's get them off their stomach when reasonable,

11   when possible and that's been as close to a national

12   standards as we have.

13        Q    Okay.  Let me just be real clear and then

14   I'm going to move on.  You're not a medical doctor

15   and you can't actually offer an opinion on to the

16   credibility or on to the voracity of the testimony

17   from Dr. Rich, right?  You're not qualified to

18   criticize it, are you?

19        A    I am not qualified to criticize it.  Yes,

20   sir.  That's accurate.

21        Q    You're not qualified to criticize any

22   medical study into the phenomenon of positional

23   asphyxia?

24        A    That's not correct.  I can criticize the

25   methodology.  I can't criticize the medical issues.

1    Q    Okay.  Are you competent to criticize

2  medical opinions regarding the risks of positional

3  asphyxia?

4    A    Not the medical issues.  I can certainly

5  criticize and evaluate and manage the methodologies

6  used to reach them.

7    Q    Okay.  And even though the methodologies

8  may be flawed, it doesn't necessarily mean that the

9  ultimate conclusions is incorrect.  It just means

10  that the methodology in Floyd was, had some

11  potential fall?

12    A    Well, in this particular case dealing with

13  healthy subjects you cannot, you cannot generalize

14  on unhealthy subjects.  Yeah, that's a huge flaw.

15    Q    Right.  But I mean if, if I judge the

16  strength of a bridge, like the Golden Gate Bridge,

17  by the taste of a hamburger, that would be a flawed

18  methodology for determining the strength of the

19  Golden Gate Bridge.  Just because there's a way to

20  criticize my methodology in concluding that the

21  bridge is strong, that doesn't necessarily mean that

22  the bridge isn't strong, right?

23    A    You know what, if you want to get into

24  this argument, what do you mean by strong?

25    Q    Is architecturally sound.

1        A     For what?  For tanks?

2        Q     For traffic.

3        A     Or cars?

4        Q     For --

5        A     For a certain --

6        Q     Vehicular travel.

7        A     For a certain amount of it, yes, sir.

8        Q     But my taking of the hamburger wouldn't be

9    a very good methodology for the conclusion that the

10   Golden Gate Bridge is architecturally strong enough

11   to handle pedestrian cars -- pedestrians and

12   vehicles, right?

13       A     As much as I hate to agree with you, I'm

14   going to agree with you.

15       Q     Okay.  But that doesn't mean that the,

16   even though my methodology is flawed, it doesn't

17   mean that we can't drive on the Golden Gate, right?

18       A     That's, yeah, you can actually drive on

19   the Golden Gate and eat a hamburger.

20       Q     What is ground stabilization?

21       A     In what context?

22       Q     In the context of a law enforcement

23   tactic.

24       A     Well, as I understand it the ground is

25   used as a friend.  It's taught in use of force

1    training and defense tactics training that the

2    ground is your friend.

3        Q    And do you know why it's taught as being

4    your friend?

5        A    Because it provides a surface which is not

6    pliable.  Especially if you're by yourself, it can

7    provide a way to help control someone.

8        Q    And it is commonly taught as a technique

9    by which officers can control subjects.  They can

10   take the, put the person on the ground and stabilize

11   them by using the ground as a resistant force?

12       A    That's correct.

13       Q    Okay.  And doing that is not an

14   unreasonable tactic, is it?

15       A    Well, you can't --

16       Q    The abstract --

17       A    In the abstract, no.  It depends on the

18   situation or condition.  But no, it can be, it can

19   be very helpful.

20       Q    All right.  I want you to go to page two

21   of your report.

22       A    Yes, sir.

23       Q    And if you look at the first paragraph or

24   second paragraph under incident assessment.

25       A    Yes, sir.

1    Q    First of all let me get a couple of things
2  out of the way.  When Officer Lewis arrives on scene
3  do you have an opinion as to whether or not he had
4  reasonable suspicion to detain Mr. Rodriguez?
5    A    Well, my understanding is that
6  Mr. Rodriguez was walking naked down the street.  So
7  certainly has some reasonable suspicion to find out
8  what is going on.
9    Q    Okay.  Would you agree with me that he
10 also had probable cause of a crime?
11   A    I suppose walking naked is a crime.
12   Q    Generally speaking if I refer to the crime
13 of indecent exposure.
14   A    Okay.  Yes, sir.  I would assume walking
15 naked is a crime of indecent exposure.
16   Q    Okay.  Was there -- were there other
17 objective indicators of possibly illegal narcotics
18 use?
19   A    Well, when you see someone walking down
20 the street naked, yeah, you can certainly make
21 assumptions that there's an issue.  The problem is
22 that you don't know if the person is in -- and the
23 phrase that I used is mad, bad or sad.
24   Q    Right.
25   A    Something is wrong.  Someone may be in

1  crisis.  Someone may be whacked out on a drug.

2  Someone may be having -- you just don't know.  But,

3  yeah, it certainly gives you some indication

4  something is wrong.

5      Q    The question I asked was was there

6  objective indicators that he might be under the

7  influence of illegal drugs?

8      A    Certainly a suspicion.

9      Q    Sure.  Which would also be reasonable

10 suspicion of potential possession of illegal drugs,

11 correct?

12     A    Not if he's naked.

13     Q    Well, if his clothes were laying in the

14 grass with his wallet inside and a bag of LCD inside

15 of it, that would be probable cause for possession,

16 right?

17     A    Well, if they knew there was a bag of LSD,

18 yes, sir.

19     Q    Right.  I'm just creating a hypothetical.

20 I'm not saying that those are necessarily the fats,

21 but you know how law enforcement investigations

22 should go and that's the natural progression that

23 one might follow, correct?

24     A    Well, your hypothetical had a bag of LSD

25 in it so absolutely that would give you some

```
 1    reasonable suspicion of probable cause.
 2        Q    Right.  And my hypothetical advanced
 3    through seeing this individual and drawing the
 4    conclusion that they may have been under the
 5    influence of an illegal drug.
 6        A    As I said, he could be mad, bad or sad.
 7    It raises suspicion for everything.  Normally you
 8    don't find a person at 10:00 at night walking down
 9    the street naked.
10        Q    That's right.  And you would also concede
11    that because there was reasonable suspicion,
12    probable cause actually, that Officer Lewis had the
13    lawful authority to command him to a specific
14    location and restrain him, detain him?
15        A    Well, I'm not going to give a legal
16    opinion, but in terms of a customary police
17    practice, yes, sir.
18        Q    Okay.  If you were training an officer in
19    a class and this were the hypothetical, you would --
20    and an officer in training ask you do I have the
21    authority to detain Mr. Fernando, Mr. Rodriguez,
22    your answer would be yes, correct?
23        A    Again, I wouldn't, I wouldn't give him a
24    legal opinion, but as a customary police practice,
25    yes, sir.
```

1      Q      What is a customary police practice?

2      A      It's something that a reasonable officer

3   would do under the circumstances.

4      Q      Are there customary police practices that

5   are not found based in law?

6      A      Well, I'm not a lawyer.  I can't give

7   those opinions.  I can give the opinion that this is

8   a customary police practice.

9      Q      But you're also an adjunct professor at

10  the law school there at South Carolina.

11     A      Yes, I am.

12     Q      Okay.  And so I'm asking you are you aware

13  of any lawful practice or any -- I'm sorry.  Any law

14  enforcement practice that is not based in some

15  authority in law?

16     A      There are a lot of law enforcement

17  practices that are not based in and established and

18  accepted laws.  I mean we see qualified immunity

19  cases all the time.  The courts are saying this

20  isn't a good idea, but there's not, there's not

21  established law.

22     Q      They say that it's unconstitutional, but

23  it's never been held unconstitutional, right?

24     A      There you go.

25     Q      That's right.  And in this case the police

1   practice of detaining someone who is naked and
2   walking down the street, you're offering no opinion
3   about whether or not that was lawful or not?
4       A    I think it's something that since we
5   walked through it and he has now committed the
6   offense of, what do you call it?
7       Q    Let's just call it indecent exposure.
8       A    Indecent exposure, well, yeah, that's a
9   crime.  And that certainly gives the officer the
10  ability to take him into custody.
11      Q    And it can be disorderly conduct or
12  anything like that.  I mean there's probably
13  multiple crimes at issue here.  But I want you to
14  make the assumption that Georgia has a criminal
15  offense for which Mr. Rodriguez's conduct satisfies
16  probable cause for.  Okay?
17      A    Yes, sir.
18      Q    Okay.  And it's your opinion that based
19  upon that, Officer Lewis had the authority to detain
20  him, correct?
21      A    Yes, sir.
22      Q    And you would agree with me that Officer
23  Lewis had the authority to give him commands to
24  effectuate that detention?
25      A    Yes, sir.

1        Q    Okay.  And Officer Lewis also had legal
2   authority to physically detain him if Mr. Rodriguez
3   did not voluntarily comply?
4        A    Well, I think he can use a minimal amount
5   of force if necessary, yes, sir.
6        Q    A minimal amount of force or the amount of
7   force necessary?
8        A    Well, let's be more specific.  A
9   reasonable amount of force.
10        Q    But a reasonable amount of force is going
11   to be commensurate with the oppositional force by
12   the subject; is that not correct?
13        A    That's certainly part of it.  My
14   understanding was that Mr., Mr. Rodriguez was not a
15   threat, was not -- he was not compliant, but he
16   wasn't resisting at any point.
17        Q    So you would agree that Officer Lewis
18   wouldn't -- the use of a firearm would probably be
19   more force than was necessary, yes?
20        A    Not probably.  Would absolutely be more
21   force.  If he is walking away from you not being
22   compliant I think, I think the Tennessee v. Garner
23   explained that you can't shoot a meandering
24   misdemeanant.
25        Q    Right.  And you would agree with me that

1    they didn't in fact shoot him, right?

2        A    Well, they shot him with a taser.

3        Q    Right.  But they didn't use a firearm to

4    shoot him?

5        A    They did not use a firearm.

6        Q    I never saw any closed-fist strikes.  Do

7    you think that closed-fist strikes would have been

8    justified on Mr. Rodriguez?

9        A    At what point in time?  Certainly not when

10   he's walking away.

11       Q    At any point in time?

12       A    I mean the guy kicked him in the face.  So

13   I'm not sure -- I think I probably rather be hit

14   than kicked.  But I don't think the kick was

15   certainly justified and I don't think a hit would be

16   justified there either.  I think the point is to get

17   him into custody as quickly and with the least

18   amount of force necessary.

19       Q    Okay.  Well, let's do it this way.  The

20   minimal amount of force is going to be officers

21   presence, right?

22       A    Well, the minimal amount of force used

23   starts with officer presence.  The minimal amount of

24   force necessary to take him into custody at this

25   point may be a little more because he's not

1    responding.

2        Q    Okay.  So in this case Officer Lewis was

3    present and announced himself?

4        A    I think he, I think he -- yeah, he did.

5    My understanding was he -- I don't remember him

6    announcing himself.  My understanding of the facts

7    was that they basically told him to get on the

8    ground or something to that effect and Mr. Rodriguez

9    just continued to walk away.

10       Q    Announcement is basically identification

11   of law enforcement authority, correct?

12       A    Yes, sir.

13       Q    Okay.  And if he's wearing a uniform, you

14   would agree with me that in common or in law

15   enforcement parliaments, that would be considered he

16   is identified and announced himself as having legal

17   authority to make it --

18       A    If a person can see him and can

19   understand, yes, sir.  But we don't know that.  The

20   guy is obviously in crisis.  He is walking down the

21   street naked.

22       Q    He did the things that most, the common

23   practices that law enforcement officers use for

24   identification.  He was wearing the uniform and he

25   presented himself, correct?

1      A     As a first step, yes, sir.

2      Q     Okay.  And in your report you indicate

3  that Officer Lewis yelled at him to get on the

4  ground.

5      A     Yes, sir.

6      Q     And when you use the world yell, I think

7  you intentionally use that for, to connote something

8  negative or sinister.  But really what it means is

9  that he was loud, correct?

10     A     Well, yes, sir.  And I didn't use it to be

11 sinister.  I used it in contradiction to what is

12 normally done to try to diffuse a situation or what

13 is taught in crisis intervention courses where you

14 try to, you try to have a conversation as opposed to

15 yelling and being loud.

16     Q     Right.  But you would agree with me that

17 given the circumstances and the behavior, it would

18 not be unreasonable to loudly order someone to get

19 on the ground?

20     A     Well, unfortunately you see it more often

21 than not.  But it certainly would be a preference to

22 try to deescalate, try to understand, try to have a

23 conversation.  It may work, it may not work.  But

24 when you start yelling and screaming, you are

25 escalating, not deescalating.  And that's why I used

```
 1   the word yell.
 2       Q    Okay.  But if he whispered, you would be
 3   critical of him not being loud enough, correct?
 4       A    Yeah.  If he whispered it probably
 5   wouldn't have any impact.
 6       Q    Right.  And at some distance being loud
 7   would be something that was objectively reasonable?
 8       A    Well, again, I think you can get away with
 9   it because -- but in what we're seeing in police
10   practice and even in 2019 is to try to deescalate,
11   try to understand a person in crisis, his or her
12   response.  And to try to have a conversation is
13   certainly better than yelling.
14       Q    Okay.  And would you agree with me that he
15   had the discretion and the lawful authority to order
16   Rodriguez to the ground?
17       A    Yes, sir.
18       Q    Okay.  You would agree with me that when
19   he, according to your report, threatened to fire his
20   taser at him, that would -- another way to say that
21   is that he warned him that noncompliance would
22   result in use of the taser, yes?
23       A    I mean, yeah, that's kind of a complicated
24   way to say it, but yes, sir.
25       Q    Okay.  I mean I have seen lots of reports
```

1    where experts criticize law enforcement for not

2    warning pre-taser deployment.

3         A    Well, most policies or I should say good

4    policies if possible require you to give a warning.

5         Q    Right.  So threatening him is one verb.

6    Warning him is another verb.

7         A    Well, but you're missing again the context

8    here when you threaten someone and say if you don't

9    do this I am going to do this.  And the person

10   either doesn't understand it or doesn't care, isn't

11   listening, is somewhere off in space, and keeps

12   walking.

13        Q    Right.

14        A    All the sudden he gets hit with 50,000

15   volts of electricity.

16        Q    Well, warning Mr. Rodriguez prior to the

17   deployment of the taser would have been consistent

18   with the nationally accepted practice, correct?

19        A    If, if you are justified in using your

20   non -- your less-lethal weapon, yes, sir.

21        Q    Okay.

22        A    I don't see where the first thing you do

23   on a continuum of force or any type of force wheel

24   using your taser is reasonable.

25        Q    Okay.  After Lewis ordered Rodriguez to

1    the ground, did he go to the ground?

2         A    No.  He kept walking.  That's when he got

3    hit with the electricity.

4         Q    Right.  And then he announced the warning

5    and then he was tasered, correct?

6         A    Correct.

7         Q    Okay.  And at that point Rodriguez does go

8    to the ground?

9         A    Face plants on the ground, yes, sir.

10        Q    Right.  What does NMI mean?

11        A    NMI?

12        Q    Yeah.  Neuromuscular --

13        A    Incapacitation.

14        Q    Incapacitation?

15        A    Yes, sir.

16        Q    Okay.  Did you see evidence of NMI on the

17   video?

18        A    It's interesting you bring that up and the

19   answer is yes.  And I can't, I would have to go back

20   and look at the report.  But oh, gosh.  Who was it.

21   I don't remember which officer was explaining that

22   he said that the taser didn't fully work because

23   after the five seconds Mr. Rodriguez, Mr. Rodriguez

24   went, started responding again.  Well, having been

25   tased before and anyone who's been through the

1    training realizes that once that five-second ride is

2    over, you're just pissed off.  You're back to

3    normal.  Sometimes you're very angry.

4         Q    Dr. Alpert, who did you fight after you

5    were tased?

6         A    Who did I fight?

7         Q    Yeah.  You said you been tased and --

8         A    I have.

9         Q    Huh?

10        A    Absolutely I was.  I was both tased with

11   the, with the cartridge and with the little prong

12   thing.

13        Q    I bet when you were tased you were ready

14   to comply with anybody who was holding the other end

15   of that taser?

16        A    I mean it was kind of an interesting

17   experience.  I was in training so I wasn't angry.  I

18   wasn't upset.  I wasn't mad, bad or sad.  I was just

19   realizing I just got shocked.

20        Q    And probably willing to comply with any

21   orders that you were given by the person holding the

22   taser?

23        A    And if I ever see a red dot on my chest,

24   I'm the first one to raise my hands.

25        Q    Nobody wants to ride that chair twice,

1    right?

2         A    No, sir.

3         Q    Okay.

4         A    I shouldn't say that.  I would say if

5    you're in a normal situation you sure don't.  Some

6    people seem to like to fight it.

7         Q    What command came after the taser

8    deployment?  Do you recall?

9         A    The, what I recall is the command to roll

10   over because he was on his back.  Roll over on his

11   stomach.  And when he didn't, he got tased again.

12        Q    You're telling me that he complied with

13   the order to roll to his stomach?

14        A    No, he did not.  And that's when he got

15   tased again.

16        Q    Okay.  Do you have any information or are

17   you aware of any evidence that at the moment that he

18   refused to comply to roll over, that he was laboring

19   under NMI?

20        A    No.  My understanding is that after the

21   five-second ride, which we all have experienced if

22   we have been tased, is the NMI, the incapacitation

23   is over.  And that's the design of the taser.

24        Q    Right.  So it's not your testimony that

25   Mr. Rodriguez was incapable because of the taser to

1    roll over?

2        A    Well, look, I can't speak again to, to

3    Mr. Rodriguez and his condition.  Normally you,

4    after the five seconds, you know -- actually there

5    has been research that some people it takes a while

6    after a five-second ride to even comprehend what the

7    order is.  The research was specifically on Miranda

8    that the conclusion was that some people after the

9    five-second ride takes a few seconds to kind of

10   revert back.

11              But look, in all ways, shapes and

12   forms what we are seeing here is a lazy cop

13   syndrome.  You know, the using a taser too early and

14   too often, not relying on any kind of communication

15   skills or hands-on.  You just go right to a less,

16   less lethal weapon.  And that's where I have my

17   problem.

18       Q    Prior to the deployment of the taser a

19   second time, was Mr. Rodriguez given a lawful

20   command to roll over?

21       A    That's an interesting question.  A lawful

22   command.  I suppose it's lawful, yes, sir.  It's not

23   maybe the smartest thing to do, but it's certainly a

24   lawful command.  Most officers who are trained in

25   the use of a taser are also trained to cuff under

```
1   power, which these guys did not do.
2        Q    When you say cuff under power, you mean go
3   hands-on, right?
4        A    No.  I mean while he's in his
5   neuromuscular incapacity to handcuff him.
6        Q    You're telling me that while he is being
7   tased he should be, that officers should risk going
8   hands-on with him?
9        A    Going hands-on he can't control his --
10  that's the point of incapacitation.  They have got a
11  window where they can handcuff him while --
12       Q    While he's being electrocuted and risk
13  being hit by the taser wires themselves?
14       A    Well, you know, when I was tased these
15  guys were, they were holding me up by my, by my arms
16  and elbows.  They weren't in any danger of being
17  shocked.  And if you're tased in, if you're tased in
18  the back, you just grab the arms and you, you
19  handcuff him.  You have to be touched by both wires
20  before you're going to have a problem.
21       Q    That's part of the reason they yelled
22  taser, taser, taser is for law enforcement to clear
23  prior to deployment, yes?
24       A    Yeah.  And then they go in and handcuff
25  them under power.  That's the training.
```

```
 1        Q     After the taser is stopped at cycle?

 2        A     No, sir.  Cuffed under power means under

 3   power.

 4        Q     Okay.  He never complied with the roll

 5   over command, right?

 6        A     That's correct.

 7        Q     Okay.  He was warned you're going to get

 8   it again, correct?

 9        A     Give it to him again is the language.

10        Q     Right.  But then around 10:13 you say he

11   attempted to sit up and he was warned you're going

12   to get it again.

13        A     Correct.

14        Q     Is that correct?

15        A     Yes, sir.

16        Q     All right.  And he had been told to get on

17   his stomach, correct?

18        A     Yes, sir.

19        Q     Okay.  Did you see him endeavor to get on

20   his stomach after being warned this time you're

21   going to get it again?

22        A     No, sir.  I have no idea if he understood

23   what the command was.  I don't know if he -- I

24   assume he heard it, but I don't know if he could

25   comprehend it.
```

1        Q     Mr. Rodriguez --

2        A     Just walking down the street -- this man

3   is walking down the street naked, how do you assume

4   he can hear and comply with these commands?

5        Q     Mr. Rodriguez is screaming and yelling at

6   the police officers, right?

7        A     Well, yeah, if you get tased.

8        Q     And he did so in English, correct?

9        A     Yes, sir.

10       Q     Okay.  Is there any indication that he

11  could not hear them?

12       A     I mean you don't know.  There's no

13  indication that he did or didn't hear them.  But

14  when you start yelling and giving orders and

15  basically if then commands, there's just different

16  ways to handle it.  And none of that was used.

17       Q     After the fourth deployment, this is when

18  Rodriguez goes backwards, falls backwards.  Stroud

19  orders Rodriguez to roll on his stomach yet again?

20       A     Yes, sir.  You're going to keep getting

21  tased I think is the language.

22       Q     Compliance, comply or you will continue to

23  be tased, correct?

24       A     Yes, sir.

25       Q     Okay.  He also tells him roll over so we

1    can get you an ambulance or something, correct?

2         A    Yep.  That is in my report.

3         Q    And how do you, what do you interpret that

4    statement to mean?

5         A    Well, I mean it could be a lot of things.

6    It could mean that I'm not going to get you any help

7    until you do what I tell you.  That's one way,

8    certainly the first thing I thought, you know.

9         Q    And you would agree it would not be, it

10   would not be tactically sound to send in medical

11   personnel on somebody who is noncompliant, naked?

12        A    I would assume medical personnel wouldn't

13   do anything.

14        Q    Right.  So getting him controlled is a, is

15   a prerequisite, is a precursor getting him medical

16   care, correct?

17        A    I totally agree that getting him

18   controlled is an important goal.

19        Q    And it must happen before he can be

20   treated?

21        A    Oh, yes, sir.

22        Q    Okay.

23        A    I mean unless -- let me rephrase that.  If

24   you're in, if you're in a -- some areas actually can

25   go in and use medicine while, you know, if officers

1    are holding him down before he is handcuffed.  But

2    no, for the most part yeah.  Well, he has to be

3    controlled, yes, sir.

4        Q    And this point he is not handcuffed and

5    he's not under control?

6        A    Well, that's, that's another one of my

7    points is there a couple of officers and this is

8    right before I think Bowlden comes in.  And when you

9    start getting multiple officers, yeah, why wouldn't

10   you go hands-on.  I mean I know why.  They have even

11   admitted.  I can't remember, I think it was Bowlden

12   kept calling him a sweating little hog.  He didn't

13   want to touch him.

14       Q    Would you agree with me that, I mean I

15   have been doing this for 22 years.  You have been

16   doing it for a really long time.  Fighting with

17   somebody who's naked and sweaty is a recipe for

18   injury?

19       A    Well, it's disgusting.  No one likes it.

20       Q    Right.  But it's also physically

21   difficult, challenging.

22       A    Well, someone who is sweaty and yeah,

23   absolutely it's difficult.  That's why you have

24   multiple officers.

25       Q    You have no way to grab, grasp someone

```
 1   because your hands will slip off their skin,

 2   correct?

 3       A    Having wrestled for many years, that's the

 4   trick, yes, sir.

 5       Q    Yeah.  You guys would lather up with baby

 6   oil.

 7       A    That's when we were playing rugby.

 8       Q    After the fourth time and he's told that

 9   he's going to get an ambulance, right?  He provides

10   an incentive for compliance beyond pain compliance?

11       A    Well, I -- let's back up for a minute

12   because I have in my report that Henry County

13   Officer Bowlden kicked Fernando with his foot and

14   asked can you hear me so I don't know --

15       Q    Bowlden is a not, Bowlden is not a Henry

16   County officer.

17       A    Okay.  You're right.  I'm sorry.

18       Q    That's okay.

19       A    But Bowlden said, Bowlden is, either is

20   being very vindictive or trying to figure out if

21   Rodriguez can even hear him.

22       Q    And I know you use the word kick, but

23   would it -- do you know, did you observe him strike

24   him for compliance with his foot?

25       A    No.
```

1      Q    Okay.  So if he says he is kicking him, it

2  may be, you know, when I fall asleep on the floor at

3  night, my wife comes by and nudges me with her foot,

4  get up.  We don't know to what extent and what

5  amount of force was applied.

6      A    Right.  I wasn't really criticizing the

7  force as much as I was criticizing or commenting on

8  the fact that maybe this guy is trying to figure out

9  that Rodriguez can't hear him or can't understand

10  him.

11      Q    Right.  Back to the original question.  By

12  offering the ambulance, he is offering a

13  noncompliance -- a non-pain compliance incentive for

14  Mr. Rodriguez, right?

15      A    Yes, sir.

16      Q    Okay.  And you would applaud that?

17      A    Well, yeah.  And assuming if Mr. Rodriguez

18  understood it, it would be a little bit better.

19  But.

20      Q    Has anyone told you that Mr. Rodriguez

21  could not understand English?

22      A    Well, it's not English.  The guy, the guy,

23  again --

24      Q    I'm going to go through the litany of

25  things.  I'm going to go through the litany of

1    things.  Has anyone told you that Mr. Rodriguez had

2    any form of hearing impairment?

3        A    No, sir.

4        Q    Okay.  And so there's nothing sort of that

5    these officers have objectively presented to them to

6    say this guy can't hear versus this guy is just not

7    complying?

8        A    Well, the middle ground is he is hearing,

9    not understanding what we want him to do.  He is not

10   processing the words that he is hearing.

11       Q    But there's nothing to indicate that he

12   had any -- that it was that versus blatant

13   noncompliance?

14       A    Except the fact that he is walking down

15   the street naked and they already made this

16   determination that there's something wrong, he is

17   either in crisis or again mad, bad or sad.

18       Q    Right.  After, after he's incentivized

19   based on medical care and he doesn't comply, he's

20   told that he needs to roll onto his stomach so they

21   can handcuff him, right?

22       A    Well, I'm not exactly sure where we are,

23   but he's also --

24       Q    Again, good point.  I'm on the second --

25   the first full paragraph of page three of your

1    report.

2         A    Okay.  Yeah.  And that's when Bowlden

3    comes in and Lewis told him I done tased him about

4    three times.

5         Q    What did Mr. Rodriguez do when Bowlden

6    asked him can you hear me?

7         A    I don't think he responded.

8         Q    At that point Lewis screamed, and when you

9    say screamed, what you mean is his voice was loud?

10        A    Yes, sir.

11        Q    You're going to get it again, right?  This

12   is moving into the second full paragraph.

13        A    Correct.

14        Q    Okay.  And again incentivizes compliance

15   with I will get you an ambulance, right?

16        A    Yes, sir.

17        Q    You're going to get it again is followed

18   up with, right?

19        A    Yes, sir.

20        Q    So this is sort of a carrot-and-a-stick

21   approach to compliance at this point, right?

22        A    It is.

23        Q    Okay.  They tried to flip him on his

24   stomach at this point, correct?

25        A    Correct.

1    Q    Even though they warned him that he was

2    going to get it again, in between 10:15 and 10:16

3    they did not tase him at -- even though they warned

4    him repeatedly that they were going to?

5    A    Yes.  They gave him a whole half a minute

6    I think.

7    Q    Which is plenty enough time for

8    compliance?

9    A    Absolutely.  If he understood, number one

10   and then was able to comprehend and wanted to comply

11   he could have.  Yes, sir.

12   Q    And it was only after they had given him

13   these repeated threats, warnings that were not

14   followed through and interpose offers of incentive

15   that they then deployed the taser for the fifth

16   time?

17   A    Yeah.  And called him a sweaty little hog.

18   So who knows if he understood that.  He might not

19   have even been offended.

20   Q    Are you drawing -- I mean is that a

21   significant point in your opinion sweaty little hog?

22   I mean I know it's un -- it's not something someone

23   in sort of, you know --

24   A    It's not professional.

25   Q    It's not professional, right.  You

1    wouldn't want it.  But you understand, and I'm sure

2    you have even done it yourself, where under stress

3    maybe playing rugby you uttered things because of

4    frustration?

5        A    Well, the culture of a rugby game is a lot

6    different so yes, sir.  But my point though is

7    rather than go to an alternative, I mean I don't, I

8    criticize the fact that they tased him, what, three

9    times already instead of going hands-on because they

10   don't want to touch him because he is sweating and

11   yeah, it is a little harder.  But I guess they tased

12   him four times because once you keep tasing someone,

13   if it doesn't work, it's not going to start working

14   after the fifth or tenth time.

15       Q    Right.  After the fifth round of

16   electricity -- and what do you mean when you say

17   fifth round?

18       A    It was the fifth deployment.

19       Q    Fifth five-second deployment?

20       A    I don't even know if they're all

21   five-second deployments or just the fifth

22   deployment.

23       Q    Have you been trained to listen to -- have

24   you ever been certified to use a taser?

25       A    I have gone through the training.  I have

1    no reason to be certified.  I can carry one on the

2    streets.

3        Q    Right.  Right.  But it would be a

4    responsible practice, probably one that would be

5    nationally accepted for you to receive that training

6    before carrying such a dangerous weapon?

7        A    Most states -- it's not -- most states

8    don't require that.

9        Q    Right.

10       A    But I have --

11       Q    But there are some states that, and some

12   people who have offered the opinion like in the

13   Rolfe case that a taser can be a deadly weapon or

14   not a deadly weapon, right?

15       A    Well, it went from nonlethal to less

16   lethal, yes, sir.

17       Q    But when you went through your training,

18   did you hear anything about listening to what the

19   taser sounds like as it is discharging?

20       A    Yes, sir.  The X-2s that these officers

21   had, it's not as easy.  I know exactly what you're

22   talking about.  Now of course they have the software

23   will tell you when contact has been made.  But you

24   can hear a difference if you have a really sharp

25   ear, yes, sir.

1      Q     And what does that sound like when you

2   don't have contact?

3      A     It's more of a, I think it's a harsher

4   clicking noise.

5      Q     Right.  Did you hear at any point in the

6   video that you watched any noise that you identified

7   as being noncontact or non-good contact?

8      A     Well, sir, I answered your question a few

9   minutes ago saying I don't know if they were all

10  five-second rides because there were times where I

11  was -- I couldn't -- I tried to slow it down and

12  tried to figure it out and then I gave up because I

13  couldn't.

14     Q     Okay.

15     A     So certainly it's possible that the

16  contact wasn't for the full five seconds.  I don't

17  know the answer.

18     Q     Would it be fair to analogize a noncontact

19  deployment of the taser with a gunshot that misses a

20  target?

21     A     A noncontact, yes, sir.  But a partial

22  contact, no, sir.

23     Q     Okay.  And if you were -- because these

24  X-2s don't have information, is it your testimony

25  that the X-2s don't have information indicating

1    whether good contact has been made or not?

2         A    I believe that's accurate, yes, sir.

3         Q    Okay.  Who would you ask if you wanted to

4    know whether or not good contact was made in this

5    situation?

6         A    Well, I mean the best person would be the

7    subject of the tasing.  I don't know the -- these

8    officers weren't trained very well in the use of the

9    taser or they wouldn't have tased him all these

10   times.  So I don't --

11        Q    When I talked to these officers they've

12   apparently been trained in the same way that you

13   have because they knew to listen for a specific

14   clicking sound to indicate noncontact.

15        A    Okay.

16        Q    Okay.  So if they testified that they had

17   been trained to listen for a specific clicking sound

18   for noncontact and they heard that clicking sound in

19   the use of the taser in this case, you would have no

20   reason to disagree with them, right?

21        A    Well, I can't speak to the voracity of any

22   witness, no, sir.

23        Q    Right.  Right.  But you don't have any

24   evidence, you're not aware of any evidence that

25   would be contrary to their affirmative statements of

1    noncontact?

2        A    Well, I think we can hear, we can get the

3    sound enhanced perhaps and figure out how many

4    seconds of electricity went through his body.  I

5    don't think I can do it listening to the videos as I

6    have them.

7        Q    So short of enhancing the sound, the best

8    source of information about noncontact would be the

9    officer, right?

10       A    Well, it would be one source, yes, sir.

11       Q    At this point it's the only source that

12   we're aware of, right?

13       A    Other than the sound that is recorded,

14   yes, sir.

15       Q    Okay.  And you just testified that you --

16   based on the current condition of the audio, you

17   can't tell anything?

18       A    I can't tell anything.

19       Q    Okay.

20       A    You know, perhaps someone who's a lot

21   better trained in and has a lot more experience in

22   listening to them could.

23       Q    Okay.

24            THE COURT REPORTER:  Mr. Morris.

25            MR. MORRIS:  You want to take a break?

```
 1              THE COURT REPORTER:  Do you mind?
 2              MR. MORRIS:  I do not.
 3        (Whereupon a recess was taken.)
 4   BY MR. MORRIS:
 5        Q    We are back on the record.  All the same
 6   ground rules apply.  You are under oath and you
 7   recognize that, Mr. Alpert -- Dr. Alpert, right?
 8        A    Yes, sir.
 9        Q    Okay.  Real quick I wanted to go back to
10   something.  A minute ago earlier you testified that
11   you could not ethically test subjects based on
12   positional asphyxia because of the people who would
13   be used as subjects would possibly have heart
14   problems or be obese or under the influence of
15   drugs, blah, blah, blah.  Was that, did I understand
16   your testimony correctly?
17        A    Well, you can't ethically use subjects who
18   are compromised, correct.
19        Q    Okay.  So how does being -- so what if you
20   used healthy subjects to test, right?
21        A    Yes, sir.  And a lot of researches, all
22   the researches use healthy subjects.
23        Q    Right.  So how, how would the results --
24   well, let me ask you this.  Let's go back.  What is
25   your understanding of what positional asphyxia is?
```

1      A    Well, it compromises your breathing.  And

2  according -- the theories have been that it

3  compromises your ability to breathe in.  More

4  recently the research has shown according to

5  Dr. Rich and others that it's not so much breathing

6  in, but it's exhaling and trapping the poisonous

7  gases in your lungs that kills you.

8      Q    Okay.  So what you're saying is that

9  positional asphyxia is the compromise of the

10  inhalation and exhalation of gases from the lungs?

11     A    Well --

12     Q    It's --

13     A    It's, think of SIDS.  I mean we use to not

14  put babies on their backs.  Or we use to put them on

15  their stomachs.  The medical profession told us no,

16  that's not smart, babies die.  So now there are

17  these techniques where you keep them on their side

18  or on their back.  And it's no different than humans

19  who are compromised.

20     Q    Did you know that Covid therapy includes

21  placing affected subjects on their stomach to

22  enhance their ability to breathe?

23     A    No, sir.

24     Q    It's a common therapy.

25     A    I hope I never have to experience.

1    Q    I hope you don't either.  Let me ask you

2   this.  Just clarification.  What I understand you to

3   be saying is that positional asphyxia involves a

4   restriction or retardation of the ability to inhale

5   and/or exhale in order to oxygenate the blood.  Is

6   that what I understand?

7    A    My understanding, and again I'm not a

8   doctor.  I'm just telling you that because of this

9   information and it doesn't harm the police function,

10  the standard police practice has been to remove

11  someone from his stomach or her stomach as quickly

12  as possible.  My understanding is that the two

13  theories is you couldn't breathe in and that's what

14  killed you.  And then that's kind of moved to you

15  can't exhale and that's what kills you.

16              So why take a chance with any of it.

17  Move them off their stomach when, when it's

18  reasonable.  When it's possible.

19   Q    Let me ask you this.  Because I want to

20  understand this.  How would, how would -- well, do

21  you know how these tests have been done,

22  administered and these studies by Dr. Kroll and

23  others?

24   A    Well, they put weights on your back.  They

25  try to compromise -- they make you run.  They get

```
 1    your blood pressure and, you know, they get you in

 2    an exercise mode.  And then they do these different

 3    tests on you.  And they, they say that these tests

 4    don't impact you very much, if at all.

 5         Q    And so your criticism is that well, if you

 6    take someone -- those are not fair subjects to test

 7    because they're different than an obese person or

 8    someone who's under the influence of drugs?  But

 9    here's my struggle with that.  And I want you to

10    answer this particular question.

11              How does me being obese or me being

12    under the influence of drugs physiologically change

13    how I will respond to weight being put on my back?

14         A    Okay.  Number one, I'm not a medical

15    doctor.  I am relating the customary police

16    practice.

17         Q    Uh-huh.

18         A    We're talking apples and oranges.  To

19    answer your question my understanding from the

20    literature that I have read is that when you have

21    these different -- if you smoke a lot you're going

22    to have a compromised lungs.  If you are obese,

23    you're going to have compromised systems.  So

24    anything that -- now, look, if a cop is dealing with

25    an Air Force cadet or a, some athlete, probably
```

1    isn't going to make any difference.  But if a cop is

2    dealing with someone who is compromised, either by

3    these other conditions, it just raises a risk that

4    it's unreasonable.

5        Q    Okay.  But if the position is what

6    compromises the lungs, it should compromise a

7    healthy person in the same way it would compromise

8    an unhealthy person, would it not?  It's just a

9    matter of physics.

10       A    Well, no, that's not true at all because

11   your lungs function differently.  I mean I'm a lot

12   older than you.  My lungs probably function

13   differently than yours.  I never smoked a cigarette.

14   Maybe they're more healthy.  I don't know.  But

15   there are differences.

16                  But I'm not going to argue the

17   medical issues.  I have -- I couldn't give a medical

18   opinion anywhere, particularly in the court.  All

19   I'm saying is that because of this research, the

20   common police practice has been to be safe and move

21   someone off of his or her stomach at the first time

22   it's possible.

23       Q    And that kind of gets me to the point I

24   was trying to make earlier.  The practice is the

25   practice and you're here to testify as to the

1    practice.  But you have no idea whether or not the

2    motivating purpose behind or the motivating science

3    or lack thereof is sound?

4         A    I am --

5         Q    You can't offer an opinion on that?

6         A    I'm not a medical doctor, but I can tell

7    you the methods of using a different sample from

8    what the police are going to use, it compromises the

9    generalized ability.

10        Q    Okay.  And that's sort of, that's a

11   laymen's criticism.  That is not a part --

12        A    No, not at all.  No, sir.  I'm sorry to

13   interrupt.  It is not a laymen's criticism at all.

14   It's one of my areas of specialization is research,

15   methodology and statistics.

16             So we are very careful, you know.  We

17   don't, we don't run tests or we don't use -- for

18   example, if we do surveys with students, can we

19   interfere that that's what the public thinks?  No.

20   We can interfere that's what students think, not

21   what general public.  College students have a lot of

22   differences.  They are very limited in age for

23   example.

24             So we can use subjects who are

25   college students, but we can't generalize to the

1    real world.

2         Q    Right.  But you're not -- you're not

3    competent to criticize the medical conclusions drawn

4    by Dr. Kroll, right?

5         A    I am not a medical doctor.  I don't

6    understand the, how the lungs work.  I don't

7    understand how those intricate details work inside

8    of the human being.  No, sir.  But I certainly can

9    talk about the methods used in terms of subjects.

10        Q    Okay.  Sort of what's been popularly

11   adopted?

12        A    I have no idea what that means.  I can

13   tell you in terms of police practice, yeah.

14        Q    Yeah, in the terms of police practice.

15        A    And the standards from the IACP, from PERF

16   and these other organizations, yes, sir.

17        Q    Okay.  And were you a part of the bodies

18   that, like are you a member of PERF that accepted or

19   adopted these?

20        A    I was at both the 2006 and 2011 meetings,

21   yes, sir.

22        Q    Okay.  And so you were a part of the group

23   that recommended removing from prone positions as a

24   standard?

25        A    I attended the meetings.  All we did was

1    suggest to the PERF people.  Yes, sir.

2        Q    So you made a recommendation to the PERF

3    organization?

4        A    I didn't make a recommendation, no, sir.

5        Q    What did you do when you attended?  I

6    don't know what that means.

7        A    Well, we had a three or four day meeting

8    where police -- there were several academics and we

9    were there for the methodological questions.  Mostly

10   there were police chiefs from all over the world who

11   came in and explained the best practice, if you

12   will, and that's what was summarized in both the

13   PERF documents.

14       Q    Okay.  And did you play any formal role in

15   the recommendation?

16       A    No, sir.  I was there again as one of the

17   few academics.  Mostly it was police chiefs and

18   trainers who were explaining what they did and what

19   was acceptable.  A couple of academics were there

20   who had done research and were kind of making sure

21   that what was talked about was, had methodological

22   rigor.

23       Q    Okay.  And it's your opinion that those,

24   those met sufficient scientific rigor?

25       A    Well, what -- the research and really

1    before 2011 there hadn't been that much.  What had

2    been done was pretty interesting.  We were there to

3    kind of listen to the police chiefs because they

4    were the ones that were explaining what they did and

5    what they didn't do, their subjects had problems and

6    died.  So it was really more of a police practice

7    than anything else.  There were a couple of medical

8    doctors.  I don't know if Kroll was there or not.

9    But I know TASER was represented by a couple of

10   people and some medical doctors.

11               And what came out of that meeting is

12   what you see in the 2006 and 2011 documents.

13        Q    Okay.  And forgive me if I'm just being

14   thick about this because I don't understand.  How

15   does it become the recommendation?  Does the PERF

16   board adopt it formally?

17        A    You know, it's just like IECP, there's a

18   policy committee that formally adopts it and PERF, I

19   don't know who makes that formal adoption.  I don't

20   know what the executive director does or whom he

21   asks.  But after the meetings we saw the draft and

22   it went around to everyone who is there and the edit

23   was made and it was published.

24        Q    Okay.  Do you receive any money from PERF?

25        A    No.  Well, I receive money when I work on

```
 1   projects, yes, sir.  But not for just being a nice
 2   guy.  On the research board, we don't get
 3   compensated for being on the research board.
 4        Q    Have you been compensated by PERF in any
 5   way related to recommendations related to positional
 6   asphyxia or prone or anything like that?
 7        A    No, sir.
 8        Q    Okay.  All right.
 9        A    In full disclosure, they paid my way to
10   the meeting.
11        Q    Because they wanted to have the, be able
12   to say that Dr. Geoff Alpert came to our meeting?
13        A    No.  They paid the way of three or four
14   academics because they wanted academics represented.
15        Q    Who were the other academics?
16        A    I would have to look at the, at the
17   report.  I don't remember.
18        Q    Okay.  Moving on in your report.  Going
19   down to the one, two, three, fourth full paragraph.
20   This is, at 10:18 Stroud can be heard saying hit him
21   again at which point Phillips tasers him.  Well, let
22   me back up to the previous paragraph.  At 10:17
23   officers agree to forcefully roll Fernando on to his
24   stomach.  And they had to forcefully roll him on to
25   his stomach because he wouldn't do it willfully,
```

1   right?

2       A    Correct.

3       Q    Okay.  This is when you say that Phillips

4   delivered a tenth shock to Fernando's body.  In what

5   way was he deploying his taser at this point?  Was

6   this drive stun or was it a probe mode?

7       A    You know, I don't recall specifically, but

8   they, later on they said, a couple of them said they

9   ran out of cartridges so I would assume this is a

10  cartridge unless it's specifically said drive stun.

11  But I don't know for sure.

12      Q    Let me go back and ask you.  When Officer

13  Phillips and Butera arrive, can you describe for me

14  the circumstances or the, what was going on when

15  they arrived?

16      A    Well, when they first arrived the other

17  officers were still trying to get control and trying

18  to, and were continually shocking or tasing

19  Mr. Rodriguez.  I mean, it was a hectic, I'm sure it

20  was a hectic situation.

21      Q    Okay.  Is it customary for law enforcement

22  to rely upon the decisions and discretions of other

23  POST or State certified law enforcement officers?

24      A    Well, I think that's a, that's a --

25  normally yes, but obviously not in situations that

1    are improper or can be handled differently.  I seen

2    cops walk away when other officers are doing things

3    they didn't think was improper -- they didn't think

4    was proper.

5         Q    Okay.  But in this situation the

6    circumstances indicated a noncompliant, resisting

7    arrest subject, right?

8         A    Yes, sir.

9         Q    And that was, that was the objective

10   information upon which Butera and Phillips arrived

11   or were faced with when they arrived?

12        A    Yes, sir.

13        Q    Okay.  And would it be unreasonable for

14   them to draw the conclusion that gaining control and

15   placing into custody Rodriguez was a paramount

16   priority?

17        A    Well, no, sir, it wouldn't be

18   unreasonable.  I don't know what the conversation

19   was between them and the other officers.  But most

20   officers coming on a scene with someone who's, who's

21   fighting them and/or at least not complying, yeah,

22   you would make the assumption that that's the

23   purpose.  How you fulfill that purpose is a

24   different question.

25        Q    And the City officers told Phillips that

1   Rodriguez was resisting arrest and being

2   noncompliant, correct?

3        A    My understanding, yes, sir.

4        Q    And Stroud repeatedly asked Phillips to

5   assist in using force to restrain Rodriguez,

6   correct?

7        A    That's correct.

8        Q    Okay.  And it was reasonable for Phillips

9   to rely upon the information and instructions from

10  Stroud?

11       A    Well, the information, yes.  The

12  instructions, I mean they don't control each other.

13  It's not like it's Phillips' supervisor.  It's

14  another officer and of course he wants to help him.

15  Was he aware that Rodriguez had been tased ten times

16  before or nine times before he delivered the tenth

17  taser shot, I don't know.  If he had --

18       Q    Are you aware of any information that he

19  had that information prior to his first deployment?

20       A    Well, no.  But he certainly should have if

21  their taser wires and cartridges and, you know.

22  That's, that's something that you should certainly

23  ask and try to find out before you start tasing

24  someone.

25       Q    Well, just because there's taser wire

1    doesn't mean they have tased him the many times that

2    they had prior to Phillips arrival, does it?

3         A    No.   That's absolutely right.   And that's

4    why Phillips, instead of just jumping in with all

5    four feet is try to understand what's happened.

6    It's not like this is, he doesn't have five seconds

7    to ask because he been tased before.   What have you

8    guys done.   I saw no evidence that he tried to find

9    that out.

10        Q    Okay.   But it would not have been

11   unreasonable for him to begin assisting and rely on

12   the judgment of the City officers?

13        A    I would agree with -- that was a complex

14   question.   I would agree with the first part, but

15   rely on the judgment without information, you know,

16   he doesn't know if Mr. Rodriguez is killed someone

17   or if Mr. Rodriguez was walking down the street

18   naked.

19        Q    Right.

20        A    He should have asked those questions.

21        Q    And is it your opinion that he needs to

22   set up a formal inquisition investigation

23   independent of what these other officers have

24   concluded?

25        A    No, sir.   He should ask them what

1  happened?  What is going on?

2       Q    Right.  And was -- withdrawn.  It was the

3  decision of the City officers to put Rodriguez on

4  the ground and use the taser after he walked away,

5  right?

6       A    In the beginning, yes, sir.  They were the

7  only ones there.

8       Q    And it was within their discretion to

9  determine whether or not that was appropriate, the

10  City officers, right?

11      A    Yes, sir.

12      Q    Your opinion that they should have just

13  continued to talk to him or should have tried to

14  calm him down doesn't contemplate risks associated

15  with him fleeing, does it?

16      A    Of course it does.

17      Q    Okay.

18      A    And that's why you try to slow things

19  down.  That's the whole deescalation issue.  He may

20  not understand that at all and it wouldn't have

21  worked.  You don't know.  But it certainly isn't

22  going to work if you don't try.

23      Q    Well, let me ask you this.  You would

24  agree with me that you would also be sitting in that

25  seat if the officers had not restrained, attempted

1    to restrain Rodriguez and he ran into the street and

2    got run over by a car?  You would be critical of

3    them not retraining him in that situation, yes?

4         A    I would be critical if they tried to do

5    nothing.  But if they started talking to him and he

6    just bolted into the street, I mean that's on him.

7    They might try to tackle him or do something.  But

8    not -- not trying to talk to him when someone is

9    just literally walking down the street naked, again

10   it may work, it may not work.  But if --

11        Q    Let me hear the narrative that you would

12   have used.  Let me hear the narrative that you would

13   have used for Fernando Rodriguez when you approached

14   him.

15        A    If I had approached him I would have

16   gotten in front of him at some distance and tried to

17   talk to him reasonably about what's his name.  Just

18   typical, the typical crisis intervention training.

19   What's his name?  What's going on?  What's bothering

20   him?  In a calm way rather than yelling and

21   screaming and threatening him.

22        Q    Okay.  So hey, Bud, what's your name?

23        A    It's a good start.

24        Q    Okay.  What's wrong with you?

25        A    No.

1      Q     Okay.

2      A     Why would you ask?

3      Q     Why are you naked?

4      A     No.  That's not, I don't think a trainer

5  would condone that kind of questioning.  I think a

6  trainer would start to gain rapport with this person

7  which may or may not work because he is naked.  He

8  is obviously in crisis.

9      Q     Hey, Bud, tell me about your home life?

10  Is that what you are saying?  What sort of rapport

11  questions are you advocating?

12      A     I'm advocating -- I don't know if these

13  officers were trained in deescalation, in CIT, in

14  anything.  But it's, the training that I have been

15  through would start with a simple question sure,

16  what's your name?  How are you?  What are you doing?

17  Why are you here?  But neutral questions, not

18  threatening questions.  Not accusatory questions,

19  but just calm questions.

20      Q     What's your doctorate in?

21      A     Mine?

22      Q     Yeah.

23      A     Sociology.

24      Q     Those are kind of sociology questions?

25      A     No.  They're -- I wouldn't have any idea

1    about this as a sociologist.  I know about this

2    because I have been through deescalate training and

3    crisis intervention training.

4         Q    Okay.  Would you agree with me that they

5    had a duty to protect not only Rodriguez, but other

6    people in the, including themselves, in the

7    vicinity?

8         A    Of course.

9         Q    Okay.  And that would include Officer

10   Phillips and Butera upon their arrival?

11        A    Of course.

12        Q    Okay.  And would they have a duty then to

13   protect the officers, to try to protect the officers

14   who were in a physical struggle with Rodriguez?

15        A    You confused me there.

16        Q    Right.  You just agreed with me that the

17   officers would have a duty to protect the public,

18   Rodriguez and each other from injury upon arrival?

19        A    Officer safety and public safety and not

20   in that order.  Probably public safety and officer

21   safety.

22        Q    Okay.  And so when Phillips arrives on

23   scene, there's already a struggle going on?

24        A    Yes, sir.

25        Q    And there's already a struggle going on

1    when Butera arrives?

2         A    Yes, sir.

3         Q    And so the other officers involved in that

4    struggle, it would have been appropriate for Butera

5    and Phillips to place their safety at a high

6    priority ranking, yeah?

7         A    Well, the officers -- public safety first,

8    officer safety second.  So the officers who are in

9    struggle, yeah, they should have told the arriving

10   officers what's going on and the arriving officers

11   should get a sense of, you know, what's happened

12   before they jump in.

13        Q    Right.  But seeing the fellow officers are

14   in a struggle, it would be reasonable for them to

15   place a high priority on protecting those officers

16   or taking action to protect the officers?

17        A    Yes, sir, I would agree with that.

18        Q    And we would agree that the method for

19   assuring everyone's safety is for Rodriguez to be

20   detained?

21        A    To be controlled, yes, sir.

22        Q    Yes.  Were you aware of any sort of

23   physical condition that affected the officers

24   ability to use common restraints on Rodriguez?

25        A    Well, I understand that he was missing

1   some fingers, but no.  You don't handcuff in the

2   fingers.  You handcuff in the wrists.

3        Q    Right.

4        A    My understanding that he had two wrists.

5        Q    Okay.  And you understand that he did not

6   have a normal size hand?

7        A    Yeah.  My understanding was he had normal

8   size wrists.

9        Q    Did you hear the testimony or are you

10  aware of the evidence that indicates that the

11  handcuffs slipped off of Mr. Rodriguez a couple of

12  times?

13       A    I don't recall testimony that when they

14  were attached that they slipped off or that -- or if

15  they did, I don't -- I don't remember testimony that

16  they had been applied properly.  To answer your

17  question specifically, I am not aware that they were

18  applied properly and they just slipped off.

19       Q    Okay.  How would they have applied them

20  improperly?

21       A    Not being tight enough.  Not having the

22  ability to clasp them.

23       Q    Okay.  Handcuffs are designed to sort of

24  be applied without actually having to look at them,

25  right?

102

1          A    Well, you can do them by feel.  But
2     depending on the situation you want to get them --
3     you can always loosen them.  Yes, sir.  So you want
4     to get them tight.  Yes, sir.
5          Q    And it's hard to tighten handcuffs to an
6     appropriate resistance when you are having to
7     wrestle with someone, right?
8          A    That's correct.
9          Q    All right.  Are you familiar with the
10    tactical difference between link handcuffs and hinge
11    handcuffs?
12         A    Yes, sir.
13         Q    And do you know what kind of handcuffs
14    were being used here?
15         A    No, sir.
16         Q    Would you agree with me in saying that
17    link handcuffs provide the opportunity for greater
18    officer control?
19         A    No, sir.  It's the opposite.
20         Q    You think that link handcuffs do?
21         A    No.  I think the -- what did you call
22    them.
23         Q    The hinge?
24         A    Hinge.
25         Q    Hinge handcuffs?

1        A     Yes, sir.

2        Q     Right.  Hinge handcuffs provide greater

3   control over a subject than link handcuffs do?

4        A     Much more, yes, sir.

5        Q     Okay.  And that's because you can twist

6   link handcuffs, right?

7        A     You don't have to twist them very far.

8        Q     Right.  But you can twist the link

9   handcuffs, yes?

10       A     The hinge handcuffs you just tweak and you

11  got enormous pain control.

12       Q     I am making a maneuver with my hands as if

13  I'm in handcuffs on the screen.  Okay.  I can rotate

14  my hands around.

15       A     With --

16       Q     That I couldn't do if I had on hinge

17  handcuffs, correct?

18       A     That's correct.

19       Q     Okay.  Assuming for me, assuming that

20  Mr. Rodriguez had on, that they applied link

21  handcuffs, he would have had greater ability or

22  retained some ability to move his wrists around once

23  handcuffed, right?

24       A     Yeah.  Most American police use link

25  handcuffs.  Yes, sir.

1    Q    Uh-huh.  And where is the most secure
2    location to put hands when being handcuffed?
3        A    Behind your back, palms out.
4        Q    Okay.  Why is that?
5        A    Because you're more secure that way.
6        Q    Why are you more secure?
7        A    Well, if your hands are in front, you have
8    the ability to -- even though they're handcuffed,
9    you still have your ability to use them.
10       Q    Okay.
11       A    I think the analogy, one training session
12   I thought was funny said it was like an elephants
13   trunk.  So that's why you want to -- typically you
14   put handcuffs behind someone's back if you can.
15       Q    Were the officers in this case able to put
16   Rodriguez's hands behind his back?
17       A    Well, they didn't until the end.  No, sir.
18       Q    Right.  And did you see them -- you may
19   not think that they tried to, but you would agree
20   with me that when they were handcuffing him, he was
21   resistant?
22       A    Yeah.  He was, he was certainly not being
23   compliant.  I don't think he was fighting as much as
24   just not letting them handcuff him.
25       Q    Right.  And that's resisting, right?

1    Correct.  That's active resistance?

2        A    It looked to me, the little bit I could

3    see on the video he just wasn't letting them

4    handcuff him.  He wasn't trying to hit him.  He

5    wasn't trying to fight them.  He just wasn't letting

6    them handcuff.

7        Q    Active resistant doesn't call for

8    striking, does it?

9        A    Depends on the definition.  For the most

10   part, no.

11       Q    Right.  So if I say that he was actively

12   resisting by pulling away, by pushing away, by

13   avoiding officers' hands, would you disagree with

14   me?

15       A    Yeah.  That would be active resistance.

16   Yes, sir.

17       Q    Okay.  So we agree that he was actively

18   resisting?

19       A    If that's what he was doing, yes, sir.

20       Q    Yes.  How many sets of handcuffs did they

21   try to put on him?

22       A    I don't recall.

23       Q    If I told you that they managed to get him

24   restrained with five sets of handcuffs, how would

25   you react to that?

1      A    I would be curious because that seems like

2    a lot of handcuffs to get even someone as large as

3    he is restrained.

4      Q    Right.  It would be not unusual for

5    officers to have to use more than one set of

6    handcuffs to restrain someone, right?

7      A    Depending on the size.  I mean I see two

8    all the time, but certainly no more than two.

9      Q    You have any reason -- even in the, on the

10   front?

11     A    I don't understand what you're.

12     Q    Have you ever seen someone double cuffed

13   on the front?

14     A    Double cuffed on the front.  I'm not sure

15   I have.

16     Q    In the video did you see the officers

17   standing on the link portion of the handcuffs

18   between Mr. Rodriguez's hands?

19     A    If I did, it wasn't something I really

20   paid attention to.  I don't recall.

21     Q    Okay.  You would agree with me that none

22   of the taser deployments by Officer Phillips

23   violated any prohibition of the tasers used by the

24   Henry County Police Department, right?

25     A    Well, because the Henry County Police

```
1   Department policy is so inadequate.  It's hard to

2   tell what's -- you know, their deployment section

3   is, is, doesn't give very much guidance.  So

4   probably nothing you could do would violate the --

5   other than tase a pregnant woman.  And even then it

6   depends on the circumstances.  So, yeah, probably

7   nothing violated the policy.

8       Q    All right.  So that's, you would agree

9   with me that they did not violate Henry County

10  policy?

11      A    Well, because Henry County policy was so

12  inadequate.  I do agree with you.

13      Q    And I just wanted to know whether or not

14  he violated it or not?

15      A    No.  He did not violate it.

16      Q    Back to the hands.  They would be

17  considered still a threat when at the front,

18  correct?

19      A    Yes, sir.

20      Q    Okay.  And as we discussed with link

21  handcuffs, he would still be able to move his wrists

22  or rotate his wrists around, correct?

23      A    Well, he could rotate his wrists and use

24  his arms.

25      Q    Okay.  Did you hear Rodriguez ever request
```

1   medical attention or help?

2          A    No, sir.

3          Q    You did hear him yelling?

4          A    Yes, sir.

5          Q    Correct.  Okay.

6          A    Well, I heard him being very loud to use

7   your language.

8          Q    He was being very loud.  Maybe he was just

9   trying to tell the officer something.  I don't know.

10  But it was nothing that was intelligible, right?

11         A    Nothing I understood.  No, sir.

12         Q    I mean he, he used some foul language,

13  right?

14         A    Yes, sir.

15         Q    Okay.  And he talked about having a son.

16  My son, my son.  Did you hear that?

17         A    I didn't -- I didn't really understand

18  much of what he said.

19         Q    Okay.  You put in your report that at

20  10:24 Officer Stroud said quit trying to bite me.

21  You're not going to bite me?

22         A    Yes, sir.

23         Q    At that point they put his head down on

24  the ground, right, forced his head down?

25         A    Yes, sir.

1      Q     And you would agree with me that that
2   would be an appropriate measure to control his head
3   from being --
4      A     Well, if he were -- that's what I said
5   earlier was Phillips saying Rodriguez turned his
6   head and that's when Stroud kicked him.  I don't
7   know if it was just a response to him turning his
8   head, which would be excessive use of force or he
9   was trying to bite him.  Even then it's an excessive
10  use of force.
11     Q     Not --
12     A     I'm sorry?
13     Q     At the 11th Circuit it wouldn't be, not to
14  a bite.
15     A     Well, if -- well.
16     Q     Fennell v. Gilstrap would say no.
17     A     To avoid a bite, I don't see where -- I'm
18  not a lawyer.  I'm just saying in police training if
19  he is trying to bite him, that's one thing.  If he
20  is just moving his head, that's something else.
21     Q     I tell you, Bobby Lee Cook and I litigated
22  that.  And a kick to the face in, to stop a bite was
23  justifiable.
24          MR. JOHNSON:  Is that a work shoe?
25          MR. MORRIS:  It was in the, it was

1           actually in the jail.

2                   MR. JOHNSON:  No.  I mean was the bite

3           after the officer's shoe?

4                   MR. MORRIS:  No.  And in fact, in this

5           case we don't know, we know there's a lot of

6           hands holding so I think it would be sort of

7           analogous if someone is yelling don't bite me

8           which is what we had in the other case, the use

9           was justifiable.

10  BY MR. MORRIS:

11      Q    You put forth as a fact in here that --

12  you can go to page four.  It says he's quit

13  breathing, right?  And then you contend Butera

14  replied are you serious?  Do you see that?  On page

15  four?

16      A    Yeah.  It says, the first paragraph that

17  says around 10:28?

18      Q    Uh-huh.  And how did you conclude that it

19  was Butera?

20      A    What I said about Butera -- well, I state

21  in here Officer Phillips stated twice he's quit

22  breathing.

23      Q    Right.  But you didn't include the part

24  where somebody says no, he is breathing.  Why is

25  that?

1       A    It's an omission.

2       Q    Is it, is it significant if someone said

3  no, he is breathing or not?

4       A    Well, I don't remember -- I wrote that a

5  while ago.  I don't remember why I didn't put that

6  in there.  But to me this was just again the point

7  of Butera saying don't relax on him too much and

8  then Officer Phillips saying he's quit breathing.

9  And then someone else says he's still breathing.

10 And Butera replies are you serious.

11      Q    Right.

12      A    So I don't know, I don't know what's

13 happening.  I don't know why I put that in there.

14 It was just kind of a series of events.

15      Q    Okay.  But I think you then ten used it as

16 a starting point to count for when he stopped

17 breathing?

18      A    Oh, I have no idea when he stopped

19 breathing.

20      Q    Okay.  So if someone says that he -- no,

21 he's breathing, would that be significant to your

22 opinions at all?

23      A    No, sir.

24      Q    Okay.  You're not contending then that at

25 that point that they should have done something

1    medically for him?

2        A    Well, if, if they know he's not breathing,

3    of course.  And they should have rolled him over

4    anyway.  But even at, I don't know who said it.  At

5    10:29 the officer commented I can't tell if he's

6    breathing.  That's when they, that's why Phillips

7    kind of took his weight off.

8        Q    Have you pinpointed a specific moment in

9    the video that you watched where he stopped

10   resisting?

11       A    No.  I can't tell.  I just can't tell

12   because there's too many bodies, too much going -- I

13   can't tell when that happened.

14       Q    How long -- I'm curious how you determine

15   whether someone is finished resisting or not?

16       A    Well, that's going to be an officer's

17   determination of, of not being, not feeling

18   resistance not, you know, kind of a calm after the

19   storm so to speak.  That's where I agree with you.

20   That's where a video from different angles might be

21   very helpful.

22       Q    You would agree with me that one of the

23   ways in which an officer might determine whether

24   someone is finished resisting or not is based upon

25   the prior actions of that individual, right?

1       A     Well, if he's quitting resisting it would

2  be under the present actions of relaxing if you will

3  or certainly not fighting.

4       Q     Right.  Right up until he starts fighting

5  again.  He's quit it right up until he starts it up

6  again, right?

7       A     If he is going to start it up again then

8  he would quit --

9       Q     Right.  You're not saying that any of my

10  people are capable of predicting future, right?

11      A     No.

12      Q     So past actions and past levels of

13  resistance might be one source of information for

14  assessing likelihood of future conduct, right?

15      A     Well, we all say that the future is based

16  on the past, but just as you said you can't predict

17  the future.  So when someone quits resisting, you

18  have to quit fighting.

19      Q     Right.

20      A     You have to quit having response to

21  resistance because there is no resistance.

22      Q     Right.

23      A     If they start fighting again, then you

24  deal with it.

25      Q     Well, let me say it this way.

1    Historically you are retained by the plaintiffs and
2    I am retained by the defendants.  Now, there's
3    nobody to say that you won't be retained by civil
4    defendant tomorrow or that I won't be retained by a
5    civil plaintiff tomorrow.  But based on the history
6    of both of us, we can kind of predict what our next
7    case is going to look like, right?
8         A    You know, I disagree with that.  I get
9    calls, I get calls from lawyers all the time, both
10   plaintiffs and defendants.
11        Q    So what I then conclude that your
12   testimony is that it would be irrational and
13   unreasonable for them to use Fernando Rodriguez's
14   prior resistance and continued resistance as an
15   indicator that he may resume resisting in the
16   future?
17        A    I, that's like a three-part question.
18        Q    Okay.
19        A    I agree that -- well, let me put it this
20   way.  Once he quits resisting, you cannot use force
21   just because he's resisting in the past.  If he
22   starts resisting physically again, then you can use
23   force again.
24        Q    But my, that's really sort of my question
25   is that without hindsight we really don't know when

1   he's finished resisting?

2       A    Well, he's finished resisting -- look,

3   when we do our research with this, we look at

4   iterations.  We see what the suspect does, we see

5   what the officer does.  We see what the suspect

6   does.  And these are interactions.  So when the

7   suspect quits fighting, the officer can't take,

8   can't start, you know, fighting just because he

9   thinks well, he might hit me again.  He's got to

10  stop.  And then if he starts resisting again, then

11  the officer can use force again.

12      Q    Well, he continues to use force, right?

13  It is reasonable for him to continue using force,

14  some amount of force?

15      A    Not when he -- to get him controlled, yes.

16      Q    Okay.  And if that means restraining him

17  on the ground, when does he decide he can no longer

18  do that?  What is the magical point that you're

19  looking for that is instructed to these officers

20  that they should have or were required to stop

21  restraining him?

22      A    Once he is controlled.

23      Q    When was he controlled?

24      A    I mean I can't tell you that.  Because

25  they had cuffs on him in some way, shape or form so

1    he was more controlled than he was before.  Was he
2    continuing to fight.  These are all the questions --
3         Q    The cuffs aren't determinative of control.
4    Because they had cuffs on him and he was out of
5    control.  You told me this a minute ago that he was
6    not under control?
7         A    He was not under control.  This is, this
8    is -- the jury is going to have to determine some of
9    these questions that we can't determine.
10        Q    Okay.  And so it's just your opinion that
11   at some magical point between him resisting and his
12   death they had control?
13        A    I mean he could have died while, before he
14   was under control.  But my point is they tased him
15   what, 14 times.  They were on his back.  They were
16   doing all sorts of things.  In fact, even the
17   medical examiner found it to be a homicide.  They
18   used unreasonable force and they used it in terms of
19   the taser and they used in terms of keeping him on
20   his stomach and putting pressure on him.
21        Q    Right.  Right.  And how many broken ribs
22   did he have?
23        A    No idea.
24        Q    Would that be objective indication of
25   force on his torso?

117

1        A    It takes a lot to break a rib so I'm not a

2   medical expert.  I don't know.

3        Q    Okay.  Certainly if there were broken

4   ribs, you would point to that as evidence of

5   downward force, yes?

6        A    If there were broken ribs it would

7   indicate a lot of pressure was used on his ribcage.

8        Q    Okay.  And behind his ribs are what?

9        A    His vital organs.

10       Q    Including his lungs?

11       A    Yes, sir.

12       Q    Okay.  Was there any, any evidence of

13  damage to his throat?

14       A    I don't recall.

15       Q    Do you recall seeing any evidence of

16  damage to his, any part of his structural thoracic

17  cavity?

18       A    No, sir.

19       Q    Okay.  Did you read in the medical -- and

20  I guess not because you didn't include it.  Are you

21  familiar with petechial hemorrhaging?

22       A    I am not a medical doctor.  I'm not a

23  medical specialist.

24       Q    Okay.  Have you ever offered an opinion as

25  the significance of petechial hemorrhaging?

1       A    No, sir.

2       Q    Is it your contention that rolling

3   Mr. Rodriguez off of the prone position would have

4   prevented his demise?

5       A    I can't -- I can't speak to the cause of

6   the death.  I can tell you that it's much more

7   likely that removing that pressure from the, putting

8   him on his stomach and putting pressure on his back,

9   he would have been safer.

10      Q    Is that not a medical opinion?

11      A    Yeah, that is kind of a medical opinion so

12  I will rephrase it and say common police practice is

13  to get him off of his stomach as soon as practical.

14      Q    Based upon medical opinions that you can't

15  criticize?

16      A    No.  Based upon common police practice.

17  That's all I can offer.

18      Q    All right.  Would you agree with me that

19  during the time period that Phillips initially

20  placed a knee on Rodriguez's upper back, that

21  Rodriguez continued to talk and yell and move his

22  body?

23      A    He was, he was certainly, he was certainly

24  raising his voice as I heard it.  And certainly

25  moving, yes, sir.

119

1       Q    Have you ever heard officers say that if

2  you're talking you're breathing?

3       A    Yes, sir.

4       Q    And you understand that the exhalation of

5  gases across the vocal cords is what creates sound?

6       A    Well, my understanding, again I'm not a

7  medical doctor, but under, in the police training I

8  have seen trainers explain that you can still, you

9  can still be talking and be, and be dying.  And

10  that's not an indication that you want to get them

11  off of his stomach to be safe.

12       Q    That you can be breathing and dying of

13  asphyxiation?

14       A    You can make --

15       Q    Is that what you said?

16       A    You can make these utterances and still --

17  yes, and still be in -- I believe George Floyd said

18  several times I can't breathe.

19       Q    Right.  Did Fernando Rodriguez ever say he

20  could not breathe?

21       A    I couldn't understand anything he said.

22       Q    But you never heard him say it?

23       A    No, sir.

24       Q    Okay.  You did hear him yelling though,

25  correctly?

1      A      I heard him raising his voice as you

2   pointed out, yes, sir.

3      Q      We will use raising your voice.  I like

4   that.  Are you objective -- are you aware of any

5   objective evidence in the autopsy, in the autopsy

6   that supports his demise from positional asphyxia?

7      A      I think I wrote that the, the autopsy

8   reported -- and I'm reading from the report.  The

9   cause of death was quote asphyxia due to physical

10  restraint in the prone position with compression of

11  the chest.

12     Q      Right.  But was there any physical

13  evidence of positional asphyxia aside from the drawn

14  conclusion?

15     A      Well, again, medical examiner found

16  injuries occurred during quote physical altercation

17  with law enforcement.  I can't give you a medical.

18  I can only read the report and tell you what it

19  says.  Someone else is going to have to interpret

20  it.

21     Q      Is there -- you would disagree with me

22  that there is absolutely no evidence or indication

23  that any officer put weight on Fernando Rodriguez's

24  abdomen?

25     A      Directly, that's correct.

1     Q    Okay.  And you told me that you're aware

2  of the studies that show placing weight on an

3  individual's back does not cause them to die from

4  asphyxiation, right?

5     A    Healthy individuals, yes, sir.

6     Q    And were you aware of recent studies that

7  show that even up to 225 pounds of prone weight on a

8  person's back was safe?

9     A    I believe again it was a Kroll study and I

10  think they used weights that they put on the backs

11  until they thought -- so, yes, I'm aware of those

12  studies.

13     Q    Okay.  And were you aware that the

14  conclusions drawn were that 225 pounds do not

15  significantly interfere with the ability to

16  ventilate?

17     A    I am aware that's what he concluded.  Yes,

18  sir.

19     Q    And they even hogtied the subject.  Did

20  you know that?

21     A    Right.  And he was a healthy subject.

22     Q    Okay.  And under those conditions there

23  was no interference with the person's ability to

24  ventilate?

25     A    That was the conclusion he drew, yes, sir.

1       Q    Okay.  And in this situation are you aware

2  of any unique condition that Mr. Rodriguez had that

3  distinguished him from the person in the test?

4       A    Well, Mr. Rodriguez was first seen naked

5  walking down the street, unable to really correspond

6  very well.  They either knew or should have known

7  that he was in some sort of crisis.  So, yes, that's

8  a huge difference.

9       Q    What does crisis mean?

10      A    Crisis can mean -- that's why I use the

11 term mad, bad or sad.  You don't know what is going

12 on through his mind.  It's just not a quote normal

13 response.

14      Q    But what is crisis?  I don't know what

15 that means in the context of law enforcement

16 training.

17      A    It means someone that is not responding as

18 a normal person would respond.

19      Q    Okay.  And there's no one set way of

20 responding to a person in crisis, is there?

21      A    Well, it takes medical doctors a long time

22 to figure out what's going on inside someone's head.

23 So a police officer can only respond, realizing that

24 this is not a normal response and act according.

25 Mad, bad or sad.

1      Q      Officers have been placing subjects and

2    detainees in the prone position and holding them

3    down with body force for decades, is that true or?

4      A      Yes, sir.  And when they started dying at

5    a higher rate is when they decided that it was

6    prudent to move them off of their stomach.

7      Q      Have you done any studies of lives saved

8    based upon rolling them off, rolling them off the

9    prone position?

10      A      Well, you wouldn't know.  You couldn't do

11    an experiment because if the person is saved he

12    didn't die.

13      Q      Is there any quantitative way to determine

14    the value of rolling someone off of a prone

15    position?

16      A      Not ethically, no, sir.

17      Q      Okay.  So what distinguishes the decision

18    to, the motivation for moving someone from the prone

19    position?  How do you say that that is anything

20    other than conjecture?

21      A      Because it is a safe procedure.  It's done

22    after the person is controlled.  And it's done in a

23    way that can help him breathe without the

24    possibility of this compression.

25      Q      But we don't really know if it helps them

1    breathe?

2        A    Well, people die when they are on their

3    stomachs.

4        Q    Well, I just told you that they put people

5    who have Covid, which is a lung compromising

6    disease, on their stomachs.

7        A    Kevin, I don't know why you keep asking me

8    these medical opinions.  I can't give them.

9        Q    Okay.  Are you aware of any reliable

10   studies that has verified that a partial body weight

11   pressure from a knee of an officer on a person's

12   back with produce or cause positional asphyxia?

13       A    I am relying on the doctors, the medical

14   doctors who have testified.  I'm relying on their

15   word and their opinions.  I am not a medical doctor.

16       Q    But you're, when you answered that

17   question you did not give me a specific study which

18   was the heart of my question.  I asked are you aware

19   of any reliable study.  You didn't answer with a

20   specific study.  Am I to conclude that you do not

21   rely on or are not aware of any reliable study?

22       A    Again, I am giving you answers based upon

23   common police practice.  I cannot read the medical

24   literature.  I don't understand it.  So I rely on

25   the fact that what has been done has impacted police

1   departments to the point where the common police

2   practice is to roll someone over as quickly as

3   possible to avoid the potential.

4        Q    Are you aware that the fairly recent trend

5   of warnings about the possibility of positional

6   asphyxia were borne out of a study in nine -- early

7   1900s, 1990s in California?

8        A    I'm aware that the, some of the original

9   research was -- I can't remember the guys name, but

10  yes, sir.

11       Q    And it has since been deemed inaccurate?

12       A    Well, it's controversial.  Put it that

13  way.

14       Q    If, so some people have concluded that the

15  conclusions drawn from that study are not reliable?

16       A    Some have said that the conclusions are

17  inaccurate.  I can't remember the guy's name, but he

18  went back and retested and has argued that it is

19  controversial.

20       Q    Okay.  The unproven theory of positional

21  asphyxia or restraint asphyxia has gained media

22  attention that has resulted in concern in law

23  enforcement, right?

24       A    Well, I think -- yes, I agree with that.

25  And that's why since it's not a risk to law

1    enforcement to roll someone over after he's been

2    controlled, that's why the customary practice is to

3    do so.

4        Q    Okay.  And would you agree with me in

5    saying that the law enforcement response to the

6    George Floyd case has been motivated by media

7    criticism?

8        A    Well, I think the -- I think the law

9    enforcement response has been motivated by fear of

10   litigation and fear of death.

11       Q    Okay.  And not science?

12       A    I mean once again you asked me --

13       Q    Can you answer that.

14       A    -- medical issues I can't respond to.  I

15   can tell you that police departments have changed

16   their policies due to what happened to George Floyd.

17       Q    Right.

18       A    For a variety of reasons.

19       Q    And this case is not the same as the

20   George Floyd case, right?

21       A    That's correct.

22       Q    This the case -- in George Floyd, the

23   officer in that case had his knee on Mr. Floyd's

24   neck for approximately ten minutes, correct?

25       A    And my understanding from the medical

1    doctors is that that is not what killed him.  What
2    killed him was leaving him in a prone position for
3    an extended period of time.
4         Q    Laying on his belly is what caused him to
5    die?
6         A    If you listen to the testimony given by
7    the medical doctors, that's right.
8         Q    Okay.  So the knee in the neck is not what
9    killed George Floyd?
10        A    That's correct.  The knee in the neck did
11   not, did not stop the breathing and did not stop the
12   blood flow.
13        Q    Okay.  Are you aware of any studies by
14   DiMaio in 2006?
15        A    Yes, sir.
16        Q    What does that the study say?
17        A    You would have to show it to me.
18        Q    When's the last time, when was the last
19   time you familiarized yourself with the DiMaio
20   study?
21        A    It's been years.
22        Q    Okay.  Are you familiar with the study in
23   2006 by Newman?
24        A    That doesn't ring a bell.  No, sir.
25        Q    Are you a familiar with a study by Hall in

1    2012?

2         A    Is that the one, the Canadian one I talked

3    about?  The RCMP?

4         Q    What about Lassoff in 2017?  Familiar with

5    that study?

6         A    No, sir.

7         Q    Savasa and Chan in 2018?

8         A    Well, I'm familiar with Chan's work, but I

9    don't recall that one specifically.

10         Q    What about Kroll and Ross in 2018?

11         A    Well, I'm familiar with Kroll and Ross,

12    but I don't know which one is which.  You would have

13    to show it to me.

14         Q    Have you read, have you consulted any of

15    these studies in formulating your opinions for

16    today?

17         A    Well, I'm familiar with some of the, with

18    the bulk of that work and I'm aware of them and I

19    understand them.  And consult them specifically, no,

20    sir.

21         Q    Okay.  So you would, you would agree with

22    me that there's no, that you didn't go and pull

23    these studies and contemplate them in formulating

24    your opinions for today?

25         A    Well, I'm very family with particularly

1    with Hall study and certainly with Kroll and Ross.
2    They have several.  In fact, with Kroll and Chan I
3    think I have a book that has 20 chapters in it about
4    tasers and positional asphyxia so I am familiar with
5    those works.  I did not pull them when I wrote my
6    report.  No, sir.
7         Q    There's a difference in not consulting
8    them and dismissing the information in the studies.
9    You are just saying that you, you didn't consult
10   them at all.  You're not saying that their studies
11   are worthy of dismissal, right?
12        A    Oh, I think, I think particularly Halls is
13   very interesting.  Again, the methodology, I got
14   problems with the methodology and the, some of the
15   Kroll stuff, again other -- if you take away the
16   sample of healthy people, I think they do good work.
17        Q    If a doctor were to tell you that there's
18   physiologically nothing wrong with evaluating the
19   risk by using healthy subjects, there's nothing that
20   impacts the value of the conclusion -- let me see if
21   I can rephrase this.  If a doctor were to tell you
22   that there's nothing in firm about a study that
23   relies solely on healthy subjects, would it change
24   your opinion?
25        A    No, sir.  I bet that doctor said there's

1   no reason to take a Covid shot.

2        Q     What if other doctors said the same thing?

3        A     Look, again I can't answer these medical

4   issues.   They're controversial.   Covid shots.

5        Q     Right.   But you have -- listen, you got to

6   agree with me.   You have made a value judgment and

7   said look, there's doctors out there that say that

8   leaving them in the prone position causes this.   So

9   I am going to use that for guiding me in consulting

10  and making recommendations.   That is a, that is a

11  foundational cornerstone to your recommendations.

12  And if that foundation were a doctor that you

13  respect said there's really no difference and we

14  don't see any harm, would it change your opinion?

15       A     No, sir because my opinion is police

16  policies and tactics should be the least harmful.

17  So even if it's controversial, we're not asking

18  police officers to do something risky.   We are

19  asking them as soon as they have reached this point

20  of control, get them off their stomach because it's

21  a controversial if not accepted medical issue.   I

22  can't speak to the medicine.   I'm only speaking to

23  the common police practice.

24       Q     Okay.

25       A     And if you ask it again, I'm going to say

1   asked and answered.  At least I made the court

2   reporter smile.

3        Q    You put in your opinion about the O.C.

4   spray.

5        A    Yes, sir.

6        Q    Is it your opinion that they should have

7   used O.C. in this case?

8        A    No.  My opinion was -- I put in the O.C.

9   spray because their policy refers to the O.C. spray.

10  That's all it was.  And it says quote, the CEW is to

11  be deployed in accordance with the policy 302.00 and

12  at the same level as force as O.C. spray.  And then

13  I quoted the O.C. spray policy which is to quote

14  overcome physical resistance used by a person

15  against the officer or who is in immediate threat to

16  the public safety or the officer.  That's the only

17  reason I used it because their policy uses it.

18       Q    Okay.  It's not your opinion that they

19  should have used an O.C. spray in this case?

20       A    I mean they could have.  My suggestion was

21  to go hands-on first and I think that's where they

22  failed and they kept shocking him.

23       Q    Okay.  You would agree with me that having

24  used O.C. spray could have compromised -- could have

25  created a greater risk to someone with compromised

1    lung capacity?

2         A    It certainly could have.

3         Q    Okay.  On page six of your report.

4         A    Yes, sir.

5         Q    You say Henry County Officer Phillips

6    arrived at the scene and without attempting to

7    reason with Fernando called for mental health

8    professionals to calm the situation down or use

9    alternative celeste force -- use alternatives to use

10   of force or minimal force, he violated accepted

11   police practices and delivered seven taser shocks

12   into Fernando's body.

13                    Isn't it true that they had, that

14   Fernando had already been offered medical

15   assistance?

16        A    Well, in terms of if you do what I tell

17   you, we will bring you an ambulance.  Yes, sir.

18        Q    Right.  They did try to incentivize his

19   compliance by telling him that medical, they would

20   give him medical care?

21        A    They -- that's the language they use.  We

22   have no idea if he understood it.

23        Q    Okay.  You also know objectively that the

24   ambulance had already been summoned and dispatched,

25   was in route?

1      A     I believe that's true, yes, sir.

2      Q     Okay.  And I'm talking about at the time

3  that Phillips arrived, medical care was on its way?

4  Yes?

5      A     Yes.

6      Q     Is it your contention, because you say

7  that he didn't call for mental health professionals,

8  do you have some knowledge about what the process

9  would have been to summon mental health

10 professionals?

11     A     I have no idea in Henry County who is on

12 call, if they have mental health professionals who

13 can assistance the police.  I don't know that.

14     Q     Okay.  If there was no one, then that

15 would be a superfluous statement that he needed to

16 summon mental health professionals?

17     A     Yeah.  If there's no one to call and

18 there's no one to work with to provide assistance,

19 then there's no one to call.

20     Q     Okay.  You said that he should have tried

21 to calm the situation down.  Is there any indication

22 or do you have any knowledge that doing something

23 other than what he did would have been effective at

24 controlling Fernando Rodriguez?

25     A     You have, have no way to know because they

134

1    didn't do anything else other than tase him seven

2    times.  So we don't know if he had done something if

3    it would have been effective.

4        Q    Or used alternatives to use of force.  I'm

5    not sure what those are.  What are alternatives to

6    use of force?

7        A    Maybe trying to calm.  Again, the

8    deescalation techniques of calming, the slowing

9    things instead of, you know, just jumping right in.

10   Trying to figure out what's going on.  Tasing him

11   seven times just is unacceptable police practice and

12   unreasonable.

13       Q    Right.  But you would agree with that they

14   used the minimal amount of force necessary to

15   control him, yes?

16       A    No.  I think tasing him what, 10, 12 times

17   is not the minimum amount of force.

18       Q    I never saw him tase him after he was

19   under control.  Is it your contention that they do?

20   Once he's compliant.  Let me put it that way.

21       A    Well, once he's compliant he's, he's

22   unresponsive basically.

23       Q    So they stop using force when he became

24   compliant?

25       A    When he became unresponsive.

1    Q    Okay.  You indicate in that same paragraph
2    that, make the conclusive statement this is a
3    violation of their own policy.  Which policy are you
4    referring to in that statement?
5    A    Well, I think the Henry County.  Maybe I'm
6    mistaken it here because I was probably assuming a
7    reasonable policy.  I guess I should say that, you
8    know, he certainly wasn't following the training
9    that TASER puts out, the manufacturer puts out.  Or
10   any reasonable policy.
11   Q    So you're not aware of any policy of Henry
12   County that was violated as we sit here today?
13   A    No because Henry County policy is
14   basically other than a pregnant woman.  And that's
15   only under certain conditions.  That they really
16   don't give you much guidance.  The taser, as I put
17   in here in 3.B, the TASER manufacturer have more
18   instructions than Henry County.  And every policy --
19   I'm sorry.  Every training I have been through in
20   police departments relies significantly on the
21   manufacturer.
22   Q    Okay.
23   A    And apparently Henry County doesn't.
24   Q    The next part is a violation of accepted
25   police practice.

136

1        A     The multiple tasings, the leaving him on

2    his stomach, the continual putting pressure on him.

3    Yes, sir.

4        Q     Can I substitute the word accepted with

5    adopted?

6        A     I mean, you can do whatever you want.  I

7    think it's acceptable police practice.

8        Q     Well, acceptable doesn't necessarily mean

9    that it's been adopted by agencies.

10       A     Well, it should be.  And Henry County

11   should have adopted it.

12       Q     Right.  Accepted police practices.  I just

13   don't know what that means.

14       A     Well, it --

15       Q     I don't know how you say that.

16       A     It's kind of like best practice.  I'm not

17   sure what that means, but everyone uses it.  And

18   this is kind of a catch phrase in policing

19   parliaments of acceptable police practice.

20       Q     So there's no, there's no quantitative

21   relationship with the wording accepted police

22   practices?  We don't know if that means 30 percent,

23   50 percent, 75 percent, do we?

24       A     Well, we do know that there have been

25   national studies, although agencies with a hundred

1    or more officers, we do have data on that sample.

2    We don't have it on a national sample with all,

3    because with so many small agencies.

4        Q    All right.  So a violation of accepted

5    police practice.  That says to me that you know the

6    number of agencies that have adopted this practice

7    and can tell me how well accepted it is.

8        A    It is accepted, like other policies, we

9    can get into pursuit policies, we can get into use

10   of force policies.  It is, we don't have, we don't

11   have definitive national data.  We do have major

12   city data.  We do have survey data.  And they all

13   point to this using the taser this many times

14   violates those practices.

15       Q    So it may, it may be a minority of

16   agencies that have adopted these practices?

17       A    I mean, I suppose if you're talking about

18   agencies with two or three people it could be.  But

19   the agencies that are surveyed by Bureau of Justice

20   Statistics, no, it isn't.

21       Q    But even though -- you don't know how

22   many -- you can't put a percentage on them by the

23   Bureau of Statistics, the FBI statistics, can you?

24       A    They have, it's kind of like a public

25   opinion survey.  Yeah, they calculate the ranges and

138

```
1    they calculate the percentages.
2         Q    But as you sit here today you can't tell
3    me the quantitative amount of agencies that have
4    adopted or have accepted this police practice?
5         A    Well, you know --
6         Q    Just start with yes or no.
7         A    No, I can't.
8         Q    Start with yes or no and then you can
9    explain it.
10        A    No, I cannot.  But again, anyone who buys
11   a taser is getting the instructions that I have
12   provided below.
13        Q    Okay.
14        A    And if agencies get that instruction, they
15   are dismissing it if they don't follow it.
16        Q    Uh-huh.  Have you conducted any study to
17   ascertain how many agencies have adopted an adequate
18   policy on positional asphyxia?
19        A    Oh, not since gosh, probably the nineties.
20   No, sir.
21        Q    Okay.  Turn to page nine.
22        A    Yes, sir.
23        Q    Your opinion in number 11.
24        A    I'm not going to give an approximate cause
25   opinion.  In Georgia I'm not allowed to I don't
```

1    think.

2         Q    Same with number 12?

3         A    Yes, sir.

4         Q    And number 13?

5         A    No.  I believe they used unnecessary and

6    unreasonable force.

7         Q    Is that not a legal conclusion?

8         A    If the Court tells me it is, then I won't

9    use it.

10        Q    Have you ever been able to -- have you

11   ever been able to offer that opinion in Federal

12   Court in the state of Georgia?

13        A    I used it, I have been able to do some in

14   some states.  I don't recall if it's Georgia or not.

15        Q    Okay.  You would agree with me, however,

16   though that part of that conclusion requires you to

17   invoke a certain knowledge of the law?

18        A    My understanding again of police practice,

19   depending on what questions I'm asked, I feel pretty

20   comfortable with some of the, with some of the

21   Supreme Court decisions.

22        Q    Okay.  But you're not here to offer a

23   legal opinion?

24        A    Right.

25        Q    And how would you make sure that the jury

1    knew that you weren't offering a legal opinion?  You

2    were offering an opinion that is based upon police

3    practices?

4          A    In training and policies.  I would preface

5    it that way.

6          Q    Okay.  But this isn't the law.  I'm not

7    giving you a legal conclusion.

8          A    That's correct.

9          Q    And of course their determination is going

10   to be based upon the law and not practices?

11         A    I will give an opinion if the Court allows

12   me.  And obviously the jury listens to all the

13   testimony and determines what they believe is

14   appropriate.

15         Q    Okay.  Let me look at my notes real quick.

16   You have no opinion about whether or not

17   Mr. Rodriguez had high blood pressure and how it may

18   have impacted his, whether it played a role in his

19   demise?

20         A    That's correct.

21         Q    You don't know whether or not he had

22   cardiovascular disease and whether or not that may

23   have played a part in his demise?

24         A    I do not know.  But again, these are

25   indicators of someone in crisis.  You have got to

1    think about those things as a police officer.

2         Q    You don't know whether or not he had an

3    enlarged heart or whether or not that may have

4    played a role in his demise?

5         A    That's correct.

6         Q    Okay.

7         A    But honestly what you're doing is

8    buttressing my concerns with doing studies of people

9    who are healthy.

10        Q    So what I just heard you say is you

11   believe that there's a correlation between the

12   ability to aspirate and someone who's taking LSD or

13   has a bad heart?

14        A    You're asking me medical questions.

15        Q    No.  You gave me a medical answer.  You

16   did.  You really did.  You said you're buttressing

17   my opinion in saying you can't use unhealthy people.

18   So you are drawing a judgment on unhealthy people

19   and how it may impact the studies.

20        A    Yeah, how it impacts studies.  Right.

21        Q    How do you have any knowledge if it would

22   impact it or not?

23        A    Because you can't do the studies.

24        Q    Well, you may be able to do the studies

25   and they may have value.  You just don't know?

1    A     You cannot do studies on -- I teach this

2   in graduate school.  I'm a certified research board,

3   we evaluate these all the time.  You cannot do

4   studies ethically on people who are compromised and

5   the risk is fair greater than the benefit.

6    Q     Right.  You did not, you don't have any

7   opinion about whether or not he had excited deliria

8   that caused his demise?

9    A     No.  I'm not a hundred percent sure -- I

10  have done the research, I have read the articles.  I

11  don't know what excited delirium is.

12        MR. MORRIS:  Very good.  I think that's

13     all I have.  About three hours and ten minutes

14     of actual cross, close to what I promised.

15        THE WITNESS:  As far as I'm concerned

16     you've gotten into my fourth hour, so.

17     We're --

18        MR. MORRIS:  Hell, if I'm going to buy it,

19     I'm going to stay.  I'm going to ask you some

20     more medical questions.

21        MR. JOHNSON:  I got some questions too.

22        MR. MORRIS:  Well, now Jess is on the

23     clock.  He is buying your fourth hour.

24        MR. JOHNSON:  Oh, no, this is your clock.

25     Are we ready to --

1           MR. MORRIS:  Wait a minute.  If it's my
2      clock, then we're done.  I have no more
3      questions.
4           MR. JOHNSON:  I'm going to ask questions.
5           MR. MORRIS:  Well, then you're buying it.
6      That is the way it works, man.  He if he is
7      going to charge me or charge for it.
8                       DIRECT EXAMINATION
9  BY MR. JOHNSON:
10      Q    Dr. Alpert, I hate to do this, but can I
11  get a brief recitation of your professional
12  background and your educational background?
13      A    I have a Ph.D. in sociology from
14  Washington State University.  I have been a
15  professor of sociology and criminology for the last
16  40 something years.  I've worked in universities and
17  I have worked in agencies.  I have, since 1980s
18  after doing the after-action report for the Miami
19  riots, I specialized in use of force and other
20  high-risk policing activities.  In my research
21  agenda published 14, 15 books, over 150 peer
22  reviewed articles.  Mostly involving these different
23  researches on these high-risk activities.
24      Q    Did any of those books and peer review
25  articles involve the use of force?

1        A    Yes, sir.  A lot of them.

2        Q    And that's by police departments and

3    police officers?

4        A    Yes, sir.

5        Q    Okay.  And do you teach about the use of

6    force?

7        A    Yes, sir.  Mostly -- well, both to

8    officers and to college.  Lately it's been

9    undergrad.  Prior to Covid is all graduate students.

10       Q    And how long have you been doing that?

11       A    Over 40 years.

12       Q    And have you conducted your own studies

13   about the use of force?

14       A    Yes, sir.

15       Q    How many?

16       A    I probably received ten or so grants from

17   the National Institute of Justice focusing on the

18   use of force or emergency driving.

19       Q    How do you receive grants from that

20   institute?

21       A    Well, you, they put out a request for

22   proposal.  You propose the research and it's a very,

23   very difficult and competitive process.  But we have

24   been very fortunate on getting the money.  It's a

25   research arm in the justice department.

1      Q    Okay.  And when you submit these grants,
2  what do you have to prove to the Department of
3  Justice?
4      A    Well, you supply a methodology of what
5  you're going to do.  And then you do the work and
6  then you have to show what you've done and what your
7  recommendations are.
8      Q    Okay.  In your studies you talk about use
9  of force, but does it cover a wider area of law
10  enforcement?
11      A    We have done, we have done work on early
12  warning systems, early notification systems.  We
13  have done work on training, a lot of work on
14  training, but again and the use of force and driving
15  issues mainly.  Done work on hiring, retaining.
16  Obviously getting in the timely topics of retention
17  and recruiting.
18      Q    And do these studies, do they look at one
19  department in general or specifically or does it
20  look at more departments across the country?
21      A    Well, some have components of surveys that
22  we do national surveys.  Some have components where
23  we survey officers.  The driving one, the last one
24  we did a few years ago pre-Covid was oh, gosh, I
25  think it was 12 or 15, 12 or 16 departments in

1    California.  But a lot of our use of force studies,

2    some of them yeah, do focus on single agency.  Some

3    on multiple.

4        Q    And these studies, are they listed in your

5    C.V.?

6        A    Yes, sir.

7        Q    Okay.  It says here in your supplemental

8    report that you're a Federal monitor for the New

9    Orleans Police Department?

10       A    Yes, sir.

11       Q    By a consent decree?

12       A    It is a Federal consent decree.  I'm one

13   of the monitors, yes, sir.

14       Q    How did you get picked as a monitor?

15       A    I was asked by the main, by the

16   monitoring -- well, the main monitoring who was

17   applying to the justice department for the City of

18   New Orleans about seven, well, probably about eight

19   years ago.  And I was one of the few academics

20   selected.

21       Q    In that case do you know what that case

22   involved?

23       A    The consent decree?

24       Q    Yes.

25       A    It was 300 and some paragraphs of reform

1    that New Orleans Police Department had to, had to

2    do.  So there were all aspects of the department

3    including use of force, including tasers,

4    including -- it was pretty much the whole department

5    training, early warning system.  I mean it was very

6    complex.  Probably the most complex consent decree.

7         Q    Did that involve the use of force as well?

8         A    Yes, sir.

9         Q    And what was the concern with the use of

10   force?

11        A    Well, they were using excessive force.

12   They were using it improperly.  They were using it

13   extensively.  They just had a lot of reform looking

14   at the statistics they didn't keep very well.  I

15   mean there's pretty much everything they did in New

16   Orleans prior, right after the storm to the time

17   where we got hired to do the consent decree was

18   pretty bad.

19        Q    And who put you in charge as a monitor?

20        A    We were approved by the Court -- well, by

21   the City, by the police department and by the

22   Federal Court.

23        Q    Okay.  That was a District Court judge?

24        A    Correct.

25        Q    It also says here compliance team member

```
 1   for the Portland, Oregon Police Bureau?

 2        A    Yes, sir.

 3        Q    And what did that case concern?

 4        A    That was mostly use of force and mental

 5   illness.  The claim was that the department, the

 6   government claimed that the department was using

 7   force excessively and extensively with people who

 8   had mental problems.

 9        Q    And how were you put into place as a

10   compliance team member?

11        A    I was hired by the director of the

12   compliance team.  It's kind of like a monitor, but

13   not exactly.  We do the same thing.  It's a more

14   limited, more limited -- it's not a consent decree.

15   It's -- oh, gosh.  It's the next level down.  I

16   can't remember the term they used.  But it's

17   basically the same thing.  We go in there and we

18   make sure that there's -- what they're doing is

19   accepted police practice.

20        Q    Okay.  And let's talk about accepted

21   police practice.  How do you determine what the

22   accepted police practice is?

23        A    Well, based on our attending meetings with

24   the International Association Chiefs of Police or

25   the Major City Chiefs Association or the Police
```

1    Executive Research Forum, talking to people,

2    reviewing their policies, understanding what they're

3    doing and why they're doing it.  So it's really an

4    understanding of what these agencies are doing.

5    It's not a survey, although the Bureau of Justice

6    Statistics does some surveys.  It's more of an

7    understanding of what these agencies, the practices

8    that they are following.

9         Q    Okay.  Have you ever been qualified in

10   court as an expert witness?

11        A    Yes, sir.

12        Q    How many times?

13        A    I mean I probably testified in court 40

14   times, 45 times, maybe 50.

15        Q    Is that in Federal Court as well as State

16   Court?

17        A    Yes, sir.

18        Q    Okay.  And have you been qualified as, in

19   a Federal Court here in Georgia?

20        A    Yes, sir.

21        Q    Do you know what district?

22        A    I don't recall.

23        Q    Okay.  Do you know how many times?

24        A    I mean I have testified in Federal Court

25   in Georgia and Florida probably five, six times over

1   my career.

2       Q    Are those all use of force or excessive

3   force cases?

4       A    It was split between driving, emergency

5   driving or pursuits and use of force.  I don't

6   recall which one was which.

7       Q    Have you ever not been qualified as an

8   expert?

9       A    I have been limited quite often.  And I

10  think there's one time in northeast that I was --

11  well, been a couple of times where the courts just

12  aren't going to accept -- aren't going to have

13  testimony from an expert.  And there was one case I

14  recall in, I can't remember.  Somewhere in the

15  northeast.  Where the lawyer in the Daubert motion

16  said I'd never testified in Federal Court and the

17  judge said well, you're not going to testify here.

18  And then I have been told other cases one or two,

19  but I never seen any documentation.

20      Q    Okay.  And in what field are you usually

21  qualified as an expert witness?

22      A    Police practices.

23      Q    What's the purpose of having a, an

24  accepted police practice or a nationally accepted

25  police practice?

1       A    It's to keep policing standardized.   I

2    mean we have 18,000 police departments and it's

3    difficult in other countries.  For example,

4    Australia eight police departments and a Federal

5    police department.  So it's trying to keep police

6    the same all around the country.

7       Q    And why is that important?

8       A    Well, it's important for sometimes if

9    officers want to move from one department to

10   another, the changes will be minimal.  It's good for

11   the public to understand they go from one place to

12   another that the rules are going to be the same.

13   It's a standardization issue where departments do

14   what is best for themselves or for officer and

15   public safety.

16      Q    The accepted police practice, does it get

17   updated over time?

18      A    Yes, sir.

19      Q    And why does it get updated?

20      A    Well, new things are, I mean technology is

21   really important.  Changes in acceptable behavior is

22   well known among departments.  Some of the larger

23   departments may experiment with things and it gets

24   filtered down.  Or smaller departments might have

25   research projects -- excuse me.  That are accepted

1   by other departments and spread very quickly.

2        Q    Is there anything that requires a police

3   department to adopt nationally accepted standards?

4        A    Well, consent decrees do.  And if you look

5   at a consent decree city, you look at the policy in

6   any consent decree city, it's probably gone through

7   the most scrutiny of any policy.  But no, if there's

8   no state law.  New Jersey has a lot of Attorney

9   General guidelines on use of force and pursuant

10  driving.  But if there are no laws and no court case

11  such as a consent decree, there's nothing that

12  requires you legally.

13       Q    Would it be fair to say that some

14  departments are behind the curve when it comes to --

15       A    Yes.

16       Q    -- when it comes to adopting standards?

17       A    Yes, sir.

18       Q    You were asked some questions about the

19  video that you reviewed in this case.  Do you

20  remember that?

21       A    Yes, sir.

22       Q    The video that you reviewed, was that from

23  Officer Lewis?

24       A    I don't recall.  It could be.  I don't

25  remember.

153

1       Q     If you look in your report on page two

2   does it appear that it was Officer Lewis or was it

3   someone else?

4       A     Yeah, it doesn't indicate.

5       Q     Okay.  But you kind of chronicled what you

6   reviewed in this video, correct?

7       A     Yes.

8       Q     And when you watched this video, were you

9   able to tell if Fernando Rodriguez was being

10  combative?

11      A     I didn't think he was being combative.  I

12  think he was being, I think he was just not being

13  cooperative.  He wasn't being compliant.  He wasn't

14  following orders.  And then after he started getting

15  shot with a taser, he became upset let's say.  And I

16  think that's where he started to resist more.

17      Q     Can you tell from the video if officers

18  used a taser on him?

19      A     Yes, sir.

20      Q     Can you tell from the video if he was

21  placed in the prone position?

22      A     Yes, sir.

23      Q     Can you tell from the video if he was

24  handcuffed?

25      A     Yes, sir.

154

1    Q    Can you tell from the video if at some

2  point he became unresponsive?

3    A    Yes, sir.

4    Q    Could you tell from the video if any of

5  the officers ever attempted to render medical aid?

6    A    I couldn't, I don't -- I didn't see any

7  officers giving assistance.  I believe it was the

8  medical EMTs who did.

9    Q    Could you tell from the video if one of

10 the officers kneeled on Fernando's back after

11 Fernando had become unresponsive?

12   A    I believe so.  But as I testified earlier,

13 it was really hard to tell how unresponsive he was

14 or if he was being held down.  And I can't

15 distinguish.

16   Q    At some point in the video would you agree

17 that there was no movement from Fernando?

18   A    That's correct.

19   Q    And at some point there was nothing, no

20 words or noises coming from his mouth?

21   A    That's correct.

22   Q    You said that one of the nationally

23 accepted police practices is to roll a person over

24 onto their side from the prone position as quickly

25 as possible, right?

1    A    Yes, sir.

2    Q    And why is that?

3    A    Because there's several, well, decades ago

4  there were people dying from this, what they called

5  them positional asphyxia, which now I think it's

6  called compression asphyxia.  And it, there was a

7  lot of research done on healthy subjects.  But the

8  general police response was to play it safe.  And

9  because there was at least a controversy if not a

10 crisis, they decided to, a lot of departments -- and

11 I think kind of the national standard became to,

12 once someone was not resisting, someone was under

13 control, to get him off of his stomach as quickly as

14 possible.

15    Q    In September --

16         MR. MORRIS:  Can we take like a two-minute

17    break real quick?

18         MR. JOHNSON:  Sure.

19    (Whereupon a recess was taken.)

20 BY MR. JOHNSON:

21    Q    Back on the record.  Dr. Alpert, back in

22 September of 2019 was it the commonly accepted

23 police practice or the nationally accepted police

24 practice to roll someone on their side as quickly as

25 possible after being placed in the prone position?

156

```
1         A     Yes, sir.

2         Q     Okay.  And did that happen in this case?

3         A     No, sir.

4         Q     And at the time of this event in September

5    of 2019, would you consider Henry County Police

6    Department's policies to be adequate when it came to

7    the use of the prone position?

8         A     No, sir.

9         Q     And why not?

10        A     I mean there just wasn't any mention of it

11   in the taser policy.  I mean, the taser policy was

12   unacceptable as well.  I didn't see any mention of

13   it in use of force policy.  The policies I saw from

14   Henry County were sub -- were woefully inadequate.

15        Q     There's been some discussion about the

16   amicus brief that you noted in your report.  How

17   long has law enforcement been aware of the dangers

18   associated with the use of the prone restraint?

19        A     Oh, since probably the late eighties,

20   early nineties.

21        Q     And I asked about the use of force policy

22   upon restraint.  Henry County Police Department's

23   taser policy in 2019, was that adequate?

24        A     Not at all.

25        Q     And why not?
```

 1        A    It didn't consider any of the problems,

 2   any of the considerations that were well known

 3   among, in the law enforcement community.  And like I

 4   said several times, one of the few restrictions for

 5   tasers was against pregnant women.  And even then it

 6   was dependent what they consider totality of the

 7   circumstances.  So they didn't consider the dangers

 8   of, of using a taser in the policy.

 9        Q    Were there other considerations that you

10   can think of off the top of your head?

11        A    In the policy?

12        Q    That it lacked?

13        A    Well, mainly the restrictions, the number

14   of applications, the dangers of multiple

15   applications.  It was just a very, very weak, weak

16   policy.

17        Q    Did it meet the standard for nationally

18   accepted police practices at the time?

19        A    No, sir.

20        Q    I think opposing counsel had talked about

21   trying to identify some magical point of when he

22   became unresponsive.  Do you recall that?

23        A    Yes, sir.

24        Q    Would you agree that at some point he did

25   in fact become unresponsive or not, or was complying

158

1   with the officers?

2        A    Well, he, I don't think he was compliant

3   until -- I mean I couldn't tell if he was compliant

4   until he became unresponsive.

5        Q    Okay.  At some point he did become

6   unresponsive?

7        A    Correct.

8        Q    And at that point would the nationally

9   accepted police practice had been to roll him on to

10  his side?

11       A    Absolutely.

12       Q    And again, that was not done?

13       A    Correct.

14       Q    You were asked about a study I believe by

15  Kroll, someone named Kroll, about 225 pounds of

16  weight was a safe amount to place on someone.  Do

17  you recall that?

18       A    Yes, sir.

19       Q    Okay.  Do you know the specifics of that

20  study?

21       A    Well, I know they, they placed free

22  weights on the back of people and then they had them

23  hooked up to monitors and basically came to the

24  conclusion it was safe to put that much weight on

25  these particular subjects.

1      Q     When you say free weights, do you know
2   what that means?
3      A     Well, they were just like ones you put on
4   barbells.
5      Q     Okay.  But not, it wasn't an actual knee
6   on someone's back?
7      A     No, sir.
8      Q     And you said these were healthy people?
9      A     Yes, sir.
10      Q     Do you know how many people?
11      A     I don't recall the number in that study.
12      Q     Is there anything else about the use of
13   force policy or the taser policy that you think is
14   important?
15      A     Well, I just think they're inadequate.  I
16   think they're very general.  I think they're very --
17   they don't give much guidance.  I think the --
18   there's nothing in there about a duty to intervene
19   that is in the power point.  Although I don't know
20   the date of the power point.  There was just a lot
21   of things that was going on in 2019 that were not
22   covered in these policies.
23      Q     In part of your research, have you ever
24   studied anything about an officers duty to assist an
25   arrestee who appears to be in medical distress?

```
 1        A    Well, you say duty to arrest.  I'm not

 2   sure that, there's a lot of discretion.  Some cases

 3   have less discretion than others.  I'm not aware

 4   of -- other than with a warrant or with, you know,

 5   some sort of court order that there's a duty to

 6   arrest.

 7        Q    I think --

 8        A    I think that's a legal opinion.

 9        Q    I think I misspoke.  I meant a duty to

10   render medical aid to someone that appears to be in

11   distress.

12             MR. MORRIS:  I just want to be clear about

13        this, Jess.  That is not a part of his opinion.

14        It is not part of his Rule 26 report.  And I'm

15        not paying for this fourth hour.  You're going

16        to ask him questions that are beyond the scope

17        of a Rule 26 report then I --

18             MR. JOHNSON:  Just curious --

19             MR. MORRIS:  Huh?

20   BY MR. JOHNSON:

21        Q    I was just curious.  Have you ever done

22   anything like that?

23        A    Have I ever done anything dealing with the

24   duty to provide medical assistance?

25        Q    Right.
```

1        A    I mean, I have been through training where

2   in use of force training where the training says,

3   you know, obviously if you can, you go and give

4   medical assistance as soon as possible.

5             MR. JOHNSON:  Okay.  I think that's all I

6        have.

7             MR. MORRIS:  Very good.  Thank you,

8        Dr. Alpert.  I appreciate it.

9             [Deposition concluded at 1:48 p.m.]

10             [Signature reserved.]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            DEPOSITION OF DR. GEOFFREY ALPERT:

 2            I do hereby certify that I have read all

 3   questions propounded to me and all answers given

 4   by me on June 30, 2022, taken before

 5   Angie Cornett, and that:

 6   _____ 1)  There are no changes noted.

 7   _____ 2)  The following changes are noted:

 8            Pursuant to Rule 30 (7)(e) of the Federal

 9   Rules of Civil Procedure and/or the Official Code

10   of Georgia Annotated 9-11-30(e), both of which read

11   in part:  Any changes to form or substance which you

12   desire to make shall be entered upon the deposition

13   with a statement of the reasons given for making them.

14   Accordingly, to assist you in effecting corrections,

15   please use the form below:

16

17   Page No. _____ Line No._____ should read:

18   _____

19   _____

20   And the reason for the change is: _____

21   _____

22   Page No. _____ Line No. ____ should read:

23   _____

24   _____

25
```

1   And the reason for the change is: _____

2   _____

3

4   If supplemental or additional pages are necessary,

5   please furnish same in typewriting annexed to this

6   deposition.

7

8                                  _____

9                                  Dr. Geoffrey Alpert

10

11  Sworn to and subscribed before me,

12  this the _____ day of _____ 2022.

13

14  _____

15  Notary Public

16  My commission expires: _____

17

18

19

20

21

22

23

24

25

```
 1
 2                 C E R T I F I C A T E
 3  STATE OF GEORGIA
 4  COUNTY OF BARTOW:
 5          I hereby certify that the foregoing
 6      transcript was taken down, as stated in
 7      the caption, and the questions and answers
 8      thereto were reduced to typewriting under
 9      my direction; that the foregoing pages 1
10      through 161 represent a true, complete, and
11      correct transcript of the evidence given
12      upon said deposition, and I further certify
13      that I am not of kin or counsel to the
14      parties in the case; am not in the regular
15      employ of counsel for any of said parties;
16      nor am I in anyway interested in the result
17      of said case.
18          This, the 30th day of June 2022.
19
20                      _____
21                      Angie Cornett, CCR B-1713
22                      My commission expires on
23                      March 31, 2023.
24
25
```

1                          DISCLOSURE

2

3    STATE OF GEORGIA

4    COUNTY OF BARTOW

5    Deposition of:  DR. GEOFFREY ALPERT

6    Date:  June 30, 2022

7

8            Pursuant to Article 8.B of the Rules and
     Regulations of the Board of Court Reporting of the
9    Judicial Council of Georgia, I make the following
     disclosure:

10

11           I am a Georgia Certified Court Reporter.  I
     am here as a sole practitioner representing Thompson
12   Reporting Services.

13

14           The firm was contacted by the offices of
     Williams, Morris & Waymire, LLC to provide court
15   reporting services for this deposition.  I will not be
     taking this deposition under any contract that is
16   prohibited by O.C.G.A. 15-14-37 (a) and (b).  This reporter
     is only capable of taking down testimony heard via Zoom
17   audio.

18

19           I have no contract/agreement to provide
     reporting services with any party to the case, any
20   counsel in the case, or any reporter or reporting
     agency from whom a referral might have been made to
21   cover this deposition.  I will charge my usual and
     customary rates to all parties in the case, and
22   a financial discount will not be given to any
     party to this litigation.

23

24           _____

25                        Angie Cornett, B-1713

---

**\***

**\*\*\*\*\*\*\*\*\*\* (2)**
4:1,3

**[**

**[audio (1)**
33:8
**[Deposition (1)**
161:9
**[Signature (1)**
161:10

**A**

**abdomen (1)**
120:24
**ability (15)**
12:11;56:10;83:3,
22;84:4;87:9;100:24;
101:22;103:21,22;
104:8,9;121:15,23;
141:12
**able (12)**
7:21;9:9;18:22;
76:10;91:11;104:15;
107:21;139:10,11,13;
141:24;153:9
**absolutely (8)**
53:25;57:20;64:10;
71:23;76:9;95:3;
120:22;158:11
**abstract (2)**
51:16,17
**academic (3)**
37:3,4;39:18
**academics (7)**
89:8,17,19;91:14,
14,15;146:19
**accept (1)**
150:12
**acceptable (5)**
89:19;136:7,8,19;
151:21
**accepted (31)**
45:15,18;46:14;
47:14;55:18;62:18;
78:5;88:18;130:21;
132:10;135:24;
136:4,12,21;137:4,7,
8;138:4;148:19,20,
22;150:24,24;151:16,
25;152:3;154:23;
155:22,23;157:18;
158:9
**accordance (1)**
131:11
**according (4)**
61:19;83:2,4;
122:24
**Accordingly (1)**

**162:14**
**account (1)**
33:22
**accuracy (1)**
46:7
**accurate (3)**
17:5;48:20;80:2
**accusatory (1)**
98:18
**across (2)**
119:5;145:20
**act (1)**
122:24
**action (2)**
32:24;100:16
**actions (4)**
35:18;112:25;
113:2,12
**active (3)**
105:1,7,15
**actively (2)**
105:11,17
**activities (2)**
143:20,23
**actual (2)**
142:14;159:5
**actually (10)**
39:3,3;41:20;
48:15;50:18;54:12;
66:4;70:24;101:24;
110:1
**added (1)**
5:21
**additional (2)**
5:18;163:4
**adequate (3)**
138:17;156:6,23
**adjunct (1)**
55:9
**administered (1)**
84:22
**admitted (1)**
71:11
**adopt (2)**
90:16;152:3
**adopted (12)**
45:22;46:8,24;
88:11,19;136:5,9,11;
137:6,16;138:4,17
**adopting (1)**
152:16
**adoption (2)**
46:25;90:19
**adopts (1)**
90:18
**advance (2)**
34:4,7
**advanced (1)**
54:2
**advised (1)**
32:18
**advocacy (4)**
39:4,10;42:17;

**44:18**
**advocate (1)**
44:1
**advocating (2)**
98:11,12
**affect (1)**
16:24
**affected (2)**
83:21;100:23
**affirm (2)**
10:20,25
**affirmative (1)**
80:25
**after-action (1)**
143:18
**after-the-act (1)**
6:19
**again (54)**
14:15;15:23;32:5;
46:3,13,19;54:23;
61:8;62:7;63:24;
65:11,15;66:2;68:8,9,
12,21;69:19;73:23;
74:17,24;75:11,14,
17;76:2;84:7;89:16;
91:21;97:9;111:6;
113:5,6,7,23;114:22,
23;115:9,10,11;
119:6;120:15;121:9;
124:22;126:12;
129:13,15;130:3,25;
134:7;138:10;
139:18;140:24;
145:14;158:12
**against (7)**
5:13;35:1;44:1,18;
48:7;131:15;157:5
**age (1)**
87:22
**agencies (13)**
136:9,25;137:3,6,
16,18,19;138:3,14,
17;143:17;149:4,7
**agency (1)**
146:2
**agenda (1)**
143:21
**aggregate (1)**
45:9
**ago (10)**
23:13;24:12;32:17;
79:9;82:10;111:5;
116:5;145:24;
146:19;155:3
**agree (44)**
14:9;16:1;35:23;
41:14;50:13,14;52:9;
56:22;57:17,25;
59:14;60:16;61:14,
18;70:9,17;71:14;
91:23;95:13,14;
96:24;99:4;100:17,
18;102:16;104:19;

**105:17;106:21;**
**107:8,12;109:1;**
**112:19,22;114:19;**
**118:18;125:24;**
**126:4;128:21;130:6;**
**131:23;134:13;**
**139:15;154:16;**
**157:24**
**agreed (3)**
23:21;42:16;99:16
**agreement (1)**
4:6
**ahead (2)**
4:21;35:5
**aid (2)**
154:5;160:10
**Air (1)**
85:25
**alcohol (1)**
36:13
**allow (3)**
14:22;18:3;26:12
**allowed (1)**
138:25
**allows (1)**
140:11
**Alm (1)**
43:5
**along (1)**
33:2
**Alpert (15)**
4:6,14,21,23;5:10;
46:5;64:4;82:7,7;
91:12;143:10;
155:21;161:8;162:1;
163:9
**alter (4)**
10:20;16:9,12,13
**altercation (1)**
120:16
**alternative (2)**
77:7;132:9
**alternatives (3)**
132:9;134:4,5
**although (3)**
136:25;149:5;
159:19
**always (2)**
12:21;102:3
**ambulance (6)**
70:1;72:9;73:12;
75:15;132:17,24
**American (1)**
103:24
**amicus (13)**
7:7;38:23;39:2,11,
17,23;40:8,11,14,16;
42:11;43:2;156:16
**among (3)**
15:25;151:22;
157:3
**amount (18)**
12:18;23:21;50:7;

**57:4,6,6,9,10;58:18,**
**20,22,23;73:5;**
**115:14;134:14,17;**
**138:3;158:16**
**analogize (1)**
79:18
**analogous (1)**
110:7
**analogy (1)**
104:11
**and/or (4)**
36:14;84:5;93:21;
162:9
**Angie (1)**
162:5
**angle (1)**
11:11
**angles (1)**
112:20
**angry (2)**
64:3,17
**annexed (1)**
163:5
**Annotated (1)**
162:10
**announced (3)**
59:3,16;63:4
**Announcement (1)**
59:10
**announcing (1)**
59:6
**answered (4)**
21:11;79:8;124:16;
131:1
**apologized (1)**
20:9
**apparently (2)**
80:12;135:23
**appear (1)**
153:2
**appears (2)**
159:25;160:10
**applaud (1)**
73:16
**apples (1)**
85:18
**applications (2)**
157:14,15
**applied (9)**
22:19,22;23:4;
73:5;101:16,18,19,
24;103:20
**apply (3)**
9:22;25:8;82:6
**applying (2)**
27:9;146:17
**appreciate (1)**
161:8
**approach (2)**
48:9;75:21
**approached (3)**
15:13;97:13,15
**appropriate (8)**

Octavio Rodriguez Cira, et al. v.
County of Henry, et al.

Dr. Geoffrey Alpert
June 30, 2022

22:2;25:24;27:7;
96:9;100:4;102:6;
109:2;140:14
**approved (3)**
22:7,8;147:20
**approximate (2)**
20:17;138:24
**approximately (1)**
126:24
**architecturally (2)**
49:25;50:10
**area (10)**
26:19,25,25;27:1,
10,12,13,17;35:12;
145:9
**areas (2)**
70:24;87:14
**argue (2)**
48:7;86:16
**argued (1)**
125:18
**argues (2)**
44:2,3
**arguing (1)**
14:19
**argument (3)**
42:22;44:4;49:24
**arguments (4)**
34:4;40:7;43:15;
44:19
**arm (1)**
144:25
**arms (3)**
67:15,18;107:24
**around (7)**
68:10;90:22;
103:14,22;107:22;
110:17;151:6
**arrest (5)**
43:7;93:7;94:1;
160:1,6
**arrestee (1)**
159:25
**arrival (3)**
95:2;99:10,18
**arrive (1)**
92:13
**arrived (6)**
92:15,16;93:10,11;
132:6;133:3
**arrives (3)**
52:2;99:22;100:1
**arriving (2)**
100:9,10
**article (6)**
40:20;42:25;43:4,
9,12;44:10
**articles (9)**
36:7,9;42:7,8;
43:18,19;142:10;
143:22,25
**ascertain (1)**
138:17

**aside (1)**
120:13
**asleep (1)**
73:2
**aspects (1)**
147:2
**asphyxia (45)**
17:11;18:18;20:17;
28:1,4,6,12,12,18;
29:3,23;35:9,12,14;
36:6,19;37:25;38:4,
21;39:1,14;40:25;
41:20,23,24;42:5;
45:11;48:23;49:3;
82:12,25;83:9;84:3;
91:6;120:6,9,13;
124:12;125:6,21,21;
129:4;138:18;155:5,
6
**asphyxiation (3)**
35:25;119:13;
121:4
**aspirate (1)**
141:12
**assessing (1)**
113:14
**assessment (3)**
9:20;34:24;51:24
**assist (4)**
32:9;94:5;159:24;
162:14
**assistance (6)**
132:15;133:13,18;
154:7;160:24;161:4
**assisting (1)**
95:11
**associated (4)**
10:9;33:14;96:14;
156:18
**Association (2)**
148:24,25
**assume (11)**
4:7;6:16;11:15;
31:5,18,20;52:14;
68:24;69:3;70:12;
92:9
**assumed (1)**
10:11
**assuming (5)**
13:14;73:17;
103:19,19;135:6
**assumption (2)**
56:14;93:22
**assumptions (1)**
52:21
**assuring (1)**
100:19
**athlete (1)**
85:25
**attached (1)**
101:14
**attempt (1)**
14:4

**attempted (3)**
68:11;96:25;154:5
**attempting (1)**
132:6
**attended (2)**
88:25;89:5
**attending (1)**
148:23
**attention (4)**
10:17;106:20;
108:1;125:22
**Attorney (8)**
19:11,16;20:1;
21:4,4,25;32:6;152:8
**attributed (1)**
20:24
**audio (1)**
81:16
**Australia (3)**
18:15;30:16;154:4
**authority (9)**
54:13,21;55:15;
56:19,23;57:2;59:11,
17;61:15
**autopsy (3)**
120:5,5,7
**available (2)**
13:13;17:2
**avoid (2)**
109:17;125:3
**avoiding (1)**
105:13
**aware (29)**
8:21;27:5;33:1;
55:12;65:17;80:24;
81:12;94:15,18;
100:22;101:10,17;
120:4;121:1,6,11,13,
17;122:1;124:9,18,
21;125:4,8;127:13;
128:18;135:11;
156:17;160:3
**away (12)**
15:19;26:4,21;
57:21;58:10;59:9;
61:8;93:2;96:4;
105:12,12;129:15

**B**

**babies (2)**
83:14,16
**baby (1)**
72:5
**back (43)**
10:18;12:8;14:24;
16:21;17:8;20:9;
26:4;37:22;39:25;
40:10;42:2,6;63:19;
64:2;65:10;66:10;
67:18;72:11;73:11;
82:5,9,24;83:18;
84:24;85:13;91:22;

92:12;104:3,14,16;
107:16;116:15;
118:8,20;121:3,8;
124:12;125:18;
154:10;155:21,21;
158:22;159:6
**background (5)**
5:4,7;44:25;
143:12,12
**backs (2)**
83:14;121:10
**backwards (2)**
69:18,18
**bad (11)**
37:8;45:20;46:12;
52:23;54:6;64:18;
74:17;122:11,25;
141:13;147:18
**bag (3)**
53:14,17,24
**balanced (1)**
42:22
**barbells (1)**
159:4
**baseball (1)**
10:23
**based (29)**
11:22;12:13;13:2,
12;14:1;16:14;17:2;
22:15;23:14;34:24;
45:18,19;55:5,14,17;
56:18;74:19;81:16;
82:11;112:24;
113:15;114:5;
118:14,16;123:8;
124:22;140:2,10;
148:23
**basic (1)**
32:6
**basically (9)**
12:17;15:13;59:7,
10;69:15;134:22;
135:14;148:17;
158:23
**became (7)**
134:23,25;153:15;
154:2;155:11;
157:22;158:4
**become (5)**
33:1;90:15;154:11;
157:25;158:5
**began (1)**
46:24
**begin (2)**
6:1;95:11
**beginning (4)**
15:8,10;16:3;96:6
**behavior (3)**
32:11;60:17;
151:21
**behind (11)**
26:25;45:21;46:8;
47:1,4;87:2;104:3,14,

16;117:8;152:14
**belief (1)**
5:16
**bell (1)**
127:24
**belly (1)**
127:4
**below (3)**
26:19;138:12;
162:15
**beneath (1)**
27:9
**benefit (1)**
142:5
**best (6)**
39:8;80:6;81:7;
89:11;136:16;151:14
**bet (2)**
64:13;129:25
**better (9)**
12:24;14:10,11;
38:25;42:12;44:21;
61:13;73:18;81:21
**beyond (2)**
72:10;160:16
**bit (2)**
73:18;105:2
**bite (12)**
25:23;26:3,10;
108:20,21;109:9,14,
17,19,22;110:2,7
**biting (2)**
25:18;26:8
**blah (3)**
82:15,15,15
**blame (1)**
25:17
**blatant (1)**
74:12
**blood (7)**
23:18;26:22;27:18;
84:5;85:1;127:12;
140:17
**board (2)**
90:16;91:2,3;142:2
**Bobby (1)**
109:21
**bodies (2)**
88:17;112:12
**body (8)**
23:20;25:2;81:4;
92:4;118:22;123:3;
124:10;132:12
**body-worn (4)**
10:4;9:11:6,10
**bolted (1)**
97:6
**book (1)**
129:3
**books (2)**
143:21,24
**borne (1)**
5:15;125:6

Octavio Rodriguez Cira, et al. v.
County of Henry, et al.

Dr. Geoffrey Alpert
June 30, 2022

**both (10)**
6:2;27:25;64:10;
67:19;88:20;89:12;
114:6,9;144:7;
162:10
**bothering (1)**
97:19
**Bowlden (10)**
8:20;71:8,11;
72:13,15,15,19,19;
75:2,5
**break (3)**
81:25;117:1;
155:17
**breathe (7)**
83:3,22;84:13;
119:18,20;123:23;
124:1
**breathing (18)**
26:13;48:5;83:1,5;
110:13,22,24;111:3,
8,9,17,19,21;112:2,6;
119:2,12;127:11
**bridge (6)**
49:16,16,19,21,22;
50:10
**brief (14)**
7:7;38:23;39:2,11,
17,23;40:8,11,14,16;
42:11;43:2;143:11;
156:16
**bring (2)**
63:18;132:17
**broad (1)**
16:15
**broken (3)**
116:21;117:3,6
**brought (2)**
10:16;40:21
**Bud (2)**
97:22;98:9
**bulk (1)**
128:18
**Bureau (4)**
137:19,23;148:1;
149:5
**Butera (10)**
92:13;93:10;99:10;
100:1,4;110:13,19,
20;111:7,10
**buttressing (2)**
141:8,16
**buy (1)**
142:18
**buying (2)**
142:23;143:5
**buys (1)**
138:10

**C**

**cadet (1)**
85:25

**cadets (2)**
35:17;36:18
**calculate (3)**
34:17;137:25;
138:1
**California (1)**
125:7;146:1
**call (11)**
28:14;31:18,20;
56:6,7;102:21;105:7;
133:7,12,17,19
**called (7)**
8:10,11;43:6;
76:17;132:7;155:4,6
**calling (2)**
28:16;71:12
**calls (2)**
114:9,9
**calm (7)**
96:14;97:20;98:19;
112:18;132:8;
133:21;134:7
**calming (1)**
134:8
**came (8)**
8:4;20:6;65:7;
89:11;90:11;91:12;
156:6;158:23
**camera (2)**
10:24;11:6
**cameras (3)**
10:4,9;11:10
**can (96)**
8:17;10:24;17:13;
25:21,21;26:1,22;
28:17,19;29:11;31:5;
37:7,19;40:1,11;
42:12;48:24;49:4;
50:18;51:6,9,9,18,18;
52:20;55:7;56:11;
57:4;59:18,18;61:8;
67:11;69:4;70:1,19,
24;72:14,21;74:21;
75:6;78:1,13,24;81:2,
2,5;87:6,18,20,24;
88:8,12;91:20;92:13;
93:1;102:1,3;103:5,8,
13;104:14;110:12;
114:6,22;115:11,17;
118:6,17;119:8,9,12,
14,16;120:18;122:10,
23;123:23;126:13,
15;129:21;133:13;
136:4,6;137:7,9,9,23;
138:8;143:10;
153:17,20,23;154:1;
155:16;157:10;161:3
**Canada (1)**
41:9
**Canadian (2)**
40:24;128:2
**capable (1)**
113:10

**capacity (1)**
132:1
**capital (1)**
6:17
**car (1)**
97:2
**cardiac (1)**
43:6
**cardiovascular (1)**
140:22
**care (5)**
62:10;70:16;74:19;
132:20;133:3
**career (1)**
150:1
**careful (1)**
87:16
**Carolina (2)**
5:2;55:10
**carrot-and-a-stick (1)**
75:20
**carry (1)**
78:1
**carrying (1)**
78:6
**cars (2)**
50:3,11
**cartridge (2)**
64:11;92:10
**cartridges (2)**
92:9;94:21
**case (59)**
10:10;12:11;13:2,
13;17:3,10,10,14,19;
18:2;19:6,20;20:2;
21:7;22:19;24:23;
29:23;30:4,23;31:4,
17;33:4,6,6,14,15,21;
38:22;39:20;43:11,
24;44:12;46:1;47:11,
13,20;49:12;55:25;
59:2;78:13;80:19;
104:15;110:5,8;
114:7;126:6,19,20,
22,23;131:7,19;
146:21,21;148:3;
150:13;152:10,19;
156:2
**cases (22)**
17:7,15;18:14;
19:2;28:1,2,3,4,11,
17,17;29:1,4,9;31:3;
32:5;36:20;41:15;
55:19;150:3,18;
160:2
**catch (1)**
136:18
**category (2)**
25:19,20
**cause (13)**
20:17,18;28:25;
52:10;53:15;54:1,12;
56:16;118:5;120:9;

**121:3;124:12;138:24**
**caused (2)**
127:4;142:8
**causes (2)**
20:20;130:8
**cavity (1)**
117:17
**celeste (1)**
132:9
**certain (6)**
12:19;20:8;50:5,7;
135:15;139:17
**certainly (31)**
25:21;27:17;34:7;
49:4;52:7,20;53:3,8;
56:9;57:13;58:9,15;
60:21;61:13;66:23;
70:8;79:15;88:8;
94:20,22;96:21;
104:22;106:8;113:3;
117:3;118:23,23,24;
129:1;132:2;135:8
**certificate (1)**
6:7
**certified (4)**
77:24;78:1;92:23;
142:2
**certify (1)**
162:2
**CEW (1)**
131:10
**chair (1)**
64:25
**challenging (1)**
71:21
**Chan (2)**
128:7;129:2
**chance (1)**
84:16
**change (8)**
12:2,5;15:1;85:12;
129:23;130:14;
162:20;163:1
**changed (2)**
22:9;126:15
**changes (3)**
151:10,21;162:6,7,
11
**Chan's (1)**
128:8
**chapters (1)**
129:3
**characteristics (1)**
7:25
**characterize (1)**
26:19
**charge (3)**
143:7,7;147:19
**Charleston (1)**
30:13
**Charlotte (1)**
30:9
**chase (1)**

**28:17**
**chest (2)**
64:23;120:11
**Chicago (1)**
30:2
**chiefs (5)**
89:10,17;90:3;
148:24,25
**Christine (1)**
40:20
**chronicled (1)**
153:5
**cigarette (1)**
86:13
**Cira (1)**
5:12
**Circuit (1)**
109:13
**circumstances (7)**
22:2;55:3;60:17;
92:14;93:6;107:6;
157:7
**CIT (1)**
98:13
**cite (4)**
10:1;42:8,19;43:5
**cited (7)**
9:20;39:9,17;
40:13;42:24,25;
47:11
**cites (1)**
39:8
**citing (1)**
43:16
**City (16)**
6:9;8:2;9:14;30:1;
32:19,22;93:25;
95:12;96:3,10;
137:12;146:17;
147:21;148:25;
152:5,6
**civil (4)**
17:20;114:3,5;
162:9
**claim (1)**
148:5
**claimed (1)**
148:6
**clarification (1)**
84:2
**clasp (1)**
101:22
**class (1)**
54:19
**Claypoole (1)**
29:18
**clear (4)**
15:10;48:13;67:22;
160:12
**clearer (1)**
5:20
**clicking (4)**
79:4;80:14,17,18

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 170 of 187
Octavio Rodriguez Cira, et al. v.
County of Henry, et al.
Dr. Geoffrey Alpert
June 30, 2022

**clients (1)**
16:2
**clock (3)**
142:23,24;143:2
**close (3)**
45:2;48:11;142:14
**closed-fist (2)**
58:6,7
**closely (1)**
33:18
**clothes (1)**
53:13
**Code (1)**
162:9
**cold (1)**
25:2
**collected (1)**
9:11
**college (5)**
35:20,20;87:21,25;
144:8
**Colorado (1)**
30:7
**combative (3)**
15:7;153:10,11
**combination (1)**
13:22
**combined (1)**
24:13
**comfortable (3)**
14:2,6;139:20
**coming (2)**
93:20;154:20
**command (8)**
54:13;65:7,9;
66:20,22,24;68:5,23
**commands (3)**
56:23;69:4,15
**commensurate (1)**
57:11
**commented (1)**
112:5
**commenting (1)**
73:7
**commission (1)**
163:16
**committed (1)**
56:5
**committee (1)**
90:18
**common (13)**
35:2;37:20;44:6;
59:14,22;83:24;
86:20;100:24;
118:12,16;124:23;
125:1;130:23
**commonly (2)**
51:8;155:22
**communicated (1)**
34:8
**communication (1)**
66:14
**communications (1)**

34:5
**community (2)**
48:8;157:3
**compared (1)**
35:1
**compelling (1)**
47:13
**compensated (2)**
91:3,4
**competent (2)**
49:1;88:3
**competitive (1)**
144:23
**complaint (3)**
6:4,5;33:17
**complete (1)**
13:3
**completed (1)**
8:9
**completely (1)**
15:18
**completeness (1)**
12:10
**complex (3)**
95:13;147:6,6
**compliance (17)**
14:8,12,13,14;
15:2;69:22;72:10,10,
24;73:13;75:14,21;
76:8;132:19;147:25;
148:10,12
**compliant (10)**
14:18;57:15,22;
104:23;134:20,21,24;
153:13;158:2,3
**complicated (1)**
61:23
**complied (2)**
65:12;68:4
**comply (8)**
57:3;64:14,20;
65:18;69:4,22;74:19;
76:10
**complying (3)**
74:7;93:21;157:25
**components (2)**
145:21,22
**comprehend (1)**
66:6;68:25;76:10
**comprehensive (1)**
43:7
**compression (6)**
28:12;35:14;36:19;
120:10;123:24;155:6
**compromise (4)**
83:9;84:25;86:6,7
**compromised (8)**
82:18;83:19;85:22,
23;86:2;131:24,25;
142:4
**compromises (5)**
48:5;83:1,3;86:6;
87:8

**compromising (1)**
124:5
**computer (2)**
19:1,4
**concede (3)**
13:11;25:3;54:10
**concern (4)**
36:15;125:22;
147:9;148:3
**concerned (3)**
23:5;25:16;142:15
**concerns (1)**
141:8
**conclude (6)**
27:19;37:8;45:8;
110:18;114:11;
124:20
**concluded (4)**
95:24;121:17;
125:14;161:9
**concluding (1)**
49:20
**conclusion (12)**
33:19;50:9;54:4;
66:8;93:14;120:14;
121:25;129:20;
139:7,16;140:7;
158:24
**conclusions (12)**
7:21;10:21;11:20;
12:13,19;13:25;37:6;
49:9;88:3;121:14;
125:15,16
**conclusive (1)**
135:2
**condition (5)**
51:18;66:3;81:16;
100:23;122:2
**conditions (4)**
23:22;86:3;121:22;
135:15
**condone (1)**
98:5
**conduct (3)**
56:11,15;113:14
**conducted (7)**
35:24;36:5,22;
38:13,25;138:16;
144:12
**conducting (1)**
35:8
**conferencing (1)**
4:16
**confused (1)**
99:15
**conjecture (1)**
123:20
**connote (1)**
60:7
**consent (10)**
146:11,12,23;
147:6,17;148:14;
152:4,5,6,11

**consequently (1)**
10:20
**consider (4)**
156:5;157:1,6,7
**considerations (2)**
157:2,9
**considered (2)**
59:15;107:17
**consistent (3)**
11:15;12:14;62:17
**consult (5)**
42:3,4;43:10;
128:19;129:9
**consulted (1)**
128:14
**consulting (2)**
129:7;130:9
**contact (8)**
32:13;78:23;79:2,
7,16,22;80:1,4
**contemplate (2)**
96:14;128:23
**contend (1)**
110:13
**contending (1)**
111:24
**contention (3)**
118:2;133:6;
134:19
**context (4)**
50:21,22;62:7;
122:15
**continual (1)**
136:2
**continually (1)**
92:18
**continue (2)**
69:22;115:13
**continued (4)**
59:9;96:13;114:14;
118:21
**continues (1)**
115:12
**continuing (1)**
116:2
**continuum (1)**
62:23
**contradict (2)**
10:25;12:4
**contradiction (1)**
60:11
**contrary (2)**
40:17;80:25
**control (25)**
21:19;23:19;25:8;
26:1;51:7,9;67:9;
71:5;92:17;93:14;
94:12;102:18;103:3,
11;109:2;116:3,5,6,7,
12,14;130:20;134:15,
19;155:13
**controlled (13)**
26:3;41:16,21;

70:14,18;71:3;
100:21;115:15,22,23;
116:1;123:22;126:2
**controlling (1)**
133:24
**controversial (5)**
125:12,19;130:4,
17,21
**controversy (1)**
155:9
**conversation (4)**
60:14,23;61:12;
93:18
**Cook (1)**
109:21
**cooperative (1)**
153:13
**coordinating (2)**
34:13;37:23
**cop (3)**
66:12;85:24;86:1
**cops (1)**
93:2
**copy (2)**
18:2;20:10
**cords (1)**
119:5
**cornerstone (1)**
130:11
**Cornett (1)**
162:5
**Corona (3)**
25:5,13,15
**coronial (2)**
18:15;30:15
**corrections (1)**
162:14
**correctly (4)**
8:19;15:12;82:16;
119:25
**correlation (1)**
141:11
**correspond (1)**
122:5
**corresponded (1)**
34:1
**correspondence (1)**
20:10
**counsel (1)**
157:20
**count (1)**
111:16
**countries (1)**
151:3
**country (2)**
145:20;151:6
**County (24)**
5:13;6:11;7:15,17;
8:18;9:23;30:13;
72:12,16;106:24,25;
107:9,11;132:5;
133:11;135:5,12,13,
18,23;136:10;156:5,

14,22
**couple (9)**
20:7;52:1;71:7;
89:19;90:7,9;92:8;
101:11;150:11
**course (9)**
23:20;39:9;78:22;
94:14;96:16;99:8,11;
112:3;140:9
**courses (1)**
60:13
**COURT (21)**
33:9;81:24;82:1;
86:18;131:1;139:8,
12,21;140:11;147:20,
22,23;149:10,13,15,
16,19,24;150:16;
152:10;160:5
**courts (2)**
55:19;150:11
**cover (1)**
145:9
**covered (1)**
159:22
**Covid (5)**
83:20;124:5;130:1,
4;144:9
**Covid-19 (1)**
25:5
**created (1)**
131:25
**creates (1)**
119:5
**creating (1)**
53:19
**credibility (4)**
36:23;37:5,14;
48:16
**crime (5)**
52:10,11,12,15;
56:9
**crimes (1)**
56:13
**criminal (3)**
5:1;40:22;56:14
**criminology (2)**
5:1;143:15
**crisis (15)**
53:1;59:20;60:13;
61:11;74:17;97:18;
98:8;99:3;122:7,9,10,
14,20;140:25;155:10
**critical (4)**
24:25;61:3;97:2,4
**criticism (8)**
36:5,5,24;37:13;
85:5;87:11,13;126:7
**criticisms (1)**
40:17
**criticize (12)**
48:18,19,21,24,25;
49:1,5,20;62:1;77:8;
88:3;118:15

**criticizing (2)**
73:6,7
**cross (1)**
142:14
CROSS-EXAMINATION (1)
4:18
**cuff (2)**
66:25;67:2
**Cuffed (3)**
68:2;106:12,14
**cuffs (3)**
115:25;116:3,4
**culture (1)**
77:5
**curious (6)**
45:17,20;106:1;
112:14;160:18,21
**current (1)**
81:16
**currently (1)**
4:25
**curve (1)**
152:14
**custody (4)**
56:10;58:17,24;
93:15
**customary (9)**
46:19;54:16,24;
55:1,4,8;85:15;
92:21;126:2
**cut (2)**
26:22,22
**cutting (2)**
27:11,18
**CV (1)**
146:5
**cycle (1)**
68:1

**D**

**damage (2)**
117:13,16
**danger (1)**
67:16
**dangerous (2)**
25:21;78:6
**dangers (3)**
156:17;157:7,14
**Daniel (10)**
18:16,17,19;19:6;
20:2;21:25;22:20;
23:2;27:14,25
**Dann (1)**
30:5
**data (10)**
12:25;13:3;40:23;
41:10,12;45:20;
137:1,11,12,12
**date (6)**
5:25,25;7:19,20,
22;159:20
**dated (2)**

5:23,24
**Daubert (1)**
150:15
**Davis (1)**
30:11
**day (2)**
89:7;163:12
**deadly (2)**
78:13,14
**deal (3)**
28:6;45:3;113:24
**dealing (4)**
49:12;85:24;86:2;
160:23
**dealt (1)**
18:16
**death (7)**
6:7;30:15;41:25;
116:12;118:6;120:9;
126:10
**decades (3)**
48:9;123:3;155:3
**decide (1)**
115:17
**decided (2)**
123:5;155:10
**decision (2)**
96:3;123:17
**decisions (2)**
92:22;139:21
**decree (9)**
146:11,12,23;
147:6,17;148:14;
152:5,6,11
**decrees (1)**
152:4
**deemed (1)**
125:11
**deescalate (3)**
60:22;61:10;99:2
**deescalating (1)**
60:25
**deescalation (3)**
96:19;98:13;134:8
**defendant (1)**
114:4
**defendants (4)**
32:19,23;114:2,10
**defense (1)**
51:1
**definition (1)**
105:9
**definitive (2)**
15:3;137:11
**deliria (1)**
142:7
**delirium (1)**
142:11
**delivered (3)**
92:4;94:16;132:11
**demise (7)**
20:20;118:4;120:6;
140:19,23;141:4;

142:8
**Department (18)**
22:7,8;106:24;
107:1;144:25;145:2,
19;146:9,17;147:1,2,
4,21;148:5,6;151:5,9;
152:3
**departments (15)**
125:1;126:15;
135:20;144:2;
145:20,25;151:2,4,
13,22,23,24;152:1,
14;155:10
**Department's (2)**
156:6,22
**dependent (1)**
157:6
**depending (3)**
102:2;106:7;
139:19
**depends (4)**
37:7;51:17;105:9;
107:6
**deployed (2)**
76:15;131:11
**deploying (1)**
92:5
**deployment (12)**
62:2,17;65:8;
66:18;67:23;69:17;
77:18,19,22;79:19;
94:19;107:2
**deployments (2)**
77:21;106:22
**deposed (1)**
17:21
**deposition (8)**
4:5,10;17:8,22;
28:14;162:1,12;
163:6
**describe (4)**
18:8;26:18;27:1;
92:13
**described (7)**
13:20;15:7,12,17,
21;16:9;22:4
**describing (1)**
10:23
**description (1)**
23:14
**descriptions (1)**
11:12
**design (1)**
65:23
**designed (1)**
101:23
**desire (1)**
162:12
**detail (4)**
11:13;13:19;14:6;
40:6
**details (1)**
88:7

**detain (2)**
52:4;54:14,21;
56:19;57:2
**detained (1)**
100:20
**detainees (1)**
123:2
**detaining (1)**
56:1
**detention (1)**
56:24
**determination (3)**
74:16;112:17;
140:9
**determinative (1)**
116:3
**determine (7)**
96:9;112:14,23;
116:8,9;123:13;
148:21
**determines (1)**
140:13
**determining (1)**
49:18
**developed (1)**
45:13
**die (8)**
47:4,5,7;83:16;
121:3;123:12;124:2;
127:5
**died (2)**
90:6;116:13
**Diego (2)**
39:22;44:3
**difference (7)**
16:24;78:24;86:1;
102:10;122:8;129:7;
130:13
**differences (2)**
86:15;87:22
**different (19)**
11:7,11,11;13:15;
15:24;25:20;29:18;
41:11,21;69:15;77:6;
83:18;85:2,7,21;
87:7;93:24;112:20;
143:22
**differently (5)**
13:21;24:20;86:11,
13;93:1
**difficult (4)**
71:21,23;144:23;
151:3
**difficulty] (1)**
33:8
**diffuse (2)**
14:5;60:12
**DiMaio (2)**
127:14,19
**DIRECT (1)**
143:8
**direction (1)**
11:14

**directly (3)**
39:13;42:3;120:25
**director (2)**
90:20;148:11
**disagree (7)**
24:3;27:3;41:18;
80:20;105:13;114:8;
120:21
**disagreed (1)**
20:14
**discern (2)**
29:2,3
**discharging (1)**
78:19
**discloses (1)**
40:9
**disclosure (1)**
91:9
**discretion (4)**
61:15;96:8;160:2,3
**discretions (1)**
92:22
**discussed (2)**
43:12;107:20
**discussion (2)**
14:4;156:15
**disease (2)**
124:6;140:22
**disgusting (1)**
71:19
**dismissal (1)**
129:11
**dismissed (1)**
32:19
**dismissing (2)**
129:8;138:15
**disorderly (1)**
56:11
**dispatched (1)**
132:24
**distance (2)**
61:6;97:16
**distinguish (1)**
154:15
**distinguished (1)**
122:3
**distinguishes (1)**
123:17
**distress (2)**
159:25;160:11
**District (2)**
147:23;149:21
**doctor (16)**
37:19;43:21;44:2;
48:3,14;84:8;85:15;
87:6;88:5;117:22;
119:7;124:15;
129:17,21,25;130:12
**doctorate (1)**
98:20
**doctors (14)**
37:10,10,11;39:21;
48:4;90:8,10;122:21;

124:13,14;127:1,7;
130:2,7
**document (1)**
18:25
**documentation (1)**
150:19
**documents (4)**
6:1;9:5;89:13;
90:12
**done (35)**
23:17,17;24:19;
35:4,11,13;41:11;
45:14,21,24;46:6;
60:12;75:3;77:2;
84:21;89:20;90:2;
95:8;111:25;123:7,
21,22;124:25;134:2;
142:10;143:2;145:6,
11,11,13,15;155:7;
158:12;160:21,23
**dot (1)**
64:23
**double (2)**
106:12,14
**down (26)**
25:1;35:22;52:6,
19;54:8;56:2;59:20;
69:2,3;71:1;74:14;
79:11;91:19;95:17;
96:14,19;97:9;
108:23,24;122:5;
123:3;132:8;133:21;
148:15;151:24;
154:14
**downward (1)**
117:5
**dozens (1)**
18:14
**DR (19)**
4:14,21;5:10;
42:13;46:5;47:9,11;
48:17;64:4;82:7;
83:5;84:22;88:4;
91:12;143:10;
155:21;161:8;162:1;
163:9
**draft (1)**
90:21
**draw (3)**
7:21;12:18;93:14
**drawing (5)**
5:14;43:24;54:3;
76:20;141:18
**drawn (6)**
11:21;37:6;88:3;
120:13;121:14;
125:15
**drew (1)**
121:25
**drive (4)**
50:17,18;92:6,10
**Driving (7)**
29:20;144:18;

145:14,23;150:4,5;
152:10
**drug (2)**
53:1;54:5
**drugs (6)**
36:14;53:7,10;
82:15;85:8,12
**due (2)**
120:9;126:16
**duly (1)**
4:15
**during (2)**
118:19;120:16
**dust (4)**
46:23;47:1,2,5
**duty (9)**
99:5,12,17;159:18,
24;160:1,5,9,24
**dying (4)**
119:9,12;123:4;
155:4

**E**

**ear (1)**
78:25
**earlier (7)**
12:9;27:4;38:24;
82:10;86:24;109:5;
154:12
**early (6)**
66:13;125:6;
145:11,12;147:5;
156:20
**easy (1)**
78:21
**eat (1)**
50:19
**edit (1)**
90:22
**educational (2)**
5:4;143:12
**effect (2)**
8:12;59:8
**effecting (1)**
162:14
**effective (2)**
133:23;134:3
**effectuate (1)**
56:24
**eight (2)**
146:18;151:4
**eighties (1)**
156:19
**either (15)**
12:22;13:20;24:6;
27:20;29:5;36:12,17;
42:22;58:16;62:10;
72:19;74:17;84:1;
86:2;122:6
**elbows (1)**
67:16
**electricity (4)**

62:15;63:3;77:16;
81:4
**electrocuted (1)**
67:12
**elephants (1)**
104:12
**else (12)**
7:9;10:12;12:15,
23;15:19;90:7;
109:20;111:9;
120:19;134:1;153:3;
159:12
**e-mails (2)**
20:12;34:10
**embedded (1)**
42:14
**emergency (2)**
144:18;150:4
**employed (1)**
4:25
**EMTs (1)**
154:8
**encounters (1)**
14:12
**end (3)**
37:21;64:14;
104:17
**endeavor (1)**
68:19
**enforcement (25)**
21:7,12,15;27:8;
48:8;50:22;53:21;
55:14,16;59:11,15,
23;62:1;67:22;92:21,
23;120:17;122:15;
125:23;126:1,5,9;
145:10;156:17;157:3
**English (3)**
69:8;73:21,22
**enhance (1)**
83:22
**enhanced (1)**
81:3
**enhancing (1)**
81:7
**enlarged (1)**
141:3
**enormous (1)**
103:11
**enough (5)**
26:12;50:10;61:3;
76:7;101:21
**entered (1)**
162:12
**escalating (1)**
60:25
**Especially (1)**
51:6
**essentially (1)**
45:9
**established (2)**
55:17,21
**ethically (4)**

82:11,17;123:16;
142:4
**evaluate (1)**
12:19;49:5;142:3
**evaluating (1)**
129:18
**evaluation (1)**
12:11
**even (27)**
12:2,2;39:19;45:7;
49:7;50:16;61:10;
66:6;71:10;72:21;
76:1,3,19;77:2,20;
104:8;106:2,9;107:5;
109:9;112:4;116:16;
121:7,19;130:17;
137:21;157:5
**event (4)**
11:11;15:23;16:15;
156:4
**events (3)**
11:8,9;111:14
**everyone (2)**
90:22;136:17
**everyone's (1)**
100:19
**evidence (13)**
13:13;63:16;65:17;
80:24,24;95:8;
101:10;117:4,12,15;
120:5,13,22
**exactly (4)**
10:24;74:22;78:21;
148:13
**EXAMINATION (1)**
143:8
**examined (1)**
4:16
**examiner (2)**
116:17;120:15
**example (6)**
14:18;16:16;37:9;
87:18,23;151:3
**except (2)**
4:9;74:14
**excessive (5)**
16:25;109:8,9;
147:11;150:2
**excessively (1)**
148:7
**excited (2)**
142:7,11
**excuse (2)**
21:2;151:25
**Executive (3)**
7:12;90:20;149:1
**exercise (1)**
85:2
**exerting (1)**
35:21
**exhalation (2)**
83:10;119:4
**exhale (2)**

84:5,15
**exhaling (1)**
  83:6
**exist (4)**
  8:22;11:19;13:1;
  38:4
**experience (5)**
  15:4;40:24;64:17;
  81:21;83:25
**experienced (1)**
  65:21
**experiment (2)**
  123:11;151:23
**expert (8)**
  9:6;17:10;27:20;
  117:2;149:10;150:8,
  13,21
**expertise (1)**
  43:23
**experts (1)**
  62:1
**expires (1)**
  163:16
**explain (5)**
  38:10;41:23;42:23;
  119:8;138:9
**explained (4)**
  22:17,18;57:23;
  89:11
**explaining (4)**
  13:19;63:21;89:18;
  90:4
**explanation (1)**
  43:8
**exposure (4)**
  52:13,15;56:7,8
**extended (1)**
  127:3
**extensively (2)**
  147:13;148:7
**extent (1)**
  73:4

### F

**face (5)**
  16:18,22;58:12;
  63:9;109:22
**faced (1)**
  93:11
**fact (16)**
  15:11;16:12;18:15;
  25:1,6;45:14;58:1;
  73:8;74:14;77:8;
  110:4,11;116:16;
  124:25;129:2;157:25
**facts (5)**
  28:10;32:6;33:16;
  34:3;59:6
**failed (1)**
  131:22
**fair (6)**
  27:19;45:8;79:18;

85:6;142:5;152:13
**fairly (2)**
  15:17;125:4
**fairy (4)**
  46:23;47:1,2,4
**fall (2)**
  49:11;73:2
**falls (1)**
  69:18
**familiar (12)**
  22:13;43:13;44:17;
  102:9;117:21;
  127:22,25;128:4,8,
  11,17;129:4
**familiarized (1)**
  127:19
**family (4)**
  31:14,22,23;
  128:25
**far (2)**
  103:7;142:15
**fatal (1)**
  47:17
**fats (1)**
  53:20
**faulty (1)**
  45:19
**FBI (1)**
  137:23
**fear (2)**
  126:9,10
**Federal (10)**
  139:11;146:8,12;
  147:22;149:15,19,24;
  150:16;151:4;162:8
**feel (2)**
  102:1;139:19
**feeling (1)**
  112:17
**feet (2)**
  16:18;95:5
**fellow (1)**
  100:13
**Fennell (1)**
  109:16
**Fernando (14)**
  5:12;54:21;72:13;
  91:23;97:13;114:13;
  119:19;120:23;
  132:7,14;133:24;
  153:9;154:11,17
**Fernando's (3)**
  92:4;132:12;
  154:10
**few (7)**
  15:9;66:9;79:8;
  89:17;145:24;
  146:19;157:4
**field (2)**
  45:10;150:20
**fifth (7)**
  76:15;77:14,15,17,
  18,19,21

**fight (5)**
  64:4,6;65:6;105:5;
  116:2
**fighting (10)**
  14:19;71:16;93:21;
  104:23;113:3,4,18,
  23;115:7,8
**figure (6)**
  72:20;73:8;79:12;
  81:3;122:22;134:10
**figured (1)**
  18:9
**file (4)**
  8:9;10:6;13:18;
  19:5
**files (2)**
  10:9,17
**filmed (1)**
  12:22
**filtered (1)**
  151:24
**final (1)**
  34:18
**find (8)**
  25:23;27:7;28:15;
  39:24;52:7;54:8;
  94:23;95:8
**fine (2)**
  4:11;5:9
**fingers (2)**
  101:1,2
**finish (1)**
  21:10
**finished (4)**
  112:15,24;115:1,2
**fire (1)**
  61:19
**firearm (3)**
  57:18;58:3,5
**firm (1)**
  129:22
**first (18)**
  4:10,15;20:6;
  51:23;52:1;60:1;
  62:22;64:24;70:8;
  74:25;86:21;92:16;
  94:19;95:14;100:7;
  110:16;122:4;131:21
**five (7)**
  23:13;63:23;66:4;
  79:16;95:6;105:24;
  149:25
**five-second (7)**
  64:1;65:21;66:6,9;
  77:19,21;79:10
**flaw (1)**
  49:14
**flawed (3)**
  49:8,17;50:16
**fleeing (1)**
  96:15
**flip (1)**
  75:23

**floor (1)**
  73:2
**Florida (1)**
  149:25
**flow (1)**
  127:12
**Floyd (13)**
  17:17;27:25;31:4;
  40:21;47:11,12;
  49:10;119:17;126:6,
  16,20,22;127:9
**Floyd's (1)**
  126:23
**focus (1)**
  146:2
**focused (1)**
  21:2
**focusing (1)**
  10:24;144:17
**follow (2)**
  53:23;138:15
**followed (2)**
  75:17;76:14
**following (5)**
  135:8;149:8;
  153:14;162:7
**follows (2)**
  4:17;23:20
**foot (3)**
  72:13,24;73:3
**force (78)**
  7:1,15,17;11:8;
  17:16;22:19,22;25:5;
  26:21;28:21,22;29:1,
  21;50:25;51:11;57:5,
  6,7,9,10,11,19,21;
  58:18,20,22,24;
  62:23,23;73:5,7;
  85:25;94:5;109:8,10;
  114:20,23;115:11,12,
  13,14;116:18,25;
  117:5;123:3;131:12;
  132:9,10,10;134:4,6,
  14,17,23;137:10;
  139:6;143:19,25;
  144:6,13,18;145:9,
  14;146:1;147:3,7,10,
  11;148:4,7;150:2,3,5;
  152:9;156:13,21;
  159:13;161:2
**forced (1)**
  108:24
**forcefully (2)**
  91:23,24
**forego (1)**
  5:6
**forehead (2)**
  27:15,16
**forgive (1)**
  90:13
**form (6)**
  4:9;34:22;74:2;
  115:25;162:11,15

**formal (1)**
  35:11,24;36:5;
  89:14;90:19;95:22
**formally (2)**
  90:16,18
**forms (2)**
  41:11;66:12
**formulate (5)**
  13:1;24:23;39:15;
  40:4;47:20
**formulated (1)**
  13:12
**formulating (5)**
  39:24;43:10;44:23;
  128:15,23
**formulation (1)**
  44:11
**forth (1)**
  110:11
**fortunate (1)**
  144:24
**Forum (2)**
  7:13;149:1
**foul (1)**
  108:12
**found (4)**
  35:3;55:5;116:17;
  120:15
**foundation (1)**
  130:12
**foundational (1)**
  130:11
**four (6)**
  77:12;89:7;91:13;
  95:5;110:12,15
**fourth (6)**
  69:17;72:8;91:19;
  142:16,23;160:15
**Frantom (1)**
  29:19
**free (2)**
  158:21;159:1
**freezing (1)**
  23:7
**friend (3)**
  50:25;51:2,4
**front (8)**
  29:7,9;97:16;
  104:7;106:10,13,14;
  107:17
**froze (1)**
  33:10
**frustration (1)**
  77:4
**fulfill (1)**
  93:23
**full (6)**
  4:22;74:25;75:12;
  79:16;91:9,19
**fully (1)**
  63:22
**function (3)**
  84:9;86:11,12

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 174 of 187
Octavio Rodriguez Cira, et al. v.                                        Dr. Geoffrey Alpert
County of Henry, et al.                                                      June 30, 2022

**funny (1)**
104:12
**furnish (1)**
163:5
**future (5)**
113:10,14,15,17;
114:16

## G

**gain (1)**
98:6
**gained (1)**
125:21
**gaining (1)**
93:14
**game (1)**
77:5
**gaps (1)**
35:3
**Garber (2)**
29:21,22
**Garner (1)**
57:22
**gases (3)**
83:7,10;119:5
**Gate (5)**
49:16,19;50:10,17,
19
**gave (3)**
76:5;79:12;141:15
**GBI (5)**
9:1,3,7,7,11
**general (10)**
6:23;8:3;20:1;21:4,
25;87:21;145:19;
152:9;155:8;159:16
**generalize (2)**
49:13;87:21
**generalized (1)**
87:9
**Generally (4)**
6:9,11;25:23;52:12
**Generals (1)**
19:11
**General's (2)**
19:16;21:5
**Geoff (2)**
4:6;91:12
**GEOFFREY (4)**
4:14,23;162:1;
163:9
**George (10)**
17:17;27:24;31:4;
40:21;119:17;126:6,
16,20,22;127:9
**Georgia (7)**
56:14;138:25;
139:12,14;149:19,25;
162:10
**gets (4)**
12:8;62:14;86:23;
151:23

**Gilstrap (1)**
109:16
**given (7)**
60:17;64:21;66:19;
76:12;127:6;162:3,
13
**Givens (1)**
30:1
**gives (4)**
14:15;37:13;53:3;
56:9
**giving (5)**
11:7;69:14;124:22;
140:7;154:7
**goal (1)**
70:18
**goes (1)**
69:18
**Golden (5)**
49:16,19;50:10,17,
19
**good (20)**
4:12;5:5,10;11:3;
13:23;14:17;28:9;
37:2;44:22;50:9;
55:20;62:3;74:24;
80:1,4;97:23;129:16;
142:12;151:10;161:7
**gosh (4)**
63:20;138:19;
145:24;148:15
**government (1)**
148:6
**grab (2)**
67:18;71:25
**graduate (2)**
142:2;144:9
**grand (6)**
18:17;19:8,14;
22:11;24:9;27:5
**grants (3)**
144:16,19;145:1
**grasp (1)**
71:25
**grass (1)**
53:14
**great (4)**
14:6;29:12;34:14;
40:6
**greater (6)**
14:23;102:17;
103:2,21;131:25;
142:5
**Green (1)**
30:22
**ground (21)**
21:10;23:6;46:24;
50:20,24;51:2,10,11;
59:8;60:4,19;61:16;
63:1,1,8,9;74:8;82:6;
96:4;108:24;115:17
**group (2)**
41:16;88:22

**guess (9)**
7:23;8:13;12:24;
24:18;32:15;34:13;
77:11;117:20;135:7
**guidance (3)**
107:3;135:16;
159:17
**guidelines (1)**
152:9
**guiding (1)**
130:9
**gunshot (1)**
79:19
**guy (8)**
58:12;59:20;73:8,
22,22;74:6,6;91:2
**guys (5)**
67:1,15;72:5;95:8;
125:9
**guy's (1)**
125:17

## H

**half (1)**
76:5
**Hall (2)**
127:25;129:1
**Halls (1)**
129:12
**Hall's (1)**
40:20
**hamburger (3)**
49:17;50:8,19
**Hampton (4)**
6:9;8:2;32:19,23
**hand (1)**
101:6
**handcuff (10)**
67:5,11,19,24;
74:21;101:1,2;
104:24;105:4,6
**handcuffed (6)**
71:1,4;103:23;
104:2,8;153:24
**handcuffing (1)**
104:20
**handcuffs (25)**
101:11,23;102:5,
10,11,13,17,20,25;
103:2,3,6,9,10,13,17,
21,25;104:14;105:20,
24;106:2,6,17;107:21
**handful (1)**
34:12
**handle (2)**
50:11;69:16
**handled (1)**
93:1
**hands (11)**
64:24;72:1;103:12,
14;104:2,7,16;
105:13;106:18;

107:16;110:6
**hands-on (7)**
66:15;67:3,8,9;
71:10;77:9;131:21
**happen (3)**
9:1;70:19;156:2
**happened (7)**
12:19;13:23;95:5;
96:1;100:11;112:13;
126:16
**happening (1)**
111:13
**happens (1)**
31:20
**hard (3)**
102:5;107:1;
154:13
**harder (1)**
77:11
**harm (2)**
84:9;130:14
**harmful (1)**
130:16
**harsher (1)**
79:3
**hate (2)**
50:13;143:10
**head (27)**
16:17,23;21:18;
22:1,5;23:5,11,18,19,
20;24:15,16,25;
25:12,24;26:1;27:16,
20;45:6;108:23,24;
109:2,6,8,20;122:22;
157:10
**health (5)**
132:7;133:7,9,12,
16
**healthy (20)**
36:2,17;38:6,15;
46:4,14,16;49:13;
82:20,22;86:7,14;
121:5,21;129:16,19,
23;141:9;155:7;
159:8
**hear (19)**
69:4,11,13;72:14,
21;73:9;74:6;75:6;
78:18,24;79:5;81:2;
97:11,12;101:9;
107:25;108:3,16;
119:24
**heard (16)**
23:16;24:5,10,19,
20;27:22;44:10;
68:24;80:18;91:20;
108:6;118:24;119:1,
22;120:1;141:10
**hearing (3)**
74:2,8,10
**hearings (1)**
18:15
**Heart (5)**

30:5;82:13;124:18;
141:3,13
**hectic (2)**
92:19,20
**heightened (1)**
25:11
**held (2)**
55:23;154:14
**Hell (1)**
142:18
**help (5)**
51:7;70:6;94:14;
108:1;123:23
**helpful (2)**
51:19;112:21
**helps (1)**
123:25
**hemorrhaging (2)**
117:21,25
**Henry (23)**
5:13;6:11;7:14,17;
8:18;9:23;72:12,15;
106:24,25;107:9,11;
132:5;133:11;135:5,
11,13,18,23;136:10;
156:5,14,22
**hereby (1)**
162:2
**here's (1)**
85:9
**Heritage (1)**
30:5
**herself (1)**
35:22
**hey (1)**
97:22;98:9
**high (3)**
100:5,15;140:17
**higher (2)**
16:8;123:5
**high-risk (2)**
143:20,23
**Hill (1)**
30:24
**himself (4)**
59:3,6,16,25
**hindsight (1)**
114:25
**hinge (7)**
102:10,23,24,25;
103:2,10,16
**hired (2)**
147:17;148:11
**hiring (1)**
145:15
**Historically (1)**
114:1
**history (2)**
47:24;114:5
**hit (8)**
58:13,15;62:14;
63:3;67:13;91:20;
105:4;115:9

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 175 of 187

Octavio Rodriguez Cira, et al. v.                                          Dr. Geoffrey Alpert
County of Henry, et al.                                                        June 30, 2022

hog (3)
  71:12;76:17,21
hogtied (1)
  121:19
holding (6)
  64:14,21;67:15;
  71:1;110:6;123:2
home (1)
  98:9
homicide (1)
  116:17
honestly (3)
  13:25,25;141:7
hooked (1)
  158:23
hope (2)
  83:25;84:1
hour (3)
  142:16,23;160:15
hours (1)
  142:13
huge (2)
  49:14;122:8
Huh (2)
  64:9;160:19
human (1)
  88:8
humans (1)
  83:18
hundred (2)
  136:25;142:9
hypo (1)
  25:12
hypoglossal (13)
  23:9,12;24:1,5,14,
  15,18;25:12,25;
  26:15,25;27:13,21
hypothetical (4)
  53:19,24;54:2,19

          I

IACP (1)
  88:15
ice (1)
  25:2
idea (15)
  8:16,24;13:23;
  23:10;33:3;34:11;
  55:20;68:22;87:1;
  88:12;98:25;111:18;
  116:23;132:22;
  133:11
identification (3)
  6:24;59:10,24
identified (2)
  59:16;79:6
identify (1)
  157:21
IECP (1)
  90:17
illegal (4)
  52:17;53:7,10;54:5

illness (1)
  148:5
immediate (1)
  131:15
immunity (1)
  55:18
impact (4)
  61:5;85:4;141:19,
  22
impacted (2)
  124:25;140:18
impacts (2)
  129:20;141:20
impairment (1)
  74:2
important (6)
  40:12;70:18;151:7,
  8,21;159:14
improper (2)
  93:1,3
improperly (2)
  101:20;147:12
inaccurate (2)
  125:11,17
inadequate (4)
  107:1,12;156:14;
  159:15
inappropriate (1)
  27:8
incalculable (1)
  46:25
incapable (1)
  65:25
Incapacitation (4)
  63:13,14;65:22;
  67:10
incapacity (1)
  67:5
incentive (3)
  72:10;73:13;76:14
incentivize (1)
  132:18
incentivized (1)
  74:18
incentivizes (1)
  75:14
incident (6)
  6:13;8:11;9:15,19;
  34:24;51:24
include (3)
  99:9;110:23;
  117:20
included (3)
  24:11;34:3;42:13
includes (1)
  83:20
Including (6)
  14:3;99:6;117:10;
  147:3,3,4
incomplete (1)
  45:20
inconsistencies (2)
  11:25;15:25

inconsistency (1)
  14:17
incorporate (1)
  34:17
incorrect (2)
  46:10;49:9
incorrectly (1)
  13:21
indecent (4)
  52:13,15;56:7,8
independent (4)
  42:15,18,19;95:23
indicate (8)
  9:17;14:23;60:2;
  74:11;80:14;117:7;
  135:1;153:4
indicated (1)
  93:6
indicates (2)
  6:4;101:10
indicating (1)
  79:25
indication (7)
  53:3;69:10,13;
  116:24;119:10;
  120:22;133:21
indicator (1)
  114:15
indicators (3)
  52:17;53:6;140:25
individual (3)
  16:2;54:3;112:25
individuals (2)
  38:9;121:5
individual's (1)
  121:3
industry (2)
  37:14;46:14
infer (1)
  41:25
influence (6)
  36:13;53:7;54:5;
  82:14;85:8,12
information (27)
  5:6,18;12:18;13:3;
  14:10,11,23;17:3,4;
  32:10;33:20;34:9,16,
  25;65:16;79:24,25;
  81:8;84:9;93:10;
  94:9,11,18,19;95:15;
  113:13;129:8
inhalation (1)
  83:10
inhale (1)
  84:4
inherit (1)
  37:14
initial (1)
  5:21
initially (1)
  118:19
injuries (1)
  120:16

injury (2)
  71:18;99:18
inquest (1)
  30:15
inquisition (1)
  95:22
insecure (1)
  12:10
insecurity (1)
  11:20
inside (4)
  53:14,14;88:7;
  122:22
instead (4)
  20:15;77:9;95:4;
  134:9
Institute (2)
  144:17,20
instructed (1)
  115:19
instruction (1)
  138:14
instructions (4)
  94:9,12;135:18;
  138:11
instructive (1)
  39:24
intelligible (1)
  108:10
intends (2)
  34:4,7
intentionally (1)
  60:7
interactions (1)
  115:6
interesting (5)
  63:18;64:16;66:21;
  90:2;129:13
interfere (3)
  87:19,20;121:15
interference (1)
  121:23
International (1)
  148:24
interpose (1)
  76:14
interpret (2)
  70:3;120:19
interrupt (1)
  87:13
intervene (1)
  159:18
intervention (3)
  60:13;97:18;99:3
into (24)
  30:15;34:17;35:13;
  37:24;38:4,19,19;
  39:14;42:4;46:7;
  48:22;49:23;56:10;
  58:17,24;75:12;
  93:15;97:1,6;132:12;
  137:9,9;142:16;
  148:9

intricate (1)
  88:7
investigation (7)
  9:2,3,7,9;22:1;
  41:17;95:22
investigations (1)
  53:21
invoke (1)
  139:17
involve (5)
  17:16;28:11;36:20;
  143:25;147:7
involved (8)
  11:24;17:16;31:17;
  36:19;41:15;44:20;
  100:3;146:22
involves (1)
  84:3
involving (2)
  17:11;143:22
irrational (1)
  114:12
isolate (1)
  28:17
issue (8)
  14:8;28:12;35:14;
  52:21;56:13;96:19;
  130:21;151:13
issues (7)
  32:7;48:25;49:4;
  86:17;126:14;130:4;
  145:15
items (1)
  10:13
iterations (1)
  115:4

          J

Jack (1)
  30:16
jail (1)
  110:1
jaw (1)
  27:9
Jersey (1)
  152:8
Jess (2)
  142:22;160:13
job (1)
  44:22
JOHNSON (19)
  4:11;31:22,24;
  32:1;33:7,14,25,25;
  109:24;110:2;
  142:21,24;143:4,9;
  155:18,20;160:18,20;
  161:5
Johnson's (1)
  33:22
journals (5)
  37:1,1,9,17;46:16
judge (3)

Octavio Rodriguez Cira, et al. v.
County of Henry, et al.

Dr. Geoffrey Alpert
June 30, 2022

49:15;147:23;
150:17
**judgment (4)**
95:12,15;130:6;
141:18
**jump (3)**
29:6;35:5;100:12
**jumping (2)**
95:4;134:9
**June (1)**
162:4
**jurisdiction (1)**
41:8
**jury (11)**
14:1;18:17;19:8,
14;22:11;24:9;27:5;
32:7;116:8;139:25;
140:12
**justice (7)**
5:2;137:19;144:17,
25;145:3;146:17;
149:5
**justifiable (2)**
109:23;110:9
**justified (4)**
58:8,15,16;62:19

**K**

**keep (8)**
20:12;69:20;77:12;
83:17;124:7;147:14;
151:1,5
**keeping (2)**
22:5;116:19
**keeps (1)**
62:11
**kept (4)**
15:14;63:2;71:12;
131:22
**Kevin (1)**
124:7
**kick (4)**
16:22;58:14;72:22;
109:22
**kicked (6)**
15:9;16:18;58:12,
14;72:13;109:6
**kicking (1)**
73:1
**killed (5)**
84:14;95:16;127:1,
2,9
**kills (2)**
83:7;84:15
**kind (28)**
8:3;10:11;11:3;
14:4;24:11,12;61:23;
64:16;66:9,14;84:14;
86:23;89:20;90:3;
98:5,24;102:13;
111:14;112:7,18;
114:6;118:11;

136:16,18;137:24;
148:12;153:5;155:11
**kinds (1)**
45:25
**knee (15)**
21:18;22:5;23:1,1,
4,4,17;24:24;27:15;
118:20;124:11;
126:23;127:8,10;
159:5
**kneeled (1)**
154:10
**knew (6)**
43:15,16;53:17;
80:13;122:6;140:1
**knowing (1)**
11:18
**knowledge (4)**
133:8,22;139:17;
141:21
**known (3)**
122:6;151:22;
157:2
**knows (1)**
76:18
**Kokaua (1)**
30:16
**Kroll (14)**
43:19;44:2,19;
84:22;88:4;90:8;
121:9;128:10,11;
129:1,2,15;158:15,15

**L**

**lab (1)**
36:11
**laboring (1)**
65:18
**lack (2)**
14:4;87:3
**lacked (1)**
157:12
**language (5)**
68:9;69:21;108:7,
12;132:21
**large (1)**
106:2
**larger (1)**
151:22
**Lassoff (1)**
128:4
**last (6)**
34:11;48:8;127:18,
18;143:15;145:23
**late (2)**
5:16;156:19
**Lately (1)**
144:8
**later (1)**
92:8
**lather (1)**
72:5

**law (33)**
21:6,11,15;27:8;
48:8;50:22;53:21;
55:5,10,13,15,16,21;
59:11,14,23;62:1;
67:22;92:21,23;
120:17;122:15;
125:22,25;126:5,8;
139:17;140:6,10;
145:9;152:8;156:17;
157:3
**lawful (8)**
54:13;55:13;56:3;
61:15;66:19,21,22,24
**laws (2)**
55:18;152:10
**lawsuit (1)**
5:13
**lawyer (4)**
31:22;55:6;109:18;
150:15
**lawyers (4)**
18:3;21:3;28:14;
114:9
**lay (1)**
35:22
**laying (2)**
53:13;127:4
**laymen's (2)**
87:11,13
**lazy (1)**
66:12
**LCD (1)**
53:14
**leading (1)**
11:8
**least (5)**
58:17;93:21;
130:16;131:1;155:9
**leave (2)**
28:23;44:7
**leaving (6)**
41:25;47:16;48:4;
127:2;130:8;136:1
**Lee (1)**
109:21
**left (1)**
47:5
**legal (9)**
54:15,24;57:1;
59:16;139:7,23;
140:1,7;160:8
**legally (1)**
152:12
**less (4)**
66:15,16;78:15;
160:3
**less-lethal (1)**
62:20
**lethal (2)**
66:16;78:16
**letters (1)**
6:17

**letting (3)**
104:24;105:3,5
**level (6)**
14:11;25:4;37:13,
14;131:12;148:15
**levels (4)**
14:23;15:1;16:8;
113:12
**Lewis (13)**
52:2;54:12;56:19,
23;57:1,17;59:2;
60:3;62:25;75:3,8;
152:23;153:2
**life (2)**
46:1;98:9
**likelihood (1)**
113:14
**likely (2)**
12:2;118:7
**likes (1)**
71:19
**limited (8)**
12:18,21;41:6,7;
87:22;148:14,14;
150:9
**line (3)**
33:2;162:17,22
**link (10)**
102:10,17,20;
103:3,6,8,20,24;
106:17;107:20
**list (4)**
6:15;7:10;17:7;
29:9
**listed (3)**
28:2;40:20;146:4
**listen (6)**
77:23;80:13,17;
90:3;127:6;130:5
**listening (4)**
62:11;78:18;81:5,
22
**listens (1)**
140:12
**lists (1)**
40:12
**litany (2)**
73:24,25
**literally (1)**
97:9
**literature (13)**
39:6,7,8,19;40:15;
41:2;43:8;44:25;
45:4;46:15;47:25;
85:20;124:24
**litigated (1)**
109:21
**litigation (1)**
126:10
**little (10)**
5:19;29:18;58:25;
64:11;71:12;73:18;
76:17,21;77:11;

105:2
**lives (1)**
123:7
**location (2)**
54:14;104:2
**long (8)**
24:8;28:23;46:18;
71:16;112:14;
122:21;144:10;
156:17
**longer (2)**
32:23;115:17
**look (26)**
7:23;8:17;9:9;
24:7;32:10;41:12;
43:14,17;51:23;
63:20;66:2,11;85:24;
91:16;101:24;114:7;
115:2,3;130:3,7;
140:15;145:18,20;
152:4,5;153:1
**looked (7)**
9:25;20:9;40:5,6;
42:6;45:23;105:2
**looking (6)**
7:24;9:12,13;
11:10;115:19;147:13
**loosen (1)**
102:3
**Lopez (1)**
29:20
**lot (29)**
28:5;37:1,18;
39:20;41:10;42:21;
48:3;55:16;70:5;
77:5;81:20,21;82:21;
85:21;86:11;87:21;
106:2;110:5;117:1,7;
144:1;145:13;146:1;
147:13;152:8;155:7,
10;159:20;160:2
**lots (1)**
61:25
**loud (7)**
60:9,15;61:3,6;
75:9;108:6,8
**loudly (1)**
60:18
**Lowe (1)**
4:8
**LSD (3)**
53:17,24;141:12
**lung (2)**
124:5;132:1
**lungs (8)**
83:7,10;85:22;
86:6,11,12;88:6;
117:10

**M**

**ma'am (1)**
4:20

Thompson Reporting Services, Inc.
(678) 483-0600

**mad (6)**
52:23;54:6;64:18;
74:17;122:11,25
**magical (3)**
115:18;116:11;
157:21
**main (3)**
21:21;146:15,16
**mainly (2)**
145:15;157:13
**major (2)**
137:11;148:25
**makes (1)**
90:19
**making (4)**
89:20;103:12;
130:10;162:13
**man (2)**
69:2;143:6
**manage (1)**
49:5
**managed (1)**
105:23
**mandible (2)**
26:19,25
**maneuver (10)**
23:9,12;24:1,5,15;
25:13,25,25;27:21;
103:12
**manufacturer (3)**
135:9,17,21
**many (16)**
17:15;34:10;72:3;
81:3;95:1;105:20;
112:12;116:21;
137:3,13,22;138:17;
144:15;149:12,23;
159:10
**Mary (1)**
30:5
**mask (5)**
23:3,7;25:9;26:5,7
**materials (5)**
9:8;19:5;34:3;
42:17;45:19
**matter (2)**
16:21;86:9
**May (37)**
5:16,23,24;8:22;
10:20;11:13;14:22,
22;15:1;16:7;19:7,7;
49:8;52:25;53:1,2;
54:4;58:25;60:23,23;
73:2;96:19;97:10,10;
98:7,7;104:18;
114:15;137:15,15;
140:17,22;141:3,19,
24,25;151:23
**maybe (15)**
11:12;15:19,19;
16:19,20;30:24,24;
66:23;73:8;77:3;
86:14;108:8;134:7;

135:5;149:14
**mean (67)**
12:17;14:13;16:16;
18:7,11;28:22;34:6;
41:10,24,25;43:5;
49:8,15,21,24;50:15,
17;55:18;56:12;
58:12;61:23,25;
63:10;64:16;67:2,4;
69:12;70:4,5,6,23;
71:10,14;75:9;76:20,
22;77:7,16;80:6;
83:13;86:11;92:19;
94:12;95:1;97:6;
106:7;108:12;110:2;
115:24;116:13;
122:9,10;126:12;
131:20;136:6,8;
137:17;147:5,15;
149:13,24;151:2,20;
156:10,11;158:3;
161:1
**meandering (1)**
57:23
**means (13)**
31:5;49:9;60:8;
68:2;88:12;89:6;
115:16;122:15,17;
136:13,17,22;159:2
**meant (1)**
160:9
**measure (3)**
35:17;46:25;109:2
**measured (1)**
35:15
**meat (1)**
45:6
**media (2)**
125:21;126:6
**medical (71)**
26:20;37:9,11,17,
19;43:21;44:2,6;
45:4,5;46:12,16;
47:13;48:2,3,3,6,7,
14,22,25;49:2,4;
70:10,12,15;74:19;
83:15;85:14;86:17,
17;87:6;88:3,5;90:7,
10;108:1;116:17;
117:2,19,22,23;
118:10,11,14;119:7;
120:15,17;122:21;
124:8,13,15,23;
126:14,25;127:7;
130:3,21;132:14,19,
20;133:3;141:14,15;
142:20;154:5,8;
159:25;160:10,24;
161:4
**medically (1)**
112:1
**medicine (2)**
70:25;130:22

**meet (1)**
157:17
**meeting (4)**
89:7;90:11;91:10,
12
**meetings (4)**
88:20,25;90:21;
148:23
**member (3)**
88:18;147:25;
148:10
**mental (7)**
132:7;133:7,9,12,
16;148:4,8
**mention (2)**
156:10,12
**mentioned (3)**
13:7;43:20;45:23
**met (1)**
89:24
**method (2)**
38:11;100:18
**methodological (2)**
89:9,21
**methodologies (5)**
45:24;46:11,11;
49:5,7
**methodology (14)**
34:21;40:9;43:17;
46:7;48:25;49:10,18,
20;50:9,16;87:15;
129:13,14;145:4
**methods (5)**
37:7,8;40:6;87:7;
88:9
**Miami (1)**
143:18
**middle (1)**
74:8
**might (14)**
10:19;12:5;13:19;
16:12;18:9;53:6,23;
76:18;97:7;112:20,
23;113:13;115:9;
151:24
**mind (2)**
82:1;122:12
**mine (2)**
20:4;98:21
**minimal (8)**
57:4,6;58:20,22,
23;132:10;134:14;
151:10
**minimum (1)**
134:17
**minority (1)**
137:15
**minute (5)**
72:11;76:5;82:10;
116:5;143:1
**minutes (5)**
11:1;23:13;79:9;
126:24;142:13

**Miranda (1)**
66:7
**misdemeanant (1)**
57:24
**missed (1)**
20:8
**misses (1)**
79:19
**missing (2)**
62:7;100:25
**misspoke (1)**
160:9
**mistaken (1)**
135:6
**mode (2)**
85:2;92:6
**moment (2)**
65:17;112:8
**money (3)**
90:24,25;144:24
**monitor (4)**
146:8,14;147:19;
148:12
**monitoring (2)**
146:16,16
**monitors (2)**
146:13;158:23
**more (34)**
13:19;22:12;25:15;
34:11;37:4,5;40:3,
12;57:8,19,20;58:25;
60:20;79:3;81:21;
83:3;86:14;90:6;
103:4;104:5,6;106:5,
8;116:1;118:6;
135:17;137:1;
142:20;143:2;
145:20;148:13,14;
149:6;153:16
**MORRIS (21)**
4:5,12,19;33:10,
12;81:24,25;82:2,4;
109:25;110:4,10;
142:12,18,22;143:1,
5;155:16;160:12,19;
161:7
**Most (18)**
11:22;23:5;37:1,
10;39:24;42:20;
59:22;62:3;66:24;
71:2;78:7,7;93:19;
103:24;104:1;105:9;
147:6;152:7
**mostly (5)**
5:14;34:13;89:9,
17;143:22;144:7;
148:4
**motion (1)**
150:15
**motivated (2)**
126:6,9
**motivating (2)**
87:2,2

**motivation (1)**
123:18
**mouth (2)**
16:20;154:20
**move (8)**
48:14;84:17;86:20;
103:22;107:21;
118:21;123:6;151:9
**moved (1)**
84:14
**movement (1)**
154:17
**moving (5)**
75:12;91:18;
109:20;118:25;
123:18
**much (23)**
14:16;15:21;16:15;
21:2;26:8;44:18;
50:13;73:7;83:5;
85:4;90:1;103:4;
104:23;107:3;
108:18;111:7;
112:12;118:6;
135:16;147:4,15;
158:24;159:17
**multiple (8)**
13:9;17:15;56:13;
71:9,24;136:1;146:3;
157:14
**must (1)**
70:19

## N

**naked (19)**
15:15;23:7;52:6,
11,15,20;53:12;54:9;
56:1;59:21;69:3;
70:11;71:17;74:15;
95:18;97:9;98:3,7;
122:4
**name (10)**
4:22,22;9:17;
17:13;97:17,19,22;
98:16;125:9,17
**named (1)**
158:15
**narcotics (1)**
52:17
**narrative (2)**
97:11,12
**national (10)**
45:2,22;46:22;
48:11;136:25;137:2,
11;144:17;145:22;
155:11
**nationally (8)**
62:18;78:5;150:24;
152:3;154:22;
155:23;157:17;158:8
**natural (1)**
53:22

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 178 of 187
Octavio Rodriguez Cira, et al. v.                                    Dr. Geoffrey Alpert
County of Henry, et al.                                                June 30, 2022

near (1)
27:17

necessarily (4)
49:8,21;53:20;
136:8

necessary (7)
57:5,7,19;58:18,
24;134:14;163:4

neck (10)
22:20,23;23:2;
27:1,3,10,17;126:24;
127:8,10

need (3)
11:17;25:4,8

needed (2)
21:10;133:15

needs (2)
74:20;95:21

negative (1)
60:8

neither (1)
16:1

nerve (1)
26:16

Neuromuscular (2)
63:12;67:5

neutral (1)
98:17

New (7)
21:25;146:8,18;
147:1,15;151:20;
152:8

Newman (1)
127:23

next (4)
28:20;114:6;
135:24;148:15

nice (1)
91:1

night (2)
54:8;73:3

nine (3)
94:16;125:6;
138:21

nineties (2)
138:19;156:20

NMI (5)
63:10,11,16;65:19,
22

No_ (1)
162:17

Nobody (2)
64:25;114:3

noise (2)
79:4,6

noises (1)
154:20

non (1)
62:20

non-advocacy (1)
39:13

noncompliance (3)
61:21;73:13;74:13

noncompliant (3)
70:11;93:6;94:2

noncontact (7)
79:7,18,21;80:14,
18;81:1,8

none (2)
69:16;106:21

non-good (1)
79:7

nonlethal (1)
78:15

non-pain (1)
73:13

non-scientific (1)
41:1

normal (7)
64:3;65:5;101:6,7;
122:12,18,24

normally (10)
10:22,25;11:10;
13:18;31:20;33:18;
54:7;60:12;66:3;
92:25

northeast (2)
150:10,15

Notary (1)
163:15

noted (3)
156:16;162:6,7

notes (1)
140:15

notice (1)
4:7

notification (1)
145:12

nudges (1)
73:3

number (10)
14:3;41:7;76:9;
85:14;137:6;138:23;
139:2,4;157:13;
159:11

O

oath (1)
82:6

obese (4)
82:14;85:7,11,22

objections (1)
4:9

objective (7)
13:3;52:17;53:6;
93:9;116:24;120:4,5

objectively (3)
61:7;74:5;132:23

objects (1)
41:20

observe (2)
14:22;72:23

obviously (8)
9:16;22:11;59:20;
92:25;98:8;140:12;

145:16;161:3

OC (9)
7:5;131:3,7,8,9,12,
13,19,24

occurred (1)
120:16

off (27)
26:22,22;27:11,18;
37:20;45:15;48:1,10;
62:11;64:2;72:1;
84:17;86:21;101:11,
14,18;112:7;118:3,
13;119:11;123:6,8,8,
14;130:20;155:13;
157:10

offended (1)
76:19

offense (2)
56:6,15

offer (9)
17:18;20:25;31:5;
33:7;48:15;87:5;
118:17;139:11,22

offered (8)
17:24;27:24,25;
28:16;32:2;78:12;
117:24;132:14

offering (7)
33:5,6;56:2;73:12,
12;140:1,2

offers (1)
76:14

Office (4)
19:11,17,25;21:5

Officer (60)
6:20;13:11;14:12;
21:17,24;22:4,16,16,
17;23:15,15;25:23,
24;26:2;27:8;52:2;
54:12,18,20;55:2;
56:9,19,22;57:1,17;
58:23;59:2;60:3;
63:21;72:13,16;81:9;
92:12;94:14;99:9,19,
20;100:8;102:18;
106:22;108:9,20;
110:21;111:8;112:5,
23;115:5,7,11;
120:23;122:23;
124:11;126:23;
131:15,16;132:5;
141:1;151:14;
152:23;153:2

officers (75)
8:9,18;11:3,5,24;
12:14;13:9,9;15:4,6,
12,25;24:1;25:14;
32:11,23;35:17;
36:17;51:9;58:20;
59:23;66:24;67:7;
69:6;70:25;71:7,9,
24;74:5;78:20;80:8,
11;91:23;92:17,23;

93:2,19,20,25;95:12,
23;96:3,10,25;98:13;
99:13,13,17;100:3,7,
8,10,10,13,15,16,23;
104:15;106:5,16;
115:19;119:1;123:1;
130:18;137:1;144:3,
8;145:23;151:9;
153:17;154:5,7,10;
158:1;159:24

officers' (1)
105:13

officer's (4)
11:1;27:15;110:3;
112:16

Official (1)
162:9

often (6)
9:5;14:10;37:17;
60:20;66:14;150:9

oil (1)
72:6

older (1)
86:12

omission (1)
111:1

omnibus (1)
9:8

once (12)
46:3,13,19;64:1;
77:12;103:22;
114:20;115:22;
126:12;134:20,21;
155:12

one (65)
8:20;10:6,6;11:14;
13:10;15:20;16:15;
17:17;18:16;21:2,17,
20;24:11;29:14,21;
38:24;40:2,3;42:11;
43:5,19,20,20;53:23;
62:5;64:24;70:7;
71:6,19;76:9;78:1,4;
81:10;85:14;87:14;
89:16;91:19;104:11;
106:5;109:19;
112:22;113:13;
122:19;128:2,2,9,12;
133:14,17,18,19;
145:18,23,23;146:12,
19;150:6,10,13,18;
151:9,11;154:9,22;
157:4

ones (4)
8:16;26:10;28:7,
11,19,21;37:3,4;
38:14;39:21;42:12;
90:4;96:7;159:3

only (19)
5:21;8:19,24;10:6,
24;13:10;31:5;38:15;
47:15,19;76:12;
81:11;96:7;99:5;

120:18;122:23;
130:22;131:16;
135:15

onto (3)
7:10;74:20;154:24

opened (1)
16:20

operated (1)
4:8

opinion (58)
12:2,5;13:2,2;15:2;
16:24;17:19;20:19;
22:9;24:23;25:4;
29:6;33:5,6;34:15,17,
18;44:24;45:5;47:20;
48:15;52:3;54:16,24;
55:7;56:2,18;76:21;
78:12;86:18;87:5;
89:23;95:21;96:12;
116:10;117:24;
118:10,11;129:24;
130:14,15;131:3,6,8,
18;137:25;138:23,
25;139:11,23;140:1,
2,11,16;141:17;
142:7;160:8,13

opinions (34)
11:22;13:12;16:10,
13,14;17:2,25;19:5;
20:14,22,24;27:24,
25;28:15;32:2,10;
34:22;39:15,24;40:4;
43:10,24;44:12;45:9,
10,12;49:2;55:7;
111:22;118:14;
124:8,15;128:15,24

opportunity (1)
102:17

opposed (3)
16:15;39:7;60:14

opposing (1)
157:20

opposite (1)
102:19

oppositional (1)
57:11

opt (1)
5:3

oranges (1)
85:18

order (8)
36:22;60:18;61:15;
65:13;66:7;84:5;
99:20;160:5

ordered (1)
62:25

orders (4)
64:21;69:14,19;
153:14

Oregon (1)
148:1

organization (1)
89:3

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 179 of 187
Octavio Rodriguez Cira, et al. v.
County of Henry, et al.
Dr. Geoffrey Alpert
June 30, 2022

**organizations (1)**
88:16
**organs (1)**
117:9
**original (10)**
5:17;6:2;35:13;
37:22;40:10,23;
41:12,22;73:11;
125:8
**Orleans (4)**
146:9,18;147:1,16
**Others (6)**
17:16;21:21;41:12;
83:5;84:23;160:3
**out (28)**
5:15;20:6;21:20;
28:15;39:8,22;46:15;
52:2,7;53:1;72:20;
73:8;79:12;81:3;
90:11;92:9;94:23;
95:9;104:3;116:4;
120:2;122:22;125:6;
130:7;134:10;135:9,
9;144:21
**outbreak (1)**
25:6
**outside (1)**
13:1
**over (25)**
6:1;28:6;37:20;
39:20;48:8;64:2;
65:10,10,18,23;66:1,
20;68:5;69:25;89:10;
97:2;103:3;112:3;
125:2;126:1;143:21;
144:11;149:25;
151:17;154:23
**overcome (1)**
131:14
**overweight (1)**
36:13
**own (2)**
135:3;144:12
**oxygen (4)**
23:19;26:22;27:11,
18
**oxygenate (1)**
84:5

**P**

**page (10)**
6:3;51:20;74:25;
110:12,14;132:3;
138:21;153:1;
162:17,22
**pages (1)**
163:4
**pagination (1)**
29:18
**paid (4)**
31:9;91:9,13;
106:20

**pain (2)**
72:10;103:11
**palms (1)**
104:3
**paragraph (8)**
51:23,24;74:25;
75:12;91:19,22;
110:16;135:1
**paragraphs (1)**
146:25
**paramount (1)**
93:15
**parliaments (2)**
59:15;136:19
**part (25)**
9:20;10:10;25:4;
28:24;33:3;35:15;
38:11;42:20;57:13;
67:21;71:2;87:11;
88:17,22;95:14;
105:10;110:23;
117:16;135:24;
139:16;140:23;
159:23;160:13,14;
162:11
**partial (2)**
79:21;124:10
**participated (1)**
35:6
**particular (6)**
13:11;39:4;40:2;
49:12;85:10;158:25
**particularly (6)**
20:4;39:21;47:25;
86:18;128:25;129:12
**past (4)**
113:12,12,16;
114:21
**pattern (2)**
16:12,15
**pavement (1)**
25:2
**paying (1)**
160:15
**Peace (1)**
6:20
**pedestrian (1)**
50:11
**pedestrians (1)**
50:11
**peer (7)**
36:4,23,25;37:2;
42:21;143:21,24
**people (29)**
28:16;35:24;47:4,
5,7;6:5;6:66,5,8;
78:12;82:12;89:1;
90:10;99:6;113:10;
124:2,4;125:14;
129:16;137:18;
141:8,17,18;142:4;
148:7;149:1;155:4;
158:22;159:8,10

**percent (4)**
136:22,23,23;
142:9
**percentage (1)**
137:22
**percentages (1)**
138:1
**PERF (11)**
7:11;45:1;88:15,
18;89:1,2,13;90:15,
18,24;91:4
**P-E-R-F (1)**
7:12
**perhaps (2)**
81:3,20
**period (3)**
22:6;118:19;127:3
**person (20)**
39:4;51:10;52:22;
54:8;59:18;61:11;
62:9;64:21;80:6;
85:7;86:7,8;98:6;
122:3,18,20;123:11,
22;131:14;154:23
**personnel (2)**
70:11,12
**person's (3)**
121:8,23;124:11
**perspective (2)**
11:7;15:24
**petechial (2)**
117:21,25
**PhD (1)**
143:13
**phenomenon (7)**
36:1;37:24;38:4,
21;39:14;45:10;
48:22
**Phillips (21)**
16:16;91:21;92:3,
13;93:10,25;94:4,8;
95:2,4;99:10,22;
100:5;106:22;109:5;
110:21;111:8;112:6;
118:19;132:5;133:3
**Phillips' (1)**
94:13
**phone (1)**
31:18
**phrase (2)**
52:23;136:18
**physical (6)**
99:14;100:23;
120:9,12,16;131:14
**physically (3)**
57:2;71:20;114:22
**physics (1)**
86:9
**physiologically (2)**
85:12;129:18
**physiology (1)**
43:8
**picked (1)**

146:14
**piece (6)**
39:4,10,13;41:1;
42:17;44:18
**pinpointed (1)**
112:8
**pissed (1)**
64:2
**Pizer (1)**
30:24
**place (5)**
100:5,15;148:9;
151:11;158:16
**placed (7)**
21:13;23:2;47:8;
118:20;153:21;
155:25;158:21
**placing (4)**
83:21;93:15;121:2;
123:1
**plaintiff (1)**
114:5
**plaintiffs (3)**
33:15;114:1,10
**plan (1)**
10:18
**plants (1)**
63:9
**play (2)**
89:14;155:8
**played (5)**
35:19,20;140:18,
23;141:4
**playing (2)**
72:7;77:3
**please (4)**
4:13;33:11;162:15;
163:5
**plenty (1)**
76:7
**pliable (1)**
51:6
**plus (1)**
5:18
**pm] (1)**
161:9
**point (48)**
7:15,18,25;8:13;
32:20;42:23,23;44:1,
5;57:16;58:9,11,16,
25;63:7;67:10;71:4;
74:24;75:8,21,24;
76:21;77:6;79:5;
81:11;86:23;91:21;
92:5;108:23;111:6,
16,25;115:18;116:11,
14;117:4;125:1;
130:19;137:13;
154:2,16,19;157:21,
24;158:5,8;159:19,20
**pointed (1)**
120:2
**pointing (1)**

27:2
**points (2)**
12:25;71:7
**poisonous (1)**
83:6
**police (97)**
6:11;7:12;8:3,4,8,
10;9:13;32:23;35:2,
17;36:17,19;37:20;
38:17;41:4,7,12;
44:7;45:15;46:19;
54:16,24;55:1,4,8,25;
61:9;69:6;84:9,10;
85:15;86:20;87:8;
88:13,14;89:8,10,17;
90:3,6;103:24;
106:24,25;109:18;
118:12,16;119:7;
122:23;124:23,25;
125:1;126:15;
130:15,18,23;132:11;
133:13;134:11;
135:20,25;136:7,12,
19,21;137:5;138:4;
139:18;140:2;141:1;
144:2,3;146:9;147:1,
21;148:1,19,21,22,
24,25;150:22,24,25;
151:2,4,5,5,16;152:2;
154:23;155:8,23,23;
156:5,22;157:18;
158:9
**policies (16)**
32:12;45:4,18;
46:8;62:3,4;126:16;
130:16;137:8,9,10;
140:4;149:2;156:6,
13;159:22
**policing (2)**
45:3,12;46:14;
136:18;143:20;151:1
**policy (32)**
7:1,3,5;90:18;
107:1,7,10,11;131:9,
11,13,17;135:3,3,7,
10,11,13,18;138:18;
152:5,7;156:11,11,
13,21,23;157:8,11,
16;159:13,13
**popularly (1)**
88:10
**porous (1)**
26:12
**portion (1)**
106:17
**portions (1)**
24:22
**Portland (1)**
148:1
**position (17)**
21:9,13;40:8;
47:17;86:5;118:3;
120:10;123:2,9,15,

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 180 of 187
Octavio Rodriguez Cira, et al. v.
County of Henry, et al.
Dr. Geoffrey Alpert
June 30, 2022

19;127:2;130:8;
153:21;154:24;
155:25;156:7
**positional (41)**
17:11;18:18;20:16;
28:1,4,6,11,18;29:3,
22;35:9,12,14,25;
36:6,19;37:24;38:4,
21;39:1,14;40:25;
41:20,23;42:4;45:11;
48:22;49:2;82:12,25;
83:9;84:3;91:5;
120:6,13;124:12;
125:5,20;129:4;
138:18;155:5
**positions (1)**
88:23
**possession (2)**
53:10,15
**possibility (2)**
123:24;125:5
**possible (16)**
14:25;19:10;37:21;
45:16;46:20;48:11;
62:4;79:15;84:12,18;
86:22;125:3;154:25;
155:14,25;161:4
**possibly (2)**
52:17;82:13
**POST (4)**
6:15,16,24;92:23
**P-O-S-T (1)**
6:17
**potential (3)**
49:11;53:10;125:3
**potentially (1)**
47:17
**pounds (3)**
121:7,14;158:15
**power (10)**
7:15,18,25;67:1,2,
25;68:2,3;159:19,20
**practical (1)**
118:13
**practice (49)**
35:2;37:20;44:7;
45:15;46:19;54:17,
24;55:1,8,13,14;56:1;
61:10;62:18;78:4;
84:10;85:16;86:20,
24,25;87:1;88:13,14;
89:11;90:6;118:12,
16;124:23;125:2;
126:2;130:23;
134:11;135:25;
136:7,16,19;137:5,6;
138:4;139:18;
148:19,21,22;150:24,
25;151:16;155:23,
24;158:9
**practices (16)**
45:4,18;55:4,17;
59:23;132:11;

136:12,22;137:14,16;
140:3,10;149:7;
150:22;154:23;
157:18
**pre-Covid (1)**
145:24
**precursor (1)**
70:15
**predict (2)**
113:16;114:6
**predicting (1)**
113:10
**preface (1)**
140:4
**preference (1)**
60:21
**pregnant (3)**
107:5;135:14;
157:5
**preparation (1)**
42:5
**prepare (1)**
6:2
**preparing (1)**
38:22
**prerequisite (1)**
70:15
**presence (2)**
58:21,23
**present (3)**
16:2;59:3;113:2
**presentation (1)**
7:18
**presented (2)**
59:25;74:5
**pressure (9)**
27:9;85:1;116:20;
117:7;118:7,8;
124:11;136:2;140:17
**presumably (1)**
11:5
**pre-taser (1)**
62:2
**pretty (13)**
5:5;13:23;14:17;
15:10,21;16:15;21:2,
3;90:2;139:19;147:4,
15,18
**prevented (1)**
118:4
**previous (1)**
91:22
**principally (1)**
40:3
**prior (14)**
31:25;33:5,6,13,
21;62:16;66:18;
67:23;94:19;95:2;
112:25;114:14;
144:9;147:16
**priority (3)**
93:16;100:6,15
**probable (5)**

52:10;53:15;54:1,
12;56:16
**Probably (33)**
18:24;21:20;22:10;
28:20;31:24;32:16;
34:11;37:4;38:24;
40:12;42:11;45:2;
56:12;57:18,20;
58:13;61:4;64:20;
78:4;85:25;86:12;
99:20;107:4,6;135:6;
138:19;144:16;
146:18;147:6;
149:13,25;152:6;
156:19
**probe (1)**
92:6
**problem (6)**
28:24;35:15;36:3;
52:21;66:17;67:20
**problems (5)**
82:14;90:5;129:14;
148:8;157:1
**procedure (3)**
27:20;123:21;
162:9
**process (2)**
133:8;144:23
**processing (1)**
74:10
**produce (3)**
31:6,7;124:12
**produced (4)**
5:12,16;18:5;19:17
**profession (1)**
83:15
**professional (6)**
17:18,25;37:2;
76:24,25;143:11
**professionals (5)**
132:8;133:7,10,12,
16
**Professor (3)**
5:1;55:9;143:15
**progression (1)**
53:22
**prohibition (1)**
106:23
**projects (2)**
91:1;151:25
**prolong (1)**
21:13
**promised (1)**
142:14
**prone (20)**
21:9,13;43:6;
47:16;88:23;91:6;
118:3;120:10;121:7;
123:2,9,14,18;127:2;
130:8;153:21;
154:24;155:25;
156:7,18
**prong (1)**

64:11
**pronounce (1)**
45:7
**proper (1)**
93:4
**properly (6)**
35:16;36:12;38:2;
45:25;101:16,18
**proposal (1)**
144:22
**propose (1)**
144:22
**propounded (1)**
162:3
**prosecutor (1)**
18:24
**protect (5)**
99:5,13,13,17;
100:16
**protecting (1)**
100:15
**prove (1)**
145:2
**provide (9)**
31:8;32:10;33:15;
40:16;51:7;102:17;
103:2;133:18;160:24
**provided (7)**
6:5;7:16;10:2;
33:25;34:8,16;
138:12
**provides (2)**
51:5;72:9
**proximate (2)**
20:18,20
**Prude (11)**
18:16,17,20;19:6;
20:2;22:1;25:6;
27:14,25;30:20;
39:19
**prudent (1)**
123:6
**Prude's (3)**
21:18;22:20;23:2
**public (11)**
87:19,21;99:17,19,
20;100:7;131:16;
137:24;151:11,15;
163:15
**publications (1)**
37:2
**published (4)**
36:22;43:13;90:23;
143:21
**pull (2)**
128:22;129:5
**pulling (1)**
105:12
**purpose (4)**
87:2;93:23,23;
150:23
**pursuant (4)**
4:6;18:5;152:9;

162:8
**pursuit (5)**
28:20;29:19,19,20;
137:9
**pursuits (1)**
150:5
**pushing (1)**
105:12
**put (44)**
7:14;18:12;20:17;
23:3,6,7;24:24;25:1,
18;26:5,5;34:23;
35:18;46:1;51:10;
83:14,14;84:24;
85:13;96:3;104:2,14,
15;105:21;108:19,
23;110:11;111:5,13;
114:19;120:23;
121:10;124:4;
125:12;131:3,8;
134:20;135:16;
137:22;144:21;
147:19;148:9;
158:24;159:3
**puts (2)**
135:9,9
**putting (4)**
116:20;118:7,8;
136:2

## Q

**qualified (8)**
48:17,19,21;55:18;
149:9,18;150:7,21
**quantitative (3)**
123:13;136:20;
138:3
**quick (3)**
82:9;140:15;
155:17
**quickly (7)**
58:17;84:11;125:2;
152:1;154:24;
155:13,24
**quit (8)**
108:20;110:12,21;
111:8;113:5,8,18,20
**quite (2)**
19:14;150:9
**quits (3)**
113:17;114:20;
115:7
**quitting (1)**
113:1
**quote (5)**
120:9,16;122:12;
131:10,13
**quoted (1)**
131:13

## R

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 181 of 187
Octavio Rodriguez Cira, et al. v.                                    Dr. Geoffrey Alpert
County of Henry, et al.                                                June 30, 2022

**raise (1)**
64:24
**raises (2)**
54:7;86:3
**raising (3)**
118:24;120:1,3
**ran (2)**
92:9;97:1
**ranges (1)**
137:25
**ranking (1)**
100:6
**rapport (2)**
98:6,10
**rate (1)**
123:5
**rather (3)**
58:13;77:7;97:20
**RCMP (2)**
40:24;128:3
**reach (1)**
49:6
**reached (1)**
130:19
**react (1)**
105:25
**read (19)**
12:13;13:23;15:11;
20:6;22:12;24:8;
33:18;37:17,17;
85:20;117:19;
120:18;124:23;
128:14;142:10;
162:2,10,17,22
**reading (3)**
14:16;44:25;120:8
**ready (2)**
64:13;142:25
**real (6)**
46:1;48:13;82:9;
88:1;140:15;155:17
**realizes (1)**
64:1
**realizing (2)**
64:19;122:23
**really (20)**
11:2;36:9;60:8;
71:16;73:6;78:24;
89:25;90:6;106:19;
108:17;114:24,25;
122:5;123:25;
130:13;135:15;
141:16;149:3;
151:21;154:13
**reason (10)**
25:11;67:21;78:1;
80:20;106:9;130:1;
131:17;132:7;
162:20;163:1
**reasonable (22)**
23:12,21,25;26:4;
48:9,10;52:4,7;53:9;
54:1,11;55:2;57:9,

10;61:7;62:24;84:18;
94:8;100:14;115:13;
135:7,10
**reasonably (1)**
97:17
**reasons (2)**
126:18;162:13
**recall (25)**
9:3;15:12;18:21;
19:15,19;32:13,21;
33:2;65:8,9;92:7;
101:13;105:22;
106:20;117:14,15;
128:9;139:14;
149:22;150:6,14;
152:24;157:22;
158:17;159:11
**receive (5)**
10:14;78:5;90:24,
25;144:19
**received (3)**
9:10;33:20;144:16
**recent (3)**
17:8;121:6;125:4
**recently (2)**
22:12;83:4
**recess (2)**
82:3;155:19
**recipe (1)**
71:17
**recitation (1)**
143:11
**recognize (1)**
82:7
**recollection (1)**
31:19
**recommendation (4)**
89:2,4,15;90:15
**recommendations (4)**
91:5;130:10,11;
145:7
**recommended (1)**
88:23
**reconcile (1)**
27:13
**record (4)**
4:22;5:5;82:5;
155:21
**recorded (1)**
81:13
**recruiting (1)**
145:17
**red (1)**
64:23
**refer (3)**
38:18,20;52:12
**reference (1)**
44:1
**referenced (2)**
19:22,23
**referencing (1)**
19:15
**referred (3)**

29:1;39:12;44:11
**referring (2)**
8:8;135:4
**refers (1)**
131:9
**reform (2)**
146:25;147:13
**refused (1)**
65:18
**regarding (2)**
38:21;49:2
**related (6)**
9:8;19:6;25:5;
35:8;91:5,5
**relating (1)**
85:15
**relationship (2)**
31:25;136:21
**relax (2)**
35:22;111:7
**relaxing (1)**
113:2
**reliable (4)**
124:9,19,21;
125:15
**relied (5)**
40:3,18;42:9;
43:23;47:20
**relies (2)**
129:23;135:20
**rely (10)**
40:2,13;43:25;
44:23;92:22;94:9;
95:11,15;124:21,24
**relying (3)**
66:14;124:13,14
**remember (22)**
8:19;19:13,13,18;
24:22,24;28:10;
30:23;32:15;59:5;
63:21;71:11;91:17;
101:15;111:4,5;
125:9,17;148:16;
150:14;152:20,25
**remind (1)**
24:7
**reminded (1)**
24:12
**remotely (1)**
4:15
**remove (3)**
5:20;46:20;84:10
**removing (2)**
88:23;118:7
**render (2)**
154:5;160:10
**repeat (1)**
33:10
**repeated (1)**
76:13
**repeatedly (2)**
76:4;94:4
**rephrase (3)**

70:23;118:12;
129:21
**replied (1)**
110:14
**replies (1)**
111:10
**report (71)**
5:11,15,17,17,21,
22;6:2,3,15,19,24;
7:13;8:3;9:16,20;
10:1,21;11:21;12:5;
16:9,12;18:2,5,8,9,
10,12,19,19;8,11,15,
17,18,20,23;20:4,18;
21:4;22:12;23:24;
28:3;31:6,8;32:16;
38:22;41:6;42:5,8,
13;45:1;47:12;51:21;
60:2;61:19;63:20;
70:2;72:12;75:1;
91:17,18;108:19;
120:8,18;129:6;
132:3;143:18;146:8;
153:1;156:16;
160:14,17
**reported (1)**
120:8
**REPORTER (4)**
33:9;81:24;82:1;
131:2
**reporting (1)**
11:4
**reports (33)**
6:9,11;8:4,7,9,10,
11,14,22;9:10,13,14,
14,15,17,21,23;
11:13,15,23;12:13;
13:18,22,22;14:16;
17:24;34:25;38:17;
41:4,7,13,23;61:25
**represent (1)**
23:24
**represented (2)**
90:9;91:14
**request (2)**
107:25;144:21
**require (1)**
62:4;78:8
**required (1)**
115:20
**requires (3)**
139:16;152:2,12
**Research (35)**
7:12;35:11,12,13;
36:10;37:12;38:12;
39:16,18;43:16;
45:14;46:7,12,12;
48:1;66:5,7;83:4;
86:19;87:14;89:20,
25;91:2,3;115:3;
125:9;142:2,10;
143:20;144:22,25;
149:1;151:25;155:7;

159:23
**researchers (2)**
37:10;44:3
**researches (3)**
82:21,22;143:23
**reserved] (1)**
161:10
**reserving (1)**
4:8
**resist (1)**
153:16
**resistance (14)**
14:24;15:1,4;16:8;
102:6;105:1,15;
112:18;113:13,21;
114:14,14;131:14
**resistant (3)**
51:11;104:21;
105:7
**resisting (21)**
15:7;57:16;93:6;
94:1;104:25;105:12,
18;112:10,15,24;
113:1,17;114:15,20,
21,22;115:1,2,10;
116:11;155:12
**resolved (2)**
19:2;33:4
**resource (1)**
44:11
**respect (1)**
130:13
**respond (4)**
85:13;122:18,23;
126:14
**responded (1)**
75:7
**responding (4)**
59:1;63:24;122:17,
20
**response (9)**
43:19;61:12;109:7;
113:20;122:13,24;
126:5,9;155:8
**responses (1)**
35:18
**responsible (3)**
35:8;37:23;78:4
**responsiveness (1)**
4:9
**restate (1)**
4:21
**restrain (4)**
54:14;94:5;97:1;
106:6
**restrained (3)**
96:25;105:24;
106:3
**restraining (2)**
115:16,21
**restraint (5)**
43:6;120:10;
125:21;156:18,22

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 182 of 187
Octavio Rodriguez Cira, et al. v.                                    Dr. Geoffrey Alpert
County of Henry, et al.                                              June 30, 2022

restraints (1)
100:24

restricting (1)
23:18

restriction (1)
84:4

restrictions (2)
157:4,13

result (1)
61:22

resulted (1)
125:22

results (1)
82:23

resume (1)
114:15

retained (10)
17:10;31:9;33:13,
21,24;103:22;114:1,
2,3,4

retaining (1)
145:15

retardation (1)
84:4

retention (1)
145:16

retested (1)
125:18

retraining (1)
97:3

revert (1)
66:10

review (15)
6:5;9:18;10:2,18;
32:10;34:22;36:4,24,
25;37:3;39:7,25;
40:14;43:7;143:24

reviewed (26)
6:2,4;7:9,11,13;
8:23;9:17;10:5;13:1,
10;36:7;37:9;38:14,
23;39:16,17;42:21;
43:18;44:13;45:1,1,
3;143:22;152:19,22;
153:6

reviewing (2)
12:3;149:2

reviews (1)
38:25

rib (1)
117:1

ribcage (1)
117:7

ribs (4)
116:21;117:4,6,8

Rich (4)
42:13;47:11;48:17;
83:5

Rich's (1)
47:9

ride (5)
64:1,25;65:21;
66:6,9

rides (1)
79:10

right (166)
5:8,25;8:21,24;
12:8,17,24;13:13,16,
24;15:22;19:1,4;
24:10;25:18;28:13;
29:5,5,14;30:18,20;
31:3,16;35:23;36:21;
37:22;38:3,5,7,15;
39:12;41:5;45:8,17;
46:21;47:2;48:17;
49:15,22;50:12,17;
51:20;52:24;53:16,
19;54:2,10;55:23,25;
57:25;58:1,3,21;
60:16;61:6;62:5,13;
63:4,10;65:1,24;
66:15;67:3;68:5,10,
16;69:6;70:14;71:8,
20;72:9,17;73:6,11,
14;74:18,21;75:11,
15,18,21;76:25;
77:15;78:3,3,9,14;
79:5;80:20,23,23;
81:9,12;82:7,20,23;
88:2,4;91:8;92:1;
93:7;95:3,19;96:2,5,
10;99:16;100:13;
101:3,25;102:7,9;
103:2,6,8,23;104:18,
25,25;105:11;106:4,
6,24;107:8;108:10,
13,24;110:13,23;
111:11;112:25;
113:4,4,5,6,9,10,14,
19,22;114:7;115:12;
116:21,21;118:18;
119:19;120:12;
121:4,21;125:23;
126:17,20;127:7;
129:11;130:5;
132:18;134:9,13;
136:12;137:4;
139:24;141:20;
142:6;147:16;
154:25;160:25

Rights (1)
37:12

rigor (3)
37:13;89:22,24

rigorous (1)
36:23

ring (1)
127:24

riots (1)
143:19

risk (7)
67:7,12;86:3;
125:25;129:19;
131:25;142:5

risks (2)
49:2;96:14

risky (1)
130:18

Rock (1)
30:24

Rodarte (1)
30:7

Rodriguez (61)
5:12,13;6:7;14:3,
18;16:17,20;52:4,6;
54:21;57:2,14;58:8;
59:8;61:16;62:16,25;
63:7,23,23;65:25;
66:3,19;69:1,5,18,19;
72:21;73:9,14,17,20;
74:1;75:5;92:19;
93:15;94:1,5,15;
95:16,17;96:3;97:1,
13;99:5,14,18;
100:19,24;101:11;
103:20;107:25;
109:5;118:3,21;
119:19;122:2,4;
133:24;140:17;153:9

Rodriguez's (6)
56:15;104:16;
106:18;114:13;
118:20;120:23

role (3)
89:14;140:18;
141:4

Rolfe (2)
30:19;78:13

roll (18)
37:20;65:9,10,13,
18;66:1,20;68:4;
69:19,25;74:20;
91:23,24;125:2;
126:1;154:23;
155:24;158:9

rolled (1)
112:3

rolling (4)
118:2;123:8,8,14

Ross (1)
128:10,11;129:1

rotate (3)
103:13;107:22,23

round (2)
77:15,17

route (1)
132:25

rugby (3)
72:7;77:3,5

Rule (8)
18:5,9,10,11;28:3;
160:14,17;162:8

rules (4)
4:7;82:6;151:12;
162:9

run (3)
84:25;87:17;97:2

risky (1)
130:18

---

**S**

sad (6)
52:23;54:6;64:18;
74:17;122:11,25

safe (7)
86:20;119:11;
121:8;123:21;155:8;
158:16,24

safer (1)
118:9

safety (10)
99:19,19,20,21;
100:5,7,8,19;131:16;
151:15

same (22)
4:7;5:17;9:22;
11:11;13:16;15:23;
25:18;36:9;43:1;
80:12;82:5;86:7;
126:19;130:2;
131:12;135:1;139:2;
148:13,17;151:6,12;
163:5

sample (1)
87:7;129:16;137:1,
2

San (2)
39:22;44:3

satisfies (1)
56:15

Savasa (1)
128:7

save (4)
5:25;19:1,2,3

saved (2)
123:7,11

saw (8)
11:4;21:1;27:14;
58:6;90:21;95:8;
134:18;156:13

saying (20)
16:17;19:4;53:20;
55:19;79:9;83:8;
84:3;86:19;91:20;
98:10;102:16;109:5,
18;111:7,8;113:9;
126:5;129:9,10;
141:17

scene (5)
12:20;52:2;93:20;
99:23;132:6

school (2)
55:10;142:2

science (8)
45:19,21;47:1,3,7,
16;87:2;126:11

scientific (23)
35:6,25;37:24;
38:3,11,19,20;39:3,
13;40:22;41:3,6,10,
17;42:4,18,19,21;

---

43:7;44:23;46:8;
47:23;89:24

scope (1)
160:16

Scott (2)
30:9;31:1

screamed (2)
75:8,9

screaming (3)
60:24;69:5;97:21

screen (1)
103:13

scrutiny (2)
37:5;152:7

Seabrooks (1)
29:19

seat (1)
96:25

second (6)
35:6;51:24;66:19;
74:24;75:12;100:8

seconds (7)
11:2;63:23;66:4,9;
79:16;81:4;95:6

section (2)
9:19;107:2

secure (4)
12:12;104:1,5,6

seeing (5)
12:6;29:17;54:3;
61:9;66:12;100:13;
117:15

seem (1)
65:6

seems (1)
106:1

segmentating (3)
23:11;25:25;27:20

segmentation (4)
22:1;24:15,16;
25:12

selected (1)
146:20

send (2)
18:1;70:10

sense (2)
14:17;100:11

sent (5)
8:7,25;10:12;
20:11;34:10

sentence (1)
24:12

September (3)
155:15,22;156:4

series (2)
11:7;111:14

serious (2)
110:14;111:10

served (1)
36:4

session (1)
104:11

set (4)

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 183 of 187
Octavio Rodriguez Cira, et al. v.                                                    Dr. Geoffrey Alpert
County of Henry, et al.                                                              June 30, 2022

13:3;95:22;106:5;
122:19
**Seth (1)**
7:7
**sets (2)**
105:20,24
**settled (1)**
17:21
**seven (4)**
132:11;134:1,11;
146:18
**several (9)**
18:15;36:11;40:5;
48:8;89:8;119:18;
129:2;155:3;157:4
**shall (1)**
162:12
**shape (1)**
115:25
**shapes (1)**
66:11
**shared (1)**
9:6
**sharp (1)**
78:24
**shock (1)**
92:4
**shocked (2)**
64:19;67:17
**shocking (2)**
92:18;131:22
**shocks (1)**
132:11
**shoe (2)**
109:24;110:3
**shoot (3)**
57:23;58:1,4
**shooting (1)**
30:4
**short (2)**
22:5;81:7
**shot (4)**
58:2;94:17;130:1;
153:15
**shots (1)**
130:4
**show (11)**
13:15;15:1,18,23;
16:7;48:6;121:2,7;
127:17;128:13;145:6
**showed (1)**
15:20
**shown (2)**
11:2;83:4
**side (6)**
17:20;27:16;83:17;
154:24;155:24;
158:10
**sides (1)**
44:4
**SIDS (1)**
83:13
**significance (1)**

117:25
**significant (4)**
35:3;76:21;111:2,
21
**significantly (4)**
36:12;40:21;
121:15;135:20
**similar (1)**
23:17
**Simmons (1)**
30:13
**simple (1)**
98:15
**simply (1)**
8:8
**single (1)**
146:2
**sinister (2)**
60:8,11
**sit (6)**
24:21;28:1;32:22;
68:11;135:12;138:2
**sited (1)**
43:4
**sitting (1)**
96:24
**situation (12)**
14:5;51:18;60:12;
65:5;80:5;92:20;
93:5;97:3;102:2;
122:1;132:8;133:21
**situations (2)**
38:16;92:25
**six (2)**
132:3;149:25
**size (3)**
101:6,8;106:7
**skills (1)**
66:15
**skin (1)**
72:1
**skip (1)**
5:3
**slight (1)**
16:23
**slip (1)**
72:1
**slipped (3)**
101:11,14,18
**slow (2)**
79:11;96:18
**slowing (1)**
134:8
**small (1)**
137:3
**smaller (1)**
151:24
**smart (1)**
83:16
**smartest (1)**
66:23
**smile (1)**
131:2

**smoke (1)**
85:21
**smoked (1)**
86:13
**sociologist (1)**
99:1
**Sociology (4)**
98:23,24;143:13,
15
**software (1)**
78:22
**solely (1)**
129:23
**somebody (3)**
70:11;71:17;
110:24
**someone (59)**
12:23;16:22;26:8;
37:20;41:25;44:7;
45:15;46:20;47:16;
48:1;51:7;52:19,25;
53:1,2;56:1;60:18;
62:8;71:22,25;76:22;
77:12;81:20;84:11;
85:6,8;86:2,21;
93:20;94:24;95:16;
97:8;102:7;106:2,6,
12;110:7;111:2,9,20;
112:15,24;113:17;
120:19;122:17;
123:14,18;125:2;
126:1;131:25;
140:25;141:12;
153:3;155:12,12,24;
158:15,16;160:10
**someone's (3)**
104:14;122:22;
159:6
**Sometimes (5)**
28:22,24;45:18;
64:3;151:8
**Somewhere (3)**
33:2;62:11;150:14
**son (3)**
108:15,16,16
**soon (6)**
37:21;45:16;46:20;
118:13;130:19;161:4
**sorry (9)**
21:23;33:9,13;
41:24;55:13;72:17;
87:12;109:12;135:19
**sort (16)**
5:16;6:23;9:7;
25:16;74:4;75:20;
76:23;87:10;88:10;
98:10;100:22;
101:23;110:6;
114:24;122:7;160:5
**sorts (1)**
116:16
**sound (11)**
49:25;70:10;79:1;

80:14,17,18;81:3,7,
13;87:3;119:5
**sounds (2)**
11:12;78:19
**source (9)**
9:8;14:10,11;
47:15,19;81:8,10,11;
113:13
**sources (3)**
40:11;47:22,23
**South (2)**
5:2;55:10
**space (1)**
62:11
**speak (5)**
66:2;80:21;112:19;
118:5;130:22
**speaking (2)**
52:12;130:22
**specialist (1)**
117:23
**specialization (1)**
87:14
**specialized (1)**
143:19
**specific (13)**
9:20;14:8;24:22;
27:5;28:10;31:19;
54:13;57:8;80:13,17;
112:8;124:17,20
**specifically (9)**
16:19;43:14;66:7;
92:7,10;101:17;
128:9,19;145:19
**specifics (1)**
158:19
**spent (1)**
39:20
**spit (5)**
23:3,7;25:8;26:5,7
**spitting (4)**
22:20;25:6,17,19
**split (1)**
150:4
**sports (2)**
35:20,20
**spray (8)**
7:5;131:4,9,9,12,
13,19,24
**spread (1)**
152:1
**sprinkle (1)**
46:23
**stabilization (1)**
50:20
**stabilize (1)**
51:10
**stand-alone (1)**
41:17
**Standard (8)**
6:20;45:2;46:9,22;
84:10;88:24;155:11;
157:17

**standardization (1)**
151:13
**standardized (1)**
151:1
**standards (5)**
45:22;48:12;88:15;
152:3,16
**standing (2)**
11:14;106:17
**start (13)**
60:24;69:14;71:9;
77:13;94:23;97:23;
98:6,15;113:7,23;
115:8;138:6,8
**started (7)**
42:3;44:19;63:24;
97:5;123:4;153:14,
16
**starting (1)**
111:16
**starts (5)**
58:23;113:4,5;
114:22;115:10
**State (7)**
31:12;92:23;
110:20;139:12;
143:14;149:15;152:8
**stated (1)**
110:21
**statement (6)**
12:5;70:4;133:15;
135:2,4;162:13
**statements (3)**
11:1;35:1;80:25
**states (4)**
78:7,11;139:14
**statistics (6)**
87:15;137:20,23,
23;147:14;149:6
**status (1)**
38:8
**stay (1)**
142:19
**staying (1)**
26:21
**Steinberg (4)**
43:6,9,12;44:10
**step (3)**
16:21,21;60:1
**still (9)**
92:17;104:9;
107:17,21;111:9;
119:8,9,16,17
**stomach (33)**
35:22;37:21;42:1;
44:7,8;45:16;46:20;
47:8;48:2,4,10;65:11,
13;68:17,20;69:19;
74:20;75:24;83:21;
84:11,11,17;86:21;
91:24,25;116:20;
118:8,13;119:11;
123:6;130:20;136:2;

Case 1:21-cv-01999-VMC Document 83 Filed 10/05/22 Page 184 of 187
Octavio Rodriguez Cira, et al. v.
County of Henry, et al.

Dr. Geoffrey Alpert
June 30, 2022

155:13
**stomachs (5)**
28:23;47:5;83:15;
124:3,6
**stop (7)**
15:14;109:22;
115:10,20;127:11,11;
134:23
**stopped (4)**
68:1;111:16,18;
112:9
**stopping (1)**
26:8
**storm (2)**
112:19;147:16
**story (1)**
37:21
**Stoughton (2)**
7:7;43:1
**straw (1)**
10:23
**street (13)**
52:6,20;54:9;56:2;
59:21;69:2,3;74:15;
95:17;97:1,6,9;122:5
**streets (1)**
78:2
**strength (2)**
49:16,18
**stress (1)**
77:2
**strike (1)**
72:23
**strikes (2)**
58:6,7
**striking (1)**
105:8
**strong (4)**
49:21,22,24;50:10
**Stroud (7)**
16:18;69:18;91:20;
94:4,10;108:20;
109:6
**Stroud's (1)**
16:18
**structural (1)**
117:16
**struggle (7)**
85:9;99:14,23,25;
100:4,9,14
**stuck (1)**
21:20
**students (7)**
35:17;36:17;87:18,
20,21,25;144:9
**studied (2)**
46:11;159:24
**studies (47)**
35:7,8,25;36:6,21;
37:24;38:3,19,20;
39:21;40:13,17,17;
42:16,19,20,21;
44:23;45:3;46:3,8,

48:6,7;84:22;121:2,6,
12;123:7;124:10;
127:13;128:15,23;
129:8,10;136:25;
141:8,19,20,23,24;
142:1,4;144:12;
145:8,18;146:1,4
**study (29)**
39:3,14,23;40:23;
41:6,10,21;42:4,18;
45:24;48:22;121:9;
124:17,19,20,21;
125:6,15;127:16,20,
22,25;128:5;129:1,
22;138:16;158:14,
20;159:11
**stuff (3)**
5:4;31:10;129:15
**stun (2)**
92:6,10
**sub (1)**
156:14
**subject (9)**
25:22;36:18;46:23;
57:12;80:7;93:7;
103:3;121:19,21
**subjects (32)**
36:3,12,15;38:6,12,
15;41:12,15,19,22;
45:25;46:4,13,17;
49:13,14;51:9;82:11,
13,17,20,22;83:21;
85:6;87:24;88:9;
90:5;123:1;129:19,
23;155:7;158:25
**submit (1)**
145:1
**submitted (4)**
19:9,10,19;39:2
**subscribed (1)**
163:11
**substance (2)**
34:14;162:11
**substitute (1)**
136:4
**sudden (1)**
62:14
**sufficient (1)**
89:24
**suggest (1)**
89:1
**suggestion (1)**
131:20
**summaries (1)**
34:9
**summarized (5)**
20:1;40:23;43:21;
45:13;89:12
**summarizes (2)**
39:5;43:1
**summary (12)**
19:17;20:13,15,23,
24;33:7,16,16;39:6,6,

42:10;43:14
**summon (2)**
133:9,16
**summoned (1)**
132:24
**superfluous (1)**
133:15
**supervisor (1)**
94:13
**supplemental (6)**
5:15,21;6:3;9:14;
146:7;163:4
**supply (1)**
145:4
**support (1)**
42:20
**supports (1)**
120:6
**suppose (3)**
52:11;66:22;
137:17
**Supreme (1)**
139:21
**Sure (20)**
15:18;18:7;38:8;
53:9;58:13;65:5;
74:22;77:1;89:20;
92:11,19;98:15;
106:14;134:5;
136:17;139:25;
142:9;148:18;
155:18;160:2
**surface (1)**
51:5
**survey (4)**
137:12,25;145:23;
149:5
**surveyed (1)**
137:19
**surveys (5)**
39:18;87:18;
145:21,22;149:6
**suspect (4)**
47:2;115:4,5,7
**suspect's (2)**
14:13,14
**suspicion (7)**
52:4,7;53:8,10;
54:1,7,11
**swear (1)**
4:13
**sweating (2)**
71:12;77:10
**sweaty (4)**
71:17,22;76:17,21
**sworn (4)**
4:15;31:6,8;163:11
**syndrome (1)**
66:13
**system (1)**
147:5
**systems (3)**
85:23;145:12,12

| | | T | | |
|---|---|---|---|---|

**tackle (1)**
97:7
**tactic (6)**
22:2,13,17;27:9;
50:23;51:14
**tactical (1)**
102:10
**tactically (1)**
70:10
**tactics (5)**
21:7,12,16;51:1;
130:16
**takeaway (1)**
17:1
**talk (8)**
16:14;88:9;96:13;
97:8,17;118:21;
145:8;148:20
**talked (9)**
34:19;38:24;44:15;
45:6;80:11;89:21;
108:15;128:2;157:20
**talking (11)**
6:16,20;27:10;
78:22;85:18;97:5;
119:2,9;133:2;
137:17;149:1
**tanks (1)**
50:1
**tape (1)**
11:2
**target (1)**
79:20
**tase (5)**
15:14;76:3;107:5;
134:1,18
**tased (25)**
14:4;15:9;63:25;
64:5,7,10,13;65:11,
15,22;67:7,14,17,17;
69:7,21,23;75:3;77:8,
11;80:9;94:15;95:1,
7;116:14
**Taser (50)**
7:3;28:21;47:25;
58:2;61:20,22;62:17,
24;63:22;64:15,22;
65:7,23,25;66:13,18,
25;67:13,22,22,22;
68:1;76:15;77:24;
78:13,19;79:19;80:9,
19;90:9;92:5;94:17,
21,25;96:4;106:22;
116:19;132:11;
135:9,16,17;137:13;
138:11;153:15,18;
156:11,11,23;157:8;
159:13
**tasered (1)**
63:5

**tasers (1)**
7:13;17:16;91:21;
106:23;129:4;147:3;
157:5
**tasing (6)**
77:12;80:7;92:18;
94:23;134:10,16
**tasings (1)**
136:1
**taste (1)**
49:17
**taught (4)**
50:25;51:3,8;60:13
**teach (2)**
142:1;144:5
**team (3)**
147:25;148:10,12
**Technically (1)**
13:16
**technique (5)**
23:16,17;24:9;
27:6;51:8
**techniques (2)**
83:17;134:8
**technology (1)**
13:16
**telling (6)**
15:20;36:10;65:12;
67:6;84:8;132:19
**tells (2)**
69:25;139:8
**ten (5)**
94:15;111:15;
126:24;142:13;
144:16
**Tennessee (1)**
57:22
**tenth (3)**
77:14;92:4;94:16
**term (6)**
23:16;24:10,17,20;
122:11;148:16
**terms (8)**
27:6;54:16;88:9,
13,14;116:18,19;
132:16
**test (5)**
45:21;82:11,20;
85:6;122:3
**testified (19)**
4:16;18:17;20:16;
22:11;23:1,13;24:8;
25:15;27:4,4;28:5;
80:16;81:15;82:10;
124:14;149:13,24;
150:16;154:12
**testify (3)**
23:11;86:25;
150:17
**testifying (1)**
19:14
**testimony (23)**
10:5;12:1;19:24;

Case 1:21-cv-01999-VMC   Document 83   Filed 10/05/22   Page 185 of 187

Octavio Rodriguez Cira, et al. v.                                                    Dr. Geoffrey Alpert
County of Henry, et al.                                                                 June 30, 2022

20:1,5;28:15;31:6,8;
42:13;44:6;47:9,12;
48:16;65:24;79:24;
82:16;101:9,13,15;
114:12;127:6;
140:13;150:13
**tests (4)**
84:21;85:3,3;87:17
**theories (3)**
42:20;83:2;84:13
**theory (1)**
125:20
**therapy (2)**
83:20,24
**thereafter (1)**
11:9
**therefore (1)**
37:5
**thereof (1)**
87:3
**thick (1)**
90:14
**thoracic (1)**
117:16
**Thorington (1)**
31:1
**though (12)**
14:9;17:1;26:8;
49:7;50:16;76:1,3;
77:6;104:8;119:24;
137:21;139:16
**thought (4)**
11:4;70:8;104:12;
121:11
**threat (4)**
25:13;57:15;
107:17;131:15
**threaten (1)**
62:8
**threatened (2)**
15:13;61:19
**threatening (3)**
62:5;97:21;98:18
**threats (1)**
76:13
**three (8)**
74:25;75:4;77:8;
89:7;91:13,19;
137:18;142:13
**three-part (1)**
114:17
**throat (1)**
117:13
**tight (2)**
101:21;102:4
**tighten (1)**
102:5
**timely (1)**
145:16
**times (27)**
9:5;14:3,10;34:13;
36:11;75:4;77:9,12;
79:10;80:10;94:15,

16;95:1;101:12;
116:15;119:18;
134:2,11,16;137:13;
149:12,14,14,23,25;
150:11;157:4
**today (8)**
5:11;13:7;24:21;
28:2;128:16,24;
135:12;138:2
**together (1)**
34:23
**told (18)**
14:20;21:24;47:24;
59:7;68:16;72:8;
73:20;74:1,20;75:3;
83:15;93:25;100:9;
105:23;116:5;121:1;
124:4;150:18
**tomorrow (2)**
114:4,5
**took (1)**
112:7
**top (1)**
157:10
**topics (1)**
145:16
**torso (1)**
116:25
**totality (1)**
157:6
**totally (2)**
42:22;70:17
**touch (2)**
71:13;77:10
**touched (1)**
67:19
**towards (2)**
16:17,23
**traditional (1)**
5:7
**traffic (1)**
50:2
**trained (9)**
22:4;66:24,25;
77:23;80:8,12,17;
81:21;98:13
**trainer (2)**
98:4,6
**trainers (2)**
89:18;119:8
**Training (37)**
6:21;7:15,17;
22:15,16;23:14,15;
24:17;26:20,21;51:1,
1;54:18,20;64:1,17;
67:25;77:25;78:5,17;
97:18;98:14;99:2,3;
104:11;109:18;
119:7;122:16;135:8,
19;140:4;145:13,14;
147:5;161:1,2,2
**trapping (1)**
83:6

**travel (1)**
50:6
**treated (1)**
70:20
**trend (1)**
125:4
**trial (2)**
10:19;40:22
**trick (1)**
72:4
**tried (10)**
34:23;75:23;79:11,
12;95:8;96:13;97:4,
16;104:19;133:20
**true (6)**
15:6;22:15;86:10;
123:3;132:13;133:1
**trunk (1)**
104:13
**truth (1)**
15:20
**try (18)**
60:12,14,14,22,22,
22;61:10,11,12;
84:25;94:23;95:5;
96:18,22;97:7;99:13;
105:21;132:18
**trying (21)**
23:3;25:22;26:2;
32:15;42:23;72:20;
73:8;86:24;92:17,17;
97:8;105:4,5;108:9,
20;109:9,19;134:7,
10;151:5;157:21
**Turn (1)**
138:21
**turned (2)**
16:17;109:5
**turning (1)**
109:7
**turns (1)**
16:22
**tweak (1)**
103:10
**twice (2)**
64:25;110:21
**twist (3)**
103:5,7,8
**two (14)**
6:3;8:19;33:15;
43:18;44:4;51:20;
84:12;91:19;101:4;
106:7,8;137:18;
150:18;153:1
**two-minute (1)**
155:16
**type (1)**
62:23
**typewriting (1)**
163:5
**typical (3)**
9:14;97:18,18
**typically (2)**

9:7;104:13

---

**U**

---

**ultimate (1)**
49:9
**un (1)**
76:22
**unable (1)**
122:5
**unacceptable (2)**
134:11;156:12
**unaware (1)**
10:8
**unconstitutional (2)**
55:22,23
**under (29)**
4:8;22:2;23:22;
36:13;51:24;53:6;
54:4;55:3;65:19;
66:25;67:2,25;68:2,
2;71:5;77:2;82:6,14;
85:8,12;113:2;116:6,
7,14;119:7;121:22;
134:19;135:15;
155:12
**undergrad (1)**
144:9
**understood (6)**
68:22;73:18;76:9,
18;108:11;132:22
**unethical (3)**
35:16;36:14;38:2
**unfortunately (1)**
60:20
**unhealthy (4)**
49:14;86:8;141:17,
18
**uniform (2)**
59:13,24
**unique (1)**
122:2
**universities (1)**
143:16
**University (2)**
5:2;143:14
**Unless (4)**
13:20;14:1;70:23;
92:10
**unnecessary (2)**
16:25;139:5
**unproven (1)**
125:20
**unreasonable (10)**
51:14;60:18;86:4;
93:13,18;95:11;
114:13;116:18;
134:12;139:6
**unresponsive (9)**
134:22,25;154:2,
11,13;157:22,25;
158:4,6
**unusual (1)**

106:4
**up (21)**
11:8;12:15;14:24;
33:10;40:21;63:18;
67:15;68:11;72:5,11;
73:4;75:18;79:12;
91:22;95:22;113:4,5,
5,7;121:7;158:23
**updated (2)**
151:17,19
**upon (29)**
13:2,12;17:2;21:9;
24:23;40:2,18;42:9,
16;43:23;44:23;
45:19,19;47:19;
56:19;92:22;93:10;
94:9;99:10,18;
112:24;118:14,16;
123:8;124:22;140:2,
10;156:22;162:12
**upper (1)**
118:20
**upset (4)**
20:6;21:3;64:18;
153:15
**use (98)**
4:10;7:1,15,17;
11:8;17:16;24:1,23;
25:12,24;26:5,20;
27:8;28:21,22;29:1,
21;34:21;37:2;38:16;
40:11;43:25;47:1,2,
4;50:25;52:18;57:4,
18;58:3,5;59:23;
60:6,7,10;61:22;
66:25;70:25;72:22;
77:24;80:8,19;82:17,
22;83:13,14;87:8,17,
24;96:4;100:24;
103:24;104:9;106:5;
107:23;108:6;109:8,
10;110:8;114:13,20,
22;115:11,12;120:3;
122:10;130:9;132:8,
9,9,21;134:4,6;137:9;
139:9;141:17;
143:19,25;144:5,13,
18;145:8,14;146:1;
147:3,7,9;148:4,4;
150:2,5;152:9;156:7,
13,18,21;159:12;
161:2;162:15
**used (45)**
22:17;23:15,22;
24:17;34:16;36:2,8;
38:15;39:18;41:24;
42:10,17;46:16;49:6;
50:25;52:23;58:22;
60:11,25;69:16;
82:13,20;88:9;97:12,
13;102:14;106:23;
108:12;111:15;
116:18,18,19;117:7;

121:10;131:7,14,17,
19,24;134:4,14;
139:5,13;148:16;
153:18
**uses (3)**
41:3;131:17;
136:17
**using (22)**
37:8;41:19,19,22;
45:25;46:4,13;51:11;
62:19,24;66:13;87:7;
94:5;115:13;129:19;
134:23;137:13;
147:11,12,12;148:6;
157:8
**Usually (3)**
15:23;36:16;
150:20
**utterances (1)**
119:16
**uttered (1)**
77:3

## V

**Valdez (1)**
30:22
**value (4)**
123:14;129:20;
130:6;141:25
**variety (2)**
26:2;126:18
**vehicles (1)**
50:12
**Vehicular (1)**
50:6
**ventilate (2)**
121:16,24
**verb (2)**
62:5,6
**verbal (1)**
33:22
**verified (1)**
124:10
**versus (8)**
30:1,11,13,22,24;
31:1;74:6,12
**via (1)**
4:16
**vicinity (1)**
99:7
**Video (35)**
6:13;9:25;10:1,1,6,
9,17;13:10;14:9,10;
15:18,20;16:5,19;
24:22;27:15;35:1;
42:14;63:17;79:6;
105:3;106:16;112:9,
20;152:19,22;153:6,
8,17,20,23;154:1,4,9,
16
**videos (13)**
10:22;11:16,17,19;

12:3;13:8,15,17;
14:21,25;15:23;16:7;
81:5
**vindictive (1)**
72:20
**violate (3)**
107:4,9,15
**violated (5)**
106:23;107:7,14;
132:10;135:12
**violates (1)**
137:14
**violation (3)**
135:3,24;137:4
**virus (3)**
25:5,13,15
**visual (1)**
14:15
**vital (1)**
117:9
**vocal (1)**
119:5
**voice (4)**
75:9;118:24;120:1,
3
**volts (1)**
62:15
**voluntarily (1)**
57:3
**volunteer (1)**
36:16
**voracity (2)**
48:16;80:21

## W

**Wait (1)**
143:1
**walk (3)**
15:19;59:9;93:2
**walked (2)**
56:5;96:4
**walking (18)**
15:15;52:6,11,14,
19;54:8;56:2;57:21;
58:10;59:20;62:12;
63:2;69:2,3;74:14;
95:17;97:9;122:5
**Waller (1)**
30:11
**wallet (1)**
53:14
**Wanskek (1)**
29:20
**wants (2)**
64:25;94:14
**warned (6)**
61:21;68:7,11,20;
76:1,3
**warning (7)**
62:2,4,6,16;63:4;
145:12;147:5
**warnings (2)**

76:13;125:5
**warrant (1)**
160:4
**Washington (1)**
143:14
**Watch (2)**
47:9,12
**watched (3)**
79:6;112:9;153:8
**watching (2)**
10:23;24:24
**way (36)**
7:10;12:10,24;
14:25;22:4;23:18;
35:19;43:1;49:19;
51:7;52:2;58:19;
61:20,24;70:7;71:25;
80:12;86:7;91:5,9,
13;92:5;97:20;104:5;
113:25;114:20;
115:25;122:19;
123:13,23;125:13;
133:3,25;134:20;
140:5;143:6
**ways (4)**
26:2;66:11;69:16;
112:23
**weak (2)**
157:15,15
**weapon (5)**
62:20;66:16;78:6,
13,14
**wearing (3)**
11:6;59:13,24
**week (1)**
34:12
**weight (8)**
85:13;112:7;
120:23;121:2,7;
124:10;158:16,24
**weights (4)**
84:24;121:10;
158:22;159:1
**weren't (4)**
9:9;67:16;80:8;
140:1
**whacked (1)**
53:1
**what's (19)**
15:16;29:8;88:10;
95:5;97:17,19,19,19,
22,24;98:16,20;
100:10,11;107:2;
111:12;122:22;
134:10;150:23
**wheel (1)**
62:23
**When's (1)**
127:18
**Whereupon (2)**
82:3;155:19
**whispered (2)**
61:2,4

**whole (5)**
13:17;47:24;76:5;
96:19;147:4
**who's (7)**
63:25;71:17;81:20;
85:8;93:20,20;
141:12
**whose (2)**
9:17;10:4
**wider (1)**
145:9
**wife (1)**
73:3
**willfully (1)**
91:25
**will-house (1)**
32:9
**willing (2)**
18:1;64:20
**window (1)**
67:11
**wire (1)**
94:25
**wires (3)**
67:13,19;94:21
**withdraw (3)**
11:18;35:7;38:19
**withdrawn (1)**
96:2
**within (1)**
96:8
**without (6)**
12:6;95:15;101:24;
114:25;123:23;132:6
**witness (5)**
4:13;80:22;142:15;
149:10;150:21
**woefully (1)**
156:14
**woman (2)**
107:5;135:14
**women (1)**
157:5
**word (4)**
61:1;72:22;124:15;
136:4
**wording (1)**
136:21
**words (2)**
74:10;154:20
**work (23)**
36:16;44:17;60:23,
23;63:22;77:13;88:6,
7;90:25;96:22;97:10,
10;98:7;109:24;
128:8,18;129:16;
133:18;145:5,11,13,
13,15
**worked (4)**
32:1;96:21;143:16,
17
**working (1)**
77:13

**works (2)**
129:5;143:6
**world (4)**
45:12;60:6;88:1;
89:10
**worthy (1)**
129:11
**wrestle (1)**
102:7
**wrestled (1)**
72:3
**wrists (7)**
101:2,4,8;103:22;
107:21,22,23
**write (2)**
15:5;18:24
**writing (1)**
19:18
**written (14)**
11:23,23;12:22;
13:18,21,22;14:6;
18:19;19:5;33:7,16;
36:5,8,11
**wrong (6)**
14:1;52:25;53:4;
74:16;97:24;129:18
**wrote (10)**
17:24;19:23;20:4,
7;21:3;43:18;44:15;
111:4;120:7;129:5

## X

**X-2s (3)**
78:20;79:24,25

## Y

**y'all (1)**
4:7
**year (1)**
32:17
**years (8)**
28:6;71:15;72:3;
127:21;143:16;
144:11;145:24;
146:19
**yell (3)**
60:6;61:1;118:21
**yelled (2)**
60:3;67:21
**yelling (9)**
60:15,24;61:13;
69:5,14;97:20;108:3;
110:7;119:24
**Yep (1)**
70:2
**York (1)**
21:25
**young (1)**
35:17

Case 1:21-cv-01999-VMC Document 83 Filed 10/05/22 Page 187 of 187
Octavio Rodriguez Cira, et al. v.
County of Henry, et al.

Dr. Geoffrey Alpert
June 30, 2022

**Z**

**Zoom (1)**
4:16

**1**

**1 (1)**
162:6
**1:48 (1)**
161:9
**10 (1)**
134:16
**10:00 (1)**
54:8
**10:13 (1)**
68:10
**10:15 (1)**
76:2
**10:16 (1)**
76:2
**10:17 (1)**
91:22
**10:18 (1)**
91:20
**10:24 (1)**
108:20
**10:28 (1)**
110:17
**10:29 (1)**
112:5
**11 (1)**
138:23
**11th (1)**
109:13
**12 (4)**
134:16;139:2;
145:25,25
**13 (1)**
139:4
**14 (2)**
116:15;143:21
**15 (2)**
143:21;145:25
**150 (1)**
143:21
**16 (1)**
145:25
**17th (2)**
5:23,24
**18,000 (1)**
151:2
**1900s (1)**
125:7
**1980s (1)**
143:17
**1990s (1)**
125:7

**2**

**2 (1)**

162:7
**20 (1)**
129:3
**2001 (1)**
7:11
**2006 (4)**
88:20;90:12;
127:14,23
**2011 (3)**
88:20;90:1,12
**2012 (1)**
128:1
**2017 (1)**
128:4
**2018 (3)**
29:15;128:7,10
**2019 (5)**
61:10;155:22;
156:5,23;159:21
**2022 (3)**
29:15;162:4;
163:12
**22 (1)**
71:15
**225 (3)**
121:7,14;158:15
**26 (7)**
18:6,9,10,11;28:3;
160:14,17

**3**

**30 (3)**
136:22;162:4,8
**300 (1)**
146:25
**302.00 (1)**
131:11
**3B (1)**
135:17

**4**

**40 (3)**
143:16;144:11;
149:13
**45 (1)**
149:14

**5**

**5/23 (1)**
5:25
**50 (2)**
136:23;149:14
**50,000 (1)**
62:14

**7**

**75 (1)**
136:23
**7e (1)**

162:8

**9**

**9-11-30e (1)**
162:10