**In The Matter Of:**

*Octavio Rodriguez Cira, et al. v.*
*County of Henry, et al.*

---

*William A. Lowe, DBA*
*June 28, 2022*

---

*Thompson Reporting Services, Inc.*
*Georgia Certified Court Reporters*
*P.O. Box 792*
*Powder Springs, Georgia 30127-0792*
*(678) 483-0600*



Original File 062822-LOWE.txt
Min-U-Script® with Word Index

```
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3  OCTAVIO RODRIGUEZ CIRA    )
    and FABIOLA MERLOS        )
 4  MARTINEZ, as Surviving    )
    Parents of FERNANDO       )
 5  OCTAVIO RODRIGUEZ,        )
    Deceased, and OCTAVIO     )
 6  RODRIGUEZ as              )
    Administrator of the      )
 7  Estate of FERNANDO        )
    OCTAVIO RODRIGUEZ,        )
 8      Plaintiffs,           )
                              )  CASE NO. 1:21-CV-01999-VMC
 9      vs.                   )
                              )
10  COUNTY OF HENRY,          )
    OFFICER ROBERT P.         )
11  BUTERA, In his            )
    Individual and Official   )
12  Capacity, and OFFICER     )
    QUINTON C. PHILLIPS, In   )
13  his Individual and        )
    Official Capacity,        )
14      Defendants.           )

15          Deposition of WILLIAM A. LOWE, DBA, taken on

16      behalf of the Defendants, pursuant to the

17      stipulations agreed to herein, before

18      Mary K. Caldwell, Certified Court Reporter,

19      at the offices of Pate, Johnson & Church,

20      101 Marietta Street, Suite 3300, Atlanta,

21      Georgia, on the 28th day of June,

22      2022, commencing at the hour of 10:55 a.m.

23          Thompson Reporting Services, Inc.
                    P.O. Box 792
24        Powder Springs, Georgia  30127-0792
              www.thompsonreportingservices.com
25      scheduling@thompsonreportingservices.com
```

INDEX TO EXAMINATIONS

Examination                                    Page

Examination by Mr. Williams                       5

Examination by Mr. Johnson                      158

Further Examination by Mr. Williams             174

INDEX TO EXHIBITS

Defendant's
Exhibit No.                                     Page

Exhibit 1   Photograph from Lewis video          92

Exhibit 2   Photograph from Lewis video          93

(Original Exhibits 1 and 2 were attached to original

transcript.)

1    APPEARANCES OF COUNSEL:

2        ON BEHALF OF THE PLAINTIFFS:

3            JESS B. JOHNSON, ESQ.
             Pate, Johnson & Church, LLC
4            101 Marietta Street
             Suite 3300
5            Atlanta, Georgia  30303
             jess@patejohnson.com
6

7

8

9        ON BEHALF OF THE DEFENDANTS:

10           TERRY E. WILLIAMS, ESQ.
             Williams, Morris & Waymire, LLC
11           4330 South Lee Street
             Building 400, Suite A
12           Buford, Georgia  30518
             (678) 541-0790
13           terry@wmwlaw.com

14                        - - -

15

16

17

18

19

20           (Pursuant to Article 10.B of the Rules and
         Regulations of the Board of Court Reporting of
21       the Judicial Council of Georgia, the court
         reporter disclosure statement is tendered at
22       the end of the transcript.)

23

24

25

1      MR. WILLIAMS:  This will be the

2      deposition of William A. Lowe, and it's

3      taken pursuant to agreement of counsel and I

4      think by Notice.

5      I propose that all objections to the

6      questions be reserved except those going to

7      the form of the question or responsiveness

8      of the answer, if that's agreeable.

9      MR. JOHNSON:  No objection.

10     MR. WILLIAMS:  If you'll swear the

11     witness in, please.

12     THE WITNESS:  May I stand up?

13     COURT REPORTER:  Sure.

14     THE WITNESS:  Yeah.  I just think it's

15     that important.

16     COURT REPORTER:  Thank you.  Do you

17     swear or affirm that the testimony you're

18     about to give will be the truth, the whole

19     truth, and nothing but the truth, so help

20     you God?

21     THE WITNESS:  So help me God.

22             WILLIAM A. LOWE,

23  having been first duly sworn, was examined and

24  testified as follows:

25  / / /

<pre>
 1                    EXAMINATION
 2   BY MR. WILLIAMS:
 3       Q    Would you state your full legal name for
 4   the record, please.
 5       A    William Alton, A-L-T-O-N (spelling), Lowe,
 6   L-O-W-E (spelling).
 7       Q    Dr. Lowe, is it?
 8       A    Yes.
 9       Q    Okay.  I may mis -- if I don't address you
10   that way, please don't --
11       A    I go by Bill.  That's fine.
12       Q    -- think that's disrespect, but --
13            So, Dr. Lowe, we just met.  I'm Terry
14   Williams.  I represent the Henry County officers in
15   Henry County who are Defendants in this action.  And
16   I'm going to be asking you questions because you've
17   been identified as a person who may offer expert
18   opinions in this case on behalf of the Plaintiff.
19            Have you ever given a deposition before?
20       A    I have.
21       Q    Okay.  So you're somewhat familiar with
22   the process, but, just as a reminder, it's a
23   question-and-answer session that the court reporter
24   is taking down; so we need to try not to talk over
25   each other, if possible.
</pre>

1            Also, if you can answer verbally rather
2     than just nodding and shaking the head when I ask
3     you questions, that will help get a clean record.
4            A     Understood, sir.
5            Q     Otherwise --
6            The only other thing is, if you respond to
7     the question, we're going to assume you understood
8     it and responded accordingly, unless you say
9     otherwise.
10           If you have any concerns about a question,
11    please let me know; and I'll try to repeat it or
12    rephrase it or whatever to help us communicate.
13           A     Thank you.
14           Q     Any time you want to take a break, let me
15    know.  I'm happy to accommodate you in that, as long
16    as there's no question that's pending.
17           A     Understood.
18           Q     And you've been identified as a person, as
19    I mentioned, who is prepared to offer expert
20    opinions in this case.
21           And you actually provided an Expert
22    Witness Report that was disclosed in the discovery
23    process.
24           Is that right?
25           A     Correct.

1      Q    All right.  You drafted a report.

2           Did you prepare the report yourself?

3      A    I did.

4      Q    Okay.  So you actually typed it in and

5   prepared it and provided it to Plaintiffs' counsel?

6      A    Yes.

7      Q    Okay.  Were there any drafts that you had

8   that were revised because of information that you

9   got either through Plaintiffs' counsel or through

10  other evidence once you prepared it?

11     A    Yes.  There were several drafts.

12     Q    Any significant changes that you recall?

13     A    The only sig --

14          The only addition is, I think that

15  information was obtained during discovery about

16  Henry County's use-of-force policies that I did not

17  have when I did my original draft.  That came back

18  maybe just a few months ago that I was given those

19  use-of-force policies and, I believe, revised the

20  report to reflect that.

21     Q    And the revised report then was provided

22  on May 16th, 2022?

23          Is that correct?

24     A    May I look at my copy?

25     Q    Yes, please, if you've got a copy.

 1     A     May 16th.  Yes, sir.

 2     Q     Okay.  And in our Notice of Deposition, we

 3 asked for you to bring all the materials that you

 4 relied upon and prepared and notes or anything like

 5 that.

 6           Do you have all those materials?

 7     A     I brought most of -- most of them.  I was

 8 not told to bring everything that I referred to.

 9     Q     Okay.  How about notes and things?

10 Because we all hopefully have the same documents

11 pretty much, and I will go through the list of what

12 you reviewed.

13           But did you prepare notes, summaries,

14 things in your own handwriting or typewritten?

15     A     I put some Post-It notes on some of the --

16 like, the police officers' POST profiles.

17     Q     Just highlighting testimony and different

18 things?

19     A     Yes, I mean, you know, how many times --

20 for example, how many times Officer A may have had

21 CPR training or use-of-force or TASER.

22     Q     Did you prepare any notes separately?  I

23 mean, sometimes I see witnesses that will review

24 things, and they'll do summaries or notes and

25 things.

1          Did you prepare anything like that?

2     A     I just reviewed my Expert Witness Report

3 several times and watched the video several times.

4     Q     So once you reviewed things, watching

5 video, reviewing things, you just type in?  You just

6 start preparing your report?

7          Is that the way you did it?

8     A     That's how I did the initial draft.  Yes,

9 sir.

10     Q     Okay.

11     A     I would literally look at it frame by

12 frame and try to do it chronologically.

13     Q     Do you still have a copy of the initial

14 draft?

15     A     I have a copy of all the drafts.  I don't

16 have hard copies with me, but --

17     Q     Okay.  Can you provide us with copies of

18 those?

19     A     Yes.

20     Q     Okay.

21          MR. WILLIAMS:  And you can provide

22      them --

23          MR. JOHNSON:  And I can get those to

24      you, yes.

25          MR. WILLIAMS:  I appreciate that.

1   BY MR. WILLIAMS:

2       Q    Okay.  So I'm not going to introduce a

3   copy of this in the record since we already have it,

4   no use in more copies; right?

5           What I want to know from Dr. Lowe is:

6   Does the report, as it is now written as of

7   May 16th, 2022, contain all the materials that

8   you've reviewed and relied upon and all of your

9   opinions that you expect to offer in the case?

10      A    Yes.

11      Q    The Curriculum Vitae that is attached to

12  it, is it fairly current?

13      A    Yes.

14      Q    Okay.  So there's nothing that you would

15  now change or revise in any way in your report as of

16  May 16th, 2022?

17      A    No.

18      Q    So you've given extensive materials

19  attached to your report, and along with a C.V.; so

20  I'm not going to go through that.  Most of that is

21  clear.

22          Just to sort of highlight, you were

23  employed as a firefighter/EMT/paramedic with Clayton

24  County for 32 years; correct?

25      A    Yes, sir.

1      Q    Retired in August 2011?

2      A    Yes, sir.

3      Q    Then in 2008 you attended the police

4 academy, I noticed in your C.V.

5      Did you become POST-certified as a peace

6 officer then?

7      A    Not at --

8      May 2008 is when I started my police

9 training.  And I believe we graduated in November,

10 so I would have been POST-certified when the

11 graduation took place.

12      Q    Toward the end of 2008?

13      A    Yes.  I believe --

14      Q    And --

15      A    I believe it was November 2008 is when I

16 became POST-certified as an officer.

17      Q    And at that point you were already,

18 obviously, certified as a paramedic/EMT.  You had

19 all the various certifications of a medic and all

20 the way up the line to the top; right?

21      A    Fire officer, HAZMAT technician.

22      Q    Right.  I saw all that in your C.V.

23      So did you decide to go to the police

24 academy so you could become an armed tactical medic?

25      A    My boss, who was the deputy fire chief,

 1  wanted me to go to the police academy more than I
 2  wanted to go.  So he was a great boss, and so I was
 3  happy to -- it was one of the few things he asked me
 4  to do that he asked several times, because it's a
 5  big commitment to go to the police academy.
 6      Q     Um-hum.
 7      A     And so he was a good boss.  I was happy to
 8  go.
 9            And my goal -- my role with Clayton County
10  Fire Department, going to the police academy was so
11  that I could become a member of the tactical medic
12  program where you have armed, deputized and sworn
13  law enforcement officers who carry bullets and
14  Band-Aids.  I mean, we would -- we would train with
15  the SWAT team for both Clayton County Police and the
16  Clayton County Sheriff's Office.  And when they
17  deployed on a SWAT call-out, we would go with them.
18            In fact, when I reported to the police
19  department -- I'm sorry.  When I reported to the
20  Fire Department wearing my Battalion Chief's
21  uniform, I had a sheriff's uniform and a police
22  uniform, as well.
23      Q     Right, because, as I noted in your report
24  and C.V., you became a part-time deputy with Clayton
25  County Sheriff's Office in 2011 through sometime in

1   2012?

2      A    Yes, sir.

3      Q    All right.  But also in 2009 you were

4 hired as a part-time reserve officer by the City of

5 Roswell Police Department; right?

6      A    Yes, sir.

7      Q    Okay.  So after you became an armed

8 tactical medic, did you ever have any occasions

9 where you went to a scene and you had to treat

10 someone who had been injured by the Clayton County

11 SWAT teams?

12          You said that you worked both for the

13 Police Department and the Sheriff's Office in that

14 regard; correct?

15      A    Yes, sir.

16      Q    Did you ever have the occasion to treat a

17 suspect detainee who had been injured through a use

18 of force?

19      A    On occasion.  I don't remember any

20 specific examples.  But it was not unusual during a

21 SWAT raid that one of the SWAT officers would hurt

22 his foot or his arm or the suspect would be

23 pepper-sprayed, so we would have to decontaminate

24 him and treat him.

25          Nothing particularly comes to mind.  I

1   don't recall anybody ever being shot when I was

2   present as a tactical medic.

3       Q    What about treating a detainee after the

4   detainee was tasered?  Did you ever have occasion to

5   treat and deal with examining someone after they

6   were exposed by a TASER?

7       A    Many, many times, not only as an officer

8   but also as an instructor, too, as a TASER

9   instructor.

10      Q    And after someone had been exposed to a

11  Conducted Energy Weapon, commonly known as TASER,

12  what would you be looking for in examining and

13  possibly treating that person?

14      A    Well, the first thing goes back to the

15  basics, airway breathing circulation, make sure that

16  their airway is open and that they're breathing

17  sufficiently to oxygenate their body; and also make

18  sure that their pulse rate is stable, not too slow,

19  not too fast.

20          So that's where it starts at just --

21      Q    Would the TASER use have any bearing on

22  their airways being open or not?

23      A    Not generally, no.

24      Q    So I know from other matters that I've

25  been involved in, a lot of times the EMS will -- the

1  medics will remove the TASER probes as one of the

2  things.  Some departments do the -- have the

3  officers do that and some want to have EMS do it.

4          Is that something you also did?

5      A    I did.

6      Q    Okay.  Did you ever have the occasion,

7  that you can recall, to examine a detainee who had

8  been exposed to electricity through a TASER who had

9  become unconscious or seemed to be still

10  experiencing the effects of the TASER?

11     A    I don't recall an incident where I ever

12  had anyone who suffered from a TASER exposure that

13  was unconscious.  I don't remember having either

14  observed it as a paramedic or as a law enforcement

15  officer, somebody who was unresponsive from a TASER.

16     Q    Right.  Yeah.  And my question wasn't very

17  well framed, but that's what I was wanting to know.

18          Have you ever had to sort of revive

19  someone who had been tasered and by accounts had

20  become unconscious or unresponsive after the use of

21  the TASER?

22     A    And I'm just pausing here for a second

23  trying to reflect upon my long career doing this,

24  because many times, as the Fire Department Battalion

25  Chief, I may show up and observe my paramedics doing

1  it, but I didn't do it.

2      Q    Okay.

3      A    But I don't recall a patient that ever had

4  to be resuscitated from a TASER deployment.

5      Q    Okay.  You became a part-time reserve

6  officer with the City of Roswell in October 2009,

7  and then you became a full-time officer with them

8  after you retired from Clayton County in 2012?

9           Is that right?

10     A    So the way it worked is, is I retired from

11  the Fire Department in August of 2011.  I went to

12  work for Sheriff Kimbrough immediately until he was

13  defeated in his run for reelection.  And then --

14          So once I retired from the Fire Department

15  and resigned from the Sheriff's Office, during that

16  time I was still a part-time police officer with

17  Roswell.  But once I retire -- once I resigned from

18  the Sheriff's Office, then I went to work for

19  Roswell full-time.  They created a new position just

20  for me.

21     Q    And who was the Chief of Police when you

22  went to work at City of Roswell?

23     A    Ed Williams.

24     Q    Is he still the Chief of Police?

25     A    He is not.  He's been retired ten years

1  maybe.

2      Q    Who's the Chief of Police now?

3      A    Oh.  Conway -- Conroy.

4      Q    Did he take over after Williams retired?

5      A    There were two chiefs in between.  We had

6  Dwayne Orrick, and then Rusty Grant, and then Chief

7  Conroy.

8      Q    Dwayne Orrick?

9      A    Orrick.

10     Q    O-R-R-I-C-K (spelling)?

11     A    O-R-R-I-C-K (spelling), yes.

12     Q    And who was after Dwayne Orrick?

13     A    Rusty Grant.

14     Q    And then the one you mentioned.  All

15  right.  Okay.

16          You related in your report and C.V. that

17  you became TASER training certified in 2010;

18  correct?

19     A    Yes.

20     Q    And that was in connection with you being

21  a armed tactical medic?

22     A    Yes.

23     Q    And then you indicate you became an

24  instructor in 2011.

25          So, obviously, you took the course and

1  went through the certification process that

2  TASER-Axon requires to become a certified trainer?

3       A    Correct.

4       Q    Okay.  Do you recall who your instructor

5  was in that program to become a TASER instructor?

6       A    I can see his face, but I don't remember

7  his name.

8       Q    What academy did you go to or what

9  location did you go to get that?

10      A    So the instructor course was taught at the

11 Roswell Police Department, and TASER provided the

12 master instructor who taught the instructor course.

13      Q    So Axon, A-X-O-N (spelling), provided the

14 instructor for that?

15      A    Yes.  And so multiple officers from

16 different agencies would attend, because once TASER

17 sponsored the instructor course, then they would

18 post it on their website and agencies would send

19 other instructors.  So some of them were Roswell.

20 Some of them were from various departments.

21      Q    Right.  And that was in 2011?

22      A    Yes.

23      Q    Okay.  In the field, how many times did

24 you deploy a TASER on a subject, either a person

25 that you had to deal with in some manner or on

1  behalf of some officers involved in an incident?

2      A    So I personally tased four suspects and

3  one Pit Bull dog.

4      Q    And were all --

5          So tell me about each one of those and

6  where you were employed and what the circumstances

7  were.

8      A    Well, they would have -- all have been

9  with Roswell Police.  I didn't -- I was never issued

10 or carried a TASER in my capacity with Clayton

11 County.

12     Q    Okay.  Even though you were trained and

13 certified on it at the time?

14     A    I was trained and certified on it, but --

15     Q    It was more --

16         Because you were working part-time with

17 City of Roswell at the same time.

18         Is that right?

19     A    That's right.

20     Q    When you worked at the City of Roswell,

21 did you carry a TASER after you were certified?

22     A    When we did the instructor class in 2010,

23 that's when Roswell first rolled out the tasers,

24 because we had a new chief, Chief Orrick.

25     Q    Um-hum.

1      A     He was -- he was an advocate for tasers,

2   so that's why Roswell had the instructor training.

3   And I was one of the instructors.  I was picked for

4   that, to be part of the TASER instructor contract.

5      Q     When did you start carrying one yourself

6   when you were on duty as an officer?

7      A     When the policy went into effect.

8           There was a delay between when we had the

9   TASER instructor course and for the policy to get

10  approved.  I don't remember the date that the policy

11  was approved, but --

12     Q     Sometime after you became an instructor in

13  2011?

14     A     Oh, yeah.  It was just maybe a few weeks,

15  maybe a month or so.  It wasn't long.  In fact --

16           In fact, I was the first officer in

17  Roswell to tase someone.  And it kind of became a

18  surprise because -- and I say that because the

19  policy went into effect on, like, a Friday

20  afternoon.  And I was working on the weekend, and so

21  I had the opportunity to tase someone who was

22  violent with law enforcement after a domestic

23  violence.  And so I tased them.  And they put it in

24  the shift report for that 12-hour shift that an

25  officer tased someone.

            Well, the chief read it over the weekend
in his email.  And he didn't think the policy went
into effect -- he didn't think the classes started
for the officers until Monday, but he didn't
realize -- because the training sergeant said, since
you've had the class, as soon as the policy goes in
effect, when the chief signs it, you can carry your
TASER.  But the chief didn't realize that officers
were doing that, so no big deal.

     Q     Um-hum.  So tell me the circumstances
about that, the incident you were just describing.

     A     Yeah.  So he was a very large Hispanic
male.  He had had a physical altercation with his
wife, I believe, in the presence of their children.
And the officers had made a determination they were
going to arrest him for domestic violence, battery.
I don't remember the charges.

            But I arrived as one of the backup
officers.  And when they tried to take him into
custody, he became very combative; so I deployed my
TASER.  And I did a drive stun where I take the
TASER cartridge off the end of it, because there
were four or five officers in a pile on the ground
trying to get him handcuffed.  And I didn't want to
take a chance on firing the TASER with the probes

1  and, perhaps, hitting another officer; so I took the

2  TASER cartridge off the end of it and then turned

3  the TASER on and drive-stunned him in his leg.

4      Q    How many times?

5      A    Just one time.  I mean, it was a

6  five-second ride, but it was the window of

7  opportunity the officers who were trying to handcuff

8  him needed to get him in -- to get him in handcuffs.

9      Q    So you used it for pain compliance?

10     A    Well, when you're doing drive stun, that's

11  all you're getting is pain.

12     Q    Right.

13     A    It's a distraction method.

14     Q    Right.

15     A    It tingles a tad bit.

16     Q    Yeah.  I've had it done before just to see

17  what it was like.  It's an interesting experience.

18     A    It's the longest five seconds of your

19  life.

20     Q    I just had them do it in drive stun for a

21  second on my leg.

22          So tell me about the second occasion.

23     A    And I'm hesitating here because I'm just

24  trying to remember it.  It's not something I had

25  refreshed my memory on in anticipation for this.

1      Q      Um-hum.

2      A      One of them was in March -- so this won't

3   be chronological.  But one of them was in, I

4   believe, March of 2019, is I received -- I was

5   dispatched to a auto accident in a private apartment

6   complex.  It was in the parking lot of an apartment

7   complex.  And the caller reported that somebody had

8   intentionally run into his vehicle head-on in the

9   parking lot, and the person appeared to be under the

10  influence or -- and was being combative or

11  difficult.

12          And I was literally just around the corner

13  and arrived within about 45 seconds.  And so when my

14  police SUV pulled up, the person who had caused the

15  wreck, who was the one that was being reported as

16  difficult, saw me and started walking away.  And

17  he's ignoring my commands to stop.  And I'm giving

18  loud commands, you're under arrest, you're under

19  arrest.  I've alerted back that I need backup and to

20  have my backup step it up or to get here sooner

21  rather than later.

22          And at some point -- I guess we had walked

23  maybe a hundred yards.  And at some point he turned

24  around and faced me, so I pointed my TASER X2 at

25  him.  And he immediately -- he followed commands and

1   got on -- got on the ground and put his hands out to

2   his side.

3         I'm alert -- dispatch is -- we call it

4   Signal 89.  They're checking on my welfare, you

5   know.  Two delta two is my rad -- might have been my

6   radio number, Signal 89; and I would say okay.

7         So we're literally just standing -- I'm

8   standing there pointing the TASER at him.  He's

9   laying on the ground.  And it's a static scene.  And

10  I can hear the sirens coming from the other

11  officers.

12        So there's no need for me to make physical

13  contact with him because we've got a static

14  situation.  I'm prepared to wait.  And I'm happy

15  with the situation where he seems to be compliant.

16        Well, at some point he took his left hand

17  and shoved it in his front pants pocket, and I began

18  to give him commands to take his hand out -- and he

19  made some -- he made -- or that I was going to tase

20  him.  And at some point he yelled out, well, go

21  ahead and tase me; and so I did.  I deployed one

22  probe -- one cartridge, two probes, to his upper

23  back.  I got good neuromuscular incapacitation.

24        And then once the five seconds of TASER

25  energy was over with, I gave him commands to lay on

the ground and -- or to stay on his stomach and put
his hands out to the side; and he did.  And maybe
15 seconds later another officer ran up, and we
handcuffed him.  And that was the end of that.

Q    So one deployment, one trigger pull,
five seconds?

A    Yes.

Q    And it achieved neuromuscular
incapacitation for --

A    Very much so.

Q    -- a period of time?

It was successful, in your view?

A    Yes.  Oh, absolutely.  And it was ruled as
a good use of force.

Q    Where did the prongs strike the person in
their bod -- his body?

A    So it was on the right side of his upper
back, one just on the scapula and then one just
above the waist.  I had maybe a two-foot probe
spread.

Q    So he was already in the prone position?

A    Yes.  He was laying facedown, prone.

Q    And he was laying facedown in the prone
position when he put his hand in his pocket?

A    He put his left hand in his pants pocket,

1    his front pants pocket.

2         Q    Okay.  Did you ever find out, did he have

3    anything in his pocket that he was trying to get to?

4         A    There was no pistol or knife or --

5              I don't remember what he had in his

6    pocket.

7         Q    Do you recall that person's name, by

8    chance?

9         A    I mean, I have the record, but I don't

10   know his name.  I don't remember his name.

11        Q    And you said that was in 2019?

12        A    Yes, I believe March of 2019.

13        Q    So how long had been -- had the subject

14   been in the facedown prone position before you used

15   the TASER on him?

16        A    Oh, maybe 45 seconds or 60 seconds.  It

17   wasn't very long.  I mean, from the time I asked

18   other officers to hurry up, we walked approximately

19   the length of a football field.  And then when he

20   turned to face me -- because I was gaining ground on

21   him.  I was closing the gap between us.  And I was

22   giving him instructions of you're making it worse,

23   stop walking away.  And at some point he turned

24   around and faced me, and that's when I went -- I

25   display -- I showed him my TASER and pointed it at

1   him, gave him -- and as soon as I gave the commands

2   to get on the ground, he did and --

3       Q    And then how long after tasing did he stay

4   in this prone position on the ground?

5       A    A relatively short period of time, and I

6   don't know, because once the other officer got there

7   and handcuffed him, I just -- I just stepped away

8   because, I mean, I had -- it had been pretty

9   intensely -- there was -- there was a lot of

10   intensity of the stress.  So once another officer

11   showed up and put him in handcuffs, that's when I

12   told everyone they could slow down, the subject has

13   been detained.  And I vaguely remember just

14   walking -- just walking off to kind of just

15   decompress.

16       Q    Do you know who the other officers were

17   who responded?

18       A    Well, Sean Thompson was the one who put

19   handcuffs on him.  And that's S-E-A-N (spelling)

20   Thompson.  And he's still there.  He's a detective.

21       Q    All right.  You mentioned four, so

22   we're -- that's two.

23          Do you remember another one?

24       A    And I guess part of the challenge I have

25   recovering here on the spot is, I've just done so

1  many TASER deployments in training and watching

2  videos, it's --

3      Q    That's fine.  If you don't recall the

4  details of them, that's fine.

5      A    The only other one I recall is when I

6  tased the Pit Bull dog.

7      Q    Okay.  I don't blame you for that.  When

8  you're in a situation with a Pit Bull dog, that may

9  be definitely the best way to handle it.

10          In the other occasions that you -- you

11  don't recall the details, but did you have to ever

12  deploy the TASER more than one occasion on a trigger

13  pull?  Deploy the TASER in more than one trigger

14  pull on an occasion is a better way to put that.

15     A    I don't ever recalling [sic] having fired

16  the TASER more than one time on one person.

17     Q    Do you recall each time that you used it,

18  that you had good contact, whether it was probe or

19  drive stun, to deliver the electrical charge?

20     A    I don't remember not having any issues

21  with the TASER, sir.

22     Q    Okay.  Do you recall any of the persons on

23  whom you used the TASER having any health

24  conditions, any physical problems as a result of

25  your use of the TASER?

1      A    No.

2      Q    Were there any complaints made against you

3 regarding the use of the TASER -- your use of the

4 TASER on any of those occasions?

5      A    Are you talking, like, maybe an official

6 complaint with the department?

7      Q    Yes, or --

8      A    No.  I mean, I'm sure they complained to

9 the sergeant that they didn't like being tased,

10 but --

11      Q    But nothing filed, no disciplinary

12 inquiry, anything of that nature?

13      A    No, not with tasers, no.

14      Q    Okay.  Have you ever had any occasion in

15 which a complaint was filed against you and there

16 was, you know, an investigation into it?

17      A    Several.

18      Q    Okay.

19      A    Many.  Sever -- well, I say several.

20           Yeah.  There were a few.

21      Q    Okay.  Well, tell me about those.  And I

22 want to know about complaints regarding use of

23 force, not some other, like, arrest or rude behavior

24 or anything like that.  I'm talking just use of

25 force.

1    A    I had no complaints regarding use of

2 force.

3    Q    Okay.

4    A    I had demeanor complaints where I was -- I

5 wasn't polite or they shouldn't have gotten the

6 ticket, but there were no allegations of excessive

7 force.

8    Q    All right.  And that's with any department

9 that you've been with as far as in your law

10 enforcement capacity, no complaints regarding use of

11 force?

12    A    No one has --

13         No citizen has ever accused me of use

14 of -- mis -- or using excessive force.

15    Q    How about any other officers or

16 supervisor?

17    A    No.

18    Q    Have you ever had to restrain a detainee

19 on any occasion in which the detainee was not being

20 compliant, was physically struggling, by putting

21 body-weight pressure on them to hold them down?

22    A    I may very well have put body-weight

23 pressure on them to get them in the handcuffs, but

24 then it came off.

25    Q    As far as putting body-weight pressure on

1  a detainee, is it ordinary police practice, if you

2  are trying to arrest someone and you need to get

3  them on the ground, to put them on a prone position

4  initially to exercise better control and exercise

5  control safely?

6      A    The preference is to get them prone,

7  facedown, so that you can get their hands behind

8  their back.

9      Q    So that's pretty much basic law

10 enforcement procedure; correct?

11     A    Yes.

12     Q    And acceptable and has been that way for

13 many years?

14     A    Yes, absolutely.  And, of course, as we've

15 seen since George Floyd, you know, expectations both

16 within law enforcement and within society, you know,

17 things are being reevaluated, and they should be.

18     Q    And it has been a common police practice

19 for many years that if a subject is resisting

20 physically during that process of when they're put

21 on the prone position and they're being handcuffed,

22 to place a knee, perhaps, or some body weight on

23 their back to sort of hold them down and get

24 control.

25          Is that true?

1    A    I think a better statement, if I may, sir,

2  is that you may very well put your knee on their

3  shoulder because your knee has got to go somewhere.

4  You've got to be close enough to be able to

5  manipulate their arms.

6    Q    Right.

7    A    And so maybe, yes, but --

8         There may be occasions where you would put

9  a knee on their shoulder or on their buttocks or

10  something like that for a short period of time --

11  for a brief period of time to get the handcuffs in

12  place.

13    Q    And it's been an acceptable practice by

14  police officers and police departments for many

15  years to use that type of body weight, either from a

16  knee or maybe even a hand, if you have one

17  available, to hold the suspect while that process of

18  handcuffing is taking place?

19    A    Agreed.

20    Q    And would you agree, too, that that

21  process of using body weight to control a suspect

22  may continue longer if the suspect is resisting and

23  not being compliant with the handcuffing or being

24  still and not flailing about?

25    A    And what I would tell you is, is officers

1  have to constantly evaluate what is the level of

2  resistance the person is offering at this moment

3  versus the amount of restraint that has been

4  applied.

5        And I would say that if the handcuffs have

6  been applied, then I would expect officers would use

7  less body weight because they've got some degree of

8  compliance.

9        I mean, the person is going to be very

10  limited to what they may be able to do if their

11  hands are -- their hands are restrained, so that's

12  two weapon system -- two personal weapon systems

13  that the officers don't have to be concerned about

14  anymore because his hands are handcuffed.

15     Q    Okay.  So do you ever recall a specific

16  incident where you had to restrain a detainee who

17  was physically resisting and being combative by

18  putting a knee on the subject's back -- upper back

19  during the handcuffing process or even after the

20  handcuffing was completed?

21     A    I don't recall a specific incident.  Do I

22  believe at some point during my service -- because

23  the only people I ever arrested was when I was a

24  Roswell police officer.

25        But when -- with people I arrested who

1   became combative in Roswell, would there have been

2   an occasion where I put -- would have put a knee on

3   their shoulder or their buttocks to handcuff them?

4   I'm sure that happened.

5       Q    Over the years you were employed with the

6   City of Roswell Police Department, how many --

7   approximately how many arrests did you make?

8       A    Well, I know in one --

9            If I had to guess, it would -- 1,800 to

10  2,000, just me coming up with a number.  I was very,

11  very proactive.

12      Q    And were you basically a patrol officer

13  the entire time you were with Roswell?

14      A    I spent some time in the traffic unit.

15  And when I was in the traffic unit, I had a hybrid

16  position; so half my workweek was devoted to traffic

17  and half my workweek was devoted to training

18  officers.  And then that -- the schedule changed, so

19  then I became --

20           But most of my time with Roswell, I was a

21  uniform patrol officer, but I was very proactive.

22  They use -- they -- I'm sorry.

23      Q    When you say "very proactive," I take it

24  from the context you're referring to making

25  arrests -- doing investigations, making arrests --

1    A    Yes.

2    Q    -- as compared to other officers?

3    A    They use to publish the statis -- the

4  department use to publish statistics of officers'

5  activities.  And when they were doing that, in

6  almost every category -- I don't remember if it was

7  monthly or quarterly, but I was always at the top of

8  traffic stops, drug arrests, custodial arrests.  I

9  was very proactive.

10    Q    Did you ever have the occasion to have to

11  detain or arrest a naked individual?

12    A    None of them come to mind.  But I've seen

13  lots of naked people during my public safety career,

14  so I'm sure some of them were at Roswell.

15    Q    But you don't recall ever having to

16  actually detain or arrest, meaning you've got to get

17  hands on and arrest -- and handcuff this person

18  who's naked?

19    A    I'm sure it happened, but I don't have a

20  particular --

21          And, see, part of the problem is, is, you

22  know, it all blends into just this -- you know, what

23  have I done for 11 years and 3 months at Roswell.

24          But was there a naked person that I had to

25  arrest because they took their clothes off for

1   whatever?  I'm sure that happened.  I'm confident it

2   did, but I can't tell you where and when.

3       Q    Do you ever recall having to arrest a

4   naked person walking down the street at night?

5       A    Well, I generally worked days, so I'm sure

6   I didn't arrest any -- I would -- it would be

7   unlikely I would have done any at night.

8            But it is something that I dealt with as a

9   paramedic.  So I've seen lots of naked people, some

10  inside their house, some outside their house, who

11  needed help.

12      Q    Did you have any occasion where a naked

13  person you tried to arrest or needed to arrest had

14  become combative and you had to go hands-on with

15  controlling them, getting compliance?

16      A    I'm sure that happened.

17      Q    You can't recall any specific occasion?

18      A    I don't recall a specific occasion.  No,

19  sir.

20      Q    Would you agree that dealing with a naked

21  person presents special challenges in terms of

22  trying to get control over them?

23      A    It does.  It does.

24      Q    And if you --

25           Are you familiar with any studies that

1  show that a naked person encountered by police is

2  four times more likely to become violent in the

3  encounter?

4      A    I would not dispute that.

5      Q    And that would likely be because whatever

6  caused the person to become naked in public, since

7  he was walking down the street, has probably

8  influenced their behavior; correct?

9      A    It's the totality of the person that we

10 find at 2:00 o'clock in the morning who's naked

11 walking down the street.  There's a lot going on

12 within their -- within their body and in their mind.

13 They're clearly -- they're in conflict.

14     Q    They're clearly not normal.  They're

15 either under the influence of drugs or emotionally

16 or mentally disturbed; correct?

17     A    Or all of the above, no doubt.

18     Q    Okay.  All right.

19     A    But if I could just add this, Terry.

20     Q    Yeah.  Sure.

21     A    Okay.

22     Q    Sorry.

23     A    Law enforcement doesn't get to pick the

24 people we come in contact when we get a 9-1-1 call.

25 And whether they're in a three-piece suit or whether

1   they're naked, the responsibility is exactly the
2   same.
3       Q    I'm trying to find --
4            You have your copy of your report; right?
5       A    I do, sir.
6       Q    Can you tell me where the list of the
7   materials that you reviewed is?
8       A    It is on Page 4, sir.
9       Q    Page 4.  All right.  It was.  I overlooked
10  it.
11      A    At the bottom.
12      Q    Ah.  Okay.  So on page -- starting on
13  Page 4 of your report and going through page -- over
14  to Page 5, you list the documents and resources you
15  consulted and reviewed; correct?
16      A    Yes.
17      Q    Is that extensive?  That's -- that covers
18  everything that you reviewed or consulted?
19      A    Yes.
20      Q    You listed a number of things that you
21  noted provided the officers at the scene with
22  probable cause to detain Ferdinand [sic] Rodriguez;
23  correct?
24           Let me go there.  It's on --
25      A    So it's on Page 15, Terry.

1    Q    15?  Yeah.  And looking at all those --

2   and I appreciate that -- I believe you are

3   correct -- you would agree that there was certainly

4   probable cause to detain and even arrest Fernando

5   Rodriguez during this incident?

6    A    Yes.  He had committed crim -- he had

7   committed violations of the Georgia Criminal Code.

8    Q    Okay.  And when Officer Quinton Phillips

9   from the Henry County Police Department arrived at

10  the scene, he was responding to calls for assistant

11  by -- assistance by the City of Hampton officers;

12  correct?

13   A    Yes.

14   Q    And he was aware that they had attempted

15  to detain someone and the suspect was being

16  combative; correct?

17   A    I don't know what Officer Phillips was

18  aware of.  I haven't heard any radio traffic.  I

19  mean, I would imagine as soon as he did his

20  windshield assessment when he pulled up, he could

21  see that, you know, there was some activity around

22  somebody laying on the ground; so, I mean, he

23  probably reached that conclusion pretty quickly.

24   Q    He certainly knew, from the radio traffic

25  that you did review, that officers needed

1   assistance --

2        A    Yes.

3        Q    -- with a suspect they were trying to

4   detain?

5        A    Yes.

6        Q    And when he arrived at the scene, as you

7   mentioned, when he first pulled up, through the

8   windshield and when he got out, he observed

9   Rodriguez naked in the street and saw the Henry --

10  saw the Hampton police officers giving him commands;

11  correct?

12       A    Yes.

13       Q    And he saw that he was ignoring the

14  officers' commands and trying to get away.

15            He was moving backwards in his crab-crawl

16  position when Phillips was approached; correct?

17       A    Yes.

18       Q    Okay.  And that certainly provided

19  Officer Phillips with justification to try to

20  restrain Ferdinand [sic] Rodriguez; correct?

21            MR. JOHNSON:  If I can interject, his

22       name is Fernando, just to be clear.

23            MR. WILLIAMS:  What did I say?

24            MR. JOHNSON:  Ferdinand.

25            MR. WILLIAMS:  I thought I said

1    Fernan -- okay.  I'm sorry.  Yeah.

2    Fernando.

3         MR. JOHNSON:  Also, the line of

4    questions, it's -- these are all leading

5    questions.

6         Can we cut back on the leading

7    questions just a bit?

8         MR. WILLIAMS:  I am allowed to lead.

9    Why would I not be allowed to lead?

10        MR. JOHNSON:  You have him on direct,

11   and you're testifying for him.

12        MR. WILLIAMS:  Yeah, but he's your

13   witness, so --

14        MR. JOHNSON:  Okay.

15        MR. WILLIAMS:  Yeah.  I mean --

16   BY MR. WILLIAMS:

17   Q    Do you understand my question, subject to

18   that objection?

19   A    Will you repeat it, please?

20        MR. WILLIAMS:  Can you repeat that?

21                  (Thereupon, the designated

22                  portion was read back by the

23                  court reporter.)

24        MR. WILLIAMS:  Fernando Rodriguez.

25   A    And I would say no.

1  BY MR. WILLIAMS:

2      Q    You don't think, based on all the things

3  we just discussed in these prior questions, that

4  Officer Phillips would have justification to

5  restrain -- to attempt to restrain Fernando

6  Rodriguez?

7      A    No.

8      Q    Why not?

9      A    There's three officers there who have been

10 dealing with Fernando.  He just shows up, and he's

11 immediately going to come up and take a leadership

12 role and determine that, hey, even though I've only

13 been on the scene for 20 seconds walking from my car

14 door to this, all of a sudden I'm going to decide

15 that I'm the person, that this is the time to arrest

16 him.

17         I would be looking at one of the senior

18 officers for Hampton and saying, what's the plan,

19 what's the strategy, where are we at.

20         I mean, there was no compelling urgency

21 whether -- it wouldn't have taken but a second for

22 Phillips to say, what's the plan, what have we got

23 here.

24     Q    Well, in fact, he didn't immediately --

25         I was just asking you that question, that

ultimately that would have given him the right to do
that should he choose to do so.

But he didn't actually come up immediately
and start trying to restrain him himself; correct?

A    And I would say he's there as a backup
officer to support the Hampton officers and --

Q    Right.  And, in fact, the Hampton officers
asked him if he would assist them in restraining
Fernando Rodriguez once he arrived at the scene, I
mean physically to their location; correct?

A    And that's different.  And that's when
they -- the four of them made the decision, now that
we've got four officers here, let's get him in
handcuffs.  And so, yes, but --

Q    And you agree that when they were making
that decision, Rodriguez was still moving and was
still not compliant; correct?

A    He was -- he was not compliant.  He
clearly wanted to be somewhere else and he was
doing -- yes.

Q    And it was appropriate for them to try to
restrain him, get him under control, since he was
still naked in the middle of the street posing a
danger to himself and to others; correct?

A    I believe --

1          My opinion is at some point Fernando was

2    going to have to be placed in handcuffs.  And the

3    officers made a decision that this is the time to do

4    it, we've got four officers here and let's get him

5    into custody now.

6          One of my principles is, if you know you

7    have to arrest someone, the sooner you get them in

8    handcuffs, generally the better it is.  Now, you may

9    pause or delay for a advantage, such as having more

10   officers there, and that's a good strategy.

11      Q    All right.  Which is apparently what the

12   Hampton officers did.

13          They were waiting for other officers to

14   arrive so they could all go on and try to restrain

15   this fellow; correct?

16      A    Yes.

17      Q    Yeah.  And you noted in your report a

18   number of times that Officer Marcus Stroud with the

19   Hampton Police Department was in control of the

20   scene, sort of the officer giving orders and giving

21   directions to the officers that were with City of

22   Hampton, and even when Phillips arrived; correct?

23      A    The Incident Report -- the City of Hampton

24   Incident Report said -- or one of the detectives'

25   reports said that Stroud was the officer in

1  charge --

2      Q    Right.

3      A    -- of the Hampton officers.

4      Q    And you saw in the video that Stroud gave

5  Officer Phillips instructions on several occasions;

6  correct?

7      A    Yes.

8      Q    About putting a knee on him, putting body

9  weight on him and using the TASER on him; correct?

10     A    He gave those instructions, but it's still

11 Officer Quinton's use of force.

12     Q    Well, I understand.  I didn't ask you that

13 question.

14     A    Yeah.

15     Q    But I just asked you:  He gave

16 instructions; correct?

17     A    He did, yeah.

18     Q    Okay.  And at some point after Phillips

19 arrived and got -- was seeing what was going on, he

20 did pull his TASER, which I think you've already

21 said was a TASER X2; correct?

22     A    Yes.

23     Q    And Stroud requested him to use his TASER

24 on Rodriguez; correct?

25     A    Yes.

1      Q    And Phillips did?

2      A    Four times.

3      Q    Well, he first deployed the TASER in the

4  prong mode --

5      A    Um-hum.

6      Q    -- correct, the trigger pull; right?

7      A    Yes.

8      Q    And you saw --

9           Were you able to determine whether the

10  probes struck Rodriguez?

11     A    No, because by then he had already been

12  tased by different officers with Hampton.

13     Q    Okay.  And you saw from the video that

14  the -- Phillips's discharge, trigger pull, that

15  first application, did not cause neuromuscular

16  incapacitation; correct?

17     A    No.  I -- Phillips' first use of the

18  TASER X2 did cause neuromuscular incapacitation

19  because you can see -- he's lying su -- he's lying

20  supine.  He's laying on his back.  And you can see

21  the electricity.  I mean, it's a pretty good probe

22  spread.  It looks like one's in his thigh and maybe

23  one's in his hip area or maybe just below his

24  diaphragm; but you can see the electricity.

25           So my assessment is, Phillips' first TASER

1  deployment with his X2 was effective.

2      Q    And you believe you can see that on video?

3      A    I can see the arcing, where the

4  electricity is arcing on the probes that are in the

5  skin.

6      Q    And you're referring to the Lewis video?

7      A    The body-cam video, yes --

8      Q    Um-hum.

9      A    -- that's 30 minutes and some seconds

10  long.

11      Q    Did you primarily rely upon the Lewis

12  body-cam video, which I will submit to you is the

13  one that shows the most of the interaction, the most

14  views of what's going on?

15          Is that what you relied upon?

16      A    That's the only video I have access to.  I

17  haven't seen any others.

18      Q    Oh.  That's the only one you've seen?

19      A    Yes.  I know they're mentioned in the

20  reports.  I think Phillips, I believe -- or maybe

21  Butera said, when I arrived on scene, I positioned

22  my patrol car with my dash cam recording.  But those

23  have not been provided to me.

24      Q    Okay.  You believe you see on that Lewis

25  body-cam video electricity arcing between the probes

1  showing what you've referred to as neuromascular --

2  neuromuscular incapacitation?

3      A    Yes.

4      Q    Okay.  We're going to watch the video.

5  I'll need you to show me that eventually, but we'll

6  do that in a little bit.

7           And as the events transpired from that

8  point forward, after the first trigger pull,

9  Officer Phillips trigger-pulled the TASER several

10 more times; correct?

11     A    Yes.

12     Q    All right.  And did you see any evidence

13 in those pulls that there was neuromascular --

14 neuromascular -- neuromuscular incapacitation?

15          I'm going to just refer to it as NMI.

16          Is that okay going forward?

17     A    That's fine.

18     Q    Okay.

19     A    No, I couldn't, because by then Lewis's

20 body cam -- they had all congregated into a pile, so

21 the image -- there was almost no light.  The camera

22 wasn't picking up anything.  All you can just see is

23 shadows more than anything else.  You can't see

24 features during the restraining of Fernando.

25     Q    So is it fair to say, the only one that

1  you can tell achieved NMI, as you've seen it, was

2  the first deployment --

3       A    Yes, with --

4       Q    -- and the first trigger pull?

5       A    With Phillips.

6       Q    Right, with Phillips.

7       A    But then if I could add that once Phillips

8  got closer, while they were going to handcuff him,

9  when he pulled the TASER X2 trigger a second time,

10  the gap would have been narrower because the TASER

11  is closer to Fernando; so the probe spread is

12  narrower than it was when he was -- when Phillips

13  was maybe seven or eight feet away.

14            Does that make sense, Counselor?

15       Q    No.  Are you talking about a second

16  deployment of different probes --

17       A    No.

18       Q    -- or you're talking about the same probes

19  that were deployed the first trigger pull?

20       A    So when Phillips pulled the trigger the

21  first time, he fired his left cartridge.  Two probes

22  came out.  And I believe one hit him in the thigh

23  somewhere, and one hit him below the diaphragm.

24  When he pulled the trigger a second time, it fires

25  the right cartridge.

1           And because they had closed in to restrain

2    him and get him in handcuffs, the TASER X2 was

3    closer to Fernando; so the probe spread narrow --

4           The closer you get, the narrower the probe

5    spread.

6       Q    Right.

7       A    And if you don't have at least --

8           Generally, the preferred is, you have to

9    have 12 inches of probe spread to get neuromuscular

10   incapacitation.  And he would have had less than

11   that.

12      Q    Do you know how much?  Are you able to

13   determine, because there's so many different probes

14   that you wouldn't be able to see with --

15      A    And that's right.  And the probes are

16   pretty much the same.

17      Q    Um-hum.

18      A    But every time -- I'm sorry.

19          So every time Phillips pulled the trigger,

20   the first one -- the first time he pulled, it fires

21   the left one.  And every time after that, it only

22   energizes the right cartridge.

23      Q    So the second trigger pull, the right

24   cartridge probes deployed.  And then the subsequent

25   trigger pulls would have been trying to impart

1  delivery of electricity through those probes from

2  the second cart -- the right cartridge?

3      A    Yes, just the ones on the right.

4      Q    Right.  And if it was a short spread, it

5  wouldn't have been imparting any electricity that

6  would conduct -- that would cause any

7  neuromuscular -- or affect the muscles at all;

8  right?

9      A    That's correct, Terry.  It would have just

10  been more pain compliance with the probes being

11  close to each other.

12      Q    And do you know that in those four trigger

13  pulls initially, first with the left cartridge and

14  then three with the right cartridge, that

15  electricity was actually being delivered to

16  Rodriguez's body?

17      A    You can't tell that from the video.  You

18  would have to have the pulse graphs from --

19      Q    Right.

20      A    And I have not -- I don't believe I've

21  seen the pulse graphs.

22      Q    You haven't seen the pulse graphs.  I

23  noticed that.

24          A TASER download will show what was

25  recorded about the electricity.  It gives pretty

1  detailed information, including diagnostic

2  information, as well as pulse graphs that show the

3  level of discharge; correct?

4       A    Well, that's right.  It will show the

5  amount of microcoulombs, which is --

6       Q    Right.

7       A    -- a measurement of energy.

8            You know, TASER prides itself that -- they

9  use to market it gives 50,000 volts of electricity.

10  A long time ago they use to market it that way.

11       Q    Right.

12       A    But that's not true.  It's generally

13  around 1,200 volts.

14       Q    Right.

15       A    The tasers today are so much safer because

16  they regulate the --

17       Q    Um-hum.

18       A    -- to give people the safest-possible

19  amount of electricity.

20       Q    And the media love to report 50,000

21  volts --

22       A    50,000.

23       Q    -- on any incident involving police use of

24  TASER; right?

25       A    Right.

1      Q    When it actually --

2          The volts really is not what determines

3 the effect on the person.  It's how it's delivered

4 in microcoulombs; correct?

5      A    That's correct.

6      Q    It's kind of similar to the amps sort of.

7 So if you've got 50,000 volts or 1,200 volts, that's

8 just the energy waiting to be deployed.

9          But how much of it's deployed depends on

10 the microcoulombs or amps; correct?

11      A    Yes.

12      Q    And, in fact, the amount that's deployed

13 in a TASER, a TASER X2, for example, is much, much,

14 much less than actually what would be imparted by an

15 AED; correct?

16          Do you know the difference?

17      A    You know, but generally defibrillators

18 are -- the measurement is joules.

19      Q    Right.

20      A    So I don't know what the comparison is

21 between a joules and a microcoulomb.  It would just

22 be a guess.

23      Q    I think it's something around 3,000 times

24 greater in an AED over a TASER.

25          But you're not familiar with those

1    statistics?

2         A    I don't know that I've ever thought about

3    it in those terms.

4         Q    Okay.  Have you ever --

5              Have you reviewed TASER download printouts

6    and pulse graphs before?

7         A    I have.

8         Q    Do you know how to read them?

9         A    I have.  I do.

10        Q    Okay.  Do you know --

11             What does it mean if the TASER download

12   shows a --

13             Let me see what we've got here.  I'll let

14   you look at this, actually.  Here we go, a cartridge

15   sense fault.

16             Do you know what a cartridge sense fault

17   is?

18        A    So for some reason the cartridge is not

19   communicating well with the TASER, or vice versa.

20             I've had that happen with my own duty

21   TASER that I carried as a Roswell police officer.

22   Oftentimes, it's a simple fix of, you take the

23   cartridge out, you set it back -- you push it back

24   in; maybe like an iPhone charger that you stick the

25   charger in your iPhone, it doesn't start charging,

1    then you turn it and it does; or sometimes, like,

2    with a TASER X2, if you'll swap the cartridges, then

3    the fault icon will go away.

4        Q    Okay.  What does that mean in terms of

5    electrical delivery of electricity -- delivery of

6    electricity?

7        A    I have fired cartridges that said

8    cartridge fault, and they fired fine and they

9    provided the same amount of electricity.

10            It's just -- like I say -- I look at it as

11   a miscommunication between the cartridge and the

12   TASER.

13       Q    Do you know what it -- what happens when

14   there is arcing between the probes?  When you see

15   the flash as you've described, what's happening in

16   that -- when that occurs?

17       A    So when the -- one of the -- when the

18   cartridges come --

19            When the probes come out of the cartridge,

20   one of them is positive and one of them is negative.

21   And all they want to do is hold hands, and they

22   prefer to hold -- they're designed to hold hands

23   within the body.  That's why if one probe hits you

24   in the shoulder and one probe hits you in the leg,

25   they will hold hands -- the electricity will use

1  your body fluids to hold hands with the electricity.

2         That's why a good TASER deployment is a

3  quiet TASER deployment because the electricity is

4  happy --

5         Q    Right.

6         A    -- because it's holding hands with the

7  opposite -- with the opposite polar.

8         Q    And if it's arcing and making noise,

9  that's an indication that it's not making the

10  contact between the two points; correct?

11        A    That's right, because if the cart -- if

12  the probes are generally more than two inches apart,

13  the electricity can't close the gap in air; so

14  that's why --

15        And you heard some of these in the

16  incident in Hampton in Henry County, is the officer

17  could say you don't have a good deployment, because

18  when Fernando was back-crawling, one of the cart --

19  one of the probes came out.  So one probe is in his

20  body.  One probe is laying on the asphalt.  The

21  officer fires his TASER again, but it's not happy

22  because the TASER probe on the asphalt is unhappy

23  because it can't find the one in the body.

24        Q    And that happened a number of times during

25  these attempted deployments of tasers, both with the

1  City officers and with Officer Phillips; correct?

2      A    And that's common with tasers.  Some

3  tasers can be positional in that they get caught in

4  baggy clothes.  So if the person is leaning one

5  direction versus the other, as long as the probe can

6  get within an inch and a half to two inches of the

7  skin, the electricity will go into the skin and hold

8  hands with the other probe.

9      Q    And if a subject that the TASER is being

10 deployed on has more fat, say if they're obese, that

11 can also affect the delivery of electricity or the

12 ability for it to affect the muscles; correct?

13     A    I would say no.  Whether they're --

14          One of the challenges is, very, very

15 skinny people are at greater risk for TASER

16 deployments, frail or infirm or skinny.  But I've

17 never --

18          With all the officers that I've tased in

19 training, whether they're plus-size or normal size

20 or small, the electricity affects them the same.

21     Q    Where do you put the tasers, though, on a

22 person -- on an officer when you're using it on them

23 in training?

24     A    We almost always probe them from the back.

25 That's part of the training doctrine that we're --

1   the procedure --

2        Q      You don't fire the probes into them in the

3   back?

4        A      Yes, we do.

5        Q      You fire the probes in them?

6        A      We fire right into them.

7        Q      You don't do the connector --

8        A      We don't do the alligator clips.

9        Q      Oh, okay.

10        A      And one reason is, is with the alligator

11   clips, it's like a drive stun.  So where the --

12   where you -- because you're clipping them to their

13   clothes, you den -- you generally get more burn

14   injuries.  And it's better to put the probes in

15   them.

16             One reason why we probe officers during

17   training, or we prefer, is it gives the students who

18   are becoming TASER instructors the opportunity to

19   take the probes out.

20        Q      Um-hum.  Do you agree with the statement

21   that if a TASER is not imparting electricity to a

22   subject, even though the trigger is being pulled,

23   those trigger pulls do not constitute a use of force

24   since no force is being applied to the subject?

25        A      I don't agree with that.

1    Q    Okay.  If a person --

2         If an officer is using an ASP baton in an

3    incident and he swings and misses the subject with

4    the ASP baton, he hasn't used force on the subject,

5    has he?

6    A    I would say he has used force.

7    Q    He's attempted to use force, but if it

8    doesn't --

9         If you shoot someone -- or shoot at

10   someone and you don't hit them, you haven't used

11   deadly force on that person, have you?  You've

12   displayed it, but you weren't successful; correct?

13   A    And I would say that you committed

14   aggravated assault -- aggravated battery if you

15   shoot at somebody and miss.

16   Q    But that's a different notion of whether

17   there's any criminal or even policy violation.  I'm

18   just talking about whether there's been any use of

19   force on that individual.

20   A    And what I --

21        So I guess the way I would answer that

22   question, Terry, is, if I fire at somebody with a

23   TASER and one probe hits them and one probe misses,

24   I still used force because their body got struck by

25   a probe.  Even though they didn't get any

1   electricity, they still got a probe inside that

2   penetrated their skin.

3       Q    Right.  You understand that the TASER

4   training materials and TASER policy does not

5   prohibit multiple discharges of a TASER during an

6   incident.

7       A    It does not.

8       Q    Correct?  Okay.

9            The training materials refer to sort of,

10  ideally, of using a number of TASER deployments and

11  then reassessing; correct?

12      A    They would tell you --

13           TASER would tell you: reassess before

14  every use of a TASER.

15      Q    Right.  And that's just a recommendation?

16      A    And that applies to all of an officer's

17  tools on their tool belt, is always reassess -- you

18  hit them with one baton strike.  You're going to

19  reassess before you hit them with another.  But

20  generally --

21      Q    Sure.

22      A    Generally, tasers is, less is best.  The

23  fewer times they get tased, generally the better

24  outcome for everyone.

25      Q    Right.  You agree it's not a violation of

1   Axon's training for an officer to use a TASER
2   multiple times if he deems it appropriate and if
3   it's reasonable under the circumstances; correct?
4        A    If it's a -- if an officer can --
5        Q    The thing about --
6             Listen, when I ask a question that calls
7   for a yes or no, please say yes or no.  That's the
8   way the process is supposed to work, because I am
9   allowed to ask cross-examination questions.
10            If you want to explain it, you can do
11  that.  You have the right to do that.  That's what
12  the judge would tell you.  But I would like to get a
13  yes or no.
14       A    Would you restate the question, please,
15  Counselor?
16       Q    It's not a violation of TASER policy or
17  TASER training to use a TASER on more than one
18  occasion on a suspect; correct?
19       A    No.
20       Q    Okay.  Let's talk about your expert
21  witness consultation and work.
22            In this case you've been identified by the
23  Plaintiffs as an expert witness, a person that's
24  going to give expert testimony under the Federal
25  Rules.

         When did you start doing this type of
work?

    A    This is the first time.

    Q    First case you've worked on?

    A    Yes, sir.

    Q    All right.

    A    I did work on -- I did work on another one
in Norcross maybe seven or eight years ago, but all
I was asked to do was to write a single statement.
There was no deposition.  I just wrote a single
statement that officers -- and I believe it's
something to the effect of officers should be
certified in tasers if they're going to carry them,
and these officers were not.

    Q    Um-hum.

    A    But that was the extent of it.

    Q    Who did you write that for?

    A    It was the Gwinnett -- it was the City --

         It involved the City of Lawrenceville
Police Department.

    Q    Okay.

    A    And it really wasn't --

         And the way the case happened is, is they
attempted to tase someone.  It was unsuccessful, so
they ended up shooting them and killing them.  And I

1  guess the gist of the lawsuit was, if they had been

2  better trained in their TASER, maybe it wouldn't

3  have transitioned to a use of force where somebody

4  had to be killed.

5      Q    Who did you write the statement for?  Who

6  asked you to do that?

7      A    The Plaintiff's lawyer.

8      Q    Who was that?

9      A    Ooh.  I don't -- I can find it.

10     Q    Okay.  And so, then, this case, then, you

11 were --

12          How did it end up that you were contacted

13 and got involved in this case?

14     A    So Jeff McCaslin is a Lieutenant at the

15 Clayton County Police Department.

16     Q    McCasolum?

17     A    McCaslin.

18     Q    How do you spell that?

19     A    M-C -- hold on -- M -- McCaslin?

20 M-C-C-A-L-I-N (spelling) [sic], McCaslin.

21          But he is the training Lieutenant for the

22 Clayton County Police Department.  He was one of my

23 instructors when I went to the police academy.  And

24 then he also became one of my students because when

25 I was a master instructor for TASER.  I certified

1    him and recertified him as a TASER instructor

2    several times, so he was one of my students when I

3    taught courses for TASER International.

4            He reached out to me and asked me was I

5    interested in becoming an expert witness and --

6    because he was approached, I believe, and had a

7    conflict because his wife or ex-wife is a law

8    enforcement officer in Henry County.  And he just

9    didn't want -- he just didn't want there to be a

10   conflict.

11       Q    Who contacted him?  Do you know?

12       A    I'm assuming Jess did.

13       Q    The attorney, Jess Johnson?

14       A    Yes.  And so McCaslin called me and asked

15   me would I be willing to talk to Jess.  And I said,

16   sure, I'm always happy to talk and listen.

17            And then I guess a few days later, Jess

18   reached out to me, and we had a conversation.

19       Q    When did you first talk with Mr. Johnson?

20       A    Maybe May, June.  I don't remember exactly

21   the day we first started our discussion.

22       Q    Of 2021?

23       A    Last year.  Yeah.  It's been with --

24   approximately a year.

25       Q    All right.  What was stated during that

1  first conversation?  What information were you

2  provided and what were you asked to do?

3      A    So I guess Jess called me and said that

4  McCaslin had recommended but that Jess was confused

5  because he wasn't sure -- he said -- he says you are

6  a fire chief but you're a police officer but you're

7  a college professor and you're a TASER master

8  instructor, so -- he said, which one are you?  And I

9  said, well, I'm all of them.  And --

10          But I think I sent him my C.V.  And then a

11  few days later, he came back and said, even though

12  you've never testified as an expert witness, we're

13  comfortable that you would be accepted.  And he sent

14  me a copy -- he sent me a link to the video, and I

15  watched it.  And that's when I said I would be happy

16  to offer my expert opinions of what I observed.

17      Q    And when Mr. Johnson first contacted you,

18  did he give you facts?  Did he represent any factual

19  information to you?

20      A    (Witness shakes head negatively.)

21      Q    Just asked you if you'd be interested in

22  looking at this?

23      A    He sent me the video.  That was the first

24  discussion we had, on whether I was interested in

25  being an expert witness and offering my opinions on

1  this.  And I think some time after -- shortly after

2  I agreed to it, then I got a Dropbox link with the

3  Incident Report and --

4      Q    All the materials that you've listed?

5      A    -- all the other materials that I --

6      Q    Um-hum.

7      A    And that's when he asked me to author an

8  expert-opinion report.

9      Q    Did Mr. Johnson give you any opinions that

10  he wanted to see if you agreed with or did you

11  provide him with all of your opinions on your own?

12      A    He gave me no direction other than to be

13  truthful and to make sure that my expert opinions

14  were my own.  And that's what I did.  No --

15          The statements that are in that 36-page

16  report, Terry, are my statements.

17      Q    So, as we've discussed previously, since

18  this is your first case, you've never testified in a

19  deposition or in court in regard to opinions about a

20  use-of-force incident or any other type of police

21  behavior?

22      A    I have not.

23      Q    Okay.  And your rates, I think you

24  indicated what those were.

25          You're charging $150 an hour?

```
 1        A    Yes, sir.

 2        Q    Okay.  And how many hours have you spent

 3   thus far in this case working for the Plaintiffs'

 4   attorney?

 5        A    I think the initial invoice was $3,900,

 6   how ever many hours that is divided by 150.  And I

 7   would imagine -- I think for the last several

 8   months, you know, like, I received the Henry County

 9   Police use-of-force policies.  And I was -- I was

10   asked to review them and offer my opinions.

11             So I would imagine I've probably got 12 to

12   15 hours that I haven't sub -- I haven't submitted

13   another invoice.  I submitted the original one I

14   provide -- when I provided the expert opinion, but

15   the rest of it --

16        Q    Right.

17        A    -- I'm just --

18             Maybe 10 or -- 12 or 14 hours that I

19   haven't submitted an invoice for yet.

20        Q    Well, we'll come back to that.

21             So you weren't provided with the Henry

22   County Police Department use-of-force policy that

23   was in effect at the time of the incident; correct?

24        A    I was.

25        Q    This incident occurred in September of
```

1    2019, and there was a use-of-force policy that was

2    in effect at that time; correct?

3         A    Yes.

4         Q    And there was a use of electronic -- or

5    Conducted Energy Weapons in place at that time, as

6    well; correct?

7         A    Yes.

8         Q    Okay.  And it looks like you were provided

9    with a copy of the use-of-force policies that were

10   adopted after this incident; correct?

11        A    Yes.

12        Q    Okay.  You agree that the use-of-force

13   policy that would control the officers' conduct

14   would have been the one in place at the time?

15        A    Absolutely.

16        Q    Okay.  At any time during your career

17   either as a armed medic or as a police officer with

18   Clayton County Sheriff's Department or with the City

19   of Roswell Police Department, have you ever been

20   involved in any way in a situation in which a

21   detainee or a subject ever was determined to have

22   died from positional or compressional or restraint

23   asphyxia?

24        A    No.

25        Q    Have you ever had the occasion, even going

1  back even further in your years as a medic, to

2  examine or see someone that it was determined had

3  died from positional or compressional asphyxia?

4      A    Yes.

5      Q    Okay.  Tell me about that occasion or

6  whichever occasions.

7      A    I mean, so some of them are when somebody

8  goes out in their driveway and decides to change the

9  oil and they jack their truck up and it rolls down

10  and, you know, maybe seven hours later their wife

11  comes home from work and finds them out there, been

12  dead all day long.

13      Q    And if a car falls on somebody, that's a

14  massive amount of weight.  We're talking thousands

15  of pounds; correct?

16      A    Sure.

17      Q    Okay.  Other than the vehicle falling on

18  someone, have you ever seen a situation where

19  someone got into a position, either prone or stuck

20  somewhere, where there was some weight against them

21  and they died from that asphyxia?

22      A    We've had a number of industrial accidents

23  where people got compressed between machinery.  One

24  of them was on Battle Creek Road right next to the

25  fire station, and it's a -- like, a carpet-weaving

1    company.  And somebody had removed a safety bar.

2    And the fabric got stuck, and so this employee

3    hoisted themselves up and tried to stick their feet

4    in to jostle the fabric loose.  And the machine

5    grabbed them and pulled them into it and into the

6    roller system.

7            And so I've seen industrial accidents like

8    that that -- very unpleasant.

9        Q    And that would be a tremendous amount of

10   pressure if they're sucked in and pressed down;

11   correct?  I don't know what the psi would be, but it

12   would be equivalent of thousands of pounds of

13   pressure; correct?

14       A    Yeah.  And I saw a couple of young men,

15   18/19/20 years old working at the bottom of a

16   plumbing trench hooking up drain lines.  And, you

17   know, they're 20 feet down and there's no shoring.

18   And the dirt walls collapse on top of them, and it's

19   all over for them, because I was on the Technical

20   Rescue Unit.  So the Technical Rescue Unit responds

21   to people who are in really, really unfortunate

22   situations.

23       Q    Had you ever seen a person who, by

24   accounts of what happened leading up to it, had died

25   from positional or compressional asphyxia from

1 someone putting weight or holding them down in some

2 manner?

3    A    With as many violent deaths as I saw in

4 Clayton County, I'm sure there were.  None of

5 them -- but were people forced down and compressed

6 so that they couldn't breathe?  Yes.

7    Q    Just through weight on their --

8    A    Yes.

9    Q    -- torso?

10    A    Yeah.

11    Q    You believe you saw that?

12    A    I'm certain.  I mean, I saw thousands of

13 deaths at Clayton County.  And I have no doubt that

14 somebody may have been crushed, yes.

15    Q    Can you identify any way:  Date?  Time?

16    A    No, sir.

17    Q    Person?  Place?

18    A    I can't, but --

19         MR. WILLIAMS:  Okay.  All right.  Let's

20         take a short break.  We've been going for a

21         while now.  We'll take a little bathroom

22         break, five minutes.

23         THE WITNESS:  Sounds good.

24              (Whereupon, there was a recess

25              in the deposition from

```
 1                    12:16 p.m. to 12:22 p.m.)

 2    BY MR. WILLIAMS:

 3        Q    Dr. Lowe, the only research materials that

 4    you apparently reviewed and you listed was a couple

 5    of articles of the -- that, I guess, were posted in

 6    the U.S. Department of Justice National Institute of

 7    Justice Bulletin.

 8             Is that right?

 9        A    Yes, yes.

10        Q    And that was a bulletin on Positional

11    Asphyxia, Sudden Death, that was issued in June

12    1995; right?

13        A    Yes, sir.

14        Q    So have you reviewed -- and maybe not in

15    connection with this case, but have you reviewed any

16    of the studies in recent years that have dealt with

17    the concept of positional or compressional asphyxia

18    through body weight applied to a subject?

19        A    No, sir.

20        Q    All right.  So I've sort of grouped

21    together your opinions that are asserted in your --

22    actually, before I do that -- strike what I just

23    said.  I tell you what, I'm going to come back to

24    that.  I will go ahead and go to this.

25             MR. WILLIAMS:  Just a second here, off
```

1    the record.

2                    (Thereupon, a discussion was

3                    held off the record.)

4            MR. WILLIAMS:  Back on the record.

5    BY MR. WILLIAMS:

6        Q    We've already covered that you discussed

7    the Georgia laws that were potentially involved and

8    that certainly provided the officers with probable

9    cause to arrest Fernando Rodriguez for various

10   offenses.

11           You also then mention in your opinions in

12   regard to that, the arrest, that the -- that you

13   believe the officers should have recognized that

14   Rodriguez was emotionally disturbed and having some

15   sort of crisis; right?

16       A    Yes.

17       Q    And that the treatment of him for that,

18   whether it's medical treatment or whatever is

19   necessary, should have been a focus of the officers

20   at some point?

21       A    It should have been the highest priority.

22       Q    Okay.  And from what's seen in the video,

23   the City officers were concerned that he was under

24   the influence of something and indicated to him

25   pretty early on they were going to get him help;

1    correct?

2        A    Yes.  Yes, sir.

3        Q    And there was an ambulance requested

4    within a few minutes after the encounter.

5            True?

6        A    No.

7        Q    What's wrong about that?

8        A    I believe it was eight minutes into the

9    encounter.  They didn't really request the

10   ambulance --

11       Q    Okay.

12       A    -- until he was in handcuffs.

13       Q    I should say a few minutes after they got

14   him -- started wrestling with him on the ground and

15   getting him in handcuffs; correct?

16       A    Yes.

17       Q    Okay.  So at that point that they've had

18   the encounter with him physically and trying to hold

19   him to the ground, within a few minutes of that

20   there was a request for EMS made; right?

21       A    Yes.

22       Q    And Officer Phillips heard that -- renewed

23   that EMS was on the way once he heard that radio

24   request by one of the -- I think it was Stroud;

25   correct?

1      A    Yes.

2      Q    Okay.  And, in fact, Stroud then followed

3  up and asked on another occasion for an ambulance to

4  be en route to the scene; correct?

5      A    I only heard one request for a Signal 4,

6  which is an ambulance.

7      Q    You didn't hear Stroud follow up and ask

8  for the ambulance and then also ask where the

9  ambulance was, trying to figure out why it wasn't

10 there yet?

11     A    I heard the officers talking among

12 themselves about where is the ambulance, what's

13 taking so long.

14     Q    Okay.  Um-hum.

15     A    But that wasn't over the radio traffic.

16 The only thing other --

17          The only other radio traffic I heard

18 reference to ambulance is, I think Stroud told them

19 he's a -- he's a mental health person in a crisis;

20 so I think he gave the -- after he asked for the

21 ambulance, a few moments later, then he said, you

22 know, he's having a crisis, or some words of those

23 effect.

24     Q    Okay.  So you didn't hear the --

25          If there was a follow-up request about the

1  ambulance via the radio, you didn't hear that in

2  what you reviewed?

3      A    No.

4      Q    Is that right?  That's correct?

5      A    No, sir.

6      Q    What I just said was correct?  You didn't

7  hear it?

8      A    I did not hear it.

9      Q    Okay.  You also note in your report that

10  once Officer Phillips arrived at the scene to assist

11  the officers, Officer Stroud repeatedly asked

12  Phillips to use force to restrain Rodriguez;

13  correct?

14      A    Yes.

15      Q    Okay.  The initial decision by the City

16  officers to use a TASER deployment on Rodriguez was

17  made after Rodriguez had attempted to continue

18  walking down the street despite their commands for

19  him to stop.

20          True?

21      A    Yes.

22      Q    And it was within their judgment or

23  discretion to determine whether it was appropriate

24  to use the TASER to accomplish that detention;

25  correct?

          1        A     Yes.

          2        Q     You agree that if they had just attempted

          3   to talk to Fernando and try to convince him to stop,

          4   that it was dangerous -- that would have been a

          5   dangerous situation because he could have continued

          6   walking down the road and it could have resulted in

          7   injuries to himself or to the public; correct?

          8        A     No.

          9        Q     Are you aware that a motorist almost hit

         10   him previous to the officers arriving and she

         11   reported that to 9-1-1?

         12        A     I did not read --

         13              I do not have that information.

         14        Q     Okay.  And you don't agree that him

         15   continuing to walk naked down the road could have

         16   caused -- could have resulted in harm to him or

         17   danger to the public?

         18        A     It could have.

         19        Q     Did you notice if there were cars parked,

         20   stopped in the vicinity as the officer -- City

         21   officers were trying to deal with Rodriguez and

         22   detain him?

         23        A     I did see other cars.

         24        Q     And if Rodriguez had run in front of those

         25   cars or other cars that may have been in the area,

1 that could have caused injuries to himself or to the

2 persons in those vehicles; correct?

3     A    Yes.

4     Q    Okay.  The officers had a duty to try to

5 protect everyone's safety at the scene; correct?

6     A    Yes.

7     Q    And so did Officer Phillips upon his

8 arrival; correct?

9     A    Yes.

10     Q    Okay.  Do you agree that Rodriguez would

11 eventually have to be restrained, given the offenses

12 that he had committed and his actions there at the

13 scene?

14     A    Yes.

15     Q    Okay.  And transported to the hospital,

16 given what the officers had seen and the fact that

17 they called for EMS to evaluate him; correct?

18     A    That would have been ideal.

19     Q    Okay.  And I know that you have served as

20 a medic for many years, and so I'm sure you're aware

21 that medics generally will not go up to a scene of

22 someone who's being combative until the law

23 enforcement officers have got that person under

24 control and it's safe for them to approach?

25     A    Paramedics want to hear scene secure, yes.

1    Q    So if EMS had arrived before the officers

2    had gotten Mr. Rodriguez under control, meaning that

3    he's no longer trying to bite or kick or swing at

4    any of the officers, the EMS would not have come to

5    evaluate him; correct?

6    A    Correct.  But can I offer more

7    information?

8    Q    Sure.  Go ahead.  Yeah.  That's --

9    A    So it's not uncommon that officers would

10   request an ambulance to stand by.

11         When I did police training at the Roswell

12   Police Department for officers -- and we talked

13   about these exact types of situations in our

14   classes -- I said, as soon as the call comes out of

15   a naked, screaming man doing whatever, ask dispatch

16   to start the ambulance and the fire department, go

17   ahead and stage them a block away, so now the medics

18   are at least en route to the scene.  And then once

19   you -- once you as the law enforcement officer

20   determine it's safe for the paramedics to come in,

21   then the paramedics and law enforcement can come up

22   with a plan, what are we going to do with this

23   person who's obviously having a medical crisis.

24   They can come up with a strategy.

25   Q    Do you know when an ambulance was actually

1  dispatched by the 9-1-1 communication officers

2  within this timeline?

3       A    I don't know the exact time.

4       Q    Do you know whether it was even before

5  Officer Stroud had asked for an ambulance to be

6  dispatched?

7       A    I have no knowledge of that.

8       Q    You note in your report that the --

9            Well, you state in your report that the

10  manner of death was homicide caused by asphyxia, and

11  you cite the Death Certificate for that statement;

12  correct?

13       A    Correct.

14       Q    But you are not qualified to offer an

15  expert opinion on the manner or cause of death;

16  correct?

17       A    No.

18       Q    You would certainly expect that that would

19  have to be a person who is trained in forensic

20  medicine and determining pathologically how someone

21  died; correct?

22       A    Correct.

23       Q    Okay.  So when you refer to positional

24  asphyxia, you are basing that on the medical

25  examiner's opinions that were rendered in the

1    autopsy report?

2        A    And also what I observed on the video.

3        Q    Well, from what you observed on the video,

4    how can you determine that Fernando Rodriguez died

5    from positional asphyxia since you're not trained on

6    determining cause of death?

7        A    Because I could hear him grunting and

8    attempting to breathe.  I mean, I heard what I

9    heard, that he was struggling to take a deep breath

10   and he --

11       Q    Well, let's --

12            It's not unusual for someone who has been

13   involved in an incident like this in which they are

14   excited and resisting arrest, combative with law

15   enforcement, to be experiencing shortness of breath

16   from exertion; correct?

17       A    Correct.

18       Q    That doesn't mean they're suffering

19   positional asphyxia, does it?

20       A    It could.

21       Q    Well, it could mean a lot of things, but

22   we've got to determine here what's the certainty.

23            You're saying that you saw evidence of

24   positional asphyxia, and you're only basing that

25   just on the -- what you saw, the shortness of

1  breath?

2       A    And office -- I'm sorry.

3       Q    Go ahead.

4       A    And officers' hands/knees/feet on Fernando

5  while he's laying prone on the asphalt with his

6  hands handcuffed over his head and leg irons on his

7  ankles.  It's -- clearly, he's having trouble

8  breathing.

9       Q    How can you say that that position was

10 causing him difficulty breathing?

11      A    Because, again, with him having the weight

12 of other officers on his back and his torso and his

13 neck is going to make it hard for him to breathe.

14      Q    All right.  And you base that upon any

15 studies that you've conducted?

16      A    Just my own experience as a paramedic for

17 40 years, that people find it easier to breathe when

18 they're sitting up or when they're laying on their

19 side than when they're laying prone.

20           One of the first things we always want to

21 do as paramedics is get people in the recovery

22 position so you get the pressure off their diaphragm

23 and chest.

24      Q    So you think it's easier for a person to

25 breathe in the sitting-upright position rather than

prone on their -- on their -- prone on the ground or
floor?

     A    I think it's easier for people to breathe
sitting in a chair or laying on their side than
laying on their stomach.

     Q    You don't have any medical training to
determine that, though, do you?

     A    Sure, I mean, basic CPR classes.

     Q    Basic CPR covers whether somebody has more
difficulty breathing in the prone position than
being on their side or in a sitting position?

     A    Basic CPR classes have people put in the
recovery position.

     Q    For what purpose?

     A    So that they don't vomit and aspirate, the
vomit gets into their lungs; but it's easier to
breathe on your side than on your stomach.

     Q    Okay.  Anything other than your CPR
classes that have provided you with medical training
in that regard?

     A    My paramedic training, all the medical
recertification I've had for more than 40 years as a
Georgia paramedic.

     Q    In your paramedic training, was there any
citation of studies that showed that there was

1   impairment -- sufficient -- significant impairment

2   of breathing from someone being in a prone position?

3        A    I don't recall those studies.

4        Q    None of the TASER deployments by

5   Officer Phillips violated any provisions of the

6   Henry County Police Department policy regarding

7   TASER use; correct?

8        A    No, not correct.

9        Q    How did he violate Henry County Police

10  Department's CEW or TASER policy in effect at the

11  time?

12       A    Well, the last two TASER deployments --

13  the last two or three TASER deployments he did were

14  not objectively reasonable.

15       Q    Why not?

16       A    Fernando had been handcuffed and

17  restrained, and he had been given no com -- he had

18  not been given any commands by anyone.  He just --

19            When Fernando was trying to breathe and he

20  would push up and you could hear some type of brief

21  struggle, that's when Phillips would tase him for a

22  second or two.  It wasn't --

23       Q    That was a drive stun?

24       A    Yeah.  It was a drive stun, but it wasn't

25  a full --

1          So he pulled the trigger, delivered

2     electricity for one or two seconds and turned the

3     trigger off; so he made it safe.  It wasn't a full

4     deployment, but he still -- he still applied force

5     two or three times on a handcuffed person who is

6     being restrained by a total of five officers.

7          Q    But that person was continuing to be

8     physically combative; correct?

9          A    I would say no, sir.

10          Q    You don't hear that over the video, the

11     officers talking about him continuing to resist,

12     trying to bite them, doing those things when

13     Officer Phillips used the drive stun?

14          A    No.

15          Q    You didn't see that?  Okay.

16          You would agree that Rodriguez had

17     demonstrated he was a flight risk by continuing to

18     walk away from the City officers when he was told to

19     stop; correct?

20          A    He failed -- yes.  He failed to comply.

21          Q    And he also demonstrated he was a flight

22     risk even after they used the TASER by trying to

23     crawl away; correct?

24          A    Correct.

25          Q    I think I touched on this a little bit

1    before.

2            But are you aware that Fernando Rodriguez

3    was considered -- was in the obese category from --

4    given his weight, his body weight?

5        A    He was a big guy.

6        Q    Do you know how much he weighed, according

7    to the report?

8        A    The Incident Report says he was five-nine,

9    160 pounds.  He was greater than that.

10       Q    Right.  I'm talking about the actual

11   measurement, not somebody's estimate.

12       A    I don't -- I don't know how much he

13   weighed.

14       Q    Okay.  And you say that you're not aware

15   that obesity significantly affects the effectiveness

16   of a Conducted Energy Weapon, a TASER?

17       A    I've never seen a difference between a

18   heavy officer and a skinny officer when I've done

19   voluntary exposures.

20       Q    You agree that the officers first talked

21   about seeing a change in Fernando Rodriguez's

22   breathing shortly after Officer Butera stated that

23   his blood pressure and pulse rate was through the

24   roof?

25       A    Yes.  That was the first alert.

1    Q    Okay.  As a trained paramedic, would you

2  recognize that, blood pressure and pulse rate being

3  through the roof, as evidence of tachycardia?

4    A    Yes.

5    Q    Okay.  Are you aware that tachycardia can

6  lead to cardiac arrest?

7    A    I am.

8    Q    Are you aware that tachycardia can lead to

9  cardiac arrest, particularly in a person with an

10  enlarged heart and atherosclerosis?

11    A    Of course.

12    Q    You agree that that certainly could be the

13  reason why Fernando Rodriguez stopped breathing?

14    A    I do not agree with that.

15    Q    You don't agree that he could have stopped

16  breathing because he had cardiac arrest following

17  tachycardia?

18    A    Caused by five officers putting their body

19  weight on him while he's prone on the asphalt.

20    Q    You agree that tachycardia can lead to

21  cardiac arrest; correct?

22    A    Yes.

23    Q    You agree that tachycardia in a person who

24  has an enlarged heart and arthrosclerosis could lead

25  to cardiac arrest; correct?

```
 1        A     Yes.

 2        Q     And all those things were present with

 3  Fernando Rodriguez at the time of this incident with

 4  the police; correct?

 5        A     No.

 6        Q     Immediately before him stopping breathing;

 7  correct?

 8        A     No.

 9        Q     After Phillips deployed the TASER the

10  first four trigger pulls using the -- after he

11  deployed the dart mode -- dart prong mode -- let's

12  state it that way --

13        A     Probe mode.

14        Q     -- probe mode -- better choice -- those

15  were reasonable -- lawful and reasonable according

16  to your report; correct?

17        A     Correct.

18        Q     And then you say that the use of the TASER

19  in the drive-stun mode thereafter, which you've

20  described as deployments 15, 16 and 17, were in

21  violation of TASER Smart Use Considerations because

22  of the circumstances.

23              Is that right?

24        A     Correct.

25        Q     And that circumstance, as you have
```

1    described earlier, was that there were officers who

2    had him handcuffed and, as you've described, under

3    control?

4        A    Correct.

5        Q    Even though you can hear them talking

6    about him continuing to be combative and attempting

7    to bite them?

8        A    He wasn't a threat to the officers.

9        Q    Okay.  And you're aware that Stroud

10   ordered Officer Phillips to use the TASER during

11   that time frame, during those deployments 15, 16 and

12   17; correct?

13       A    No.

14       Q    You weren't aware of that, that during

15   that time frame, that Officer Stroud ordered

16   Phillips to use the TASER?

17       A    I did not hear Stroud giving any orders to

18   Phillips for the last three TASER deployments where

19   he was drive-stunned.

20       Q    Let's see.  You have stated that from your

21   review, you noticed that Stroud was the supervisor

22   at the scene; correct?

23       A    Of Henry County, yes.

24       Q    And that he --

25       A    I'm sorry.  Of Hampton, of Hampton.

1     Q     He was the supervisor who ordered officers

2  to put body weight on Fernando?

3     A     Correct.

4     Q     And that included Officer Phillips?

5     A     Yes.

6     Q     Okay.  Now, you state in one of the bullet

7  points of your opinions that you believe Fernando's

8  ability to inhale and exhale was compromised by

9  having multiple officers kneeling on him and

10 compressing his head, neck, torso and limbs onto the

11 pavement.

12          So that's somewhat vague.  I don't know

13 what officers you're talking about and who was

14 kneeling on where.  Can you explain that, who do you

15 believe --

16          Can you identify the officers you believe

17 were kneeling on Fernando and what part of his body

18 they were kneeling on during this incident?

19     A     Sometimes it's hard to see which officer

20 because all you see is a leg or a hand or an elbow.

21          Phillips certainly had -- you can see him

22 with his knee on his -- on Fernando's shoulder,

23 between his shoulder and his head, on the neck area.

24 And he's got his TASER in his right hand in the

25 small of his back, and the TASER is activated.  It's

1    turned on because you can see the light.  He hasn't

2    energized it, but he --

3         Q    Right.

4         A    Phillips has certainly done that.

5         Q    Phillips's knee --

6              It was his left knee, correct, that was on

7    Fernando?

8         A    May I refer to my --

9         Q    We'll watch -- yes.

10        A    Thank you.

11        Q    And while you're looking for that, just

12   think about this question.

13             The knee, whether it was left or right,

14   that was placed on him was placed on his upper back

15   between his shoulder blades; correct?

16        A    In that region, yes.

17        Q    Did you ever see any images where the knee

18   was actually on Rodriguez's neck?

19        A    So on Page 12 of my report, there's an

20   image there, Phillips' left knee on Fernando's back

21   between the shoulder blades and the neck.

22             His left shoulder is blocking the image,

23   and it's -- there's a shadow there; so it's kind of

24   hard for me to tell exactly where the knee is or his

25   lower leg is.

1    MR. WILLIAMS:  Okay.  We're going to

2    mark that as Defendant's Exhibit 1.

3                    (Thereupon, marked for

4                    identification purposes,

5                    Defendant's Exhibit 1.)

6    BY MR. WILLIAMS:

7    Q    Okay.  I'm going to hand you what I've had

8    the court reporter mark as Defendant's Exhibit 1, a

9    photograph taken from the Lewis video.  And do you

10   want to take a look at it?  It's timestamped from

11   the video.

12        Does that look familiar to you from -- as

13   an image from the video you reviewed?

14   A    It does.

15   Q    Okay.  Would you agree that that shows

16   that Lewis -- that Phillips's left knee is on

17   Rodriguez's upper back between his shoulder blades,

18   not on his neck?

19   A    In this image here, it does appear that

20   his knee is on his upper back between his shoulder

21   blades, in close proximity --

22        I mean, yes, but -- I agree.

23   Q    And that's where he kept his knee from the

24   point that they got Fernando somewhat under control

25   and he was trying to restrain him; correct?

1          In other words, do you ever see him move

2    his knee to another part of his -- of Fernando's

3    body?

4        A    But in some of the Lewis body cam, the

5    image changed because --

6          So I don't know that Lewis did not -- in

7    another image that may or may not have been captured

8    by the body cam, that his knee didn't move.

9        Q    Okay.  Well, we'll watch the video, and

10   I'll let you show me where you think it, if that

11   ever, occurs.

12                    (Thereupon, marked for

13                     identification purposes,

14                     Defendant's Exhibit 2.)

15   BY MR. WILLIAMS:

16       Q    But for now, let me hand you what's been

17   marked as Defendant's Exhibit 2.

18          MR. JOHNSON:  Can I see it first?

19   BY MR. WILLIAMS:

20       Q    Do you recognize that?

21          MR. JOHNSON:  Okay.

22   BY MR. WILLIAMS:

23       Q    Do you recognize that as being from the

24   Lewis video?

25       A    Okay.

1    Q    And if you don't, I'll just tell you, just

2  for the record -- and we can verify it, but -- that

3  it was taken from the Lewis video.  It was just a

4  still shot we made from the Lewis video.

5    A    Okay.

6    Q    And you see where Officer Phillips's knee

7  is in that picture?

8    A    I mean, I see a hand.

9         Is that a hand there with a watch or

10 something?

11   Q    Well, do you see anybody having any part

12 of their body on Rodriguez's neck in that picture?

13   A    No.

14   Q    Okay.  That's the point.

15        MR. JOHNSON:  And I just want to say

16     for the record, if I can, I'm not sure the

17     lighting in that document is the best.

18 BY MR. WILLIAMS:

19   Q    Well, can you see the lighting?  Can you

20 see his neck -- Rodriguez's neck in that picture?

21   A    Yes.

22   Q    Okay.  And you can see there's no knee on

23 his neck in that picture; correct?

24   A    Well -- yes.

25        MR. WILLIAMS:  Okay.  All right.  Let's

1       take a break.  I want to have a little bit

2       of a lunch break -- it's about 1:00

3       o'clock -- maybe just 30 minutes.  I'll go

4       downstairs.  That's pretty quick.  And we'll

5       start back up at -- shoot for 1:30.  And I

6       don't think I'll have that much more, maybe

7       an hour.

8               MR. JOHNSON:  Okay.

9                       (Whereupon, there was a lunch

10                      recess in the deposition from

11                      12:56 p.m. to 1:52 p.m.)

12              MR. WILLIAMS:  So we can go on the

13      record now.

14   BY MR. WILLIAMS:

15      Q    Dr. Lowe, what I want to do is play this.

16   And then at some point -- I'm going to get up to

17   where I'm going to stop it, and I'm going to ask you

18   some questions, basically what we are seeing, and

19   have you tell me, you know, what you're seeing

20   there.

21          Okay?

22      A    Yes, sir.

23      Q    Do you recognize this?  Just for the

24   record, this is the Lewis body-cam video.

25      A    Yes.

1     Q    And you've seen --

2          This is the one you've seen before;

3 correct?

4     A    Yes.

5     Q    All right.  We're already a minute and

6 19 seconds into it.  They've already tasered.

7          But my -- our guys, Officer Phillips and

8 Officer Butera, are not present yet?

9     A    Correct.

10     Q    Okay.  So we'll just start it from here.

11                (Video played.)

12         MR. WILLIAMS:  Okay.  I'm going to stop

13    it right here for a second.

14                (Video stopped.)

15 BY MR. WILLIAMS:

16     Q    Do you know which of those officers are

17 whom?

18     A    So the person standing is Stroud, and the

19 person whose camera it is is Lewis.

20     Q    Yep.  So the one -- and we're talk -- that

21 was saying "we're going to get you some help" is

22 Officer Lewis, because you heard that voice but not

23 from the guy that you can see; right?

24     A    I think they were both --

25          Weren't both officers articulating --

```
 1        Q      Talking at different times.

 2        A      Yes.

 3        Q      Yeah.   Okay.

 4                        (Video played.)

 5                        (Video stopped.)

 6   BY MR. WILLIAMS:

 7        Q      Do you know who that officer is who just

 8   arrived?

 9        A      So that's Bowlden.

10        Q      Bowlden.

11        A      Bowlden.

12        Q      Also with City of Hampton; right?

13        A      Correct.

14                        (Video played.)

15                        (Video stopped.)

16   BY MR. WILLIAMS:

17        Q      And that was Officer Stroud who said,

18   we're going to get you an ambulance and figure out

19   what's going on?

20        A      Um-hum.

21        Q      That's yes?

22        A      Yes, yes.

23                        (Video played.)

24                        (Video stopped.)

25
```

1  BY MR. WILLIAMS:

2      Q    And that was Officer Stroud that mentioned

3  the ambulance again at 22:14, approximately 56?

4      A    Yes.

5                        (Video played.)

6                        (Video stopped.)

7  BY MR. WILLIAMS:

8      Q    You recognize that's Rodriguez saying, hit

9  him with the TASER, hit him with the TASER?

10     A    Yes, mocking the officers.

11                       (Video played.)

12                       (Video stopped.)

13 BY MR. WILLIAMS:

14     Q    And that was at 22:15, approximately

15 44 seconds, on the date stamp -- timestamp?

16     A    Yes.

17                       (Video played.)

18                       (Video stopped.)

19 BY MR. WILLIAMS:

20     Q    And you hear what Rodriguez said there?

21 That was him cursing at the officers --

22     A    Yes.

23     Q    -- at 22:15:48?

24     A    Yes.

25                       (Video played.)

1                    (Video stopped.)

2  BY MR. WILLIAMS:

3       Q    Okay.  You recognize another officer

4  walking up at that point?

5       A    Yes.  That is Henry County

6  Officer Phillips.

7       Q    That was Phillips.

8            So he arrived at approximately 22:16 -- or

9  walked up at approximately 22:16:04-ish; right?

10      A    Agreed.

11      Q    Okay.  And at that time you heard a TASER

12 being deployed and you heard clicking with the

13 TASER; correct?

14      A    Correct.

15      Q    And that indicates there's not a good

16 connection and no electricity being delivered?

17      A    Correct.

18                        (Video played.)

19                        (Video stopped.)

20 BY MR. WILLIAMS:

21      Q    And do you know who deployed the TASER

22 there?

23      A    That's Bowlden.

24      Q    Okay.

25                        (Video played.)

1                    (Video stopped.)

2    BY MR. WILLIAMS:

3        Q    Okay.  Now, as shown right there, before

4    the TASER is deployed at 22:16, approximately

5    25 seconds, even after the TASER initially deployed

6    by Bowlden, Rodriguez is still trying to move away;

7    correct?

8        A    Correct.

9        Q    So he's still resisting and not being

10   compliant; correct?

11       A    He's trying to move away.  I would not say

12   he's resisting.

13       Q    Okay.  He's not following the officers'

14   commands to roll over; correct?

15       A    Correct.

16                    (Video played.)

17                    (Video stopped.)

18   BY MR. WILLIAMS:

19       Q    All right.  At 22:16, approximately

20   50 seconds, that's Officer Stroud talking to

21   Officer Phillips; correct?

22       A    We can listen to it again, but I thought

23   it was Lewis maybe saying --

24       Q    It's Lewis?  Okay.  I see what you --

25            Yeah.  I wasn't sure about that, either.

1  Let's see.  I hate to move these things because it's
2  probably going to --
3                    (Video played.)
4          MR. WILLIAMS:  Well, I don't know if I
5      got --
6          Did I actually go backwards?
7                    (Video stopped.)
8          MR. WILLIAMS:  Did it go backwards or
9      are we still going forward?
10         MR. JOHNSON:  I'm not sure.
11         MR. WILLIAMS:  Let's try this.  All
12     right.  Now I think I have --
13                    (Video played.)
14                    (Video stopped.)
15 BY MR. WILLIAMS:
16     Q    All right.  At 22:17:21, Rodriguez is
17 still moving around, moving on the pavement;
18 correct?
19     A    Yes.
20     Q    And is still on his back, hasn't been --
21 hasn't moved over into his prone position; correct?
22     A    Correct.
23                    (Video played.)
24                    (Video stopped.)
25

BY MR. WILLIAMS:

    Q    All right.  It's at this point, around 22:17:45, where the officers go in to put hands on to try to control him?

    A    Yes, after Phillips deployed his X2.

        And I men -- we mentioned earlier about you can see the electricity, and I see it here.

    Q    Okay.  Let me see if I can back up and let's --

    A    You can -- you can see the arcing from the probes that are in his body from Phillips's X2.

    Q    Okay.

               (Video played.)

BY MR. WILLIAMS:

    Q    That's Bowlden deploying right there at 22:17:26; correct?

    A    With a drive stun.

    Q    Right.  Okay.

               (Video stopped.)

BY MR. WILLIAMS:

    Q    And after that deployment, at 22:17:34, it shows Rodriguez still not complying and still not moving over to his stomach; correct?

    A    Correct.

               (Video played.)

```
 1                          (Video stopped.)
 2   BY MR. WILLIAMS:
 3        Q    Okay.  Now, is that deployment by
 4   Officer Phillips, the X2?
 5        A    Yes.
 6        Q    Okay.  I just missed where you're talking
 7   about the -- seeing the flashes.
 8             Tell me when you see that.
 9                          (Video played.)
10                          (Video stopped.)
11        A    It's further up.
12   BY MR. WILLIAMS:
13        Q    Oops.  I thought I went back, but I must
14   have went forward.  Yeah.  It's jumping.
15        A    Try it there.
16        Q    Okay.
17                          (Video played.)
18   BY MR. WILLIAMS:
19        Q    Tell me, so I can stop it, when it gets to
20   that point when you see it.
21        A    As soon as the image goes to him laying on
22   the ground.  There.
23                          (Video stopped.)
24   BY MR. WILLIAMS:
25        Q    Okay.  So are you talking about seeing
```

1  those light -- that light --

2      A    Yeah.

3      Q    -- dots and streak?

4      A    Yes.

5      Q    You're saying that you're seeing the

6  deployment between the prongs?

7      A    Yes.  And there's one on his upper thigh,

8  too, on his thigh, so where they're communicating

9  with each other.

10                    (Video played.)

11                    (Video stopped.)

12  BY MR. WILLIAMS:

13      Q    But you see that immediately Rodriguez is

14  still moving around as that noise is occurring from

15  the TASER; correct?

16      A    And I would expect him to.

17      Q    He's not achieving NMI, then?

18      A    That's possible, but it's only going to

19  affect the muscles and nerves on that side of his

20  body.  So even though that side of the body is

21  locked up, you can still move the other side.  It

22  only immobilizes the muscles and nerves between the

23  positive and the negative probe.

24      Q    Okay.

25                    (Video played.)

BY MR. WILLIAMS:

　　Q　　Tell me if you see again any arcing or the
lights that you referred to when there's the TASER
deployment triggered.

　　A　　Yes, sir.  I will.

　　　　　　　　(Video stopped.)

BY MR. WILLIAMS:

　　Q　　Now, we heard more clicking.

　　　　　　And when you're hearing clicking, like,
from the TASER, then there's not good connection;
correct?

　　A　　Correct.

　　Q　　Okay.  Do you know that that was one of
Officer Phillips's TASER pulls?

　　A　　I'm assuming so, that one of the probes
might have come out or maybe one of the wires had
broke.

　　　　　　When you've got four officers there plus
Fernando, when you turn him on his side, it's easy
for one of the officers to have stepped on a wire.
They're just copper wires.  It's easy to break them.

　　Q　　In your report, you refer to timestamps,
and you've got individual numbers.

　　A　　Yes.

　　Q　　If you look at Page 9, in other words,

1    you've got:  Officers make physical contact to

2    restrain/handcuff Fernando at 6:32.

3         A    Yes.

4         Q    What does that correlate to?

5         A    So I'm using the -- the time of the

6    video --

7         Q    Okay.  So --

8         A    -- not the time on the display.

9         Q    You're using this time up here where the

10   arrow is --

11        A    Yes, yes.

12        Q    -- playing on the computer?

13        A    Yes.

14        Q    Okay.  I figured that's what it was.  All

15   right.  So it's 6 -- okay.

16             So you noted in your report at 7:20 --

17   which we're at 7:26 up here on the screen right now.

18   But you noted:  At 7:20 Stroud commanded "hit him

19   again" and Phillips delivers another trigger pull

20   reenergizing the X2 previously deployed right

21   cartridge for five seconds.

22        A    Yes.

23        Q    And that's the clicking we heard; correct?

24        A    Yes.

25        Q    Okay.  Which indicates no good connection?

1      A      At least for one of the probes.  But if
2  he's dry -- I don't know that he's not drive-stunned
3  him at the same time because they're all right
4  there.  If I was the X2 operator -- but I'm assuming
5  he did not.
6      Q      Right.
7      A      It's very hard to tell.
8      Q      Okay.
9                    (Video played.)
10                   (Video stopped.)
11  BY MR. WILLIAMS:
12      Q      Okay.  And then you've got in your report,
13  and as we've just heard here, at 7:29 on that and
14  timestamp 22:18:43, that's when Stroud yells "hit
15  him again" and Phillips reenergizes his TASER X2
16  deployed right cartridge for five seconds, according
17  to your report?
18      A      Yes.  And the other thing with the
19  clicking noise is, now that the TASER is closer to
20  the probes, the speaker is going to pick it up
21  because it's not seven feet away.  But now that
22  they're all there, I mean, literally --
23      Q      Closer to Lewis' --
24      A      Yeah.
25      Q      -- body cam?

1        A     The probes are right there with the

2   electricity going through them.  If the TASER is

3   close to it, the speaker within the TASER that

4   captures the audio for this is going to be closer,

5   so it's going to sound louder.

6        Q     The speaker that's within the TASER?

7        A     Well, there's a microphone.  The micro --

8        Q     What we're listening to is Lewis' body-cam

9   video.

10       A     Well, okay, his body cam.

11       Q     Yeah.

12       A     But they're all bent over there together.

13             Yes.  You're correct.  I stand corrected.

14       Q     This is not a TASER video --

15       A     No, no.

16       Q     -- from the weapon.

17       A     No, no.

18       Q     I know what you're talking about, and

19   that's not what this is.

20       A     But it's -- the speaker for the TASER --

21   body cam is now closer to the probes and to the

22   TASER, so that's why it would sound louder.

23       Q     Um-hum.

24       A     Does that make sense?

25       Q     But it's still a clicking noise, which

1    normally you wouldn't hear if there was good probe

2    spread --

3          A     Right.

4          Q     -- and good contact; correct?

5          A     Yes.

6          Q     Okay.  And you also see from the video

7    that during this time when there's the clicking of

8    the attempted TASER deployment, that Rodriguez is

9    moving around?

10         A     Um-hum.

11         Q     Yes?

12         A     Yes, yes.

13         Q     Sorry.

14                        (Video played.)

15                        (Video stopped.)

16   BY MR. WILLIAMS:

17         Q     Okay.  At timestamp on the video at

18   22:18:55 and then on the computer that you've noted

19   in your report 07:41, Stroud says "somebody sit on

20   him."

21         Correct?

22         A     Correct.

23         Q     And according to what you've written, you

24   saw that as Stroud issuing commands to the other

25   three officers to sit on Fernando; right?

1     A    Correct.

2     Q    Okay.  Now, tell me, do you see officers

3 actually sitting on him from this point forward?

4 Let me -- tell me if you do and who.

5                  (Video played.)

6     A    So there's a knee on his -- between his

7 shoulder blades.

8                  (Video stopped.)

9 BY MR. WILLIAMS:

10     Q    All right.

11     A    I don't know who that is.

12                  (Video played.)

13                  (Video stopped.)

14 BY MR. WILLIAMS:

15     Q    Okay.  It may well be Officer Phillips

16 putting a knee on him between his shoulder blades;

17 right?

18     A    Yes.

19     Q    That's probable?

20        And the knee that we saw before we got to

21 this point was between the shoulder blades, upper

22 back, not on the neck; correct?

23     A    Correct.

24     Q    Okay.  And you would agree that at that

25 point Rodriguez is not even in the prone position;

1  correct?

2      A    He's, you know, transitioning from being

3  on his hands and knees with his chest and head on

4  the ground.  They just haven't pulled his -- his

5  right knee is anchored to the ground, so he's not

6  flat prone.

7      Q    For lack of a better phrase, his butt is

8  up in the air; correct?

9      A    His butt is up in the air.

10      Q    So he's not prone, not on his stomach, on

11  the ground at that point; correct?

12      A    Correct.

13      Q    Okay.

14                      (Video played.)

15                      (Video stopped.)

16  BY MR. WILLIAMS:

17      Q    And at that point, even up to where we are

18  now at 22:19:17, there's only one officer who has a

19  knee up on his upper back between the shoulder

20  blades; correct?

21      A    Yes, but you can't see any of the

22  extremities.

23      Q    Yeah.  So the officers could have had some

24  weight on extremities, but only one officer has any

25  weight on his torso, either stomach or back area;

1  correct?

2      A    Officer Phillips does, yes.

3      Q    Right.

4                    (Video played.)

5                    (Video stopped.)

6  BY MR. WILLIAMS:

7      Q    All right.  At 22:19:39 -- and I'll just

8  stick with that timestamp on the actual video --

9  Rodriguez is still in that same position with his

10 butt up in the air, and he's still clearly breathing

11 and talking; correct?

12     A    It looks as if his right knee has now laid

13 out.  He's more prone now than he was a moment ago.

14     Q    But he's still not down fully onto his

15 stomach, correct, at 22:19:39?

16     A    My assessment is, he is on his stomach.

17     Q    You think at 22:19:39 he's already fully

18 down all the way prone on his stomach?

19     A    I think his stomach is on the ground.

20     Q    Let's watch it.

21                   (Video played.)

22                   (Video stopped.)

23 BY MR. WILLIAMS:

24     Q    Right there, does it not look like his

25 butt is still hiked up in the air?  You can see a

1  knee joint right there.

2      A    His butt may not be all the way on the

3  ground, but his stomach is on the ground.

4      Q    So his full body weight from his -- his

5  torso, bottom half of it's not fully on the ground;

6  correct?

7      A    It doesn't look like his right buttocks is

8  on the ground.

9                    (Video played.)

10                   (Video stopped.)

11  BY MR. WILLIAMS:

12     Q    See where he's turned up on his side a

13  little bit right there at 22:20:05; right?

14         Let me take it back a little bit.  This is

15  always off when you try to do --

16         What did I say?  22:20:05?

17     A    Yes.

18     Q    Yeah.

19                   (Video played.)

20                   (Video stopped.)

21  BY MR. WILLIAMS:

22     Q    So 22:20:05, you would agree that at least

23  his knee -- right knee was still propping his butt

24  up a little bit off the pavement?

25     A    Correct.

1    Q    And then at that point, at 22:20:05, he's

2    actually somewhat turned himself to his side;

3    correct?

4    A    Yes.  And if I could add.

5    Q    Yeah.

6    A    So it looks to me that that's a

7    consequence of them trying to straighten his leg out

8    and put his right leg in closer proximity to his

9    left leg so they can get the shackles on.

10    Q    And that, in fact, turns him and certainly

11    relieves any of his own body-weight pressure on his

12    diaphragm area and his stomach; correct?

13    A    Momentarily, until the legs -- the ankles

14    are adjacent to each other.

15                    (Video played.)

16                    (Video stopped.)

17    BY MR. WILLIAMS:

18    Q    Okay.  You've heard in the video Rodriguez

19    is yelling, clearly able to breathe at that point;

20    right?

21    A    Just because he's making verbal sounds,

22    he's yelling, doesn't mean he's breathing.

23    Q    He's still got air in his lungs to be able

24    to make noises to male -- especially to yell;

25    correct?

1    A    And the challenge is, is when you're

2  exhaling to make noise, your lung -- your rib cage

3  and lungs are getting smaller because you're getting

4  air out of your lungs.  And with body weight on

5  people, the lungs -- it's more challenging to

6  inhale.  It's harder to breathe when people are on

7  top of you.

8    Q    And when he continues to make statements,

9  if he does, as we watch the video, after this, that

10 would mean he's still getting air into his lungs to

11 be able to yell or scream or make audible noises;

12 correct?

13    A    Correct.

14                    (Video played.)

15                    (Video stopped.)

16 BY MR. WILLIAMS:

17    Q    Do you hear Stroud say again to officers

18 "put weight on him"?

19    A    I did.  And I also heard Fernando say,

20 "oh, fuck, get off of me."  And it's clearly he has

21 less -- it's not as loud as he had been previously.

22    Q    Do you know how much body weight is

23 required to compress someone so that it

24 significantly interferes with their ability to

25 oxygenate?

1    A    I do not.

2    Q    Regardless of whether it causes difficulty

3 breathing, which can happen for a number of reasons

4 and people can still oxygenate, you don't have any

5 ability to tell what his oxygenation level was at

6 this point, do you?

7    A    No.

8                    (Video played.)

9                    (Video stopped.)

10 BY MR. WILLIAMS:

11    Q    Tell me --

12         Now, can you see where Officer Phillips

13 has placed his knee at that point, 22:21:08/09?

14    A    It appears to be in approximately the same

15 place, on his upper back between the shoulder

16 blades.

17    Q    Between the shoulders, right.

18    A    But you can also see other officers

19 have --

20         There's an ungloved hand on his right

21 shoulder, and there's a gloved hand further down his

22 back.

23    Q    And those -- they're just basically

24 touching him, correct, with their hands?

25    A    Well --

        Q    Like, the one at the shoulder up there is,
like, two fingers that touch.

                        (Video played.)

BY MR. WILLIAMS:

        Q    Let me move it on a little bit more so you
can see.  I know it's hard to see.

                        (Video stopped.)

        A    And there's an officer standing on his
arm, it looks like.

BY MR. WILLIAMS:

        Q    The other officers, whether it's Stroud,
Lewis, they're on the extremities, hands, arms --
correct --

        A    Yeah.

        Q    -- during this period of time after they
get some cuffs on him?

        A    By all indications.  It's not clear.

        Q    And, in fact, one officer talks about
stepping on the -- on the handcuffs to -- on the
chain to hold the handcuffs; correct?

        A    I think one officer is standing on the
handcuffs, and one was standing on -- Butera was
standing on the leg irons.

        Q    Right.  And only --

             Again, at this point, 22:21:18, only

1  Officer Phillips with one knee on his upper back

2  between the shoulder blades, correct, one knee?

3      A    And other than -- and the -- and the

4  hands.

5      Q    And the hand, which you don't know whose

6  hand that is?

7      A    I don't know whose.

8      Q    It could be Officer Phillips, too?

9                   (Video played.)

10                  (Video stopped.)

11 BY MR. WILLIAMS:

12     Q    Okay.  Even at 22:21:25 -- 24/25,

13 Rodriguez is getting enough air to where he can yell

14 out pretty loudly; correct?

15     A    Correct.

16                  (Video played.)

17                  (Video stopped.)

18 BY MR. WILLIAMS:

19     Q    And you see that arm there that's on

20 Rodriguez's shoulder?

21     A    Yes.

22     Q    It's basically just trying to hold that

23 arm down; correct?

24     A    Well, I can see the tension on

25 Fernando's --

1    Q    Yeah.

2    A    -- skin.

3    Q    On his shoulder; right?

4    A    Yes, his upper arm and his shoulder.  I

5  mean, I can see the tension there where somebody's

6  pressing down.

7    Q    And you can see that Fernando's arm is up,

8  elbow is up, the pavement is down below; correct?

9    A    Yes.  And I -- and I would say that that's

10  a consequence of him trying to get pressure off his

11  back so he can expand his lungs.

12    Q    He's still pushing up; correct?

13    A    He's trying -- he's wanting to breathe

14  deep.

15    Q    Or he's wanting to get away from the

16  officers; right?  Could be either/or.

17          You don't know if he's pushing up because

18  he's trying to breathe or he's pushing up because

19  he's wanting to get them off of him?

20    A    And I would say, Counselor, that if you're

21  desperate for oxygen, that's prob -- that's his only

22  focus, is to breathe deep, because he needs oxygen

23  in his lungs.

24    Q    Tell me what physically you see on this

25  video that indicates he's desperate for oxygen up to

1  this point.

2      A    What I see is he's trying to push himself

3  off to get the pressure off his chest and his

4  stomach so that he can take a deep breath.  You

5  can --

6            I can hear from his tones that the volume

7  of his voice is diminished.  He -- I think he's

8  becoming desperate for oxygen.  And I've been in

9  that situation myself as a patient.

10                    (Video played.)

11  BY MR. WILLIAMS:

12      Q    Another clicking sound of the TASER

13  attempting to be used, right --

14      A    Yes.

15      Q    -- at 22:21:37?

16                    (Video stopped.)

17  BY MR. WILLIAMS:

18      Q    All right.  Right there, you see in this

19  one a clear view of Officer Phillips with his knee

20  on Rodriguez's back.

21            You agree?

22      A    And a hand above Phillips' knee closer to

23  the head.  I've got another hand, another hand, it

24  looks like a knee on Fernando's left buttocks.

25            So I've got at least three arms and two

1    knees on that -- on that image.

2                        (Video played.)

3                        (Video stopped.)

4    BY MR. WILLIAMS:

5        Q    Okay.  You can see right there that

6    Fernando, at 22:21:38, has still got his arm --

7    elbow bent and he's pushing up; correct?

8        A    Yes.

9                        (Video played.)

10                       (Video stopped.)

11   BY MR. WILLIAMS:

12       Q    And the officer commenting "he is not

13   getting up," that's a indication that they feel like

14   he's still trying to get up; correct?

15            You would agree with that?

16       A    I agree with the off -- I agree I heard

17   what the officer said.  I don't think any reasonable

18   officer, with five officers present with somebody

19   who's been shackled on their legs and handcuffed on

20   their hands, would have any thought that he's going

21   to get up and escape and assault them.

22       Q    I didn't ask that, but that he's trying to

23   get up?

24       A    To breathe.  That's my assessment,

25   Counselor.

1      Q    He never said anything about breathing,

2   did he?

3      A    No.

4      Q    Did Rodriguez say anything about not being

5   able to breathe?

6      A    No.

7      Q    He's talking.  He's saying "F you" to

8   them; right?

9      A    That was significantly earlier in the

10  event.

11     Q    That's just a few seconds earlier.

12          What was preventing him from saying I

13  can't breathe if he was not able to breathe at that

14  point?

15     A    I don't know what was through his mind.  I

16  don't know why he didn't say I can't breathe.

17     Q    Well, you certainly would expect it

18  because he's articulating.  You heard him say "F

19  you" and "get off of me" just a few seconds earlier;

20  right?

21     A    But I think that -- those comments were

22  significantly earlier in the physical altercation

23  before he's been compressed for some period of time

24  where now his -- now he's got less oxygen in his

25  lungs.

1     Q     Um-hum.  And you know that because of

2     what?

3         A     I know that from my years of training,

4     treating COPD patients with emphysema and asthma

5     patients.  I know that from being a patient in the

6     hospital where I couldn't catch my breath and --

7         Q     Okay.  It couldn't be from the struggle

8     when he's trying to push up and trying to get away

9     from these officers' grasps?

10        A     He's not struggling to get away from the

11    officers or to assault the officers.  He's

12    struggling to breathe, and it wasn't recognized,

13    sadly.

14                          (Video played.)

15                          (Video stopped.)

16    BY MR. WILLIAMS:

17        Q     Okay.  At 22:22, approximately 21, it's

18    Officer Stroud that says that he's trying to bite me

19    and if he -- he says he's going to kick his teeth

20    in?

21        A     I heard that.

22                          (Video played.)

23                          (Video stopped.)

24    BY MR. WILLIAMS:

25        Q     Okay.  So he's --

1          You heard Rodriguez talking there at

2    22:22:30 and 31/32; correct?

3          A    Yes.

4          Q    Okay.  He hasn't said anything about not

5    being able to breathe; correct?

6          A    He did not say that.

7          Q    Okay.  At this point, up to this time at

8    22:22:32, have you ever seen Officer Phillips' knee

9    anywhere other than upper back between his shoulder

10   blades?

11         A    No.

12                        (Video played.)

13                        (Video stopped.)

14   BY MR. WILLIAMS:

15         Q    22:22, approximately 49/50, Stroud again

16   says "huh-uh, dude" indicating what to you?

17         A    Whatever Stroud saw that he wanted to

18   restate.

19         Q    That Rodriguez was trying to bite him

20   again?

21         A    Well, I heard him say "if you bite my

22   foot."  But he's got a leather police duty boot on,

23   I'm assuming; so it's not like he's out there with

24   flip-flops and he's going to get bitten on the toes.

25   I don't know how dangerous a set of teeth is if

1  you're wearing leather work boots.

2                          (Video played.)

3                          (Video stopped.)

4  BY MR. WILLIAMS:

5      Q    Have you heard them call for an ambulance

6  yet?

7      A    They -- it was much earlier.

8      Q    And he just said, trying to get an

9  ambulance here, or something to that effect?

10          That was Stroud that just said that?

11     A    Yeah.

12     Q    Okay.  So they clearly are thinking an

13  ambulance is going to be there at any moment;

14  correct?

15     A    It never can get there fast enough,

16  Counselor.

17     Q    They're, obviously, waiting on an

18  ambulance to arrive?

19     A    They're very anxious to transfer care of

20  Fernando to the paramedics, yes.

21                          (Video played.)

22     A    But if I could insert --

23                          (Video stopped.)

24     A    So this is where I'm hearing Fernando

25  grunting, where now he's not able to talk.  He's not

1    able to scream and cuss.

2    BY MR. WILLIAMS:

3        Q    Um-hum.

4        A    And the fact that Officer Phillips has his

5    knee on his back between the shoulder blades --

6            Well, you know, my heart is right about

7    here, so on the other side of my backbone where, you

8    know, if I was Fernando, that's where Phillips's

9    knee would be is right above my heart if I'm

10   facedown into the asphalt; so compressing the heart,

11   the lungs, your trachea.  All that is right there

12   where your back is.

13       Q    Your breathing is primarily done through

14   your diaphragm; correct?

15       A    Yes.  But if it's --

16       Q    Your chest cavity moves very little.  It's

17   the diaphragmatic breathing that is important;

18   correct?

19       A    Correct.  But if everything is being

20   compressed, that makes it hard for the diaphragm to

21   do its job because there's nothing for the diaphragm

22   to expand upon.

23       Q    Are you aware of the fact that there's

24   numerous studies that have been done that indicate

25   that it takes over 400 pounds of pressure to

1    significantly impair somebody's breathing to deprive

2    them of oxygen?

3        A    I'm sure it takes a lot, yes.

4        Q    Yeah.  And you would agree that

5    Officer Phillips is not even imparting his entire

6    body weight during the time he's got his knee on

7    Rodriguez's back; correct?

8        A    I would not agree with that.

9        Q    He's squatting with one leg on the

10    pavement, and he's putting -- has the other knee on

11    Fernando; correct?

12        A    But I don't know where he's applying his

13    mass.  I don't know which --

14        Q    It's got to be distributed between the two

15    of them.  You just don't know how much; right?

16        A    Correct.  It doesn't have to be

17    distributed equally.  And I --

18        Q    Right.

19        A    And I would suggest that he would -- he

20    would have put more on his knee than on his foot.

21        Q    But, in any event, it's not more than he

22    weighs.  So if he weighs 200/210 pounds, he's not

23    putting the entire amount of his weight on

24    Rodriguez's back; correct?

25        A    Correct, but the cumulative effect of

1    doing it for five seconds versus several minutes.

2         Q    Does what?

3         A    It becomes cumulative.  I think it becomes

4    harder for Fernando to breathe.

5         Q    And you base that on your own years of

6    experience?

7         A    Absolutely, because I've watched people

8    suffocate who have had respiratory distress from

9    injury and trauma.

10        Q    Have you ever in your experience, though,

11   watched somebody with body-weight pressure on their

12   back get to where they couldn't breathe and die

13   because of the weight on their back?

14        A    Not with the pressure on theirself.

15        Q    Right.  You have not had that experience;

16   correct?

17        A    No, because we've already rescued them

18   from whatever pressure was affecting their

19   breathing, and now they're on the stretcher in the

20   back of the ambulance.

21                    (Video played.)

22                    (Video stopped.)

23   BY MR. WILLIAMS:

24        Q    You hear the officers struggling to

25   breathe, can you hear that on the video, both Lewis

1    and other officers around him?

2         A    I do.

3         Q    Yeah.  And they're not suffering from

4    positional asphyxia, are they?

5         A    No, but I think it's a demonstration of

6    how much pressure they applied and how much force

7    they've used, the fact that they themselves are

8    having to take deep breaths.

9         Q    It's a result of their physical exertion;

10   correct?

11        A    Correct.

12        Q    Yeah.

13                      (Video played.)

14                      (Video stopped.)

15   BY MR. WILLIAMS:

16        Q    At 22:24:18/19, Rodriguez is still able to

17   take in air and yell out; correct?

18        A    Correct.

19        Q    And at this point the knee has been on

20   his -- between his upper shoulders for a couple of

21   minutes or so; right?

22        A    Correct.

23        Q    So, obviously, it hasn't deprived him of

24   his ability to get some air in his lungs to be able

25   to yell out; correct?

 1      A     I don't agree with that.

 2      Q     You don't agree that he had air in his

 3 lungs to be able to yell out what we just heard on

 4 the video?

 5      A     And my assessment is, the reason he has

 6 air in his lungs to yell out is he got some relief,

 7 because as the officers -- their verbal banter

 8 has -- they've stopped talking about Fernando, and

 9 now they're talking about imagine-fest, this is the

10 first time I've seen a naked person.

11            Because the officers are relaxed, I would

12 imagine they would also become -- not only are they

13 verbally relaxed, but I think they're physically

14 relaxed.  And I think because of that, they've stood

15 up and they've taken --

16            They've done something to alter the

17 pressure that they were putting on Fernando, and now

18 he's gotten a little bit -- he was able to take a

19 breath.

20      Q     Do you ever see Officer Phillips stand up

21 in that video up to this point after he put his knee

22 on his back?

23      A     At some point he will stand up, but I

24 don't know what point --

25      Q     Right.  He hasn't to this point, has he?

       A     But he may very well have transitioned.

             But it's clear that Fernando got a burst
of oxygen and is -- because he wasn't saying
anything for 45/60 seconds, he was doing the
grunting, because he couldn't take deep breaths, and
now he has.

             That's my assessment of why he's said that
because he got some relief.  The officers are not
only verbally relaxed, but I think they're
physically relaxed, as well.

             You mentioned earlier about them
breathe -- the officers having trouble breathing.
Well, shortly here they're going to talk about that
their feet were cramping because they were standing
on top of him.  They're tired.

       Q     Sure.

                         (Video played.)

                         (Video stopped.)
BY MR. WILLIAMS:

       Q     All right.  There.  We've seen up to this
point in the video, 22:24:36, get back to seeing
Officer Phillips's positioning.

             He's in the same position he had been when
we saw him earlier in the video; correct?

       A     Approximately.

1      Q    As far as his knee between the shoulder

2   blades and upper back; correct?

3      A    And then he's got his left hand pushing

4   down on his right shoulder --

5      Q    Right.

6      A    -- and he's got the TASER tased in his

7   small of his back.

8      Q    On his back, right.

9      A    And then you see other arms -- other --

10     Q    Holding down his legs --

11     A    Yeah.

12     Q    -- down toward the bottom, towards his

13  knee joint; right?

14     A    Yes.  But most of the torso pressure is

15  being applied by Officer Phillips.

16     Q    On his upper back?

17     A    Um-hum.

18     Q    Right?

19     A    Yes.

20                    (Video played.)

21                    (Video stopped.)

22  BY MR. WILLIAMS:

23     Q    You could -- before I stopped it, it got a

24  little blurry.

25          But before I stopped it, did you see

1  Rodriguez's neck?  Did you see his head and his

2  neck?

3       A    I see his head.

4       Q    Okay.  Let's back it up just a little bit.

5                      (Video played.)

6  BY MR. WILLIAMS:

7       Q    Watch there, and you'll see it.  We'll get

8  a little neck light.

9            COURT REPORTER:  I'm sorry.  I didn't

10      hear you.

11           MR. WILLIAMS:  I'm sorry.  We'll get a

12      little light.

13                     (Video stopped.)

14 BY MR. WILLIAMS:

15      Q    Well, I'll stop it here.

16      A    It almost looks like somebody's hand is

17 forcing his head down.

18      Q    I think I may have gone past where I

19 meant.

20           But at any point have you seen

21 Officer Phillips move his knee to Rodriguez's neck,

22 from what you can tell on the video?

23      A    No.  It's primarily on his --

24      Q    He stayed pretty much in the same area;

25 correct?

1      A      Yes.

2      Q      And you said that it looks like somebody

3   may have been taking his hand and putting it up to

4   the back of his head, of Fernando's head?

5      A      It looks like --

6      Q      Hard to tell?

7      A      -- a gloved hand.  It's got -- looks like

8   it's got a black glove on it.

9      Q      And we just heard one of the officers say

10  "I'm glad you guys got here."

11             Is this the time, you think, when the EMS

12  first arrived?

13     A      They arrived shortly after this.

14     Q      22:25:33?

15                     (Video played.)

16     A      Yeah.

17                     (Video stopped.)

18  BY MR. WILLIAMS:

19     Q      Okay.  So one of the City officers -- it

20  may be Lewis -- has got his gloved hand on

21  Rodriguez's head?

22     A      And then another glove -- another hand is

23  on his left shoulder.

24     Q      Do you know who that -- whose hands -- I

25  know it's hard to say.

1    A    It could very well be the same --

2    Q    Obviously, it looks like Lewis because the

3  body-cam video is down right on it, so it's from his

4  camera.

5    A    But that looks like Lewis's watch maybe on

6  his left wrist.

7    Q    Uh-huh.

8    A    See the watch band right in front of us?

9    Q    Right.  Yeah.

10    A    And then maybe that's Lewis's right hand

11  pushing his head down.

12         So another officer clearly has his hand on

13  his -- on Fernando's left shoulder.

14    Q    Shoulder there?

15    A    And then Phillips still has his knee in

16  his back.

17    Q    Right.  Yeah.

18                    (Video played.)

19                    (Video stopped.)

20  BY MR. WILLIAMS:

21    Q    All right.  Now you see --

22         So you can see there that Phillips's knee

23  is several inches away from Fernando's neck and

24  head; correct?

25    A    Now it looks like his knee is further over

1  the right scapula than over the center of the back.

2      Q     Here's his shoulder.  Here's his head.

3  And then the knee is way up in this area; right?

4      A     To me, from this image, it looks like the

5  should -- the knee is not midline over the spine

6  anymore.

7      Q     Which way do you think it's moved?

8      A     It looks like it's more on the -- over the

9  right shoulder than in the center of the back.  I

10 mean, it's very hard to tell.

11          MR. WILLIAMS:  And, for the record,

12      we're looking at timestamp 22:25:43.

13          All right.

14                  (Video played.)

15      A     And, see, there was a --

16                  (Video stopped.)

17 BY MR. WILLIAMS:

18      Q     There's another good view that shows that

19 Phillips's knee is several inches away from

20 Fernando's neck and head; correct?

21      A     Yes, but it also looks like there's a

22 whole lot of pressure being applied to that knee to

23 Fernando's body.

24      Q     And you can also see that Fernando is

25 picking up his head and moving his head around;

1  correct?

2      A    But it's also being restrained by, I

3  guess, Officer Phillips -- or Officer Lewis.

4      Q    And that's timestamp 22:26:03,

5  approximately.

6                    (Video played.)

7                    (Video stopped.)

8  BY MR. WILLIAMS:

9      Q    Okay.  Do you hear them say they could see

10 the -- or couldn't see or could see the blue lights?

11     A    I'm assuming they were talking to the

12 para -- about the paramedics.

13     Q    Yeah.

14     A    Yeah.

15     Q    Had you heard that they actually

16 arrived -- went to -- the wrong direction and had to

17 come back to where they were?

18     A    I've seen all the delays possible,

19 Counselor.

20     Q    Yeah.

21     A    I mean, it's -- people get the wrong

22 address or they -- yeah.  It's unfortunate.

23     Q    So the officers are trying to get them to

24 the correct location at that point, it appears?

25     A    Yes.

1                    (Video played.)

2                    (Video stopped.)

3   BY MR. WILLIAMS:

4        Q    You agree at 22:27:14, approximately a few

5   seconds before that, that Officer Butera and

6   Officer Phillips are looking intently and watching

7   Fernando Rodriguez?

8        A    Yes.  They're a foot and a half away from

9   him.  They're faced Fer --

10       Q    And they're watching him; right?

11       A    Yes.

12                   (Video played.)

13                   (Video stopped.)

14  BY MR. WILLIAMS:

15       Q    And these officers during this time frame

16  are talking about what EMS may be able to do for

17  Rodriguez?

18       A    Correct.

19       Q    Right?  Doesn't that indicate they have

20  concern for him and his condition?

21       A    No.

22                   (Video played.)

23                   (Video stopped.)

24  BY MR. WILLIAMS:

25       Q    Okay.  22:27:36/37, Officer Butera, who's

1    been watching him, says "his pulse rate is through

2    the roof"; correct?

3         A    Correct.

4         Q    Okay.

5                        (Video played.)

6                        (Video stopped.)

7    BY MR. WILLIAMS:

8         Q    And that's -- and then you hear him

9    question about "are you breathing, brother."

10             Correct?

11        A    Correct.

12        Q    All right.

13        A    He doesn't answer.

14        Q    That's the first time there's been any

15   indication that they noticed any difficulty in him

16   breathing, correct --

17        A    The first time --

18        Q    -- the officers?

19        A    Yes.

20        Q    The first time they've --

21        A    Yes.

22        Q    And that was at 22:27:42, approximately.

23                        (Video played.)

24                        (Video stopped.)

25

1  BY MR. WILLIAMS:

2      Q    Okay.  So then a few seconds after that,

3  Officer Butera actually stands up off of him, and

4  Stroud says "don't relax on him too much."

5           Right?

6      A    Correct.

7      Q    And Butera puts his foot, I think, down on

8  his lower leg area to -- just to hold him.  Is

9  that -- you can't really see it from there.

10          Is that what you understood he did?

11     A    Yes.  And I would have expected him to

12 have done something different.

13     Q    Let's see what we've got here.

14                   (Video played.)

15                   (Video stopped.)

16 BY MR. WILLIAMS:

17     Q    All right.  At 22:28:00 or 01, officer

18 says "he's quit breathing."

19     A    Correct.

20     Q    Do you know who that was --

21     A    No.

22     Q    -- who said that?

23                   (Video played.)

24     A    And this is where I would have expected

25 Officer Butera to have done something different.

1          (Video stopped.)

2  BY MR. WILLIAMS:

3      Q    He knows that EMS is right there and is

4  coming down to take a look at Rodriguez; correct?

5  He's even looking at them right now?

6      A    Yes, but he's medically trained to make an

7  initial assessment.  And I would have expected

8  Butera to move to Fernando's head to check his

9  breathing, to check his heart rate and his carotid

10  artery.

11          (Video played.)

12          (Video stopped.)

13  BY MR. WILLIAMS:

14      Q    Okay.  You recognize that a medic has

15  arrived and now an officer, Stroud or -- I think

16  it's Stroud -- talking to them?

17      A    Yes.

18      Q    Okay.  The medic didn't go over and start

19  checking on Rodriguez right away?

20      A    And I think that's a direct consequence of

21  what Stroud told him of he's playing possum and the

22  fact that --

23      Q    So would you believe, then --

24          Normally, a medic who comes up to the

25  scene should immediately go and check somebody

1    they've been called to check out; right?

2         A    Agreed.

3         Q    And you think he didn't because of what

4    Stroud said to him?

5         A    Yes, and the fact that nobody was doing

6    anything medically for him.

7                      (Video played.)

8                      (Video stopped.)

9    BY MR. WILLIAMS:

10        Q    So he didn't tell him he was playing

11   possum until, it looked like, about 15 seconds or

12   more after EMS --

13        A    Correct.

14        Q    -- medic arrived; right?

15        A    Correct.

16                     (Video played.)

17                     (Video stopped.)

18   BY MR. WILLIAMS:

19        Q    Do you hear one of the officers say

20   they're scared to touch him?

21        A    Yes.  And I also observed Officer Butera.

22   He transitioned to Fernando's head and stood on his

23   hands.

24        Q    No.  He's standing on the handcuffs.  We

25   can look at it again.  In fact, the City officer

1   asked him to take over for him right there.

2           Did you not hear that?

3       A   But I would --

4       Q   He put his foot down --

5           Because EMS are there at that point;

6   right?

7       A   Well, they're on scene.  They're not there

8   providing patient care.

9       Q   But they're standing right there near

10  where the officers are; right?

11      A   They're on the scene.  They're gathering

12  their equipment, but they're not -- they're not --

13                      (Video played.)

14                      (Video stopped.)

15  BY MR. WILLIAMS:

16      Q   So you see they're standing on the

17  handcuffs; correct?

18      A   And I see -- I see Fernando's left hand

19  under that pile of handcuffs.  That's what I see.

20          And I would expect Officer Butera to be on

21  his hands and knees turning Fernando on his back

22  opening his airway, checking his breathing -- airway

23  breathing circulation.

24      Q   Even though the medics are present?

25      A   The medics are on the scene, but they're

1    not present at Fernando's side.  Even though --

2        Q    They were just talking to them right there

3    beside the officers.

4        A    They've arrived --

5             The medics have arrived on scene, but

6    things don't happen instantly.  They're gathering

7    their equipment, and they're on the way, as they

8    will in just a moment, to provide medical care for

9    Fernando.

10            But Officer Butera is one of two medically

11   trained First Responders, and they're CPR-certified.

12   None of that was provided.

13                         (Video played.)

14                         (Video stopped.)

15   BY MR. WILLIAMS:

16       Q    And that's 22:30:08, the EMS tapping on

17   him?

18       A    Yeah.  That's probably a para -- a

19   firefighter or paramedic's boot right there --

20       Q    Yeah, right, right.

21       A    -- yes, where they're trying to shake and

22   shout.

23                         (Video played.)

24   BY MR. WILLIAMS:

25       Q    They're not attempting any CPR or

```
1   attempting to see if he's breathing at that point?
2        A    Well, that's all -- you know, the shake
3   and shout will determine what his level of
4   consciousness is.
5        Q    Um-hum.
6   BY MR. WILLIAMS:
7        Q    All right.  At this point, obviously, EMS
8   has taken over as far as trying to figure out what's
9   going on with him; correct?
10       A    Correct.  They're making their assessment.
11       Q    All right.  And we'll stop it.
12                      (Video stopped.)
13            COURT REPORTER:  I'm sorry.  I didn't
14       hear you.
15            THE WITNESS:  They're making their
16       assessment.
17            MR. WILLIAMS:  All right.  I need to
18       take a short bathroom break.
19            MR. JOHNSON:  Okay.
20            MR. WILLIAMS:  And that's all we're
21       going to do with the video.
22                      (Whereupon, there was a recess
23                      in the deposition from 2:52 p.m.
24                      to 2:57 p.m.)
25            MR. WILLIAMS:  We're back on.
```

BY MR. WILLIAMS:

    Q    Dr. Lowe, would you agree that someone who has actually conducted studies, researched on the theory of compression or positional asphyxia would be more qualified to offer an opinion as to whether body weight on a person's back in the prone position could cause compressional asphyxia than you would be?

    A    Yes.

    Q    You were not able to determine, obviously, what Fernando Rodriguez's percentage of oxygen intake was during the physical restraint in the prone position?

    A    The exact percentage?

    Q    Yeah, what oxygenation he had.

    A    No.

    Q    And you are aware that there was no evidence of any rib fractures to Fernando Rodriguez noted on the autopsy?

    A    I didn't see the autopsy report.

    Q    Oh, you didn't?  Okay.

    Are you aware that typically in crush-type of compressional asphyxia, there's usually evidence of internal injuries such as rib fractures, other type of trauma to internal organs associated with

1  it?

2      A    Would you repeat the question, please?

3      Q    Are you familiar with the fact that in

4  compressional asphyxia situations such as a car

5  falling on someone, somebody getting squeezed in

6  machinery as you've discussed, there's typically

7  evidence of internal damage such as rib fractures

8  and other type of trauma?

9      A    I don't know that it's always true,

10 though.

11     Q    But you haven't done any study?  You're

12 not qualified to offer an opinion about that?

13     A    I haven't done any studies on compression.

14     Q    Are you aware of Rodriguez having any

15 internal injuries at all during this incident?

16     A    Just the fact that his heart and lungs

17 stopped working.

18     Q    How do you know his lungs stopped working,

19 first of all?

20     A    Well, the paramedics -- he's not

21 breathing.

22     Q    Well --

23     A    So his lungs have stopped working.

24     Q    His lungs stopped work -- he stops

25 breathing --

1          A person stops breathing when they go into
2     cardiac arrest and their heart starts -- stops
3     beating; correct?
4          A    Sometimes you go into respiratory arrest,
5     and then your heart stops.
6          Q    You don't know which one occurred here, do
7     you?
8          A    I do not know which one occurred first.
9          Q    Okay.
10         A    I know they both eventually occurred.
11         Q    Pretty much everybody that dies heart
12    stops beating and --
13              Right?
14         A    Correct.
15         Q    -- whatever the cause is?  All right.
16              I have just a few things I want to go
17    through I have marked up on this other report that I
18    now have.
19         A    Yes, sir.
20         Q    All right.  In your report, Page 5 --
21    let's see -- Incident Overview.  You put that on
22    September 22nd, 2019 --
23              Is that your understanding of the date
24    this incident occurred?
25         A    That's a typo.  It's September 20th.

1      Q      Okay.  On Page 6 of your report --

2      A      Can I refer to my report?

3      Q      Yeah.  Oh, yeah.

4      A      Okay.

5      Q      I'm assuming you would do that.

6      A      Okay.

7      Q      Page 6 of your report, under the Incident

8  Timeline and Participants Activities, you state

9  that, the second sentence:  Officers Lewis and

10  Stroud arrived almost simultaneously and both

11  officers took the exact same actions at seeing a

12  naked male walking in the middle of a virtually

13  deserted public street.

14           Where do you come up with this notion that

15  it was a virtually deserted public street?

16      A      Well, it was virtually deserted compared

17  to me working for the City of Roswell Police

18  Department.  I saw one car driving north, I guess,

19  and one car that stopped south.  I saw --

20      Q      So if you only see a couple of vehicles,

21  if you're in Roswell, you think that's virtually

22  deserted?

23      A      Yeah.  That's right in the middle of

24  COVID.

25      Q      Okay.  But you do -- that was my point.

1    You do note that there are vehicles that

2  are in the area.

3    In fact, that's how 9-1-1 was called, was

4  motorists that were in the area on that street;

5  correct?

6    A    Yes.

7    Q    And then there was the motorists that were

8  stopped because of what was going on; correct?

9    A    Correct.

10    Q    All right.  In the -- let me see -- third

11  full paragraph of Page 7 --

12    A    Yes.

13    Q    -- you state that -- in the third --

14  well -- second sentence but starting at the end of

15  the third line:  Fernando had received 25 seconds of

16  electricity within a one-minute-and-five-minute

17  [sic] period.

18    And is that just from your observation of

19  what you see and hear from the Lewis video?

20    A    Yes.

21    Q    Okay.  Because, as you stated before, you

22  haven't reviewed the pulse graphs or TASER downloads

23  from any of the tasers used in the incident;

24  correct?

25    A    I don't -- no, no.

1     Q   Okay.  Fortunately, it looks like we've

2  discussed everything that I've been making notes on,

3  so I think we're -- so let me -- I'm still going

4  through it here.

5          All right.  Let's go down to Page 12 of

6  your report.  I just want to clarify.  On Page 12

7  you have an image embedded taken from the Lewis

8  body-cam video.  And in that below the image, you

9  put that the "BWC image showing Phillips' left knee

10 on Fernando's back between shoulder blades and

11 neck." And you go on to state:  The TASER X2 armed

12 pressed in Fernando's lower back above his buttocks.

13          Right?

14     A   Yes.

15     Q   You do not state that the knee is

16 anywhere -- is not -- is on the neck; correct?

17     A    From this image it's hard to tell because

18 I just don't know how his hips are angled, that part

19 of his lower leg may be on the neck, as well.

20     Q   But you didn't see that when we watched

21 the video.

22          We never saw an image of his knee being on

23 the neck; correct?

24     A   Again, it's in very close proximity to the

25 neck.

1     Q    You would agree that Butera's right foot

2 being pressed down on Fernando's left calf region

3 would not have any effect on his ability to breathe?

4     A    Correct.

5     Q    What do you characterize as passive

6 resistance from a subject?

7     A    So passive resistance is exactly that.

8 They're not trying to strike the officer or kick the

9 officer.  They're just simply not complying.

10 They're sitting there not complying.

11     Q    They're not being physically resistive, in

12 other words?

13     A    No.

14     Q    That's correct?

15     A    They're just not doing what the officers

16 asked them to do.  They're just -- they're not doing

17 what they were told.

18     Q    If there's physical resistance, shoving,

19 pushing, that kind of thing, that's active

20 resistance; correct?

21     A    Yes, if it's done with the intent for the

22 officers -- against the officers.  But just moving

23 around, no.

24     Q    All right.  And I know I may be somewhat

25 beating a dead horse.  We've already discussed it,

1    but I just want to -- because for some reason I keep

2    seeing this.

3            But Page 34, when you get down in your

4    bullet points under conclusions and opinions, No. 6,

5    second sentence --

6            Are you with me?

7        A    Yes.

8        Q    Second sentence says:  Fernando's ability

9    to inhale and exhale was further compromised by

10   having multiple officers kneeling on and compressing

11   his head, neck, torso and limbs onto the pavement.

12           Again -- we went through this with the

13   video, but the only officer that's ever seen that we

14   can tell on the video, I believe, is

15   Officer Phillips, who's actually putting a knee on

16   Rodriguez's torso -- upper back and torso; correct?

17       A    And, again, it's in -- it's in -- if it's

18   not on the neck, it's in very, very close proximity.

19   It's -- I can't tell --

20       Q    I know.  But, first of all, it is only

21   Rodriguez [sic] who's got a knee up in the upper

22   back?

23       A    Phillips.

24       Q    I mean Phillips.  Did I say Rodriguez?

25   Yes.

1    Phillips; correct?

2    A    Phillips is the only officer I observed

3    who had pressure on the torso --

4    Q    Right.

5    A    -- beyond hands.

6    Q    And you mentioned neck there, and that's

7    what I'm concerned about.

8    But you agree that there's -- haven't seen

9    any image clearly showing that he had his knee ever

10   on his neck area?

11   You call it proximity of the neck, which

12   is -- still can be upper back.

13   A    If it's not on the neck, it's in close

14   proximity.  The images that we see are either

15   blocked by an arm or another body part or shadows or

16   the lighting.

17   I don't know how wide Phillips's knee is,

18   but it's all right there.

19   Q    Well, what's the -- what's the

20   significance of any knee pressure ever being at the

21   neck, anyway, to you?

22   A    To me it's a difference without a

23   distinction.  There was still significant body

24   weight applied to his upper back, maybe his neck;

25   but he was not able to inhale to oxygenate his body.

1    Q    You don't contend that there was any

2  cutting-off of his air supply through the windpipes

3  traveling through his neck area; correct?

4         Do you know what I'm talking about?

5    A    The trachea.

6    Q    You can asphyxiate somebody by basically

7  cutting off their wind.

8         You're not contending that that occurred;

9  correct?

10   A    My assessment is, is Officer Phillips's

11 knee on the upper back in close prox -- if not on

12 the neck or in close proximity made it impossible

13 for Fernando to take deep breaths and get oxygen

14 into his lungs.  And the cumulative effect was, he

15 went from screaming to not -- to talking less loud,

16 to grunting, to not doing anything in a period of

17 about four minutes or so.

18   Q    You're talking about basically compression

19 on chest or torso; correct?

20   A    That made it impossible for him to

21 breathe.

22   Q    Yeah.  I'm just trying to clarify, just if

23 you'd work with me here.  I'm just trying to

24 clarify.

25        You're not claiming they cut his wind

1    supply off around his neck?

2        A    No.

3        Q    All right.  Can you cite to any scientific

4    study that has verified that body-weight pressure

5    from one person through application of one knee on a

6    person's back can produce or cause positional

7    asphyxia?

8        A    No.

9        Q    You cite to this 1995, almost a

10   30-year-old, document from the Department of Justice

11   about possible positional asphyxia; right?

12       A    And there have been others since then.

13       Q    Do you know that the study that that was

14   based on is actually later rebunked by -- or

15   debunked by its own author?

16            Were you aware of that?

17       A    I'm not aware.

18       Q    Okay.  Do you know what excited delirium

19   is?

20       A    Yes.

21       Q    What is that?

22       A    It's a true medical emergency where

23   people, for a variety of different causes, such as

24   drug use, psychotic illnesses, can become out of

25   control, crazy, breaking windows, have elevated body

1    temperature.  It's a true medical -- it's a -- it's

2    a true medical emergency.

3        Q    Do you think that excited --

4            Have you seen instances of excited

5    delirium in patients you were involved with or

6    subjects you were involved with as an EMT/medic --

7        A    I have.

8        Q    -- paramedic?

9        A    Yes, sir.

10       Q    Did you see any that died from being in a

11   state of excited delirium?

12       A    They may very well have died in the

13   emergency room long after I had departed, but I

14   don't specifically remember any who died.

15       Q    Okay.  Have you seen literature or

16   received any instruction or training that excited

17   delirium in conjunction with heart disease and drug

18   use could cause cardiac arrest and death?

19       A    Yes.

20           MR. WILLIAMS:  All right.  Let's see.

21       I'm about finished.

22   BY MR. WILLIAMS:

23       Q    Did you note, when you listened to the --

24   and watched the video, that the officers talked

25   about how Fernando Rodriguez was demonstrating

1  extraordinary strength?

2       A    I heard them say that.

3       Q    And it was hard for them to hold on to him

4  and hold him down?

5       A    Yes.  I heard that.

6       Q    Have you ever reviewed any research on

7  crowd crush?

8       A    No.

9            MR. WILLIAMS:  All right.  That's all

10       the questions I have at this time.

11            MR. JOHNSON:  I just have a few

12       questions for you.

13            THE WITNESS:  Yes, sir.

14                    EXAMINATION

15  BY MR. JOHNSON:

16       Q    Dr. Lowe, I believe that counsel had asked

17  you about whether it's a violation of TASER policies

18  to TASER someone multiple times.

19            Do you remember that?

20       A    Yes.

21       Q    And I think you said no; right?  It's not

22  a violation?

23       A    There's no exact number.

24       Q    Well, it sounded like you wanted to

25  expound on that or explain that answer.

1          Was there anything else there?

2      A    So generally it's recommended 15 seconds

3  of exposure.  And then you need to start thinking

4  about transitioning to other force options because

5  if you tased them three times and it's not effective

6  for a total of 15 seconds of electricity, then

7  clearly it's not working.

8          And so whether you use OC or a baton or

9  de-escalate or wait for backup --

10         But tasers are cumulative.  The more often

11 somebody gets tased, the longer the duration of

12 exposures.  Cumulatively generally makes things

13 worse for the person.

14     Q    Okay.  And is it your opinion that one of

15 the County officers in this case used excessive

16 force when it came to the tasers?

17     A    Yes.  Officer Phillips, his last three

18 TASER deployments I did not find objectively

19 reasonable.  We have a handcuffed person who's got

20 two linked handcuffs on his wrists, leg chains on

21 his ankles.  He's stretched out prone.  There's five

22 officers holding him to the ground with either their

23 hands, their feet or a knee.

24         And every time Fernando, in my -- in my

25 expert opinion, was pushing up to try to inflate --

1    to expand his rib cage so he could breathe, that

2    Phillips drive-stunned him for just one or

3    two seconds.

4          So he -- he had the TASER on the whole

5    time staged in his back because you can see the LED

6    display on the TASER X2 and the flashlight pressed

7    in his back on the video.  But there were three

8    times where, when Fernando tried to push up to take

9    a breath, that Phillips pulled the trigger but then

10   turned it off after a second by turning the switch

11   off; so that's why it was only a one- or two-second

12   ride because Phillips turned it off early.

13       Q    And did you say you reviewed the policies

14   that were in place by Henry County Police Department

15   regarding the use of tasers that were in effect at

16   the time?

17       A    I did review them.

18       Q    Did you find those problematic at all?

19       A    They didn't address many of the concerns

20   that I observed in this as far as

21   positional asphyxiate -- making sure that they're

22   not in a prone position, making sure that you get

23   them medical attention sooner rather than later.

24       Q    Counsel was talking about a study

25   involving 400 pounds of weight, or something along

1    those lines.

2              Have you ever read or heard that study?

3        A    I have not.

4        Q    Okay.  In your opinion or in your

5    training, can you kill someone with less than

6    400 pounds?

7        A    Absolutely.

8        Q    And do you believe that's what happened

9    here?

10       A    Yes.

11       Q    Regarding the use of excessive force as

12   far as the prone position goes, what should have the

13   officers done here?

14       A    Are you talking about from the moment they

15   arrived on the scene?

16       Q    Well, when they got him into the prone

17   position, from that point forward what should they

18   have done differently, in your view?

19       A    Once they got him in the prone position,

20   got him handcuffed, leg-ironed, roll him over on his

21   side, let one of the officers have their lower

22   leg -- or their -- kneel down beside him and roll

23   him back over on the officer's legs so that he can

24   breathe, have an officer support his head so you

25   take all the pressure off his diaphragm and chest

1  and hips and his --

2       It only makes it worse when you've got an

3  officer pushing his face into the asphalt.  So not

4  only has he got a knee in his back, but he's got a

5  hand pushing his face into the asphalt.

6       They should have turn -- they should have

7  got him in the recovery position.  Every one of them

8  had CPR training, two of them whom, Stroud and

9  Butera, were trained by the Georgia POST as First

10 Responders, which is a 60-hour class on advanced

11 first aid, but it talks about that recovery position

12 and how important it is to get people off their

13 stomach.

14     Q    And what is the recovery position?

15     A    The recovery position is when you turn

16 them on their side, maybe pull their knees up to

17 take pressure off the diaphragm and the stomach and

18 support their head so that their head is not leaning

19 over, if they can't control their head because

20 they're either unconscious -- but support their

21 head, keep their airway open.

22     Q    Would you agree at some point that

23 Mr. Rodriguez became unresponsive?

24     A    Yes.

25     Q    Okay.  And at that point what were the

duties of the officers involved?

A   To transition from restraint to resuscitation.  They should have immediately --

I mean, there was a lot of discussion about I think he quit breathing, well, maybe he did, he's playing possum.

You know, the first time somebody said I don't think he's breathing, I would have expected one of the two officers who were field training officers, Butera and Stroud, to say let's check.  If you don't think he's breathing or you think his pulse is fast and his blood pressure is fast or elevated, let's make an assessment.

You've got five police officers there. You've got an ambulance on the way.  Nobody's at risk.  It didn't take that -- it wouldn't have taken any time to make a determination.  And maybe, had they done that, they could have started CPR immediately to restore his circulation and his airflow.  And then they could have got on the radio and said, you know, advise the ambulance we're doing CPR on our patient now.

So the ambulance would already have been prompted, hey, we're not just rolling to a naked man in the street in City of Hampton, but now we're

Thompson Reporting Services, Inc.
(678) 483-0600

responding to a cardiac arrest where the officers
are telling us they're doing CPR.

I would expect the paramedics to have got
off the ambulance faster with all the gear they
needed so they didn't have to go back to the truck.

Q    At the point that Mr. Rodriguez became
unresponsive, do you consider the knee on the back
to constitute excessive force?

A    Yes.

Q    Why?

A    Because once he's become unconscious,
what's -- what is the justification for the knee on
the back?  Not only is he leg-ironed and handcuffed,
but now he's become unresponsive.  And you're just
continuing to apply more pressure.

And Phillips literally doesn't take his
knee off the back until the last few moments before
the paramedics take over.  Even -- so it was just
that --

It just seemed cumulative and excessive to
continue to apply pressure to the back when he's
already unconscious.

Q    And in your training and your experience,
do you believe that that knee on the back could have
killed him?

1     A     Yes.  And if I could offer this,

2  Counselor.

3     Q     Of course.

4     A     Of all five officers on the scene, the one

5  officer who had the most -- the -- one of the

6  strongest parts of their body, their leg, and who

7  was -- he's a good-size officer.  He's a young,

8  stout officer.  He was -- he was the one who had

9  primary body weight on Fernando's torso.  Other

10 people had a hand or maybe two hands, but Phillips

11 is the one who had dedicated body weight on --

12 through his knee into Fernando's back.

13    Q     And you believe that his body weight

14 constituted excessive force?

15    A     Yes.

16         MR. WILLIAMS:  Object to the form.  Now

17      you're leading your own client -- your

18      witness, I should say.  That's what's

19      improper.

20         MR. JOHNSON:  Okay.

21 BY MR. JOHNSON:

22    Q     These officers, did they have the same

23 amount of training and experience --

24    A     As -- no.

25    Q     -- as one another?

1     A    No.

2     Q    Who had the most training and experience

3 of the County officers?

4     A    Butera.

5     Q    How much more?

6     A    A significant amount.  He had been an

7 officer for 14 years.  He was a field training

8 officer, so he was charged with the responsibility

9 of training recruits.  He was medically trained as a

10 First Responder.  He had crisis intervention

11 training where you recognize people in a medical

12 crisis and you have tools and techniques to manage

13 them, one of which is de-escalation.

14     Now, I recognize by the time that Henry

15 County arrived, all the de-escalation was out the

16 window because Hampton didn't use that.

17     But Butera also was CPR-trained.  He was

18 trained on tasers.  He had been re -- he had been

19 recertified repeatedly.  And part of that training

20 is the Smart Use guidelines of don't continue to

21 tase people when it's not objectively reasonable.

22 And my assessment from his lower chevron and upper

23 chevron, he was the highest-ranking Henry County

24 officer on the scene.

25     Phillips was one day short of his one-year

anniversary graduation from the academy.  He's a --
he's an inexperienced officer.  And Butera had a
responsibility, as the senior officer on the scene,
to give him good advice.

Whatever the City of Hampton does --

And as a Clayton County Fire Department
Battalion Chief, I interacted with all different
types of agencies not part of Clayton County Fire
Department.  But when I committed Clayton County
Fire Department resources and personnel, I had to
factor in is what that agency was asking us to do as
part of mutual aid, was it being done in compliance
with our policies and our training.  We weren't
going to do --

Just because it was in the City of Morrow,
if Clayton County came into the City of Morrow and
Morrow was doing it bad, Clayton County is not going
to play because we're not going to be a party to
that.

And I would have expected Butera when he
got there to have told Phillips to stop tasing him
in the back just because he's pushing up.  I would
have expected Butera to have -- as a medically
trained law enforcement officer, CPR-certified, to
have got down and made -- checked his -- opened his

1  airway and checked for breathing and circulation

2  instead of standing on his hands and looking

3  longingly over his shoulder where's the ambulance.

4      Q    Did Officer Butera have a duty to tell

5  Officer Phillips to get off of Mr. Rodriguez?

6      A    Yes.

7      Q    And was the failure to do so a

8  violation --

9          MR. WILLIAMS:  Object to form.

10 BY MR. JOHNSON:

11     Q    -- of his constitutional rights,

12 Mr. Rodriguez's?

13         MR. WILLIAMS:  Object to form, leading.

14     A    Butera should have told Phillips to get

15 off his back.

16 BY MR. JOHNSON:

17     Q    Have you had a chance to review Henry

18 County Police Department's use-of-force policies

19 that were in effect at the time?

20     A    Yes.

21     Q    In your opinion, were those policies

22 adequate to protect Mr. Rodriguez's constitutional

23 rights?

24     A    There were a lot of gaps.  There were a

25 lot of gaps, and we saw that with the revised policy

1   that was executed a year and a half later where they

2   added a lot more definitions.

3          But it's one thing to write a policy and

4   to publish it in the procedure manual.  The real

5   responsibility comes through the training, what's

6   actually being done to provide that policy to the

7   officers who operate in the field.  That's where

8   the re -- that's where the real responsibility is.

9      Q    And what kind of training would you

10  expect?

11     A    I would expect exactly that, is that once

12  you get some --

13          And this is not novice stuff.  Once you

14  get somebody restrained and they're in handcuffs and

15  leg irons and you've got five officers on the scene,

16  I would expect the amount of force needed would go

17  down because you've got a person who is no threat to

18  the officers, no threats to the public.  They're not

19  going anywhere.

20          And if for some reason this superstrong

21  person breaks the handcuffs and starts flailing,

22  then you have to deal with that -- with the amount

23  of force that's reasonable.

24          But nothing changed.  Once they got him

25  handcuffed and restrained, they didn't stop applying

1  force.  They continued.  Force was still applied

2  literally up until the moment they handed him over

3  to the paramedics, where a moment before Stroud had

4  said he's playing possum.

5       Q    There was some discussion about CPR

6  classes; right?

7       A    Yes.

8       Q    Do you know if these officers had received

9  CPR training?

10      A    I know that when I went through Basic

11  Mandate, it was in my Basic Mandate class; but it's

12  also noted on the officer's POST profile of when

13  they got recertified in CPR.

14      Q    And were these officers trained in CPR?

15      A    Yes.

16      Q    And what is the purpose of CPR?

17      A    The purpose of CPR is to restore

18  circulation and breathing to the body by applying

19  chest compressions.  And mouth-to-mouth has gone out

20  of favor, but many officers carry breathing masks so

21  you have the protection from infectious diseases.

22  But many departments, such as Roswell, have

23  automatic emergency defibrillators.

24      Q    In your opinion, should the officers in

25  this case have used CPR?

```
1        A    Yes.

2        Q    At what point?

3        A    At the point when it was made I don't

4   think he's breathing, that's a clue.  That's a clue

5   that for the officers who are CPR-trained or Butera,

6   who's a First Responder, then said, let me go to his

7   head.  That's where the important part is.  I

8   wouldn't expect him to stay at the feet and not move

9   to the head.

10       Q    Is there anything else aside from CPR that

11  you think they could have done?

12       A    After he stopped breathing?

13       Q    Right.

14       A    No, because you'll notice on the video,

15  one of the first things the paramedics did or the

16  firefighters is, they started doing chest

17  compressions as soon as they put him on the

18  stretcher.

19       Q    Did it appear to you about whether there

20  was a delay between when the paramedics got there

21  and when they actually were attending to

22  Mr. Rodriguez?

23       A    There was.

24       Q    Do you know what that delay was for?

25       A    That's just a consequence of we're here.
```

You've got -- I'm assuming some of them got off a
fire truck.  And people will arrive at different
times from the fire truck.  The officer who sits in
the front right seat will generally get off first.
You'll have a firefighter who sits in the back.
He'll get off with the officer.  But the engineer,
the person who drives the truck, he's got to -- he's
got to set the parking brakes.  He's got to chock
the wheel so the fire truck won't roll a thousand
yards down the street into a house or a ditch.  And
generally the engineer would stay with the truck.
That's their assignment.  And then the two
paramedics, one of them is probably at the
stretcher -- at the ambulance getting the stretcher
and equipment while the other paramedic walks up and
finds out what have we got.  Well, we've got a
person who's playing possum, or whatever the
dialogue was that --

        So there was a delay, but that's the
reality of the job.  It doesn't -- they just don't
parachute in and immediately have all their
equipment right in front of them.  They have to go
get it.  I mean, it's all in different parts of the
ambulance.

        Q    And so who's responsible for the patient

1  or the detained individual while the paramedics are

2  getting their items ready?

3      A    And what I would say is, as soon as the

4  paramedic -- whichever -- whoever was in charge of

5  the scene, the highest-ranking medically trained

6  person, the paramedic.

7          And I would say that once that paramedic

8  walked up and put eyes on Fernando, that he should

9  have made an assess -- he should have made a medical

10 assessment right there and not simply depend upon --

11 especially when you can visually look at him and say

12 that don't look good to me.

13         I mean, normally I would expect, when

14 somebody is in handcuffs surrounded by a bunch of

15 officers, somebody is going to be screaming and

16 cussing.  And to see somebody who's proned out and

17 you can -- I can see on the video the injuries to

18 his back from him crab-crawling across the asphalt.

19 I just would have --

20         And I would have expected the paramedics

21 to have -- to have made an assessment before they

22 just went back and got the stuff out of the

23 ambulance, in a -- in a perfect world.

24     Q    And just to be clear on this -- I don't

25 know if I touched on this -- in your training and

1   your experience, can a knee on the back while

2   someone's in the prone position cause someone to

3   receive inadequate oxygenation?

4        A    Yes.

5        Q    And do you believe that's what happened

6   here?

7        A    I'm certain that's what happened.

8             MR. JOHNSON:  That's all I have.  Thank

9        you.

10            MR. WILLIAMS:  All right.  Dr. Lowe, I

11       have a few more questions.

12                   FURTHER EXAMINATION

13  BY MR. WILLIAMS:

14       Q    First of all, are you aware that Fernando

15  Rodriguez was not handcuffed in a secure way because

16  of the way his -- I think it was his right hand that

17  only had a couple of fingers, was smaller than the

18  left?

19       A    No.

20       Q    You weren't aware they couldn't get

21  handcuffs on him properly because of that?

22       A    No.

23       Q    You weren't aware they had to use two sets

24  of handcuffs to connect together and that was why

25  they were standing on that pile of handcuffs?

```
 1              You weren't aware of that?
 2       A     That was not my assessment --
 3       Q     Okay.
 4       A     -- of how they got two handcuffs together.
 5       Q     So if that being the case, they didn't get
 6  him properly handcuffed, if they had just let him
 7  go, then he might have been able to swing and do the
 8  things he had done previously; correct?
 9       A     No.
10       Q     He could have tried to crawl away using
11  his arms?
12       A     No.
13       Q     You don't think so with two sets of --
14       A     I think he was properly handcuffed.
15       Q     -- handcuffs?  Oh.  You don't -- you think
16  still --
17       A     I do.
18       Q     Oh, okay.  So you're not familiar with
19  that?
20       A     I mean, he never --
21       Q     That's fine.
22       A     -- pulled a hand out.
23       Q     Well, they never let him pull a hand out
24  if they got those cuffs on him and stood on the
25  cuffs; right?
```

1      A     Well, he wouldn't have had the opportunity

2    with a foot on his hand --

3      Q     Right.

4      A     -- inside the cuffs.

5      Q     That's why they kept it on there so he

6    wasn't having the opportunity to continue to try to

7    resist; right?

8      A     But they were even doing that where he was

9    unconscious.

10     Q     Okay.  You recognize that Rodriguez had

11   resisted for a long period of time when the City

12   officers were trying to get him to get on the ground

13   and then trying to get him to roll over after they

14   used the tasers on him; correct?

15     A     He was not compliant.

16     Q     For a long period of time?

17     A     Some period of --

18     Q     Eight or ten minutes; correct?

19     A     I don't think it was that long.

20     Q     From the time the City officers first

21   arrived 'til they got him down onto the ground and

22   secured in the handcuffs, to the extent they could?

23     A     The over --

24           A lot of the time Fernando was just

25   sitting there when they were giving the commands to

1 get on the ground, but he clearly was not complying.

2 And my assessment is, it's because he was having a

3 medical emergency.

4    Q    Obviously, the City officers were

5 concerned that he might start resisting or being

6 combative again by the comments that they made about

7 him, you know, playing possum, you know, don't let

8 up the pressure, those kind of comments.

9         Would you agree with that?

10    A    That was their assessment.

11    Q    And that -- those comments were around the

12 time that you have said that he -- Rodriguez could

13 have been experiencing a lack of breathing,

14 sufficient oxen -- oxygenation; correct?

15    A    Correct.

16    Q    And you've already indicated now that

17 Officer Phillips was a fairly inexperienced officer;

18 correct?

19    A    He was.

20    Q    So an inexperienced officer like

21 Officer Phillips, hearing these City officers saying

22 that this individual could be faking it, could be

23 playing possum would give him reason to continue to

24 hold him, at least put some pressure on his back, to

25 make sure he didn't become combative again; correct?

1          A    No.

2          Q    Okay.  You agree that those statements

3     were made by the City officers, right, about him

4     playing possum, don't let up the pressure --

5          A    I heard them say that.

6          Q    -- that sort of thing?

7               MR. WILLIAMS:  Okay.  That's all.

8          Thank you.

9               THE WITNESS:  Thank you very much.

10               MR. JOHNSON:  Okay.  I think we're

11          done.

12               COURT REPORTER:  Copies of the

13          transcript?

14               MR. WILLIAMS:  Yeah.  I want to get

15          just our usual, electronic, condensed and

16          everything, just all electronic but that --

17          all of those formats.

18               MR. JOHNSON:  I'll get a hard copy, as

19          well.

20          (Pursuant to Rule 30(e) of the Federal Rules of

21     Civil Procedure and/or O.C.G.A. 9-11-30(3), signature of

22     the witness, WILLIAM A. LOWE, has been reserved.)

23

24          (Deposition concluded at 3:40 p.m.)

25                    - - -

1          E R R A T A     S H E E T

2              I, WILLIAM A. LOWE, the witness herein, have
read the transcript of my testimony and the same is true
3  and correct to the best of my knowledge.

4  _____ There are no corrections.
   _____ Any corrections/additions are listed below.

5

6  PAGE/LINE            SHOULD READ            REASON

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19                      _____
                        WILLIAM A. LOWE
20

21 Sworn to and subscribed before me
   this _____ day of _____ 20___.
22

23 _____
   Notary Public.
24 My commission expires _____.

25

```
 1              C E R T I F I C A T E

 2

 3     STATE OF GEORGIA:
       HENRY COUNTY:
 4

 5              I hereby certify that the foregoing transcript

 6     was taken down, as stated in the caption, and the

 7     questions and answers thereto were reduced to printing

 8     under my direction; that the foregoing pages 1 through

 9     178 represent a true and correct transcript, to the best

10     of my ability, of the evidence given upon said hearing,

11     and I further certify that I am not of kin or counsel to

12     the parties in the case; am not in the regular employ of

13     counsel for any of said parties; nor am I in anywise

14     interested in the result of said case.

15              Pursuant to Article 10.B. of the Rules and

16     Regulations of the Board of Court Reporting of the

17     Judicial Council of Georgia and O.C.G.A. 15-14-37 (a) and

18     (b), written disclosure is attached herein.

19              This, the 25th day of July, 2022.

20

21

22                         _____
                           MARY K. CALDWELL, CSR, B-1325
23                         Certified Shorthand Reporter
                           Certification expires 3/31/23
24

25
```

1                          DISCLOSURE

2     STATE OF GEORGIA:
      COUNTY OF HENRY:
3

4     DEPONENT:  WILLIAM A. LOWE

5     Date of Deposition:  June 28, 2022

6

7              Pursuant to Article 10.B. of the Rules and

8     Regulations of the Board of Court Reporting of the

9     Judicial Council of Georgia, I make the following

10    disclosure:

11             I am a Georgia Certified Court Reporter.  I am

12    not disqualified for a relationship of interest under the

13    provisions of O.C.G.A. 9-11-28(c).

14             I am here as a representative of Precision

15    Reporting, Inc.

16             Precision Reporting, Inc., was contacted by

17    Thompson Reporting Services to provide court reporting

18    services for this deposition.

19             Precision Reporting, Inc., will not be taking

20    this deposition under any contract that is prohibited by

21    Georgia law.

22

23                        _____
                          Mary K. Caldwell, CSR B-1325
24                        Certified Shorthand Reporter
                          Certification expires 3/31/23
25

**$**

**$150 (1)**
66:25
**$3,900 (1)**
67:5

**[**

**[sic] (6)**
28:15;38:22;40:20;
63:20;150:17;153:21

**A**

**ability (7)**
57:12;90:8;115:24;
116:5;129:24;152:3;
153:8
**able (21)**
32:4;33:10;46:9;
50:12,14;114:19,23;
115:11;122:5,13;
124:5;125:25;126:1;
129:16,24;130:3,18;
138:16;146:10;
154:25;175:7
**above (5)**
25:19;37:17;
120:22;126:9;151:12
**absolutely (5)**
25:13;31:14;68:15;
128:7;161:7
**academy (8)**
11:4,24;12:1,5,10;
18:8;63:23;167:1
**acceptable (2)**
31:12;32:13
**accepted (1)**
65:13
**access (1)**
47:16
**accident (1)**
23:5
**accidents (2)**
69:22;70:7
**accommodate (1)**
6:15
**accomplish (1)**
76:24
**according (4)**
86:6;88:15;107:16;
109:23
**accordingly (1)**
6:8
**accounts (2)**
15:19;70:24
**accused (1)**
30:13
**achieved (2)**
25:8;49:1
**achieving (1)**

**104:17**
**across (1)**
173:18
**action (1)**
5:15
**actions (2)**
78:12;149:11
**activated (1)**
90:25
**active (1)**
152:19
**activities (2)**
35:5;149:8
**activity (1)**
39:21
**actual (2)**
86:10;112:8
**actually (21)**
6:21;7:4;35:16;
43:3;51:15;53:1,14;
54:14;72:22;79:25;
91:18;101:6;110:3;
114:2;137:15;140:3;
146:3;153:15;
156:14;169:6;171:21
**add (3)**
37:19;49:7;114:4
**added (1)**
169:2
**addition (1)**
7:14
**address (3)**
5:9;137:22;160:19
**adequate (1)**
168:22
**adjacent (1)**
114:14
**adopted (1)**
68:10
**advanced (1)**
162:10
**advantage (1)**
44:9
**advice (1)**
167:4
**advise (1)**
163:21
**advocate (1)**
20:1
**AED (2)**
53:15,24
**affect (4)**
51:7;57:11,12;
104:19
**affecting (1)**
128:18
**affects (2)**
57:20;86:15
**affirm (1)**
4:17
**afternoon (1)**
20:20
**again (17)**

**56:21;82:11;98:3;**
**100:22;105:2;**
**106:19;107:15;**
**115:17;117:25;**
**124:15,20;142:25;**
**151:24;153:12,17;**
**177:6,25**
**against (4)**
29:2,15;69:20;
152:22
**agencies (3)**
18:16,18;167:8
**agency (1)**
167:11
**aggravated (2)**
59:14,14
**ago (4)**
7:18;52:10;62:8;
112:13
**agree (37)**
32:20;36:20;39:3;
43:15;58:20,25;
60:25;68:12;77:2,14;
78:10;85:16;86:20;
87:12,14,15,20,23;
92:15,22;110:24;
113:22;120:21;
121:15,16,16;127:4,
8;130:1,2;138:4;
146:2;152:1;154:8;
162:22;177:9;178:2
**agreeable (1)**
4:8
**Agreed (5)**
32:19;66:2,10;
99:10;142:2
**agreement (1)**
4:3
**Ah (1)**
38:12
**ahead (5)**
24:21;72:24;79:8,
17;82:3
**aid (2)**
162:11;167:12
**air (14)**
56:13;111:8,9;
112:10,25;114:23;
115:4,10;118:13;
129:17,24;130:2,6;
155:2
**airflow (1)**
163:20
**airway (6)**
14:15,16;143:22,
22;162:21;168:1
**airways (1)**
14:22
**alert (2)**
24:3;86:25
**alerted (1)**
23:19
**allegations (1)**

**30:6**
**alligator (2)**
58:8,10
**allowed (3)**
41:8,9;61:9
**almost (7)**
35:6;48:21;57:24;
77:9;133:16;149:10;
156:9
**along (2)**
10:19;160:25
**alter (1)**
130:16
**altercation (2)**
21:13;122:22
**Alton (1)**
5:5
**A-L-T-O-N (1)**
5:5
**always (7)**
35:7;57:24;60:17;
64:16;82:20;113:15;
147:9
**ambulance (29)**
74:3,10;75:3,6,8,9,
12,18,21;76:1;79:10,
16,25;80:5;97:18;
98:3;125:5,9,13,18;
128:20;163:15,21,23;
164:4;168:3;172:14,
24;173:23
**among (1)**
75:11
**amount (12)**
33:3;52:5,19;
53:12;55:9;69:14;
70:9;127:23;165:23;
166:6;169:16,22
**amps (2)**
53:6,10
**anchored (1)**
111:5
**and/or (1)**
178:21
**angled (1)**
151:18
**ankles (3)**
82:7;114:13;
159:21
**anniversary (1)**
167:1
**anticipation (1)**
22:25
**anxious (1)**
125:19
**anymore (2)**
33:14;136:6
**apart (1)**
56:12
**apartment (2)**
23:5,6
**apparently (2)**
44:11;72:4

**appear (2)**
92:19;171:19
**appeared (1)**
23:9
**appears (2)**
116:14;137:24
**application (2)**
46:15;156:5
**applied (10)**
33:4,6;58:24;
72:18;85:4;129:6;
132:15;136:22;
154:24;170:1
**applies (1)**
60:16
**apply (2)**
164:15,21
**applying (3)**
127:12;169:25;
170:18
**appreciate (2)**
9:25;39:2
**approach (1)**
78:24
**approached (2)**
40:16;64:6
**appropriate (3)**
43:21;61:2;76:23
**approved (2)**
20:10,11
**approximately (16)**
26:18;34:7;64:24;
98:3,14;99:8,9;100:4,
19;116:14;123:17;
124:15;131:25;
137:5;138:4;139:22
**arcing (7)**
47:3,4,25;55:14;
56:8;102:10;105:23
**area (12)**
46:23;77:25;90:23;
111:25;114:12;
133:24;136:3;140:8;
150:2,4;154:10;
155:3
**arm (8)**
13:22;117:9;
118:19,23;119:4,7;
121:6;154:15
**armed (6)**
11:24;12:12;13:7;
17:21;68:17;151:11
**arms (5)**
32:5;117:12;
120:25;132:9;175:11
**around (15)**
23:12,24;26:24;
39:21;52:13;53:23;
101:17;102:2;
104:14;109:9;129:1;
136:25;152:23;
156:1;177:11
**arrest (28)**

21:16;23:18,19;
29:23;31:2;35:11,16,
17,25;36:3,6,13,13;
39:4;42:15;44:7;
73:9,12;81:14;87:6,9,
16,21,25;148:2,4;
157:18;164:1
**arrested (2)**
33:23,25
**arrests (5)**
34:7,25,25;35:8,8
**arrival (1)**
78:8
**arrive (3)**
44:14;125:18;
172:2
**arrived (23)**
21:18;23:13;39:9;
40:6;43:9;44:22;
45:19;47:21;76:10;
79:1;97:8;99:8;
134:12,13;137:16;
141:15;142:14;
144:4,5;149:10;
161:15;166:15;
176:21
**arriving (1)**
77:10
**arrow (1)**
106:10
**artery (1)**
141:10
**arthrosclerosis (1)**
87:24
**articles (1)**
72:5
**articulating (2)**
96:25;122:18
**aside (1)**
171:10
**ASP (2)**
59:2,4
**asphalt (8)**
56:20,22;82:5;
87:19;126:10;162:3,
5;173:18
**asphyxia (18)**
68:23;69:3,21;
70:25;72:11,17;
80:10,24;81:5,19,24;
129:4;146:4,7,23;
147:4;156:7,11
**asphyxiate (2)**
155:6;160:21
**aspirate (1)**
83:15
**assault (3)**
59:14;121:21;
123:11
**asserted (1)**
72:21
**assess (1)**
173:9

**assessment (17)**
39:20;46:25;
112:16;121:24;
130:5;131:7;141:7;
145:10,16;155:10;
163:13;166:22;
173:10,21;175:2;
177:2,10
**assignment (1)**
172:12
**assist (2)**
43:8;76:10
**assistance (2)**
39:11;40:1
**assistant (1)**
39:10
**associated (1)**
146:25
**assume (1)**
6:7
**assuming (7)**
64:12;105:15;
107:4;124:23;
137:11;149:5;172:1
**asthma (1)**
123:4
**atherosclerosis (1)**
87:10
**attached (2)**
10:11,19
**attempt (1)**
42:5
**attempted (7)**
39:14;56:25;59:7;
62:24;76:17;77:2;
109:8
**attempting (5)**
81:8;89:6;120:13;
144:25;145:1
**attend (1)**
18:16
**attended (1)**
11:3
**attending (1)**
171:21
**attention (1)**
160:23
**attorney (2)**
64:13;67:4
**audible (1)**
115:11
**audio (1)**
108:4
**August (2)**
11:1;16:11
**author (2)**
66:7;156:15
**auto (1)**
23:5
**automatic (1)**
170:23
**autopsy (3)**
81:1;146:19,20

**available (1)**
32:17
**aware (20)**
39:14,18;77:9;
78:20;86:2,14;87:5,
8;89:9,14;126:23;
146:17,22;147:14;
156:16,17;174:14,20,
23;175:1
**away (20)**
23:16;26:23;27:7;
40:14;49:13;55:3;
79:17;85:18,23;
100:6,11;107:21;
119:15;123:8,10;
135:23;136:19;
138:8;141:19;175:10
**Axon (1)**
18:13
**A-X-O-N (1)**
18:13
**Axon's (1)**
61:1

## B

**back (89)**
7:17;14:14;23:19;
24:23;25:18;31:8,23;
33:18,18;41:6,22;
46:20;54:23,23;
57:24;58:3;65:11;
67:20;69:1;72:23;
73:4;82:12;90:25;
91:14,20;92:17,20;
95:5;101:20;102:8;
103:13;110:22;
111:19,25;113:14;
116:15,22;118:1;
119:11;120:20;
124:9;126:5,12;
127:7,24;128:12,13,
20;130:22;131:21;
132:2,7,8,16;133:4;
134:4;135:16;136:1,
9;137:17;143:21;
145:25;146:6;
151:10,12;153:16,22;
154:12,24;155:11;
156:6;160:5,7;
161:23;162:4;164:5,
7,13,17,21,24;
165:12;167:22;
168:15;172:5;
173:18,22;174:1;
177:24
**backbone (1)**
126:7
**back-crawling (1)**
56:18
**backup (5)**
21:18;23:19,20;
43:5;159:9

**backwards (3)**
40:15;101:6,8
**bad (1)**
167:17
**baggy (1)**
57:4
**band (1)**
135:8
**Band-Aids (1)**
12:14
**banter (1)**
130:7
**bar (1)**
70:1
**base (2)**
82:14;128:5
**based (2)**
42:2;156:14
**basic (6)**
31:9;83:8,9,12;
170:10,11
**basically (6)**
34:12;95:18;
116:23;118:22;
155:6,18
**basics (1)**
14:15
**basing (2)**
80:24;81:24
**bathroom (2)**
71:21;145:18
**baton (4)**
59:2,4;60:18;159:8
**Battalion (3)**
12:20;15:24;167:7
**battery (2)**
21:16;59:14
**Battle (1)**
69:24
**bearing (1)**
14:21
**beating (3)**
148:3,12;152:25
**became (15)**
11:16;12:24;13:7;
16:5,7;17:17,23;
20:12,17;21:20;34:1,
19;63:24;162:23;
164:6
**become (15)**
11:5,24;12:11;
15:9,20;18:2,5;
36:14;37:2,6;130:12;
156:24;164:11,14;
177:25
**becomes (2)**
128:3,3
**becoming (3)**
58:18;64:5;120:8
**began (1)**
24:17
**behalf (2)**
5:18;19:1

**behavior (1)**
29:23;37:8;66:21
**behind (1)**
31:7
**below (4)**
46:23;49:23;119:8;
151:8
**belt (1)**
60:17
**bent (2)**
108:12;121:7
**beside (2)**
144:3;161:22
**best (3)**
28:9;60:22;94:17
**better (9)**
28:14;31:4;32:1;
44:8;58:14;60:23;
63:2;88:14;111:7
**beyond (1)**
154:5
**big (3)**
12:5;21:9;86:5
**Bill (1)**
5:11
**bit (1)**
22:15;41:7;48:6;
85:25;95:1;113:13,
14,24;117:5;130:18;
133:4
**bite (6)**
79:3;85:12;89:7;
123:18;124:19,21
**bitten (1)**
124:24
**black (1)**
134:8
**blades (14)**
91:15,21;92:17,21;
110:7,16,21;111:20;
116:16;118:2;
124:10;126:5;132:2;
151:10
**blame (1)**
28:7
**blends (1)**
35:22
**block (1)**
79:17
**blocked (1)**
154:15
**blocking (1)**
91:22
**blood (3)**
86:23;87:2;163:12
**blue (1)**
137:10
**blurry (1)**
132:24
**bod (1)**
25:16
**body (45)**
14:17;25:16;31:22;

32:15,21;33:7;37:12;
45:8;48:20;51:16;
55:23;56:1,20,23;
59:24;72:18;86:4;
87:18;90:2,17;93:3,4,
8;94:12;102:11;
104:20,20;107:25;
108:10,21;113:4;
115:4,22;127:6;
136:23;146:6;
154:15,23,25;156:25;
165:6,9,11,13;170:18
**body-cam (7)**
47:7,12,25;95:24;
108:8;135:3;151:8
**body-weight (6)**
30:21,22,25;
114:11;128:11;156:4
**boot (2)**
124:22;144:19
**boots (1)**
125:1
**boss (3)**
11:25;12:2,7
**both (9)**
12:15;13:12;31:15;
56:25;96:24,25;
128:25;148:10;
149:10
**bottom (4)**
38:11;70:15;113:5;
132:12
**Bowlden (6)**
97:9,10,11;99:23;
100:6;102:15
**brakes (1)**
172:8
**break (7)**
6:14;71:20,22;
95:1,2;105:21;
145:18
**breaking (1)**
156:25
**breaks (1)**
169:21
**breath (7)**
81:9,15;82:1;
120:4;123:6;130:19;
160:9
**breathe (28)**
71:6;81:8;82:13,
17,25;83:3,17;84:19;
114:19;115:6;
119:13,18,22;121:24;
122:5,13,13,16;
123:12;124:5;128:4,
12,25;131:12;152:3;
155:21;160:1;161:24
**breathing (38)**
14:15,16;82:8,10;
83:10;84:2;86:22;
87:13,16;88:6;
112:10;114:22;

116:3;122:1;126:13,
17;127:1;128:19;
131:12;139:9,16;
140:18;141:9;
143:22,23;145:1;
147:21,25;148:1;
163:5,8,11;168:1;
170:18,20;171:4,12;
177:13
**breaths (3)**
129:8;131:5;
155:13
**brief (2)**
32:11;84:20
**bring (2)**
8:3,8
**broke (1)**
105:17
**brother (1)**
139:9
**brought (1)**
8:7
**Bull (3)**
19:3;28:6,8
**bullet (2)**
90:6;153:4
**Bulletin (2)**
72:7,10
**bullets (1)**
12:13
**bunch (1)**
173:14
**burn (1)**
58:13
**burst (1)**
131:2
**Butera (23)**
47:21;86:22;96:8;
117:22;138:5,25;
140:3,7,25;141:8;
142:21;143:20;
144:10;162:9;
163:10;166:4,17;
167:2,20,23;168:4,
14;171:5
**Butera's (1)**
152:1
**butt (6)**
111:7,9;112:10,25;
113:2,23
**buttocks (5)**
32:9;34:3;113:7;
120:24;151:12
**BWC (1)**
151:9

**C**

**cage (2)**
115:2;160:1
**calf (1)**
152:2
**call (5)**

24:3;37:24;79:14;
125:5;154:11
**called (5)**
64:14;65:3;78:17;
142:1;150:3
**caller (1)**
23:7
**call-out (1)**
12:17
**calls (2)**
39:10;61:6
**cam (7)**
47:22;48:20;93:4,
8;107:25;108:10,21
**came (7)**
7:17;30:24;49:22;
56:19;65:11;159:16;
167:16
**camera (3)**
48:21;96:19;135:4
**can (91)**
6:1;9:17,21,23;
15:7;18:6;21:7;
24:10;31:7;38:6;
40:21;41:6,20;46:19,
20,24;47:2,3;48:22;
49:1;57:3,5,11;61:4,
10;63:9;71:15;79:6,
21,24;81:4;82:9;
87:5,8,20;89:5;90:14,
16,21;91:1;93:18;
94:2,16,19,19,22;
95:12;96:23;100:22;
102:7,8,10,10;
103:19;104:21;
112:25;114:9;116:3,
4,12,18;117:6;
118:13,24;119:5,7,
11;120:4,5,6;121:5;
125:15;128:25;
133:22;135:22;
136:24;142:25;
149:2;153:14;
154:12;155:6;156:3,
6,24;160:5;161:5,23;
173:11,17,17;174:1
**capacity (2)**
19:10;30:10
**captured (1)**
93:7
**captures (1)**
108:4
**car (6)**
42:13;47:22;69:13;
147:4;149:18,19
**cardiac (8)**
87:6,9,16,21,25;
148:2;157:18;164:1
**care (3)**
125:19;143:8;
144:8
**career (3)**
15:23;35:13;68:16

**carotid (1)**
141:9
**carpet-weaving (1)**
69:25
**carried (2)**
19:10;54:21
**carry (5)**
12:13;19:21;21:7;
62:13;170:20
**carrying (1)**
20:5
**cars (4)**
77:19,23,25,25
**cart (3)**
51:2;56:11,18
**cartridge (19)**
21:22;22:2;24:22;
49:21,25;50:22,24;
51:2,13,14;54:14,16,
18,23;55:8,11,19;
106:21;107:16
**cartridges (3)**
55:2,7,18
**case (14)**
5:18;6:20;10:9;
61:22;62:4,23;63:10,
13;66:18;67:3;72:15;
159:15;170:25;175:5
**catch (1)**
123:6
**category (2)**
35:6;86:3
**caught (1)**
57:3
**cause (13)**
38:22;39:4;46:15,
18;51:6;73:9;80:15;
81:6;146:7;148:15;
156:6;157:18;174:2
**caused (6)**
23:14;37:6;77:16;
78:1;80:10;87:18
**causes (2)**
116:2;156:23
**causing (1)**
82:10
**cavity (1)**
126:16
**center (2)**
136:1,9
**certain (2)**
71:12;174:7
**certainly (10)**
39:3,24;40:18;
73:8;80:18;87:12;
90:21;91:4;114:10;
122:17
**certainty (1)**
81:22
**Certificate (1)**
80:11
**certification (1)**
18:1

**certifications (1)**
11:19
**certified (8)**
11:18;17:17;18:2;
19:13,14,21;62:13;
63:25
**CEW (1)**
84:10
**chain (1)**
117:20
**chains (1)**
159:20
**chair (1)**
83:4
**challenge (2)**
27:24;115:1
**challenges (2)**
36:21;57:14
**challenging (1)**
115:5
**chance (3)**
21:25;26:8;168:17
**change (3)**
10:15;69:8;86:21
**changed (3)**
34:18;93:5;169:24
**changes (1)**
7:12
**characterize (1)**
152:5
**charge (3)**
28:19;45:1;173:4
**charged (1)**
166:8
**charger (2)**
54:24,25
**charges (1)**
21:17
**charging (2)**
54:25;66:25
**check (5)**
141:8,9,25;142:1;
163:10
**checked (2)**
167:25;168:1
**checking (3)**
24:4;141:19;
143:22
**chest (8)**
82:23;111:3;120:3;
126:16;155:19;
161:25;170:19;
171:16
**chevron (2)**
166:22,23
**chief (3)**
11:25;15:25;16:21,
24;17:2,6;19:24,24;
21:1,7,8;65:6;167:7
**chiefs (1)**
17:5
**Chief's (1)**
12:20

children (1)
21:14
chock (1)
172:8
choice (1)
88:14
choose (1)
43:2
chronological (1)
23:3
chronologically (1)
9:12
circulation (5)
14:15;143:23;
163:19;168:1;170:18
circumstance (1)
88:25
circumstances (4)
19:6;21:10;61:3;
88:22
citation (1)
83:25
cite (3)
80:11;156:3,9
citizen (1)
30:13
City (30)
13:4;16:6,22;
19:17,20;34:6;39:11;
44:21,23;57:1;62:18,
19;68:18;73:23;
76:15;77:20;85:18;
97:12;134:19;
142:25;149:17;
163:25;167:5,15,16;
176:11,20;177:4,21;
178:3
Civil (1)
178:21
claiming (1)
155:25
clarify (3)
151:6;155:22,24
class (4)
19:22;21:6;162:10;
170:11
classes (6)
21:3;79:14;83:8,
12,19;170:6
Clayton (18)
10:23;12:9,15,16,
24;13:10;16:8;19:10;
63:15,22;68:18;71:4,
13;167:6,8,9,16,17
clean (1)
6:3
clear (6)
10:21;40:22;
117:17;120:19;
131:2;173:24
clearly (12)
37:13,14;43:19;
82:7;112:10;114:19;

115:20;125:12;
135:12;154:9;159:7;
177:1
clicking (8)
99:12;105:8,9;
106:23;107:19;
108:25;109:7;120:12
client (1)
165:17
clipping (1)
58:12
clips (2)
58:8,11
close (10)
32:4;51:11;56:13;
92:21;108:3;151:24;
153:18;154:13;
155:11,12
closed (1)
50:1
closer (10)
49:8,11;50:3,4;
107:19,23;108:4,21;
114:8;120:22
closing (1)
26:21
clothes (3)
35:25;57:4;58:13
clue (2)
171:4,4
Code (1)
39:7
collapse (1)
70:18
college (1)
65:7
com (1)
84:17
combative (12)
21:20;23:10;33:17;
34:1;36:14;39:16;
78:22;81:14;85:8;
89:6;177:6,25
comfortable (1)
65:13
coming (3)
24:10;34:10;141:4
commanded (1)
106:18
commands (13)
23:17,18,25;24:18,
25;27:1;40:10,14;
76:18;84:18;100:14;
109:24;176:25
commenting (1)
121:12
comments (4)
122:21;177:6,8,11
commitment (1)
12:5
committed (5)
39:6,7;59:13;
78:12;167:9

common (2)
31:18;57:2
commonly (1)
14:11
communicate (1)
6:12
communicating (2)
54:19;104:8
communication (1)
80:1
company (1)
70:1
compared (2)
35:2;149:16
comparison (1)
53:20
compelling (1)
42:20
complained (1)
29:8
complaint (2)
29:6,15
complaints (5)
29:2,22;30:1,4,10
completed (1)
33:20
complex (2)
23:6,7
compliance (5)
22:9;33:8;36:15;
51:10;167:12
compliant (7)
24:15;30:20;32:23;
43:17,18;100:10;
176:15
comply (1)
85:20
complying (4)
102:22;152:9,10;
177:1
compress (1)
115:23
compressed (4)
69:23;71:5;122:23;
126:20
compressing (3)
90:10;126:10;
153:10
compression (3)
146:4;147:13;
155:18
compressional (7)
68:22;69:3;70:25;
72:17;146:7,23;
147:4
compressions (2)
170:19;171:17
compromised (2)
90:8;153:9
computer (2)
106:12;109:18
concept (1)
72:17

concern (1)
138:20
concerned (4)
33:13;73:23;154:7;
177:5
concerns (2)
6:10;160:19
concluded (1)
178:24
conclusion (1)
39:23
conclusions (1)
153:4
condensed (1)
178:15
condition (1)
138:20
conditions (1)
28:24
conduct (2)
51:6;68:13
Conducted (5)
14:11;68:5;82:15;
86:16;146:3
confident (1)
36:1
conflict (3)
37:13;64:7,10
confused (1)
65:4
congregated (1)
48:20
conjunction (1)
157:17
connect (1)
174:24
connection (5)
17:20;72:15;99:16;
105:10;106:25
connector (1)
58:7
Conroy (2)
17:3,7
consciousness (1)
145:4
consequence (4)
114:7;119:10;
141:20;171:25
consider (1)
164:7
Considerations (1)
88:21
considered (1)
86:3
constantly (1)
33:1
constitute (2)
58:23;164:8
constituted (1)
165:14
constitutional (2)
168:11,22
consultation (1)

61:21
consulted (2)
38:15,18
contact (6)
24:13;28:18;37:24;
56:10;106:1;109:4
contacted (3)
63:12;64:11;65:17
contain (1)
10:7
contend (1)
155:1
contending (1)
155:8
context (1)
34:24
continue (6)
32:22;76:17;
164:21;166:20;
176:6;177:23
continued (2)
77:5;170:1
continues (1)
115:8
continuing (6)
77:15;85:7,11,17;
89:6;164:15
contract (1)
20:4
control (15)
31:4,5,24;32:21;
36:22;43:22;44:19;
68:13;78:24;79:2;
89:3;92:24;102:4;
156:25;162:19
controlling (1)
36:15
conversation (2)
64:18;65:1
convince (1)
77:3
Conway (1)
17:3
COPD (1)
123:4
copies (4)
9:16,17;10:4;
178:12
copper (1)
105:21
copy (9)
7:24,25;9:13,15;
10:3;38:4;65:14;
68:9;178:18
corner (1)
23:12
corrected (1)
108:13
correlate (1)
106:4
counsel (5)
4:3;7:5,9;158:16;
160:24

Counselor (7)
49:14;61:15;
119:20;121:25;
125:16;137:19;165:2
County (35)
5:14,15;10:24;
12:9,15,16,25;13:10;
16:8;19:11;39:9;
56:16;63:15,22;64:8;
67:8,22;68:18;71:4,
13;84:6,9;89:23;
99:5;159:15;160:14;
166:3,15,23;167:6,8,
9,16,17;168:18
County's (1)
7:16
couple (5)
70:14;72:4;129:20;
149:20;174:17
course (8)
17:25;18:10,12,17;
20:9;31:14;87:11;
165:3
courses (1)
64:3
COURT (9)
4:13,16;5:23;
41:23;66:19;92:8;
133:9;145:13;178:12
covered (1)
73:6
covers (2)
38:17;83:9
COVID (1)
149:24
CPR (18)
8:21;83:8,9,12,18;
144:25;162:8;
163:18,22;164:2;
170:5,9,13,14,16,17,
25;171:10
CPR-certified (2)
144:11;167:24
CPR-trained (2)
166:17;171:5
crab-crawl (1)
40:15
crab-crawling (1)
173:18
cramping (1)
131:14
crawl (2)
85:23;175:10
crazy (1)
156:25
created (1)
16:19
Creek (1)
69:24
crim (1)
39:6
Criminal (2)
39:7;59:17

crisis (6)
73:15;75:19,22;
79:23;166:10,12
cross-examination (1)
61:9
crowd (1)
158:7
crush (1)
158:7
crushed (1)
71:14
crush-type (1)
146:22
cuffs (4)
117:16;175:24,25;
176:4
cumulative (5)
127:25;128:3;
155:14;159:10;
164:20
Cumulatively (1)
159:12
current (1)
10:12
Curriculum (1)
10:11
cursing (1)
98:21
cuss (1)
126:1
cussing (1)
173:16
custodial (1)
35:8
custody (2)
21:20;44:5
cut (2)
41:6;155:25
cutting (1)
155:7
cutting-off (1)
155:2
CV (6)
10:19;11:4,22;
12:24;17:16;65:10

**D**

damage (1)
147:7
danger (2)
43:24;77:17
dangerous (3)
77:4,5;124:25
dart (2)
88:11,11
dash (1)
47:22
date (4)
20:10;71:15;98:15;
148:23
day (3)
64:21;69:12;

166:25
days (3)
36:5;64:17;65:11
dead (2)
69:12;152:25
deadly (1)
59:11
deal (5)
14:5;18:25;21:9;
77:21;169:22
dealing (2)
36:20;42:10
dealt (2)
36:8;72:16
Death (6)
72:11;80:10,11,15;
81:6;157:18
deaths (2)
71:3,13
debunked (1)
156:15
decide (2)
11:23;42:14
decides (1)
69:8
decision (4)
43:12,16;44:3;
76:15
decompress (1)
27:15
decontaminate (1)
13:23
dedicated (1)
165:11
deems (1)
61:2
deep (7)
81:9;119:14,22;
120:4;129:8;131:5;
155:13
de-escalate (1)
159:9
de-escalation (2)
166:13,15
defeated (1)
16:13
Defendants (1)
5:15
Defendant's (5)
92:2,5,8;93:14,17
defibrillators (2)
53:17;170:23
definitely (1)
28:9
definitions (1)
169:2
degree (1)
33:7
delay (5)
20:8;44:9;171:20,
24;172:19
delays (1)
137:18

delirium (4)
156:18;157:5,11,
17
deliver (1)
28:19
delivered (4)
51:15;53:3;85:1;
99:16
delivers (1)
106:19
delivery (4)
51:1;55:5,5;57:11
delta (1)
24:5
demeanor (1)
30:4
demonstrated (2)
85:17,21
demonstrating (1)
157:25
demonstration (1)
129:5
den (1)
58:13
departed (1)
157:13
Department (31)
12:10,19,20;13:5,
13;15:24;16:11,14;
18:11;29:6;30:8;
34:6;35:4;39:9;
44:19;62:20;63:15,
22;67:22;68:18,19;
72:6;79:12,16;84:6;
149:18;156:10;
160:14;167:6,9,10
departments (4)
15:2;18:20;32:14;
170:22
Department's (2)
84:10;168:18
depend (1)
173:10
depends (1)
53:9
deploy (3)
18:24;28:12,13
deployed (19)
12:17;21:20;24:21;
46:3;49:19;50:24;
53:8,9,12;57:10;88:9,
11;99:12,21;100:4,5;
102:5;106:20;107:16
deploying (1)
102:15
deployment (15)
16:4;25:5;47:1;
49:2,16;56:2,3,17;
76:16;85:4;102:21;
103:3;104:6;105:4;
109:8
deployments (11)
28:1;56:25;57:16;

60:10;84:4,12,13;
88:20;89:11,18;
159:18
deposition (9)
4:2;5:19;8:2;
62:10;66:19;71:25;
95:10;145:23;178:24
deprive (1)
127:1
deprived (1)
129:23
deputized (1)
12:12
deputy (2)
11:25;12:24
described (4)
55:15;88:20;89:1,2
describing (1)
21:11
deserted (4)
149:13,15,16,22
designated (1)
41:21
designed (1)
55:22
desperate (3)
119:21,25;120:8
despite (1)
76:18
detailed (1)
52:1
details (2)
28:4,11
detain (7)
35:11,16;38:22;
39:4,15;40:4;77:22
detained (2)
27:13;173:1
detainee (9)
13:17;14:3,4;15:7;
30:18,19;31:1;33:16;
68:21
detective (1)
27:20
detectives' (1)
44:24
detention (1)
76:24
determination (2)
21:15;163:17
determine (10)
42:12;46:9;50:13;
76:23;79:20;81:4,22;
83:7;145:3;146:10
determined (2)
68:21;69:2
determines (1)
53:2
determining (2)
80:20;81:6
devoted (2)
34:16,17
diagnostic (1)

52:1
**dialogue (1)**
172:18
**diaphragm (9)**
46:24;49:23;82:22;
114:12;126:14,20,21;
161:25;162:17
**diaphragmatic (1)**
126:17
**die (1)**
128:12
**died (9)**
68:22;69:3,21;
70:24;80:21;81:4;
157:10,12,14
**dies (1)**
148:11
**difference (3)**
53:16;86:17;
154:22
**different (14)**
8:17;18:16;43:11;
46:12;49:16;50:13;
59:16;97:1;140:12,
25;156:23;167:7;
172:2,23
**differently (1)**
161:18
**difficult (2)**
23:11,16
**difficulty (4)**
82:10;83:10;116:2;
139:15
**diminished (1)**
120:7
**direct (2)**
41:10;141:20
**direction (3)**
57:5;66:12;137:16
**directions (1)**
44:21
**dirt (1)**
70:18
**discharge (2)**
46:14;52:3
**discharges (1)**
60:5
**disciplinary (1)**
29:11
**disclosed (1)**
6:22
**discovery (2)**
6:22;7:15
**discretion (1)**
76:23
**discussed (6)**
42:3;66:17;73:6;
147:6;151:2;152:25
**discussion (5)**
64:21;65:24;73:2;
163:4;170:5
**disease (1)**
157:17

**diseases (1)**
170:21
**dispatch (2)**
24:3;79:15
**dispatched (3)**
23:5;80:1,6
**display (3)**
26:25;106:8;160:6
**displayed (1)**
59:12
**dispute (1)**
37:4
**disrespect (1)**
5:12
**distinction (1)**
154:23
**distraction (1)**
22:13
**distress (1)**
128:8
**distributed (2)**
127:14,17
**disturbed (2)**
37:16;73:14
**ditch (1)**
172:10
**divided (1)**
67:6
**doctrine (1)**
57:25
**document (2)**
94:17;156:10
**documents (2)**
8:10;38:14
**dog (3)**
19:3;28:6,8
**domestic (2)**
20:22;21:16
**done (22)**
22:16;27:25;35:23;
36:7;86:18;91:4;
126:13,24;130:16;
140:12,25;147:11,13;
152:21;161:13,18;
163:18;167:12;
169:6;171:11;175:8;
178:11
**door (1)**
42:14
**dots (1)**
104:3
**doubt (2)**
37:17;71:13
**down (39)**
5:24;27:12;30:21;
31:23;36:4;37:7,11;
69:9;70:10,17;71:1,
5;76:18;77:6,15;
112:14,18;116:21;
118:23;119:6,8;
132:4,10,12;133:17;
135:3,11;140:7;
141:4;143:4;151:5;

152:2;153:3;158:4;
161:22;167:25;
169:17;172:10;
176:21
**download (3)**
51:24;54:5,11
**downloads (1)**
150:22
**downstairs (1)**
95:4
**Dr (8)**
5:7,13;10:5;72:3;
95:15;146:2;158:16;
174:10
**draft (3)**
7:17;9:8,14
**drafted (1)**
7:1
**drafts (3)**
7:7,11;9:15
**drain (1)**
70:16
**drive (9)**
21:21;22:10,20;
28:19;58:11;84:23,
24;85:13;102:17
**drives (1)**
172:7
**drive-stun (1)**
88:19
**drive-stunned (4)**
22:3;89:19;107:2;
160:2
**driveway (1)**
69:8
**driving (1)**
149:18
**Dropbox (1)**
66:2
**drug (3)**
35:8;156:24;
157:17
**drugs (1)**
37:15
**dry (1)**
107:2
**dude (1)**
124:16
**duly (1)**
4:23
**duration (1)**
159:11
**during (24)**
7:15;13:20;16:15;
31:20;33:19,22;
35:13;39:5;48:24;
56:24;58:16;60:5;
64:25;68:16;89:10,
11,14;90:18;109:7;
117:15;127:6;
138:15;146:12;
147:15
**duties (1)**

163:1
**duty (5)**
20:6;54:20;78:4;
124:22;168:4
**Dwayne (3)**
17:6,8,12

# E

**earlier (9)**
89:1;102:6;122:9,
11,19,22;125:7;
131:11,24
**early (3)**
73:25;160:12
**easier (4)**
82:17,24;83:3,16
**easy (2)**
105:19,21
**Ed (1)**
16:23
**effect (16)**
20:7,19;21:3,7;
53:3;62:12;67:23;
68:2;75:23;84:10;
125:9;127:25;152:3;
155:14;160:15;
168:19
**effective (2)**
47:1;159:5
**effectiveness (1)**
86:15
**effects (1)**
15:10
**eight (4)**
49:13;62:8;74:8;
176:18
**either (12)**
7:9;15:13;18:24;
32:15;37:15;68:17;
69:19;100:25;
111:25;154:14;
159:22;162:20
**either/or (1)**
119:16
**elbow (3)**
90:20;119:8;121:7
**electrical (2)**
28:19;55:5
**electricity (29)**
15:8;46:21,24;
47:4,25;51:1,5,15,25;
52:9,19;55:5,6,9,25;
56:1,3,13;57:7,11,20;
58:21;60:1;85:2;
99:16;102:7;108:2;
150:16;159:6
**electronic (3)**
68:4;178:15,16
**elevated (2)**
156:25;163:13
**else (4)**
43:19;48:23;159:1;

171:10
**email (1)**
21:2
**embedded (1)**
151:7
**emergency (5)**
156:22;157:2,13;
170:23;177:3
**emotionally (2)**
37:15;73:14
**emphysema (1)**
123:4
**employed (3)**
10:23;19:6;34:5
**employee (1)**
70:2
**EMS (14)**
14:25;15:3;74:20,
23;78:17;79:1,4;
134:11;138:16;
141:3;142:12;143:5;
144:16;145:7
**EMT/medic (1)**
157:6
**en (2)**
75:4;79:18
**encounter (4)**
37:3;74:4,9,18
**encountered (1)**
37:1
**end (6)**
11:6;21:22;22:2;
25:4;63:12;150:14
**ended (1)**
62:25
**energized (1)**
91:2
**energizes (1)**
50:22
**Energy (6)**
14:11;24:25;52:7;
53:8;68:5;86:16
**enforcement (13)**
12:13;15:14;20:22;
30:10;31:10,16;
37:23;64:8;78:23;
79:19,21;81:15;
167:24
**engineer (2)**
172:6,11
**enlarged (2)**
87:10,24
**enough (3)**
32:4;118:13;
125:15
**entire (3)**
34:13;127:5,23
**equally (1)**
127:17
**equipment (4)**
143:12;144:7;
172:15,22
**equivalent (1)**

70:12
**escape (1)**
121:21
**especially (2)**
114:24;173:11
**estimate (1)**
86:11
**evaluate (3)**
33:1;78:17;79:5
**Even (26)**
19:12;32:16;33:19;
39:4;42:12;44:22;
58:22;59:17,25;
65:11;68:25;69:1;
80:4;85:22;89:5;
100:5;104:20;
110:25;111:17;
118:12;127:5;141:5;
143:24;144:1;
164:18;176:8
**event (2)**
122:10;127:21
**events (1)**
48:7
**eventually (3)**
48:5;78:11;148:10
**everybody (1)**
148:11
**everyone (2)**
27:12;60:24
**everyone's (1)**
78:5
**evidence (7)**
7:10;48:12;81:23;
87:3;146:18,23;
147:7
**exact (5)**
79:13;80:3;146:14;
149:11;158:23
**exactly (5)**
38:1;64:20;91:24;
152:7;169:11
**EXAMINATION (3)**
5:1;158:14;174:12
**examine (2)**
15:7;69:2
**examined (1)**
4:23
**examiner's (1)**
80:25
**examining (2)**
14:5,12
**example (2)**
8:20;53:13
**examples (1)**
13:20
**except (1)**
4:6
**excessive (7)**
30:6,14;159:15;
161:11;164:8,20;
165:14
**excited (6)**

81:14;156:18;
157:3,4,11,16
**executed (1)**
169:1
**exercise (2)**
31:4,4
**exertion (2)**
81:16;129:9
**exhale (2)**
90:8;153:9
**exhaling (1)**
115:2
**Exhibit (5)**
92:2,5,8;93:14,17
**expand (3)**
119:11;126:22;
160:1
**expect (12)**
10:9;33:6;80:18;
104:16;122:17;
143:20;164:3;
169:10,11,16;171:8;
173:13
**expectations (1)**
31:15
**expected (7)**
140:11,24;141:7;
163:8;167:20,23;
173:20
**experience (9)**
22:17;82:16;128:6,
10,15;164:23;
165:23;166:2;174:1
**experiencing (3)**
15:10;81:15;
177:13
**expert (15)**
5:17;6:19,21;9:2;
61:20,23,24;64:5;
65:12,16,25;66:13;
67:14;80:15;159:25
**expert-opinion (1)**
66:8
**explain (3)**
61:10;90:14;
158:25
**exposed (3)**
14:6,10;15:8
**exposure (2)**
15:12;159:3
**exposures (2)**
86:19;159:12
**expound (1)**
158:25
**extensive (2)**
10:18;38:17
**extent (2)**
62:16;176:22
**extraordinary (1)**
158:1
**extremities (2)**
111:22,24;117:12
**ex-wife (1)**

64:7
**eyes (1)**
173:8

**F**

**fabric (2)**
70:2,4
**face (4)**
18:6;26:20;162:3,5
**faced (3)**
23:24;26:24;138:9
**facedown (5)**
25:22,23;26:14;
31:7;126:10
**fact (19)**
12:18;20:15,16;
42:24;43:7;53:12;
75:2;78:16;114:10;
117:18;126:4,23;
129:7;141:22;142:5,
25;147:3,16;150:3
**factor (1)**
167:11
**facts (1)**
65:18
**factual (1)**
65:18
**failed (2)**
85:20,20
**failure (1)**
168:7
**fair (1)**
48:25
**fairly (2)**
10:12;177:17
**faking (1)**
177:22
**falling (2)**
69:17;147:5
**falls (1)**
69:13
**familiar (6)**
5:21;36:25;53:25;
92:12;147:3;175:18
**far (7)**
30:9,25;67:3;
132:1;145:8;160:20;
161:12
**fast (4)**
14:19;125:15;
163:12,12
**faster (1)**
164:4
**fat (1)**
57:10
**fault (4)**
54:15,16;55:3,8
**favor (1)**
170:20
**features (1)**
48:24
**Federal (2)**

61:24;178:20
**feel (1)**
121:13
**feet (7)**
49:13;70:3,17;
107:21;131:14;
159:23;171:8
**fellow (1)**
44:15
**Fer (1)**
138:9
**Ferdinand (3)**
38:22;40:20,24
**Fernan (1)**
41:1
**Fernando (53)**
39:4;40:22;41:2,
24;42:5,10;43:9;
44:1;48:24;49:11;
50:3;56:18;73:9;
77:3;81:4;82:4;
84:16,19;86:2,21;
87:13;88:3;90:2,17;
91:7;92:24;105:19;
106:2;109:25;
115:19;121:6;
125:20,24;126:8;
127:11;128:4;130:8,
17;131:2;136:24;
138:7;143:21;144:9;
146:11,18;150:15;
155:13;157:25;
159:24;160:8;173:8;
174:14;176:24
**Fernando's (22)**
90:7,22;91:20;
93:2;118:25;119:7;
120:24;134:4;
135:13,23;136:20,23;
141:8;142:22;
143:18;144:1;
151:10,12;152:2;
153:8;165:9,12
**few (18)**
7:18;12:3;20:14;
29:20;64:17;65:11;
74:4,13,19;75:21;
122:11,19;138:4;
140:2;148:16;
158:11;164:17;
174:11
**fewer (1)**
60:23
**field (5)**
18:23;26:19;163:9;
166:7;169:7
**figure (3)**
75:9;97:18;145:8
**figured (1)**
106:14
**filed (2)**
29:11,15
**find (8)**

26:2;37:10;38:3;
56:23;63:9;82:17;
159:18;160:18
**finds (2)**
69:11;172:16
**fine (6)**
5:11;28:3,4;48:17;
55:8;175:21
**fingers (2)**
117:2;174:17
**finished (1)**
157:21
**Fire (20)**
11:21,25;12:10,20;
15:24;16:11,14;58:2,
5,6;59:22;65:6;
69:25;79:16;167:6,8,
10;172:2,3,9
**fired (4)**
28:15;49:21;55:7,8
**firefighter (2)**
144:19;172:5
**firefighter/EMT/paramedic (1)**
10:23
**firefighters (1)**
171:16
**fires (3)**
49:24;50:20;56:21
**firing (1)**
21:25
**first (48)**
4:23;14:14;19:23;
20:16;40:7;46:3,15,
17,25;48:8;49:2,4,19,
21;50:20,20;51:13;
62:3,4;64:19;21;65:1,
17,23;66:18;82:20;
86:20,25;88:10;
93:18;130:10;
134:12;139:14,17,20;
144:11;147:19;
148:8;153:20;162:9,
11;163:7;166:10;
171:6,15;172:4,7;
174:14;176:20
**five (15)**
21:23;22:18;24:24;
25:6;71:22;85:6;
87:18;106:21;
107:16;121:18;
128:1;159:21;
163:14;165:4;169:15
**five-nine (1)**
86:8
**five-second (1)**
22:6
**fix (1)**
54:22
**flailing (2)**
32:24;169:21
**flash (1)**
55:15
**flashes (1)**

103:7
**flashlight (1)**
160:6
**flat (1)**
111:6
**flight (2)**
85:17,21
**flip-flops (1)**
124:24
**floor (1)**
83:2
**Floyd (1)**
31:15
**fluids (1)**
56:1
**focus (2)**
73:19;119:22
**follow (1)**
75:7
**followed (2)**
23:25;75:2
**following (2)**
87:16;100:13
**follows (1)**
4:24
**follow-up (1)**
75:25
**foot (8)**
13:22;124:22;
127:20;138:8;140:7;
143:4;152:1;176:2
**football (1)**
26:19
**force (30)**
13:18;25:14;29:23,
25;30:2,7,11,14;
45:11;58:23,24;59:4,
6,7,11,19,24;63:3;
76:12;85:4;129:6;
159:4,16;161:11;
164:8;165:14;
169:16,23;170:1,1
**forced (1)**
71:5
**forcing (1)**
133:17
**forensic (1)**
80:19
**form (4)**
4:7;165:16;168:9,
13
**formats (1)**
178:17
**Fortunately (1)**
151:1
**forward (6)**
48:8,16;101:9;
103:14;110:3;161:17
**four (12)**
19:2;21:23;27:21;
37:2;43:12,13;44:4;
46:2;51:12;88:10;
105:18;155:17

**fractures (3)**
146:18,24;147:7
**frail (1)**
57:16
**frame (5)**
9:11,12;89:11,15;
138:15
**framed (1)**
15:17
**Friday (1)**
20:19
**front (6)**
24:17;26:1;77:24;
135:8;172:4,22
**fuck (1)**
115:20
**full (5)**
5:3;84:25;85:3;
113:4;150:11
**full-time (2)**
16:7,19
**fully (3)**
112:14,17;113:5
**further (6)**
69:1;103:11;
116:21;135:25;
153:9;174:12

## G

**gaining (1)**
26:20
**gap (3)**
26:21;49:10;56:13
**gaps (2)**
168:24,25
**gathering (2)**
143:11;144:6
**gave (8)**
24:25;27:1,1;45:4,
10,15;66:12;75:20
**gear (1)**
164:4
**generally (16)**
14:23;36:5;44:8;
50:8;52:12;53:17;
56:12;58:13;60:20,
22,23;78:21;159:2,
12;172:4,11
**George (1)**
31:15
**Georgia (4)**
39:7;73:7;83:23;
162:9
**gets (3)**
83:16;103:19;
159:11
**gist (1)**
63:1
**given (9)**
5:19;7:18;10:18;
43:1;78:11,16;84:17,
18;86:4

**gives (3)**
51:25;52:9;58:17
**giving (7)**
23:17;26:22;40:10;
44:20,20;89:17;
176:25
**glad (1)**
134:10
**glove (2)**
134:8,22
**gloved (3)**
116:21;134:7,20
**goal (1)**
12:9
**God (2)**
4:20,21
**goes (5)**
14:14;21:6;69:8;
103:21;161:12
**good (17)**
12:7;24:23;25:14;
28:18;44:10;46:21;
56:2,17;71:23;99:15;
105:10;106:25;
109:1,4;136:18;
167:4;173:12
**good-size (1)**
165:7
**grabbed (1)**
70:5
**graduated (1)**
11:9
**graduation (2)**
11:11;167:1
**Grant (2)**
17:6,13
**graphs (6)**
51:18,21,22;52:2;
54:6;150:22
**grasps (1)**
123:9
**great (1)**
12:2
**greater (3)**
53:24;57:15;86:9
**ground (25)**
21:23;24:1,9;25:1;
26:20;27:2,4;31:3;
39:22;74:14,19;83:1;
103:22;111:4,5,11;
112:19;113:3,3,5,8;
159:22;176:12,21;
177:1
**grouped (1)**
72:20
**grunting (4)**
81:7;125:25;131:5;
155:16
**guess (11)**
23:22;27:24;34:9;
53:22;59:21;63:1;
64:17;65:3;72:5;
137:3;149:18

**guidelines (1)**
166:20
**guy (2)**
86:5;96:23
**guys (2)**
96:7;134:10
**Gwinnett (1)**
62:18

## H

**half (6)**
34:16,17;57:6;
113:5;138:8;169:1
**Hampton (18)**
39:11;40:10;42:18;
43:6,7;44:12,19,22,
23;45:3;46:12;56:16;
89:25,25;97:12;
163:25;166:16;167:5
**hand (33)**
24:16,18;25:24,25;
32:16;90:20,24;92:7;
93:16;94:8,9;116:20,
21;118:5,6;120:22,
23,23;132:3;133:16;
134:3,7,20,22;
135:10,12;143:18;
162:5;165:10;
174:16;175:22,23;
176:2
**handcuff (4)**
22:7;34:3;35:17;
49:8
**handcuffed (17)**
21:24;25:4;27:7;
31:21;33:14;82:6;
84:16;85:5;89:2;
121:19;159:19;
161:20;164:13;
169:25;174:15;
175:6,14
**handcuffing (4)**
32:18,23;33:19,20
**handcuffs (28)**
22:8;27:11,19;
30:23;32:11;33:5;
43:14;44:2,8;50:2;
74:12,15;117:19,20,
22;142:24;143:17,
19;159:20;169:14,
21;173:14;174:21,24,
25;175:4,15;176:22
**handed (1)**
170:2
**handle (1)**
28:9
**hands (27)**
24:1;25:2;31:7;
33:11,11,14;35:17;
55:21,22,25;56:1,6;
57:8;82:6;102:3;
111:3;116:24;

**guidelines (1)**
117:12;118:4;
121:20;134:24;
142:23;143:21;
154:5;159:23;
165:10;168:2
**hands/knees/feet (1)**
82:4
**hands-on (1)**
36:14
**handwriting (1)**
8:14
**happen (3)**
54:20;116:3;144:6
**happened (10)**
34:4;35:19;36:1,
16;56:24;62:23;
70:24;161:8;174:5,7
**happening (1)**
55:15
**happens (1)**
55:13
**happy (8)**
6:15;12:3,7;24:14;
56:4,21;64:16;65:15
**hard (13)**
9:16;82:13;90:19;
91:24;107:7;117:6;
126:20;134:6,25;
136:10;151:17;
158:3;178:18
**harder (2)**
115:6;128:4
**harm (1)**
77:16
**hate (1)**
101:1
**HAZMAT (1)**
11:21
**head (29)**
6:2;65:20;82:6;
90:10,23;111:3;
120:23;133:1,3,17;
134:4,4,21;135:11,
24;136:2,20,25,25;
141:8;142:22;
153:11;161:24;
162:18,18,19,21;
171:7,9
**head-on (1)**
23:8
**health (2)**
28:23;75:19
**hear (25)**
24:10;75:7,24;
76:1,7,8;78:25;81:7;
84:20;85:10;89:5,17;
98:20;109:1;115:17;
120:6;128:24,25;
133:10;137:9;139:8;
142:19;143:2;
145:14;150:19
**heard (30)**
39:18;56:15;74:22,

23;75:5,11,17;81:8,9;
96:22;99:11,12;
105:8;106:23;
107:13;114:18;
115:19;121:16;
122:18;123:21;
124:1,21;125:5;
130:3;134:9;137:15;
158:2,5;161:2;178:5
**hearing (3)**
105:9;125:24;
177:21
**heart (11)**
87:10,24;126:6,9,
10;141:9;147:16;
148:2,5,11;157:17
**heavy (1)**
86:18
**held (1)**
73:3
**help (7)**
4:19,21;6:3,12;
36:11;73:25;96:21
**Henry (17)**
5:14,15;7:16;39:9;
40:9;56:16;64:8;
67:8,21;84:6,9;
89:23;99:5;160:14;
166:14,23;168:17
**Here's (2)**
136:2,3
**hesitating (1)**
22:23
**hey (2)**
42:12;163:24
**highest (1)**
73:21
**highest-ranking (2)**
166:23;173:5
**highlight (1)**
10:22
**highlighting (1)**
8:17
**hiked (1)**
112:25
**himself (6)**
43:4,24;77:7;78:1;
114:2;120:2
**hip (1)**
46:23
**hips (2)**
151:18;162:1
**hired (1)**
13:4
**Hispanic (1)**
21:12
**hit (10)**
49:22,23;59:10;
60:18,19;77:9;98:8,
9;106:18;107:14
**hits (3)**
55:23,24;59:23
**hitting (1)**

22:1
**hoisted (1)**
70:3
**hold (17)**
30:21;31:23;32:17;
55:21,22,22,25;56:1;
57:7;63:19;74:18;
117:20;118:22;
140:8;158:3,4;
177:24
**holding (4)**
56:6;71:1;132:10;
159:22
**home (1)**
69:11
**homicide (1)**
80:10
**hooking (1)**
70:16
**hopefully (1)**
8:10
**horse (1)**
152:25
**hospital (2)**
78:15;123:6
**hour (2)**
66:25;95:7
**hours (5)**
67:2,6,12,18;69:10
**house (3)**
36:10,10;172:10
**huh-uh (1)**
124:16
**hundred (1)**
23:23
**hurry (1)**
26:18
**hurt (1)**
13:21
**hybrid (1)**
34:15

# I

**icon (1)**
55:3
**ideal (1)**
78:18
**ideally (1)**
60:10
**identification (2)**
92:4;93:13
**identified (3)**
5:17;6:18;61:22
**identify (2)**
71:15;90:16
**ignoring (2)**
23:17;40:13
**illnesses (1)**
156:24
**image (16)**
48:21;91:20,22;
92:13,19;93:5,7;

103:21;121:1;136:4;
151:7,8,9,17,22;
154:9
**images (2)**
91:17;154:14
**imagine (4)**
39:19;67:7,11;
130:12
**imagine-fest (1)**
130:9
**immediately (11)**
16:12;23:25;42:11,
24;43:3;88:6;104:13;
141:25;163:3,19;
172:21
**immobilizes (1)**
104:22
**impair (1)**
127:1
**impairment (2)**
84:1,1
**impart (1)**
50:25
**imparted (1)**
53:14
**imparting (3)**
51:5;58:21;127:5
**important (4)**
4:15;126:17;
162:12;171:7
**impossible (2)**
155:12,20
**improper (1)**
165:19
**inadequate (1)**
174:3
**incapacitation (7)**
24:23;25:9;46:16,
18;48:2,14;50:10
**inch (1)**
57:6
**inches (5)**
50:9;56:12;57:6;
135:23;136:19
**incident (26)**
15:11;19:1;21:11;
33:16,21;39:5;44:23,
24;52:23;56:16;59:3;
60:6;66:3,20;67:23,
25;68:10;81:13;86:8;
88:3;90:18;147:15;
148:21,24;149:7;
150:23
**included (1)**
90:4
**including (1)**
52:1
**indicate (3)**
17:23;126:24;
138:19
**indicated (3)**
66:24;73:24;
177:16

**indicates (3)**
99:15;106:25;
119:25
**indicating (1)**
124:16
**indication (3)**
56:9;121:13;
139:15
**indications (1)**
117:17
**individual (5)**
35:11;59:19;
105:23;173:1;177:22
**industrial (2)**
69:22;70:7
**inexperienced (2)**
167:2;177:17,20
**infectious (1)**
170:21
**infirm (1)**
57:16
**inflate (1)**
159:25
**influence (3)**
23:10;37:15;73:24
**influenced (1)**
37:8
**information (8)**
7:8,15;52:1,2;65:1,
19;77:13;79:7
**inhale (4)**
90:8;115:6;153:9;
154:25
**initial (5)**
9:8,13;67:5;76:15;
141:7
**initially (3)**
31:4;51:13;100:5
**injured (2)**
13:10,17
**injuries (6)**
58:14;77:7;78:1;
146:24;147:15;
173:17
**injury (1)**
128:9
**inquiry (1)**
29:12
**insert (1)**
125:22
**inside (3)**
36:10;60:1;176:4
**instances (1)**
157:4
**instantly (1)**
144:6
**instead (1)**
168:2
**Institute (1)**
72:6
**instruction (1)**
157:16
**instructions (4)**

26:22;45:5;10,16
**instructor (18)**
14:8,9;17:24;18:4,
5,10,12,14,17;
19:22;20:2,4,9,12;
63:25;64:1;65:8
**instructors (4)**
18:19;20:3;58:18;
63:23
**intake (1)**
146:12
**intensely (1)**
27:9
**intensity (1)**
27:10
**intent (1)**
152:21
**intentionally (1)**
23:8
**intently (1)**
138:6
**interacted (1)**
167:7
**interaction (1)**
47:13
**interested (3)**
64:5;65:21,24
**interesting (1)**
22:17
**interferes (1)**
115:24
**interject (1)**
40:21
**internal (4)**
146:24,25;147:7,
15
**International (1)**
64:3
**intervention (1)**
166:10
**into (30)**
20:7,19;21:3,19;
23:8;29:16;35:22;
44:5;48:20;57:7;
58:2,6;69:19;70:5,5;
74:8;83:16;96:6;
101:21;115:10;
126:10;148:1,4;
155:14;161:16;
162:3,5;165:12;
167:16;172:10
**introduce (1)**
10:2
**investigation (1)**
29:16
**investigations (1)**
34:25
**invoice (3)**
67:5,13,19
**involved (10)**
14:25;19:1;62:19;
63:13;68:20;73:7;
81:13;157:5,6;163:1

**involving (2)**
52:23;160:25
**iPhone (2)**
54:24,25
**irons (3)**
82:6;117:23;
169:15
**issued (2)**
19:9;72:11
**issues (1)**
28:20
**issuing (1)**
109:24
**items (1)**
173:2

**J**

**jack (1)**
69:9
**Jeff (1)**
63:14
**Jess (6)**
64:12,13,15,17;
65:3,4
**job (2)**
126:21;172:20
**JOHNSON (26)**
4:9;9:23;40:21,24;
41:3,10,14;64:13,19;
65:17;66:9;93:18,21;
94:15;95:8;101:10;
145:19;158:11,15;
165:20,21;168:10,16;
174:8;178:10,18
**joint (2)**
113:1;132:13
**jostle (1)**
70:4
**joules (2)**
53:18,21
**judge (1)**
61:12
**judgment (1)**
76:22
**jumping (1)**
103:14
**June (2)**
64:20;72:11
**Justice (3)**
72:6,7;156:10
**justification (3)**
40:19;42:4;164:12

**K**

**keep (2)**
153:1;162:21
**kept (2)**
92:23;176:5
**kick (3)**
79:3;123:19;152:8
**kill (1)**

161:5
**killed (2)**
63:4;164:25
**killing (1)**
62:25
**Kimbrough (1)**
16:12
**kind (7)**
20:17;27:14;53:6;
91:23;152:19;169:9;
177:8
**knee (73)**
31:22;32:2,3,9,16;
33:18;34:2;45:8;
90:22;91:5,6,13,17,
20,24;92:16,20,23;
93:2,8;94:6,22;110:6,
16,20;111:5,19;
112:12;113:1,23,23;
116:13;118:1,2;
120:19,22,24;124:8;
126:5,9;127:6,10,20;
129:19;130:21;
132:1,13;133:21;
135:15,22,25;136:3,
5,19,22;151:9,15,22;
153:15,21;154:9,17,
20;155:11;156:5;
159:23;162:4;164:7,
12,17,24;165:12;
174:1
**kneel (1)**
161:22
**kneeling (5)**
90:9,14,17,18;
153:10
**knees (4)**
111:3;121:1;
143:21;162:16
**knew (1)**
39:24
**knife (1)**
26:4
**knowledge (1)**
80:7
**known (1)**
14:11
**knows (1)**
141:3

**L**

**lack (2)**
111:7;177:13
**laid (1)**
112:12
**large (1)**
21:12
**Last (7)**
64:23;67:7;84:12,
13;89:18;159:17;
164:17
**later (9)**

23:21;25:3;64:17;
65:11;69:10;75:21;
156:14;160:23;169:1
**law (13)**
12:13;15:14;20:22;
30:9;31:9,16;37:23;
64:7;78:22;79:19,21;
81:14;167:24
**lawful (1)**
88:15
**Lawrenceville (1)**
62:19
**laws (1)**
73:7
**lawsuit (1)**
63:1
**lawyer (1)**
63:7
**lay (1)**
24:25
**laying (12)**
24:9;25:22,23;
39:22;46:20;56:20;
82:5,18,19;83:4,5;
103:21
**lead (6)**
41:8,9;87:6,8,20,24
**leadership (1)**
42:11
**leading (5)**
41:4,6;70:24;
165:17;168:13
**leaning (2)**
57:4;162:18
**least (6)**
50:7;79:18;107:1;
113:22;120:25;
177:24
**leather (2)**
124:22;125:1
**LED (1)**
160:5
**left (20)**
24:16;25:25;49:21;
50:21;51:13;91:6,13,
20,22;92:16;114:9;
120:24;132:3;
134:23;135:6,13;
143:18;151:9;152:2;
174:18
**leg (17)**
22:3,21;55:24;
82:6;90:20;91:25;
114:7,8,9;117:23;
127:9;140:8;151:19;
159:20;161:22;
165:6;169:15
**legal (1)**
5:3
**leg-ironed (2)**
161:20;164:13
**legs (4)**
114:13;121:19;

132:10;161:23
**length (1)**
26:19
**less (8)**
33:7;50:10;53:14;
60:22;115:21;
122:24;155:15;161:5
**level (4)**
33:1;52:3;116:5;
145:3
**Lewis (23)**
47:6,11,24;92:9,
16;93:4,6,24;94:3,4;
95:24;96:19,22;
100:23,24;117:12;
128:25;134:20;
135:2;137:3;149:9;
150:19;151:7
**Lewis' (2)**
107:23;108:8
**Lewis's (3)**
48:19;135:5,10
**Lieutenant (2)**
63:14,21
**life (1)**
22:19
**light (6)**
48:21;91:1;104:1,
1;133:8,12
**lighting (3)**
94:17,19;154:16
**lights (2)**
105:3;137:10
**likely (2)**
37:2,5
**limbs (2)**
90:10;153:11
**limited (1)**
33:10
**line (3)**
11:20;41:3;150:15
**lines (2)**
70:16;161:1
**link (2)**
65:14;66:2
**linked (1)**
159:20
**list (3)**
8:11;38:6,14
**listed (3)**
38:20;66:4;72:4
**Listen (3)**
61:6;64:16;100:22
**listened (1)**
157:23
**listening (1)**
108:8
**literally (6)**
9:11;23:12;24:7;
107:22;164:16;170:2
**literature (1)**
157:15
**little (14)**

48:6;71:21;85:25;
95:1;113:13,14,24;
117:5;126:16;
130:18;132:24;
133:4,8,12
**location (3)**
18:9;43:10;137:24
**locked (1)**
104:21
**long (15)**
6:15;15:23;20:15;
26:13,17;27:3;47:10;
52:10;57:5;69:12;
75:13;157:13;
176:11,16,19
**longer (3)**
32:22;79:3;159:11
**longest (1)**
22:18
**longingly (1)**
168:3
**look (13)**
7:24;9:11;54:14;
55:10;92:10,12;
105:25;112:24;
113:7;141:4;142:25;
173:11,12
**looked (1)**
142:11
**looking (9)**
14:12;39:1;42:17;
65:22;91:11;136:12;
138:6;141:5;168:2
**looks (17)**
46:22;68:8;112:12;
114:6;117:9;120:24;
133:16;134:2,5,7;
135:2,5,25;136:4,8,
21;151:1
**loose (1)**
70:4
**lot (13)**
14:25;23:6,9;27:9;
37:11;81:21;127:3;
136:22;163:4;
168:24,25;169:2;
176:24
**lots (2)**
35:13;36:9
**loud (3)**
23:18;115:21;
155:15
**louder (2)**
108:5,22
**loudly (1)**
118:14
**love (1)**
52:20
**Lowe (12)**
4:2,22;5:5,7,13;
10:5;72:3;95:15;
146:2;158:16;
174:10;178:22

**L-O-W-E (1)**
5:6
**lower (6)**
91:25;140:8;
151:12,19;161:21;
166:22
**lunch (2)**
95:2,9
**lung (1)**
115:2
**lungs (18)**
83:16;114:23;
115:3,4,5,10;119:11,
23;122:25;126:11;
129:24;130:3,6;
147:16,18,23,24;
155:14
**lying (2)**
46:19,19

**M**

**machine (1)**
70:4
**machinery (2)**
69:23;147:6
**makes (3)**
126:20;159:12;
162:2
**making (12)**
26:22;34:24,25;
43:15;56:8,9;114:21;
145:10,15;151:2;
160:21,22
**male (3)**
21:13;114:24;
149:12
**man (2)**
79:15;163:24
**manage (1)**
166:12
**Mandate (2)**
170:11,11
**manipulate (1)**
32:5
**manner (4)**
18:25;71:2;80:10,
15
**manual (1)**
169:4
**many (22)**
8:19,20;14:7,7;
15:24;18:23;22:4;
28:1;29:19;31:13,19;
32:14;34:6,7;50:13;
67:2,6;71:3;78:20;
160:19;170:20,22
**March (3)**
23:2,4;26:12
**Marcus (1)**
44:18
**mark (2)**
92:2,8

**marked (4)**
92:3;93:12,17;
148:17
**market (2)**
52:9,10
**masks (1)**
170:20
**mass (1)**
127:13
**massive (1)**
69:14
**master (3)**
18:12;63:25;65:7
**materials (10)**
8:3,6;10:7,18;38:7;
60:4,9;66:4,5;72:3
**matters (1)**
14:24
**May (35)**
4:12;5:9,17;7:22,
24;8:1,20;10:7,16;
11:8;15:25;28:8;
30:22;32:1,2,8,22;
33:10;44:8;64:20;
71:14;77:25;91:8;
93:7,7;110:15;113:2;
131:1;133:18;134:3,
20;138:16;151:19;
152:24;157:12
**maybe (33)**
7:18;17:1;20:14,
15;23:23;25:2,19;
26:16;29:5;32:7,16;
46:22,23;47:20;
49:13;54:24;62:8;
63:2;64:20;67:18;
69:10;72:14;95:3,6;
100:23;105:16;
135:5,10;154:24;
162:16;163:5,17;
165:10
**M-C (1)**
63:19
**M-C-C-A-L-I-N (1)**
63:20
**McCaslin (6)**
63:14,17,19,20;
64:14;65:4
**McCasolum (1)**
63:16
**mean (36)**
8:19,23;12:14;
22:5;26:9,17;27:8;
29:8;33:9;39:19,22;
41:15;42:20;43:10;
46:21;54:11;55:4;
69:7;71:12;81:8,18,
21;83:8;92:22;94:8;
107:22;114:22;
115:10;119:5;
136:10;137:21;
153:24;163:4;
172:23;173:13;

175:20
**meaning (2)**
35:16;79:2
**meant (1)**
133:19
**measurement (3)**
52:7;53:18;86:11
**media (1)**
52:20
**medic (13)**
11:19,24;12:11;
13:8;14:2;17:21;
68:17;69:1;78:20;
141:14,18,24;142:14
**medical (14)**
73:18;79:23;80:24;
83:6,19,21;144:8;
156:22;157:1,2;
160:23;166:11;
173:9;177:3
**medically (6)**
141:6;142:6;
144:10;166:9;
167:23;173:5
**medicine (1)**
80:20
**medics (6)**
15:1;78:21;79:17;
143:24,25;144:5
**member (1)**
12:11
**memory (1)**
22:25
**men (2)**
70:14;102:6
**mental (1)**
75:19
**mentally (1)**
37:16
**mention (1)**
73:11
**mentioned (9)**
6:19;17:14;27:21;
40:7;47:19;98:2;
102:6;131:11;154:6
**met (1)**
5:13
**method (1)**
22:13
**micro (1)**
108:7
**microcoulomb (1)**
53:21
**microcoulombs (3)**
52:5;53:4,10
**microphone (1)**
108:7
**middle (3)**
43:23;149:12,23
**midline (1)**
136:5
**might (4)**
24:5;105:16;175:7;

177:5
**mind (4)**
13:25;35:12;37:12;
122:15
**minute (1)**
96:5
**minutes (11)**
47:9;71:22;74:4,8,
13,19;95:3;128:1;
129:21;155:17;
176:18
**mis (2)**
5:9;30:14
**miscommunication (1)**
55:11
**miss (1)**
59:15
**missed (1)**
103:6
**misses (3)**
59:3,23
**mocking (1)**
98:10
**mode (6)**
46:4;88:11,11,13,
14,19
**moment (7)**
33:2;112:13;
125:13;144:8;
161:14;170:2,3
**Momentarily (1)**
114:13
**moments (2)**
75:21;164:17
**Monday (1)**
21:4
**month (1)**
20:15
**monthly (1)**
35:7
**months (3)**
7:18;35:23;67:8
**more (33)**
10:4;12:1;19:15;
28:12,13,16;37:2;
44:9;48:10,23;51:10;
56:12;57:10;58:13;
61:17;79:6;83:9,22;
95:6;105:8;112:13;
115:5;117:5;127:20,
21;136:8;142:12;
146:5;159:10;
164:15;166:5;169:2;
174:11
**morning (1)**
37:10
**Morrow (3)**
167:15,16,17
**most (7)**
8:7,7;10:20;34:20;
47:13,13;132:14;
165:5;166:2
**motorist (1)**

77:9
**motorists (2)**
150:4,7
**mouth-to-mouth (1)**
170:19
**move (10)**
93:1,8;100:6,11;
101:1;104:21;117:5;
133:21;141:8;171:8
**moved (2)**
101:21;136:7
**moves (1)**
126:16
**moving (9)**
40:15;43:16;
101:17,17;102:23;
104:14;109:9;
136:25;152:22
**much (25)**
8:11;25:10;31:9;
50:12,16;52:15;53:9,
13,13,14;86:6,12;
95:6;115:22;125:7;
127:15;129:6,6;
133:24;140:4;
148:11;166:5;178:9
**multiple (6)**
18:15;60:5;61:2;
90:9;153:10;158:18
**muscles (4)**
51:7;57:12;104:19,
22
**must (1)**
103:13
**mutual (1)**
167:12
**myself (1)**
120:9

**N**

**naked (19)**
35:11,13,18,24;
36:4,9,12,20;37:1,6,
10;38:1;40:9;43:23;
77:15;79:15;130:10;
149:12;163:24
**name (6)**
5:3;18:7;26:7,10,
10;40:22
**narrow (1)**
50:3
**narrower (3)**
49:10,12;50:4
**National (1)**
72:6
**nature (1)**
29:12
**near (1)**
143:9
**necessary (1)**
73:19
**neck (33)**

82:13;90:10,23;
91:18,21;92:18;
94:12,20,20,23;
110:22;133:1,2,8,21;
135:23;136:20;
151:11,16,19,23,25;
153:11,18;154:6,10,
11,13,21,24;155:3,
12;156:1
**need (7)**
5:24;23:19;24:12;
31:2;48:5;145:17;
159:3
**needed (6)**
22:8;36:11,13;
39:25;164:5;169:16
**needs (1)**
119:22
**negative (2)**
55:20;104:23
**negatively (1)**
65:20
**nerves (2)**
104:19,22
**neuromascular (3)**
48:1,13,14
**neuromuscular (8)**
24:23;25:8;46:15,
18;48:2,14;50:9;51:7
**new (2)**
16:19;19:24
**next (1)**
69:24
**night (2)**
36:4,7
**NMI (3)**
48:15;49:1;104:17
**nobody (1)**
142:5
**Nobody's (1)**
163:15
**nodding (1)**
6:2
**noise (5)**
56:8;104:14;
107:19;108:25;115:2
**noises (2)**
114:24;115:11
**None (4)**
35:12;71:4;84:4;
144:12
**Norcross (1)**
62:8
**normal (2)**
37:14;57:19
**normally (3)**
109:1;141:24;
173:13
**north (1)**
149:18
**note (4)**
76:9;80:8;150:1;
157:23

**noted (8)**
12:23;38:21;44:17;
106:16,18;109:18;
146:19;170:12
**notes (7)**
8:4,9,13,15,22,24;
151:2
**Notice (4)**
4:4;8:2;77:19;
171:14
**noticed (4)**
11:4;51:23;89:21;
139:15
**notion (2)**
59:16;149:14
**November (2)**
11:9,15
**novice (1)**
169:13
**number (9)**
24:6;34:10;38:20;
44:18;56:24;60:10;
69:22;116:3;158:23
**numbers (1)**
105:23
**numerous (1)**
126:24

# O

**obese (2)**
57:10;86:3
**obesity (1)**
86:15
**Object (3)**
165:16;168:9,13
**objection (2)**
4:9;41:18
**objections (1)**
4:5
**objectively (3)**
84:14;159:18;
166:21
**observation (1)**
150:18
**observe (1)**
15:25
**observed (8)**
15:14;40:8;65:16;
81:2,3;142:21;154:2;
160:20
**obtained (1)**
7:15
**obviously (9)**
11:18;17:25;79:23;
125:17;129:23;
135:2;145:7;146:10;
177:4
**OC (1)**
159:8
**occasion (18)**
13:16,19;14:4;
15:6;22:22;28:12,14;

29:14;30:19;34:2;
35:10;36:12,17,18;
61:18;68:25;69:5;
75:3
**occasions (6)**
13:8;28:10;29:4;
32:8;45:5;69:6
**occurred (4)**
67:25;148:6,8,10,
24;155:8
**occurring (1)**
104:14
**occurs (2)**
55:16;93:11
**OCGA (1)**
178:21
**o'clock (2)**
37:10;95:3
**October (1)**
16:6
**off (34)**
21:22;22:2;27:14;
30:24;35:25;72:25;
73:3;82:22;85:3;
113:15,24;115:20;
119:10,19;120:3,3;
121:16;122:19;
140:3;155:7;156:1;
160:10,11,12;161:25;
162:12,17;164:4,17;
168:5,15;172:1,4,6
**offenses (2)**
73:10;78:11
**offer (10)**
5:17;6:19;10:9;
65:16;67:10;79:6;
80:14;146:5;147:12;
165:1
**offering (2)**
33:2;65:25
**Office (6)**
12:16,25;13:13;
16:15,18;82:2
**Officer (133)**
8:20;11:6,16,21;
13:4;14:7;15:15;
16:6,7,16;20:6,16,25;
22:1;25:3;27:6,10;
33:24;34:12,21;39:8,
17;40:19;42:4;43:6;
44:18,20,25;45:5,11;
48:9;54:21;56:16,21;
57:1,22;59:2;61:1,4;
64:8;65:6;68:17;
74:22;76:10,11;
77:20;78:7;79:19;
80:5;84:5;85:13;
86:18,18,22;89:10,
15;90:4,19;94:6;
96:7,8,22;97:7,17;
98:2;99:3,6;100:20,
21;103:4;105:14;
110:15;111:18,24;

112:2;116:12;117:8,
18,21;118:1,8;
120:19;121:12,17,18;
123:18;124:8;126:4;
127:5;130:20;
131:22;132:15;
133:21;135:12;
137:3,3;138:5,6,25;
140:3,17,25;141:15;
142:21,25;143:20;
144:10;152:8,9;
153:13,15;154:2;
155:10;159:17;
161:24;162:3;165:5,
7,8;166:7,8,24;167:2,
3,24;168:4,5;172:3,6;
177:17,17,20,21
**officers (139)**
5:14;12:13;13:21;
15:3;18:15;19:1;
21:4,8,15,19,23;22:7;
24:11;26:18;27:16;
30:15;32:14,25;33:6,
13;34:18;35:2;38:21;
39:11,25;40:10;42:9,
18;43:6,7,13;44:3,4,
10,12,13,21;45:3;
46:12;57:1,18;58:16;
62:11,12,14;73:8,13,
19,23;75:11;76:11,
16;77:10,21;78:4,16,
23;79:1,4,9,12;80:1;
82:12;85:6,11,18;
86:20;87:18;89:1,8;
90:1,9,13,16;96:16,
25;98:10,21;102:3;
105:18,20;106:1;
109:25;110:2;
111:23;115:17;
116:18;117:11;
119:16;121:18;
123:11,11;128:24;
129:1;130:7,11;
131:8,12;134:9,19;
137:23;138:15;
139:18;142:19;
143:10;144:3;149:9,
11;152:15,22,22;
153:10;157:24;
159:15,22;161:13,21;
163:1,9,10,14;164:1;
165:4,22;166:3;
169:7,15,18;170:8,
14,20,24;171:5;
173:15;176:12,20;
177:4,21;178:3
**officers' (7)**
8:16;35:4;40:14;
68:13;82:4;100:13;
123:9
**officer's (3)**
60:16;161:23;
170:12

**official (1)**
29:5
**often (1)**
159:10
**Oftentimes (1)**
54:22
**oil (1)**
69:9
**old (1)**
70:15
**once (21)**
7:10;9:4;16:14,17,
17;18:16;24:24;27:6,
10;43:9;49:7;74:23;
76:10;79:18,19;
161:19;164:11;
169:11,13,24;173:7
**one (113)**
12:3;13:21;15:1;
17:14;19:3,5;20:3,5;
21:18;22:5;23:2,3,
15;24:21,22;25:5,5,
18,18;27:18,23;28:5,
12,13,16,16;30:12;
32:16;34:8;42:17;
44:6,24;47:13,18;
48:25;49:22,23;
50:20,21;55:17,20,
20,23,24;56:18,19,
19,20,23;57:4,14;
58:10,16;59:23,23;
60:18;61:17;62:7;
63:22,24;64:2;65:8;
67:13;68:14;69:23;
74:24;75:5;82:20;
85:2;90:6;96:2,20;
104:7;105:13,15,16,
20;107:1;111:18,24;
117:1,18,21,22;
118:1,2;120:19;
127:9;134:9,19;
142:19;144:10;
148:6,8;149:18,19;
156:5,5;159:14;
160:2;161:21;162:7;
163:9;165:4,5,8,11,
25;166:13,25;169:3;
171:15;172:13
**one- (1)**
160:11
**one-minute-and-five-minute (1)**
150:16
**ones (1)**
51:3
**one's (2)**
46:22,23
**one-year (1)**
166:25
**only (34)**
6:6;7:13,14;14:7;
28:5;33:23;42:12;
47:16,18;48:25;
50:21;72:3;75:5,16,

17;81:24;104:18,22;
111:18,24;117:24,25;
119:21;130:12;
131:9;149:20;
153:13,20;154:2;
160:11;162:2,4;
164:13;174:17
**onto (6)**
90:10;112:14;
153:11;176:21
**Ooh (1)**
63:9
**Oops (1)**
103:13
**open (3)**
14:16,22;162:21
**opened (1)**
167:25
**opening (1)**
143:22
**operate (1)**
169:7
**operator (1)**
107:4
**opinion (10)**
44:1;67:14;80:15;
146:5;147:12;
159:14,25;161:4;
168:21;170:24
**opinions (15)**
5:18;6:20;10:9;
65:16,25;66:9,11,13,
19;67:10;72:21;
73:11;80:25;90:7;
153:4
**opportunity (5)**
20:21;22:7;58:18;
176:1,6
**opposite (2)**
56:7,7
**options (1)**
159:4
**ordered (3)**
89:10,15;90:1
**orders (2)**
44:20;89:17
**ordinary (1)**
31:1
**organs (1)**
146:25
**original (2)**
7:17;67:13
**Orrick (5)**
17:6,8,9,12;19:24
**O-R-R-I-C-K (2)**
17:10,11
**others (3)**
43:24;47:17;
156:12
**Otherwise (2)**
6:5,9
**out (40)**
19:23;24:1,18,20;

25:2;26:2;40:8;
49:22;54:23;55:19;
56:19;58:19;64:4,18;
69:8,11;75:9;79:14;
97:18;105:16;
112:13;114:7;115:4;
118:14;124:23;
129:17,25;130:3,6;
142:1;145:8;156:24;
159:21;166:15;
170:19;172:16;
173:16,22;175:22,23
**outcome (1)**
60:24
**outside (1)**
36:10
**over (32)**
5:24;17:4;21:1;
24:25;34:5;36:22;
38:13;53:24;70:19;
75:15;82:6;85:10;
100:14;101:21;
102:23;108:12;
126:25;135:25;
136:1,5,8;141:18;
143:1;145:8;161:20,
23;162:19;164:18;
168:3;170:2;176:13,
23
**overlooked (1)**
38:9
**Overview (1)**
148:21
**own (9)**
8:14;54:20;66:11,
14;82:16;114:11;
128:5;156:15;165:17
**oxen (1)**
177:14
**oxygen (9)**
119:21,22,25;
120:8;122:24;127:2;
131:3;146:11;155:13
**oxygenate (4)**
14:17;115:25;
116:4;154:25
**oxygenation (4)**
116:5;146:15;
174:3;177:14

**P**

**Page (16)**
38:8,9,12,13,13,14,
25;91:19;105:25;
148:20;149:1,7;
150:11;151:5,6;
153:3
**pain (3)**
22:9,11;51:10
**pants (3)**
24:17;25:25;26:1
**para (1)**

137:12;144:18
**parachute (1)**
172:21
**paragraph (1)**
150:11
**paramedic (12)**
15:14;36:9;82:16;
83:21,23,24;87:1;
157:8;172:15;173:4,
6,7
**paramedic/EMT (1)**
11:18
**paramedics (16)**
15:25;78:25;79:20,
21;82:21;125:20;
137:12;147:20;
164:3,18;170:3;
171:15,20;172:13;
173:1,20
**paramedic's (1)**
144:19
**parked (1)**
77:19
**parking (3)**
23:6,9;172:8
**part (13)**
20:4;27:24;35:21;
57:25;90:17;93:2;
94:11;151:18;
154:15;166:19;
167:8,12;171:7
**Participants (1)**
149:8
**particular (1)**
35:20
**particularly (2)**
13:25;87:9
**parts (2)**
165:6;172:23
**part-time (5)**
12:24;13:4;16:5,
16;19:16
**party (1)**
167:18
**passive (2)**
152:5,7
**past (1)**
133:18
**pathologically (1)**
80:20
**patient (6)**
16:3;120:9;123:5;
143:8;163:22;172:25
**patients (3)**
123:4,5;157:5
**patrol (3)**
34:12,21;47:22
**pause (1)**
44:9
**pausing (1)**
15:22
**pavement (6)**
90:11;101:17;

113:24;119:8;
127:10;153:11
**peace (1)**
11:5
**pending (1)**
6:16
**penetrated (1)**
60:2
**people (25)**
33:23,25;35:13;
36:9;37:24;52:18;
57:15;69:23;70:21;
71:5;82:17,21;83:3,
12;115:5,6;116:4;
128:7;137:21;
156:23;162:12;
165:10;166:11,21;
172:2
**pepper-sprayed (1)**
13:23
**percentage (2)**
146:11,14
**perfect (1)**
173:23
**perhaps (2)**
22:1;31:22
**period (11)**
25:11;27:5;32:10,
11;117:15;122:23;
150:17;155:16;
176:11,16,17
**person (48)**
5:17;6:18;14:13;
18:24;23:9,14;25:15;
28:16;33:2,9;35:17,
24;36:4,13,21;37:1,6,
9;42:15;53:3;57:4,
22;59:1,11;61:23;
70:23;71:17;75:19;
78:23;79:23;80:19;
82:24;85:5,7;87:9,
23;96:18,19;130:10;
148:1;156:5;159:13,
19;169:17,21;172:7,
17;173:6
**personal (1)**
33:12
**personally (1)**
19:2
**personnel (1)**
167:10
**persons (2)**
28:22;78:2
**person's (3)**
26:7;146:6;156:6
**Phillips (72)**
39:8,17;40:16,19;
42:4,22;44:22;45:5,
18;46:1;47:20;48:9;
49:5,6,7,12,20;50:19;
57:1;74:22;76:10,12;
78:7;84:5,21;85:13;
88:9;89:10,16,18;

90:4,21;91:4;96:7;
99:6,7;100:21;102:5;
103:4;106:19;
107:15;110:15;
112:2;116:12;118:1,
8;120:19;126:4;
127:5;130:20;
132:15;133:21;
135:15;137:3;138:6;
153:15,23,24;154:1,
2;159:17;160:2,9,12;
164:16;165:10;
166:25;167:21;
168:5,14;177:17,21
**Phillips' (6)**
46:17,25;91:20;
120:22;124:8;151:9
**Phillips's (12)**
46:14;91:5;92:16;
94:6;102:11;105:14;
126:8;131:22;
135:22;136:19;
154:17;155:10
**photograph (1)**
92:9
**phrase (1)**
111:7
**physical (8)**
21:13;24:12;28:24;
106:1;122:22;129:9;
146:12;152:18
**physically (10)**
30:20;31:20;33:17;
43:10;74:18;85:8;
119:24;130:13;
131:10;152:11
**pick (2)**
37:23;107:20
**picked (1)**
20:3
**picking (2)**
48:22;136:25
**picture (4)**
94:7,12,20,23
**pile (4)**
21:23;48:20;
143:19;174:25
**pistol (1)**
26:4
**Pit (3)**
19:3;28:6,8
**place (9)**
11:11;31:22;32:12,
18;68:5,14;71:17;
116:15;160:14
**placed (4)**
44:2;91:14,14;
116:13
**Plaintiff (1)**
5:18
**Plaintiffs (1)**
61:23
**Plaintiffs' (3)**

7:5,9;67:3
**Plaintiff's (1)**
63:7
**plan (3)**
42:18,22;79:22
**play (2)**
95:15;167:18
**played (65)**
96:11;97:4,14,23;
98:5,11,17,25;99:18,
25;100:16;101:3,13,
23;102:13,25;103:9,
17;104:10,25;107:9;
109:14;110:5,12;
111:14;112:4,21;
113:9,19;114:15;
115:14;116:8;117:3;
118:9,16;120:10;
121:2,9;123:14,22;
124:12;125:2,21;
128:21;129:13;
131:17;132:20;
133:5;134:15;
135:18;136:14;
137:6;138:1,11,22;
139:5,23;140:14,23;
141:11;142:7,16;
143:13;144:13,23
**playing (9)**
106:12;141:21;
142:10;163:6;170:4;
172:17;177:7,23;
178:4
**please (9)**
4:11;5:4,10;6:11;
7:25;41:19;61:7,14;
147:2
**plumbing (1)**
70:16
**plus (1)**
105:18
**plus-size (1)**
57:19
**pm (7)**
72:1,1;95:11,11;
145:23,24;178:24
**pocket (6)**
24:17;25:24,25;
26:1,3,6
**point (49)**
11:17;23:22,23;
24:16,20;26:23;
33:22;44:1;45:18;
48:8;73:20;74:17;
92:24;94:14;95:16;
99:4;102:2;103:20;
110:3,21,25;111:11,
17;114:1,19;116:6,
13;117:25;120:1;
122:14;124:7;
129:19;130:21,23,24,
25;131:21;133:20;
137:24;143:5;145:1,

7;149:25;161:17;
162:22,25;164:6;
171:2,3
**pointed (2)**
23:24;26:25
**pointing (1)**
24:8
**points (3)**
56:10;90:7;153:4
**polar (1)**
56:7
**police (51)**
8:16;11:3,8,23;
12:1,5,10,15,18,21;
13:5,13;16:16,21,24;
17:2;18:11;19:9;
23:14;31:1,18;32:14,
14;33:24;34:6;37:1;
39:9;40:10;44:19;
52:23;54:21;62:20;
63:15,22,23;65:6;
66:20;67:9,22;68:17,
19;79:11,12;84:6,9;
88:4;124:22;149:17;
160:14;163:14;
168:18
**policies (9)**
7:16,19;67:9;68:9;
158:17;160:13;
167:13;168:18,21
**policy (17)**
20:7,9,10,19;21:2,
6;59:17;60:4;61:16;
67:22;68:1,13;84:6,
10;168:25;169:3,6
**polite (1)**
30:5
**portion (1)**
41:22
**posing (1)**
43:23
**position (32)**
16:19;25:21,24;
26:14;27:4;31:3,21;
34:16;40:16;69:19;
82:9,22,25;83:10,11,
13;84:2;101:21;
110:25;112:9;
131:23;146:6,13;
160:22;161:12,17,19;
162:7,11,14,15;174:2
**positional (15)**
57:3;68:22;69:3;
70:25;72:10,17;
80:23;81:5,19,24;
129:4;146:4;156:6,
11;160:21
**positioned (1)**
47:21
**positioning (1)**
131:22
**positive (2)**
55:20;104:23

**possible (4)**
5:25;104:18;
137:18;156:11
**possibly (1)**
14:13
**possum (8)**
141:21;142:11;
163:6;170:4;172:17;
177:7,23;178:4
**POST (4)**
8:16;18:18;162:9;
170:12
**POST-certified (3)**
11:5,10,16
**posted (1)**
72:5
**Post-It (1)**
8:15
**potentially (1)**
73:7
**pounds (7)**
69:15;70:12;86:9;
126:25;127:22;
160:25;161:6
**practice (3)**
31:1,18;32:13
**prefer (2)**
55:22;58:17
**preference (1)**
31:6
**preferred (1)**
50:8
**prepare (4)**
7:2;8:13,22;9:1
**prepared (5)**
6:19;7:5,10;8:4;
24:14
**preparing (1)**
9:6
**presence (1)**
21:14
**present (6)**
14:2;88:2;96:8;
121:18;143:24;144:1
**presents (1)**
36:21
**pressed (4)**
70:10;151:12;
152:2;160:6
**pressing (1)**
119:6
**pressure (30)**
30:21,23,25;70:10,
13;82:22;86:23;87:2;
114:11;119:10;
120:3;126:25;
128:11,14,18;129:6;
130:17;132:14;
136:22;154:3,20;
156:4;161:25;
162:17;163:12;
164:15,21;177:8,24;
178:4

**pretty (12)**
8:11;27:8;31:9;
39:23;46:21;50:16;
51:25;73:25;95:4;
118:14;133:24;
148:11
**preventing (1)**
122:12
**previous (1)**
77:10
**previously (4)**
66:17;106:20;
115:21;175:8
**prides (1)**
52:8
**primarily (3)**
47:11;126:13;
133:23
**primary (1)**
165:9
**principles (1)**
44:6
**printouts (1)**
54:5
**prior (1)**
42:3
**priority (1)**
73:21
**private (1)**
23:5
**proactive (4)**
34:11,21,23;35:9
**prob (1)**
119:21
**probable (4)**
38:22;39:4;73:8;
110:19
**probably (6)**
37:7;39:23;67:11;
101:2;144:18;172:13
**probe (25)**
24:22;25:19;28:18;
46:21;49:11;50:3,4,
9;55:23,24;56:19,20,
22;57:5,8,24;58:16;
59:23,23,25;60:1;
88:13,14;104:23;
109:1
**probes (28)**
15:1;21:25;24:22;
46:10;47:4,25;49:16,
18,21;50:13,15,24;
51:1,10;55:14,19;
56:12,19;58:2,5,14,
19;102:11;105:15;
107:1,20;108:1,21
**problem (1)**
35:21
**problematic (1)**
160:18
**problems (1)**
28:24
**procedure (4)**

31:10;58:1;169:4;
178:21
**process (8)**
5:22;6:23;18:1;
31:20;32:17,21;
33:19;61:8
**produce (1)**
156:6
**professor (1)**
65:7
**profile (1)**
170:12
**profiles (1)**
8:16
**program (2)**
12:12;18:5
**prohibit (1)**
60:5
**prompted (1)**
163:24
**prone (30)**
25:21,22,23;26:14;
27:4;31:3,6,21;
69:19;82:5,19;83:1,1,
10;84:2;87:19;
101:21;110:25;
111:6,10;112:13,18;
146:6,13;159:21;
160:22;161:12,16,19;
174:2
**proned (1)**
173:16
**prong (2)**
46:4;88:11
**prongs (2)**
25:15;104:6
**properly (3)**
174:21;175:6,14
**propose (1)**
4:5
**propping (1)**
113:23
**protect (2)**
78:5;168:22
**protection (1)**
170:21
**provide (6)**
9:17,21;66:11;
67:14;144:8;169:6
**provided (16)**
6:21;7:5,21;18:11,
13;38:21;40:18;
47:23;55:9;65:2;
67:14,21;68:8;73:8;
83:19;144:12
**providing (1)**
143:8
**provisions (1)**
84:5
**prox (1)**
155:11
**proximity (7)**
92:21;114:8;

151:24;153:18;
154:11,14;155:12
**psi (1)**
70:11
**psychotic (1)**
156:24
**public (7)**
35:13;37:6;77:7,
17;149:13,15;169:18
**publish (3)**
35:3,4;169:4
**pull (13)**
25:5;28:13,14;
45:20;46:6,14;48:8;
49:4,19;50:23;
106:19;162:16;
175:23
**pulled (14)**
23:14;39:20;40:7;
49:9,20,24;50:19,20;
58:22;70:5;85:1;
111:4;160:9;175:22
**pulls (6)**
48:13;50:25;51:13;
58:23;88:10;105:14
**pulse (11)**
14:18;51:18,21,22;
52:2;54:6;86:23;
87:2;139:1;150:22;
163:12
**purpose (3)**
83:14;170:16,17
**purposes (2)**
92:4;93:13
**pursuant (2)**
4:3;178:20
**push (5)**
54:23;84:20;120:2;
123:8;160:8
**pushing (11)**
119:12,17,18;
121:7;132:3;135:11;
152:19;159:25;
162:3,5;167:22
**put (31)**
8:15;20:23;24:1;
25:1,24,25;27:11,18;
28:14;30:22;31:3,20;
32:2,8;34:2,2;57:21;
58:14;83:12;90:2;
102:3;114:8;115:18;
127:20;130:21;
143:4;148:21;151:9;
171:17;173:8;177:24
**puts (1)**
140:7
**putting (13)**
30:20,25;33:18;
45:8,8;71:1;87:18;
110:16;127:10,23;
130:17;134:3;153:15

**Q**

**qualified (3)**
80:14;146:5;
147:12
**quarterly (1)**
35:7
**question-and-answer (1)**
5:23
**quick (1)**
95:4
**quickly (1)**
39:23
**quiet (1)**
56:3
**Quinton (1)**
39:8
**Quinton's (1)**
45:11
**quit (2)**
140:18;163:5

**R**

**rad (1)**
24:5
**radio (8)**
24:6;39:18,24;
74:23;75:15,17;76:1;
163:20
**raid (1)**
13:21
**ran (1)**
25:3
**rate (5)**
14:18;86:23;87:2;
139:1;141:9
**rates (1)**
66:23
**rather (4)**
6:1;23:21;82:25;
160:23
**re (2)**
166:18;169:8
**reached (3)**
39:23;64:4,18
**read (5)**
21:1;41:22;54:8;
77:12;161:2
**ready (1)**
173:2
**real (2)**
169:4,8
**reality (1)**
172:20
**realize (2)**
21:5,8
**really (6)**
53:2;62:22;70:21,
21;74:9;140:9
**reason (8)**
54:18;58:10,16;

87:13;130:5;153:1;
169:20;177:23
**reasonable (8)**
61:3;84:14;88:15,
15;121:17;159:19;
166:21;169:23
**reasons (1)**
116:3
**reassess (3)**
60:13,17,19
**reassessing (1)**
60:11
**rebunked (1)**
156:14
**recall (19)**
7:12;14:1;15:7,11;
16:3;18:4;26:7;28:3,
5,11,17,22;33:15,21;
35:15;36:3,17,18;
84:3
**recalling (1)**
28:15
**receive (1)**
174:3
**received (5)**
23:4;67:8;150:15;
157:16;170:8
**recent (1)**
72:16
**recertification (1)**
83:22
**recertified (3)**
64:1;166:19;
170:13
**recess (3)**
71:24;95:10;
145:22
**recognize (10)**
87:2;93:20,23;
95:23;98:8;99:3;
141:14;166:11,14;
176:10
**recognized (2)**
73:13;123:12
**recommendation (1)**
60:15
**recommended (2)**
65:4;159:2
**record (12)**
5:4;6:3;10:3;26:9;
73:1,3,4;94:2,16;
95:13,24;136:11
**recorded (1)**
51:25
**recording (1)**
47:22
**recovering (1)**
27:25
**recovery (6)**
82:21;83:13;162:7,
11,14,15
**recruits (1)**
166:9

**reelection (1)**
16:13
**reenergizes (1)**
107:15
**reenergizing (1)**
106:20
**reevaluated (1)**
31:17
**refer (6)**
48:15;60:9;80:23;
91:8;105:22;149:2
**reference (1)**
75:18
**referred (3)**
8:8;48:1;105:3
**referring (2)**
34:24;47:6
**reflect (2)**
7:20;15:23
**refreshed (1)**
22:25
**regard (4)**
13:14;66:19;73:12;
83:20
**regarding (7)**
29:3,22;30:1,10;
84:6;160:15;161:11
**Regardless (1)**
116:2
**region (2)**
91:16;152:2
**regulate (1)**
52:16
**related (1)**
17:16
**relatively (1)**
27:5
**relax (1)**
140:4
**relaxed (5)**
130:11,13,14;
131:9,10
**relied (3)**
8:4;10:8;47:15
**relief (2)**
130:6;131:8
**relieves (1)**
114:11
**rely (1)**
47:11
**remember (15)**
13:19;15:13;18:6;
20:10;21:17;22:24;
26:5,10;27:13,23;
28:20;35:6;64:20;
157:14;158:19
**reminder (1)**
5:22
**remove (1)**
15:1
**removed (1)**
70:1
**rendered (1)**

80:25
**renewed (1)**
74:22
**repeat (4)**
6:11;41:19,20;
147:2
**repeatedly (2)**
76:11;166:19
**rephrase (1)**
6:12
**Report (42)**
6:22;7:1,2,20,21;
9:2,6;10:6,15,19;
12:23;17:16;20:24;
38:4,13;44:17,23,24;
52:20;66:3,8,16;
76:9;80:8,9;81:1;
86:7,8;88:16;91:19;
105:22;106:16;
107:12,17;109:19;
146:20;148:17,20;
149:1,2,7;151:6
**reported (5)**
12:18,19;23:7,15;
77:11
**REPORTER (8)**
4:13,16;5:23;
41:23;92:8;133:9;
145:13;178:12
**reports (2)**
44:25;47:20
**represent (2)**
5:14;65:18
**request (6)**
74:9,20,24;75:5,
25;79:10
**requested (2)**
45:23;74:3
**required (1)**
115:23
**requires (1)**
18:2
**Rescue (2)**
70:20,20
**rescued (1)**
128:17
**research (2)**
72:3;158:6
**researched (1)**
146:3
**reserve (2)**
13:4;16:5
**reserved (2)**
4:6;178:22
**resigned (2)**
16:15,17
**resist (2)**
85:11;176:7
**resistance (5)**
33:2;152:6,7,18,20
**resisted (1)**
176:11
**resisting (7)**

31:19;32:22;33:17;
81:14;100:9,12;
177:5
**resistive (1)**
152:11
**resources (2)**
38:14;167:10
**respiratory (2)**
128:8;148:4
**respond (1)**
6:6
**responded (2)**
6:8;27:17
**Responder (2)**
166:10;171:6
**Responders (2)**
144:11;162:10
**responding (2)**
39:10;164:1
**responds (1)**
70:20
**responsibility (5)**
38:1;166:8;167:3;
169:5,8
**responsible (1)**
172:25
**responsiveness (1)**
4:7
**rest (1)**
67:15
**restate (2)**
61:14;124:18
**restore (2)**
163:19;170:17
**restrain (11)**
30:18;33:16;40:20;
42:5,5;43:4,22;
44:14;50:1;76:12;
92:25
**restrain/handcuff (1)**
106:2
**restrained (7)**
33:11;78:11;84:17;
85:6;137:2;169:14,
25
**restraining (2)**
43:8;48:24
**restraint (4)**
33:3;68:22;146:12;
163:2
**result (2)**
28:24;129:9
**resulted (2)**
77:6,16
**resuscitated (1)**
16:4
**resuscitation (1)**
163:3
**retire (1)**
16:17
**Retired (6)**
11:1;16:8,10,14,
25;17:4

**review (6)**
8:23;39:25;67:10;
89:21;160:17;168:17
**reviewed (16)**
8:12;9:2,4;10:8;
38:7,15,18;54:5;72:4,
14,15;76:2;92:13;
150:22;158:6;160:13
**reviewing (1)**
9:5
**revise (1)**
10:15
**revised (4)**
7:8,19,21;168:25
**revive (1)**
15:18
**rib (5)**
115:2;146:18,24;
147:7;160:1
**ride (2)**
22:6;160:12
**right (191)**
6:24;7:1;10:4;
11:20,22;12:23;13:3,
5;15:16;16:9;17:15;
18:21;19:18,19;
22:12,14;25:17;
27:21;30:8;32:6;
37:18;38:4,9;43:1,7;
44:11;45:2;46:6;
48:12;49:6,25;50:6,
15,22,23;51:2,3,4,8,
14,19;52:4,6,11,14,
24,25;53:19;56:5,11;
58:6;60:3,15,25;
61:11;62:6;64:25;
67:16;69:24;71:19;
72:8,12,20;73:15;
74:20;76:4;82:14;
86:10;88:23;90:24;
91:3,13;94:25;96:5,
13,23;97:12;99:9;
100:3,19;101:12,16;
102:2,15,18;106:15,
17,20;107:3,6,16;
108:1;109:3,25;
110:10,17;111:5;
112:3,7,12,24;113:1,
7,13,13,23;114:8,20;
116:17,20;117:24;
119:3,16;120:13,18,
18;121:5;122:8,20;
126:6,9,11;127:15,
18;128:15;129:21;
130:25;131:20;
132:4,5,8,13,18;
135:3,8,9,10,17,21;
136:1,3,9,13;138:10,
19;139:12;140:5,17;
141:3,5,19;142:1,14;
143:1,6,9,10;144:2,
19,20,20;145:7,11,
17;148:13,15,20;

149:23;150:10;
151:5,13;152:1,24;
154:4,18;156:3,11;
157:20;158:9,21;
170:6;171:13;172:4,
22;173:10;174:10,
16;175:25;176:3,7;
178:3
**rights (2)**
168:11,23
**risk (4)**
57:15;85:17,22;
163:16
**Road (3)**
69:24;77:6,15
**Rodriguez (55)**
38:22;39:5;40:9,
20;41:24;42:6;43:9,
16;45:24;46:10;73:9,
14;76:12,16,17;
77:21,24;78:10;79:2;
81:4;85:16;86:2;
87:13;88:3;98:8,20;
100:6;101:16;
102:22;104:13;
109:8;110:25;112:9;
114:18;118:13;
122:4;124:1,19;
129:16;138:7,17;
141:4,19;146:18;
147:14;153:21,24;
157:25;162:23;
164:6;168:5;171:22;
174:15;176:10;
177:12
**Rodriguez's (17)**
51:16;86:21;91:18;
92:17;94:14,20;
118:20;120:20;
127:7,24;133:1,21;
134:21;146:11;
153:16;168:12,22
**role (2)**
12:9;42:12
**roll (5)**
100:14;161:20,22;
172:9;176:13
**rolled (1)**
19:23
**roller (1)**
70:6
**rolling (1)**
163:24
**rolls (1)**
69:9
**roof (3)**
86:24;87:3;139:2
**room (1)**
157:13
**Roswell (26)**
13:5;16:6,17,19,
22;18:11,19;19:9,17,
20,23;20:2,17;33:24;

34:1,6,13,20;35:14,
23;54:21;68:19;
79:11;149:17,21;
170:22
**route (2)**
75:4;79:18
**rude (1)**
29:23
**Rule (1)**
178:20
**ruled (1)**
25:13
**Rules (2)**
61:25;178:20
**run (3)**
16:13;23:8;77:24
**Rusty (2)**
17:6,13

## S

**sadly (1)**
123:13
**safe (3)**
78:24;79:20;85:3
**safely (1)**
31:5
**safer (1)**
52:15
**safest-possible (1)**
52:18
**safety (3)**
35:13;70:1;78:5
**same (15)**
8:10;19:17;38:2;
49:18;50:16;55:9;
57:20;107:3;112:9;
116:14;131:23;
133:24;135:1;
149:11;165:22
**saw (22)**
11:22;23:16;40:9,
10,13;45:4;46:8,13;
70:14;71:3,11,12;
81:23,25;109:24;
110:20;124:17;
131:24;149:18,19;
151:22;168:25
**saying (10)**
42:18;81:23;96:21;
98:8;100:23;104:5;
122:7,12;131:3;
177:21
**scapula (2)**
25:18;136:1
**scared (1)**
142:20
**scene (28)**
13:9;24:9;38:21;
39:10;40:6;42:13;
43:9;44:20;47:21;
75:4;76:10;78:5,13,
21,25;79:18;89:22;

141:25;143:7,11,25;
144:5;161:15;165:4;
166:24;167:3;
169:15;173:5
**schedule (1)**
34:18
**scientific (1)**
156:3
**scream (2)**
115:11;126:1
**screaming (3)**
79:15;155:15;
173:15
**screen (1)**
106:17
**Sean (1)**
27:18
**S-E-A-N (1)**
27:19
**seat (1)**
172:4
**second (17)**
15:22;22:21,22;
42:21;49:9,15,24;
50:23;51:2;72:25;
84:22;96:13;149:9;
150:14;153:5,8;
160:10
**seconds (27)**
22:18;23:13;24:24;
25:3,6;26:16,16;
42:13;47:9;85:2;
96:6;98:15;100:5,20;
106:21;107:16;
122:11,19;128:1;
131:4;138:5;140:2;
142:11;150:15;
159:2,6;160:3
**secure (2)**
78:25;174:15
**secured (1)**
176:22
**seeing (10)**
45:19;86:21;95:18,
19;103:7,25;104:5;
131:21;149:11;153:2
**seemed (2)**
15:9;164:20
**seems (1)**
24:15
**send (1)**
18:18
**senior (2)**
42:17;167:3
**sense (4)**
49:14;54:15,16;
108:24
**sent (4)**
65:10,13,14,23
**sentence (4)**
149:9;150:14;
153:5,8
**separately (1)**

8:22
**September (3)**
67:25;148:22,25
**sergeant (2)**
21:5;29:9
**served (1)**
78:19
**service (1)**
33:22
**session (1)**
5:23
**set (3)**
54:23;124:25;
172:8
**sets (2)**
174:23;175:13
**seven (4)**
49:13;62:8;69:10;
107:21
**Sever (1)**
29:19
**several (13)**
7:11;9:3,3;12:4;
29:17,19;45:5;48:9;
64:2;67:7;128:1;
135:23;136:19
**shackled (1)**
121:19
**shackles (1)**
114:9
**shadow (1)**
91:23
**shadows (2)**
48:23;154:15
**shake (2)**
144:21;145:2
**shakes (1)**
65:20
**shaking (1)**
6:2
**Sheriff (1)**
16:12
**Sheriff's (7)**
12:16,21,25;13:13;
16:15,18;68:18
**shift (2)**
20:24,24
**shoot (4)**
59:9,9,15;95:5
**shooting (1)**
62:25
**shoring (1)**
70:17
**short (6)**
27:5;32:10;51:4;
71:20;145:18;166:25
**shortly (4)**
66:1;86:22;131:13;
134:13
**shortness (2)**
81:15,25
**shot (2)**
14:1;94:4

**shoulder (33)**
32:3,9;34:3;55:24;
90:22,23;91:15,21,
22;92:17,20;110:7,
16,21;111:19;116:15,
21;117:1;118:2,20;
119:3,4;124:9;126:5;
132:1,4;134:23;
135:13,14;136:2,9;
151:10;168:3
**shoulders (2)**
116:17;129:20
**shout (2)**
144:22;145:3
**shoved (1)**
24:17
**shoving (1)**
152:18
**show (7)**
15:25;37:1;48:5;
51:24;52:2,4;93:10
**showed (3)**
26:25;27:11;83:25
**showing (3)**
48:1;151:9;154:9
**shown (1)**
100:3
**shows (6)**
42:10;47:13;54:12;
92:15;102:22;136:18
**side (17)**
24:2;25:2,17;
82:19;83:4,11,17;
104:19,20,21;105:19;
113:12;114:2;126:7;
144:1;161:21;162:16
**sig (1)**
7:13
**Signal (3)**
24:4,6;75:5
**signature (1)**
178:21
**significance (1)**
154:20
**significant (4)**
7:12;84:1;154:23;
166:6
**significantly (5)**
86:15;115:24;
122:9,22;127:1
**signs (1)**
21:7
**similar (1)**
53:6
**simple (1)**
54:22
**simply (2)**
152:9;173:10
**simultaneously (1)**
149:10
**single (2)**
62:9,10
**sirens (1)**

24:10
**sit (2)**
109:19,25
**sits (2)**
172:3,5
**sitting (6)**
82:18;83:4,11;
110:3;152:10;176:25
**sitting-upright (1)**
82:25
**situation (7)**
24:14,15;28:8;
68:20;69:18;77:5;
120:9
**situations (3)**
70:22;79:13;147:4
**size (1)**
57:19
**skin (5)**
47:5;57:7,7;60:2;
119:2
**skinny (3)**
57:15,16;86:18
**slow (2)**
14:18;27:12
**small (3)**
57:20;90:25;132:7
**smaller (2)**
115:3;174:17
**Smart (2)**
88:21;166:20
**society (1)**
31:16
**somebody (24)**
15:15;23:7;39:22;
59:15,22;63:3;69:7,
13;70:1;71:14;83:9;
109:19;121:18;
128:11;134:2;
141:25;147:5;155:6;
159:11;163:7;
169:14;173:14,15,16
**somebody's (4)**
86:11;119:5;127:1;
133:16
**someone (27)**
13:10;14:5,10;
15:19;20:17,21,25;
31:2;39:15;44:7;
59:9,10;62:24;69:2,
18,19;71:1;78:22;
80:20;81:12;84:2;
115:23;146:2;147:5;
158:18;161:5;174:2
**someone's (1)**
174:2
**sometime (2)**
12:25;20:12
**sometimes (4)**
8:23;55:1;90:19;
148:4
**somewhat (5)**
5:21;90:12;92:24;

114:2;152:24
**somewhere (4)**
32:3;43:19;49:23;
69:20
**soon (7)**
21:6;27:1;39:19;
79:14;103:21;
171:17;173:3
**sooner (3)**
23:20;44:7;160:23
**sorry (11)**
12:19;34:22;37:22;
41:1;50:18;82:2;
89:25;109:13;133:9,
11;145:13
**sort (9)**
10:22;15:18;31:23;
44:20;53:6;60:9;
72:20;73:15;178:6
**sound (3)**
108:5,22;120:12
**sounded (1)**
158:24
**Sounds (2)**
71:23;114:21
**south (1)**
149:19
**speaker (4)**
107:20;108:3,6,20
**special (1)**
36:21
**specific (5)**
13:20;33:15,21;
36:17,18
**specifically (1)**
157:14
**spell (1)**
63:18
**spelling (7)**
5:5,6;17:10,11;
18:13;27:19;63:20
**spent (2)**
34:14;67:2
**spine (1)**
136:5
**sponsored (1)**
18:17
**spot (1)**
27:25
**spread (8)**
25:20;46:22;49:11;
50:3,5,9;51:4;109:2
**squatting (1)**
127:9
**squeezed (1)**
147:5
**stable (1)**
14:18
**stage (1)**
79:17
**staged (1)**
160:5
**stamp (1)**

98:15
**stand (5)**
4:12;79:10;108:13;
130:20,23
**standing (13)**
24:7,8;96:18;
117:8,21,22,23;
131:14;142:24;
143:9,16;168:2;
174:25
**stands (1)**
140:3
**start (11)**
9:6;20:5;43:4;
54:25;62:1;79:16;
95:5;96:10;141:18;
159:3;177:5
**started (3)**
11:8;21:3;23:16;
64:21;74:14;163:18;
171:16
**starting (2)**
38:12;150:14
**starts (3)**
14:20;148:2;
169:21
**state (9)**
5:3;80:9;88:12;
90:6;149:8;150:13;
151:11,15;157:11
**stated (4)**
64:25;86:22;89:20;
150:21
**statement (6)**
32:1;58:20;62:9,
11;63:5;80:11
**statements (4)**
66:15,16;115:8;
178:2
**static (2)**
24:9,13
**station (1)**
69:25
**statis (1)**
35:3
**statistics (2)**
35:4;54:1
**stay (4)**
25:1;27:3;171:8;
172:11
**stayed (1)**
133:24
**step (1)**
23:20
**stepped (2)**
27:7;105:20
**stepping (1)**
117:19
**stick (3)**
54:24;70:3;112:8
**still (43)**
9:13;15:9;16:16,
24;27:20;32:24;

43:16,17,23;45:10;
59:24;60:1;85:4,4;
94:4;100:6,9;101:9,
17,20;102:22,22;
104:14,21;108:25;
112:9,10,14,25;
113:23;114:23;
115:10;116:4;
119:12;121:6,14;
129:16;135:15;
151:3;154:12,23;
170:1;175:16
**stomach (15)**
25:1;83:5,17;
102:23;111:10,25;
112:15,16,18,19;
113:3;114:12;120:4;
162:13,17
**stood (3)**
130:14;142:22;
175:24
**stop (12)**
23:17;26:23;76:19;
77:3;85:19;95:17;
96:12;103:19;
133:15;145:11;
167:21;169:25
**stopped (78)**
77:20;87:13,15;
96:14;97:5,15,24;
98:6,12,18;99:1,19;
100:1,17;101:7,14,
24;102:19;103:1,10,
23;104:11;105:6;
107:10;109:15;
110:8,13;111:15;
112:5,22;113:10,20;
114:16;115:15;
116:9;117:7;118:10,
17;120:16;121:3,10;
123:15,23;124:13;
125:3,23;128:22;
129:14;130:8;
131:18;132:21,23,25;
133:13;134:17;
135:19;136:16;
137:7;138:2,13,23;
139:6,24;140:15;
141:1,12;142:8,17;
143:14;144:14;
145:12;147:17,18,23,
24;149:19;150:8;
171:12
**stopping (1)**
88:6
**stops (6)**
35:8;147:24;148:1,
2,5,12
**stout (1)**
165:8
**straighten (1)**
114:7
**strategy (3)**

42:19;44:10;79:24
**streak (1)**
104:3
**street (11)**
36:4;37:7,11;40:9;
43:23;76:18;149:13,
15;150:4;163:25;
172:10
**strength (1)**
158:1
**stress (1)**
27:10
**stretched (1)**
159:21
**stretcher (4)**
128:19;171:18;
172:14,14
**strike (4)**
25:15;60:18;72:22;
152:8
**strongest (1)**
165:6
**Stroud (37)**
44:18,25;45:4,23;
74:24;75:2,7,18;
76:11;80:5;89:9,15,
17,21;96:18;97:17;
98:2;100:20;106:18;
107:14;109:19,24;
115:17;117:11;
123:18;124:15,17;
125:10;140:4;
141:15,16,21;142:4;
149:10;162:8;
163:10;170:3
**struck (2)**
46:10;59:24
**struggle (2)**
84:21;123:7
**struggling (5)**
30:20;81:9;123:10,
12;128:24
**stuck (2)**
69:19;70:2
**students (3)**
58:17;63:24;64:2
**studies (8)**
36:25;72:16;82:15;
83:25;84:3;126:24;
146:3;147:13
**study (5)**
147:11;156:4,13;
160:24;161:2
**stuff (2)**
169:13;173:22
**stun (9)**
21:21;22:10,20;
28:19;58:11;84:23,
24;85:13;102:17
**su (1)**
46:19
**sub (1)**
67:12

**subject (13)**
18:24;26:13;27:12;
31:19;41:17;57:9;
58:22,24;59:3,4;
68:21;72:18;152:6
**subjects (1)**
157:6
**subject's (1)**
33:18
**submit (1)**
47:12
**submitted (3)**
67:12,13,19
**subsequent (1)**
50:24
**successful (1)**
25:12;59:12
**sucked (1)**
70:10
**sudden (2)**
42:14;72:11
**suffered (1)**
15:12
**suffering (2)**
81:18;129:3
**sufficient (2)**
84:1;177:14
**sufficiently (1)**
14:17
**suffocate (1)**
128:8
**suggest (1)**
127:19
**suit (1)**
37:25
**summaries (2)**
8:13,24
**superstrong (1)**
169:20
**supervisor (3)**
30:16;89:21;90:1
**supine (1)**
46:20
**supply (2)**
155:2;156:1
**support (4)**
43:6;161:24;
162:18,20
**supposed (1)**
61:8
**Sure (28)**
4:13;14:15,18;
29:8;34:4;35:14,19;
36:1,5,16;37:20;
60:21;64:16;65:5;
66:13;69:16;71:4;
78:20;79:8;83:8;
94:16;100:25;
101:10;127:3;
131:16;160:21,22;
177:25
**surprise (1)**
20:18

**surrounded (1)**
173:14
**suspect (8)**
13:17,22;32:17,21,
22;39:15;40:3;61:18
**suspects (1)**
19:2
**SUV (1)**
23:14
**swap (1)**
55:2
**SWAT (5)**
12:15,17;13:11,21,
21
**swear (2)**
4:10,17
**swing (1)**
79:3;175:7
**swings (1)**
59:3
**switch (1)**
160:10
**sworn (2)**
4:23;12:12
**system (2)**
33:12;70:6
**systems (1)**
33:12

## T

**tachycardia (6)**
87:3,5,8,17,20,23
**tactical (5)**
11:24;12:11;13:8;
14:2;17:21
**tad (1)**
22:15
**talk (9)**
5:24;61:20;64:15,
16,19;77:3;96:20;
125:25;131:13
**talked (3)**
79:12;86:20;
157:24
**talking (30)**
29:5,24;49:15,18;
59:18;69:14;75:11;
85:11;86:10;89:5;
90:13;97:1;100:20;
103:6,25;108:18;
112:11;122:7;124:1;
130:8,9;137:11;
138:16;141:16;
144:2;155:4,15,18;
160:24;161:14
**talks (2)**
117:18;162:11
**tapping (1)**
144:16
**tase (7)**
20:17,21;24:19,21;
62:24;84:21;166:21

**tased (7)**
19:2;20:23,25;
28:6;29:9;46:12;
57:18;60:23;132:6;
159:5,11
**TASER (134)**
8:21;14:6,8,11,21;
15:1,8,10,12,15,21;
16:4;17:17;18:5,11,
16,24;19:10,21;20:4,
9;21:8,21,22,25;22:2,
3;23:24;24:8,24;
26:15,25;28:1,12,13,
16,21,23,25;29:3,4;
45:9,20,21,23;46:3,
18,25;48:9;49:9,10;
50:2;51:24;52:8,24;
53:13,13,24;54:5,11,
19,21;55:2,12;56:2,3,
21,22;57:9,15;58:18,
21;59:23;60:3,4,5,10,
13,14;61:1,16,17,17;
63:2,25;64:1,3;65:7;
76:16,24;84:4,7,10,
12,13;85:22;86:16;
88:9,18,21;89:10,16,
18;90:24,25;98:9,9;
99:11,13,21;100:4,5;
104:15;105:3,10,14,
14,20,22;109:8;
120:12;132:6;
150:22;151:11;
158:17,18;159:18;
160:4,6
**TASER-Axon (1)**
18:2
**tasered (3)**
14:4;15:19;96:6
**tasers (16)**
19:23;20:1;29:13;
52:15;56:25;57:2,3,
21;60:22;62:13;
150:23;159:10,16;
160:15;166:18;
176:14
**tasing (2)**
27:3;167:21
**taught (3)**
18:10,12;64:3
**team (1)**
12:15
**teams (1)**
13:11
**Technical (2)**
70:19,20
**technician (1)**
11:21
**techniques (1)**
166:12
**teeth (2)**
123:19;124:25
**telling (1)**

164:2
**temperature (1)**
157:1
**ten (2)**
16:25;176:18
**tension (2)**
118:24;119:5
**terms (3)**
36:21;54:3;55:4
**Terry (6)**
5:13;37:19;38:25;
51:9;59:22;66:16
**testified (3)**
4:24;65:12;66:18
**testifying (1)**
41:11
**testimony (3)**
4:17;8:17;61:24
**theirself (1)**
128:14
**theory (1)**
146:4
**thereafter (1)**
88:19
**Thereupon (4)**
41:21;73:2;92:3;
93:12
**thigh (4)**
46:22;49:22;104:7,
8
**thinking (2)**
125:12;159:3
**third (3)**
150:10,13,15
**Thompson (2)**
27:18,20
**though (13)**
19:12;42:12;57:21;
58:22;59:25;65:11;
83:7;89:5;104:20;
128:10;143:24;
144:1;147:10
**thought (5)**
40:25;54:2;100:22;
103:13;121:20
**thousand (1)**
172:9
**thousands (3)**
69:14;70:12;71:12
**threat (2)**
89:8;169:17
**threats (1)**
169:18
**three (10)**
42:9;51:14;84:13;
85:5;89:18;109:25;
120:25;159:5,17;
160:7
**three-piece (1)**
37:25
**thus (1)**
67:3
**ticket (1)**

30:6
**til (1)**
176:21
**timeline (2)**
80:2;149:8
**times (25)**
8:19,20;9:3,3;12:4;
14:7,25;15:24;18:23;
22:4;37:2;44:18;
46:2;48:10;53:23;
56:24;60:23;61:2;
64:2;85:5;97:1;
158:18;159:5;160:8;
172:3
**timestamp (6)**
98:15;107:14;
109:17;112:8;
136:12;137:4
**timestamped (1)**
92:10
**timestamps (1)**
105:22
**tingles (1)**
22:15
**tired (1)**
131:15
**today (1)**
52:15
**toes (1)**
124:24
**together (4)**
72:21;108:12;
174:24;175:4
**told (8)**
8:8;27:12;75:18;
85:18;141:21;
152:17;167:21;
168:14
**tones (1)**
120:6
**took (6)**
11:11;17:25;22:1;
24:16;35:25;149:11
**tool (1)**
60:17
**tools (2)**
60:17;166:12
**top (5)**
11:20;35:7;70:18;
115:7;131:15
**torso (12)**
71:9;82:12;90:10;
111:25;113:5;
132:14;153:11,16,16;
154:3;155:19;165:9
**total (2)**
85:6;159:6
**totality (1)**
37:9
**touch (2)**
117:2;142:20
**touched (2)**
85:25;173:25

**touching (1)**
116:24
**Toward (2)**
11:12;132:12
**towards (1)**
132:12
**trachea (2)**
126:11;155:5
**traffic (8)**
34:14,15,16;35:8;
39:18,24;75:15,17
**train (1)**
12:14
**trained (14)**
19:12,14;63:2;
80:19;81:5;87:1;
141:6;144:11;162:9;
166:9,18;167:24;
170:14;173:5
**trainer (1)**
18:2
**training (38)**
8:21;11:9;17:17;
20:2;21:5;28:1;
34:17;57:19,23,25;
58:17;60:4,9;61:1,
17;63:21;79:11;83:6,
19,21,24;123:3;
157:16;161:5;162:8;
163:9;164:23;
165:23;166:2,7,9,11,
19;167:13;169:5,9,
170:9;173:25
**transcript (1)**
178:13
**transfer (1)**
125:19
**transition (1)**
163:2
**transitioned (3)**
63:3;131:1;142:22
**transitioning (2)**
111:2;159:4
**transpired (1)**
48:7
**transported (1)**
78:15
**trauma (3)**
128:9;146:25;
147:8
**traveling (1)**
155:3
**treat (4)**
13:9,16,24;14:5
**treating (3)**
14:3,13;123:4
**treatment (2)**
73:17,18
**tremendous (1)**
70:9
**trench (1)**
70:16
**tried (5)**

21:19;36:13;70:3;
160:8;175:10
**trigger (22)**
25:5;28:12,13;
46:6,14;48:8;49:4,9,
19,20,24;50:19,23,
25;51:12;58:22,23;
85:1,3;88:10;106:19;
160:9
**triggered (1)**
105:4
**trigger-pulled (1)**
48:9
**trouble (2)**
82:7;131:12
**truck (7)**
69:9;164:5;172:2,
3,7,9,11
**true (8)**
31:25;52:12;74:5;
76:20;147:9;156:22;
157:1,2
**truth (3)**
4:18,19,19
**truthful (1)**
66:13
**try (14)**
5:24;6:11;9:12;
40:19;43:21;44:14;
77:3;78:4;101:11;
102:4;103:15;
113:15;159:25;176:6
**trying (43)**
15:23;21:24;22:7,
24;26:3;31:2;36:22;
38:3;40:3,14;43:4;
50:25;74:18;75:9;
77:21;79:3;84:19;
85:12,22;92:25;
100:6,11;114:7;
118:22;119:10,13,18;
120:2;121:14,22;
123:8,8,18;124:19;
125:8;137:23;
144:21;145:8;152:8;
155:22,23;176:12,13
**turn (4)**
55:1;105:19;162:6,
15
**turned (10)**
22:2;23:23;26:20,
23;85:2;91:1;113:12;
114:2;160:10,12
**turning (2)**
143:21;160:10
**turns (1)**
114:10
**two (29)**
17:5;24:5,5,22;
27:22;33:12,12;
49:21;56:10,12;57:6;
84:12,13,22;85:2,5;
117:2;120:25;

127:14;144:10;
159:20;160:3;162:8;
163:9;165:10;
172:12;174:23;
175:4,13
**two-foot (1)**
25:19
**two-second (1)**
160:11
**type (7)**
9:5;32:15;62:1;
66:20;84:20;146:25;
147:8
**typed (1)**
7:4
**types (2)**
79:13;167:8
**typewritten (1)**
8:14
**typically (2)**
146:22;147:6
**typo (1)**
148:25

---

**U**

**ultimately (1)**
43:1
**Um-hum (19)**
12:6;19:25;21:10;
23:1;46:5;47:8;
50:17;52:17;58:20;
62:15;66:6;75:14;
97:20;108:23;
109:10;123:1;126:3;
137:17;145:5
**uncommon (1)**
79:9
**unconscious (7)**
15:9,13,20;162:20;
164:11,22;176:9
**under (15)**
23:9,18,18;37:15;
43:22;61:3,24;73:23;
78:23;79:2;89:2;
92:24;143:19;149:7;
153:4
**Understood (4)**
6:4,7,17;140:10
**unfortunate (2)**
70:21;137:22
**ungloved (1)**
116:20
**unhappy (1)**
56:22
**uniform (4)**
12:21,21,22;34:21
**unit (4)**
34:14,15;70:20,20
**unless (1)**
6:8
**unlikely (1)**
36:7

**unpleasant (1)**
70:8
**unresponsive (5)**
15:15,20;162:23;
164:7,14
**unsuccessful (1)**
62:24
**unusual (2)**
13:20;81:12
**up (83)**
4:12;11:20;15:25;
23:14,20;25:3;26:18;
27:11;34:10;39:20;
40:7;42:10,11;43:3;
48:22;62:25;63:12;
69:9;70:3,16,24;75:3,
7;78:21;79:21,24;
82:18;84:20;95:5,16;
99:4,9;102:8;103:11;
104:21;106:9,17;
107:20;111:8,9,17,
19;112:10,25;113:12,
24;117:1;119:7,8,12,
17,18,25;121:7,13,
14,21,23;123:8;
124:7;130:15,20,21,
23;131:20;133:4;
134:3;136:3,25;
140:3;141:24;
148:17;149:14;
153:21;159:25;
160:8;162:16;
167:22;170:2;
172:15;173:8;177:8;
178:4
**upon (9)**
8:4;10:8;15:23;
47:11,15;78:7;82:14;
126:22;173:10
**upper (22)**
24:22;25:17;33:18;
91:14;92:17,20;
104:7;110:21;
111:19;116:15;
118:1;119:4;124:9;
129:20;132:2,16;
153:16,21;154:12,24;
155:11;166:22
**urgency (1)**
42:20
**use (49)**
10:4;13:17;14:21;
15:20;25:14;28:25;
29:3,3,22,24;30:1,10,
13;32:15;33:6;34:22;
35:3,4;45:11,23;
46:17;52:9,10,23;
55:25;58:23;59:7,18;
60:14;61:1,17;63:3;
68:4;76:12,16,24;
84:7;88:18,21;89:10,
16;156:24;157:18;
159:8;160:15;

161:11;166:16,20;
174:23
**used (16)**
22:9;26:14;28:17,
23;59:4,6,10,24;
85:13,22;120:13;
129:7;150:23;
159:15;170:25;
176:14
**use-of-force (10)**
7:16,19;8:21;
66:20;67:9,22;68:1,9,
12;168:18
**using (10)**
30:14;32:21;45:9;
57:22;59:2;60:10;
88:10;106:5,9;
175:10
**usual (1)**
178:15
**usually (1)**
146:23

## V

**vague (1)**
90:12
**vaguely (1)**
27:13
**variety (1)**
156:23
**various (3)**
11:19;18:20;73:9
**vehicle (2)**
23:8;69:17
**vehicles (3)**
78:2;149:20;150:1
**verbal (2)**
114:21;130:7
**verbally (3)**
6:1;130:13;131:9
**verified (1)**
156:4
**verify (1)**
94:2
**versa (1)**
54:19
**versus (3)**
33:3;57:5;128:1
**via (1)**
76:1
**vice (1)**
54:19
**vicinity (1)**
77:20
**video (182)**
9:3,5;45:4;46:13;
47:2,6,7,12,16,25;
48:4;51:17;65:14,23;
73:22;81:2,3;85:10;
92:9,11,13;93:9,24;
94:3,4;95:24;96:11,
14;97:4,5,14,15,23,

24;98:5,6,11,12,17,
18,25;99:1,18,19,25;
100:1,16,17;101:3,7,
13,14,23,24;102:13,
19,25;103:1,9,10,17,
23;104:10,11,25;
105:6;106:6;107:9,
10;108:9,14;109:6,
14,15,17;110:5,8,12,
13;111:14,15;112:4,
5,8,21,22;113:9,10,
19,20;114:15,16,18;
115:9,14,15;116:8,9;
117:3,7;118:9,10,16,
17;119:25;120:10,
16;121:2,3,9,10;
123:14,15,22,23;
124:12,13;125:2,3,
21,23;128:21,22,25;
129:13,14;130:4,21;
131:17,18,21,24;
132:20,21;133:5,13,
22;134:15,17;135:3,
18,19;136:14,16;
137:6,7;138:1,2,12,
13,22,23;139:5,6,23,
24;140:14,15,23;
141:1,11,12;142:7,8,
16,17;143:13,14;
144:13,14,23;145:12,
21;150:19;151:8,21;
153:13,14;157:24;
160:7;171:14;173:17
**videos (1)**
28:2
**view (4)**
25:12;120:19;
136:18;161:18
**views (1)**
47:14
**violate (1)**
84:9
**violated (1)**
84:5
**violation (7)**
59:17;60:25;61:16;
88:21;158:17,22;
168:8
**violations (1)**
39:7
**violence (2)**
20:23;21:16
**violent (3)**
20:22;37:2;71:3
**virtually (4)**
149:12,15,16,21
**visually (1)**
173:11
**Vitae (1)**
10:11
**voice (2)**
96:22;120:7
**volts (6)**

52:9,13,21;53:2,7,7
**volume (1)**
120:6
**voluntary (1)**
86:19
**vomit (2)**
83:15,16

## W

**waist (1)**
25:19
**wait (2)**
24:14;159:9
**waiting (3)**
44:13;53:8;125:17
**walk (2)**
77:15;85:18
**walked (4)**
23:22;26:18;99:9;
173:8
**walking (12)**
23:16;26:23;27:14,
14;36:4;37:7,11;
42:13;76:18;77:6;
99:4;149:12
**walks (1)**
172:15
**walls (1)**
70:18
**watch (9)**
48:4;91:9;93:9;
94:9;112:20;115:9;
133:7;135:5,8
**watched (6)**
9:3;65:15;128:7,
11;151:20;157:24
**watching (5)**
9:4;28:1;138:6,10;
139:1
**way (24)**
5:10;9:7;10:15;
11:20;16:10;28:9,14;
31:12;52:10;59:21;
61:8;62:23;68:20;
71:15;74:23;88:12;
112:18;113:2;136:3,
7;144:7;163:15;
174:15,16
**Weapon (5)**
14:11;33:12,12;
86:16;108:16
**Weapons (1)**
68:5
**wearing (2)**
12:20;125:1
**website (1)**
18:18
**weekend (2)**
20:20;21:1
**weeks (1)**
20:14
**weighed (2)**

86:6,13
**weighs (2)**
127:22,22
**weight (30)**
31:22;32:15,21;
33:7;45:9;69:14,20;
71:1,7;72:18;82:11;
86:4,4;87:19;90:2;
111:24,25;113:4;
23;128:13;146:6;
154:24;160:25;
165:9,11,13
**welfare (1)**
24:4
**weren't (8)**
59:12;67:21;89:14;
96:25;167:13;
174:20,23;175:1
**what's (17)**
42:18,19,22;47:14;
55:15;73:22;74:7;
75:12;81:22;93:16;
97:19;145:8;154:19,
19;164:12;165:18;
169:5
**wheel (1)**
172:9
**where's (1)**
168:3
**Whereupon (3)**
71:24;95:9;145:22
**whichever (2)**
69:6;173:4
**whole (3)**
4:18;136:22;160:4
**Who's (14)**
17:2;35:18;37:10;
78:22;79:23;121:19;
138:25;153:15,21;
159:19;171:6;
172:17,25;173:16
**whose (4)**
96:19;118:5,7;
134:24
**wide (1)**
154:17
**wife (3)**
21:14;64:7;69:10
**William (4)**
4:2,22;5:5;178:22
**WILLIAMS (123)**
4:1,10;5:2,14;9:21,
25;10:1;16:23;17:4;
40:23,25;41:8,12,15,
16,20,24;42:1;71:19;
72:2,25;73:4,5;92:1,
6;93:15,19,22;94:18,
25;95:12,14;96:12,
15;97:6,16;98:1,7,13,
19;99:2,20;100:2,18;
101:4,8,11,15;102:1,
14,20;103:2,12,18,

24;104:12;105:1,7;
107:11;109:16;
110:9,14;111:16;
112:6,23;113:11,21;
114:17;115:16;
116:10;117:4,10;
118:11,18;120:11,17;
121:4,11;123:16,24;
124:14;125:4;126:2;
128:23;129:15;
131:19;132:22;
133:6,11,14;134:18;
135:20;136:11,17;
137:8;138:3,14,24;
139:7;140:1,16;
141:2,13;142:9,18;
143:15;144:15,24;
145:6,17,20,25;
146:1;157:20,22;
158:9;165:16;168:9,
13;174:10,13;178:7,
14

**willing (1)**
64:15
**wind (2)**
155:7,25
**window (2)**
22:6;166:16
**windows (1)**
156:25
**windpipes (1)**
155:2
**windshield (2)**
39:20;40:8
**wire (1)**
105:20
**wires (2)**
105:16,21
**within (14)**
23:13;31:16,16;
37:12,12;55:23;57:6;
74:4,19;76:22;80:2;
108:3,6;150:16
**without (1)**
154:22
**witness (19)**
4:11,12,14,21;
6:22;9:2;41:13;
61:21,23;64:5;65:12,
20,25;71:23;145:15;
158:13;165:18;
178:9,22
**witnesses (1)**
8:23
**words (4)**
75:22;93:1;105:25;
152:12
**work (12)**
16:12,18,22;61:8,
21;62:2,7,7;69:11;
125:1;147:24;155:23
**worked (5)**
13:12;16:10;19:20;

36:5;62:4
**working (9)**
19:16;20:20;67:3;
70:15;147:17,18,23;
149:17;159:7
**workweek (2)**
34:16,17
**world (1)**
173:23
**worse (3)**
26:22;159:13;
162:2
**wreck (1)**
23:15
**wrestling (1)**
74:14
**wrist (1)**
135:6
**wrists (1)**
159:20
**write (4)**
62:9,17;63:5;169:3
**written (2)**
10:6;109:23
**wrong (3)**
74:7;137:16,21
**wrote (1)**
62:10

## X

**X2 (16)**
23:24;45:21;46:18;
47:1;49:9;50:2;
53:13;55:2;102:5,11;
103:4;106:20;107:4,
15;151:11;160:6

## Y

**yards (2)**
23:23;172:10
**year (3)**
64:23,24;169:1
**years (17)**
10:24;16:25;31:13,
19;32:15;34:5;35:23;
62:8;69:1;70:15;
72:16;78:20;82:17;
83:22;123:3;128:5;
166:7
**yell (7)**
114:24;115:11;
118:13;129:17,25;
130:3,6
**yelled (1)**
24:20
**yelling (2)**
114:19,22
**yells (1)**
107:14
**Yep (1)**
96:20

**young (2)**
70:14;165:7

## 0

**01 (1)**
140:17
**07:41 (1)**
109:19

## 1

**1 (3)**
92:2,5,8
**1,200 (2)**
52:13;53:7
**1,800 (1)**
34:9
**1:00 (1)**
95:2
**1:30 (1)**
95:5
**1:52 (1)**
95:11
**10 (1)**
67:18
**11 (1)**
35:23
**12 (6)**
50:9;67:11,18;
91:19;151:5,6
**12:16 (1)**
72:1
**12:22 (1)**
72:1
**12:56 (1)**
95:11
**12-hour (1)**
20:24
**14 (2)**
67:18;166:7
**15 (9)**
25:3;38:25;39:1;
67:12;88:20;89:11;
142:11;159:2,6
**150 (1)**
67:6
**16 (2)**
88:20;89:11
**160 (1)**
86:9
**16th (4)**
7:22;8:1;10:7,16
**17 (2)**
88:20;89:12
**18/19/20 (1)**
70:15
**19 (1)**
96:6
**1995 (2)**
72:12;156:9

## 2

**2 (2)**
93:14,17
**2,000 (1)**
34:10
**2:00 (1)**
37:10
**2:52 (1)**
145:23
**2:57 (1)**
145:24
**20 (2)**
42:13;70:17
**200/210 (1)**
127:22
**2008 (4)**
11:3,8,12,15
**2009 (2)**
13:3;16:6
**2010 (2)**
17:17;19:22
**2011 (6)**
11:1;12:25;16:11;
17:24;18:21;20:13
**2012 (2)**
13:1;16:8
**2019 (5)**
23:4;26:11,12;
68:1;148:22
**2021 (1)**
64:22
**2022 (3)**
7:22;10:7,16
**20th (1)**
148:25
**21 (1)**
123:17
**22:14 (1)**
98:3
**22:15 (1)**
98:14
**22:15:48 (1)**
98:23
**22:16 (3)**
99:8;100:4,19
**22:16:04-ish (1)**
99:9
**22:17:21 (1)**
101:16
**22:17:26 (1)**
102:16
**22:17:34 (1)**
102:21
**22:17:45 (1)**
102:3
**22:18:43 (1)**
107:14
**22:18:55 (1)**
109:18
**22:19:17 (1)**
111:18

**22:19:39 (3)**
112:7,15,17
**22:20:05 (4)**
113:13,16,22;
114:1
**22:21:08/09 (1)**
116:13
**22:21:18 (1)**
117:25
**22:21:25 (1)**
118:12
**22:21:37 (1)**
120:15
**22:21:38 (1)**
121:6
**22:22 (2)**
123:17;124:15
**22:22:30 (1)**
124:2
**22:22:32 (1)**
124:8
**22:24:18/19 (1)**
129:16
**22:24:36 (1)**
131:21
**22:25:33 (1)**
134:14
**22:25:43 (1)**
136:12
**22:26:03 (1)**
137:4
**22:27:14 (1)**
138:4
**22:27:36/37 (1)**
138:25
**22:27:42 (1)**
139:22
**22:28:00 (1)**
140:17
**22:30:08 (1)**
144:16
**22nd (1)**
148:22
**24/25 (1)**
118:12
**25 (2)**
100:5;150:15

## 3

**3 (1)**
35:23
**3,000 (1)**
53:23
**3:40 (1)**
178:24
**30 (2)**
47:9;95:3
**30e (1)**
178:20
**30-year-old (1)**
156:10
**31/32 (1)**

124:2
**32 (1)**
    10:24
**34 (1)**
    153:3
**36-page (1)**
    66:15

### 4

**4 (4)**
    38:8,9,13;75:5
**40 (2)**
    82:17;83:22
**400 (3)**
    126:25;160:25;
    161:6
**44 (1)**
    98:15
**45 (2)**
    23:13;26:16
**45/60 (1)**
    131:4
**49/50 (1)**
    124:15

### 5

**5 (2)**
    38:14;148:20
**50 (1)**
    100:20
**50,000 (4)**
    52:9,20,22;53:7
**56 (1)**
    98:3

### 6

**6 (4)**
    106:15;149:1,7;
    153:4
**6:32 (1)**
    106:2
**60 (1)**
    26:16
**60-hour (1)**
    162:10

### 7

**7 (1)**
    150:11
**7:20 (2)**
    106:16,18
**7:26 (1)**
    106:17
**7:29 (1)**
    107:13

### 8

**89 (2)**

24:4,6

### 9

**9 (1)**
    105:25
**9-1-1 (4)**
    37:24;77:11;80:1;
    150:3
**9-11-303 (1)**
    178:21