IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| OCTAVIO RODRIGUEZ CIRA, *et al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>COUNTY OF HENRY, *et al.*, )<br>)<br>Defendants. ) | CIVIL ACTION FILE<br><br>NO. 1:21-CV-01999-VMC |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

COME NOW DEFENDANTS, and pursuant to Local Rule 7.1 (C), file this their Reply Brief in Support of their Motion for Summary Judgment, showing the Court as follows:

**I.    PLAINTIFFS' ERRONEOUS ARGUMENTS**

**A. PLAINTIFFS MISGUIDELY ARGUE THAT THE TASER DISCHARGES CAUSED RODRIGUEZ TO RESIST AND EXCUSE HIS BEHAVIOR**

First, by speculating that the Taser discharges caused Rodriguez to resist, Plaintiffs apparently fail to understand how a Taser works. A Taser operates in probe mode and drive stun mode. Lowe depo. at 46, 49-51, 85, 88. Alpert depo. at 92. In probe mode, two probes with wire leads are deployed, and when the probes sufficiently connect with a person, an electrical circuit is closed and the person may be **temporarily** incapacitated. Doc. 73-12 (EX 14 Dr. Alpert Rpt) at 6; Lowe depo. at 46. In drive stun, the Taser is placed directly on the person's body.

*Marshall v. Penn Twp.*, 2010 U.S. Dist. LEXIS 102224, at *7-9 n.5 (W.D. Pa. Sep. 28, 2010) ("When the contacts are placed directly against the body, the Taser may be used as a stun gun. Used in this way . . . the Taser causes pain, but there is no neuromuscular disruption."); Lowe depo. at 22 (Well, when you're doing drive stun, that's all you're getting is pain. It's a distraction method.").

Regardless of the mode used, the electrical charge ends when the cycle or contact ends. "When it's over, it's over." As a result, once the electrical charge ends, the pain and involuntary muscle movements also end.

Throughout Plaintiffs' arguments, however, they repeatedly speculate that Rodriguez refused to comply and stop resisting because a Taser had been used. Doc. 74 (Pltffs' SMODF) at ¶¶ 18, 21, 24, 25 Plaintiffs assert "Mr. Rodriguez was not "swinging his arms violently" or "attempting to flee," and ". . . video clearly shows that Mr. Rodriguez was simply trying to get away from the painful taser shocks by moving along the pavement on his back for a short distance…." Doc. 73-1 (Response Brf) at n. 7 (cits. omitted). "Mr. Rodriguez's limited movement was in response to painful stimuli caused by the officers." *Id*. at 16. In other words, because Plaintiffs know that it would be reasonable for the officers to construe Rodriguez's continued movement as resistance, which would then justify additional force, they do the only thing they can: they claim he was merely reacting to "painful stimuli" from the Taser. This argument, however, flies in the

face of how the Taser works and is even contrary to the positions of their own experts.

Taser discharges do not cause continuing muscular contractions or pain after the cycle ends. Whether used in probe mode or drive stun mode, the Taser electrical cycle only lasts five (5) seconds and then neuromuscular incapacitation or pain from muscle contraction ends. Lowe depo. at 22; Alpert depo. at 65.

Plaintiffs' specious attempt to manufacture a fact dispute as to whether Rodriguez was physically resisting by speculating that Taser "pain" caused his movements should be rejected.

### B. THE *DYKSMA* CASE IS NEITHER BINDING NOR INSTRUCTIVE

Plaintiffs rely heavily on the decision in *Dyksma v. Pierson*, 2018 U.S. Dist. LEXIS 117503, at *3 (M.D. Ga. July 16, 2018) to argue that the restraint force violated clearly established law. *Dyksma,* however, involved substantially different facts and circumstances. Moreover, that decision did not clearly establish that restraining a suspect in the pone position with some body weight was unconstitutional under these facts and circumstances.

In *Dyksma,* the defendant deputy allegedly put a knee on the suspect's neck in circumstances where no force was objectively necessary, causing him to suffer cardiac arrest. Plaintiffs' medical expert opined that pressure on the **neck** interfered with the functioning of the vagus nerve and caused **cardiac**

*arrhythmia*. *Dyksma*, 2018 U.S. Dist. LEXIS 117503, at *11. Critical to the Court's decision, the video showed no resistance by Dyksma when the deputies pulled him out of his vehicle and onto the ground. "Nicholas did not struggle or resist. His body appeared to be limp, and he was clearly incapacitated."

Furthermore, the deputy had put his knee on Dyksma's neck immediately after Dyksma was on the ground, but he took it off after handcuffing was completed, moved around and "jammed" his knee **back** on Dyksma's neck even though there had been no resistance. Therefore, the Court held that the first knee restraint to Dyksma's neck arguably was necessary, but the deputy jamming his knee into Dyksma's neck the second time (when Dyksma was clearly handcuffed, restrained, and incapacitated) was not.

That case is readily distinguishable because Rodriguez clearly had been physically resisting the officers for an extended time period, and he had demonstrated cycles of resistance (resistance on and off), creating a continuing risk of danger to himself and officers if he was not controlled. Thus, this is not a case where, like Dyksma, the suspect had been handcuffed, completely secured, with all risks of danger and flight passed. That is, the restraint force was not "wholly unnecessary to any legitimate law enforcement purpose." *Lee v. Farraro*, 284 F.3d 1188, 1198 (11th Cir. 2002). Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and police officers

are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Kisela v. Hughes,* 138 U.S. 1148, 1153 (2015).

Here, Rodriguez had physically resisted throughout the time the Hampton officers and then the Defendants tried to control him, and his resistance came in waves, vacillating between brief moments of recovery and unpredictable rage. Therefore, there was a law enforcement purpose for Defendants to continue to use restraint force to ensure control over Rodriguez until EMS arrived and could assess him.

Finally, *Dyksma* would not even qualify as clearly established law because it is well-settled that "clearly established law consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of Georgia]." *Patel v. City of Madison*, 959 F.3d 1330, 1338 (11th Cir. 2020). The qualified immunity legal analysis appeared in the District Court's order on summary judgment, and while the 11th Circuit affirmed the decision, it did so without analysis in an unpublished opinion, which means that it is not binding. *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018)(holding that unpublished cases are not "binding precedent and cannot be relied upon to define clearly established law.").

## II. OFFICER PHILLIPS' TASER DEPLOYMENTS WERE OBJECTIVELY REASONABLE AND DID NOT VIOLATE CLEARLY ESTABLISHED LAW

Ofc. Phillips' final three[1] Taser deployments were objectively reasonable and did not violate clearly established law. These three deployments are reflected on Ofc. Phillips' Taser log at lines 698-700, and the Taser log shows that the durations for these deployments were: 1 second, 1 second, and 2 seconds[2].

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 698 | 20 Sep 2019 22:25:31 | Arc | C1: Cartridge Sense Fault<br>C2: Cartridge Sense Fault | 1 | | 86 |
| 699 | 20 Sep 2019 22:26:10 | Arc | C1: Cartridge Sense Fault<br>C2: Cartridge Sense Fault | 1 | | 85 |
| 700 | 20 Sep 2019 22:27:24 | Arc | C1: Cartridge Sense Fault<br>C2: Cartridge Sense Fault | 2 | | 85 |

Doc. 69-13 (Ex 15 Phillips Taser Log) at 24. Further, the evidence shows that there was approximately forty (40) seconds in between Seq. # 698 and Seq. # 699 and a minute and fourteen seconds in between Seq. #699 and Seq. #700[3].

The proper inquiry is whether *any of these three very brief applications of the Taser disproportionate to the need.* They were not. At 00:08:13;00, as

---

[1]   Ofc. Phillips deployed his Taser 7 times on the night in question. Plaintiffs' Response Brief only addresses the final 3. "Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned." *Welch v. Delta Air Lines*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997); *see also Case v. Eslinger*, 555 F.3d 1317 (11th Cir. 2009).

[2]   *Hoyt v. Cooks*, 672 F.3d at 976 (11th Cir. 2012)(holding that "an 'activation' of the Taser does not mean that the Taser actually touched or stunned Allen.").

[3]   The corresponding video times for each deployment are 00:08:24;00 (Seq. #698), 00:09:03;00 (Seq. #699); and 00:10:17;00 (Seq. #700).

happened repeatedly throughout the encounter, Rodriguez's resistance begins slowly and builds over several seconds and culminates with a indecipherable bellow, accompanied by an effort to break free from the officers' control. He starts by exclaiming, "What's up?", and one of the officers asks, "Are the handcuffs on him good?" Rodriguez then tries to move more, and the officers give him clear commands to "No. STOP! STOP!", Then, with a scream, Rodriguez tries to rotate his lifted right hip, and change his position, causing the officers to struggle to hold him. *Id.*, at 00:08:24;00. In response, Ofc. Phillips deploys his Taser a mere 2 seconds. *Compare* Def. Ex. 4 (Combined BWC) at 00:08:24;00 *with* Doc. 69-13 (Ex 15 Phillips Taser Log) at 24.

Similarly, at 00:08:50;00, while Rodriguez briefly stopped resisting, at 00:08:53;00, he starts moving again. An officer tells him to "stop moving", but Rodriguez does not comply and begins shifting his body around, prompting a Hampton officer to say, "Step on his arm. Just step on it" *Id.* at 00:08:54;00. Rodriguez then tries to bite Hampton Ofc. Stroud.

Even with several officers trying to hold him, Rodriguez was able to shift and squirm. At 22:20:18 on Lewis' BWC, Rodriguez can be seen twisting and thrashing to break free from their control. Pls. Ex.1 (Lewis BWC) at 22:20:18. Ofc. Phillips then activates his Taser for one-second. Doc. 69-13 (Ex 15 Phillips Taser Log (Seq. #699)) at 24. Although the audible clicking heard on the video

suggests Ofc. Phillips never made contact, a one-second deployment was not disproportionate to Rodriguez's resistance. And, the one second deployment did not achieve compliance because the video shows Rodriguez's resistance and belligerence intensified over the next forty-seconds.

Ofc. Phillips' final Taser activation occurred when Rodriguez started resisting again after a brief pause. At 00:10:00;00, Rodriguez momentarily stops resisting, but by 00:10:10;00, while the officers are discussing how to reposition the handcuffs so Rodriguez's arms are behind him, Rodriguez bellows loudly "Where's my fucking angel dust?", Def. Ex. 4 (Combined BWC) at 00:10:12;02, and resumes thrashing and shifting and manages to get his right arm free. *Id.* at 00:10:13;05--00:10:14;03. In response, Ofc. Phillips again activates his Taser for one-second. *Compare* Def. Ex. 4 (Combined BWC) at 00:10:17;00 *with* Doc. 69-13 (Ex 15 Phillips Taser Log (Seq. #700)) at 24.



Under these circumstances, it cannot be credible argued that Ofc. Phillips' very brief Taser activations were unreasonable or that they violated the law. *See Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) ("[F]orce applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive."); *see also Hoyt*, 672 F.3d at 978-80 (11th Cir. 2012)(refusing to extend *Oliver's* holding when officers tased the suspect after he fell to the ground because he "continued to pose a danger" and "never ceased his vigorous resistance to the attempts to handcuff him"); *Callwood v. Jones*, 727 Fed. Appx. 552 (11th Cir. 2018) (qualified immunity granted to officers who repeatedly tased the naked decedent who was aggressively resisting).

### III. PLAINTIFFS HAVE NOT SHOWN A VIOLATION OF CLEARLY ESTABLISHED LAW

#### A. USING A KNEE TO RESTRAIN AN ARRESTEE IN THE PRONE POSITION IS NOT UNCONSTITUTIONAL

The Eleventh Circuit has never held that it is unconstitutional for an officer to use a knee or body weight to restrain an arrestee in the prone position; to the contrary, it has held such force to be objectively reasonable when, like here, the subject "has refused to comply with officers' orders" and has demonstrated a danger to resist or try to flee. *Lewis v. City of West Palm Beach,* 561 F.3d 1288 (11th Cir. 2009); *Mongeau v. Jacksonville Sheriff's Office*, 197 F. App'x 847, 851

(11th Cir. 2006); *see also Sullivan v. City of Pembroke Pines*, 161 F. App'x 906, 910 (11th Cir. 2006)(concluding that force by officer who "placed his knee on her back" was *de minimis*). Accordingly, it was not a violation of Rodriguez's Fourth Amendment rights to place him in the prone position and restrain or control him with a knee or body weight under these unique facts and circumstances.

### B. RODRIGUEZ'S CYCLES OF AGGRESSIVE RESISTENCE JUSTIFIED HIS CONTINUED PRONE RESTRAINT

Past behavior is a reliable predictor of future behavior. Here, the officers had observed Rodriguez's violent and unpredictable, dangerous behavior for an extended time, and it was reasonable for them to believe he could continue to resist or lash out. Rodriguez engaged in repeated cycles of aggressive resistance and injurious conduct during the encounter, and the use of force must be examined in that context.

Defendants responded to a request to run "10-18," which informed them that officers were facing a hostile, non-compliant suspect. Upon arrival, Officer Phillips observed a Hampton officer tasing Rodriguez, who was naked and pushing himself on his back across the asphalt in the street, which was dangerous behavior. When Phillips tried to grab Rodriguez's arm, he yanked it away and started swinging his arms violently. Def. Ex. 12 (GBI statement Quinton Phillips) at 1; Def. Ex. 4 (Combined BWC Video) at 00:05:03;06—00:05:10;06.

Over the next four minutes, Rodriguez swung between brief moments of pause and outbursts of unpredictable and threatening[4] behavior. Def. Ex. 4 (Combined BWC Video) at 00:06:14;06 (Rodriguez pausing while officer plead with him to roll over onto his stomach); 00:06:31;04 (Rodriguez violently pulling his arm away from Lewis); 00:07;45;22–00:08;20;00 (Rodriguez pausing from resisting for approximately 45 seconds); 00:08;24;00--00:08:29;11(resuming his cycle of resistance and trying to overpower the officers restraining him); 00:10:00;00 (another brief pause in Rodriguez's resistance before he returned to twisting and thrashing); 00:10:25;05, 00:11:09;01, 00:11:18;21; 00:11:29;26 (trying to bite again); 00:11:33;00 ("uh-uh [negative] Dude!"); 00:12:15;00

---

[4] The concept of an arrestee being a threat extends beyond the typical scenario of an arrestee intentionally trying to cause injury to the officer. The notion of an arrestee being a threat includes the risk of injury that they pose to themselves. Here, Rodriguez arguably posed no serious threat to the officers by physically resisting their efforts to control him, but he clearly was a threat to himself, thereby justifying Phillips and Butera's efforts to restrain him. *Davis v. City of Leesburg*, 2014 U.S. Dist. LEXIS 138534, at *47-48 (M.D. Fla. Sep. 30, 2014)(concluding that it was not unreasonable to use four point restraints on Ms. Davis to prevent her from harming herself or others. *See Lewis*, 561 F.3d at 1292 (finding that use of a hobble restraint that was tightened to form a hogtie was not sufficiently egregious to constitute excessive force because suspect refused to sit upright, was unable to remain calm and therefore "remained a safety risk to himself and others."); *Garrett v. Athens-Clarke County, Georgia*, 378 F.3d 1274, 1280-81 (11th Cir. 2004) (finding police officers were entitled to qualified immunity because it was not unconstitutionally excessive force to pepper spray and fetter a suspect by tying his wrists less than 12 inches from his ankles where suspect continued to violently resist, thereby posing a risk of harm to himself and others); *Cottrell v. Caldwell*, 85 F.3d 1480, 1488, 1492 (11th Cir. 1996) (concluding officers did not use excessive force, although arrestee died of positional asphyxia, where officers placed arrestee in handcuffs and leg restraints after a 20-minute struggle and put him in a prone position in the back of a police car). *See also Rubio v. Lopez*, 445 Fed. Appx. 170 (11th Cir. Aug. 30, 2011) (using hobble restraint on arrestee who kept kicking windows of patrol car, including placing arrestee onto hot pavement during the placement of the restraints, resulting in second degree burns, did not constitute excessive force).

("Stop!"); 00:13:02;00 ("Dude, Relax!" as Rodriguez "woots" repeatedly); 00:13:16;00 ("Quit trying to bite me! You're not going to bite me!"); 00:13;36:00 ("Put your head down!"); 00:14:25;13 ("Dude! Keep your head down!"); 00:14:31;00 (crying); 00:14:52:00 ("Keep your face down!"); 00:15:08;00 ("Don't move."); 00:15;34;19 ("Don't move.").

For fifteen and a half minutes, Rodriguez displayed waves of active, physical resistance. Rodriguez cursed and swung wildly at the officers as they tried to secure his hands, he tried to bite at officers positioned closely beside him, and he displayed an intent to try to move and get loose from control. That behavior indicated the officers needed to continue to restrain him. Defendants reasonably believed it was necessary to keep Rodriguez in the prone position with some restraint force even when he briefly stopped resisting and at one point had stopped breathing or holding his breath, given his prior conduct.

Furthermore, although Rodriguez had made numerous comments and outbursts, he never stated or indicated in any way that he was having difficulty breathing. Thus, Officer Phillips had no knowledge that holding his knee on Rodriguez's back to make sure he stayed controlled until EMS could check him out was causing Rodriguez to have difficulty breathing.

Plaintiffs focused on the final minutes before the medics took over and ignore Rodriguez's behavior during the majority of this encounter. That is not the

proper analysis, as the use of force must be analyzed under the totality of the facts and circumstances *as viewed from the perspective of an objective reasonable officer*. *Robinson v. City of Huntsville*, No. 21-13979, 2022 U.S. App. LEXIS 24438, at *9 (11th Cir. Aug. 30, 2022); quoting *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

Here, an objectively reasonable officer in Defendants' position knew (1) Rodriguez had been a threat to himself and others by walking naked in the middle of the street at night; (2) Rodriguez had refused officer commands to stop walking and get out of the street; (3) officers had to use a Taser repeatedly to get Rodriguez to stop and ultimately get him on the ground; (4) Rodriguez had continued trying to get away from the officers, talking wildly and being noncompliant; (5) Rodriguez had continued moving, resisting and ignoring officers even after being tased briefly several more times as the officers were trying to control him; (6) Rodriguez tried to raise up and tried to bite officers as they were trying to handcuff and control him; and (7) Rodriguez had stopped and restarted his noncompliant several times during the handcuffing and attempts to contain him.

Under these facts and circumstances, an objectively reasonable officer certainly could have believed it was necessary to continue using one knee and a shin on Rodriguez's upper back to keep him down until EMS checked him out. It

certainly was not a violation of Rodriguez's clearly established constitutional rights to have maintained the restraint under the circumstances.

That these Defendants did not violate clearly established[5] law is evidenced by the fact that the 11th Circuit has previously granted qualified immunity to officers in factually analogous cases. In *Lewis*, the Court found no violation of clearly established law by the use of the knee on the neck to restrain a compliant suspect, even though in that case the officers' actions involved much more extensive body weight pressure on the decedent's back and neck **and involved** hogtying the suspect and leaving him in a prone position. *Lewis v. City of West Palm Beach, Fla.,* 561 F.3d 1288 (2009). The *Lewis* Court found that while the additional restraints once Lewis was subdued may not have been entirely necessary, it was not such an egregious violation of a constitutional right to defeat qualified immunity.

Similarly, in *Mongeau v. Jacksonville Sheriff's Office*, the 11th Circuit found that Mongeau's efforts to avoid apprehension posed a danger to the officers pursuing him and the civilians he encountered. It went on to reason that

---

[5] To the extent the Court is drawn to denying qualified immunity based on the rare theory of "obvious clarity," the fact that Circuit precedent has extended qualified immunity to officers in cases that are factually analogous belies both the obviousness and clarity of the alleged unconstitutional conduct. *Slaughter v. Bryson*, No. 5:15-cv-90, 2018 U.S. Dist. LEXIS 45599, at *73 (S.D. Ga. Mar. 20, 2018)("When there exists a Circuit split on this exact issue and where related Eleventh Circuit precedent militates toward granting qualified immunity, an 'obvious clarity' case does not lie.").

Mongeau's action would have led officers reasonably to believe that he had little regard for his own life or others. The Court also noted that Mongeau was a flight risk, as evidenced by the chase and his refusal to cooperate. For those reasons, the Court found that the officers' conduct in restraining and incapacitating Mongeau, specifically including Officer Edmonds' placement of his knee on Mongeau's back and neck even after he was compliant, was not excessive; that is, the Court held that the officer's method to restrain him was objectively reasonable given Mongeau's **previous** resistance and **risk** of flight, *i.e.,* his past conduct was a reliable predictor of his future behavior.

Accordingly, because Plaintiffs cannot show that Officers Phillips and Butera violated clearly established law, they are entitled to qualified immunity.

## **CONCLUSION**

WHEREFORE, for the reasons set forth in their Initial Brief and this Reply Brief, Defendants request the Court to grant complete summary judgment in their favor. Should the Court dismiss fewer than all defendants or claims, Defendants respectfully request the Court to certify any dismissal as a final order under Fed. R. Civ. P. 54.

(signatures-next page)

This 11th day of October, 2022.

                         WILLIAMS, MORRIS & WAYMIRE, LLC

                         */s/ Terry E. Williams*
                         TERRY E. WILLIAMS
                         Georgia Bar No. 764330

                         */s/ G. Kevin Morris*
                         G. KEVIN MORRIS
                         Georgia Bar No. 523895
                         Attorneys for Defendants Henry County,
                         Butera and Phillips

Bldg. 400, Suite A
4330 South Lee Street
Buford, GA 30518
678-541-0790
678-541-0789
kevin@wmwlaw.com

## CERTIFICATE OF TYPE STYLE

This document was prepared using Century Schoolbook 13-point font.

This 11th day of October, 2022.

                                  WILLIAMS, MORRIS & WAYMIRE, LLC

                                  */s/ Terry E. Williams*
                                  TERRY E. WILLIAMS
                                  Georgia Bar No. 764330

                                  */s/ G. Kevin Morris*
                                  G. KEVIN MORRIS
                                  Georgia Bar No. 523895
                                  Attorneys for Defendants Henry County,
                                  Butera and Phillips

Bldg. 400, Suite A
4330 South Lee Street
Buford, GA 30518
678-541-0790
678-541-0789
kevin@wmwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT on all parties via U.S. Mail and/or the Court's electronic filing system, as follows:

Jess B. Johnson<br>
PATE, JOHNSON & CHURCH, LLC<br>
101 Marietta Street, Suite 3300<br>
Atlanta, Georgia 30303<br>
jess@patejohnson.com

This 11th day of October, 2022.

                                            WILLIAMS, MORRIS & WAYMIRE, LLC

                                            */s/ Terry E. Williams*
                                            TERRY E. WILLIAMS
                                            Georgia Bar No. 764330

                                            */s/ G. Kevin Morris*
                                            G. KEVIN MORRIS
                                            Georgia Bar No. 523895
                                            Attorneys for Defendants Henry County,
                                            Butera and Phillips

Bldg. 400, Suite A
4330 South Lee Street
Buford, GA 30518
678-541-0790
678-541-0789
kevin@wmwlaw.com